**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| BP EXPLORATION & PRODUCTION INC. and BP AMERICA PRODUCTION COMPANY, | |
| *Plaintiffs*, | Case No. _____ |
| v. | |
| *DEEPWATER HORIZON* COURT SUPERVISED SETTLEMENT PROGRAM; and PATRICK A. JUNEAU, in his official capacity as Claims Administrator of the *Deepwater Horizon* Court Supervised Settlement Program administering the *Deepwater Horizon* Economic and Property Damages Settlement Agreement, and in his official capacity as Trustee of the *Deepwater Horizon* Economic and Property Damages Settlement Trust, | *********************** <br><br> Section __ <br><br> Judge _____ <br><br> Magistrate Judge _____ |
| *Defendants*. | |

## COMPLAINT

Plaintiffs BP Exploration & Production Inc. and BP America Production Company (collectively, "BP") hereby file their Complaint against Defendants (i) the *Deepwater Horizon* Court Supervised Settlement Program (the "Settlement Program"); and (ii) Patrick A. Juneau, in both his official capacity as Claims Administrator administering the *Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended on May 2, 2012 ("Claims Administrator"), and in his official capacity as Trustee of the Deepwater Horizon Economic and Property Damages Settlement Trust ("Settlement Trust").

### INTRODUCTION

1.      BP's Complaint seeks, among other relief, specific performance of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement, as amended on May 2, 2012 (the "Settlement Agreement or "Agreement").   Currently,  the  Court-Appointed  Claims

1

Administrator is processing Business Economic Loss claims ("BEL Claims") in a manner that is contrary to the terms of the Agreement, with the consequence that many business claimants are receiving substantial awards for fictitious losses not contemplated by the Agreement.  BP seeks preliminary and permanent injunctive relief ordering the Claims Administrator to process BEL Claims and to distribute funds only in conformity with the terms of the Settlement Agreement. Absent such injunctive relief, the Settlement Program and the Claims Administrator/Settlement Trustee will continue to process and distribute funds for such BEL Claims contrary to the plain language and fundamental purposes of the Settlement Agreement.

2.     To date, and based on expert analysis, it appears that the Claims Administrator's failure to comply with the Settlement Agreement has resulted in improper offers to BEL claimants of hundreds of millions of dollars, and growing.[1]  Many such businesses have been awarded compensation for fictitious "losses" that do not exist at all, let alone claimed losses that bear any rational connection to the oil spill.  Contrary to the Settlement Agreement, a number of these awards went to businesses earning demonstrable profits in the May-December 2010 post-spill period that were ***greater than*** their pre-spill profits (i.e., they did not experience spill-related ***losses***).  *See, e.g.*, Hall Decl. (Karron Decl.  Ex. 6) ¶ 22; Finch Decl. (Karron Decl. Ex. 3) ¶ 14; Oustalniol Decl. (Karron Decl. Ex. 10) ¶ 32; Sider Decl. (Karron Decl. Ex. 14) ¶ 12.  The Claims Administrator's misapplication of the Settlement Agreement is ongoing and, based on an extrapolation of claims applications in process, could result in the payment of billions of dollars to claimants for fictitious losses.  *See* Sider Supp. Decl. (Karron Decl. Ex. 15) ¶ 21.

---

[1]   *See* Sider Supp. Decl. (Karron Decl. Ex. 15) ¶ 20 (claimants in the construction, professional services, agriculture, real estate, wholesale, manufacturing, and retail industries have received offers totaling $787 million); *id.* tbl. 4 (between 61% and 99% of analyzed offers in these industries are affected by the use of flawed or incomplete data as authorized by the Claims Administrator's decision); *see also id.* tbl. 1.  The declaration of Andrew T. Karron, to which all cited declarations appear as exhibits, will be filed today in the case number established for this matter.

3.       In April 2012, BP and plaintiffs in the lawsuit entitled *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al.*, C.A. No. 12-970 (E.D. La.), entered into the Settlement Agreement to resolve the majority of economic and property damages claims allegedly caused by the *Deepwater Horizon* spill, including "[l]oss of income, earnings or profits suffered by . . . [business] Entities *as a result of the DEEPWATER HORIZON INCIDENT*." Settlement Agreement (Att. A) §§ 1, 1.3.1.2 (emphasis added); *see also id.* §§ 38.57.  The *Bon Secour* Court granted final approval to the Settlement Agreement on December 21, 2012, to "resolve[] claims for economic loss and property damage resulting from the "*Deepwater Horizon Incident.*"  MDL 2179 Rec. Doc. 8138 at 6.

4.       The Settlement Agreement established the Settlement Program and provided for a Court-Appointed Claims Administrator to (a) "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement," (b) "head the Settlement Program, oversee and supervise the Claims Administration Vendors (including any subcontractors) and staff in the processing and payment of Claims," and (c) "engage in supervision and oversight activities designed to ensure the implementation and integrity of the overall Settlement Program."  Settlement Agreement (Att. A) §§ 4.1, 4.3.1, 4.3.2, and 4.3.10.  The *Bon Secour* Court appointed Defendant Juneau to serve in the position of Claims Administrator.  *See* MDL 2179 Rec. Doc. 5988 (Mar. 8, 2012).

5.       In furtherance of his duties as Claims Administrator, Defendant Juneau was also appointed Trustee of the Settlement Trust.  *See* MDL 2179 Rec. Doc. 6418 (May 2, 2012). Pursuant to the Trust Agreement, Mr. Juneau further agreed not to take any action that would violate the terms of the Settlement Agreement.  *See* Trust Agreement (Att. B) § 2.1.

6.       Exhibit 4 to the Settlement Agreement contains a Business Economic Loss

3

Framework (the "BEL Framework") specifying what claimants must demonstrate to obtain compensation for spill-related losses.  That exhibit requires the Claims Administrator and Settlement Program to (1) calculate a claimant's monthly "Variable Profit" by subtracting from the claimant's monthly revenue the "corresponding variable expenses" incurred to earn that revenue; and (2) compare the claimant's Variable Profit in certain months of the post-spill 2010 Compensation Period to the "comparable" months of the pre-spill Benchmark Period (which could be either 2009, 2008-2009, or 2007-2009, at the claimant's election).  *See* Settlement Agreement (Att. A), Ex. 4C at 1-2.

7.     The correct application of these contractual provisions is critical both to achieving the parties' purpose of compensating class members for "loss of income, earnings or profits suffered by . . . [business] Entities as a result of the DEEPWATER HORIZON INCIDENT" and to avoiding windfall awards to claimants for nonexistent "losses."  Despite this, the Claims Administrator has implemented the provisions of the BEL Framework in a manner that is contrary to the plain language of that Agreement as well as to fundamental principles of economics, accounting, and common sense.  Specifically, in a policy determination issued on January 15, 2013 (the "BEL Policy Decisions"), the Claims Administrator announced that the Settlement Program would calculate "Variable Profit" by simply comparing cash received in a given month with cash paid out for expenses in that same month, without regard to (a) when the "revenue" was earned, or (b) whether the cash paid out in the month represented expenses "corresponding" to those revenues.  *See* Jan. 15 Juneau BEL Policy Decisions (Att. C) (filed under seal in its entirety out of an abundance of caution).  The Settlement Program has also mechanically compared the selected months of the Compensation Period to the identical months of the Benchmark Period, instead of using "comparable" months as required by the Agreement.

4

*See* Finch Decl. (Karron Decl. Ex. 4) ¶ 31; Dietrich Decl. (Karron Decl. Ex. 2) ¶ 31.

8.     The result of the Administrator's approach is that, for businesses that do not receive payments at the time goods or services are provided, the Settlement Program generates nonsensical and incorrect outputs masquerading as "Variable Profit" calculations that do not reflect actual financial performance in compliance with the requirements of the Settlement Agreement and fundamental principles of economics and accounting.  The Settlement Program's error is compounded enormously by the application of multipliers (called risk-transfer premiums ("RTPs")) under the Settlement Agreement.  *See* Sider Decl. (Karron Decl. Ex. 14) ¶ 86.  Adding risk-transfer premiums as multipliers to nonexistent or exaggerated losses shows that the challenged BEL awards go beyond all logic.

9.     BP sought unsuccessfully to resolve this problem through the dispute-resolution mechanisms of Sections 4.3.4 and 4.3.5 of the Settlement Agreement.  Class Counsel to the *Bon Secour* class members insisted that the Claims Administrator must continue to apply the BEL Framework in the manner described above, even though it plainly violates the terms of the Settlement Agreement, produces senseless results, and compensates for nonexistent "losses" that do not qualify under the terms of the Settlement Agreement.  The Claims Administrator took the position that he lacks authority to reject this approach absent specific direction from the Court. This dispute about the BEL Framework was not carried out in a fashion similar to "other questions and issues that the Claims Administrator presented to BP and Class Counsel." Moskowitz Decl. (Karron Decl. Ex. 9) ¶ 12.  Instead, significant delay was interjected and a different process was used such that by the time the Claims Administrator addressed the dispute between Class Counsel and BP, "the Claims Administrator had already processed and issued determinations on approximately 3,248 BEL claims for total awards of approximately

$764,261,922." *Id.*

10.     The *Bon Secour* Court temporarily upheld the Claims Administrator's BEL Policy Decisions on January 30, 2013, following an *in camera* review of the dispute.  On February 6, 2013, however, the Court reconsidered and vacated its January 30 decision and in another *in camera* order directed the parties to mediate their dispute before Daniel Balhoff, Esq.  The mediation failed to produce a resolution.  This dispute was thus put back before the Court for resolution.  Following the submission of additional *in camera* memoranda on February 19, the Court entered an order on March 5, 2013, affirming the BEL Policy Decisions issued by the Claims Administrator.  *See* MDL 2179 Rec. Doc. 8812 (Mar. 15, 2013) (Att. D).

11.     The United States Court of Appeals for the Fifth Circuit has recognized the appropriateness of filing an independent action seeking specific performance of a settlement agreement in situations where disputes arise over the agreement's interpretation during the period between final approval and termination of the claims administration process.  Inherent in any such independent action is that it is a collateral case to preexisting class settlement litigation.  This Complaint is such an independent action.

12.     For the reasons explained below, preliminary and permanent injunctive relief ordering specific contractual performance is warranted.  The Settlement Program's current practice violates the requirements of the Settlement Agreement and results in unauthorized and sizable awards to BEL Claimants that irreparably harm BP.  Obtaining a favorable judgment reversing such awards and payments at the conclusion of the Settlement Agreement administration process (expected to occur in 2014) will not remedy the immediate harm.  As a practical matter, it will be impossible at that point — more than a year from now — to recover from a multitude of business claimants what could amount to billions of dollars in fictitious or

exaggerated awards, both of which create windfalls.  The size of the improper awards to date (as well as future awards), the impracticality of seeking and obtaining individual damages judgments as an alternative, and the legal availability in this Circuit of specific performance against the violators of settlement agreements all support an injunctive order granting such relief as well as the issuance of related declaratory and/or equitable remedies.

13.     Given the pendency of additional unwarranted and unlawful awards, which will cause irreparable harm to BP when paid (and compound the irreparable harm BP has already experienced), and the interest of all parties in the timely settlement of claims arising out of the *Deepwater Horizon* Incident, BP requires urgent relief.

## I.     PARTIES

### A.     Plaintiffs

14.     Plaintiff BP Exploration & Production Inc. ("BPXP") is a Delaware corporation with its principal place of business in Warrenville, Illinois.  It is a party to the Settlement Agreement.

15.     Plaintiff BP America Production Company ("BP America") is a Delaware corporation with its principal place of business in Houston, Texas.  It is a party to the Settlement Agreement.

### B.     Defendants

16.     Defendant Settlement Program was established by the Settlement Agreement to review and pay qualified claims made by class members who were injured by the *Deepwater Horizon* Incident.  *See* Settlement Agreement (Att. A) §§ 1-3; *see also* MDL 2179 Rec. Doc. 6418 (May 2, 2012) ¶ 23 (directing Settlement Program to commence operations by June 4, 2012).  The Settlement Program is located and headquartered in Louisiana, and while it processes claims from all class members that meet the class geography test, it is a locally focused

entity and Mr. Juneau has so represented.

17.     The *Bon Secour* Court established the Settlement Program as a separate legal entity when it approved the Settlement Agreement as part of an enforceable order.   *See* Settlement Agreement ¶ 4.3.2; *see also id.* ¶ 4.4.7.  The Court also imposed independent duties upon the Settlement Program.  *See, e.g., id.* ¶¶ 4.3.7, 4.3.10, 4.4.2, 5.2.1, 5.10.3.1.1.   The Settlement Agreement also repeatedly refers to decisions of the Settlement Program.  *See generally id.* § 6; MDL 2179 Rec. Doc. 8138 at 9.

18.     Defendant Patrick A. Juneau is a resident of Louisiana.  Mr. Juneau is named as a defendant in his official capacity as Claims Administrator of the Settlement Program and in his official capacity as Trustee of the Settlement Trust.  *See* MDL 2179 Rec. Doc. 6418 (May 2, 2012) ¶ 23 (appointing Claims Administrator); *id.* ¶ 28 (appointing Settlement Trustee).

## II.      JURISDICTION AND VENUE

### A.      Subject Matter Jurisdiction

19.     This Court has subject-matter jurisdiction under six provisions of federal law.  *See* 28 U.S.C. §§ 1331, 1332, 1333, 1367; 33 U.S.C. § 2717; and 43 U.S.C. § 1349(b)(1).

20.     The district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  This action asserts claims arising under several federal laws and that concern a settlement resolving underlying federal claims.  It therefore falls within this Court's jurisdiction.

21.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, as all plaintiffs are diverse from all defendants and the amount in controversy substantially exceeds $75,000.  Plaintiffs BPXP and BP America are citizens of Delaware and Illinois and Delaware and Texas, respectively.  Defendants Juneau and Settlement Program are each citizens of Louisiana.

22.     Jurisdiction also exists in this Court pursuant to 28 U.S.C. § 1333, which provides

that the district courts shall have jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction." Because the underlying claims settled were maritime in nature for jurisdictional purposes, the Settlement Agreement provides that it shall be interpreted "in accordance with General Maritime Law as well as in a manner intended to comply with [the Oil Pollution Act]." *See* Settlement Agreement (Att. A) ¶ 36.1. The Settlement Agreement is accordingly a maritime contract. This action — which alleges, *inter alia*, breach of such a maritime contract — arises under maritime law, including under the Admiralty Extension Act. *See* 46 U.S.C. § 30101(a).

23. **Rule 9(h) Election**: The claims presented herein are admiralty or maritime claims within the meaning of Rule 9(h). Plaintiffs hereby designate this case as an admiralty or maritime case pursuant to Rule 9(h) and its interpretive advisory committee notes.

24. The Oil Pollution Act ("OPA"), 33 U.S.C. § 2717, provides that district courts "shall have exclusive original jurisdiction over all controversies arising under this Act." Because the Settlement Agreement resolves claims arising under OPA and must be interpreted in a manner that complies with OPA, *see, e.g.*, Settlement Agreement ¶ 36.1, this controversy arises under OPA and therefore falls within the original jurisdiction of the district courts.

25. The Outer Continental Shelf Lands Act ("OCSLA") provides that district courts shall have "jurisdiction of cases and controversies arising out of, or in connection with . . . any operation conducted on the Outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the Outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b)(1). This case arises out of exploratory operations on the Outer Continental Shelf because the claims resolved by this Settlement Agreement would not have arisen but for those exploratory activities.

26. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over

claims under the contract between BP and the Claims Administrator.  *See infra* ¶¶ 73 - 81.
Construction and application of that contract involves "claims that are so related to claims in the
action within such original jurisdiction that they form part of the same case or controversy under
Article III of the United States Constitution."  *Id.* § 1367(a).  Even the title of the contract —
"Undertaking of Patrick Juneau in Furtherance of Court Order Appointing Him Claims
Administrator" — likewise reflects that it is inextricably intertwined with the Court's
appointment of Mr. Juneau to serve as Claims Administrator of the Settlement Agreement.  28
U.S.C. § 1367(b)'s exceptions to supplemental jurisdiction are inapplicable.

27.      This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over
claims asserted herein arising under the Trust Agreement.  *See infra* ¶¶ 82 - 90.  Construction
and application of that agreement involves "claims that are so related to claims in the action
within such original jurisdiction that they form part of the same case or controversy under Article
III of the United States Constitution."  *Id.* § 1367(a).  28 U.S.C. § 1367(b)'s exceptions to
supplemental jurisdiction are inapplicable.

**B.      Venue**

28.      Venue is proper in this District under 33 U.S.C. § 2717(b) and 43 U.S.C.
§ 1349(b)(1).   Fundamentally, the Settlement Program was created, and the Claims
Administrator was appointed, to administer the settlement of a lawsuit that was filed in this
judicial district and that remains under the administration of the Judges in this judicial district.
Additionally, damages from the *Deepwater Horizon* Incident occurred within this District.
Moreover, this District is the closest to the area on the Outer Continental Shelf where the
Incident occurred, leading ultimately to the settled claims at issue.  Claims Administrator Juneau
carries out his business administering the Settlement Agreement within this District and the
Settlement Program is located and operates within this District.  The Settlement Agreement was

10

principally negotiated and signed in this District.  Finally, Defendant Juneau (as Settlement

Trustee) agreed to submit to the jurisdiction of this Court.  *See* Trust Agreement (Att. B) § 7.9.

### III.   FACTUAL ALLEGATIONS

**A.   Procedural Background**

29.     On April 20, 2010, following a loss of well control at the Macondo well in the

MC 252 block in the Gulf of Mexico, an explosion and fire aboard Transocean's drilling rig

*Deepwater Horizon* set in motion a chain of events that tragically caused loss of life and injuries

to persons aboard the rig, and also resulted in an oil spill lasting for nearly three months.

30.     On August 10, 2010, the Judicial Panel on Multidistrict Litigation centralized in

this District all spill-related federal actions, excluding shareholder suits.  The consolidated action

is captioned "*In re:  Oil Spill by the Oil Rig 'DEEPWATER HORIZON' in the Gulf of Mexico, on*

*April 20, 2010.*"

31.     On October 19, 2010, the presiding Court organized the numerous cases

centralized before it by creating pleading bundles for various claims brought by those claiming

injury due to the explosion, the ensuing oil spill, and its aftermath.  Among the pleading bundles

was the "B1" bundle, encompassing all claims for economic loss and property damage.  *See*

MDL 2179 Rec. Doc. 569 (Oct. 19, 2010).  The cases comprising the B1 bundle were the subject

of hotly contested litigation between the parties.  *See* MDL 2179 Rec. Doc. 8138 (Dec. 21, 2012)

at 2.

32.     On March 2, 2012, BP and the Plaintiffs' Steering Committee ("PSC") informed

the presiding Court that they had reached an Agreement in Principle to settle.  A contract was

thereafter entered into between Mr. Juneau as Claims Administrator of the Transition Process,

BP, and Interim Class Counsel on April 9, 2012.  *See* Undertaking of Patrick Juneau in

Furtherance of Court Order Appointing Him Claims Administrator (Att. E).  Under that contract,

Mr. Juneau expressly agreed to "undertake the responsibilities of Claims Administrator as set forth in: (a) the Transition Order (and any amendments or modifications thereof); (b) the Agreement-in-Principle Regarding 'Deepwater Horizon' Economic Loss and Property Damages Settlement; (c) a final settlement agreement among the parties, should such agreement be finalized and filed and approved by the Court; and (d) as otherwise ordered by the Court." *Id.* ¶ 1. Mr. Juneau further agreed "that he will comply with all legal and ethical obligations related to his Court appointed role as the Claims Administrator." *Id.*; *see also id.* ¶ 8 ("This Undertaking shall inure to the benefit of and be binding upon Juneau, BP and Interim Class Counsel and shall not be assigned by either party without the prior written consent of the other party.").

33.     On April 18, 2012, BP and the PSC announced that they had reached a comprehensive class action settlement to resolve the vast majority of the private claims for economic loss and property damage arising out of the *Deepwater Horizon* spill — the *Deepwater Horizon* Economic and Property Damages Settlement Agreement. The agreement was amended on May 2, 2012.

34.     To facilitate the class certification associated with the Settlement Agreement, the PSC filed in April 2012 the lawsuit entitled *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al.*, C.A. No. 12-970 (E.D. La.), which is the case in which the Settlement Agreement received final approval.

35.     On May 2, 2012, the *Bon Secour* Court granted preliminary approval to the Settlement Agreement, preliminarily and conditionally certified the class for settlement purposes, and authorized notice to the class. *See* MDL 2179 Rec. Doc. 6418.

36.     Consistent with the terms of the Settlement Agreement, the *Deepwater Horizon*

12

Court Supervised Settlement Program commenced operations on June 4, 2012. BP agreed with the PSC to the start of operations and claims payouts *before* final approval was granted to the Settlement Agreement so as facilitate the payment of legitimate claims as rapidly as possible.

37.     On or about June 25, 2012, BP, Mr. Juneau, and Lead Class Counsel entered into an amendment to the April 9, 2012, "Undertaking," pursuant to which Mr. Juneau ceased being Claims Administrator of the Transition Process, became Claims Administrator of the preliminarily approved Settlement Agreement, and also assumed the role of Settlement Trustee of the Settlement Trust. *See* Supplement and Amendment to Undertaking of Patrick Juneau in Furtherance of Court Order Appointing Him Claims Administrator (Att. F).

38.     On December 21, 2012, the *Bon Secour* Court certified the class for settlement purposes only and granted final approval of the Settlement Agreement. *See* MDL 2179 Rec. Docs. 8138, 8139. Several objectors have filed appeals challenging these orders, which remain pending, but whatever the outcome of those appeals, BP is entitled to a remedy for breach of contract to prevent the payment of monies to claimants with fictitious or inflated losses, in violation of the Settlement Agreement's terms.

**B.     The Settlement Agreement and Its BEL Framework**

39.     As the *Bon Secour* Court recognized, the purpose of the Settlement Agreement is to resolve "certain claims for economic loss . . . resulting from the '*Deepwater Horizon*' Incident." MDL 2179 Rec. Doc. 8138 (Dec. 21, 2012) at 6.

40.     The Settlement Agreement recognizes six categories of damage: "(1) specified types of economic loss for businesses and individuals, (2) specified types of real property damage (coastal, wetlands, and real property sales damage), (3) Vessel of Opportunity Charter Payment, (4) Vessel Physical Damage, (5) Subsistence Damage, and (6) the Seafood Compensation Program." MDL 2179 Rec. Doc. 8138 (Dec. 21, 2012) at 7. It also offers a suite

of other benefits to the Class.

41. The only aspect of the Settlement Agreement at issue in this case is the BEL Framework, the most significant provisions of which appear at Exhibits 4A, 4B, 4C, and 4D to the Settlement Agreement. *See* MDL 2179 Rec. Docs. 6430-8, 6430-9, 6430-10, 6430-11. These exhibits are contained within Attachment A to this Complaint. The BEL Framework "compares the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010." MDL 2179 Rec. Doc. 6430-10 at 1. As the *Bon Secour* Court has recognized, the BEL Framework is "derived from recognized and accepted methodologies applied in evaluating business economic loss claims." MDL 2179 Rec. Doc. 8138 (Dec. 21, 2012) at 10.

42. The BEL Framework uses an objective analysis both to determine causation (*i.e.*, whether the claimant's business was truly affected by the spill) and the full and fair amount of compensation agreed to between the parties. The objective analysis does so by comparing the claimants' pre- and post-spill financial data. The objective analysis cannot serve its purpose if it is applied to data that does not correctly reflect the economic performance of the business.

43. The BEL Framework's compensation provisions operate by comparing a claimant's **Variable Profit** in a defined pre-Spill period to its Variable Profit in the "**comparable**" post-spill period. The Settlement Agreement is explicit that Variable Profit is calculated in two steps: (1) summing the revenue over the period, and (2) subtracting the corresponding variable expenses from that revenue. *See* BEL Framework (Ex. 4C) at 2.

44. Thus, determining **Variable Profit** requires the Settlement Program to calculate accurately both (1) **revenue**, and (2) the "**corresponding variable expenses**" incurred in generating that revenue. Each of these terms must be construed within the context of the

14

Settlement Agreement as a whole and, in particular, the BEL Framework, which is expressly designed to calculate changes in Variable Profit between the pre- and post-spill periods, consistent with the general approach used in standard lost-profits methodologies.  This is a standard economic approach.

> **1.      Determination of Variable Profit Requires Accurate Identification of "Revenue."**

45.     Revenue is earned through work performed over a period of time.  It is the inflow of net assets associated with the earnings process of a business — that is, the activities surrounding the sale of goods and services to customers.  Revenue does not simply appear at the moment cash payment is received.  Rather, revenue is earned through effort undertaken to provide goods or services well before or after cash payment actually is received.  *See* Dietrich Decl. (Karron Decl. Ex. 2) ¶ 16; Weil Decl. (Karron Decl. Ex. 16) at 4:138-140.  This is the only reasonable interpretation of the agreement consistent with determining losses in Variable Profits under the Settlement Agreement, and it is consistent with widely recognized definitions of the term "revenue" among accountants, economists, and other financial professionals.

46.     In many cases, expenses are incurred, goods or services are provided, and payments are received roughly contemporaneously, making the measurement of revenue simple.  But for certain BEL claimants, there can be a significant lag time between when the business **earns** the revenue, and when it **receives** and records payment.  The problem is acute in the construction industry, among others, because construction projects are often compensated for on a lump-sum basis despite the fact that labor and material outlays as well construction work itself can extend over many-month periods.  *See* Hall Decl. (Karron Decl. Ex. 6) ¶ 4(3); *see also infra* ¶ 52, bullet two.  Similarly, farms have long earnings cycles, in which the resources put into growing and harvesting crops that will be harvested and sold are applied long before cash is

received from the sale; that is, the revenue is earned months before the cash is received.  *See* Finch Decl. (Karron Decl. Ex. 3) ¶ 5(c).

> **2.     Determination of Variable Profit Requires Accurate Assessment of "*Corresponding*" Variable Expenses.**

47.     Pursuant to Exhibit 4C of the Settlement Agreement, in order to calculate Variable Profit, "corresponding" variable expenses incurred in generating revenue must be subtracted from the revenue.  If the revenue does not correspond to the expenses, there is no way to evaluate how a business is actually performing.  *See* Polinsky Decl. (Karron Decl. 12) ¶ 7.  It is widely understood and accepted that correspondence between revenue and expenses is required to understand a business's financial performance.  *See* Hall Decl. (Karron Decl. Ex. 6) ¶ 14; Oustalniol Decl. (Karron Decl. 10) ¶ 14.

> **3.     Determination of Compensation Requires Accurate Comparison To The "*Comparable*" Months of the Benchmark Period.**

48.     The BEL Framework instructs that it is necessary to identify the "comparable months" for comparison purposes.  To be "comparable," months must involve similar business activities.  Comparable months in farming, for example, would not necessarily be the identical calendar months in every year because the months in which a farmer plants, harvests, and/or sells crops can vary from year to year, depending on weather and market conditions.  *See* Finch Decl. (Karron Decl. Ex. 3) ¶ 7.

> **4.     Misapplication Of the Settlement Agreement Is Producing Absurd Results Contrary to the Text and Basic Intent of the Settlement Agreement.**

49.     The Claims Administrator and the Settlement Program are processing BEL Claims in a manner that violates the express terms of the Settlement Agreement.  The Claims Administrator and Settlement Program are applying the BEL tests to such claimants' monthly ***receipts*** — that is, a claimant's recorded proceeds — regardless of when ***revenue*** was ***earned*** or

when the *expenses* were incurred to generate that *revenue*.  That is to say, contrary to the

Settlement Agreement, the Claims Administrator's interpretation, which rewrites the Agreement,

cannot properly and does not in fact calculate Variable Profit (which he is required to do), since

his interpretation does not correctly measure *revenue* and does not properly subtract from

revenue the *corresponding* variable expenses.

      50.     In total, the Claims Administrator and Settlement Program's interpretation of the

Settlement Agreement results in rewriting the following provisions of the Settlement Agreement,

with the result that the Settlement Program is issuing awards to claimants who suffered no

damages at all and/or paying out supposed "damages" in an amount far in excess of actual injury:

     (1)     Section 1.3.1.2, which requires that a Class Member have a "[l]oss of income, earnings or profits suffered . . . as a result of the DEEPWATER HORIZON INCIDENT";

     (2)     Section 38.57, which defines "Economic Damage" as "loss of profits, income and/or earnings arising in the Gulf Coast Areas or Specified Gulf Waters allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident";

     (3)     Section 38.61, which requires that the "Economic Damage Compensation Amount" be calculated "pursuant to the terms of the Agreement and the Economic Damage Claim Frameworks";

     (4)     Exhibits 4B and 4C, each of which requires that economic performance be measured by considering "revenue" earned over a selected "period" of "months";

     (5)     Exhibit 4C at 2, which requires that "corresponding variable expenses" be subtracted from monthly revenue for the Compensation Period and the comparable Benchmark Period;

     (6)     Exhibit 4C at 2, which requires a true "Variable Profit" calculation to be made — a step that is ignored by the Claims Administrator's approach; and

     (7)     Exhibit 4C at 1 and 3, which requires that Variable Profit in the Compensation Period be compared to the "comparable months" during the Benchmark Period.

*See also* App'x A, Settlement Agreement as Rewritten by the Claims Administrator's Policy

Decisions.

51.     As a direct result of the Claims Administrator's misinterpretation of the Agreement pursuant to his BEL Policy Decisions, many of the largest awards made by the Claims Administrator and the Settlement Program have been for fictitious losses.  The Claims Administrator acknowledged this problem in his January 15, 2013 Policy Decisions, writing that the results of his decision "can be disproportionate awards for certain types of claims."  Jan. 15 Juneau BEL Policy Decisions (Att. C) (filed under seal in its entirety out of an abundance of caution).  And in prohibiting claimants who prepared profit or loss statements on an accrual basis from restating them on a cash basis to submit claims, the Claims Administrator has previously taken steps to avoid the absurdity that is produced when revenues and expenses do not properly correspond.  *See* Moskowitz Decl. (Karron Decl. Ex. 9) ¶ 6 n.2.

52.     The following are but four of the hundreds of examples of unjustified awards that have already been made because of the Administrator's erroneous BEL Policy Decisions that fail to interpret the Settlement Agreement to avoid absurd results:

- $21 million to a Zone B[2] rice mill even though its 2010 spill year revenue exceeded its revenue in each of the years 2007-2009;

- $9.7 million to a Zone D highway, street, and bridge construction company in Northern Alabama (almost 200 miles from the Gulf) even though its May-December 2010 variable profit exceeded its May-December 2007-2009 average variable profit by 21%;

- $3.7 million to a Zone C digital printing business in southeastern Alabama even though its May-December 2010 variable profit exceeded its May-December 2009 (Benchmark Period) variable profit by 14%; and

- $3.3 million to a Zone C law office located in central Louisiana, even though its profit in the year of the spill exceeded its benchmark period profits by 10%.

---

[2]     BEL claimants are categorized into four economic loss zones that "reasonably reflect the likelihood that a given class member suffered economic damage as a result of the spill," Rec. Doc. 8138 (Dec. 21, 2012) at 86, with those in Zone A being most likely to have experienced a spill-related loss and those in Zone D least likely.

*See also* App'x B (listing numerous other examples).

53.     The erroneous awards resulting from this misapplication of the BEL Framework are both numerous and costly.   While the Claim's Administrator's errors have impacted claimants in virtually every industry, the errors are particularly pronounced in the farming, construction, and professional services industries in light of the way participants in these industries keep their books and unique features regarding the timing of revenues and expenses in these industries.   At least 87 farming claimants have been awarded $52 million, at least 596 construction companies have been awarded $210 million, and at least 562 professional services claimants have been awarded $156 million.   *See* Sider Supp. Decl. (Karron Decl. Ex. 15) tbl. 4. Many of the farming, construction, and professional services claimants who have received awards incurred no loss of profits whatsoever, and many others have received awards far in excess of any actual loss.   Nor has this trend abated; many more similarly inflated claims are expected from those industries.  *See id.* ¶¶ 21-29.

### 5.     BP's Interpretation of the Settlement Agreement Is Based Upon Its Plain Terms And Also Fulfills the Settlement's Purpose.

54.     Unlike the Claims Administrator's interpretation, BP's interpretation (1) accounts for the meaning of the terms "revenue," "comparable," and "corresponding," and gives meaning to the overall endpoint calculation of "Variable Profit"; (2) comports with the rest of the Settlement Agreement's terms, frameworks, and structure; and (3) results in a calculation of Variable Profit that accurately reflects a business claimant's economic performance.

55.     The identification of when revenue is earned, the necessity of subtracting from that revenue the "corresponding variable expenses" incurred to earn it, and the comparison of "comparable" months in the Benchmark Year(s) and the Compensation Period, are expressly required by the Settlement Agreement and readily achievable.  *See* Finch Decl. (Karron Decl. Ex.

19

3) ¶¶ 5(e), 33; Hall Decl. (Karron Decl. Ex. 6) ¶ 29; Oustalniol Decl. (Karron Decl. Ex. 11) ¶ 6; Sider Decl. (Karron Decl. Ex. 14) ¶ 82; Weil Decl. (Karron Decl. Ex. 16) at 9:341-361.

56.     The Claims Administrator acknowledged at the time he issued his BEL Policy Decisions that BP's interpretation works and can be followed by the Settlement Program's accountants, who routinely perform such calculations in providing accounting functions outside of the Settlement.   *See* Jan. 15 Juneau BEL Policy Decisions (Att. C) ("[T]he Claims Administrator acknowledges that the type [of] approach proposed by BP is a reasonable one") (filed under seal in its entirety out of an abundance of caution).   Nonetheless, the Claims Administrator adopted Class Counsel's interpretation.

### 6.     The Appeal of the Claims Administrator's January 15, 2013 Determination to This Court and the Establishment of Parallel Tracks.

57.     Concurrently with the filing of this Complaint, BP is also filing a parallel preliminary injunction motion in the *Bon Secour* action.   That motion seeks to suspend the implementation of the BEL Policy Decisions as well as the payment of certain awards by the Settlement Program.   BP is making these parallel filings to address and remedy the Claims Administrator's and Settlement Program's material breach of contract, and so that BP can be assured that it has the ability to protect its rights fully, including by securing appellate review of any decision by this Court.

## IV.     PROPRIETY OF GRANTING PRELIMINARY INJUNCTIVE RELIEF

58.     To obtain a preliminary injunction, BP must show (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest.

59.     BP has a high likelihood of success on the merits of its claims because BP's

approach to the Settlement Agreement is compelled by the Agreement's plain language and is consistent with the settlement's purpose — to compensate class members for their *actual* losses caused by the spill.

60.     The *Bon Secour* Court's March 5, 2013, decision affirming the Claims Administrator's BEL Policy Decisions does not affect BP's likelihood of success in obtaining the contractual and quasi-contractual relief sought in this Complaint.     Both the Claims Administrator's determination and the District Court's affirmance thereof will become subject to *de novo* review in the Fifth Circuit.   The March 5 Order asserts various reasons as to why the Claims Administrator should be affirmed, including extrinsic evidence, but it fails to grapple with or construe the textually binding contractual provisions of the Settlement Agreement.   For that reason and others, the March 5 Order is erroneous.

61.     If the Claims Administrator's erroneous interpretation is not corrected, BP will be forced to continue to pay awards to claimants with fictitious losses that do not stem from the *Deepwater Horizon* Incident.   Additionally, absent the relief sought here, BP stands no hope of recouping those improper payments.   BP cannot feasibly sue all the potentially thousands of claimants in order to recover the windfalls.   Likewise, BP cannot recover overpayments from the Settlement Program, which has no assets other than those BP has provided to it.   Finally, even if some quantum of money damages could be recovered, the process would itself visit irreparable harm to BP in the form of unrecoverable litigation and transactions costs from a multiplicity of recovery actions.

62.     BP thus faces the irreparable loss of what could amount to billions of dollars.   By contrast, Claimants awarded wrongful windfalls have no cognizable interest in receiving settlement payments to which they are not entitled.

63.     No public interest is served in making settlement payments for fictitious or exaggerated losses.

## CAUSES OF ACTION

### COUNT ONE: Breach of Contract/Consent Decree Involving the Settlement Agreement

64.     BP re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 63 of this Complaint as though fully set forth herein.

65.     The Settlement Agreement is a valid contract meeting all required elements: offer, acceptance, and consideration.  It was also entered as an Order of this Court.  *See* MDL 2179 Rec. Doc. 8139 (Dec. 21, 2012).

66.     The Settlement Agreement was both preliminarily and finally approved as fair, reasonable, and adequate.  *See* MDL 2179 Rec. Doc. 8138 (Dec. 21, 2012).

67.     The BEL Framework and each of its terms is a material and essential element of the Settlement Agreement.

68.     The Settlement Agreement, contract law, and consent decree law impose a duty on the Claims Administrator, the Settlement Program, and the parties to properly interpret and implement the Agreement.  *See* Settlement Agreement (Att. A) ¶ 21.2; *see also* MDL 2179 Rec. Doc. 8139 (Dec. 21, 2012).  The Claims Administrator specifically agreed not to violate the Settlement Agreement in his Undertaking as supplemented, in the Trust Agreement, and in accepting the Court's appointment as Claims Administrator.  This fully bound the Claims Administrator to compliance with the Settlement Agreement.

69.     At all times, BP has performed its obligations under the Settlement Agreement.

70.     The Settlement Agreement specifies that the Claims Administrator shall "faithfully implement and administer the Settlement, according to its terms and procedures . . .

consistent with this Agreement."   Settlement Agreement (Att. A) ¶ 4.3.1.  It also provides that the Claims Administrator is to "head the Settlement Program, oversee and supervise the Claims Administration Vendors (including any subcontractors) and staff in the processing and payment of Claims."  *Id.* ¶ 4.3.2.  It further states that "[t]he Settlement Program, under the supervision and direction of the Claims Administrator, shall implement the terms of this Agreement."  *Id.* ¶ 4.3.10.   The Claims Administrator's interpretation of the Settlement Agreement's BEL Framework — specifically the calculation of "Variable Profit," and the Settlement Program's implementation of that interpretation — are incorrect deviations from the terms of the Agreement and constitute material breaches of the Settlement Agreement.

71.   BP could lose billions of dollars through wrongful payments under the erroneous interpretation of the Settlement Agreement.  It is not possible to estimate with precision what BP's losses will be.

72.   Specific performance is the only adequate remedy for the Settlement Program's and Claims Administrator's breach of contract.   Absent specific performance, the Claims Administrator and Settlement Program will continue to misinterpret the Settlement Agreement and issue awards to business claimants for fictitious, non-existent losses — all to BP's detriment.

**COUNT TWO: Breach of Contract Concerning the Undertaking and Agreement of Patrick Juneau to Act as Claims Administrator of the Transition Process and Later as Claims Administrator**

73.   BP re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 72 of this Complaint as though fully set forth herein.

74.   BP, Mr. Juneau, and Lead Class Counsel agreed to an April 9, 2012, Undertaking, supplemented and amended on or about June 25, 2012, which provided for Mr. Juneau to act as Claims Administrator of the Transition Process and later Claims Administrator.  *See* Atts. E & F. Those Agreements were signed by Mr. Juneau in his official capacity as Court-Appointed Claims

Administrator.  That Undertaking and Agreement, as amended, is a fully binding contract that includes the elements of offer, acceptance, and consideration.  The amended version of the contract, entered into once Lead Class Counsel were finally appointed by the Court, is the presently operable version of the contract, which incorporates the original version of the contract entered into with then-Interim Class Counsel.

75.     At all times, BP has performed its obligations under the Undertaking and Agreement.

76.     Mr. Juneau agreed "that he will comply with all legal and ethical obligations related to his Court appointed role as the Claims Administrator."  Juneau Undertaking (Att. E) ¶ 1; *see also id.* ¶ 8 ("This Undertaking shall inure to the benefit of and be binding upon Juneau, BP and Interim Class Counsel and shall not be assigned by either party without the prior written consent of the other party.").

77.     Misinterpreting the text of the Settlement Agreement's BEL Framework is contrary to Mr. Juneau's assumed contractual duties.  The Claims Administrator agreed to enforce the Settlement Agreement as written, not to rewrite that Agreement, or make policy decisions, or substitute his own judgment for the terms of the Agreement.  Hence, Mr. Juneau, in his official capacity as Claims Administrator, is in material breach of the Undertaking and Agreement he entered into with BP and Lead Class Counsel.

78.     In rewriting the Settlement Agreement at Class Counsel's request to pay what could amount to billions of dollars to claimants with fictitious or overstated losses, the Claims Administrator is also in material breach of the Undertaking and Agreement, as supplemented, that he entered into with BP and Lead Class Counsel.

79.     The Settlement Agreement that Mr. Juneau undertook to administer specifies that

the Claims Administrator shall "faithfully implement and administer the Settlement, according to its terms and procedures . . . consistent with the Agreement."  Settlement Agreement (Att. A) ¶ 4.3.1.  It also states that the Claims Administrator is to "head the Settlement Program, oversee and supervise the Claims Administration Vendors (including any subcontractors) and staff in the processing and payment of Claims."  It further states that "[t]he Settlement Program, under the supervision and direction of the Claims Administrator, shall implement the terms of this Agreement."  *Id.* ¶¶ 4.3.2, 4.3.10.  By deviating from the terms of the Agreement, the Claims Administrator has materially breached his Undertaking and Agreement, as supplemented. *Compare* Jan. 15 Juneau BEL Policy Decisions (Att. C) (filed under seal in its entirety out of an abundance of caution).

80.     BP agreed to provide an indemnity to Mr. Juneau, pursuant to which Mr. Juneau is to be reimbursed for any damages awarded based on a breach of the Settlement Agreement. As a result, the indemnity provides an additional basis for a specific performance order against the Claims Administrator to prevent his breaches of contract:  A damages award against the Claims Administrator would simply require BP to indemnify the Claims Administrator for any such relief, which is pointless and would constitute no remedy at all to BP for an ongoing violation of the Settlement Agreement.

81.     Specific performance is the only adequate remedy for the Claims Administrator's breach of the Undertaking and Agreement.  Absent entry of this remedy of specific performance, the Claims Administrator and Settlement Program will continue to misinterpret the Settlement Agreement and continue to award business claimants for fictitious, non-existent losses — all to BP's detriment.

**COUNT THREE:  Breach of Contract Concerning *Deepwater Horizon* Economic and Property Damages Trust Agreement**

82.     BP re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 81 of this Complaint as though fully set forth herein.

83.     BP, Lead Class Counsel, Patrick Juneau as Claims Administrator and Trustee, and J.P. Morgan Trust Company of Delaware as Directed Trustee agreed to a May 4, 2012 Deepwater Horizon Economic and Property Damages Trust Agreement.  *See* Trust Agreement (Att. B).  That agreement is a fully binding contract that includes the elements of offer, acceptance, and consideration and has been approved by the Court.  *See* MDL 2179 Rec. Doc. 6418 (May 2, 2012) ¶ 28.

84.     Among Mr. Juneau's powers as Trustee is to make distributions, including claim awards, from the General Claims Fund, which fund includes assets intended for the purpose of paying ***legitimate*** BEL claims.  *See* Trust Agreement (Att. B) ¶¶1.6, 2.4(c).

85.     Mr. Juneau agreed "not to take any action that that will . . . violate the terms of the Settlement Agreement."  *Id.* ¶ 2.1.

86.     Misinterpreting the text of the Settlement Agreement's BEL Framework is contrary to Mr. Juneau's assumed contractual duties.  Hence, Mr. Juneau, in his official capacity as Claims Administrator and Trustee, has breached the Trust Agreement that BP and Lead Class Counsel entered into with him.

87.     Mr. Juneau breached his duties of loyalty and care to the Trust by, among other things, substituting his own judgment for the terms of the Agreement and making payments from the General Claims Fund for claims that were exaggerated or ineligible for payment.

88.     The Settlement Program, to the extent it has paid funds beyond what BP would owe under a correct interpretation of the Settlement Agreement, has aided Mr. Juneau's breach

of trust.

89.     In misinterpreting the Settlement Agreement to authorize the payment of what could amount to billions of dollars to claimants with fictitious or overstated losses, Mr. Juneau, as Claims Administrator and Trustee, has committed to distribute funds from the General Claims Fund to make these payments, and is in material breach of Trust Agreement he entered into with BP and Lead Class Counsel.

90.     The Settlement Agreement Mr. Juneau undertook to administer specifies that the Claims Administrator shall "faithfully implement and administer the Settlement, according to its terms and procedures . . . consistent with this Agreement."  Settlement Agreement (Att. A) ¶ 4.3.1.  It also states that the Claims Administrator is to "head the Settlement Program, oversee and supervise the Claims Administration Vendors (including any subcontractors) and staff in the processing and payment of Claims."  It further states that "[t]he Settlement Program, under the supervision and direction of the Claims Administrator, shall implement the terms of the Agreement."  *Id.* ¶¶ 4.3.2, 4.3.10.  By deviating from the terms of the Agreement, the Claims Administrator has breached his Undertaking and Agreement, as supplemented and the associated Trust Agreement.  *Compare* Jan. 15 Juneau BEL Policy Decisions (Att. C) (filed under seal in its entirety out of an abundance of caution).

**COUNT FOUR: Specific Performance for Breach of Interrelated Contracts**

91.     BP re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 90 of this Complaint as though fully set forth herein.

92.     BP has performed its obligations under (i) the Settlement Agreement (Att. A.), (ii) the Undertaking and Agreement of Patrick Juneau to Act as Claims Administrator of the Transition Process and Later Claims Administrator (Atts. D & E); and (iii) the *Deepwater*

*Horizon* Economic and Property Damages Trust Agreement (Att. B).  In contrast, as described above, the Claims Administrator and Settlement Program have materially breached and/or violated their contractual and legal obligations.

93.     A damages remedy would be insufficient to restore BP to its position before the Claims Administrator adopted his erroneous interpretation of the Settlement Agreement. Instead, this Court should halt the payment of such monies in the first place.

94.     As a damages remedy would be insufficient, it would not provide a suitable substitute to performance.  Moreover, the improper Settlement Program awards are going to be made now, and BP will have no effective remedy to recover those improper awards in the future. Accordingly, this Court needs to stop payments from being made immediately, in order to avoid irreparable injury to BP.

### COUNT FIVE: *Ultra Vires* Actions by the Claims Administrator and Settlement Program

95.     BP re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 94 of this Complaint as though fully set forth herein.

96.     The Claims Administrator and the Settlement Program are creations of and governed by the Settlement Agreement.  *See* Settlement Agreement (Att. A) ¶ 4.3.   The Settlement Agreement provides that the Claims Administrator "shall . . . faithfully implement and administer the Settlement, according to its terms and procedures."  *Id.* ¶ 4.3.1.  Because the Claims Administrator and Settlement Program derive their authority from the Settlement Agreement and are obligated to faithfully implement the Settlement Agreement, they may not act in a manner contrary to it.

97.     By deviating from the terms of the Settlement Agreement and authorizing the award of payments that the Agreement does not permit, the Claims Administrator and Settlement

Program have exceeded their authority.

98.     The awards based upon BEL Policy Decisions reflect the Claims Administrator's erroneous interpretation of the Settlement Agreement, and accordingly, they are null and void.

99.     Because the Court has retained jurisdiction over the *Bon Secour* case and established the Court Supervised Settlement Program, the Claims Administrator, while a private actor, is operating pursuant to the supervision of an Article III Court.  The enactment governing the Settlement Program is the Court-approved Settlement Agreement.  By acting in a manner directly contrary to that Agreement, the Claims Administrator has acted outside the bounds of his legal authority.  The actions of the Claims Administrator and the Settlement Program in violation of the Settlement Agreement and related judicial orders should thus be vacated.

**PRAYER FOR RELIEF**

**WHEREFORE**, BP prays for judgment against the Claims Administrator and Settlement Program Defendants as follows, including the remedies set out below, as required by law or equity.  Except as noted below, all relief is sought against both the Claims Administrator and the Settlement Program:

A.     To maintain the *status quo* concerning payments that have not yet been made, grant a preliminary injunction against the Claims Administrator and Settlement Program to enjoin them from issuing or paying to claimants any determinations for BEL claims where the amount of the determination depends, in whole or in part, on the BEL Policy Decisions — or, in the alternative, enjoining the Claims Administrator and Settlement Program from issuing or paying to claimants in the in the agriculture, construction, professional services, real estate, wholesale trade, manufacturing, and retail trade industries (*i.e.*, all industries with NAICS codes starting with 11 (except for codes

29

114111, 114112, 114119, and 114210), 23, 31 (except for codes 311711 and 311712), 32, 33, 42 (except for 424460), 44, 45, 53, or 54) — pending final judicial establishment of the correct interpretation of the Settlement Agreement.

B.      Grant a permanent injunction enjoining Defendants from reestablishing or acting upon the BEL Policy Decisions, or from acting upon any erroneous interpretation of the Settlement Agreement's BEL Framework in any fashion.

C.      Enter a declaratory judgment that the BEL Policy Decisions constitute an erroneous interpretation of the Settlement Agreement by Defendants and violate the agreed-upon terms of the Settlement Agreement and would lead to windfall payouts to undeserving BEL claimants.

D.      Enter an order of specific contractual performance against the Defendants concerning breach of the Settlement Agreement, directing Defendants to properly interpret and implement the Settlement Agreement according to its terms.

E.      Enter an award of specific contractual performance against the Claims Administrator concerning breach of the Undertaking and Agreement, as supplemented, requiring Defendants to comply with its terms by correctly interpreting and implementing the Settlement Agreement and the Undertaking and Agreement.

F.      Enter an award of specific contractual performance against the Claims Administrator concerning breach of the Trust Agreement, requiring Defendants to comply with its terms by correctly interpreting and implementing the Settlement Agreement and the Trust Agreement, and enjoin the Settlement Program from aiding the Claims Administrator's breach of the Settlement Agreement and the Trust Agreement.

G.      Establish a constructive trust, in the alternative, against the Claims Administrator

30

as assisted by the Settlement Program to avoid wrongfully making claims payouts based on the Claims Administrator's erroneous interpretation of the Settlement Agreement as reflected in the BEL Policy Decisions.

H.     Award any other relief that the Court finds BP entitled to recover, including any relief that it is equitable and appropriate for this Court to order.

Dated:  March 15, 2013

Respectfully submitted,

_____/s/ R. Keith Jarrett_____

S. Gene Fendler (Bar #05510)
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

**OF COUNSEL:**

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Jeffrey Lennard
Keith Moskowitz
SNR DENTON US LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Christopher Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

**ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY**

**NOTICE OF LAWSUIT AND SERVICE OF SUMMONS**
**WILL BE SERVED ON DEFENDANTS BELOW**

Deepwater Horizon Court Supervised Settlement Program
Deepwater Horizon Economic Claims Center
935 Gravier St., Suite 1905
New Orleans, LA 70112

Patrick Juneau, in his official capacity as Claims Administrator of the Deepwater Horizon Court Supervised Settlement Program administering the Deepwater Horizon Economic and Property Damages Settlement Agreement, and in his official capacity as Trustee of the Deepwater Horizon Economic and Property Damages Settlement Trust Deepwater Horizon Economic Claims Center
935 Gravier St., Suite 1905
New Orleans, LA 70112

### APPENDIX A — SETTLEMENT AGREEMENT AS REWRITTEN BY THE CLAIMS ADMINISTRATOR'S POLICY DECISIONS

#### Body of Settlement Agreement

**Section 1.3.1.2:**  Economic ~~Damage~~ <u>Compensation</u> Category. ~~Loss of income, earnings or profits~~ <u>Difference in net cash flow as measured by the construct in Exhibit 4C for</u> … Entities ~~as a result of the DEEPWATER HORIZON INCIDENT~~, subject to certain Exclusions. (Exhibits 16-19)

**Section 38.57:**  Economic ~~Damage~~ <u>Compensation</u> shall mean ~~loss of profits, income and/or earnings~~ <u>difference in net cash flow as measured by the construct in Exhibit 4C</u> arising in the Gulf Coast Areas or Specified Gulf Waters ~~allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident~~; …

**Section 38.61:**  Economic ~~Damage~~ Compensation Amount shall mean the compensation amount calculated for an Economic ~~Damage~~ <u>Compensation</u> Claimant pursuant to the <u>rewritten</u> terms of the Agreement and the Economic ~~Damage~~ Claim Frameworks, as applicable.

#### Relevant Portions Of Exhibit 4B

[Delete the word "~~revenue~~" from the numerous places where it appears and replace with "<u>receipts</u>."]

#### Relevant Portions Of Exhibit 4C

The compensation framework for business claimants compares the actual ~~profit~~ <u>net cash flow</u> of a business during a defined post-spill period in 2010 to the ~~profit~~ <u>net cash flow</u> that the claimant might have expected to ~~earn~~ <u>generate</u> ~~in the comparable post-spill period~~ <u>in the same months</u> of 2010.  The calculation is divided into two steps:

> **Step 1** – Compensates claimants for any reduction in ~~profit~~ <u>net cash flow</u> between the 2010 Compensation Period selected by the claimant and the <u>same</u> ~~comparable~~ months of the Benchmark Period.  Step 1 compensation reflects the reduction in ~~Variable Profit~~ <u>Net Cash Flow</u> (which reflects the claimant's ~~revenue~~ <u>receipts</u> less its variable ~~costs~~ <u>expenditures</u>) over this period.
>
> *        *        *

**~~Variable Profit~~ <u>Net Cash Flow</u>**:  This is calculated for both the Benchmark Period and the Compensation Period as follows:

1. Sum the monthly ~~revenue~~ <u>receipts</u> over the period.

2. Subtract the ~~corresponding~~ variable ~~expenses~~ <u>expenditures</u> ~~from revenue~~ over the same time period.  …

*      *      *

## I.      Description of Compensation Calculation

**<u>Step 1 Compensation</u>**

Step 1 of the compensation calculation is determined as the difference in ~~Variable Profit~~ <u>Net Cash Flow</u> between the 2010 Compensation Period selected by the claimant and the ~~Variable Profit~~ <u>Net Cash Flow</u> over the ~~comparable~~ <u>same</u> months of the Benchmark Period.

<u>The Settlement Program is to determine Net Cash Flow based only on the monthly financial records submitted by the claimant, without making any corrections or adjustments whatsoever to the monthly financial records, or any reconciliations between the monthly financial records and the claimant's annual financial records.  Even where the Settlement Program determines that the monthly financial records presented by a claimant contain recordation errors, mistakes, or are otherwise inaccurate and include incorrect data, the Settlement Program must use such inaccurate, erroneous, and incorrect data in calculating compensation under the Settlement Agreement.</u>

### APPENDIX B — NON-EXHAUSTIVE EXAMPLES OF CLAIMS AFFECTED BY MISAPPLICATION OF BUSINESS ECONOMIC LOSS FRAMEWORK[*]

<u>Awards to Construction Industry Claimants</u>

- Claim  Claimant is a Zone D housing construction company (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $10.1 million in pre-RTP lost profit ($12.7 million post-RTP[**]). This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 103% over actual variable profit in the Benchmark Period.[***]

- Claim  Claimant is a Zone D highway, street and bridge construction company (almost 200 miles from the Gulf). The Settlement Program awarded Claimant $7.7 million in pre-RTP lost profit ($9.7 million post-RTP) notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark years (2007-2009) average variable profit by 21%.

- Claim : Claimant is a Zone D general contractor . The Settlement Program awarded Claimant more than $3.8 million in pre-RTP lost profit ($4.8 million post-RTP) notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 20%.

- Claim : Claimant is a Zone C commercial building construction company located . The Settlement Program awarded Claimant $1.7 million pre-RTP lost profit ($2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its benchmark years (2008-2009) average variable profit by 7%.

- Claim : Claimant is a Zone D glass and glazing contractor . The Settlement Program awarded Claimant more than $1.6 million in pre-RTP lost profit (more than $2 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

---

[*]   Additional examples are discussed in the declarations and/or supplemental declarations of David A. Hall, Charles E. Finch, Xavier Oustalniol, and Hal Sider.

[**]   All post-RTP awards listed include reimbursement for accounting support and offsets of any prior Spill-related payments.

[***]   Unless otherwise noted, the comparison made in these examples compares Claimant's May-December (post-Spill period) 2010 variable profit to its average May-December variable profit in the Benchmark Year or Years. Where data and percentages are based on annual performance, rather than performance in just the May-December period, the description notes that the information is based on annual performance. Further, for any comparison of Claimant's variable profit to prior years described below, the reported years are the benchmark period even if not specifically indicated. Finally, where noted, the post-RTP award amount is Claimant's final award amount, post-RTP, plus claimant accounting support, less prior Spill-related payments.

- Claim ████: Claimant is a Zone D construction company ████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $1 million in pre-RTP lost profit ($1.4 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 7%.

- Claim ████: Claimant is a Zone D commercial building construction company █ ████████████ (more than 150 miles from the Gulf). The Settlement Program awarded Claimant $952,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual Benchmark variable profit by 45%.

- Claim ████: Claimant is a Zone D housing construction company ████████████. The Settlement Program awarded Claimant $942,000 in pre-RTP lost profit ($1.2 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 155% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D residential remodeling company ████████████ (more than 150 miles from the Gulf). The Settlement Program awarded Claimant $939,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 61%.

- Claim ████: Claimant is a Zone D housing construction company ████████████. The Settlement Program awarded Claimant $863,000 in pre-RTP lost profit (more than $1 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 103% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D housing construction company ████████████ (more than 150 miles from Gulf Coast). The Settlement Program awarded Claimant $775,000 in pre-RTP lost profit ($972,000 post-RTP). This award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 48%.

- Claim ████: Claimant is a Zone D housing construction company ████████████ (more than 138 miles from the Gulf). The Settlement Program awarded Claimant $740,000 in pre-RTP lost profit ($927,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 162% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D plumbing, heating and air-conditioning contractor █ ████████████. The Settlement Program awarded Claimant $711,000 in pre-RTP lost profit (more than $899,000 post-RTP). This pre-RTP award assumes that, in the absence

of the Spill, Claimant could have expected its 2010 variable profit to increase by 70% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮ : Claimant is a Zone D single-family housing construction company located ▮▮▮▮▮▮▮▮ (almost 100 miles from the Gulf). The Settlement Program awarded Claimant $680,000 in pre-RTP lost profit ($850,000 in post-RTP). This award implies that, in the absence of the Spill, Claimant could have expected its 2010 annual variable profit to increase by 625% over actual annual variable profit in the Benchmark Period.

- Claim ▮▮▮▮ :  Claimant is a Zone D drywall and insulation contractor ▮▮▮▮▮▮▮▮ ▮▮▮▮. The Settlement Program awarded Claimant $666,000 in pre-RTP lost profit (more than $837,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 50% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮ : Claimant is a Zone C electrical contractor ▮▮▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $616,000 in pre-RTP lost profit ($769,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 7%.

- Claim ▮▮▮▮ : Claimant is a Zone B residential construction company ▮▮▮▮▮▮▮▮ ▮▮▮▮. The Settlement Program awarded Claimant $567,000 in pre-RTP lost profit ($1.28 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ▮▮▮▮ : Claimant is a Zone C housing construction company ▮▮▮▮▮▮▮▮ ▮▮▮▮. The Settlement Program awarded Claimant $502,000 in pre-RTP lost variable profit ($635,000 post-RTP) notwithstanding its 2010 variable profit exceeded its 2007-2009 average variable profit.

- Claim ▮▮▮▮ :  Claimant is a Zone D landscaping company ▮▮▮▮▮▮▮▮ (more than 200 miles from the Spill). The Settlement Program awarded Claimant $478,000 in pre-RTP lost profit ($599,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 50% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮ :  Claimant is a Zone C building materials dealer ▮▮▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $462,000 in pre-RTP lost profit ($584,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ▮▮▮▮ :  Claimant is a Zone D housing construction company ▮▮▮▮▮▮▮▮ ▮▮▮▮. The Settlement Program awarded Claimant $439,000 in pre-RTP lost profit (more than $549,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 101% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone D asbestos remediation contractor ████████ ██████. The Settlement Program awarded Claimant $392,000 in pre-RTP lost profit ($492,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 9%.

- Claim ████: Claimant is a Zone D single-family housing construction company █ ██████████. The Settlement Program awarded Claimant $379,000 in pre-RTP lost-profit ($477,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 136%.

- Claim ████: Claimant is a Zone D single-family housing construction company ████ █████. The Settlement Program awarded Claimant $345,000 in pre-RTP lost profit ($432,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ████: Claimant is a Zone D site preparation contractor ████████████. The Settlement Program awarded Claimant $337,000 in pre-RTP lost profit ($425,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.

- Claim ████: Claimant is a Zone B single-family house construction company ███ █████████. The Settlement Program awarded Claimant $329,000 in pre-RTP lost profit ($743,000 in post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 71%.

- Claim ████: Claimant is a Zone D commercial and institutional building construction company ████████████. The Settlement Program awarded Claimant $328,000 in pre-RTP lost profit ($413,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 253%.

- Claim ████: Claimant is a Zone B housing construction company ████████ ██████. The Settlement Program awarded Claimant $303,000 in pre-RTP lost profit ($686,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 78% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone C single-family housing construction company █ ████████. The Settlement Program awarded Claimant $294,000 in pre-RTP lost profit ($370,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ████: Claimant is a Zone D residential remodeling construction company ███ ████████. The Settlement Program awarded Claimant $271,000 in pre-RTP lost profit ($340,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.

- Claim ▇▇▇▇ :   Claimant is a Zone C single-family housing construction company ▇▇ ▇▇▇▇▇▇▇.   The Settlement Program awarded Claimant $264,000 in pre-RTP lost profit, notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.

- Claim ▇▇▇▇ :   Claimant is a Zone D construction material wholesaler ▇▇▇▇▇▇ ▇▇▇.   The Settlement Program awarded Claimant $240,000 in pre-RTP lost profit ($305,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 8%.

- Claim ▇▇▇▇ :   Claimant is a Zone D construction company ▇▇▇▇▇▇▇ (more than 100 miles from the Gulf.   The Settlement Program awarded Claimant $212,000 in pre-RTP lost profit ($269,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 22%.

- Claim ▇▇▇▇ :   Claimant is a Zone D single-family housing construction company ▇▇▇ ▇▇▇▇, ▇▇.   The Settlement Program awarded Claimant $190,000 in pre-RTP lost profit ($241,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 47%.

- Claim ▇▇▇▇ :   Claimant is a Zone B single-family housing construction company ▇▇ ▇▇▇▇.   The Settlement Program awarded Claimant $165,000 in pre-RTP lost profit ($375,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.   Claimant was unprofitable in the Benchmark years, losing $119,000 in variable profit that year, and became profitable in 2010, earning $384,000 in variable profit.

- Claim ▇▇▇▇ : Claimant is a Zone C construction company ▇▇▇▇▇▇▇.   The Settlement Program awarded Claimant $154,000 in pre-RTP lost profit ($194,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2007-2009 average variable profit by 75%.

- Claim ▇▇▇▇ :   Claimant is a Zone C electrical contractor ▇▇▇▇▇▇▇.   The Settlement Program awarded Claimant $135,000 in pre-RTP lost profit ($171,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ▇▇▇▇ :   Claimant is a Zone D residential remodeler ▇▇▇▇▇▇▇ (more than 180 miles from the Gulf).   The Settlement Program awarded Claimant $135,000 in pre-RTP lost profit ($171,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 84%.

- Claim ▇▇▇▇ Claimant is a Zone C plumbing contractor ▇▇▇▇▇▇▇.   The Settlement Program awarded Claimant $133,000 in pre-RTP lost profit ($107,000 post-

RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 6%.

- Claim  :   Claimant is a Zone D housing construction company . The Settlement Program awarded Claimant $127,000 in pre-RTP lost profits ($70,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.

- Claim ▮▮▮ :   Claimant is a Zone D construction company ▮▮▮ (more than 150 miles from the Gulf). The Settlement Program awarded Claimant $126,000 in pre-RTP lost profit ($159,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 190% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮ :   Claimant is a Zone C heating and air-conditioning contractor ▮▮▮. The Settlement Program awarded Claimant $122,000 in pre-RTP lost profits ($155,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 7%.

- Claim ▮▮▮ :   Claimant is a Zone D housing construction company ▮▮▮. The Settlement Program awarded Claimant $119,000 in pre-RTP lost profits ($150,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 15%.

- Claim ▮▮▮ :   Claimant is a Zone C residential remodeler ▮▮▮. The Settlement Program awarded Claimant $117,000 in pre-RTP lost profits ($147,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 13%.

- Claim ▮▮▮ :   Claimant is a Zone D building finishing contractor ▮▮▮ (more than 150 miles from the Gulf). The Settlement Program awarded Claimant $114,000 in pre-RTP lost profits ($145,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 12%.

- Claim ▮▮▮ :   Claimant is a Zone C housing construction company ▮▮▮. The Settlement Program awarded Claimant $107,000 in pre-RTP lost profits ($134,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 1226%.

- Claim ▮▮▮ : Claimant is a Zone D construction company ▮▮▮. The Settlement Program awarded Claimant $103,000 in pre-RTP lost profit ($131,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 average variable profit by 57%.

- Claim ▮▮▮ :   Claimant is a Zone D construction contractor ▮▮▮. The Settlement Program awarded Claimant $83,000 in pre-RTP lost profit (more than

$103,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 59% over actual variable profit in the Benchmark Period.

- Claim  : Claimant is a Zone D drywall and insulation construction contractor (more than 300 miles from the Gulf).  The Settlement Program awarded Claimant $75,000 in pre-RTP lost profit ($94,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 103%.

- Claim ▬ : Claimant is a Zone D plumbing, heating, and air-conditioning contractor ▬ (more than 100 miles from the Gulf).  The Settlement Program awarded Claimant $63,286 in pre-RTP lost profit ($79,108 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 710%.

- Claim ▬ : Claimant is a Zone D housing construction company ▬.  The Settlement Program awarded Claimant $55,000 in pre-RTP lost profit ($70,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 59%.

- Claim ▬ : Claimant is a Zone D roofing contractor ▬.  The Settlement Program awarded Claimant $52,000 in pre-RTP lost profit ($65,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 128%.

- Claim ▬ : Claimant is a Zone C safety equipment contractor ▬. The Settlement Program awarded Claimant $31,000 in pre-RTP lost profit ($40,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 35%.

- Claim ▬ : Claimant is a Zone D construction company ▬ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $30,000 in pre-RTP lost profit ($39,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 45%.

**Awards to Agricultural Industry Claimants**

- Claim ▬ : Claimant is a Zone B rice mill ▬.  The Settlement Program awarded Claimant $9.4 million in pre-RTP lost profit ($21 million in post-RTP), notwithstanding that Claimant's 2010 annual revenue exceeded its annual revenue in all benchmark years.  This award implies that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to exceed its Benchmark variable profit by 59%.

B-7

- Claim ███: Claimant is a Zone B alligator farm ██████████████. The Settlement Program awarded Claimant $7.4 million in pre-RTP lost profit ($16.6 million post-RTP). This pre-RTP award assumes that in absence of spill Claimant's annual 2010 variable profit would have more than tripled its variable profit in the Benchmark year.

- Claim ███: Claimant is a Zone D rice farm ████████████ (nearly 200 miles from the Gulf). The Settlement Program awarded Claimant $2.4 million in pre-RTP lost profit ($3 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 214% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone D fish farm ██████████████ (more than 300 miles from the Gulf). The Settlement Program awarded Claimant $1.25 million in pre-RTP lost profit ($1.57 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 342% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone D peanut farm ██████████████. The Settlement Program awarded Claimant $1,047,000 in pre-RTP lost profit ($1,313,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 12%.

- Claim ███: Claimant is a Zone D crop farmer ██████████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $938,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 5%.

- Claim ███: Claimant is a Zone C gator farm ██████████████ The Settlement Program awarded Claimant $917,000 in pre-RTP lost profit ($1.2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2008-2009 average variable profit. Claimant was unprofitable in the Benchmark years, losing an average of $289,000 in variable profit per year, and became profitable in 2010, earning $1,565,000 in variable profit.

- Claim ███: Claimant is a Zone D fish farm ██████████████ (almost 200 miles from the Gulf). The Settlement Program awarded Claimant $872,000 in pre-RTP lost profit (more than $1 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 68% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone D catfish farm ██████████████ (more than 300 miles from Gulf). The Settlement Program awarded Claimant $772,000 in pre-RTP lost profit ($968,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its Benchmark (2009) annual variable profit by 5204%.

B-8

- Claim : Claimant is a Zone D cotton farmer located ██████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $680,000 in pre-RTP lost profit ($857,000 post-RTP). This award implies that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to have increased by 120% over Benchmark variable profit.

- Claim ████: Claimant is a Zone D farmer ██████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $635,000 in pre-RTP lost profit ($796,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 68% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D rice farmer ██████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $555,000 in pre-RTP lost profit ($697,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 102% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D corn farm ██████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $497,000 in pre-RTP lost profit ($624,000 post-RTP), notwithstanding that its 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 55%.

- Claim ████: Claimant is a Zone D soybean farmer ██████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $447,000 in pre-RTP lost profit ($561,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 16%.

- Claim ████: Claimant is a Zone D cotton, corn, soybean and wheat farm ██████████ (more than 300 miles from Gulf Coast). The Settlement Program awarded claimant $441,000 in pre-RTP lost profit ($553,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 42%.

- Claim ████: Claimant is a Zone D soybean farm ██████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $413,000 in pre-RTP lost profit ($518,000 in post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable in the Benchmark years by 44%.

- Claim ████: Claimant is a Zone D cotton farmer ██████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $411,000 in pre-RTP lost profit ($515,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 108% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone D corn farmer ████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $396,000 in pre-RTP lost profit ($499,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 62% over actual variable profit in the Benchmark Period.

- Claim ████ Claimant is a Zone D oilseed and grain farm ████████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $383,000 in pre-RTP lost profit ($480,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark Period (2009) variable profit by 191%.

- Claim ████: Claimant is a Zone D oilseed and grain farm ████████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $370,000 in pre-RTP lost profit ($462,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 822%.

- Claim ████: Claimant is a Zone D farm supplies wholesaler ████████████ (more than 150 miles from the Gulf). The Settlement Program awarded Claimant $361,000 in pre-RTP lost profit ($451,00 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 12%.

- Claim ████: Claimant is a Zone D cotton farm ████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $348,000 in pre-RTP lost profit ($435,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit. Claimant was unprofitable in 2009, losing $408,000 in variable profit, and became profitable in 2010, earning $1,347,000 in variable profit.

- Claim ████ Claimant is a Zone D timber harvesting business ████████████ (more than 100 miles from the Gulf). The Settlement Program awarded Claimant $318,000 in pre-RTP lost profit ($397,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 82%.

- Claim ████: Claimant is a Zone B gator farmer ████████████. The Settlement Program awarded Claimant $311,000 in pre-RTP lost profit ($699,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 18%.

- Claim ████: Claimant is a Zone D soybean farmer ████████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $284,000 in pre-RTP lost profit ($356,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 27%.

- Claim ████: Claimant is a Zone D oilseed and grain farm ████████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $268,000 in

B-10

pre-RTP lost profit ($337,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 67%.

- Claim :  Claimant is a Zone D oilseed and grain farm ███████████████ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $262,000 in pre-RTP lost profit ($330,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 20%.

- Claim ████: Claimant is a Zone D soybean farm i███████████████ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $219,000 in pre-RTP lost profit ($275,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 21%.

- Claim ████:  Claimant is a Zone D cotton farmer ██████████ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $195,000 in pre-RTP lost profit ($245,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 81%.

- Claim ████:  Claimant is a Zone D oilseed and grain farm ████████████i (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $184,000 in pre-RTP lost profit ($234,000 post-RTP).  Claimant was unprofitable in the Benchmark Period, losing an average of $44,000 in variable profit per year.  This award assumes that, in the absence of the Spill, Claimant could have expected to reverse this trend and earn $72,000 in variable profit in 2010.

- Claim ████:  Claimant is a Zone D farmer ███████████ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $143,000 in pre-RTP lost profit ($180,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 131% over actual variable profit in the Benchmark Period.

- Claim ████:  Claimant is a Zone D cotton farmer located ██████████ (more than 300 miles from the Gulf).  The Settlement Program awarded Claimant $137,000 in pre-RTP lost profit ($174,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ████:  Claimant is a Zone D agricultural business ██████████ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $123,000 in pre-RTP lost profit ($155,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ████:  Claimant is a Zone D oilseed and grain farmer ███████████ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $115,000 in pre-RTP lost profits ($146,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 55%.

- Claim :  Claimant is a Zone D agricultural company engaged in postharvest crop activities ████████████ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $110,000 in pre-RTP lost profits ($138,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 9%.

- Claim ██████: Claimant is a Zone D cotton farm ████████████ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $106,000 in pre-RTP lost profit ($134,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit.  Claimant was unprofitable in 2009, losing $265,000 in variable profit, and became profitable in 2010, earning $131,000 in variable profit.

- Claim ████████ Claimant is a Zone D soil preparation and cultivation company ██ ████████ (more than 250 miles from the Gulf).  The Settlement Program awarded Claimant $95,158 in pre-RTP lost profit ($119,383 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 99%.

## Awards to Professional Services Industry Claimants

- Claim ██████: Claimant is a Zone C law office located ████████████.  The Settlement Program awarded Claimant $2.7 million in pre-RTP lost profit ($3.3 million in post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark period by 10%.  Claimant represents claimants in at least 43 claims brought under the Settlement Agreement.

- Claim ██████: Claimant is a Zone B law office ████████████. The Settlement Program awarded Claimant $1.6 million in pre-RTP lost profit ($3.6 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit.  Claimant represents claimants in at least 47 claims brought under the Settlement Agreement.

- Claim ████: Claimant is a Zone C engineering services business ████████████.  The Settlement Program awarded Claimant $1.3 million in pre-RTP lost profit, notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) average variable profit.

- Claim ██████: Claimant is a Zone D law office ████████████ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $1.25 million in pre-RTP lost profit ($1.57 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 9%.

- Claim ████████ Claimant is a Zone D architectural services firm ████████████ (more than 200 miles from the Gulf).   The Settlement Program awarded Claimant $802,000 in pre-RTP lost profit (more than $1 million post-RTP).  This pre-RTP award

assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 64% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone C law firm ████████████. The Settlement Program awarded Claimant $699,000 in pre-RTP lost profit ($875,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 14%.

- Claim ███: Claimant is a Zone B law office ████████████. The Settlement Program awarded Claimant $656,000 in pre-RTP lost profit ($1.48 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 8%.

- Claim ███: Claimant is a Zone C law office ████████████. The Settlement Program awarded Claimant $641,000 in pre-RTP lost profit ($808,000 post-RTP), notwithstanding that Claimant's annual variable profit in 2010 exceeded its annual variable profit in the Benchmark years by 14%.

- Claim ███: Claimant is a Zone B dental office ████████████. The Settlement Program awarded Claimant $504,000 in pre-RTP lost profit ($1.14 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark period.

- Claim ███: Claimant is a Zone C health care office ████████████. The Settlement Program awarded Claimant $458,000 in pre-RTP lost profit ($572,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 6%.

- Claim ███: Claimant is a Zone C architectural firm ████████████. The Settlement Program awarded Claimant $436,000 in pre-RTP lost profit ($554,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark period by 7%.

- Claim ███: Claimant is a Zone C law office ████████████. The Settlement Program awarded Claimant $403,000 in pre-RTP lost profit ($505,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 8%.

- Claim ███: Claimant is a Zone D landscape and architectural services firm ████████████. The Settlement Program awarded Claimant $358,000 in pre-RTP lost profit ($450,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 9%.

- Claim ███: Claimant is a Zone B law office ████████████. The Settlement Program awarded Claimant $328,000 in pre-RTP lost profit ($739,000 post-RTP),

B-13

notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 14%.

- Claim : Claimant is a Zone D law office ████████████. The Settlement Program awarded Claimant $296,000 in pre-RTP lost profit ($376,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 84%. Claimant represents claimants in at least 57 claims brought under the Settlement Agreement.

- Claim ████: Claimant is a Zone B law office ████████████████. The Settlement Program awarded Claimant $293,000 in pre-RTP lost profit ($659,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 46%.

- Claim █████: Claimant is a Zone C scientific and technical professional services firm █ ███████████. The Settlement Program awarded Claimant $290,000 pre-RTP lost profit ($365,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 17%.

- Claim █████: Claimant is a Zone B law firm i████████████████. The Settlement Program awarded Claimant $277,000 in pre-RTP lost profit ($623,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 18%.

- Claim █████: Claimant is a Zone D event planning company ████████████████. The Settlement Program awarded Claimant $273,000 in pre-RTP lost profit (more than $619,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 156% over actual variable profit in the Benchmark Period.

- Claim █████: Claimant is a Zone D architectural services firm ███████████ ██████. The Settlement Program awarded Claimant $241,000 in pre-RTP lost profit ($305,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 55%.

- Claim ████: Claimant is a Zone D advertising agency ████████████████. The Settlement Program awarded Claimant $216,000 in pre-RTP lost profit ($269,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 7%.

- Claim ████: Claimant is a Zone C law office ███████████████. The Settlement Program awarded Claimant $200,000 in pre-RTP lost profit ($251,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 176%. Claimant represents claimants in at least 33 claims brought under the Settlement Agreement.

- Claim ■■■■: Claimant is a Zone D law firm ■■■■■■■■■■. The Settlement Program awarded Claimant $193,000 in pre-RTP lost profit ($245,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 6%.

- Claim ■■■■: Claimant is a Zone C law firm ■■■■■■■■■■. The Settlement Program awarded Claimant $177,000 in pre-RTP lost profit ($222,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 8%.

- Claim ■■■■: Claimant is a Zone C law firm ■■■■■■■■■. The Settlement Program awarded Claimant $174,000 in pre-RTP lost profit ($220,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 48%.

- Claim ■■■■: Claimant is a Zone D real estate company ■■■■■■■■■ (more than 150 miles from the Gulf). The Settlement Program awarded Claimant $149,000 in pre-RTP lost profit ($189,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 59%.

- Claim ■■■■: Claimant is a Zone D real estate agency ■■■■■■■■■ (more than 275 miles from the Gulf). The Settlement Program awarded Claimant $148,000 in pre-RTP lost profit ($188,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 17%.

- Claim ■■■■: Claimant is a Zone B law office ■■■■■■■■■. The Settlement Program awarded Claimant $141,000 in pre-RTP lost profit ($319,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 19%.

- Claim ■■■■: Claimant is a Zone B architectural services company ■■■■■■■■■■■■. The Settlement Program awarded Claimant $140,000 in pre-RTP lost profit ($317,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 32%.

- Claim ■■■■: Claimant is a Zone D real estate office ■■■■■■■■■ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $132,000 in pre-RTP lost profits ($167,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 16%.

- Claim ■■■■: Claimant is a Zone C physician's office ■■■■■■■■■. The Settlement Program awarded Claimant $128,000 in pre-RTP lost profit ($162,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 8%.

- Claim ███: Claimant is a Zone C physicians' office ██████████. The Settlement Program awarded Claimant $128,000 in pre-RTP lost profits ($162,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 12%.

- Claim ███: Claimant is a Zone C physicians' office ████████████. The Settlement Program awarded Claimant $125,000 in pre-RTP lost profits ($159,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 24%.

- Claim ███: Claimant is a Zone B physicians' office ███████████. The Settlement Program awarded Claimant $125,000 in pre-RTP lost profits ($282,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 219%.

- Claim ███: Claimant is a Zone C physicians' office █████████████. The Settlement Program awarded Claimant $118,000 in pre-RTP lost profit ($149,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ███: Claimant is a Zone C real estate agency █████████. The Settlement Program awarded Claimant $117,000 in pre-RTP lost profit ($67,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 19%.

- Claim ███: Claimant is a Zone D law firm ████████████. The Settlement Program awarded Claimant $117,000 in pre-RTP lost profits ($148,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 13%.

- Claim ███: Claimant is a Zone D real estate office ████████████. The Settlement Program awarded Claimant $117,000 in pre-RTP lost profits ($147,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 23%.

- Claim ███: Claimant is a Zone B real estate office ████████████. The Settlement Program awarded Claimant $115,000 in pre-RTP lost profits ($262,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 10%.

- Claim: ███: Claimant is a Zone C architectural services company ████████████ ████a. The Settlement Program awarded Claimant $109,000 in pre-RTP lost profits ($138,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 10%.

- Claim ████: Claimant is a Zone C real estate agency ██████████. The Settlement Program awarded Claimant $107,000 in pre-RTP lost profit ($135,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 13%.

- Claim ████: Claimant is a Zone C physician's office ██████████. The Settlement Program awarded Claimant $98,000 in pre-RTP lost profit ($124,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 13%.

- Claim ████: Claimant is a Zone C architect ██████████. The Settlement Program awarded Claimant $74,000 in pre-RTP lost profit ($92,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 34%.

- Claim ████: Claimant is a Zone D tourism guide provider ██████████ (more than 120 miles from the Gulf). The Settlement Program awarded Claimant $62,000 in pre-RTP lost profit ($140,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 54%.

- Claim ████: Claimant is a Zone C physician ██████████. The Settlement Program awarded Claimant $50,000 in pre-RTP lost profit ($63,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 24%.

- Claim ████: Claimant is a Zone D computer programming company ██████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $50,000 in pre-RTP lost profit ($63,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 62% over actual variable profit in the Benchmark Period.

- Claim ████: Claimant is a Zone C environmental consulting business ██████ ████████. The Settlement Program awarded Claimant $44,000 in pre-RTP lost profit ($56,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 4%.

- Claim ████: Claimant is a Zone C real estate agent ██████████. The Settlement Program awarded Claimant $40,000 in pre-RTP lost profit ($50,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit.

- Claim ████: Claimant is a Zone C technology consultant ██████████. The Settlement Program awarded Claimant $30,000 in pre-RTP lost profit ($38,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 92%.

**Awards to Claimants in Other Industries**

- Claim ███: Claimant is a Zone D manufacturer ████████████. The Settlement Program awarded Claimant $3.3 million in pre-RTP lost profit ($4.2 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 66% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone C Digital Printing Business ████████████. The Settlement Program awarded Claimant $2.9 million in pre-RTP lost profit ($3.7 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 14%.

- Claim ███: Claimant is a Zone D steel manufacturer ████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $1.96 million in pre-RTP lost profit ($2.46 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant's 2010 variable profit would have increased by 59% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone D used car dealer i████████████ (almost 100 miles from the Gulf). The Settlement Program awarded Claimant $1.14 million in pre-RTP lost profit ($1.45 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark period by 28%.

- Claim ███: Claimant is a Zone D electrical equipment supplier ████████████. The Settlement Program awarded Claimant $829,000 in pre-RTP lost profit ($1 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit. Claimant was unprofitable in 2009, losing $29,000, and became profitable in 2010, earning $133,000 in variable profit.

- Claim ███: Claimant is a Zone C business ████████████. The Settlement Program awarded Claimant $759,000 in pre-RTP lost profit ($2 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit.

- Claim ███: Claimant is a Zone B meat wholesaler ████████████. The Settlement Program awarded Claimant $634,000 in pre-RTP lost profit ($1.4 million post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 56% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone D plastics manufacturer ████████████. The Settlement Program awarded Claimant $634,000 in pre-RTP lost profit (more than $805,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 231% over actual variable profit in the Benchmark Period.

- Claim ███ :  Claimant is a Zone D manufacturer ██████████ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $516,000 in pre-RTP lost profit ($656,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 65% over actual variable profit in the Benchmark Period.

- Claim ███ :  Claimant is a Zone D apparel accessories manufacturer ██████ ██████ .  The Settlement Program awarded Claimant $497,000 in pre-RTP lost profit, notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 6%.

- Claim ███ :  Claimant is a Zone B retail business ██████████ .  The Settlement Program awarded Claimant $496,000 in pre-RTP lost profit ($1.5 million post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit.

- Claim ███ :  Claimant is a Zone B building materials dealer ██████████ .  The Settlement Program awarded Claimant $468,000 in pre-RTP lost profit ($1.05 million post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ███ :  Claimant is a Zone C car dealership ██████████ .  The Settlement Program awarded Claimant $441,000 in pre-RTP lost profit ($552,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 13%.

- Claim ███ :  Claimant is a Zone D heating and air-conditioning business ██████ ██████ .  The Settlement Program awarded Claimant $415,000 in pre-RTP lost profit ($528,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 27%.

- Claim ███ :  Claimant is a Zone D caterer ██████████ .  The Settlement Program awarded Claimant $411,000 in pre-RTP lost profit ($1.3 million post-RTP), notwithstanding that its 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 16%.

- Claim ███ :  Claimant is a Zone D plumbing and heating equipment supply company ██ ██████████ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $410,000 in pre-RTP lost profit ($513,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 15%.

- Claim ███ :  Claimant is a Zone D motor vehicle body manufacturing firm ██ ██████████ , ██████ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $408,000 in pre-RTP lost profit ($518,000 post-RTP), notwithstanding

that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 5%.

- Claim ██████: Claimant is a Zone D mobile home dealer i██████████████████ (more than 250 miles from the Gulf). The Settlement Program awarded Claimant $370,000 in pre-RTP lost variable profit ($464,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its 2009 (Benchmark Period) variable profit by 339%.

- Claim ██████: Claimant is a Zone C construction and mining machinery company ██████████████████. The Settlement Program awarded Claimant $307,000 in pre-RTP lost profit ($390,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 97%.

- Claim ██████: Claimant is a Zone C boat dealer ████████████████. The Settlement Program awarded Claimant $260,000 in pre-RTP lost profit ($331,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 5%.

- Claim ██████:  Claimant is a Zone D metal manufacturer ████████████████. The Settlement Program awarded Claimant $256,000 in pre-RTP lost profit (more than $325,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 21%.

- Claim ██████:  Claimant is a Zone D metals manufacturer ████████████████. The Settlement Program awarded Claimant $249,000 in pre-RTP lost profit ($313,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 116% over actual variable profit in the Benchmark Period.

- Claim ██████: Claimant is a Zone D air-conditioning and heating equipment manufacturer ████████████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $240,000 in pre-RTP lost profit ($300,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit. Claimant was unprofitable in 2009, losing $68,000 in variable profit, and became profitable in 2010, earning $129,000 in variable profit.

- Claim ██████: Claimant is a Zone B durable goods merchant i████████████████. The Settlement Program awarded Claimant $234,000 in pre-RTP lost profit ($530,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 9%.

- Claim ██████: Claimant is a Zone D amusement park ████████████████. The Settlement Program awarded Claimant $227,000 in pre-RTP lost profit ($511,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 25%.



- Claim ███: Claimant is a Zone D fabricated metal company █████████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $217,000 in pre-RTP lost profit ($275,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit.

- Claim ███: Claimant is a Zone C wholesale trade agent ████████. The Settlement Program awarded Claimant $205,000 in pre-RTP lost profit ($595,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 37%.

- Claim ███: Claimant is a Zone D swimming pool equipment retailer ██████ ████ (more than 200 miles from the Gulf). The Settlement Program awarded Claimant $204,000 in pre-RTP lost profit ($259,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 4%.

- Claim ███: Claimant is a Zone D electrical apparatus and equipment company ██ ████. The Settlement Program awarded Claimant $202,000 in pre-RTP lost profit ($257,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 8%.

- Claim ███: Claimant is a Zone B gas station chain ███████████. The Settlement Program awarded Claimant $198,000 in pre-RTP lost profit (more than $594,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 93% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone C sporting goods store ███████████. The Settlement Program awarded Claimant $185,000 in pre-RTP lost profit ($522,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 17%.

- Claim ███: Claimant is a Zone D stone product manufacturer █████████. The Settlement Program awarded Claimant $183,000 in pre-RTP lost profit ($229,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 30%.

- Claim ███: Claimant is a Zone C dealer of building materials ████████ ████. The Settlement Program awarded Claimant $182,000 in pre-RTP lost profit ($230,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 129% over actual variable profit in the Benchmark Period.

- Claim ███: Claimant is a Zone D gas station █████████. The Settlement Program awarded Claimant $182,000 in pre-RTP lost profit ($411,000 post-RTP),

notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 16%.

- Claim : Claimant is a Zone C building materials dealer ████████████. The Settlement Program awarded Claimant $175,000 in pre-RTP lost profit ($221,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 16%.

- Claim ████: Claimant is a Zone B wholesaler ████████████. The Settlement Program awarded Claimant $171,000 in pre-RTP lost profit ($389,000 post-RTP). This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 60% over actual variable profit in the Benchmark Period.

- Claim ████:  Claimant is a Zone C gas station chain ████████████. The Settlement Program awarded Claimant $162,000 in pre-RTP lost profit ($459,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 86% over actual variable profit in the Benchmark Period.

- Claim ████:  Claimant is a Zone D beauty salon ████████████ (more than 210 miles from the Gulf).  The Settlement Program awarded Claimant $145,000 in pre-RTP lost profit ($184,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ████:  Claimant is a Zone D car dealer ████████████ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $143,000 in pre-RTP lost profit ($181,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 41%.

- Claim ████:  Claimant is a Zone C medical software company ████████████. The Settlement Program awarded Claimant $143,000 in pre-RTP lost profit ($181,000 post-RTP), notwithstanding that Claimant's annual 2010 variable profit exceeded its annual variable profit in the Benchmark years by 16%.

- Claim ████:  Claimant is a Zone D motor vehicle dealer ████████████ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $140,000 in pre-RTP lost profit ($178,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 35%.

- Claim ████: Claimant is a Zone D sporting goods store ████████████ (more than 120 miles from the Gulf).  The Settlement Program awarded Claimant $130,000 in pre-RTP lost profit ($294,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit.

- Claim ▮▮▮▮:  Claimant is a Zone D sheet metal manufacturer ▮▮▮▮▮▮▮▮▮ (more than 200 miles from the Gulf).  The Settlement Program awarded Claimant $126,000 in pre-RTP lost profit ($160,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 11%.

- Claim ▮▮▮▮:  Claimant is a Zone D commercial equipment wholesaler ▮▮▮▮▮▮ ▮▮▮▮▮▮ (more than 100 miles from the Gulf).  The Settlement Program awarded Claimant $125,000 in pre-RTP lost profit ($159,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 23%.

- Claim ▮▮▮▮:  Claimant is a Zone B commercial leasing company ▮▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $117,000 in pre-RTP lost profit ($267,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 23%.

- Claim ▮▮▮▮:  Claimant is a Zone D sporting goods store ▮▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $114,000 in pre-RTP lost profits ($257,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 48%.

- Claim ▮▮▮▮:  Claimant is a Zone C specialized freight trucking company ▮▮▮▮▮▮▮ ▮▮▮▮.  The Settlement Program awarded Claimant $108,000 in pre-RTP lost profits ($137,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 14%.

- Claim ▮▮▮▮:  Claimant is a Zone B snack and nonalcoholic beverage bar ▮▮▮▮▮ ▮▮▮▮▮▮.  The Settlement Program awarded Claimant $102,000 in pre-RTP lost profits ($281,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 298%.

- Claim ▮▮▮▮:  Claimant is a Zone D general freight trucking company ▮▮▮▮▮▮ ▮▮▮▮.  The Settlement Program awarded Claimant $100,000 in pre-RTP lost-profits ($127,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark variable profit by 16%.

- Claim ▮▮▮▮:  Claimant is a Zone C manufacturer ▮▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $85,000 in pre-RTP lost profit ($108,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 58% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮: Claimant is a Zone C electrical equipment supplier ▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $80,000 in pre-RTP lost profit ($101,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2009) variable profit by 8%.

B-23

- Claim ▮▮▮: Claimant is a Zone D security service provider ▮▮▮▮▮▮▮▮▮▮. The Settlement Program awarded Claimant $76,000 in pre-RTP lost profit ($95,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit.

- Claim ▮▮▮:  Claimant is a Zone D gas station chain ▮▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $73,000 in pre-RTP lost profit ($123,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 134% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮: Claimant is a Zone D prosthetics manufacturer ▮▮▮▮▮▮▮▮ ▮▮▮.  The Settlement Program awarded Claimant $60,000 in pre-RTP lost profit ($76,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years.

- Claim ▮▮▮: Claimant is a Zone C real estate appraiser ▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $57,000 in pre-RTP lost profit ($72,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 5%.

- Claim ▮▮▮: Claimant is a Zone D gas station i▮▮▮▮▮▮▮▮ (more than 130 miles from the Gulf).  The Settlement Program awarded Claimant $53,000 in pre-RTP lost profit ($119,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit by 12%.

- Claim ▮▮▮: Claimant is a Zone D stone products manufacturer ▮▮▮▮▮▮▮ ▮▮▮   The Settlement Program awarded Claimant $53,000 in pre-RTP lost profit ($67,000 post-RTP), notwithstanding that Claimant's 2010 annual variable profit exceeded its annual variable profit in the Benchmark years by 15%.

- Claim ▮▮▮: Claimant is a Zone C new car dealer ▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $48,000 in pre-RTP lost profit ($60,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2007-2009) variable profit by 9%.

- Claim ▮▮▮:  Claimant is a Zone C limousine service ▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $46,000 in pre-RTP lost profit ($138,000 post-RTP), notwithstanding that Claimant's 2010 variable profit exceeded its Benchmark (2008-2009) variable profit.  Claimant was unprofitable in 2008-2009, losing $14,000 in variable profit, and became profitable in 2010, earning $6,000 in variable profit.

- Claim ▮▮▮:  Claimant is a Zone C restaurant ▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $40,000 in pre-RTP lost profit ($119,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected

its 2010 variable profit to increase by 1,368% over actual variable profit in the Benchmark Period.

- Claim ▮▮▮▮:  Claimant is a Zone C trucking company ▮▮▮▮▮▮▮▮▮▮.  The Settlement Program awarded Claimant $32,000 in pre-RTP lost profit ($41,000 post-RTP).  This pre-RTP award assumes that, in the absence of the Spill, Claimant could have expected its 2010 variable profit to increase by 113% over actual variable profit in the Benchmark Period.

## LIST OF ATTACHMENTS TO COMPLAINT

A.   Notice of and *Deepwater Horizon* Economic and Property Damages Settlement Agreement as Amended May 2, 2012 (MDL 2179 Rec. Doc. 6430), filed May 3, 2012 ("Settlement Agreement").

B.   *Deepwater Horizon* Economic and Property Damages Trust Agreement Among BP Exploration & Production Inc. and BP America Production Company as Settlors, Lead Class Counsel, Patrick Juneau, as Claims Admin. & Trustee and J.P. Morgan Trust Co. of Del. as Directed Trustee, Pursuant to Deepwater Horizon Economic & Property Damages Settlement Agreement, dated April 18, 2012 and as amended May 1, 2012, dated May 4, 2012.

C.   Cover E-Mail and Memo from Patrick A. Juneau, to Class Counsel and BP Re: Announcement of Policy Decisions Regarding Claims Admins., dated Jan. 15, 2013 (filed under seal in its entirety out of an abundance of caution).

D.   Order on Review of Issue from Panel (Matching of Revenue and Expense) (MDL 2179 Rec. Doc. 8812), dated Mar. 5, 2013.

E.   Undertaking of Patrick Juneau in Furtherance of Court Order Appointing Him Claims Admin., dated Apr. 9, 2012 (filed under seal in its entirety out of an abundance of caution).

F.   Supplement and Amendment to Undertaking of Patrick Juneau in Furtherance of Court Order Appointing Him Claims Admin., effective on or about June 25, 2012 (filed under seal in its entirety out of an abundance of caution).