# ATTACHMENT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179<br><br>SECTION J |
| This document relates to all actions. | * * * | HONORABLE CARL J. BARBIER |
| | * * * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated, | * * * | Civil Action No. 12-970<br><br>SECTION J |
| Plaintiffs, | * * | |
| v. | * * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * * | MAGISTRATE JUDGE SHUSHAN |
| Defendants. | * | |

## NOTICE OF FILING OF THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT AS AMENDED ON MAY 2, 2012, AND AS PRELIMINARILY APPROVED BY THE COURT ON MAY 2, 2012

**PLEASE TAKE NOTICE** that the Plaintiffs and BP Exploration & Production Inc. and BP America Production Company hereby file into the record the Economic and Property Damages Settlement Agreement as Amended on May 2, 2012, and as preliminarily approved by the Court on May 2, 2012.[1]

---

[1] The filing includes the executed signature pages for the original April 18, 2012 Agreement as well as the May 2, 2012 First Amendment.

May 3, 2012                                    Respectfully submitted,


__/s/ Stephen J. Herman_____        __/s/ James Parkerson Roy_____

Stephen J. Herman, La. Bar No. 23129         James Parkerson Roy, La. Bar No. 11511
HERMAN HERMAN KATZ & COTLAR       DOMENGEAUX WRIGHT ROY &
LLP                                          EDWARDS LLC
820 O'Keefe Avenue                           556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                 Lafayette, Louisiana 70501
Telephone: (504) 581-4892                    Telephone: (337) 233-3033
Fax No. (504) 569-6024                       Fax No. (337) 233-2796

Lead Economic and Property Damages           Lead Economic and Property Damages Class
Class Counsel                                Counsel

### *ECONOMIC AND PROPERTY DAMAGES CLASS COUNSEL*
_____

Joseph F. Rice                               Conrad S.P. "Duke" Williams
MOTLEY RICE LLC                              WILLIAMS LAW GROUP
28 Bridgeside Blvd.                          435 Corporate Drive, Suite 101
Mount Pleasant, SC 29464                     Maison Grand Caillou
Office:  (843) 216-9159                      Houma, LA 70360
Telefax: (843) 216-9290                      Office:  (985) 876-7595
                                             Telefax: (985) 876-7594

Brian H. Barr                                Robin L. Greenwald
LEVIN, PAPANTONIO, THOMAS,                   WEITZ & LUXENBERG, PC
MITCHELL, ECHSNER & PROCTOR, PA              700 Broadway
316 South Baylen St., Suite 600              New York, NY  10003
Pensacola, FL 32502-5996                     Office:  (212) 558-5802
Office:  (850) 435-7045                      Telefax: (212) 344-5461
Telefax: (850) 436-6187

Jeffrey A. Breit                             Rhon E. Jones
BREIT DRESCHER IMPREVENTO &                  BEASLEY, ALLEN, CROW, METHVIN,
WALKER, P.C.                                 PORTIS & MILES, P. C.
999 Waterside Drive, Suite 1000              218 Commerce St., P.O. Box 4160
Norfolk, VA 23510                            Montgomery, AL 36104
Office:  (757) 670-3888                      Office:  (334) 269-2343
Telefax: (757) 670-3895                      Telefax: (334) 954-7555

Elizabeth J. Cabraser
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Office: (415) 956-1000
Telefax: (415) 956-1008

Philip F. Cossich, Jr.
COSSICH, SUMICH, PARSIOLA &
TAYLOR
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Office: (504) 394-9000
Telefax: (504) 394-9110

Robert T. Cunningham
CUNNINGHAM BOUNDS, LLC
1601 Dauphin Street, P. O. Box 66705
Mobile, AL 36660
Office: (251) 471-6191
Telefax: (251) 479-1031

Alphonso Michael "Mike" Espy
MORGAN & MORGAN, P.A.
188 East Capitol Street, Suite 777
Jackson, MS 39201
Office: (601) 949-3388
Telefax: (601) 949-3399

Calvin C. Fayard, Jr.
FAYARD & HONEYCUTT
519 Florida Avenue, SW
Denham Springs, LA 70726
Office: (225) 664-4193
Telefax: (225) 664-6925

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Office: (305) 476-7400
Telefax: (305) 476-7444

Matthew E. Lundy
LUNDY, LUNDY, SOILEAU & SOUTH,
LLP
501 Broad Street
Lake Charles, LA 70601
Office: (337) 439-0707
Telefax: (337) 439-1029

Michael C. Palmintier
deGRAVELLES, PALMINTIER,
HOLTHAUS & FRUGÉ
618 Main Street
Baton Rouge, LA 70801-1910
Office: (225) 344-3735
Telefax: (225) 344-0522

Paul M. Sterbcow
LEWIS, KULLMAN, STERBCOW &
ABRAMSON
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Office: (504) 588-1500
Telefax: (504) 588-1514

Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Office: (214) 521-3605
Telefax: (214) 599-1172

Mikal C. Watts (PSC)
WATTS GUERRA CRAFT, LLP
Four Dominion Drive, Building 3, Suite 100
San Antonio, TX 78257
Office: (210) 447-0500
Telefax: (210) 447-0501

James J. Neath
Mark Holstein
BP AMERICA INC.
501 Westlake Park Boulevard
Houston, TX  77079
Telephone:  (281) 366-2000
Telefax:  (312) 862-2200

Daniel A. Cantor
Andrew T. Karron
Ellen K. Reisman
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone:  (202) 942-5000
Telefax:  (202) 942-5999

Jeffrey Lennard
Keith Moskowitz
SNR DENTON
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
Telephone:  (312) 876-8000
Telefax:  (312) 876-7934

***OF COUNSEL***

 

   */s/ Richard C. Godfrey, P.C.*
Richard C. Godfrey, P.C.

J. Andrew Langan, P.C.
Andrew B. Bloomer, P.C.
Wendy L. Bloom
R. Chris Heck
Christopher J. Esbrook
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000
Telefax:  (312) 862-2200

Jeffrey Bossert Clark
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5000
Telefax:  (202) 879-5200

*/s/ Don K. Haycraft*
Don K. Haycraft (Bar #14361)
R. Keith Jarrett (Bar #16984)
LISKOW & LEWIS
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Telephone:  (504) 581-7979
Telefax:  (504) 556-4108

Robert C. "Mike" Brock
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 662-5985
Telefax:  (202) 662-6291

***ATTORNEYS FOR BP EXPLORATION & PRODUCTION INC.
AND BP AMERICA PRODUCTION COMPANY***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on All Counsel by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 3rd day of May 2012.

<u>/s/ Don K. Haycraft</u>
Don K. Haycraft

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * * | MDL NO. 2179 |
| | | SECTION J |
| This document relates to all actions. | * * | |
| | * * | HONORABLE CARL J. BARBIER |
| | * * | |
| | * * | MAGISTRATE JUDGE SHUSHAN |
| | * | |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc., et al., on behalf of themselves and all others similarly situated, | * * | Civil Action No. 12-970 |
| | * | SECTION J |
| Plaintiffs, | * * | |
| v. | * * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production Inc.; BP America Production Company; BP p.l.c., | * * | MAGISTRATE JUDGE SHUSHAN |
| Defendants. | * | |

## *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT AS AMENDED ON MAY 2, 2012

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................. i

RECITALS ............................................................................................................................... 1

1.  CLASS DEFINITION. .................................................................................................... 3

2.  EXCLUSIONS FROM THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT
    CLASS DEFINITION. ..................................................................................................... 8

3.  EXPRESSLY RESERVED CLAIMS. .............................................................................. 12

4.  IMPLEMENTATION OF THE SETTLEMENT. ................................................................ 12

5.  SETTLEMENT BENEFITS. ............................................................................................ 28

    5.2.  SEAFOOD COMPENSATION PROGRAM. ............................................................. 29

    5.3.  ECONOMIC DAMAGE COMPENSATION. ............................................................. 29

    5.4.  SUBSISTENCE DAMAGE COMPENSATION. ......................................................... 31

    5.5.  VoO CHARTER PAYMENT ................................................................................. 32

    5.6.  VESSEL PHYSICAL DAMAGE COMPENSATION. ................................................. 33

    5.7.  COASTAL REAL PROPERTY DAMAGE COMPENSATION ..................................... 33

    5.8.  WETLANDS REAL PROPERTY DAMAGE COMPENSATION ................................... 33

    5.9.  REAL PROPERTY SALES DAMAGE COMPENSATION .......................................... 34

6.  CLAIMS APPEAL PROCESS ........................................................................................ 55

7.  PRELIMINARY APPROVAL BY THE COURT AND CLASS CERTIFICATION. ............ 62

8.  NOTICE AND FAIRNESS HEARING. ............................................................................ 63

9.  COMMUNICATIONS TO THE PUBLIC. ........................................................................ 68

10.  RELEASE AND DISMISSAL OF ALL CLAIMS AND OTHER PROTECTIONS. ............. 69

11.  ASSIGNMENT AND PROTECTIONS. ............................................................................ 76

12.  DENIAL OF WRONGDOING OR LIABILITY. ................................................................ 76

13.  REPRESENTATIONS AND WARRANTIES .................................................................... 78

14.  PLAINTIFFS' COUNSEL'S ATTORNEY'S FEES AND COSTS. ..................................... 79

15. FINAL ORDER AND JUDGMENT, DISMISSAL WITH PREJUDICE. ...................... 79

16. COOPERATION OF PARTIES AS TO CONSUMMATION OF SETTLEMENT........ 81

17. COOPERATION OF PARTIES AS TO SUPPORT OF SETTLEMENT. ...................... 81

18. CONTINUING JURISDICTION. .................................................................................. 81

19. STAY OR ADJOURNMENT OF ALL PROCEEDINGS. ............................................... 82

20. DUTIES OF ECONOMIC CLASS COUNSEL. ............................................................ 82

21. ILLEGALITY OR UNENFORCEABILITY OF PROVISIONS.................................... 83

22. PRESERVATION OF CONFIDENTIAL DOCUMENTS. ........................................... 85

23. INTERPRETATION...................................................................................................... 86

24. NO PENALTY OR FINE. .............................................................................................. 86

25. AGREEMENT MUTUALLY PREPARED. ................................................................... 86

26. BINDING AND ENTIRE AGREEMENT. .................................................................... 87

27. RECEIPT OF ADVICE OF COUNSEL. ....................................................................... 87

28. EXTENSION OF TIME AND MINISTERIAL CHANGES. ......................................... 87

29. EXECUTION OF AGREEMENT IN COUNTERPARTS. ............................................ 87

30. DECEASED, DISSOLVED OR BANKRUPT CLASS MEMBERS. ............................. 88

31. MINOR AND INCOMPETENT CLASS MEMBER SETTLEMENT PROVISION. .... 88

32. NO TAX ADVICE. ........................................................................................................ 89

33. NO OTHER RIGHTS OR REMEDIES. ........................................................................ 90

34. NOTICE ........................................................................................................................ 90

35. WAIVER......................................................................................................................... 91

36. APPLICABLE LAW ...................................................................................................... 91

37. GUARANTOR ............................................................................................................... 91

38. DEFINITIONS............................................................................................................... 91

# ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT

## (Subject to Court Approval)

This **AGREEMENT**,[1] dated as of April 18, 2012, is made and entered into by and among (i) defendants BP Exploration & Production Inc. and BP America Production Company (hereinafter the "**BP PARTIES**"), by and through their attorneys, and (ii) **PLAINTIFFS**, on behalf of the **ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS**, by and through the **INTERIM CLASS COUNSEL**, in the **DEEPWATER HORIZON ECONOMIC LITIGATION**. The purpose of this Agreement is to settle all and only the **RELEASED CLAIMS** of the Economic Class, **PLAINTIFFS,** and **ECONOMIC CLASS MEMBERS** against all and only the **RELEASED PARTIES**.

### RECITALS

A.     BP Exploration & Production Inc. and BP America Production Company are corporations organized under the laws of the State of Delaware, engaged in the business of oil and gas production, exploration and/or development.

B.     **ECONOMIC CLASS REPRESENTATIVES** are the named plaintiffs in the Amended Economic and Property Damage Class Complaint (the "**ACTION**") entitled *Bon Secour Fisheries, Inc., et al. v. BP Exploration & Production Inc., et al.*, No. 12-970, filed May 2, 2012 in the **COURT.**

C.     The Action alleges federal statutory and maritime claims, including violations of the Oil Pollution Act, negligence, gross negligence, willful misconduct, strict liability, negligence *per se*, nuisance, and other claims. Plaintiffs in the Action seek compensatory damages, punitive damages, other damages and declaratory relief on behalf of themselves and the Economic Class Members, and all such claims, damages and theories of liability, unless expressly reserved, are extinguished, discharged and released by the terms of this Agreement.

---

[1] The first time defined terms appear in this Agreement, they are set forth in bold and all capital letters for emphasis. Thereafter, they are set forth with initial capital letters only.

D.      Plaintiffs contend they would prevail in litigation.  **BP** disputes and denies the Plaintiffs' claims, has raised various affirmative and legal and other defenses, and contends that it would prevail in litigation.

E.      After careful consideration, Plaintiffs, Interim Class Counsel and the **PROPOSED ECONOMIC CLASS COUNSEL** have concluded that it is in the best interests of Plaintiffs and the Economic Class to compromise and settle certain claims asserted by the Economic Class against BP and other Released Parties in the Deepwater Horizon Economic Litigation in consideration of the terms and benefits of the **SETTLEMENT** set forth in this Agreement.  After arm's length negotiations with **BP's COUNSEL**, Plaintiffs and Proposed Economic Class Counsel have considered, among other things,  (1) the complexity, expense, and likely duration of the litigation; (2) the stage of the litigation and amount of discovery completed; (3) the potential for Plaintiffs or BP prevailing on the merits; and (4) the range of possible recovery and certainty of damages; and have determined the Agreement is fair, reasonable, adequate and in the best interests of Plaintiffs and the Economic Class Members.

F.      BP has concluded that, in light of the costs, risks, burden, and delay of litigation, Settlement in this complex litigation is appropriate.  In this regard, BP and BP's Counsel agree that this Agreement is fair, reasonable, and an adequate resolution of the Deepwater Horizon Economic Litigation.

G.      The **PARTIES** agree that this Agreement is subject to the **EFFECTIVE DATE**. Nevertheless, to facilitate the expeditious resolution of **CLAIMS** for the benefit of the Economic Class, the Parties have agreed to a **TRANSITION PROCESS**, and for the establishment of a Court-supervised settlement program to take effect within thirty days of the **PRELIMINARY APPROVAL ORDER** (or as otherwise ordered by the Court).

H.      The Parties further agree that an Economic Class Member determined to qualify for one or more **SETTLEMENT PAYMENTS** shall have the option to receive prompt payment of such compensation prior to the Effective Date upon the execution of an **INDIVIDUAL RELEASE**.  The BP Parties' obligation to make Settlement Payments to any qualifying Economic Class Member who signs an Individual Release prior to the Effective Date, and the

terms of every such Individual Release, shall be fully enforceable, binding and irrevocable, regardless of whether the Effective Date occurs.

NOW THEREFORE, it is agreed that the foregoing recitals are hereby expressly incorporated into this Agreement, and made a part hereof, and further, that in consideration of the agreements, promises, and mutual covenants, representations and warranties set forth in this Agreement; the benefits, payments, assignments and **RELEASE** described in this Agreement; the entry by the Court of a **FINAL ORDER AND JUDGMENT** as described below; and for such other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, this Action shall be settled, compromised and resolved as between BP, the Released Parties and the Economic Class under and subject to the following terms and conditions:

1. **CLASS DEFINITION.**

Economic and Property Damages Settlement Class shall mean the **NATURAL PERSONS** and **ENTITIES** defined in this Section 1, subject to the **EXCLUSIONS** in Section 2 below. If a person or entity is included within the geographical descriptions in Section 1.1 or Section 1.2, and their claims meet the descriptions of one or more of the Damage Categories described in Section 1.3, that person or entity is a member of the Economic and Property Damages Settlement Class, <u>unless</u> the person or entity is excluded under Section 2:

1.1. **Individuals**. Unless otherwise specified, all Natural Persons residing in the United States who, at any time between April 20, 2010 and April 16, 2012, lived in, worked in, were offered and accepted work in, owned or leased real or personal property located within, or owned or leased or worked on a vessel harbored or **HOME PORTED** in the States of Louisiana, Mississippi, or Alabama, the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas, or the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of

Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama, or those described counties of Texas or Florida (the "**GULF COAST AREAS**") (Exhibit 22), or the U.S. waters of the Gulf of Mexico and all adjacent bays, estuaries, straits, and other tidal or brackish waters within the Gulf Coast Areas, as specifically shown and described in Exhibit 23 ("**SPECIFIED GULF WATERS**"), or worked on a vessel in Specified Gulf Waters after April 20, 2009. With respect to **SEAFOOD CREW**[2] Claims, persons must have worked on a vessel that landed **SEAFOOD** in the Gulf Coast Areas after April 20, 2009.

and

1.2.    **Entities.**  All Entities doing business or operating in the Gulf Coast Areas or Specified Gulf Waters that:

1.2.1.    at any time from April 20, 2010 to April 16, 2012, owned, operated, or leased a physical facility in the Gulf Coast Areas or Specified Gulf Waters and (A) sold products in the Gulf Coast Areas or Specified Gulf Waters (1) directly to **CONSUMERS** or **END USERS** of those products or (2) to another Entity that sold those products directly to Consumers or End Users of those products, or (B) regularly purchased Seafood harvested from Specified Gulf Waters in order to produce goods for resale;

1.2.2.    are service businesses with one or more full-time employees (including owner-operators) who performed their full-time services while physically present in the Gulf Coast Areas or Specified Gulf Waters at any time from April 20, 2010 to April 16, 2012; or

1.2.3.    owned, operated, or leased a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to

---

[2] See Seafood Distribution Chain Definitions, Exhibit 3.  Exhibit 3 contains definitions for a wide variety of participants in the Seafood industry, including Seafood Crew, Commercial Fisherman, Oyster Leaseholders, and Seafood Vessel Owner.

April 16, 2012; or

1.2.4.      owned or leased **REAL PROPERTY** in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012;

1.3.      Individuals and Entities who meet the geographical descriptions of Sections 1.1 or 1.2 above are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories described below.

1.3.1.      The following are summaries of the Damage Categories, which are fully described in the attached Exhibits 1A-15:

1.3.1.1.      **SEAFOOD COMPENSATION PROGRAM.** Damages suffered by a **COMMERCIAL FISHERMAN,** Seafood Crew, or **SEAFOOD VESSEL OWNER** that owned, operated, leased or worked on a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; and damages suffered by, *inter alia,* **OYSTER LEASEHOLDERS** and IFQ Owners. (Exhibit 10). Claims for Economic Damage arising from the fishing, processing, selling, catching, or harvesting of menhaden (or "pogy") fish are excluded from the Seafood Compensation Program and other Economic Damage Claims under this Agreement.

1.3.1.2.      Economic Damage Category. Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the **DEEPWATER HORIZON INCIDENT**, subject to certain Exclusions. (Exhibits 16-19)

1.3.1.3.      Subsistence Damage Category. Damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, including Seafood and **GAME**, in a traditional or customary manner, to sustain their basic or family dietary, economic security, shelter, tool or clothing needs, and who relied upon Subsistence resources that were diminished or restricted in the geographic region used

by the **CLAIMANT** due to or resulting from the Deepwater Horizon Incident**.**  (Exhibit 9)

1.3.1.4.   VoO Charter Payment Category.  Damages suffered by Natural Persons or Entities who registered to participate in BP's Vessels of Opportunity ("VoO") program and executed a **VoO MASTER VESSEL CHARTER AGREEMENT** with BP, Lawson, USMS, USES, DRC, or any other BP subcontractor as **CHARTERER**, and completed the initial VoO training program.

1.3.1.5.   Vessel Physical Damage Category.  Physical damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program. (Exhibit 14)

1.3.1.6.   Coastal Real Property Damage Category.  Damages alleged by a Coastal Real Property Claimant that meet the requirements set forth in the Coastal Real Property Claim Framework.

1.3.1.7.   Wetlands Real Property Damage Category.  Damages alleged by a Wetlands Real Property Damage Claimant that meet the requirements set forth in the Wetlands Real Property Claim Framework.

1.3.1.8.   Real Property Sales Damage Category.  Damages alleged by a Real Property Sales Claimant that meet the requirements set forth in the Real Property Sales Framework.

1.3.1.9.   Individuals/Employees in Otherwise Excluded Oil and Gas, Gaming, Banking, Insurance, Funds, Defense Contractors, Developers Industries, and any Entity selling or marketing BP-branded fuel (including jobbers and branded dealers):  As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses and employers in these otherwise excluded industries described in Section 2 may submit

Claims for Economic Damage outside of these excluded industries, and may pursue all other recovery permitted under other aspects of the Settlement.

1.3.1.10. Individuals/Employees in Support Services to Oil and Gas Industry: As more fully described in Exhibit 16 and Section 5.10 below, individuals and employees of businesses/employers in the **SUPPORT SERVICES TO OIL AND GAS INDUSTRY**, described in Exhibit 16 may submit Claims for Economic Damage incurred as a result of their employment in the Support Services to Oil and Gas Industry for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non oil and gas industry Economic Damages due to or resulting from the Deepwater Horizon Incident, except for moratoria claims. As is also more fully described in Exhibit 16, these individuals and employees may also pursue Claims for other Economic Damage outside the Support Service to Oil and Gas Industry, and may pursue all other recovery permitted under other aspects of the Settlement.

1.3.1.11. Businesses/Employers in Otherwise Excluded Gaming, Banking, Insurance, Funds, Defense Contractors and Developers Industries: As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in these otherwise excluded industries described in Section 2 may submit Claims only for Coastal Real Property Damage and Wetlands Real Property Damage, but are not entitled to recover under any other aspect of the Settlement.

1.3.1.12. Businesses/Employers in Support Services to Oil and Gas Industry: As more fully described in Exhibit 16 and Section 5.10 below, businesses and employers in the "Support Services to Oil and Gas Industry," described in Exhibit 16, may submit Claims for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non-oil and gas industry Economic Damages arising out of, due to, resulting

7

from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, except for moratoria claims, and may pursue all other recovery permitted under other aspects of the Settlement.

2. **EXCLUSIONS FROM THE ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS DEFINITION.**

2.1.     Notwithstanding the above, the following individuals and Entities, including any and all of their past and present predecessors, successors, personal representatives, agents, trustees, insurers, reinsurers, indemnitors, subrogees, assigns, and any other Natural Person, legal or juridical person or Entity entitled to assert any Claim on behalf of or in respect of any such individual or Entity in their respective capacities as such are excluded from the Economic Class.

2.2.     Excluded Individuals or Entities:

2.2.1.     Any Economic Class Member who or which timely elects to be excluded from the Economic Class under the deadlines and procedures to be set forth in the **ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS ACTION SETTLEMENT NOTICE**.

2.2.2.     Defendants in **MDL 2179**, and individuals who are current employees, or who were employees during the **CLASS PERIOD**, of BP or other defendants in MDL 2179.

2.2.3.     The Court, including any sitting judges on the United States District Court for the Eastern District of Louisiana, their law clerks serving during the pendency of the MDL, and members of any such judge's or current law clerk's immediate family.

2.2.4.     The following exclusions are based on the substantive nature of the business, not the legal or juridical form of that business. Any of the following types of Entity, or any Natural Person to the extent he or she alleges Economic Damage based on their employment by such an Entity,

8

during the Class Period are excluded:

2.2.4.1.    Financial Institutions as identified in the NAICS codes listed on Exhibit
18, which include, by way of example, commercial banks; savings
institutions; credit card issuers; credit insurers; factors or other sales
finance entities; financial or investment advisers or portfolio managers;
fund managers; investment banking entities; lending institutions; real
estate mortgage or lending entities; brokers or dealers of securities,
commodities, commodity contracts or loans; securities or commodities
exchanges; entities serving as custodians, fiduciaries or trustees of
securities or other financial assets; or entities engaged in other financial
transaction intermediation, processing, reserve or clearinghouse activities,
*provided*, that the following shall not be excluded solely pursuant to this
Section 2.2.4.1 unless they are subject to a different exclusion**:**  stand-
alone ATMs, credit unions, pawn shops, businesses engaged
predominantly in making payday loans or paycheck advances and
businesses that sell goods and services and offer financing on these
purchases to their customers.

2.2.4.2.    Funds, Financial Trusts, and Other Financial Vehicles, as identified in the
NAICS codes listed on Exhibit 18, after giving effect to the bracketed
exceptions contained in NAICS Codes  525920 and 523991, which
include by way of example, public-open end investment funds; investment
funds; real estate investment trusts; REMICS; mutual funds; money
market funds; derivatives; health and welfare funds; insurance funds;
pension funds; financial trusts; and special purpose financial vehicles
*provided,* that successions, estates, testamentary trusts, trusts of Natural
Persons, bankruptcy estates, limited liability companies, corporations,
Sub-Chapter "S" corporations, partnerships, limited partnerships, joint
ventures, and any other businesses or juridical Entities, shall not be
excluded pursuant to this Section 2.2.4.2 solely by reason of their form of
legal or juridical structure or organization, except to the extent they are

excluded pursuant to another exclusion in Section 2.2 of this Agreement.

2.2.4.3. Gaming, as identified in the NAICS codes listed on Exhibit 18, which includes, by way of example, casinos; casino hotels; off-track betting parlors; racetracks and other gambling establishments *provided*, that the following shall not be excluded solely pursuant to this Section 2.2.4.3 unless they are subject to a different exclusion: (a) bingo parlors, and (b) video gaming at bars, bingo parlors, hotels, off-track betting parlors, racetracks, restaurants and truck stops.

2.2.4.4. Insurance Entities, as identified in the NAICS codes listed on Exhibit 18, which include, by way of example, insurance carriers issuing disability, health, life, medical, property and casualty, title or other insurance; reinsurers; insurance agencies and brokerages; underwriting agencies or organizations; claims adjusters and processors; third-party insurance or fund administrators; or other insurance-related businesses.

2.2.4.5. Oil and Gas Industry, as identified in the NAICS codes listed on Exhibit 17, which includes by way of example, firms engaged in: extracting crude petroleum, natural gas or other hydrocarbons; drilling wells; preparing, maintaining or constructing petroleum or natural gas well-sites or other mineral extraction sites; mining; maintaining or constructing petroleum or natural gas pipeline or distribution facilities; pipeline distribution of crude petroleum, refined petroleum, oil or natural gas; petroleum or natural gas refining or other mineral refining and/or manufacturing; manufacturing petroleum lubricating oil and grease, petrochemical products, or other petroleum and coal products or chemical products derived from extracted minerals; merchant wholesaling of construction and mining (except oil well) machinery and equipment; wholesale distribution of oil well machinery, equipment and supplies; wholesale distribution of petroleum, petroleum products, other extracted minerals, chemical products produced from extracted or refined minerals, petroleum bulk stations and terminals,

petroleum and petroleum products merchant wholesalers.

2.2.4.6.   Defense Contractors/Subcontractors, including firms which derive in excess of at least 50% of their annual revenue from contracts with the United States Department of Defense and Individuals whose employer qualifies as a Defense Contractor.

2.2.4.7.   Real Estate Developers, including any Natural Person or Entity that develops commercial, residential or industrial properties.  This includes, but is not limited to, any Entity developing an entire subdivision (as defined by the law of the state in which the parcel is located) of Real Property, including condominiums with multiple residential units and/or a residential subdivision with contiguous home sites and homes, *provided,* however, that Real Estate Developers shall be eligible to assert Coastal Real Property Claims under Section 5.7 and Real Property Sales Damage Claims under Section 5.9.

2.2.4.8.   Any Entity selling or marketing BP-branded fuel, including jobbers and branded dealers.

2.2.5.   **GOVERNMENTAL ORGANIZATIONS**, as defined in this Agreement, provided that Native American tribal Entities may consent to participate in the Settlement as to otherwise eligible Claims.

2.2.6.   Any Natural Person or Entity who or that made a claim to the **GCCF**, was paid and executed a **GCCF RELEASE AND COVENANT NOT TO SUE**, *provided,* however, that the execution of a GCCF Release and Covenant Not to Sue shall not prevent a Natural Person or Entity from making a VoO Charter Payment Claim or a Vessel Damage Claim, nor shall a release covering only bodily injury prevent a Natural Person from making Claims under this Agreement.

11

3. **EXPRESSLY RESERVED CLAIMS.**

The following Claims are not recognized or released under the Agreement, and are reserved to the Economic Class Members:

3.1. **BODILY INJURY CLAIMS**, which are excluded from the Economic Class, but certain of which may be asserted in the Medical Benefits Class Action Settlement referenced herein.

3.2. Claims of BP shareholders in any derivative or direct action solely in their capacity as a BP shareholder.

3.3. Claims of Natural Persons and Entities for **MORATORIA LOSSES.**

3.4. Claims relating to menhaden (or "pogy") fishing, processing, selling, catching, or harvesting.

3.5. Claims for Economic Damage suffered by Entities or employees (to the extent they allege Economic Damage based on their employment by such Entity during the Class Period) in the Banking, Gaming, Financial, Insurance, Oil and Gas, Real Estate Development, Defense Contractor Industries, and Entities selling or marketing BP-branded fuel (including jobbers and branded dealers) as defined in Section 2.2.

3.6. Claims of the Economic Class, Plaintiffs, and Economic Class Members for punitive damages against **HALLIBURTON** and **TRANSOCEAN** are reserved.

3.7. The Economic Class, Plaintiffs and Economic Class Members, but only through the Economic Class, specifically reserve its and their rights to assert the Assigned Claims against Transocean and Halliburton subject to Exhibit 21.

4. **IMPLEMENTATION OF THE SETTLEMENT.**

4.1. Establishment of **DEEPWATER HORIZON COURT SUPERVISED SETTLEMENT PROGRAM**. The Parties shall jointly make arrangements to establish the Deepwater Horizon Court Supervised Settlement Program

("**SETTLEMENT PROGRAM**") prior to the Court entering the Preliminary Approval Order.

4.2.    Transition Claims Process.

    4.2.1.    In its First Amended Order Creating Transition Process, entered by the Court on March 8, 2012 (Doc. 5995), and clarified in its March 14, 2012 Order (Doc. 6049), the Court appointed Patrick Juneau as the **CLAIMS ADMINISTRATOR** (subject to commercial terms) of the **TRANSITION PROCESS** and the proposed Settlement Program, and Lynn Greer as **TRANSITION COORDINATOR** of the Transition Process.  The processes set forth in this Section 4.2 are based on the transition orders already entered by the Court and will be subject to any further such orders which the Court may enter with regard to the Transition Process.

    4.2.2.    In supervising the transition, the Court, in its March 8, 2012 First Amended Order Creating Transition Process, has directed the Claims Administrator and Transition Coordinator to cause the Transition Process to be implemented in an orderly, transparent and timely manner.  The Court has directed the Transition Coordinator to evaluate claims currently pending with the GCCF and evaluate any new claims submitted before the Settlement Program agreed to by the Parties is opened, and, where appropriate under the existing GCCF rules, methodologies, and protocols, to pay the amounts set forth in the Court's March 8, 2012 First Amended Order Creating Transition Process.   The Court has directed that the evaluation and processing of claims during the Transition Process shall be performed by Garden City Group, Inc., BrownGreer PLC, PricewaterhouseCoopers LLP and other service providers as identified by the Claims Administrator and the Transition Coordinator.  The Court has further directed the Claims Administrator to periodically and upon request report to the Court, BP, and Interim Class Counsel regarding all matters relating to the operation of the Transition Process.

4.2.3.     As set forth in the Court's First Amended Order Creating Transition Process, for all Transition Claims where the claimant has not been paid and has not executed a **GCCF RELEASE AND COVENANT NOT TO SUE** that was received by the GCCF as of 11:59 p.m., EST, on February 26, 2012, the following applies:

4.2.3.1.     If a non-expired GCCF offer was pending as of March 8, 2012, and if the claimant elects to accept the offer, then the Transition Process will pay 60% of the offer on an interim basis without requiring a release.  If the claimant receiving the 60% payment is an Economic Class Member, the claimant has a right to additionally recover from the Settlement Program the greater of:  (a) the remaining 40% of the GCCF offer, or (b) the Economic Class Settlement Payment minus any amount previously paid by the Transition Process, in either case in exchange for an Individual Release in the form attached hereto as Exhibit 26, which shall contain terms substantially similar to the Release described in Section 10.  However, if the claimant receiving the 60% payment is not an Economic Class Member or **OPTS OUT** of the Economic Class without participating in the Settlement Class **CLAIMS PROCESSES** (*i.e.*, prior to submitting an Economic Class **CLAIM FORM**) then the claimant may (a) request to be paid the remaining 40% of the GCCF offer subject to executing a release, or (b) elect to pursue any and all claims and rights available under applicable law.

4.2.3.2.     If a **PENDING UNRESOLVED GCCF CLAIM** is in process, the Transition Process will continue processing that claim.  If the Transition Process extends an offer by the BP Parties before the Settlement Program is processing Claims, the Transition Process will pay 60% of the offer without requiring a release.  If the claimant receiving the 60% payment is an Economic Class Member, the claimant has a right to additionally recover from the Settlement Program the greater of:  (a) the remaining 40% of the GCCF offer, or (b) the Class Settlement Payment minus any

14

amount previously paid by the Transition Process, in either case in exchange for an Individual Release. However, if no GCCF offer has been extended by the Transition Process to the Economic Class Member by the time the Settlement Program starts processing Claims, then, if the claimant completes a Claim Form the Claim shall be processed under the terms of the Class Settlement by the Settlement Program. However, if the claimant receiving the 60% payment is not an Economic Class Member or Opts Out of the Economic Class without participating in the Settlement Class Claims Processes (i.e., prior to submitting an Economic Class Claim Form) then the claimant may (a) request to be paid the remaining 40% of the GCCF offer subject to executing a release, or (b) elect to pursue any and all claims and rights available under applicable law.

4.2.4.    For claims eligible for the GCCF quick pay program, the Court has directed that: A. The Transition Coordinator shall issue a letter to all claimants eligible to participate in the GCCF quick pay program who have not previously executed a GCCF Release and Covenant Not to Sue notifying them that the quick pay program shall terminate on May 7, 2012. The letter shall further advise of the option to either submit a claim under the applicable Transition Claims Process set forth above, or accept the quick pay in exchange for a release. The letter shall be clear that the claimant has the right to choose the greater offer if a payment under the Transition Process is offered before May 7, 2012; and B. All claimants eligible to elect a quick pay must do so on or before May 7, 2012.

4.2.5.    Economic Class Members with expired offers from the GCCF are not eligible for transition payments, but can file a Claim in the Settlement Program. Economic Class Members with expired offers from the GCCF who Opt Out of the Economic Class shall be deemed to have satisfied the presentment requirements under the Oil Pollution Act of 1990 ("**OPA**").

4.2.6.    The Transition Coordinator shall process and issue interim payments

pursuant to the current GCCF rules as amended by the Court's March 8, 2012 Order until the date on which the Settlement Program commences processing Claims.  Economic Class Member recipients of interim payments during this period shall also have the right to submit a Claim to the Settlement Program.  Any Claimant who is an Economic Class Member and who has a Transition Claim for interim payment that is in process at the time the Settlement Program is processing Claims shall have the right to submit a Claim to the Settlement Program, but shall not receive any interim payment from the Transition Process.  Any interim payments made by the Transition Process to a Claimant shall reduce the amount of that Claimant's Settlement Payment from the Settlement Program.  When the Settlement Program begins processing Claims, there will be no right to request or receive interim payments from the Transition Process or the Settlement Program.

4.2.7.   Transition payments made by the Transition Process during the Transition Process and transition payments made by the Settlement Program to Economic Class Members that are Commercial Fishermen, Seafood Crew, **SEAFOOD BOAT CAPTAINS, SEAFOOD DECKHANDS**, Oyster Leaseholders, and **SEAFOOD VESSEL OWNERS** shall reduce, dollar for dollar, the $2.3 billion amount for the Seafood Compensation Program.

4.2.8.   Transition Claims paid in connection with the Transition Process shall be paid from the **DEEPWATER HORIZON OIL SPILL TRUST**.  BP is hereby authorized to take any necessary actions with regard to the Deepwater Horizon Oil Spill Trust to permit the payment of claims in connection with the Transition Process.

4.2.9.   In its March 14, 2012 Order clarifying the Court's First Amended Order of March 8, 2012, the Court clarified that nothing in that Order shall prevent any defendant from settling a "Bundle A" personal injury and/or wrongful death case.

4.3.    Claims Administrator.

16

4.3.1.   The Claims Administrator shall be selected and appointed by the Court, and shall be responsible to the Court, serve as directed by the Court, and faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court.

4.3.2.   The Claims Administrator shall head the Settlement Program, oversee and supervise the **CLAIMS ADMINISTRATION VENDORS** (including any subcontractors) and staff in the processing and payment of Claims, report and provide information to the Court, BP, and/or **LEAD CLASS COUNSEL** (or their designee) as may be requested on an ongoing basis and/or as the Court directs, and participate on the Claims Administration Panel. The Court shall retain ongoing and exclusive jurisdiction over the Settlement Program until the consideration and determination of all Claims is complete and the Settlement Program is terminated by the Court.

4.3.3.   Should the Court determine at any time that the Claims Administrator needs to be replaced, Lead Class Counsel or their designee and BP will agree to make a joint recommendation of one or more candidates for appointment by the Court, as Claims Administrator. They shall continue the process of joint recommendation as necessary until Court approval is obtained.

4.3.4.   A three-person Claims Administration Panel shall be established consisting of the Claims Administrator, one representative designated by Lead Class Counsel and one representative designated by BP. Upon the request of any member of the Claims Administration Panel, it shall address and attempt to resolve unanimously any issues or disagreements that arise regarding the Claims Administrator's oversight responsibilities, Settlement administration, or any other issue involving the Settlement Program. Issues or disagreements that cannot be unanimously resolved by the Claims Administration Panel will be referred to the Court for resolution.

4.3.5.   The initial Claims Administration Vendors agreed to by the Parties (including Garden City Group, BrownGreer, PWC, and Postlewaite) have been appointed by the Court and are subject to the supervision and direction of the Claims Administrator.  Subsequently, if the Claims Administrator ever wishes to replace (in part or in whole) any such Claims Administration Vendor (or subcontractor thereof) he shall seek unanimous agreement of the Claims Administration Panel.  If unanimous agreement is not forthcoming, the Court shall resolve the issue.

4.3.6.   Claims Administration Vendors.

4.3.6.1.   As to any Claims Administration Vendors proposed by the Claims Administrator and not identified in Section 4.3.5 and the **CLAIMS ADMINISTRATION STAFF**, BP and Lead Class Counsel (or their designee) shall meet and confer and attempt to approve such Claims Administration Vendors and the Claims Administrator's senior staff proposed by the Claims Administrator.  If BP and Lead Class Counsel cannot agree, the Claims Administrator will present such candidates to the Court for proposed appointment and retention.

4.3.7.   The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall work with Economic Class Members (including individual Economic Class Members' counsel and Class Counsel) to facilitate Economic Class Members' assembly and submission of Claims Forms, including all supporting documentation necessary to process Claim Forms under the applicable Claims Processes.  The Settlement Program, including the Claims Administrator and Claims Administration Vendors, shall use its best efforts to provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of the Agreement.

18

4.3.8.     The Claims Administration Vendors shall evaluate and process the information in the completed Claim Form and all supporting documentation under the terms in the Economic Damage Claim Process to produce the greatest **ECONOMIC DAMAGE COMPENSATION AMOUNT** that such information and supporting documentation allows under the terms of the **ECONOMIC DAMAGE CLAIM FRAMEWORK**. By way of example, but not to be exclusive, if the Claimant selected a **COMPENSATION PERIOD** or **BENCHMARK PERIOD** based on information in a completed Claim Form and all supporting documentation submitted by the Claimant, but a different Compensation Period or Benchmark Period from the information in the submitted Claim Form and/or the supporting documentation results in a greater Economic Damage Compensation Amount under the terms of the Economic Damage Claim Framework, that latter, different Compensation Period and/or Benchmark Period shall be applied.

4.3.9.     Subject to Section 4.3.5 above, the Claims Administrator may hire staff with the approval of BP and Lead Class Counsel, which consent shall not be unreasonably withheld.

4.3.10.    The Settlement Program, under the supervision and direction of the Claims Administrator,  shall implement the terms of the Agreement.  The Claims Administrator may engage in supervision and oversight activities designed to ensure the implementation and integrity of the overall Settlement Program.

4.3.11.    Subject to certain indemnities that the BP Parties will provide to the Claims Administrator and the Claims Administration Vendors in connection with their respective contracts to undertake the Claims administration set forth in this Agreement, neither the Parties (including their Affiliates, and their and their Affiliates' respective heirs, beneficiaries, agents, estates, executors, administrators, personal representatives, subsidiaries, parents, partners,

19

limited partners, members, joint venturers, shareholders, predecessors, successors, assigns, insurers, trustees, servants, past, present or future officers, directors, agents, employees and/or independent contractors, and/or any other successors, assigns, or legal representatives thereof), nor any of the Parties' Counsel, nor the Plaintiffs' Steering Committee, Co-Liaison Counsel, or any Class Counsel or Interim Class Counsel (including their respective heirs, beneficiaries, agents, estates, executors, administrators, personal representatives, subsidiaries, parents, partners, limited partners, members, joint venturers, shareholders, predecessors, successors, assigns, insurers, trustees, servants, past, present or future officers, directors, agents, employees and/or independent contractors, and/or any other successors, assigns, or legal representatives thereof), shall be liable for any act, or failure to act, of the Claims Administrator and/or the Claims Administration Vendors.

4.3.12.    Administration Costs.  As set forth in Section 5.12.1, the BP Parties will be responsible for paying any and all of the reasonable compensation and out-of-pocket costs and expenses of the Settlement Program.

4.4.    Process for Making Claims.

4.4.1.    The Parties shall jointly request that the Court issue an order directing that all claims-related information files and data previously submitted to the GCCF and/or that has been submitted to the Transition Process shall be transferred to the Settlement Program.  This order shall include a provision that: (a) authorizes the Settlement Program to maintain such claims-related information and data for the duration of the Claims administration process; and (b) authorizes the Claims Administrator to release copies of such information or data to any claimant that submitted that information or data upon the written request of the claimant or the claimant's authorized representative. All such information and data shall be treated by the Settlement Program and the Parties and counsel as "confidential" under Pre-

Trial Order No. 13. The Claims Administrator shall issue a status report to the Court documenting the transfer of claims and claims-related information, files and data and thereafter issue a final report to the Court after the transfer of the Transition Claims, claims-related information, files and data is complete.

4.4.2.  The Settlement Program shall as soon as practicable, but on a schedule to be established by the Claims Administrator, issue a notice to all claimants who (a) received and/or accepted a 60% offer pursuant to Paragraph 12 of the Transition Order; or (b) whose claim is still being processed at the time that the Transition Process terminates pursuant to Paragraph 20 of the Transition Order (collectively, "Pending Transition Claimants"). This notice shall advise the claimant of the right to participate in the Settlement Program if the claimant is an Economic Class Member. The Settlement Program shall as soon as practicable after the Claim frameworks are finalized, but on a schedule to be established by the Claims Administrator, review the claims-related information and data submitted to the GCCF and/or Transition Process for each Pending Transition Claimant to determine what, if any, additional information may be necessary or desirable for such claimants to pursue that claim under this Agreement. The Settlement Program shall then notify each such Pending Transition Claimant of what, if any, additional information may be necessary or desirable to pursue such claim(s) under the terms of the Settlement Agreement.

4.4.3.  In the event that during the course of evaluating a Claim filed pursuant to Section 4.4.2, the Settlement Program determines that additional information is required or may be desirable to properly evaluate a Claim pursuant to this Settlement Agreement, nothing in Section 4.4.2 precludes the Settlement Program from requesting such additional information.

4.4.4.  The deadline for submitting Claim Forms shall be April 22, 2014 or six (6) months after the Effective Date, whichever occurs later, other than Claims

21

under the Seafood Compensation Program, as set forth in Sections 5.11.8 and 5.11.9.

4.4.5.     Economic Class Members must submit Claim Forms to participate in the Settlement Program.  Each Claim Form must be signed under penalty of perjury and individually signed by the Natural Person or Entity who or which suffered damages.  Regardless of whether Claim Forms are submitted individually or in a group, each Claim Form must independently satisfy the relevant requirements.

4.4.6.     The Parties shall request the Court to enter a standing order expressly providing that the signature on a Claim Form or **SWORN WRITTEN STATEMENT** supporting a Claim can be electronic so long as the electronic signature is an individual, unique signature, and that such electronic signature shall have the same legal effect for all purposes in connection with the Settlement as, and be deemed the equivalent of, a handwritten signature.  The Claims Administrator shall adopt appropriate Claim procedures agreed to by the Parties, which may include acceptance of electronically-filed documents, use of electronic signatures and/or Adobe EchoSign, electronic funds transfer capabilities, and payment directly to counsel for those Claimants who are represented by counsel and provide appropriate authorization.

4.4.7.     The Settlement Program and its Claims procedures shall be subject to the ongoing supervision of the Court.  The criteria, documentation, proof, and **COMPENSATION AMOUNT** provisions of each of the Claims categories shall apply equally to all Claimants regardless whether they are proceeding individually, represented by others, or proceeding as an assignee of an individual Claim.  The Claims Administrator shall explore and consider the utilization of streamlined procedures to improve the efficiency of the Claims process, without changing Claims criteria.

4.4.7.1.     With respect to Claims by any Entity, or by a Natural Person related to his

or her employment by an Entity, the Settlement Program shall determine the appropriate NAICS code for the Entity based on its review of (a) the NAICS code shown on an Entity Claimant's 2010 tax return, (b) 2010 business permits or license(s), and/or (c) other evidence of the Entity's activities necessary for the Settlement Program to determine the appropriate NAICS code.

4.4.8.    Subject to the limitations in Section 5.11.9, Claimants shall have six (6) months from the date of initial payment by the Settlement Program of the Claimant's first paid Claim to file all additional Claims, provided that (1) upon payment of the first paid Claim and execution of an Individual Release, the Economic Class Member may not Opt Out of the Economic Class; (2) the Individual Release executed upon payment of the first paid Claim shall release all Claims within the Economic Class, subject only to allowing submission of subsequent timely-filed Claims within the Economic Class and reservation of all rights within the **APPEAL PROCESS**, or rights reserved within the Release and (3) nothing in this Section 4.4.8 serves to extend the otherwise-applicable deadline for submitting all Claim Forms.

4.4.9.    An Economic Class Member who had a claim with the GCCF that was rejected or denied by the GCCF for any reason shall be treated like any other Economic Class Member submitting a Claim to the Settlement Program.  Specifically, there shall be no negative inference or presumption of any kind as to the eligibility or right of any Economic Class Member to receive a Settlement Payment under the terms of the Settlement Agreement.

4.4.10.    Individual Releases.

4.4.10.1.    If an Economic Class Member submits one or more Claim Forms and qualifies for a Settlement Payment under the terms of the Agreement (as modified or amended) as described in Section 5 below, then, prior to, and as a precondition to, receiving any Settlement Payment on a Claim, the Economic Class Member shall execute an Individual Release.

23

4.4.10.2.  The Individual Release, which is set forth in Exhibit 26, shall provide that the Individual Release constitutes the final, complete, and exclusive agreement and understanding between BP and Claimant and supersedes any and all other agreements, written or oral, between BP and Claimant with respect to such subject matter of the Individual Release in settlement of Claims arising out of or related to the Deepwater Horizon Incident.  The Individual Release shall incorporate the protections from Exhibit 21.  The Individual Release shall remain effective regardless of any appeals or court decisions relating in any way to the liability of the Released Parties and regardless of whether the Effective Date occurs.

4.4.10.3.  Subject to Economic Class Members' rights under Section 4.4.8, and in accordance with the terms of the Individual Release, Economic Class Members who receive Settlement Payments shall acknowledge that the Settlement Payments are in full, complete, and total satisfaction of all of the Released Claims against the Released Parties, that the Settlement Payments are sufficient and adequate consideration for each and every term of the Individual Releases, and that those Individual Releases shall be binding whether or not the Claimant receives any benefits in addition to the Settlement Payments, including benefits resulting from the Assigned Claims.  In addition, Economic Class Members will agree that the Settlement Payments are made in full, complete, and total satisfaction of all of their compensatory damage claims against the **TRANSOCEAN PARTIES** and the **HALLIBURTON PARTIES**, as defined in Exhibit 21.

4.4.10.4.  An Individual Release may not be signed by any form of electronic signature, but must be signed by a handwritten signature.  An electronic signature is insufficient.

4.4.11.  The Individual Release shall provide that any and all disputes, cases, or controversies concerning the Individual Release, including disputes

concerning the interpretation or enforceability of the Individual Release, shall be filed in the United States District Court for the Eastern District of Louisiana accompanied by a legal request for such dispute to be made part of MDL 2179 (if it is still pending). No actions to enforce the Individual Release shall be filed in state courts, provided, that nothing herein shall preclude the assertion in a state court action of a defense based on the existence of the Individual Release. Claimants and the Released Parties agree not to contest the existence of federal jurisdiction in MDL 2179 (if it still exists).

4.4.12. The Individual Release shall provide that payments made to Class Members are made without any admission of liability or wrongdoing by BP or any other Released Party and are made purely by way of compromise and settlement.

4.4.13. Claimant Accounting Support. The BP Parties will reimburse reasonable and necessary accounting fees related to Claims preparation, either directly to the Claimant, or counsel if individually represented (and/or his or her or its accountant) and/or through services made available by and through Class Counsel. Accounting support reimbursement paid to a Claimant in the Seafood Compensation Program shall be paid out of the **SEAFOOD COMPENSATION FUND**. The terms conditions, guidelines and restrictions of this accounting services program are as follows:

4.4.13.1. Subject to the terms of Section 4.4.13, all Claimants who receive Settlement Payments for Economic Damage Compensation Amounts are eligible for reimbursement of accounting services.

4.4.13.2. All reimbursable accounting fees under this Section, whether paid directly to the Claimant or counsel if individually represented (and/or his or her or its accountant) and/or through services made available by and through Class Counsel must adhere to this reimbursement framework.

4.4.13.3.   Only services provided by a Certified Public Accountant, an enrolled agent or an individual with an IRS Preparer Tax Identification Number (PTIN), or under their direct supervision, are eligible for reimbursement. While registration and licensing requirements vary by state, any retained professional must have all required state professional licenses and be active and held in good standing by those state regulatory bodies.

4.4.13.4.   Retained professionals must verify that to the best of their knowledge they have submitted information provided to them by the claimant on a consistent basis and have not ignored the implications of information known or reasonably suspected to be untrue, incomplete, inconsistent or inaccurate.

4.4.13.5.   Reimbursement will be limited to the accounting services necessary to complete the claim form or prepare documentation.

4.4.13.6.   All reasonable and necessary hours will be reimbursed up to the following standard hourly rates.  Review and supervision hours may not exceed 25% of total time spent.

|  | Individual Claim | Business Claim |
| --- | --- | --- |
| Preparation | $85 | $110 |
| Supervision & Review | $130 | $160 |

4.4.13.7.   **INDIVIDUAL CLAIMANTS** shall be reimbursed for accounting fees based on actual fees incurred. The total fee may not exceed 2% of the total Economic Damage Compensation Amount (excluding **RTP**) for individual Claims over $10,000 with all other Claims limited to $200.  All Claims (regardless of final Claim amount) will be subject to an overall accounting support reimbursement  limit of $6,000.

26

4.4.13.8.  **BUSINESS CLAIMANTS** shall be reimbursed for accounting fees based on actual fees incurred.  The total fee may not exceed 2% of the total Economic Damage Compensation Amount (excluding RTP) for business Claims over $50,000 with all other Claims limited to $1000.  All Claims (regardless of final Claim amount) will be subject to an overall accounting support reimbursement limit of $50,000.

4.4.13.9.  Reimbursement requests must be itemized by date and person, and will specify the work being performed on behalf of the Claimant.

4.4.13.10.  The Settlement Program shall have the right to request and review any work papers (whether historical or specific to the Claim), time sheets or other supporting documentation related to the Claim or request for accounting support reimbursement and the reasonableness of the fees pursuant to Section 4.4.13.5.

4.4.13.11.  Accounting support reimbursement will not be included in the base compensation, including for purposes of applying any RTP, but shall be paid over and above any compensation due under the Agreement.

4.4.14.  The Claimant may request and receive reasonable access to his, her, or its Settlement Program and/or Transition Process Claim File and supporting information, but only after issuance of a Final Determination of the Claim in part or in whole.  Access by a Claimant to his, her, or its GCCF Claim File may be granted at the discretion of the Settlement Program Administrator. Claimants shall be provided reasonable access to all materials submitted by or on behalf of such Claimant to the GCCF, Transition Process, and/or Settlement Program.  BP and Class Counsel shall have access to all Claim Files and Claims-related data transferred to or generated in the Settlement Program for any legitimate purpose including, without limitation, the operation of BP's separate OPA facility, prosecuting and defending appeals, reviewing and auditing the Settlement Program, reporting financial results, and pursuing indemnification, contribution, subrogation, insurance and other

27

claims from third parties. However, BP and Class Counsel shall not have access to any Claim Files for Claims that are being processed and have not yet been resolved in the Settlement Program except if the Claim File is needed by BP, a Claimant, or their counsel to prosecute or defend an Appeal.

4.4.15. Supplemental Information Program. The Settlement will also include a Supplemental Information Program, subject to approval by the Court. The BP Parties will bear the expenses of the Supplemental Information Program, in the amount of $5 million, which it will fund within 10 days of the Preliminary Approval Order, provided the Supplemental Information Program: (i) is consistent with the goals of the Economic Class Action Settlement Notice Program; (ii) is approved by the Court; and (iii) its content is submitted in advance for review and comment by BP. If any amount of the $5 million remains unspent, that amount will revert to the Promotional Fund.

4.4.16. The Settlement Program and its Claims procedures shall terminate upon issuance of an order of the Court determining that the last Claim eligible for payment has been paid and the last appeal pursuant to the Appeal Process has been completed and that the Settlement Program is closed.

5. **SETTLEMENT BENEFITS.**

5.1. Plaintiffs, by and through the Interim Class Counsel, and the BP Parties agree that, in consideration for the Release described in Section 10 below, and the Individual Releases described in Section 4.4.10, and subject to the terms of this Agreement, including all Exhibits hereto, the BP Parties will make Settlement Payments to Economic Class Members or, in the event that an Economic Class Member is represented by counsel, then payment will be made jointly to the Economic Class Member and his or her counsel, unless otherwise instructed by the Economic Class Member and his or her counsel. (In this Section 5 and the Economic Damage Claim Frameworks references to payments received by the

Claimant from the BP Parties or the GCCF pursuant to OPA's claims process shall include, but not be limited to, payments received by a Claimant from the Transition Process).

5.2.    SEAFOOD COMPENSATION PROGRAM.

5.2.1.    The Seafood Compensation Program shall cover and compensate the Economic Damage Claims not otherwise excluded for Commercial Fishermen, Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners, as defined in Exhibit 3, for individual or business Economic Damage Claims arising out of their commercial fishing related activities. The Seafood Compensation Program shall be funded with the **SEAFOOD COMPENSATION PROGRAM AMOUNT** and operated under a process approved by the Court-appointed Neutral, John W. Perry, Jr. and implemented by the Settlement Program.

5.2.2.    Within the Seafood Compensation Program, no previous compensation paid to the Claimant by the BP Parties or another Charterer in connection with the VoO Program shall be considered, and neither the VoO Settlement Payment Offset nor the VoO Earned Income Offset shall apply.

5.2.3.    The terms of the Seafood Compensation Program are set forth in Exhibit 10 to this Agreement.

5.3.    ECONOMIC DAMAGE COMPENSATION.

5.3.1.    The **ECONOMIC DAMAGE CLAIM PROCESS**, **ECONOMIC DAMAGE CLAIM FRAMEWORKS**, and other details for determining the **ECONOMIC DAMAGE COMPENSATION AMOUNTS** are set forth in the Exhibits to the Agreement, which are incorporated herein by reference.  All exhibits to this Agreement shall be read together with this Agreement.

5.3.2.    BUSINESS ECONOMIC LOSS.

5.3.2.1.   Overview.  The frameworks setting forth the documentation requirements governing **BUSINESS ECONOMIC LOSS CLAIMS**, and the standards for evaluating such Claims and determining compensation for such Claims, are set forth in Exhibits 4A-7 to the Agreement.  To account for specific circumstances of particular types of business Claims, the frameworks include separate specialized frameworks addressing Business Economic Loss Claims by **MULTI-FACILITY BUSINESSES** (Exhibit 5)**, FAILED BUSINESSES** (Exhibit 6), and **START-UP BUSINESSES** (Exhibit 7).  Sections 5.3.2, 5.3.3, 5.3.4 and 5.3.5 identify the exhibits containing those frameworks, which apply to businesses, or to self-employed individuals filing IRS Form 1040 Schedules C, E, or F for the 2010 calendar year or any part of a fiscal year in 2010, except for (i) those covered under the Seafood Compensation Program, (ii) VoO Claims, or (iii) Subsistence Claims.

5.3.2.2.   Documentation Requirements For Business Economic Loss Claims Generally are set forth in Exhibit 4A.

5.3.2.3.   Causation Requirements For Business Economic Loss Claims Generally. Business Economic Loss Claimants, unless causation is presumed, must establish that their loss was due to or resulting from the Deepwater Horizon Incident.  The causation requirements for such Claims are set forth in Exhibit 4B.

5.3.2.4.   The compensation methodology for Business Economic Loss Claims generally is set forth in Exhibits 4C-4E.

5.3.3.   Multi-Facility Businesses.  The Claim options for Multi-Facility Businesses, are set forth in Exhibit 5.

5.3.4.   Failed Businesses. The framework governing Claims of Failed Businesses is set forth in Exhibit 6.  That framework also applies to **FAILED START-UP BUSINESSES.**

5.3.5.    Start-Up Businesses.  The framework governing  Claims by Start-Up Businesses (other than property development, construction or real estate development businesses) is set forth in Exhibit 7.

5.3.6.    INDIVIDUAL ECONOMIC LOSS.

5.3.6.1.    The framework setting forth the documentation, causation and compensation requirements governing **INDIVIDUAL ECONOMIC LOSS CLAIMS**, and the standards for evaluating such Claims and determining compensation for such Claims, are set forth in Exhibit 8A-8E to the Agreement.  The framework addresses Claims by individuals with varying employment circumstances and amounts of documentation, and includes specialized provisions governing Claims by individuals who changed jobs or careers, individuals who held multiple jobs, **NEW ENTRANTS TO EMPLOYMENT**, **INDIVIDUAL PERIODIC VENDORS** and **FESTIVAL VENDORS**, and Claims including loss of employment benefits.

5.3.6.2.    Applicability.  The framework governing Individual Economic Loss Claims shall apply to Claims by all Natural Persons within the Economic Class Definition for Economic Damage due to or resulting from the Deepwater Horizon Incident, except for:  (i) self-employed individuals filing IRS Form 1040 Schedules C, E, or F for the 2010 calendar year or any part of a fiscal year in 2010, who are covered under the Business Economic Loss methodology; (ii) Seafood Vessel Owners, Commercial Fishermen, Seafood Crew or Oyster Leaseholders, who are covered under the Seafood Compensation Program, (iii) VoO Claims, or (iv) Subsistence Claims.  In addition, Section 5.10 of this Agreement summarizes certain additional limitations on Claims by Natural Persons.

5.4.    SUBSISTENCE DAMAGE COMPENSATION.

5.4.1.    The framework governing Claims by Subsistence Claimants who fish or

31

hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources (including Seafood and Game), in a traditional or customary manner, to sustain his or her basic personal or family dietary, economic security, shelter, tool, or clothing needs and who relied upon Subsistence resources that were diminished or restricted in the geographic region used by the Claimant due to or resulting from the Deepwater Horizon Incident is set forth in Exhibit 9 to the Agreement. The time period of loss of Subsistence use must be consistent with the closure or impairment of geographic areas relied upon by the Claimant between April 20, 2010 and December 31, 2011.

5.5.     VoO CHARTER PAYMENT

5.5.1.     The **VoO CLAIM PROCESS, VoO AGREEMENT**, and other details for determining the **WORKING VoO** and **NON-WORKING VoO COMPENSATION AMOUNTS** are summarized below. VoO Claimants may recover either Working or Non-Working VoO Benefits.

5.5.2.     **WORKING VoO PARTICIPANTS** are entitled to the following payments, based on boat size, representing pay for 26 days' work under the **VoO MASTER VESSEL CHARTER AGREEMENT**:

<u>CHART A</u>

| <u>Boat Size</u> | <u>Amount of Compensation</u> |
|---|---|
| Less than 30 feet | $41,600 |
| 30 feet-45 feet | $49,400 |
| 46 feet-65 feet | $62,400 |
| Greater than 65 feet | $88,400 |

5.5.2.1.     Economic Damage payments to any Working VoO Participants who are

not participants in the Seafood Compensation Program will be reduced by any VoO Settlement Payment Offset and VoO Earned Income Offset. No other claims are subject to this reduction.

5.5.3. **NON-WORKING VoO PARTICIPANTS** are entitled to the following payments without any offset:

CHART B

| Boat Size | Amount of Compensation |
|---|---|
| Less than 30 feet | $4,800 |
| 30 feet-45 feet | $5,700 |
| 46 feet-65 feet | $7,200 |
| Greater than 65 feet | $10,200 |

5.6. VESSEL PHYSICAL DAMAGE COMPENSATION.

5.6.1. The **VESSEL PHYSICAL DAMAGE CLAIM PROCESS, VESSEL PHYSICAL DAMAGE CLAIM FRAMEWORK**, and other details for determining the **VESSEL PHYSICAL DAMAGE COMPENSATION AMOUNT** are set forth in Exhibit 14 to the Agreement.

5.7. COASTAL REAL PROPERTY DAMAGE COMPENSATION

5.7.1. The **COASTAL REAL PROPERTY CLAIM PROCESS, COASTAL REAL PROPERTY CLAIM FRAMEWORK**, and other details for determining the **COASTAL REAL PROPERTY COMPENSATION AMOUNTS** are set forth in Exhibits 11A-11C to the Agreement.

5.8. WETLANDS REAL PROPERTY DAMAGE COMPENSATION

5.8.1. The **WETLANDS REAL PROPERTY CLAIM PROCESS,**

33

WETLANDS REAL PROPERTY CLAIM FRAMEWORK, and other details for determining the WETLANDS REAL PROPERTY DAMAGE COMPENSATION AMOUNTS are set forth in Exhibits 12A-12D to the Agreement.

5.9.     REAL PROPERTY SALES DAMAGE COMPENSATION

5.9.1.   The REAL PROPERTY SALES CLAIM PROCESS, REAL PROPERTY SALES CLAIM FRAMEWORK, and other details for determining the REAL PROPERTY SALES COMPENSATION AMOUNTS are set forth in Exhibits 13A-13B to the Agreement.

5.9.2.   ELIGIBLE REAL PROPERTY SALES CLAIMANTS include Individuals and Entities who sold RESIDENTIAL PARCELS located in the REAL PROPERTY SALES COMPENSATION ZONE identified on the map attached as Exhibit 13B from April 21, 2010 to December 31, 2010. The sales contract must have been (1) executed on or after April 21, 2010, or (2) executed prior to April 21, 2010 but subjected to a price reduction due to the Deepwater Horizon Incident. In addition, sales shall not include transfers from borrowers to lenders that take place as part of the foreclosure process, such as deeds in lieu of foreclosure, foreclosure deeds, or sheriff's deeds.

5.9.3.   Other than as set forth in Section 5.7, Section 5.8 or this Section 5.9, (including Exhibits 13A and 13B to this Agreement), a Natural Person or Entity may not recover under this Agreement, including any Exhibit thereto, for Economic Damage based on a reduction in sale price, or an alleged reduction in market value, of real estate they owned or in which they had an ownership interest. Other than as set forth in this Section 5.9 (including Exhibit 13A) a claim by a Natural Person or Entity that he or she or it would have sold real estate owned by that Natural Person or Entity earlier, or at a higher price, in the absence of the Deepwater Horizon Incident, is not a Claim that is eligible under this Settlement Agreement.

34

5.10.    ADDITIONAL CLAIMS CRITERIA RELATED TO EXCLUDED
         INDUSTRIES AND MORATORIA LOSSES.

    5.10.1.    Notwithstanding the foregoing, additional criteria set forth in Exhibit 16
apply with respect to excluded industries.  The following is a summary.

    5.10.2.    Oil and Gas Industry.

      5.10.2.1.    Business/employers.

        5.10.2.1.1.    Businesses and employers identified on the NAICS codes listed on
Exhibit 17 are excluded from the Economic Class.

      5.10.2.2.    Individuals/employees.

        5.10.2.2.1.    Individuals /employees employed by businesses or employers in
the oil and gas industry are barred from recovery for any type of
Individual Economic Loss Claim arising out of any employment or
former employment within that industry.  However, such
individuals/employees are permitted to pursue Individual
Economic Loss Claims for other jobs outside of excluded
industries.  If any of the Claimant's other jobs is for a
business/employer in the Support Services to Oil and Gas
Industry, evaluation of the Claimant's Individual Economic
Loss Claim shall proceed pursuant to requirements specified
in the Support Services to Oil and Gas Industry column set
forth in Exhibit 16.  If all the Claimant's other jobs are for a
business/employer other than an excluded industry,
business/employer in the oil and gas industry, or Support
Services to Oil and Gas Industry, then the Claimant's
Individual Economic Loss Claim shall be evaluated under the
standard Economic Damage Claim Frameworks.  Such
individuals/employees are permitted to pursue all other

35

recovery permitted under other aspects of the Economic
Class.

5.10.2.2.2.   All individuals/employees in this category are barred from
recovering moratoria damages and do not release moratoria claims.

5.10.3.   Support Services to Oil and Gas Industry.

5.10.3.1.   Businesses/employers.

5.10.3.1.1.   Business Employers the Claims Administrator determines fall
within the NAICS codes and descriptions marked with an "x" in
Section I of "Industry Types Subject to Review by Claims
Administrator for Potential Moratoria Losses," Exhibit 19,
shall be subject to automatic review to determine whether their
losses, or any portion thereof, constitute Moratoria Losses.  The
Claimant shall be required to provide supplemental
information in order for the Settlement Program to conduct this
review.  The Settlement Program shall create a dedicated team
to evaluate such Claims.

5.10.3.1.2.   Businesses / employers that the Claims Administrator determines
to fall within the NAICS codes and descriptions marked with an
"x" in Section II of "Industry Types Subject to Review by
Claims Administrator for Potential Moratoria Losses,"
Exhibit 19, shall be subject to the following question:  "In
2009, did your business provide significant services, goods,
and/or supplies to businesses in the offshore oil & gas
industry in the Gulf of Mexico?"  If the Claimant responds
affirmatively, its Claim shall be routed by the Settlement
Program to a team dedicated to the evaluation of Business
Economic Loss Claims for Moratoria Losses.  The Claimant
shall be required to provide supplemental information in

36

order for the Settlement Program to conduct this review. If the Claimant responds negatively, its Claim shall proceed under the Economic Damage Claim Process.

5.10.3.1.3.  All businesses/employers in this category are barred from recovery for Moratoria Losses. However, no businesses/employers in this category release moratoria claims.

5.10.3.1.4.  All businesses/employers in this category are permitted to pursue Business Economic Loss Claims for (i) non-moratoria business interruption from Support Services to Oil and Gas Industry activities and (ii) non-oil and gas industry Economic Damages that are not otherwise excluded, but the Claimant must establish (i) and (ii) above were in the judgment of the Settlement Program due to or resulting from the Deepwater Horizon Incident.

5.10.3.1.5.  Such Claims and Claimants are subject to the additional provisions discussed in detail in Exhibit 16, 19.

5.10.3.2.  Individuals/employees

5.10.3.2.1.  An individual/employee Claimant's application shall include sufficient evidence of their employer's business activities to allow the Settlement Program to determine whether the business/employer falls under the Support Services to Oil and Gas Industry, described in Exhibit 19 of "Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses."

5.10.3.2.2.  Individuals/employees of businesses or employers that the Claims Administrator determines fall within the NAICS codes and descriptions marked with an "x" in Section I of "Industry Types Subject to Review by Claims Administrator for Potential

Moratoria Losses," Exhibit 19, are subject to automatic review for Moratoria Losses and shall be routed by the Settlement Program to a dedicated team for evaluation. Claimants shall be required to provide supplemental information in order for the Settlement Program to conduct this review.

5.10.3.2.3.    Individuals/employees of businesses/employers that the Claims Administrator determines fall within the NAICS codes and descriptions marked with an "x" in Section II of "Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses," Exhibit 19, and whose business/employer affirms that in 2009 the business/employer provided significant services, goods, and/or supplies to businesses in the offshore oil & gas industry in the Gulf of Mexico, shall be subject to review for potential Moratoria Losses and shall be routed by the Settlement Program to a dedicated team for evaluation.  Claimants shall be required to provide supplemental information in order for the Settlement Program to conduct this review.

5.10.3.2.4.    But an individual/employee Claimant will not be subject to automatic review for potential Moratoria Losses if, before the individual/employee's Economic Damage claim is approved for payment, his business/employer already has been approved for claims compensation by the Settlement Program with no Moratoria Losses deducted.

5.10.3.2.5.    All individuals/employees in this category are barred from recovering Moratoria Losses, but do not release moratoria claims.

5.10.3.2.6.    All individuals/employees in this category are permitted to pursue Claims for Economic Damage incurred as a result of their employment in the Support Services to Oil and Gas Industry for

38

(i) non-moratoria business interruption from oil and gas industry support service activities and (ii) non Oil and Gas Industry Economic Damages that are not otherwise excluded. A Claimant must establish (i) and (ii) above were due to or resulting from the Deepwater Horizon Incident.

5.10.3.2.7.  Such Claims and Claimants are subject to the additional provisions discussed in detail in Exhibit 16, 19.

5.10.4.  Gaming, Banking, Insurance, Funds, Defense Contractors and Developers

5.10.4.1.  Businesses/employers

5.10.4.1.1.  Businesses/employers in these categories of excluded industries are barred from recovery in the Settlement for any type of Business Economic Losses, but are permitted to pursue Coastal Real Property Damage and Wetlands Real Property Damage Claims.

5.10.4.1.2.  No recovery is permitted for businesses and employers in these categories under any other aspect of the Economic Class.

5.10.4.2.  Individuals/employees

5.10.4.2.1.  Individuals/employees employed by businesses or employers in these categories (and any Entity selling or marketing BP-branded fuel, including jobbers and branded-dealers) are barred from recovery for any type of Individual Economic Loss Claim for work performed for an excluded employer. However, such individuals/employees are permitted to pursue Individual Economic Loss Claims for other jobs outside of excluded industries. If any of the Claimant's other jobs is for a business/employer in the Support Services to Oil and Gas Industry, evaluation of the Claimant's Individual Economic Loss Claim shall proceed pursuant to requirements specified

in Support Services to Oil and Gas Industry column set forth in Exhibit 16.  If all the Claimant's other jobs are for a business/employer other than an employer in the Oil and Gas Industry, or Support Services to Oil and Gas Industry, then the Claimant's claim shall be evaluated under the standard Economic Loss Claim Frameworks.  Such individuals/employees are permitted to pursue all other recovery permitted under other aspects of the Economic Class.

5.10.4.2.2.   All individuals/employees in this category are barred from recovering Moratoria Losses, but do not release moratoria claims.

5.11.   GENERAL PROVISIONS APPLICABLE TO PAYMENT OF ALL COMPENSATION AMOUNTS.

5.11.1.   Total Compensation Amounts shall be paid  to qualifying Claimants on a claims made basis only (*i.e.*, with payments made only to those who submit a Claim determined to be valid).  Total Compensation Amounts will be paid from the qualified settlement fund described below on a rolling basis, as Claim Forms have been submitted and evaluated in accordance with the Claim Processes.

5.11.2.   The Claims Administrator will submit a list, on a weekly basis for the first year, and thereafter on a monthly basis, to Lead Class Counsel and BP's Counsel, identifying the Claims that have been paid and the amounts of the payments, as well as those that are pending.

5.11.3.   Any amount paid pursuant to any of the above Damage Categories will be the only payment Class Members are entitled to receive for that category pursuant to this Agreement, provided that Class Members are additionally entitled to reimbursement for reasonable and necessary accounting fees

40

relating to Claims preparation, subject to the guidelines and restrictions set forth in Section 4.4.13.

5.11.4.    Claimants shall have the right to appeal the determination related to the denial or award of a Total Compensation Amount pursuant to the Appeal Process as more fully set forth in Section 6 below.

5.11.5.    The Claims Administrator shall also submit a list, on a weekly basis for the first year, and thereafter on a monthly basis, to the Lead Class Counsel and BP's Counsel identifying any Claims that have been appealed pursuant to the Appeal Process.

5.11.6.    Claimants entitled to receive Total Compensation Amounts pursuant to more than one of the Seafood Compensation Program, Coastal Real Property Claim Process, Economic Damage Claim Process, Real Property Sales Claim Process, Subsistence Claim Process, VoO Claim Process, Vessel Physical Damage or Wetlands Real Property Claim Process may submit Claims for a single Damage Category and accept payment, but must then effectuate an Individual Release for all Damage Categories. However, subject to Section 5.11.9, the Individual Release shall allow the Claimant up to six (6) months from the date of initial payment by the Settlement Program of the Claimant's first paid Claim for submitting further Claims in other Damage Categories as provided in Section 4.4.8.

5.11.7.    The Total Compensation Amount a qualifying Claimant receives for any of the above categories shall be in addition to the Total Compensation Amount the Claimant is entitled to receive under any other category.

5.11.8.    For all Claims other than those made under the Seafood Compensation Program, the deadline for submission of Claim Forms to the Settlement Program shall be April 22, 2014 or 6 (six) months after the Effective Date, whichever occurs later, and the Settlement Program shall remain open through the determination, appeals, and where applicable, payment of all

timely submitted Claim Forms.

5.11.9.    The deadline for submission of Seafood Program Compensation Claim Forms to the Settlement Program shall be 30 days after the date of entry of the Final Order and Judgment by the Court.

5.11.10.   Subject to the provisions of Section 4.4.5, Claim Forms must be signed under penalty of perjury and individually signed by the Natural Person or Entity who suffered damages, and subject to the provisions of Section 4.4.10, Claims and Claim Forms may not be submitted en masse with the Claims and Claim Forms of other Natural Persons or Entities.

5.12.    Funding of Payments.

5.12.1.    A Settlement Trust (the "Settlement Trust") shall be established for the purpose of paying Settlement Payments and the costs of administering the Settlement Program.  The Settlement Trust shall be established pursuant to the order of the Court.  The Settlement Trust shall be structured and operated in a manner so that it qualifies as a "qualified settlement fund" under section 468B(d)(2) of the Internal Revenue Code and Treasury Regulation §1.468B-1.  The Settlement Trust shall be created and governed by a Trust Agreement in form and substance reasonably satisfactory to the Claims Administrator, Lead Class Counsel and the BP Parties (the "Economic Settlement Trust Agreement").  The Claims Administrator shall serve as Trustee of the Settlement Trust, and J. P. Morgan Trust Company of Delaware shall serve as the "Directed Trustee" with limited authority as set forth in the Economic Settlement Trust Agreement.   Should the Court determine at any time that the Trustee or the Directed Trustee needs to be replaced, Lead Class Counsel or their designee and BP will agree to make a joint recommendation of one or more candidates for appointment by the Court, as Trustee or Directed Trustee, as the case may be.  They shall continue the process of joint recommendation as necessary until Court approval is obtained. The Economic Settlement Trust Agreement shall be

subject to approval by the Court. The Settlement Trust, subject to the requirements of Section 4.3.5 and Section 4.3.6.1, may hire Claims Administration Staff or Claims Administration Vendors as necessary for the Settlement Program. The Settlement Trust shall be initially comprised of the following separate funds, which shall together constitute a single qualified settlement fund**:**

5.12.1.1.1.     Seafood Compensation Program Settlement Fund (the "Seafood Compensation Fund"), which shall be used by the Claims Administrator to make payments under the Seafood Program;

5.12.1.1.2.     General Claims Settlement Fund (the "General Claims Fund" and together with the Seafood Compensation Fund, the "Claims Funds"), which shall be used by the Claims Administrator to make payments under all Claims programs other than the Seafood Program;

5.12.1.1.3.     Administrative Expense Fund (the "Administrative Fund" and together with the Claims Funds, the "Funds"), which shall be used by the Claims Administrator to pay all reasonable and necessary expenses incurred in connection with the operation of the Settlement Program, except for the payment of Claims or as otherwise provided in this Agreement (the "Administrative Expenses").

5.12.1.1.4.     Gulf Tourism and Seafood Promotional Fund, as described in Section 5.13.

5.12.1.1.5.     Supplemental Information Program Fund, as described in Section 4.4.15.

5.12.1.1.6.     Economic Settlement Trust Account, into which the BP Parties shall pay, or cause to be paid, all amounts required to be paid to the Settlement Trust and from which the Trustee and/or the Directed

Trustee shall transfer into the Funds listed in Section 5.12.1 such amounts as required under Section 5.12

5.12.1.1.7.  With consent of the Parties and consistent with the terms of the Settlement Agreement, the Claims Administrator, as Trustee, may establish, or cause to be established, one or more additional funds for the payment of resolved Claims.  Such additional funds shall be considered "Funds" for purposes of this Settlement Agreement, and, together with the Funds listed in Section 5.12.1, shall constitute a single qualified settlement fund.

5.12.1.1.8.  The Claims Administrator is authorized and directed to establish, or cause to be established, and operate a Reserve Fund in the event the Economic Class receives any monies due pursuant to Section 5.15.  Notwithstanding the preceding sentence, in the event that there are monies remaining in this Reserve Fund, and the Agreement is terminated pursuant to Section 21, any remaining unspent funds in this Reserve Fund shall revert as determined by BP and Lead Class Counsel at the time such Reserve Fund is established. However, nothing herein shall prevent the expenditure of any such funds prior to Final Approval.

5.12.1.2.  The Settlement Trust and each of the Funds shall be managed by the Trustee and the Directed Trustee  and shall be subject to the continuing jurisdiction and supervision of the Court.  The Claims Administrator shall serve as the Trustee and as the administrator of the qualified settlement fund for purposes of Treasury Regulation §1.468B-2(k)(3) and shall be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Settlement Trust and responding to any questions from, or audits regarding such taxes by, the Internal Revenue Service or any state or local tax authority, as well as questions from the Department of Labor.  The

Trustee shall also be responsible for complying with all tax information reporting and withholding requirements with respect to payments made by the Settlement Trust, as well as paying any associated interest and penalties. Any such tax, interest and penalty payments shall be paid from the Administrative Fund. The Trustee may delegate any of his responsibilities as trustee to the Directed Trustee as set forth in the Economic Settlement Trust Agreement.

5.12.1.3.  The BP Parties shall pay or cause to be paid, within 10 days of Preliminary Approval, an initial amount of $1 billion to the Settlement Trust.  Of this initial $1 billion, $500 million shall be transferred to the Seafood Compensation Fund, and $500 million shall be transferred to the General Claims Fund.  Thereafter, the BP Parties shall pay or cause to be paid, within 10 days of the commencement of each calendar quarter, beginning with the third quarter of 2012, six additional quarterly payments as follows:

(i) $500 million per quarter to the Settlement Trust for three quarters (of which additional $500 million payments, $300 million shall transferred paid to the Seafood Compensation Fund, and $200 million shall be transferred to the General Claims Fund);

(ii) then, $400 million per quarter to the Settlement Trust for one quarter (of which additional $400 million payment, $300 million shall be transferred to the Seafood Compensation Fund, and $100 million shall be transferred to the General Claims Fund); and

(iii) then, $300 million per quarter to the Settlement Trust for two quarters (of which additional $300 million payments, all $300 million shall be transferred to the Seafood Compensation Fund).

The initial $1 billion payment and the six subsequent quarterly payments described in clauses (i) through (iii) above shall be irrevocable payments

by the BP Parties. If at any time the balance in the Seafood Compensation Fund falls below $300 million and/or the balance in the General Claims Fund falls below $200 million, the Claims Administrator shall provide a written notice to the BP Parties and Lead Class Counsel specifying the balance in the Settlement Trust and each of the Claims Funds. The BP Parties will promptly pay or cause to be paid additional amounts to the Settlement Trust, from time to time upon receipt of such notice, sufficient to restore the balance of the General Claims fund to at least $200 million and the balance of the Seafood Compensation Fund to at least $300 million; provided that in no event will the sum of all amounts allocated and paid into the Seafood Compensation Fund under all provisions of this Agreement, in the aggregate, exceed the Seafood Compensation Program Amount (and if it is determined that any amounts were contributed to the Seafood Compensation Fund in excess of the Seafood Compensation Program Amount, the amount of such excess shall be repaid from the Seafood Compensation Fund to the BP Parties). The Claims Administrator will provide the BP Parties and Lead Class Counsel with periodic reports relating to the Claims or other amounts paid from the Seafood Compensation Fund and the General Claims Fund and projections of Claims or other payments that are in process, in each case in such detail and with such frequency as the BP Parties may reasonably request.

5.12.1.4.   The BP Parties shall pay or cause to be paid to the Settlement Trust for transfer to the Administrative Fund (i) an initial amount equal to $50 million to be paid by no later than 10 days after Preliminary Approval, and (ii) additional amounts as may be required on a monthly basis thereafter during the administration of the Settlement Program in accordance with an administrative expense budget to be developed by the Claims Administrator, subject to the reasonable approval of the BP Parties and Lead Class Counsel (the "Administrative Budget"). Contracts entered into with Claims Administration Vendors and their subcontractors shall provide the BP Parties and Lead Class Counsel with a right to receive

invoices submitted by Claims Administration Vendors and their subcontractors and a reasonable amount of time to raise concerns or objections to such invoices prior to their payment. The Claims Administrator shall provide the BP Parties and Lead Class Counsel on a monthly basis with a report of Administrative Expenses paid in connection with the Settlement Program in such detail as the BP Parties may reasonably request and a reconciliation of such payments in comparison to the Administrative Budget. The BP Parties and the Claims Administrator shall adjust the monthly payment amounts accordingly to assure that sufficient funds are on deposit in the Administrative Fund to cover the Administrative Expenses on a timely basis. Payment of administrative expenses by the Claims Administrator shall be subject to oversight by the District Court.

5.12.1.5. The BP Parties shall have the right (but not the obligation) to prepay, or cause to be prepaid, any of their payment obligations to the Funds under the Settlement Agreement. In connection with any such prepayment, the BP Parties shall designate in writing the payment obligation that is being prepaid and how such prepayment should effect the BP Parties' remaining payment obligations (*i.e.*, whether the amount prepaid should be credited against the next payment obligation or to one or more subsequent payment obligations or a combination thereof). No such prepayment or designation shall otherwise limit the BP Parties' obligations under the Settlement Agreement.

5.12.1.5.1. The BP Parties have established the Deepwater Horizon Oil Spill Trust pursuant to a Trust Agreement dated as of August 6, 2010 (the "Deepwater Horizon Trust Agreement") for the purpose of providing funds to be used to satisfy damage claims, as more particularly described in the Deepwater Horizon Trust Agreement, arising from or related to the DWH Oil Spill. The BP Parties may satisfy each of its payment obligations under this Section 5.12.1 by

47

arranging for the Deepwater Horizon Oil Spill Trust to make such payment. It is contemplated by the BP Parties that such payments generally will be made by the Deepwater Horizon Oil Spill Trust. Nothing contained herein in any way limits or impairs the duties and obligations of the BP Parties under this Agreement or the Guarantees of payment obligations under this Agreement provided by BPCNA and BP p.l.c. set forth in Exhibit 24.

5.12.1.5.2.   The Claims Administrator, as Trustee, and/or the Directed Trustee shall establish an escrow account (each a "Fund Account") for each Fund with the Lead Paying Agent (as defined below) as escrow agent. Each payment specified in this Section 5.12.1 shall be made into the principal Fund Account established for the applicable Fund, as designated in writing by the Claims Administrator.

5.12.1.5.3.   Upon closure of the Settlement Program under 4.4.16, any funds remaining in the General Claims Fund, or Administrative Fund, beyond the initial $1 billion and the subsequent six quarterly payments referenced in clauses (i) – (iii) of Section 5.12.1.3 shall revert to the BP Parties.

5.12.1.6.   Amounts deposited in the Settlement Trust and each Fund Account shall be invested conservatively in a manner designed to assure timely availability of funds, protection of principal and avoidance of concentration risk, only in the following types of investments:

- United States government money market funds having a AAA/Aaa rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's or Fitch); or
- Short-dated United States treasury bills and/or interest bearing deposits at federally insured depository institutions that are at all times rated A+/A1 or higher by Standard & Poor's and Moody's provided such depository institution

48

rated A+/A1 or higher at all times holds a stable or positive outlook.

5.12.1.6.1.   The total amount of cash invested in any single United States government money market fund by the Funds in the aggregate shall not exceed $200 million and the total amount invested in deposits at federally insured depository institutions by the Funds in the aggregate shall not exceed $40 million per depository institution.

5.12.1.6.2.   To provide liquidity, the Lead Paying Agent, in its capacity as escrow agent for the Claims Funds, shall also be permitted to deposit funds in a federally insured depository account with the Gulf Region Bank (as defined below) in such amount as may be specified in the Lead Payment Agent Agreement.

5.12.1.6.3.   Any earnings attributable to the Economic Settlement Trust Account and the General Claims Funds shall be transferred to the Administrative Fund and any earnings on the Administrative Fund shall be retained in the Administrative Fund.  Any earnings attributable to the Seafood Compensation Fund shall be retained in the Seafood Compensation Fund.  Any earnings attributable to the Gulf Tourism and Seafood Promotional Fund shall be retained in the Gulf Tourism and Seafood Promotional Fund.  Any earnings attributable to the Supplemental Information Program Fund shall be retained in the Supplemental Information Program Fund.

5.12.1.7.   The Claims Administrator, the Trustee and the Directed Trustee shall enter into a Paying Agent Agreement, in form and substance reasonably satisfactory to the BP Parties and Lead Class Counsel and approved by the Court, pursuant to which a federally insured depository institution approved by the BP Parties and Lead Class Counsel and the Court will serve as the lead paying agent and escrow agent for the Claims Funds (the

"Lead Paying Agent"), and Garden City Group, Inc. (or another entity agreed to by the BP Parties and Lead Class Counsel, with approval of the Court) will serve as the claims payment agent for the Claims Funds (the "Claims Payment Agent"). In addition, the Lead Paying Agent may enter into an arrangement with one or more other federally insured depository institutions with branch locations in the Gulf Region (collectively, the "Gulf Region Bank") and/or another check cashing facility agreed to by BP and Lead Class Counsel, and approved by the Court that provides that checks drawn on the Fund Accounts of the Claims Funds will be eligible to be cashed or deposited in branches of the Gulf Region Bank in a manner that will expedite the recipients' access to such funds (the "Check Cashing Arrangement").

5.12.1.7.1. The Paying Agent Agreement and the Check Cashing Arrangement collectively shall provide for the following actions in connection with the payment of claims by the Claims Funds:

- The Claims Payment Agent shall be provided with checks that reflect the name of the Gulf Region Bank, the Gulf Region Bank's New Orleans, Louisiana address, and are drawn on the applicable Fund Account maintained by the Lead Paying Agent.

- The Claims Payment Agent, at the direction of the Claims Administrator (or its authorized designee), shall write checks in payment of Claims from the applicable Claims Fund. The Claims Payment Agent shall provide to the Lead Paying Agent (or its affiliate) a nightly, system-generated notification of all check issuances, through an electronic file. This notification report shall be used by the Lead Paying Agent in connection with its operation of the encashment program described below.

- The Gulf Region Bank will accept such checks for cashing without the requirement that the holder open or maintain an account at the Gulf Region Bank.

- The Lead Paying Agent and the Gulf Region Bank (and, if appropriate, the Court-appointed check cashing facility) will maintain an encashment program in a form acceptable to BP designed to prevent fraud or other improper payments of checks drawn on the Fund Accounts of the Claims Funds.

5.12.1.7.2.    Payments from the Administrative Fund shall be made by the Lead Paying Agent in its capacity as escrow agent for the Administrative Fund Account, at the instruction of the Claims Administrator.

5.12.1.7.3.    The Paying Agent Agreement will also provide standard indemnification by the Settlement Trust and the BP Parties of the Lead Paying Agent (in its capacity as such and as escrow agent for the Fund Accounts) and the Claims Payment Agent. Such indemnification shall exclude negligence and willful misconduct. The Paying Agent Agreement shall be governed as stipulated in the Paying Agent Agreement.

5.12.1.7.4.    In the event the Claims Administrator is unable to enter into any of the arrangements specified in this Section 5.12.1 or any of such arrangements thereafter terminate, the Claims Administrator and the BP Parties and Lead Class Counsel shall cooperate to develop and implement (subject to Court approval) an alternative program that, to the extent practicable, provides for the ability of Claimants to cash checks drawn on either of the Claims Funds at branches located in the Gulf Region of one or more depository institutions without the requirement that the holder open or maintain an account at such depository institution and provides for an encashment program designed to detect and eliminate fraud or other improper application of funds.

5.12.2.    Notwithstanding any other provision of this Agreement, the BP Parties may enter into an arrangement with the Claims Administrator and the Corporate Trustee and/or Lead Paying Agent (as such terms are defined in the Deepwater Horizon Trust Agreement) of the Deepwater Horizon Oil Spill Trust with respect to Settlement Payments as directed by the Claims Administrator in accordance with the Deepwater Horizon Trust Agreement.

5.12.3.    Pursuant to Section 21.3.9, upon any termination of the Agreement under

Section 21, any unspent funds under this Section 5.12 shall revert to BP.

5.13.    Gulf Tourism and Seafood Promotional Fund ("Promotional Fund").  The BP Parties will fund, within 10 days after Preliminary Approval, $57 million ($57,000,000) to promote the Gulf Coast Areas and waters.  The Promotional Fund will be administered by the Claims Administrator.

5.13.1.    The purpose of the $57 million Promotional Fund is to promote tourism and the seafood industry in Gulf Coast areas impacted by the Deepwater Horizon Incident.  In particular, one of the primary purposes of this Promotional Fund shall be for the support of programs directed to advertising, promotion and/or marketing which supports Gulf tourism and the seafood industries.

5.13.2.    The Promotional Fund shall be administered and directed by the Claims Administrator.

5.13.3.    In administration of this Promotional Fund, the Administrator may solicit proposals and applications from public, quasi-public and/or non-profit entities or organizations located within the Gulf States for support of programs directed to advertising, promotion and/or marketing of the Gulf tourism and seafood industries.  The public, quasi-public and/or non-profit entities or organizations seeking Promotional Fund Awards shall apply to a three-person panel, consisting of a Lead Class Counsel designee, the Claims Administrator or his designee, and a BP Parties designee (hereinafter "Panel"), as follows:

5.13.3.1.    Applications for such awards shall be in writing, addressed to the Claims Administrator.  The application shall contain:  (1) a budget for the specific activities proposed ("Budget Narrative"[3]) and (2) a description of the

---

[3]Budget Narrative: Relevant documents for a budget narrative include, for example: 1) IRS letter documenting filing status/tax ID number, 2) most recent audited financial statement (if the most recent audited financial statement is not available, submit most recent IRS Form 990); 3) Current Operating Budget; 4) copies of an itemized project budget with description of how funds will be spent.

content of the activities or projects which are being proposed, and identification of the particular channels or media where the project will be utilized ("Project Narrative").[4]

5.13.3.2.  Each application should outline the financial stability of the Applicant by providing, among other relevant items, tax returns, past grant awards received, financial statements of the organization, annual reports and other such materials.[5]

5.13.3.3.  In selection of recipients, special attention will be paid to the diversity, geographic and otherwise, of Applicants.  Multiple Promotional Fund Awards may be awarded to the same applicant; however no more than $500,000 per year combined may be disbursed *in toto* to any one applicant.  Furthermore, each award shall be subject to periodic and/or final reporting to and auditing/or review by the Claims Administrator, as deemed appropriate by the Claims Administrator.

5.13.4.  The Panel may also receive and consider requests from others, in addition to those seeking grants as described above, which requests must receive the unanimous approval of the Panel in keeping with the primary purpose of the Promotional Fund.

5.13.5.  Upon receiving requests, the Claims Administrator shall consult with the Panel jointly to determine the most effective methods to satisfy the purposes of this Promotional Fund.  Either the Claims Administrator or the Panel may retain an independent expert or consultant to advise the Claims Administrator and/or the Panel with respect to the propriety or effectiveness of any award.

---

[4] Project Narrative: A successful award Applicant's project narrative should describe, *inter alia*, the organization's history and mission; the specific problem or challenge to be addressed; how the proposed project will address this issue; how funds will be used and how Fund's financial support will be leveraged by support from the organization or other sources; the physical location (if any) of project; the audience served, anticipated outcomes, and any needs assessment that has been done; how to evaluate the project's success; and plans for long-term sustainability of the program.

5.14.    As additional consideration to the Economic Class, the BP Parties agree to use due diligence to prosecute the reserved claims for Insurance Proceeds for Transocean Personnel described in Section 1.1.4.2 of Exhibit 21, and, if successful in obtaining a recovery or judgment, to pay an amount equal to the amount of such recovery to the Economic Class, only as a juridical entity and not to Economic Class Members individually.  Because any such funds are for the benefit of the Economic Class as a whole, these funds will be held in reserve by the Trustee in a qualified settlement fund authorized by the Court pending an equitable and appropriate allocation or use of such funds, to be approved by the Court, which may include:  (a) pro rata distribution to Economic Class Members; (b) to augment the Seafood Compensation Program; or (c) to address extraordinary needs or circumstances as agreed to by the BP Parties, which agreement shall not be unreasonably withheld.  In any event, the Court will decide and direct any allocation, and may appoint a special master or other neutral party to create any allocation or for other appropriate purposes.  If the Agreement is terminated pursuant to Section 21, any of these funds that have not been disbursed shall revert to the BP Parties.

5.15.    Additional Reserve Funds.  With Court approval, Lead Class Counsel or their designee may create one or more Reserve Funds with any Settlement proceeds from third or other parties, provided, however, that the Reserve Fund must not affect the approval or operation of the Economic Class, and may not increase the BP Parties' costs of administration or any other costs.

5.16.    Unless the Court directs otherwise, a separate fund (intended to qualify as a "qualified settlement fund," under § 468(d)(2) of the Internal Revenue Code and Treasury Regulation § 1.468B.1) will be established out of which common benefit attorneys' fees and costs to the Economic Class Counsel and/or other common benefit attorneys who have submitted time and costs in compliance with Pretrial Order 9, will be paid by Order of the Court.  This separate qualified settlement fund will be established pursuant to Order of the Court, and operated under Court supervision and control.  This separate qualified settlement fund shall be separate

54

from any of the funds described in Section 5.12, and will not be administered by the Claims Administrator. BP's discharge from liability regarding payment of these attorneys' fees and costs into the Fund described in Section 5.16 shall be determined in conjunction with the negotiation of attorneys' fees to be conducted and shall be set forth in Exhibit 27 and as approved by the Court. The Court shall determine the form and manner of administering this fund, in which BP will have no reversionary interest.

6. **CLAIMS APPEAL PROCESS**

6.1.     Subject to and in accordance with Sections 4.3.7 and 4.3.8, Economic Class Members will have up to three opportunities, depending on their circumstances, to have their Claims reconsidered and reviewed to assure accuracy, transparency, independence, and adherence by the Settlement Program to the terms of this Agreement.

6.1.1.     Appeal for Insufficient Documentation.

6.1.1.1.     In the event a Claim is denied because it cannot be fully processed, in whole or in part, on grounds of insufficient documentation, the Claimant has the option to seek a review by a separate **DOCUMENTATION REVIEWER** assigned by the Claim Administrator. Such appeal shall be filed within 20 days of issuance of written notice to the Claimant from the Settlement Program of insufficient documentation. If the Documentation Reviewer finds error in the denial for insufficient documentation, the Claimant's Claim will be referred back to the Settlement Program which will then process the Claim. Any decision of the Documentation Reviewer with respect to the documentation issue discussed in this Section shall be without prejudice to the Claimant's right at any time prior to termination of the Settlement Agreement to resubmit the Claim.

6.1.2.     Appeal of Final Determination of Settlement Program.

6.1.2.1.     Reconsideration.

55

6.1.2.1.1.  Within 30 days of issuance of notice in writing to the Claimant of a final determination of a Claim by the Settlement Program, a Claimant may request in writing reconsideration by the Settlement Program of that determination on the grounds that the Settlement Program committed a calculation error, failed to take into account relevant information or data or otherwise failed to follow the standards governing the determination. The Settlement Program will also maintain a website where a form of request for reconsideration may be filed. The Settlement Program shall provide access to the Claimant and the BP Parties of all forms, calculations and worksheets relied upon by the Settlement Program in reaching the final determination.

6.1.2.2.  Appeals to Panel

6.1.2.2.1.  Appeals shall be heard by either a single-member **APPEAL PANEL** or a three-member Appeal Panel depending on the value of the Claim being appealed.

6.1.2.2.2.  **APPEAL PANELIST** pool:  The roster of Appeal Panelists eligible to sit on an Appeal Panel shall consist of between 10 and 20 Appeal Panelists.

6.1.2.2.3.  Nomination of the Appeal Panelist pool:  Within 21 days of Preliminary Approval, the Parties shall agree on a list of at least 30 individuals as potential Appeal Panelists and jointly submit that list of nominees to the Court, who will select the Appeal Panelists.

6.1.2.2.4.  Selection of the Appeal Panelist pool:  The Parties shall agree to the joint recommendation of at least 30 candidates possessing the relevant experience and qualifications for appointment by the Court, in the exercise of its independent discretion, to serve as the Appeal Panelists.  The Parties shall continue this process of joint

56

selection, as necessary, to accomplish the Court's approval and appointment of a full panel of Appeal Panelists. The Parties shall indicate along with the submission whether the potential Appeal Panelist is qualified to hear appeals on Claims of $1,000,000 or more. From the joint list of nominees, the Court may select some or all of the nominees for inclusion in the Appeal Panelist pool. In the event the Court's selection does not fill the Appeal Panel, or in the event of a vacancy on the Appeal Panel, the Parties shall nominate additional candidates, in accordance with this Section, for the Court's consideration for appointment to the Appeal Panel.

6.1.2.2.5. Selection of the Appeal Panel: The appointment to and service on the Appeal Panels is subject to the oversight of the Court, which shall retain jurisdiction over the Appeal Panels.

6.1.2.2.5.1. Appeals of Claims Under $1,000,000: Appeals taken by either Party on claims less than $1,000,000 shall be decided by a single-member Appeal Panel. The Appeal Panelists shall be randomly selected by the Claims Administrator from the Appeal Panelist pool.

6.1.2.2.5.2. Appeals of Claims of $1,000,000 or more: Appeals taken by either Party on Compensation Amounts for $1,000,000 or more shall be decided by a three-member Appeal Panel. If the appeal is being taken by a Claimant, the three-member Appeal Panel shall have at least one Appeal Panelist from the Claimant's home state. Only Appeal Panelists approved by the Court to hear claims for Compensation Amounts of $1,000,000 or more shall be eligible to sit on a three-member Appeal Panel. The Appeal Panelists shall be randomly selected by the Claims Administrator from the approved Appeal Panelists in the Appeal Panelist pool who are eligible to hear claims for Compensation Amounts of $1,000,000 or more. In the event

57

that the Appeal is being taken by a Claimant, the home-state Appeal Panelists shall be randomly selected from the sub-list of Appeal Panelists from that state; the remaining two Appeal Panelists shall be randomly selected from the entire Appeal Panelists pool approved by the Court to hear claims for Compensation Amounts of $1,000,000 or more.

6.1.2.2.5.3.   The continued service on the Appeal Panels is within the sole discretion of the Court which shall retain jurisdiction over the Appeal Panels.

6.1.2.2.5.4.   The Appeal Panel shall have the right to establish its own procedural rules regarding the review of appeals.

6.1.2.3.   Claimant Appeal.  A Claimant may Appeal within 30 days of the issuance of final written notice from the Settlement Program of a determination of final compensation award.  For purposes of determining a filing fee and the type of Appeal Panel or Panelists, the amount of compensation sought by the Claimant shall be treated as the Compensation Amount.  A Claimant that exercises the right to Appeal shall elect at the time of filing, to either:

6.1.2.3.1.   Pay a filing fee that shall be refunded if the Claimant prevails. ("Prevails" means that the Claimant is awarded an increase in the Compensation Amount).  The amount of the filing fee shall be as follows:

| **Compensation Amount** | **Fee** |
|---|---|
| Up to $10,000 | $100 |
| $10,001 to $25,000 | $150 |
| $25,001 to $50,000 | $200 |
| $50,001 to $100,000 | $250 |

| | |
|---|---|
| $100,001 to $250,000 | $500 |
| $250,001 to $500,000 | $1,000 |
| $500,001 or more | $2,500 |

or

6.1.2.3.2.    Agree in writing that, if the Claimant does not prevail, any Compensation Amount (exclusive of any RTP) that had been determined by the Settlement Program shall be reduced by 5%.

6.1.2.4.    BP Appeal. The BP Parties may Appeal a final compensation award determination only where the Compensation Amount determined by the Settlement Program is in excess of $25,000. The BP Parties shall receive notice of an award on the same date that notice is provided to the Economic Class Member and shall have the following time periods within which to exercise their Appeal right for Claims in the following monetary ranges: (a) for awards of $25,000 to $250,000 the BP Parties shall have ten days from the date of notice of the award to Appeal; (b) for awards of $250,001 to $500,000 the BP Parties shall have fifteen days from the date of notice of the award to Appeal; and (c) for awards of greater than $500,001 the BP Parties shall have twenty days from the date of the notice of the award to Appeal. The BP Parties shall pay the following filing fees to exercise their right to Appeal:

| **Compensation Amount** | **Fee** |
|---|---|
| $25,001 to $50,000 | $400 |
| $50,001 to $100,000 | $500 |
| $100,001 to $250,000 | $1,000 |
| $250,001 to $500,000 | $2,000 |

| $500,001 to $1,000,000 | $4,000 |
| More than $1,000,000 | $5,000 |

6.1.3.    Filing fees for Appeals shall be added to the Promotional Fund referred to in Section 5.13.

6.2.    Appeals Compensation Method.  All Appeals where the issue is the Compensation Amount shall be conducted using a baseball process in which the Claimant and the BP Parties exchange and submit in writing to the Appeal Panelist or Appeal Panel their respective proposals ("Initial Proposal") for the base  Compensation  Amount they propose the Claimant should receive. The Appeal Panelists or Appeal Panel may consider only the following documentation:  the Initial and Final Proposal and any memorandum in support thereof; the complete record of the Claimant in the Settlement Program; the Agreement and all of its attachments; Court rulings on similar issues; and prior Appeal rulings on similar issues.  The Claimant and the BP Parties must exchange and submit a final proposed base compensation amount ("Final Proposal") to the Appeal Panelist or Appeal Panel.  Either Party shall have five (5) days to accept the other Party's Final Proposal and end the Appeal.  Without an agreed resolution, the Appeal Panelist or Appeal Panel must choose to award the Claimant either the Final Proposal by the Claimant or the Final Proposal by the BP Parties but no other amount.  The Claimant and the BP Parties may choose to reach a compromise at any point up to the time the Appeal Panelist or Appeal Panel issues its decision.  Once the Appeal Panelist or Appeal Panel issues a decision, it shall be final.  The base compensation amount will then be presented to the Claims Administrator to further process the Claim as appropriate.

6.3.    The procedures attached as Exhibit 25 hereto shall apply to Appeals pursuant to this Section 6.  The Settlement Program may establish additional procedures for the Appeal Process not inconsistent with Exhibit 25.

6.4.     Appeal Review Standards.  The Standard of Review by the Appeal Panelist or Appeal Panel shall be a de novo review of the complete record of that Claimant in the Settlement Program to enforce compliance with this Agreement as approved by the Court.

6.5.     Review Costs.   In the event that a Claimant prevails in an Appeal the Claimant shall be entitled to an additional 5% added to the total pre-RTP amount of the final award.  If the Claimant is being compensated by the Seafood Compensation Fund, any additional compensation awarded as part of the 5% additional payment shall not be paid by the Seafood Compensation Fund but shall be paid separately by BP.

6.6.     Court Inherent Jurisdiction.  The Court maintains the discretionary right to review any Appeal determination to consider whether the determination was in compliance with the Agreement.  Upon reviewing such a determination, the Court shall treat the Appeal determination as if it were a recommendation by a Magistrate Judge.

6.7.     Written Appeal Compensation Determination.  For every Appeal, the Appeal Panelist or Appeal Panel shall issue a written determination.  For all Appeals in which the Appeal Panel determines the Claimant should receive a Compensation Amount of $1,000,000 or more, the Appeal Panel shall issue a written opinion describing the basis for its determination.

6.8.     Immediately upon issuance of final written notice from the Claims Administrator of a determination of a Claim, the Settlement Program shall provide BP, Lead Class Counsel, Claimant and Claimant's counsel (if Claimant is represented) with electronic access to the full record of the Claim at issue.

6.9.     Compensation for Appeal Panelists.   The Claims Administrator shall devise a uniform compensation program for Appeal Panelists as to which he shall seek input from the Claims Administration Panel.  Such compensation program shall be subject to the approval of the Court.

7. **PRELIMINARY APPROVAL BY THE COURT AND CLASS CERTIFICATION.**

7.1.     Economic Class Counsel and BP's Counsel agree to take all actions and steps reasonably necessary to obtain a Preliminary Approval Order from the Court.

7.2.     CLASS CERTIFICATION FOR SETTLEMENT PURPOSES ONLY. The Parties agree to jointly seek class certification of the Economic Class under Fed. R. Civ. P. 23(a) and 23(b)(3) for the sole purpose of effectuating this Agreement under its terms and conditions.  The Parties do not waive or concede any position or argument they have for or against class certification of any class for any other purpose in any action or proceeding.  Any class certification order entered under this Agreement shall not constitute evidence, an admission, or a finding that the Economic Class or any class proposed by an Economic Class Member for any other purpose is appropriate for class certification.  To the extent the Court enters the proposed form of Preliminary Approval Order and Final Judgment without material alteration, the Final Order will provide for vacation of the Preliminary Approval Order in the event the Agreement does not become effective.  In the event that the Court certifies the proposed Economic Class in connection with this Agreement, BP will not oppose the motion brought by Interim Class Counsel or Lead Class Counsel (or their designee) seeking to certify a litigation class against Transocean or Halliburton, but limited to the recovery of punitive damages and/or assigned rights from the BP Parties.

7.3.     Tolling of Statute of Limitations and Presentment.

7.3.1.     Upon entry of the Preliminary Approval Order, the statutes of limitation applicable to any and all claims or causes of action that have been or could be asserted by or on behalf of any Economic Class Member are hereby tolled and stayed. The limitations period shall not begin to run again for any Economic Class Member unless and until (a) they Opt Out of the Economic Class, or (b) they execute an Individual Release (the Individual Release will contain a provision that further Claims can be made under this Agreement, as allowed by this Agreement, regardless of any statute of limitations) or (c)

the Agreement is terminated pursuant to Court Order. In the event the Agreement is terminated pursuant to Court Order, the limitations period for each Economic Class Member as to whom the limitations period had not expired as of the date of the Preliminary Approval Order shall extend for the longer of 90 days from the last required issuance of notice of termination or the period otherwise remaining before expiration. Notwithstanding the temporary tolling agreement herein, the Parties recognize that any time already elapsed for any Plaintiffs or Economic Class Members on any applicable statutes of limitations shall not be reset, and no expired claims shall be revived, by virtue of this temporary tolling agreement. Plaintiffs and Class Members do not admit, by entering into this Agreement, that they have waived any applicable tolling protections available as a matter of law or equity. Nothing in this Agreement shall constitute an admission in any manner that the statute of limitations has been tolled for anyone outside the Economic Class, nor does it constitute a waiver of legal positions regarding tolling.

7.3.2. Regardless of whether the Agreement becomes effective, Claims with a sum certain and some documentation and/or other proof that are submitted to the Settlement Program shall be deemed to satisfy presentment and all requirements of 33 U.S.C. § 2713.

## 8. NOTICE AND FAIRNESS HEARING.

### 8.1. CLASS NOTICE

8.1.1. As part of their Joint Motion for Preliminary Approval, the Parties shall submit to the Court an agreed upon **ECONOMIC AND PROPERTY DAMAGES SETTLEMENT CLASS NOTICE PLAN**.

8.1.2. The Class Notice Plan, to be implemented at the BP Parties' expense in accordance with the terms of the Class Notice Plan, shall be designed to meet the requirements of Fed. R. Civ. P. 23 (c)(2)(B) and shall include:

8.1.2.1.    A multi-media notice effort covering the entire United States with a focus on the Gulf Coast Areas.

8.1.2.1.1.    The media notice effort will include publication in over 1,100 local newspapers and nationwide publication in leading national consumer magazines, trade, business and specialty publications, local television, radio and newspapers in the Gulf Coast Areas, appropriate foreign language and African-American publications and online banner advertising.

8.1.2.2.    Individual mailed notification to those Class Members who can practicably be identified from Court filings and records, GCCF records, and otherwise, pursuant to the Court approved Class Notice Plan.

8.1.2.2.1.    The Economic Class Action Settlement Notice shall be mailed to identifiable potential Class Members in the Economic Class, plaintiffs in the MDL, including Natural Persons and Entities who filed short form joinders in the MDL.  To the extent BP or Economic Class Counsel is aware that any of these Economic Class Members are represented by counsel other than Economic Class Counsel, the Economic Class Action Settlement Notice shall also be mailed to their attorney.

8.1.2.3.    Prior to mailing, all addresses will be checked against the National Change of Address database managed by the **CLASS NOTICE ADMINISTRATOR**.  If a record is returned as invalid, the Class Notice Administrator will update the address through third-party address search services and re-mail as appropriate.

8.1.2.4.    A case website where potential Economic Class Members can obtain additional information and documents, including the Economic Class Action Settlement Notice, **SUMMARY PUBLICATION NOTICE**, Agreement, Claim Form, relevant orders of the Court and any other

64

information the Parties may agree to provide or that the Court may require.

8.1.2.5.   A toll-free telephone system through which potential Economic Class Members can obtain additional information, and the Economic Class Action Settlement Notice and Claim Form.

8.1.3.   In addition to the foregoing, a Court-approved notice will be given if the Settlement terminates, and a Court-approved reminder notice will be given in advance of the Claim filing deadline at BP's expense.

8.2.   **OPT OUTS**

8.2.1.   The Economic Class Action Settlement Notice shall provide instructions regarding the procedures that must be followed for Economic Class Members to exclude themselves ("Opt Out") from the Economic Class pursuant to Fed. R. Civ. P. 23(c)(2)(B). The Parties agree that, to validly exclude themselves from the Economic Class, Economic Class Members must submit a written request to Opt Out, which must be received by the Entity identified in the Class Notice Plan for that purpose, properly addressed, and postmarked no later than October 1, 2012, or such later date as the Court orders in the Preliminary Approval Order. A written request to Opt Out may not be signed by any form of electronic signature, but must be signed by a handwritten signature. Economic Class Counsel will be provided with identifying information on **OPT OUTS** on a weekly basis, under a confidentiality Order of the Court, to enable them to determine the validity of Opt Outs and assist those who wish to revoke an Opt Out. All requests to Opt Out must be signed by the Natural Person or Entity seeking to exclude himself, herself or itself from the Economic Class. Attorneys for such Natural Persons or Entities may submit a written request to Opt Out, but they must still be signed by the Natural Person or Entity.

8.2.2.   An Economic Class Member has the right to Opt Out of the Economic

65

Class.  An Economic Class Member may make one or more Claims for Seafood Compensation Program, Economic Damage, Subsistence Damage, VoO Charter Payment, Vessel Physical Damage, Coastal Real Property Damage, Wetlands Real Property Damage and/or Real Property Sales Damage.  However, Economic Class Members who exercise the right to Opt Out of the Economic Class must do so for all included Claims that the Economic Class Member possesses.

8.2.3.     Pursuit of Excluded and Reserved Claims. Class Members are not required to Opt Out in order to pursue Expressly Reserved Claims, and may make included Claims without releasing the foregoing Expressly Reserved Claims. BP agrees not to raise any defense of "claim splitting" it otherwise might have raised with respect to such prosecution of the foregoing Expressly Reserved Claims.  BP also agrees not to raise any defense of "claim splitting" it otherwise might have raised with respect to prosecution of Claims brought by employees in the otherwise excluded Gaming, Oil and Gas, Banking, Insurance, Funds, Defense Contractors and Developers Industries referred to in Section 1.3.1.9, but only regarding their lost earnings from employment in those industries.

8.2.4.     All Economic Class Members who do not timely and properly Opt Out shall in all respects be bound by all terms of this Agreement and the Final Order and Judgment, shall be entitled to all procedural opportunities and protections described herein and provided by the Court, and all compensation for which they qualify under its terms, and shall be permanently and forever barred from commencing, instituting, maintaining or prosecuting any action based on any Released Claim against any Released Parties in any court of law or equity, arbitration tribunal or administrative or other forum.

8.2.5.     Any Economic Class Member may revoke his, her or its Opt Out from the Economic Class and thereby receive the benefit of this Economic and

Property Damage Settlement up until three (3) days prior to the Fairness Hearing; or later, if the BP Parties consent in their sole and unilateral discretion as provided in Section 8.2.6 below; or otherwise, if the Court so orders on good cause shown.

8.2.6.   After the Fairness Hearing and in addition to the provisions of Section 8.2.5 of this Agreement, the BP Parties shall have the discretion, but not the obligation, to provide a new Economic Class Action Settlement Notice to Economic Class Members who have timely and properly opted out from the Economic Class allowing them the option, upon such conditions reasonably imposed by the BP Parties, to rescind or withdraw their Opt Out and to participate in the Economic Class.  This provision does not apply to Economic Class Members who have gone through the **OPA PROCESS** and provided a release as part of that OPA Process.  Any such new Economic Class Action Settlement Notice that the BP Parties decide to send out, if they so decide, must be approved by Economic Class Counsel and the Court before it is sent.

8.3.   **REQUIREMENTS FOR OBJECTIONS AND APPEARANCES.**

8.3.1.   Subject to Court approval, any Economic Class Member may present written objections, if he, she or it has any, explaining why the Agreement should not be approved as fair, reasonable and adequate, or why attorneys' fees and expenses to Economic Class Counsel should not be awarded in the amounts requested.  Any Economic Class Member who or that wishes to object to any aspect of the Agreement must file with the Court, and serve on Economic Class Counsel and BP's Counsel, by first-class mail, no later than August 31, 2012, a written statement of the objection(s).  The written statement of the objection(s) must include (a) a detailed statement of the Economic Class Member's objection(s); (b) the Economic Class Member's name, address and telephone number; (c) written proof that the individual or Entity is in fact an Economic Class Member, such as proof of residency,

ownership of property and the location thereof, and/or business operation and the location thereof; and (d) any other supporting papers, materials or briefs the Economic Class Member wishes the Court to consider when reviewing the objection.

8.3.2. Economic Class Members may raise an objection either on their own or through an attorney hired at their own expense. If an Economic Class Member hires an attorney to represent him, her or it, the attorney must (a) file a notice of appearance with the Clerk of the Court no later than August 31, 2012; and (b) comply with the procedures described in Section 8.3.1 above.

8.3.3. An Economic Class Member who files an objection, but then submits and releases a Claim before the Fairness Hearing shall lose the right to object. Economic Class Members, or their attorneys, who intend to make an appearance at the Fairness Hearing must serve on Economic Class Counsel and BP's Counsel, by first-class mail, and file with the Court, no later than August 31, 2012, or as the Court otherwise may direct, a notice of their intention to appear at the Fairness Hearing.

8.3.4. Any Economic Class Member, and/or their attorney(s), who fails to comply with the provisions of the preceding subsections shall waive and forfeit any and all rights they may have to object to the Agreement, and shall be bound by all the terms of the Agreement and by all proceedings, orders and judgments in the Deepwater Horizon Economic Litigation.

9. **COMMUNICATIONS TO THE PUBLIC.**

9.1. The Parties, BP's Counsel and Economic Class Counsel may jointly or separately issue press releases announcing and describing this Agreement upon filing. The form, content, and timing of such press releases relating to this Agreement shall be subject to mutual agreement of the Parties, which shall not be unreasonably withheld, and in addition, the BP Parties shall, in their sole discretion, be entitled

68

to include such information as required by law or regulation. Lead Class Counsel (or their designee) and the BP Parties will consult regarding press releases. Communications by or on behalf of the Parties and their respective Counsel regarding this Agreement with the public and media shall be made in good faith, shall be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final approval of the Settlement, and the information contained in such communications shall be consistent with the content of the Notice approved by the Court. Nothing herein is intended to or shall be interpreted to inhibit or interfere with Economic Class Counsel's ability to communicate with the Court, Economic Class Members, potential Economic Class Members, or their counsel.

## 10. RELEASE AND DISMISSAL OF ALL CLAIMS AND OTHER PROTECTIONS.

10.1.    The Economic Class, Plaintiffs and all Economic Class Members, on behalf of themselves and their heirs, beneficiaries, estates, executors, administrators, personal representatives, agents, trustees, insurers, reinsurers, subsidiaries, corporate parents, predecessors, successors, indemnitors, subrogees, assigns, and any natural, legal or juridical person or Entity entitled to assert any claim on behalf of or in respect of the Economic Class or any Plaintiff or Economic Class Member, hereby release and forever discharge with prejudice, and covenant not to sue, the Released Parties for any and all Released Claims; provided however that this Release does not apply to, and the term Released Claims does not include, Expressly Reserved Claims. In the event a Released Party is sold or otherwise transferred to, or purchases or otherwise acquires, or enters into a partnership or joint venture with, a Natural Person or Entity that is not otherwise a Released Party immediately prior to giving effect to such transaction, then the non-Released Party shall as a result of such transaction obtain a benefit under this Release only with respect to any liability of the Released Party that it, or any such partnership or joint venture, has acquired or assumed or otherwise become liable for, and not in its own right.

10.2.    Released Claims shall include all claims arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, including any and all actions, claims, costs, expenses, taxes, rents, fees, profit shares, liens, remedies, debts, demands, liabilities, obligations, or promises of any kind or nature whatsoever, in both law or in equity, past or present, whether known or unknown, including claims for any and all Unknown Claims or damages, future injuries, damages or losses not currently known, but which may later develop, provided they arise out of, are due to, result from, or relate in any way to, directly or indirectly, in whole or in part, the Deepwater Horizon Incident, whether possessed or asserted directly, indirectly, derivatively, representatively or in any other capacity, and whether or not such clams were or could have been raised or asserted before the Court, and regardless of whether pursuant to statutory law, codal law, adjudication, quasi-adjudication, regulation, or ordinance, including common law, maritime or admiralty, statutory and non-statutory attorneys' fees, breach of contract, breach of any covenant of good faith and/or fair dealing, fraud, misrepresentation, fraudulent concealment, deception, consumer fraud, antitrust, defamation, tortious interference with contract or business expectations, loss of business expectations or opportunities, loss of employment or earning capacity, diminution of property value, violation of the federal Racketeer Influenced and Corrupt Organizations Act or any similar state law, violations of any consumer protection act, punitive damages, exemplary damages, multiple damages, non-compensatory damages, compensatory damages, pain and suffering, interest, injunctive relief, declaratory judgment, costs, deceptive practices, unfair business practices, regulation, strict liability, negligence, gross negligence, willful misconduct, nuisance, trespass, fraudulent concealment, statutory violations, including the Oil Pollution Act of 1990 or other statutory claims, unfair business practices, breach of fiduciary duty, and all other theories, whether existing now or arising in the future, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident.  Released Claims shall not include Expressly Reserved Claims, which means the following Claims that are not recognized or released under the

Agreement, and are reserved to the Economic Class Members: (1) Bodily Injury Claims, which are excluded from the Economic Class, but certain of which may be asserted in the Medical Benefits Class Action Settlement as described therein; (2) claims of BP shareholders in any derivative or direct action solely in their capacity as BP shareholders; (3) claims of Natural Persons and Entities for Moratoria Losses; (4) claims relating to menhaden (or "pogy") fishing, processing, selling, catching, or harvesting; and (5) claims for Economic Damage suffered by Entities or employees (to the extent they allege Economic Damage based on their employment by such an Entity during the Class Period) in the Banking, Gaming, Financial, Insurance, Oil and Gas, Real Estate Development, Defense Contractor Industries, and Entities selling or marketing BP-branded fuel (including jobbers and branded dealers) as defined in Section 2.2.4. In addition, the Economic Class, Plaintiffs' and Economic Class Members' Claims for punitive or exemplary damages against Halliburton and Transocean are reserved.

10.3.    Released Parties, for purposes of the Released Claims means (i) BP (including all persons, entities, subsidiaries, divisions and business units comprised thereby), together with (ii) the Deepwater Horizon Oil Spill Trust; (iii) the persons, entities, divisions, and business units listed on Exhibit 20 ("Other Released Parties"); (iv) each of BP's and the Other Released Parties' respective past, present and future directors, officers, employees, general or limited partners, members, joint venturers, and shareholders, and their past, present and future spouses, heirs, beneficiaries, estates, executors, administrators, personal representatives, attorneys, agents, trustees, insurers, reinsurers, predecessors, successors, indemnitees, assigns; (v) any natural, legal or juridical person or Entity acting on behalf of or having liability in respect of BP or the Other Released Parties, in their respective capacities as such; and (vi) the federal Oil Spill Liability Trust Fund and any state or local fund, and, as to i-vi above, each of their respective Affiliates, including their Affiliates' officers, directors, shareholders, employees, and agents. Released Parties will also include any vessels owned or chartered by any Released Party (except for the Deepwater Horizon itself). Notwithstanding anything herein to the contrary, in no event shall any of the following be deemed

71

to be a Released Party:  Transocean or Halliburton.  The Economic Class, Plaintiffs and Economic Class Members specifically reserve its and their rights for punitive and exemplary damages against Transocean and Halliburton.  In addition, the Economic Class specifically reserves its rights under the Assigned Claims.

10.4.      Release shall mean those Releases set forth in this Section 10.

10.5.      Unknown Claims and damages or not currently known claims and damages (whether or not capitalized) shall mean all past, present and future claims and damages arising out of facts, including new facts or facts found hereafter to be other than or different from the facts now believed to be true, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident covered by the Release in Section 10 that any Natural Person or Entity providing a Release, including the Plaintiffs and Economic Class Members, do not, in whole or in part, know or suspect to exist and which, if known by them, might have affected their decision to provide such Release, including all claims arising out of new facts or facts found hereafter to be other than or different from the facts now believed to be true.

10.6.      The Economic Class, Plaintiffs and the Economic Class Members expressly waive and release with prejudice, and shall be deemed to have waived and released with prejudice, any and all rights that they may have under any law, codal law, statute, regulation, adjudication, quasi-adjudication, decision, administrative decision, or common law principle that would otherwise limit the effect of the Release to those claims or matters actually known or suspected to exist at the time of execution of the Release.  California law is not applicable to this Agreement, but purely for illustrative purposes the Released Claims include, but are not limited to the release of claims provided for in Section 1542 of the California Civil Code, which provides as follows:  **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or**

72

**her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

10.7.     The Release is not intended to prevent BP from exercising its rights of contribution, subrogation, or indemnity under the OPA or any other law, including its rights of assignment regarding Assigned Claims as set forth in Exhibit 21. BP is hereby subrogated to any and all rights that the Economic Class Members, or any of them, may have had or have arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the *Deepwater Horizon* Incident under the OPA. All such rights of BP to contribution, indemnity, and subrogation, and BP's subrogation to the rights of Economic Class Members, are subject to the provisions regarding Assigned Claims in Exhibit 21.

10.8.     The Economic Class Members shall be required to provide the following certifications:

10.8.1.     For business or property claims: "I certify that either: (1) I have not made an insurance claim or received any insurance proceeds for any business or property claim arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident; <u>or</u> (2) if I have made or do make an insurance claim and/or receive or have received insurance proceeds for any business or property claim arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, I will indemnify BP for any liability and defense costs it incurs for a subrogation claim made against BP arising out of (a) such insurance proceeds provided that the subrogation claim is brought by an entity seeking payment of insurance proceeds to me for any business or property claim arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident; and (b) the amount that I indemnify BP shall not exceed the amount of insurance proceeds that I received for the business or property claim at issue."

10.8.2.     For individual claims: "I certify that either (1) I have not made a claim for

unemployment insurance benefits arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident; <u>or</u> (2) if I have made or do make a claim for unemployment insurance benefits arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, I will indemnify BP for any liability and defense costs it incurs for a subrogation claim made against BP arising out of such insurance proceeds provided that the subrogation claim is brought by an entity seeking payment of insurance proceeds to me for any business or property claim arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident; and the amount that I indemnify BP shall not exceed the amount of insurance proceeds that I received for the unemployment insurance benefits claim at issue."

10.9.    As a condition precedent to receiving a Settlement Payment, including after the Effective Date, a Claimant must sign an Individual Release.

10.10.   The Parties agree that this Agreement and Release is entered into in consideration of the agreements, promises, and mutual covenants set forth in this Agreement, the Release, the entry of the Final Order and Judgment dismissing all Released Claims against all Released Parties with prejudice and approving the terms and conditions of the Settlement as set forth in this Agreement, and for such other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, subject to the Parties' ongoing performance of this Agreement and the **GUARANTOR'S** and **BACK-UP GUARANTOR'S** respective Guarantees of the BP Parties' payment obligations hereunder in accordance with the terms of the Guarantees.

10.11.   Consistent with the Claim Frameworks for Coastal Real Property Claims and Wetlands Real Property Claims, the Economic Class, Plaintiffs and the Economic Class Members agree not to institute federal or state regulatory proceedings concerning cleanup, removal, spill response or remediation of Real Property as a

means to seek the redress of Released Claims. Other provisions concerning regulatory proceedings in the Claim Framework for Coastal Real Property Claims and Wetlands Real Property Claims are incorporated herein by reference.

10.12.  Dismissal of All Claims

10.12.1.  In consideration of the benefits provided under this Agreement, upon the Effective Date, all Released Claims by or on behalf of the Economic Class, Plaintiffs or any and all Economic Class Members against any and all Released Parties shall be dismissed with prejudice.

10.12.2.  From and after the Effective Date for the consideration provided for herein and by operation of the Final Order and Judgment, this Agreement shall be the exclusive remedy for any and all Released Claims by or on behalf of the Economic Class, Plaintiffs or any and all Economic Class Members against any and all Released Parties, and the Economic Class, Plaintiffs and Economic Class Members shall not recover, directly or indirectly, any sums from any Released Parties for any Released Claims other than those received for the Released Claims under the terms of this Agreement.

10.12.3.  From and after the Effective Date, the Parties agree that the Economic Class, Plaintiffs and each and every Economic Class Member, and all other persons and Entities claiming by, through, or on behalf of, them will be forever barred and enjoined from commencing, filing, initiating, instituting, prosecuting, maintaining, or consenting to any judicial, arbitral, or regulatory action against the Released Parties with respect to the Released Claims.

10.12.4.  From and after the Effective Date, if the Economic Class, Plaintiffs or any Economic Class Member commences, files, initiates, or institutes any new action or other proceeding for any Released Claims against the Released Parties in any federal or state court, arbitration tribunal, or administrative or other forum, such action or other proceeding shall be dismissed with

prejudice and at the cost of (a) the Economic Class if the Economic Class brings such action or proceeding, or (b) the Plaintiffs and/or Economic Class Members who bring such action or proceeding provided, however, before any costs may be assessed, counsel for such Economic Class Member, or, if not represented, such Class Member shall be given reasonable notice and an opportunity voluntarily to dismiss such new action or proceeding with prejudice. Furthermore, if any Released Party brings any legal action before any Court or arbitration, regulatory agency, or other tribunal to enforce its rights under this Agreement, such Released Party shall be entitled to recover any and all related costs and expenses (including attorneys' fees) from (a) the Economic Class if the Economic Class brings such action, or (b) the Plaintiffs and/or Economic Class Members who bring such action; in violation or breach of its obligations under this Section 10.

11. **ASSIGNMENT AND PROTECTIONS.**

11.1. The Parties have agreed to the terms of an assignment and certain protections for Released Parties as set forth in Exhibit 21.

12. **DENIAL OF WRONGDOING OR LIABILITY.**

12.1. This Agreement constitutes the resolution of disputed claims and is for settlement purposes only. BP expressly denies that it has committed all of the alleged wrongdoing in the Action, or is liable for all of the wrongs and theories alleged therein. Nevertheless, BP has concluded that it is in BP's best interest that the Action be settled on the terms and conditions set forth in this Agreement. BP reached this conclusion after considering the factual and legal issues in the Action, the substantial benefits of a final resolution of the Action, the expense that would be necessary to defend the Action through trial and any appeals that might be taken, the benefits of disposing of protracted and complex litigation, and the desire of BP to conduct its business unhampered by the distractions of continued litigation over the Released Claims. Plaintiffs and BP agree that neither this Agreement, nor any actions undertaken by the BP Parties in the negotiation, execution or satisfaction of this Agreement shall constitute, or be construed as, an

admission of any liability or wrongdoing, or recognition of the validity of any allegation of fact or law made by the Plaintiffs, the Economic Class or by any Economic Class Member in this Action or in any other action or proceeding.

12.2.    This Agreement, any statements or negotiations made in connection with this Agreement, and any actions undertaken by BP under this Agreement, shall not be offered or be admissible as evidence or used in any other fashion against BP in any lawsuit, action, hearing or proceeding for any purpose, including the existence, certification or maintenance of any purported class, except (i) in any action or proceeding brought to enforce the terms of this Agreement by the Economic Class, or by any Economic Class Member, against the BP Parties, or (ii) by BP in defense of any claims against it brought by Plaintiffs, the Economic Class, or by any Economic Class Member in any other action.  Nor shall this Agreement serve as precedent in any manner, because the Agreement is based on the specific facts of this matter and is for settlement purposes only.

12.3.    The use of environmental data (including **SCAT** and NRDA data) as part of this Agreement shall not constitute an admission or judicial determination related to the admissibility or interpretation of such data for any other purpose, and, further, the use of such data shall have no effect on, and shall be without prejudice to, the use, admissibility and interpretation of such data for any other purpose, including any claims for natural resource damages.  The fact that the Claims Administrator or the Court accepts or relies upon any evidence of loss submitted by the Economic Class or any Economic Class Member shall not constitute a finding or determination of loss or damage for any purpose including, but not limited to, in any proceedings related to claims for natural resource damages; further the Parties agree that the use, submission, interpretation or acceptance (including non-objection) of such evidence shall not constitute an admission or determination that such evidence is relevant or admissible for any purpose other than the Settlement Program under this Agreement.

13. **REPRESENTATIONS AND WARRANTIES.**

13.1.    Interim Class Counsel and Proposed Economic Class Counsel represent and
warrant that they have authority to enter into this Agreement on behalf of the
Economic Class Representatives**.**

13.2.    The BP Parties represent and warrant that they have all requisite corporate power
and authority to execute, deliver and perform this Agreement.  The execution,
delivery, and performance by the BP Parties of this Agreement has been duly
authorized by all necessary corporate action.  This Agreement has been duly and
validly executed and delivered by the BP Parties, and constitutes their legal, valid
and binding obligation.

13.3.    The Parties warrant and represent that no promise or inducement has been offered
or made for the Release contained in Section 10, except as set forth expressly
herein, and that this Agreement, including its Release, is executed without
reliance on any statements or any representations not contained herein, and that
this Agreement and its Release reflect the entire Agreement between the Parties.
The warranties and representations made throughout the Agreement shall survive
the execution and delivery of this Release and shall be binding upon the
respective heirs, representatives, successors and assigns of each of the Parties.

13.4.    Plaintiffs and Proposed Economic Class Counsel expressly acknowledge and
represent that they (a) have performed an independent investigation of the
allegations of fact and law made in connection with the Deepwater Horizon
Economic Litigation; and (b) may hereafter discover facts in addition to, or
different from, those that they now know or believe to be true with respect to the
subject matter of this Agreement and/or the actions or matters covered by the
Release.  Nevertheless, the Parties intend to resolve their disputes pursuant to the
terms of this Agreement and thus, in furtherance of their intentions, the
Agreement shall remain in full force and effect notwithstanding the discovery
after the date of this Agreement or at any other time of any additional facts or law,

78

or changes in law, and this Agreement shall not be subject to rescission or modification by reason of any change or difference in facts or law.

13.5.    The Parties specifically understand that there may be further pleadings, discovery responses, documents, testimony, or other matters or materials owed by the Parties to each other, pursuant to existing pleading requirements, discovery requests, pretrial rules, procedures, orders, decisions, or otherwise, and that, as of the date of this Agreement, each Party expressly waives any right to receive, inspect, or hear such pleadings, discovery, testimony, or other matters or materials during the pendency of the Settlement proceedings contemplated by this Agreement and subject to further order of the Court.

## 14. PLAINTIFFS' COUNSEL'S ATTORNEY'S FEES AND COSTS.

14.1.    As a material term and condition precedent to a Settlement Agreement, the BP Parties and the PSC must reach agreement regarding the amount of attorneys' fees and costs for the common benefits to the putative Economic Class, which will be subject to final determination and approval by the Court.  In no event will the BP Parties be obligated to pay more in fees and costs in connection with the putative Economic Class than the amount to be agreed to with the PSC.  The Parties have not had any fees discussion to date, and will not have such a discussion until the Court has first authorized such discussions.  Details regarding this provision shall be negotiated and attached as Exhibit 27.

## 15. FINAL ORDER AND JUDGMENT, DISMISSAL WITH PREJUDICE.

15.1.    The Parties shall jointly seek a Final Order and Judgment that:

15.1.1.    approves the Settlement in its entirety pursuant to Fed. R. Civ. P. 23(e) as fair, reasonable, and adequate;

15.1.2.    finds that this Agreement, with respect to Economic Class Members who are minors, lack capacity, or are incompetent, is fair, reasonable and adequate;

15.1.3.     confirms the certification of the Economic Class, for settlement purposes only;

15.1.4.     confirms the appointment of the Economic Class Representatives;

15.1.5.     confirms the appointment of the Economic Class Counsel and Lead Class Counsel;

15.1.6.     finds that the Class Notice and Class Notice Plan satisfied and satisfy the requirements set forth in Fed. R. Civ. P. 23(c)(2)(B);

15.1.7.     permanently bars and enjoins each Economic Class Member from commencing, asserting, and/or prosecuting any and all Released Claims against any Released Party;

15.1.8.     dismisses with prejudice the Action without further costs, including claims for interest, penalties, costs and attorneys' fees;

15.1.9.     dismisses with prejudice all the Released Claims by the Releasing Parties against the Released Parties without further costs, including claims for interest, penalties, costs and attorneys' fees;

15.1.10.     orders the dismissal with prejudice of all **RELATED CLAIMS** pending in the Court, and without further costs, including claims for interest, penalties, costs, and attorneys' fees;

15.1.11.     orders all Economic Class Members with Related Claims pending in any federal or state court, forum, or tribunal other than the Court to dismiss with prejudice such Related Claims, and without further costs, including claims for interest, penalties, costs, and attorneys' fees;

15.1.12.     confirms the appointment of the Claims Administrator and Claims Administration Vendors;

15.1.13.     expressly incorporates the terms of this Agreement and provides that the

Court retains continuing and exclusive jurisdiction over the Parties, the Economic Class Members and this Agreement, to interpret, implement, administer and enforce the Agreement, in accordance with its terms;

15.1.14.    orders all Economic Class Members to comply with the Assignment and Protections provisions of Section 11 and Exhibit 21.

## 16. COOPERATION OF PARTIES AS TO CONSUMMATION OF SETTLEMENT.

16.1.    The Parties agree to take all actions necessary to obtain final approval of this Agreement and entry of a Final Order and Judgment, including the terms and provisions described in this Agreement, and dismissing all Released Claims against all Released Parties with prejudice.  Upon the Effective Date, the Parties also agree to take all actions and steps necessary to obtain dismissal of all other lawsuits that are pending and/or may be filed against BP, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the subject matter of the Deepwater Horizon Economic Litigation, to the extent of Released Claims against Released Parties.

## 17. COOPERATION OF PARTIES AS TO SUPPORT OF SETTLEMENT.

17.1.    The Parties agree to support the final approval and implementation of this Agreement and defend it against objections, appeal, or collateral attack.  Neither the Parties nor their Counsel, directly or indirectly, will encourage any person to object to the Economic and Property Damages Settlement.  Nothing in this Agreement shall impair BP's right to take any action to defend itself in any trial where BP is a party.

## 18. CONTINUING JURISDICTION.

18.1.    Pursuant to the Final Order and Judgment, the Court shall retain continuing and exclusive jurisdiction over the Parties and their Counsel for the purpose of enforcing, implementing and interpreting this Agreement, including all issues relating to the scope, application and/or operation of the Release in Section 10 above, including jurisdiction over all Economic Class Members, and over the

81

administration and enforcement of the Agreement and the distribution of its benefits to Economic Class Members, and any dispute arising as to the action or election of any Party under Section 21 below regarding the enforceability or illegality of any provisions of this Agreement. Any disputes or controversies arising out of or related to the interpretation, enforcement or implementation of the Agreement and the Release shall be made by motion to the Court. In addition, the Parties, including each member of the Economic Class as defined in the Final Order and Judgment, and their Counsel are hereby deemed to have submitted irrevocably to the exclusive jurisdiction of this Court for any suit, action, proceeding or dispute arising out of or relating to this Agreement. The terms of the Agreement shall be incorporated into the Final Order and Judgment of the Court dismissing with prejudice all Released Claims by the Economic Class, Plaintiffs, and Economic Class Members against all Released Parties, which shall allow that Final Order and Judgment to serve as an enforceable injunction by the Court for purposes of the Court's continuing jurisdiction related to the Agreement.

18.2.     Before filing any motion or petition in the Court raising a dispute arising out of or related to this Agreement, counsel for the Parties shall consult with each other and certify to the Court that they have consulted.

## 19. **STAY OR ADJOURNMENT OF ALL PROCEEDINGS.**

19.1.     BP's position is that a stay or adjournment of any trial proceeding (including the previously set Phase I trial) that would or might determine BP's liability to the Economic Class is a material term and condition precedent to the Settlement from the date of the Parties' execution of this Agreement through the Court's determination of the fairness of the Settlement. Plaintiffs and Proposed Economic Class Counsel shall not oppose BP's position.

## 20. **DUTIES OF ECONOMIC CLASS COUNSEL.**

20.1.     Interim Class Counsel and Proposed Economic Class Counsel acknowledge that under applicable law their duty is to the entire Economic Class, to act in the best interest of the Economic Class as a whole, with respect to promoting, supporting,

and effectuating, as fair, adequate and reasonable, the approval, implementation, and administration of the Settlement embodied in this Agreement, and that their professional responsibilities as attorneys are to be viewed in this light, under the ongoing supervision and jurisdiction of the Court that appoints them to represent the interests of the Economic Class.

21. **ILLEGALITY OR UNENFORCEABILITY OF PROVISIONS.**

21.1.　In the event that the Release contained in Section 10 above, or the Individual Releases as to all Economic Class Members contained in Section 4 above, or any portion or provision thereof, shall for any reason be held in whole or in part to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision, or portion thereof, if the BP Parties elect in their sole discretion in writing to proceed as if such invalid, illegal, or unenforceable provision, or portion thereof, had never been included in this Agreement.  Alternatively, the BP Parties, in these circumstances, may elect in writing that the entire Agreement be rendered null and void consistent with the terms described in Section 21.3 below.

21.2.　In the event that any other material provision of this Agreement, with materiality to be determined jointly by the Parties in their sole but good faith discretion, shall for any reason be held in whole or in part to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision, or portion thereof, of this Agreement if either Party elects in writing to proceed as if such invalid, illegal, or unenforceable provision, or portion thereof, had never been included in this Agreement.  Alternatively, either Party may, in these circumstances, elect in writing that the entire Agreement be rendered null and void consistent with the terms described in Section 21.3 below. Such election shall be prospective from the date of the election.

21.3.　This Agreement shall, at the written election of the BP Parties filed in the MDL 2179 (E.D. La.), become null and void and shall have no further effect with respect to any Party to the Deepwater Horizon Economic Litigation if any of the

events or actions in Sections 21.3.1 to 21.3.4 occur.  If this Agreement for any reason terminates and becomes null and void, the Claims Administrator will continue to process Claims that have been submitted but as to which the Claimant has not executed an Individual Release.  However, each such Claimant must agree to be individually represented by an attorney of the Claimant's choice (if not already represented) or by one or more of the attorneys who served as Economic Class Counsel, who must agree in writing to accept such representation, as a precondition for payment.  There shall be no payment until an Individual Release has been executed.  Claimants who have already received an initial payment on one or more of their Claims and executed an Individual Release shall still receive the full six months from the initial payment to make another Claim, as provided in Section 4.4.8, notwithstanding any termination of the Agreement.

21.3.1.   the Preliminary or Final Approval of the Settlement described in this Agreement is not obtained or is reversed on appeal by a court of last resort; or

21.3.2.   the Effective Date does not occur for any reason; or

21.3.3.   entry of the Final Order and Judgment is finally reversed; or

21.3.4.   the Final Order and Judgment is materially modified by the Court or on appeal by a court of last resort.

21.3.5.   Such written election must be made within thirty (30) days of the BP Parties receiving written notice of any of the events described in Sections 21.3.1 through 21.3.4 above.

21.3.6.   In addition, the BP Parties have the absolute and unconditional right, before the date of the Final Approval Hearing, solely at their option, to terminate this Agreement in the event the number of potential Economic Class Members who have filed valid and timely requests for exclusion (Opt Out) exceeds a number agreed to by the Parties and to be filed with the Court in a sealed envelope or in the event the Court permits or allows a certified class

84

of Natural Persons or Entities who are also members of the Economic Class to Opt Out of the Settlement after the BP Parties and/or Plaintiffs challenge such Opt Out by a certified class.

21.3.7. In the event this Agreement is terminated, this Agreement shall not be offered into evidence or used in this or any other action for any purpose, including in support or opposition to the existence, certification or maintenance of any purported class. In such event, this Agreement, and all negotiations, proceedings, documents prepared and statements made in connection with this Agreement, shall be without prejudice to any Party and shall not be admissible into evidence and shall not be deemed or construed to be an admission or concession by any Party of any fact, matter or proposition of law and shall not be used in any manner for any purpose, and all Parties shall stand in the same position as if this Agreement had not been negotiated, made, entered into or filed with the Court.

21.3.8. If this Agreement for any reason terminates and becomes null and void, the Parties shall jointly move the Court to vacate the Preliminary Approval Order and any other orders certifying a class in the Action. However, as set forth more fully in Section 10 above, any Economic Class Member who or that received a Settlement Payment and executed an Individual Release is fully bound and shall continue to be bound by the Individual Release.

21.3.9. If the Agreement terminates for any of the reasons in this Section, any unspent funds shall revert to BP, including any funds described in Section 5.12.

22. **PRESERVATION OF CONFIDENTIAL DOCUMENTS.**

22.1. In the event any confidential documentation is provided by or on behalf of the Parties in the course of the Settlement process, the Parties and their Counsel agree that all such documentation shall be preserved until after performance of all terms of the Agreement is completed, and the use of such documentation shall be

85

governed by the following pretrial orders entered in the MDL: Pretrial Order No. 13, Order Protecting Confidentiality; Pretrial Order No. 29, Regarding Documents Produced by BP in the Texas City Litigation; Pretrial Order No. 38, Order Relating to Confidentiality of Settlement Communications; and Pretrial Order No. 47, Order Regarding Designation of Documents as "Confidential" or "Highly Confidential." The Parties shall continue to treat documents in conformity with the requirements of the confidentiality requirements of the foregoing pretrial orders.

23. **INTERPRETATION.**

   23.1.    All references in this Agreement to a section, article, exhibit or schedule are to a section, article, exhibit or schedule of this Agreement, unless otherwise indicated. Whenever the context may require, any pronoun will include the corresponding masculine, feminine, and neuter forms. The words "includes" and "including" will be deemed to be followed by the words "without limitation" whenever used. Any definition of or reference to any agreement, instrument or other document will be construed as from time to time amended, supplemented or otherwise modified. Any definition of or reference to any law will be construed as referring to such law as from time to time amended and any successor to such law and to the rules and regulations issued from time to time under such law.

   23.2.    The titles in this Agreement are for convenience only and shall not be used to interpret the provisions of the Agreement.

24. **NO PENALTY OR FINE.**

   24.1.    The Parties agree and acknowledge that no consideration, amount or sum paid, credited, offered, or extended, or to be paid, credited, offered, or extended, by any of the Defendants in the performance of this Agreement constitutes a penalty, fine, or any other form of assessment for any alleged claim or offense.

25. **AGREEMENT MUTUALLY PREPARED.**

   25.1.    This Agreement shall be deemed to have been mutually prepared by the Parties and shall not be construed against any of them by reason of authorship.

26. **BINDING AND ENTIRE AGREEMENT.**

26.1.    Plaintiffs, the Economic Class, and each Economic Class Member and the BP
Parties expressly and each agree that the terms of this Agreement, and all
provisions hereof, including all representations, promises, agreements, covenants
and warranties, and including the Exhibits thereto, are contractual and not a mere
recital and shall survive the execution of this Agreement.  This Agreement and its
exhibits, attachments, and appendices shall constitute the entire agreement and
understanding among the Parties and supersedes all prior proposals, negotiations,
agreements, and understandings relating to the subject matter of this Agreement.
This Agreement shall be binding upon and shall inure to the benefit of the Parties
hereto and their representatives, heirs, successors and assigns.

27. **RECEIPT OF ADVICE OF COUNSEL.**

27.1.    Plaintiffs acknowledge, agree and specifically warrant and represent that they
have discussed with a representative of Interim Class Counsel the terms of this
Agreement relevant to them, and the Release contained in Section 10 above, have
received legal advice with respect to the advisability of entering into this
Agreement and the Release, and the legal effect of this Agreement and the
Release.

28. **EXTENSION OF TIME AND MINISTERIAL CHANGES.**

28.1.    The Parties may agree, subject to approval of the Court where required, to
reasonable extensions of time to carry out and/or implement the terms and
provisions of this Agreement and to make necessary ministerial changes to this
Agreement.

29. **EXECUTION OF AGREEMENT IN COUNTERPARTS.**

29.1.    This Agreement may be executed in counterparts, and a facsimile signature shall
be deemed an original signature for purposes of this Agreement.

## 30. DECEASED, DISSOLVED OR BANKRUPT CLASS MEMBERS.

30.1.    Where an Economic Class Member is deceased and a payment is due to that Economic Class Member, upon receipt of proper notification and documentation the Settlement Payment will be made to such Economic Class Member's personal representative.  Where an Economic Class Member is no longer in business or dissolved and a Settlement Payment is due to that Economic Class Member, upon receipt of proper notification and documentation the Settlement Payment will be made to such Economic Class Member or its creditors (including governmental taxing authorities) as the Claims Administrator shall reasonably determine.  Where an Economic Class Member has been declared bankrupt, or is the subject of an open and ongoing bankruptcy proceeding, and a Settlement Payment is due to that Economic Class Member, upon receipt of proper notification and documentation the Settlement Payment shall be made to such Economic Class Member in accordance with the applicable United States Bankruptcy Code provisions.

## 31. MINOR AND INCOMPETENT CLASS MEMBER SETTLEMENT PROVISION.

31.1.    A Guardian Ad Litem shall be nominated by the Parties and approved by the Court under Fed. R. Civ. P. 17(c) to examine this Agreement and make a recommendation to the Court regarding the fairness, reasonableness and adequacy of this Agreement to determine whether the Settlement is in the best interest of such Economic Class Members who are **MINOR CLASS MEMBERS** or **INCOMPETENT CLASS MEMBERS**.  The Guardian Ad Litem shall investigate the potential claims for all persons who are minors or incompetent adults, who, but for their lack of capacity, may otherwise participate as Economic Class Members, and shall, following such investigation, report the results of his or her independent investigation to the Parties, and make a recommendation to the Court as to the fairness, reasonableness and adequacy of this Agreement to determine whether the Settlement is in the best interest of such Economic Class Members.

31.2.    In processing a Minor Class Member's claim, to promote judicial efficiency, the Claims Administrator may review all relevant laws relating to distribution of a Minor Class Member's benefits under this Agreement, such that where streamlined procedures exist not requiring domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of a claims administration protocol applicable to Minor Class Members. The Claims Administrator is also authorized to exercise reasonable discretion in delaying payment to a Minor Class Member where, through a reasonable period of time, such person will reach age of majority; thereby rendering moot any minor settlement or similar proceedings following the law of that Minor Class Member's domicile.

31.3.    Minor or Incompetent Class Members who are otherwise represented by another adult Natural Person, as tutor, guardian, conservator or similar fiduciary at the time of submission of a Claim Form, need not have their rights protected under this Agreement through the Guardian Ad Litem.

31.4.    The Guardian Ad Litem shall work with the Claims Administrator to identify those persons in need of representation before the Court to promote the interests of judicial efficiency through application of federal procedural law, taking into account any relevant state laws that impact distribution to such Minor Class Members and Incompetent Class Members, to ensure that the rights of those persons are fully exercised under the terms of this Agreement.

31.5.    Where a Minor Class Member or Incompetent Class Member is also legally represented in accordance with the law of domicile of such person, the Guardian Ad Litem shall have no standing or power on behalf of such Minor Class Member or Incompetent Class Member

## 32. **NO TAX ADVICE.**

32.1.    No opinion regarding the tax consequences of this Settlement to any individual Economic Class Member is being given or will be given by BP or its counsel,

Interim Class Counsel or Proposed Economic Class Counsel, nor is any representation or warranty in this regard made by virtue of this Agreement. Plaintiffs must consult their own tax advisors regarding the tax consequences of the Settlement, including any payments provided hereunder and any tax reporting obligations they may have with respect thereto. Each Economic Class Member's tax obligations, and the determination thereof, are his, her, or its sole responsibility, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Economic Class Member. The BP Parties shall have no liability or responsibility whatsoever for any such tax consequences resulting from payments under this Settlement. To the extent required by law, the BP Parties will report payments made under the Agreement to the appropriate authorities.

## 33. **NO OTHER RIGHTS OR REMEDIES.**

33.1.  Nothing expressed or implied in this Agreement is intended to or shall be construed to confer upon or give any Natural Person or Entity other than Economic Class Members, Plaintiffs, the BP Parties and the Released Parties any right, benefit, entitlement, claim, cause of action or remedy under or by reason of this Settlement.

## 34. **NOTICE**

34.1.  Written Notice to the Plaintiffs or Economic Class Counsel must be given to Stephen J. Herman, Herman Herman Katz & Cotlar, 820 O'Keefe Avenue, New Orleans, LA 70113, Sherman@hhkc.com, and James P. Roy, Domengeaux Wright Roy & Edwards, 556 Jefferson Street, Lafayette, LA 70502, jimr@wrightroy.com. Written notice to BP must be given to Richard C. Godfrey, Kirkland & Ellis LLP, 300 North LaSalle Blvd, Chicago, IL 60654, rgodfrey@kirkland.com, and R. Keith Jarrett, Liskow & Lewis, Suite 5000, One Shell Square, 701 Poydras Street, New Orleans, LA 70139, rkjarrett@liskow.com. All notices required by the Agreement shall be sent by overnight delivery and electronic mail.

35. **WAIVER**

35.1.  The waiver by any Party of any breach of this Agreement by another Party shall not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, to this Agreement.

36. **APPLICABLE LAW**

36.1.  Notwithstanding the law applicable to the underlying claims, which the Parties dispute, this Agreement and the Release and Individual Releases hereunder shall be interpreted in accordance with General Maritime Law as well as in a manner intended to comply with OPA.

37. **GUARANTOR**

37.1.  BPCNA shall not be a Party to this Agreement, but shall serve as Guarantor of the BP Parties' payment obligations under this Agreement as set forth in the Guarantee attached hereto as Exhibit 24A. BP p.l.c. shall not be a Party to this Agreement, but shall serve as a Back-Up Guarantor as set forth in the Guarantee attached hereto as Exhibit 24B.

38. **DEFINITIONS.**[6]

38.1.  For purposes of this Agreement, the following terms (designated by capitalization throughout this Agreement) shall have the following meanings. Terms used in the singular shall be deemed to include the plural and vice versa. In addition, many of the Exhibits to this Agreement contain Definitions, which shall be applicable to any and all provisions applying, referencing or incorporating such Exhibit.[7]

38.2.  Action shall mean the Complaint filed in *Bon Secour Fisheries, Inc. v. BP* on or about April 16, 2012, Civil Action No. 12-970, and any amendments thereto.

38.3.  Affiliate means with respect to any Natural Person or Entity, any other Natural Person or Entity that directly, or indirectly, through one or more intermediaries,

---

[6] These definitions are of key terms used in the Agreement. Additional definitions may be found in the Exhibits hereto, and shall not be repeated herein.

[7] For example, Exhibit 3 contains Seafood Distribution Chain definitions.

controls, or is controlled by, or is under common control with, such Natural Person or Entity.

38.4.  Agreement shall mean this Economic and Property Damages Settlement Agreement.

38.5.  Appeal Panel shall mean the panel appointed pursuant to the Appeal Process.

38.6.  Appeal Panelist shall mean an individual serving on the Appeal Panel pursuant to the Appeal Process.

38.7.  Appeal Process shall mean the process through which an Economic Class Member may appeal a decision by the Settlement Program regarding the payment of compensation pursuant to one or more of the Claims Processes under this Agreement as set forth in Section 6 above and presented more fully in Exhibit 25.

38.8.  Assigned Claims shall mean the claims defined in Exhibit 21.

38.9.  Back-Up Guarantor shall mean BP p.l.c.

38.10.  Benchmark Period shall have the meaning set forth in the Definitions section of the relevant framework (*e.g.*, Business Economic Loss, Individual Economic Loss) applicable to a Claim.

38.11.  Bodily Injury Claims shall mean claims and damages, including lost wages, for or resulting from personal injury, latent injury, future injury, progression of existing injury, damage, disease, death, fear of disease or injury or death, mental or physical pain or suffering, or emotional or mental harm, anguish or loss of enjoyment of life, including any claim for mental health injury, arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident.

38.12.  BP shall mean BP Exploration & Production Inc., BP America Production Company, BP America Inc., BP Company North America Inc., BP Corporation North America Inc., BP Corporation North America Inc. Savings Plan

Investment Oversight Committee, BP Energy Company, BP Exploration (Alaska) Inc., BP Global Special Products (America) Inc., BP Holdings North America Limited, BP p.l.c., BP Products North America Inc., and each of their respective direct or indirect parents, subsidiaries and subsidiary undertakings (as those terms are defined in the U.K. Companies Act 2006), Affiliates, divisions, and business units.

38.13.   BP's Counsel shall mean Kirkland & Ellis LLP and Liskow & Lewis.

38.14.   BP Parties shall mean BP Exploration & Production Inc. and BP America Production Company.

38.15.   Business Claimant or Business Economic Loss Claimant shall mean an Entity, or a self-employed Natural Person who filed a Form 1040 Schedule C, E or F, which or who is an Economic Class Member claiming Economic Damage allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident.

38.16.   Business Economic Loss Claims shall mean the Claims brought by the Business Economic Loss Claimants described in Exhibits 4A-7.

38.17.   Charterer shall mean BP, Lawson, USMS, USES, DRC, or any other BP subcontractor utilized by BP to implement the VoO Program.

38.18.   Charter Fishing shall mean owners, captains and deckhands that carry Passenger(s) for Hire to engage in Recreational Fishing.

38.19.   Claim shall mean any demand or request for compensation (other than Bodily Injury Claims or Expressly Reserved Claims), together with any properly completed form and accompanying required documentation, submitted by a Claimant to the Settlement Program.

38.20.   Claimant shall mean any Natural Person or Entity that submits a Claim to the Settlement Program seeking compensation as a member of the Economic Class.

93

38.21.  Claims Administrator shall mean that person or entity selected and appointed or designated by the Court who shall administer this Economic and Property Damages Settlement under the supervision of the Court in accordance with the terms set forth in Section 4.

38.22.  Claims Administration Panel shall mean the panel consisting of the Claims Administrator, one representative designated by BP and one representative designated by Lead Class Counsel.

38.23.  Claims Administration Staff shall mean the individuals employed by the Claims Administrator and or Claims Administration Vendors.

38.24.  Claims Administration Vendor. The initial Claims Administration Vendors have been selected by the Parties and approved by the Court. Subsequently, Claims Administration Vendors shall mean an Entity or Entities selected by the Parties and approved by the Court.

38.25.  Claim Forms shall mean all forms and materials required under this Agreement or by the Settlement Program to support a Claim, including all supporting documentation required by any such Claim Form.

38.26.  Claim Processes shall mean the Seafood Compensation Program Claim Process, Coastal Real Property Claim Process, Economic Damage Claim Process, Real Property Sales Claim Process, Subsistence Claim Process, VoO Claim Process, Vessel Physical Damage Claim Process and Wetlands Real Property Claim Process.

38.27.  Class Notice Administrator shall mean the entity selected and appointed or designated by the Court who shall administer the Class Notice and Class Notice Plan.

38.28.  Class Period shall mean April 20, 2010 until the date of the filing of the Action, which is April 16, 2012.

38.29.   Coastal Real Property shall mean the property in the Coastal Real Property Claim Zone.

38.30.   Coastal Real Property Claim Process shall mean that process described in the Compensation Framework for Coastal Real Property Claims, attached as Exhibit 11A.

38.31.   Coastal Real Property Claim Zone shall mean the areas identified on the Coastal Real Property Compensation Zone Map included with the Coastal Real Property Claim Framework.

38.32.   Coastal Real Property Claimant shall mean an Economic Class Member claiming to have suffered Coastal Real Property Damage.

38.33.   Coastal Real Property Compensation Amount shall mean the Compensation Amount calculated for an eligible Coastal Real Property Claimant for Coastal Real Property Damage pursuant to the terms of the Agreement including the Coastal Real Property Claim Framework.

38.34.   Coastal Real Property Damage shall mean a loss alleged by a Coastal Real Property Claimant that satisfies the requirements set forth in the Coastal Real Property Claim Framework.

38.35.   Compensation Amount shall mean that amount awarded to a Claimant prior to the addition of any RTP.

38.36.   Compensation Period shall have the meaning set forth in the Definitions section of the relevant framework (*e.g.*, Business Economic Loss, Individual Economic Loss) applicable to a Claim.

38.37.   Consumer shall mean a Natural Person or an Entity who or which buys any product for individual use or consumption and not for manufacture or resale.

38.38.   "Contemporaneous" or "Contemporaneously prepared" records or documentation shall mean documents or other evidence generated or received in the ordinary

95

course of business at or around the time period to which they relate; in the case of financial statements, this shall include all periodic financial statements regularly prepared in the ordinary course of business. In addition, "contemporaneous" or "contemporaneously" prepared evidence or documentation, even if not proximate in time to the event or occurrence to which it relates, shall include (1) documentation that is based on or derived from other data, information, or business records created at or about the time of the event, occurrence or item in question, (2) a statement that is consistent with documentation created at or about the time of the event, occurrence or item in question, or (3) would support a reasonable inference that such event, occurrence, or other item in question actually occurred.

38.39.   Corporate Headquarters or Headquarters shall mean a physical office in which the principal executive offices and direct support staff for senior management functions of a business Entity are located.

38.40.   Court shall mean the United States District Court for the Eastern District of Louisiana, Judge Carl Barbier, presiding, in *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179.

38.41.   Deepwater Horizon Court Supervised Settlement Program or Settlement Program shall mean all of the activities and obligations of the Claims Administrator or those under his supervision necessary to implement the Deepwater Horizon Economic and Property Damages Settlement Agreement.

38.42.   Deepwater Horizon Economic Litigation shall mean all Claims brought by Plaintiffs or any Economic Class Member for damage covered by the Seafood Compensation Program, Coastal Real Property Damage, Economic Damage, Real Property Sales Damage, Subsistence Damage, VoO Charter Payment, Vessel Physical Damage or Wetlands Real Property Damages allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident, in the multidistrict litigation titled *In re Oil Spill by*

the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010 (MDL
No. 2179).

38.43.   Deepwater Horizon Incident shall mean the events, actions, inactions and
         omissions leading up to and including (i) the blowout of the **MC252 WELL;** (ii)
         the explosions and fire on board the *Deepwater Horizon* on or about April 20,
         2010; (iii) the sinking of the *Deepwater Horizon* on or about April 22, 2010; (iv)
         the release of oil, other hydrocarbons and other substances from the MC252 Well
         and/or the *Deepwater Horizon* and its appurtenances; (v) the efforts to contain the
         MC252 Well; (vi) **RESPONSE ACTIVITIES**, including the VoO Program; (vii)
         the operation of the GCCF; and (viii) BP public statements relating to all of the
         foregoing.

38.44.   Deepwater Horizon Oil Spill Trust shall mean the irrevocable common law trust
         established under Delaware law in accordance with the trust agreement titled
         "Deepwater Horizon Oil Spill Trust" dated August 6, 2010, and entered into
         among BP Exploration & Production Inc.; John S. Martin, Jr. and Kent D.
         Syverud, as individual trustees; and Citigroup Trust-Delaware, N.A., as corporate
         trustee.

38.45.   Directed Trustee shall mean the J. P. Morgan Trust Company of Delaware,
         exercising the limited authority as set forth in the Economic Settlement Trust
         Agreement, with the Claims Administrator serving as Trustee of the Settlement
         Trust.

38.46.   Economic and Property Damages Settlement Class shall have the meaning set
         forth in Sections 1 and 2.

38.47.   Economic Settlement Trust Account shall mean the account of the Settlement
         Trust into which the BP Parties shall pay, or cause to be paid, all amounts
         required to be paid to the Settlement Trust and from which the Trustee and/or the
         Directed Trustee shall transfer into the Funds listed in Section 5.12.1 such
         amounts as required under Section 5.12.

38.48.    Documentation Reviewer shall be the individual assigned by the Claims Administrator to review Claims denied, in whole or in part, on grounds of insufficient documentation.

38.49.    Economic and Property Damages Settlement Class Member or Economic Class Member shall mean all such Natural Persons or Entities who or that satisfy the requirements for membership in the Economic Class and do not timely and properly Opt Out of the Economic Class as set forth in Section 8 above.

38.50.    Economic and Property Damages Settlement Class Member Individual Release or Individual Release shall mean the document attached as Exhibit 26, which is a Release and Covenant not to Sue that must be executed by any Economic Class Member who or that receives compensation for a Claim pursuant to one or more of the Claim Processes prior to the Effective Date.

38.51.    Economic and Property Damages Settlement Class Notice Plan or Class Notice Plan shall mean that which sets forth the methods, timetable, and responsibilities for providing notice of this Agreement to Economic Class Members.

38.52.    Economic and Property Damages Settlement Class Representatives or Plaintiffs shall mean the named Plaintiffs in the Action.

38.53.    Economic Class shall mean the Economic and Property Damages Settlement Class.

38.54.    Economic Class Counsel shall mean the Economic and Property Damages Settlement Class Counsel appointed by the Court.

38.55.    Economic Class Release shall mean the Release described in Section 10.

38.56.    Economic Class Representatives shall mean the named plaintiffs in the Action.

38.57.    Economic Damage shall mean loss of profits, income and/or earnings arising in the Gulf Coast Areas or Specified Gulf Waters allegedly arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater

Horizon Incident; provided, however, that Economic Damage does not include (1) loss of profits or earnings, or damages for injury relating to real property or personal property that constitutes any part of the Seafood Compensation Program, Coastal Real Property Damage, Real Property Sales Damage, Wetlands Real Property Damage, Vessel Physical Damage, or (2) VoO Charter Payment, or (3) damages for loss of Subsistence use of natural resources, which constitutes Subsistence Damage.

38.58. Economic Damage Claim Process shall mean that process described in the Economic Damage Claim Frameworks.

38.59. Economic Damage Claim Frameworks shall mean the rules described in Exhibits 4A-8E.

38.60. Economic Damage Claimant shall mean an Individual Claimant or Business Claimant who or that claims to have suffered Economic Damage.

38.61. Economic Damage Compensation Amount shall mean the compensation amount calculated for an Economic Damage Claimant pursuant to the terms of the Agreement and the Economic Damage Claim Frameworks, as applicable.

38.62. Effective Date shall mean (1) the day following the expiration of the deadline for appealing the entry by the Court of the Final Order and Judgment, if no such appeal is filed, or (2) if an appeal of the Final Order and Judgment is filed, the date upon which all appellate courts with jurisdiction (including the United States Supreme Court by petition for certiorari) affirm such Final Order and Judgment, or deny any such appeal or petition for certiorari, such that no future appeal is possible, or (3) such date as the Parties otherwise agree in writing.

38.63. Eligible Real Property Sales Claimants shall mean those Claimants who were sellers of Residential Parcels within the Real Property Sales Compensation Zone who satisfy the following criteria:

38.63.1. owned a Residential Parcel in the Real Property Sales Compensation Zone

on April 20, 2010; and

    38.63.2.    executed a sales contract[8] for the sale of that Residential Parcel that meets the following criteria:

    38.63.2.1.  the sales contract was executed on or after April 21, 2010 and the sale closed during the time period of April 21, 2010 to December 31, 2010; or

    38.63.2.2.  the sales contract was executed before April 21, 2010, but the Settlement Program determines pursuant to the Real Property Sales Claim Framework that the contract price was reduced as a result of the Deepwater Horizon Incident.  Additionally, the sale must have closed during the time period April 21, 2010 to December 31, 2010.

38.64.    End User shall mean a Natural Person or Entity that buys any product for his, her or its individual use or consumption and not for manufacture or resale.

38.65.    Entity shall mean an organization or entity, other than a **GOVERNMENTAL ORGANIZATION**, operating or having operated for profit or not-for-profit, including a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture or an unincorporated association of any kind or description.

38.66.    Exclusions shall mean the Natural Persons or Entities excluded from membership in the Economic Class, as set forth in Section 2 above.

38.67.    Expressly Reserved Claims shall mean the following Claims which are not recognized or released under the Agreement, and are reserved to the Economic Class Members:  (1) Bodily Injury Claims, which are excluded from the Economic Class, but certain of which may be asserted in the Medical Benefits Class Action Settlement as described herein; (2) claims of BP shareholders in any derivative or direct action solely in their capacity as BP shareholders; (3) claims

---

[8] Sales do not include transfers from borrowers to lenders that take place as part of the foreclosure process, such as deeds in lieu of foreclosure, foreclosure deeds, or Sheriff's deeds.

of Natural Persons and Entities for Moratoria Losses; (4) claims relating to menhaden (or "pogy") fishing, processing, selling, catching, or harvesting; and (5) claims for Economic Damage suffered by Entities or employees (to the extent they allege Economic Damage based on their employment by such an Entity during the Class Period) in the Banking, Gaming, Financial, Insurance, Oil and Gas, Real Estate Development, and Defense Contractor Industries, as defined in Section 2.2.4.

38.68.    Failed Business shall mean a business Entity that commenced operations prior to November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy or (iii) otherwise initiated or completed a liquidation of substantially all of its assets, as more fully described in Exhibit 6.

38.69.    Failed Start Up Business shall mean a business Entity that commenced operations on or after November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy or (iii) otherwise initiated or completed a liquidation of substantially all of its assets, as more fully described in Exhibit 6.

38.70.    Fairness Hearing shall mean the hearing set and conducted by the Court pursuant to Fed. R. Civ. P. 23(e) to consider and determine whether to grant final approval to this Agreement, as described in Section 8 above.

38.71.    Festival Vendors shall have the meaning set forth in Exhibit 8D.

38.72.    Final Order and Judgment shall mean an order entered by the Court, described in Section 15 above.

38.73.    Finfish shall mean fish other than shellfish and octopuses.

38.74.    GCCF shall mean the Gulf Coast Claims Facility.

38.75.    GCCF Release and Covenant Not to Sue shall mean the release executed in exchange for payment of a GCCF claim.

38.76.    Game shall include nutria, mink, otters, raccoons, muskrats, alligators, and other wildlife.

38.77.    Governmental Organization shall mean:  (a) the government of the United States of America, (b) any state or local government, (c) any agency, branch, commission, department, or unit of the government of the United States of America or of any state or local government, or (d) any Affiliate of, or any business or organization of any type that is owned in whole or at least 51% in part by the government of the United States of America or any state or local government, or any of their agencies, branches, commissions, departments, or units.

38.78.    Guarantee shall mean the guarantees attached as Exhibit 24A, 24B.

38.79.    Guarantor shall mean BPCNA.

38.80.    Gulf Coast Areas shall mean the States of Louisiana, Mississippi, and Alabama; the counties of Chambers, Galveston, Jefferson and Orange in the State of Texas; and the counties of Bay, Calhoun, Charlotte, Citrus, Collier, Dixie, Escambia, Franklin, Gadsden, Gulf, Hernando, Hillsborough, Holmes, Jackson, Jefferson, Lee, Leon, Levy, Liberty, Manatee, Monroe, Okaloosa, Pasco, Pinellas, Santa Rosa, Sarasota, Taylor, Wakulla, Walton and Washington in the State of Florida, including all adjacent Gulf waters, bays, estuaries, straits, and other tidal or brackish waters within the States of Louisiana, Mississippi, Alabama or those described counties of Texas or Florida.  (Exhibit 22)

38.81.    Halliburton shall mean Halliburton Energy Services, Inc. and all and any of its Affiliates, other than any Natural Person or Entity that is also an Affiliate of any of the Released Parties.

38.82.    Home Ported shall mean the home port of a vessel as documented by a 2009 or 2010 government-issued vessel registration.

38.83.    Incompetent Class Member shall mean a Natural Person who lacks the capacity to enter into a contract on his or her behalf at the time of a Claims Form submission to the Claims Administrator, in accordance with the state laws of that person's domicile as applied to adult capacity issues, whether through power of attorney, agency documents, guardianship, conservatorship, tutorship, or otherwise.

38.84.    Individual Claimant shall mean a Natural Person who is an Economic Class Member alleging Economic Damage arising out of, due to, resulting from, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident with a Claim in addition to or other than a Claim for Economic Damage related to such Natural Person's sole proprietorship business or other self-employment as reflected on Schedule C, D or E of a federal income tax form.

38.85.    Individual Economic Loss Claims shall mean the Claims brought by individuals described in Exhibits 8A-8E.

38.86.    Individual Periodic Vendor shall have the meaning set forth in Exhibit 8D.

38.87.    Individual Release shall mean the form of release described in Section 4.4.10.2.

38.88.    Interim Class Counsel shall mean James Parkerson Roy and Stephen J. Herman.

38.89.    Lead Class Counsel shall mean the Economic and Property Damages Settlement Lead Class Counsel appointed by the Court.

38.90.    MC252 Well shall mean the exploratory well named "Macondo" that was being drilled by the Transocean *Marianas* and *Deepwater Horizon* rigs in Mississippi Canyon, Block 252 on the outer continental shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana.

38.91.    MDL 2179 or MDL shall mean the federal multidistrict litigation titled *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010* (MDL No.  2179).

38.92.    Minor Class Member shall mean a Natural Person whose age is below that of the majority rule for the state in which the minor resides at the time of a Claim Form submission to the Claims Administrator.

38.93.    Moratoria Loss shall mean any loss whatsoever caused by or resulting from federal regulatory action or inaction directed at offshore oil industry activity -- including shallow water and deepwater activity -- that occurred after May 28, 2010, including the federal moratoria on offshore permitting and drilling activities imposed on May 28, 2010 and July 12, 2010 and new or revised safety rules, regulations, inspections or permitting practices.

38.94.    Multi-Facility Business shall have the meaning set forth in Exhibit 5.

38.95.    Natural Person shall mean a human being, and shall include the estate of a human being who died on or after April 20, 2010.  For purposes of this Agreement, a Natural Person that is the estate of a human being who died on or after April 20, 2010, a Minor Class Member or Incompetent Class Member, shall be deemed to act through his, her or its Representative.

38.96.    New Entrant to Employment shall have the meaning set forth in Exhibit 8A.

38.97.    Non-Working VoO Compensation Amount shall mean the Compensation Amount calculated for a Non-Working VoO Participant pursuant to the Section 5.5.3 of the Agreement.

38.98.    Non-Working VoO Participant shall mean a vessel owner who executed a VoO Master Vessel Charter Agreement with a Charterer, and completed the initial VoO training program, but was never dispatched, placed on hire or otherwise asked to perform work for a Charterer.

38.99.    OPA shall mean the Oil Pollution Act of 1990, 33 U.S.C. § 2701, et seq.

38.100.   OPA Process shall mean the claims presentment procedure pursuant to the OPA, including claims that have been submitted to the BP Parties or claims that have been submitted to the GCCF as part of the OPA Process.

38.101.   Opt Out shall mean the process by which any Natural Person (acting through such Natural Person's Representative, if applicable) or Entity included in the Economic Class exercises his, her or its right to exclude himself, herself or itself from the Economic Class in accordance with Fed. R. Civ. P. 23(c)(2) and the procedures set forth in the Class Notice.

38.102.   Opt Outs shall mean those Natural Persons (acting through their Representatives, if applicable) or Entities included in the Economic Class who or which have timely and properly exercised their right to Opt Out and therefore are not Economic Class Members.

38.103.   Parties shall mean the Plaintiffs and the BP Parties.

38.104.   Passenger(s) for Hire shall mean a passenger for whom consideration is contributed as a condition of carriage on the vessel, whether directly or indirectly flowing to the owner, operator, agent, deckhand, or any other person having an interest in the vessel.

38.105.   Pending Unresolved GCCF Claims shall mean all claims in the GCCF except where the GCCF has issued final offers that have neither been accepted nor rejected by the Claimant and have not expired by their own terms.

38.106.   Plaintiffs shall mean those Natural Persons and Entities appearing as named plaintiffs and proposed class representatives in the Action.

   38.106.1.   Plaintiffs' Steering Committee or PSC shall mean those counsel appointed to the Plaintiffs' Steering Committee by the Court, in its Pretrial Order No. 46, dated October 5, 2011 (Doc. 4226) in the MDL.

38.107.   Proposed Economic Class Counsel shall mean the members of the Plaintiffs Executive Committee and Plaintiffs Steering Committee, who seek to be appointed Economic and Property Damage Settlement Class Counsel by the Court.

38.108.   PSC shall mean the Plaintiffs' Steering Committee.

38.109.   Real Property shall mean land, including improvements thereon, and property of any nature appurtenant or affixed thereto.

38.110.   Real Property Compensation Zone Map(s) shall mean the map(s) attached to the Agreement as Exhibit 13B.

38.111.   Real Property Sales Claim Process shall mean that process described in the Real Property Sales Claim Framework.

38.112.   Real Property Sales Damage shall mean a loss alleged by an eligible Claimant that satisfies the requirements set forth in the Real Property Sales Claim Framework.

38.113.   Real Property Sales Claim Framework shall mean the requirements described in the document captioned Real Property Sales Claim Framework, attached to this Agreement as Exhibits 13A and 13B.

38.114.   Real Property Sales Claimant shall mean an Economic Class Member claiming to have suffered Real Property Sales Damage.

38.115.   Real Property Sales Compensation Amount shall mean the Compensation Amount calculated for an Eligible Real Property Sales Claimant for Real Property Sales Damage pursuant to the terms of the Agreement and the Real Property Sales Claim Framework.

38.116.   Real Property Sales Compensation Zone shall be defined as Residential Parcels identified in the Real Property Compensation Zone Map.

38.117.   Real Property Sales Damage shall mean a loss alleged by a Real Property Sales Claimant that satisfies the requirements set forth in the Real Property Sales Claim Framework.

38.118.   Recreational Fishing shall mean fishing for sport or pleasure.

38.119.    Related Claims shall mean all claims brought by Economic Class Members against any of the Released Parties that are covered by the Release and which are pending in the Court, in any other federal court, in any state court, or in any other tribunal or forum.

38.120.    Release is defined in Section 10.4 above.

38.121.    Released Claims is defined in Section 10.2 above.

38.122.    Released Parties is defined in Section 10.3 above.

38.123.    Representative shall mean in the context of a Natural Person who is a minor or incapacitated, his legal guardian; or in the case of a deceased Natural Person, the duly authorized legal representative of his estate.

38.124.    Residential Parcels shall mean those parcels within the Real Property Sales Compensation Zone for which the county where the parcel is located has designated the parcel as a residential classification.

38.125.    Response Activities shall mean the clean up, remediation efforts, and all other responsive actions (including the use and handling of dispersants) relating to the releases of oil, other hydrocarbons and other pollutants from the MC252 Well and/or the *Deepwater Horizon* and its appurtenances, and the Deepwater Horizon Incident.

38.126.    RTP (risk transfer premium) shall mean the amount paid to a Claimant for any and all alleged damage, including potential future injuries, damages or losses not currently known, which may later manifest themselves or develop, arising out of, due to, resulting from, or relating in any way to the Deepwater Horizon Incident, and any other type or category of damages claimed, including claims for punitive damages. To the extent that an RTP is to be paid to a Claimant, it shall be a factor which is multiplied with those Compensation Amounts which the Exhibits to this Agreement specify are eligible for an RTP to calculate a sum which is added to the Compensation Amount paid to the Claimant. For example, if the

107

Compensation Amount is $1, and the RTP is 2.5, then $1 is multiplied by 2.5, which product is then added to the $1 to reach the total amount of compensation ($1 + $2.50 = $3.50 in total compensation). The RTP Chart (Risk Transfer Premium) is set forth in Exhibit 15.

38.127.   SCAT shall mean the Deepwater Horizon Unified Command Shoreline Cleanup Assessment Teams.

38.128.   Seafood shall mean fish and shellfish, including shrimp, oysters, crab, and Finfish, caught in the Specified Waters of the Gulf of Mexico. Seafood shall exclude menhaden.

38.129.   Seafood Compensation Program shall mean the program defined in Section 5.2.

38.130.   Seafood Compensation Program Amount shall mean $2.3 billion, as such amount is reduced (i) pursuant to Section 4.2.7 for certain transition payments to Commercial Fisherman, Seafood Crew, Oyster Leaseholders and Seafood Vessel Owners, and (ii) for credits, if any, to the BP Parties in respect of certain Opt Outs by Commercial Fisherman, Seafood Crew, Oyster Leaseholders and Seafood Vessel Owners pursuant to the **SEAFOOD PROGRAM OPT OUT TERMS.**

38.131.   Seafood Compensation Program Settlement Fund shall mean the fund used by the Claims Administrator to make payments under the Seafood Compensation Program.

38.132.   Seafood Program Opt Out Terms shall mean the terms agreed to by the Parties with respect to Seafood Compensation Program Opt Outs. The Seafood Program Opt Out Terms will be submitted under seal to the Court.

38.133.   Settlement shall mean the terms and conditions of the Agreement reached by the Parties.

38.134.   Settlement Payment shall mean the Total Compensation Amount to be paid to a Claimant for any Claim made pursuant to the terms of the Agreement, including the Frameworks in the exhibits.

38.135.   Settlement Trust shall have the meaning set forth in Section 5.12.1.

38.136.   Specified Gulf Waters shall mean the U.S. waters of the Gulf of Mexico and all adjacent bays, estuaries, straits, and other tidal or brackish waters within the Gulf Coast Areas, as specifically shown and described in Exhibit 23.

38.137.   Start Up Business shall mean a business with less than 18 months of operating history at the time of the Deepwater Horizon Incident, as more fully described in Exhibit 7.

38.138.   Subsistence shall mean fishing or hunting to harvest, catch, barter, consume or trade Gulf of Mexico natural resources (including Seafood and Game), in a traditional or customary manner, to sustain basic personal or family dietary, economic security, shelter, tool, or clothing needs.

38.139.   Subsistence Claim Process shall mean that process for determining eligibility and compensation described in the Subsistence Claim Framework.

38.140.   Subsistence Claim Framework shall mean the document attached to this Agreement as Exhibit 9.

38.141.   Subsistence Compensation Amount shall mean the Compensation Amount calculated for an eligible Subsistence Claimant for Subsistence Damage pursuant to this Agreement and the Subsistence Claim Framework.

38.142.   Subsistence Damage shall mean a loss of value of Subsistence use of natural resources alleged to arise out of, result from or relate in any way to, directly or indirectly, the Deepwater Horizon Incident.

38.143.   Summary Publication Notice shall mean that notice of Preliminary Approval Order, the Agreement, and the Fairness Hearing as approved by the Court.

38.144.   Supplemental Information Program shall mean a program developed by the PSC to provide additional information to Economic Class Members regarding the Settlement.

38.145.    Support Services to Oil and Gas Industry shall mean Entities the Claims Administrator determines fall within the NAICS codes and descriptions marked with an "x" on Exhibit 19.

38.146.    Sworn Written Statement shall mean a statement provided under penalty of perjury, in support of a Claim.

38.147.    Total Compensation Amount shall mean the Compensation Amount, plus any RTP and any other amounts due for any Claim less any applicable offsets under this Agreement or its Frameworks.

38.148.    Tourism shall mean the definition set forth in Exhibit 2.

38.149.    Transition Claims shall mean those claims, including Pending Unresolved GCCF Claims, submitted as part of the Transition Claims Process described in Section 4.2.

38.150.    Transition Coordinator shall mean the Claims coordinator described in Section 4.2.

38.151.    Transition Process shall mean the Claims process described in Section 4.2.

38.152.    Transocean shall mean Transocean Ltd., Transocean, Inc., Transocean Offshore Deepwater Drilling Inc., Transocean Deepwater Inc., Transocean Holdings LLC, and Triton Asset Leasing GmbH and all and any of their Affiliates, other than any Natural Person or Entity that is also an Affiliate of any of the Released Parties

38.153.    Trustee shall mean the Claims Administrator when serving as trustee of the Settlement Trust, with Directed Trustee J. P. Morgan Trust Company of Delaware exercising the limited authority as set forth in the Economic Settlement Trust Agreement.

38.154.    Unknown Claims is defined in Section 10.5 above.

38.155.   Vessel Physical Damage shall mean physical damage that was sustained by an eligible Claimant's eligible vessel due to or resulting from the Deepwater Horizon Incident or the Deepwater Horizon Incident response cleanup operations, including the Vessels of Opportunity Program, that were consistent with the National Contingency Plan or specifically ordered by the Federal On-Scene Coordinator or delegates thereof.

38.156.   Vessel Physical Damage Claim Framework shall mean the rules described in the document captioned Vessel Physical Damage Framework attached to this Agreement as Exhibit 14.

38.157.   Vessel Physical Damage Claim Process shall mean that process described in the Vessel Physical Damage Claim Framework.

38.158.   Vessel Physical Damage Compensation Amount shall mean the Compensation Amount calculated for a Vessel Physical Damage Claimant pursuant to the terms of the Agreement and the Vessel Physical Damage Claim Framework.

38.159.   VoO shall mean Vessels of Opportunity, the program through which BP, or its contractors, contracted with vessel owners to assist in Deepwater Horizon Incident response efforts.

38.160.   VoO Agreement shall mean the terms provided in Section 5.5 of the Agreement.

38.161.   VoO Claim Process shall mean that process described Section 5.5 of the Agreement.

38.162.   VoO Charter Payment shall mean a loss alleged by a VoO Charter Payment Claimant for any payment or compensation related to participation in the VoO program that satisfies the requirements set forth in Section 5.5 above.

38.163.   VoO Charter Payment Claimant shall mean an Economic Class Member claiming to have suffered a VoO Charter Payment loss.

38.164.   VoO Earned Income Offset shall mean the offset whereby, if a VoO Charter Payment Claimant has previously been paid under a VoO Master Vessel Charter Agreement, the Claimant's Compensation Amount for its Claim relating to a non-Seafood-related business directly involving the use of the vessel that performed the VoO services, or employment in such business or service, shall be reduced by 33% of the amount previously paid for services performed under a VoO Master Vessel Charter Agreement. This reduction shall be applied after the addition of any applicable RTP to the base Economic Damage Compensation Amount, excluding prior income from the VoO Charter Payments.

38.165.   VoO Master Vessel Charter Agreement shall mean the standard agreements utilized by BP and its agents or subcontractors to charter the vessels available for work or service in connection with the VoO program.

38.166.   VoO Settlement Payment Offset shall mean the offset whereby the Total Compensation Amount for a Natural Person or Entity relating to a non-Seafood-related business directly involving the use of the vessel that performed the VoO services, or employment in such business or service, shall be reduced by 50% of the amount of the Working VoO Participant Settlement Payment. The VoO Settlement Payment Offset shall be applied after the addition of any applicable RTP to the base Economic Damage Compensation Amount, excluding prior income from the VoO Charter Payments.

38.167.   Wetlands Real Property Claimant shall mean an Economic Class Member claiming to have suffered Wetlands Real Property Damage.

38.168.   Wetlands Real Property Claim Process shall mean that process described in the Wetlands Real Property Claim Framework.

38.169.   Wetlands Real Property Claim Framework shall mean the requirements described in the document captioned Compensation Framework for Wetlands Real Property Claims, attached to this Agreement as Exhibits 12A-12B.

38.170.   Wetlands Real Property Compensation Amount shall mean the Compensation Amount calculated for an eligible Wetlands Real Property Claimant for Wetlands Real Property Damage pursuant to the terms of the Agreement and the Wetlands Real Property Claim Framework.

38.171.   Wetlands Real Property Damage shall mean a loss alleged by a Wetlands Real Property Claimant that satisfies the requirements set forth in the Wetlands Real Property Claim Framework.

38.172.   Working VoO Compensation Amount shall mean the Compensation Amount calculated for a Working VoO Participant pursuant to Section 5.5.2 of the Settlement Agreement.

38.173.   Working VoO Participant shall mean a vessel owner who executed a VoO Master Vessel Charter Agreement, completed the initial VoO training program, and was dispatched or placed on-hire (*i.e.*, requested by a Charterer to perform work and such request was accepted) by a Charterer (evidence of which shall include Charterers' dispatch logs).

38.174.   Zone A shall mean the geographic areas set forth in Exhibits 1A-1C.

38.175.   Zone B shall mean the geographic areas set forth in Exhibits 1A-1C.

38.176.   Zone C shall mean the geographic areas set forth in Exhibits 1A-1C.

38.177.   Zone D shall mean the residual portions of the Gulf Coast Areas outside of Zones A-C.

**ORIGINAL SIGNATURE PAGES FOR *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT DATED APRIL 18, 2012**

Executed this 18th day of April, 2012.

BP EXPLORATION & PRODUCTION INC.

By: _____
Name: James J. Neath
Title: Associate General Counsel

By: _____
Name: Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP Exploration & Production Inc.

BP AMERICA PRODUCTION COMPANY

By: _____
Name: James J. Neath
Title: Associate General Counsel

By: _____
Name: Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP America Production Company

PLAINTIFFS' INTERIM CLASS COUNSEL

By: _____

Name: James Parkerson Roy

By: _____

Name: Stephen J. Herman

**SIGNATURE PAGES FOR FIRST AMENDMENT TO *DEEPWATER HORIZON*
ECONOMIC AND PROPERTY DAMAGES
SETTLEMENT AGREEMENT DATED MAY 2, 2012**

BP EXPLORATION & PRODUCTION INC.

By: _____
Name: James J. Neath
Title: Associate General Counsel

By: _____

Name: Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP Exploration & Production Inc.

BP AMERICA PRODUCTION COMPANY

By: _____
Name: James J. Neath
Title: Associate General Counsel

By: _____

Name: Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP America Production Company

BP EXPLORATION & PRODUCTION INC.


By: _____
Name:  James J. Neath
Title:  Associate General Counsel




By: _____

Name:  Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP Exploration & Production Inc.




BP AMERICA PRODUCTION COMPANY




By: _____
Name:  James J. Neath
Title:  Associate General Counsel




By: _____

Name:  Richard C. Godfrey, P.C.
Kirkland & Ellis LLP
Counsel for BP America Production Company

PLAINTIFFS' INTERIM CLASS COUNSEL

By: _____

Name: James Parkerson Roy


By: _____

Name:  Stephen J. Herman

amend. N°.1 (ECON.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | * * * | MDL No. 2179 |
| | * | SECTION: J |
| | * | |
| This document relates to all actions. | * | |
| | * | HONORABLE CARL J. BARBIER |
| | * | |
| | * | MAGISTRATE JUDGE SHUSHAN |
| | * | |
| | * | |

| | | |
|---|---|---|
| Bon Secour Fisheries, Inc. et al., on behalf of themselves and all others similarly situated, | * * | No. 12-970 |
| | * | |
| Plaintiffs, | * | SECTION: J |
| | * | |
| v. | * | |
| | * | HONORABLE CARL J. BARBIER |
| BP Exploration & Production Inc.; | * | |
| BP America Production Company; | * | MAGISTRATE JUDGE SHUSHAN |
| BP p.l.c., | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

## EXHIBITS TO *DEEPWATER HORIZON* ECONOMIC AND PROPERTY DAMAGES SETTLEMENT AGREEMENT AS AMENDED ON MAY 2, 2012

## EXHIBITS

| Exhibit Number | Document | Bates Range |
|---|---|---|
| 1A | Map of Economic Loss Zones | 028314-028328 |
| 1B | Geographical Definitions of Zones | 028269-028290 |
| 1C | Zone Classifications and Implementation | 26397 |
| 2 | Tourism Definition | 028973-028988 |
| 3 | Seafood Distribution Chain Definitions | 028950-028954 |
| 4A | Documentation Requirements for Business Economic Loss Claims | 026539-026542 |
| 4B | Causation Requirements for Business Economic Loss Claims | 028725-028738; 028779-028780 |
| 4C | Compensation Framework for Business Economic Loss Claims | 026294 - 026298; 028779-028780 |
| 4D | Attachment A - Compensation Framework for Business Economic Loss Claims - Fixed and Variable Costs | 28778 |
| 4E | Addendum to Compensation for Business Economic Loss Claims - Compensation for Spill-Related Cancellations | 028781-028786 |
| 5 | Compensation for Multi-Facility Businesses | 028019-028022 |
| 6 | Failed Business Compensation Framework | 028690-028704 |
| 7 | Framework for Start-Up Business Claims | 028661-028674 |
| 8A | Framework for Individual Economic Loss Claims | 028839-028890 |
| 8B | Individual Economic Loss Claims Examples | 028582-028607 |
| 8C | Addendum Regarding Compensation Related to a Claimant's Loss of Employment Related Benefits Income as a Result of the DWH Spill | 025226-025235 |
| 8D | Addendum to Individual Framework | 027375-027392 |
| 8E | Addendum Regarding Interviews of Claimants Alleging Individual Economic Loss and Other Individuals Providing Sworn Statements in Support of Such Claim | 027180-027181 |
| 9 | Framework for Subsistence Claims | 028015-028018 |
| 10 | Seafood Compensation Program | 029298-029392 |
| 11A | Compensation Framework for Coastal Real Property Claims | 027505-027537 |
| 11B | Appendix A to Compensation Framework for Coastal Real Property Claims: Coastal Real Property Claim Zone Map | 025288-025355 |

| Exhibit Number | Document | Bates Range |
|---|---|---|
| 11C | Appendix D to Compensation Framework for Coastal Real Property Claims:  Eligible Parcel Compensation Category Map | 025356-025498 |
| 12A | Compensation Framework for Wetlands Real Property Claims | 027808-027838 |
| 12B | Appendix A to Compensation Framework for Wetlands Real Property Claims:  Wetlands Real Property Claim Zone Map | 028028-028039 |
| 12C | Appendix C  to Compensation Framework for Wetlands Real Property Claims:  Eligible Parcel Compensation Category Map | 028040-028051 |
| 12D | Appendix D  to Compensation Framework for Wetlands Real Property Claims:  Area of Potential Eligibility Map | 028052-028063 |
| 13A | Compensation Framework for Real Property Sales | 026375-026384 |
| 13B | Appendix A Real Property Sales Compensation Zone Map | 026307-026374 |
| 14 | Compensation Framework for Vessel Physical Damage Claims | 027893-027905 |
| 15 | RTP Chart (Risk Transfer Premium) | 028739-028742 |
| 16 | Excluded Industries Chart | 026686-026693 |
| 17 | Oil & Gas Industry Exclusions | 026694-026703 |
| 18 | Economic Loss and Property Class Definition Exclusions | 028759-028772 |
| 19 | Industry Types Subject to Review by Claims Administrator for Potential Moratoria Losses | 026613-026631 |
| 20 | Other Released Parties | 028895-028899 |
| 21 | Assignment and Protections | 028989-029000 |
| 22 | Gulf Coast Area Map | 28894 |
| 23 | Specified Gulf Waters Map | 028891-028893 |
| 24A | BP Corporation North America Inc. Guarantee | 029261-029267 |
| 24B | BP PLC Back-up Guarantee | 029001-029008 |
| 25 | Procedures for Filing and Briefing of Appeals | 028955-028956 |
| 26 | Individual Release | 029268-029288 |
| 27 | Fees and Costs | 029289-029297 |

# EXHIBIT 1A

# Economic Loss Zones

028314

# All Economic Loss Zones



# Economic Loss Zones A-C



LEGEND
Zone A
Zone B
Zone C

# Texas



LEGEND

Zone A
Zone B
Zone C
Zone D

Economic Loss Zones

028317

4

# South Louisiana



LEGEND
- Zone A
- Zone B
- Zone C
- Zone D

Economic Loss Zones

028318

5

# Southwest Louisiana



LEGEND
- Zone A
- Zone B
- Zone C
- Zone D

Economic Loss Zones

028319

6

# Southeast Louisiana



LEGEND
Zone A
Zone B
Zone C
Zone D

Economic Loss Zones

028320

7

# New Orleans



Economic Loss Zones

028321

8

Case 2:10-md-02179-CJB-SS   Document 6430-3   Filed 05/03/12   Page 10 of 16

# Mississippi



LEGEND
- Zone A
- Zone B
- Zone C
- Zone D

# Alabama



# Florida Panhandle (Western Section)



LEGEND
Zone A
Zone B
Zone C
Zone D

# Florida Panhandle (Central Section)



Economic Loss Zones

028325

12

# Florida Panhandle (Eastern Section)



LEGEND
- Zone A
- Zone B
- Zone C
- Zone D

Economic Loss Zones

028326

13

# Florida (Tampa to Marco Island)



LEGEND
Zone A
Zone B
Zone C
Zone D

Economic Loss Zones

**028327**

14

# Florida Keys



Economic Loss Zones

028328

# EXHIBIT 1B

GEOGRAPHICAL DEFINITIONS OF ZONES

This document contains a written description of the boundaries of the proposed zones for the Economic Loss Class. The descriptions for the zones are organized to move roughly from westernmost geographical area within the class definition for which there is a zone to the easternmost geographical area within the class definition for which there is a zone, beginning with Zone A, followed by Zone B, and concluding with Zone C. Each zone is given a name which corresponds to the general geographical area or areas it covers; these names are intended for reference purposes only. Each zone is also given a number which indicates the type of zone and the order in which it appears in this document. The names of streets and highways are written to correspond as closely as possible with those which appear on the "base map" on which these zones were drawn. The base map used in the creation of the zones is the Microsoft Bing Hybrid map.

ZONE A DEFINITIONS

**A-1**, *South Louisiana, Zone 1*: This zone consists of two sections divided roughly in the middle by the Vermilion Bay/Atchafalaya Bay. The western zone is bounded by the Texas/Louisiana state line (Sabine Pass) to the west, the Gulf of Mexico to the south, and the eastern shore of Marsh Island to the east. The northern boundary of this zone is as follows:

- Highway 82 from the eastern shore of Sabine Pass to Bayou Road
- Bayou Road from Highway 82 to Parish Road 548
- Parish Road 548 from Bayou Road to its terminus
- The line connecting the terminus of Parish Road 548 to the northern shore of Mud Lake
- The line connecting the northern shore of Mud Lake to the intersection of Highway 82 and the Calcasieu River
- Highway 82 to the intersection of Schooner Bayou Canal
- Southern bank of Schooner Bayou Canal from Highway 82 to Vermilion Bay
- The southern shoreline of Vermilion Bay and West Cote Blanche Bay from Schooner Bayou Canal to the end of Marsh Island

The eastern section of this zone is bounded by the eastern shore of East Cote Blanche Bay to the west and the northern shore of the Gulf of Mexico to the south. The northern boundary is defined as the line connecting the following points :

- The southern terminus of Highway 317 (St. Mary Parish)
- The southern terminus of Levee Road (Terrebonne Parish)
- The southern terminus of Bayou Dularge Road (Terrebonne Parish)
- The southern terminus of Four Point Road (Terrebonne Parish)
- The intersection of the Houma Navigation Canal and Bayou Petit (Terrebonne Parish)
- The southern terminus of Island Road (Terrebonne Parish)
- The southern terminus of Lower Highway 665 (Terrebonne Parish)
- The eastern terminus of the Jean Plaisance Canal (Lafourche Parish)

1

028269

The eastern boundary of this section is defined as follows:

- Federal levee system from Jean Plaisance Canal to southern terminus
- Up to but not including properties abutting Highway 1 from the southern terminus of the federal levee system until Highway 1 splits from Bayou Lafourche
- Bayou Lafourche from the split with Highway 1 to the Gulf of Mexico

**A-2**, *South Louisiana, Zone 2*: This zone consists of two sections divided roughly by the Mississippi River and the developed areas surrounding it (as described in Zone B-2 in the following section). It also includes the Chandeleur Islands off the coast of the St. Bernard Parish wetlands. The western section of this zone has the following northern boundary:

- Southern bank of Intercoastal Waterway from Station No. 7 Road to the Hero Canal
- Southern bank of Hero Canal from Station No. 7 Road to canal/federal levee system west of Highway 23

The eastern boundary of the western section is as follows:

- Canal/federal levee west of Highway 23 from Hero Canal to Wilkinson Canal
- Wilkinson Canal toward Mississippi River to canal/levee west of Highway 23
- Canal/levee from Wilkinson to Deer Range Canal
- Deer Range Canal to Canal/Levee East of Hermitage Road
- Canal/Levee from Hermitage Road to Pipeline Canal
- Pipeline Canal to Highway 23 in West Pointe a la Hache
- Highway 23 from Pipeline Canal in West Pointe a la Hache to Canal/Levee in Happy Jack (southeast of Fosters Road)
- Canal/Levee from Happy Jack to eastern shore of Adams Bay west of Highway 23
- Eastern shore of Adams Bay/Long Bay/Hospital Bay/Yellow Cotton Bay from canal/levee to Spanish Pass
- Southern shoreline of Spanish Pass from eastern shore of Yellow Cotton Bay to Highway 23
- Highway 23 from Spanish Pass intersection of Venice Boat Harbor Road
- Line connecting intersection of Venice Boat Harbor Road and Pass Tante Phine
- Southern bank of Pass Tante Phine to Tiger Pass
- Eastern shore of Tiger Pass from Pass Tante Phine to the western shoreline of the Mississippi River
- Western Shoreline of Mississippi River through the Southwest Pass to the Gulf of Mexico

The southern boundary of the western section is as follows:

- Area just north of (but not including) Highway 1 from Highway 3090 to end of mainland
- Gulf of Mexico, south end of Grand Terre Islands, Lanaux Island, Shell Islands, Pelican Island, and other wetlands

The western boundary of the western section is as follows:

2

028270

- Federal levee system from Intracoastal Waterway to Bayou Lafourche
- Eastern bank of Bayou Lafourche from federal levee system to Leeville Bridge
- Areas up to (but not including) Highway 1 from Leeville Bridge to Highway 3090

The eastern portion of the zone contains the following boundaries. The section's southern boundary is Pass a Loutre from the Gulf of Mexico to the Mississippi River. The northern boundary of the eastern section of this zone is as follows:

- Southern/eastern levee along Joe Brown Canal from Bertrandville to Forty Arpent Canal
- Southern/eastern levee along Forty Arpent Canal to Highway 39 east of Braithwaite Golf Course
- Highway 39 from Forty Arpent Canal to Bayou Road
- Bayou Road from Highway 39 to Highway 46
- Highway 46 from Bayou Road to the Levee in Verret
- From Levee in Verret through the Mississippi River-Gulf Outlet (MR-GO) to Lake Borgne west of Stump Bayou
- Southern shore of Lake Borgne from Stump Bayou to Isle au Pitre

The western boundary of the eastern section is as follows:

- Eastern shore of Mississippi River from Pass a Loutre to Ostrica Locks at Bayou Tortillen
- Bayou Tortillen from the Ostrica Locks to Bayou Lamoque
- Bayou Lamoque from Bayou Tortillen to Breton Sound
- Western shore of Breton Sound from Bayou Lamoque to Fucich Bayou
- Nothern bank of Fucich Bayou from Breton Sound to Back Levee Canal
- Eastern bank of Back Levee Canal from Fucich Bayou to Highway 39
- Highway 39 from Back Levee Canal to Canal/Levee in Belair east of Highway 39
- Canal/levee in Belair east of Highway 39 from Highway 39 to Joe Brown Canal

The eastern boundary of the eastern section is as follows:

- From Isle au Pitre along the western shores of Chandeleur Sound past Brush Island, Martin Island, Mitchell Island, Comfort Island, Deadman Island, Gardener Island to the south shore of the Breton Sound
- South shore of Breton Sound from Bay Denesse to the North pass of the mouth of the Mississippi River

The southern boundary of the eastern section is as follows:

- Northern bank of Pass a Loutre from Breton Sound to the Mississippi River

**A-3**, *Grand Isle*: This zone consists exclusively and entirely of the island containing Grand Isle.

028271

**A-4**, *Downtown New Orleans*: This zone is bounded by Calliope Street (which runs underneath the Pontchartrain Expressway) in the south and extends to Elysian Fields Avenue in the north. The eastern boundary is the Mississippi River. The western boundary consists of the following streets:

- St. Charles Avenue from Calliope Street to St. Joseph Street
- St. Joseph Street from St. Charles Avenue to S. Peters Street
- S. Peters Street from St. Joseph Street to Notre Dame Street
- Notre Dame Street from S. Peters Street to Convention Center Boulevard
- Convention Center Boulevard from Notre Dame Street to Poydras Street
- Poydras Street from Convention Center Boulevard to S. Peters Street
- S. Peters Street from Poydras Street to Canal Street
- Canal Street from S. Peters Street to N. Rampart Street
- Rampart Street (which becomes St. Claude Avenue) from Canal Street to Elysian Fields Avenue.

**A-5**, *Slidell Area*: This zone begins at the intersection of Highway 90 (Chef Menteur Boulevard) at Interstate 510 and includes all properties fronting Highway 90 until the north side of the Rigolets Pass. The zone then broadens to include areas between Front Street (and the railroad tracks) in the west, the Louisiana/Mississippi state line (the Pearl River) in the east, and the continuous shoreline of Lake Pontchartrain, the Rigolets Pass, and Lake Borgne in the south. The northern boundary consists of the following roads:

- Old Spanish Trail to Interstate 10
- Interstate 10 from Old Spanish Trail to Highway 190 East
- Highway 190 East from Interstate 10 to Highway 90
- Highway 90 from Highway 190 to the Louisiana/Mississippi state line (the Pearl River)

This zone also includes the wetlands south of the Rigolets Pass to the Mississippi River-Gulf Outlet and all wetlands.

**A-6**, *Bay St. Louis*: This zone is bounded in the south by the Mississippi Sound/Lake Borgne shoreline. Its northern boundary begins at the crossing of Interstate 10 over the Pearl River and continues along Interstate 10 until Highway 607. It runs along Highway 607 until the intersection with Highway 90, and continues along Highway 90 and terminates at the beginning of the bridge over Bay St. Louis, where it meets the zone's southern boundary. The western boundary of the zone is configured as follows:

- The Pearl River from Interstate 10 to Highway 90
- Highway 90 from Pearl River to to Lower Bay Road
- Lower Bay Road to (30.236°N, -89.52°W), at which point the boundary cuts due south to intersect with John's Bayou
- John's Bayou from point described above to Grand Plains Bayou
- Grand Plains Bayou from John's Bayou to the Pearl River

4

**A-7**, *Gulfport/Biloxi/Ocean Springs*: This zone begins at the Highway 90 bridge on the east side of Bay St. Louis. Its western boundary is the shoreline of Bay St. Louis south of the bridge and its southern boundary is the shoreline of the Mississippi Sound but includes Cat Island, Ship Island, Horn Island, and Deer Island. Its eastern boundary is Halstead Road in Ocean Springs. The northern boundary is as follows:

- W. Beach Boulevard (Highway 90) to CSX Railroad
- CSX Railroad from Beach Boulevard to Tegarden Road
- Tegarden Road from CSX Railroad to E. Pass Road
- E. Pass Road from Tegarden Road to Lorraine Road
- Lorraine Road from E. Pass Road to Bernard Bayou
- Southern bank of Bernard Bayou from Lorraine Road to Big Lake/Back Bay of Biloxi
- Southern shore of Back Bay of Biloxi from Bernard Bayou to Highway 90
- Highway 90 from western shore of Back Bay of Biloxi to eastern shore of Back Bay of Biloxi
- Eastern shore of Back Bay of Biloxi from Highway 90 to Old Fort Bayou
- Southern shore of Old Fort Bayou from Back Bay of Biloxi to Washington Avenue
- Washington Avenue from Old Fort Bayou to Highway 90
- Highway 90 from Washington Avenue to Halstead Road

**A-8**: *Interstate 110 to Biloxi:* This zone consists of Interstate 110 south of Interstate 10 and within one quarter-mile of the exit ramp on Rodriguez Street.

**A-9**, *Bayou LaBatre*: This zone is triangular in shape and contains the area between Bayou LaBatre to Highway 188 (Alabama Coastal Connection). It continues on Highway 188 to the bayou southwest of Coden. Its southern boundary is the Gulf of Mexico.

**A-10**, *Dauphin Island*: This zone consists exclusively and entirely of Dauphin Island.

**A-11**, *Gulf Shores/Orange Beach*: This zone is bounded by the Gulf of Mexico to the south, from the western tip of Fort Morgan State Park to the Alabama/Florida state line. It also includes the entirety of Ono Island. Its northern boundary begins at the canal connecting Mobile Bay and Wolf Bay and continues to Bayou la Launch, Arnica Bay, Bayou St. John, and Old River.

**A-12**, *Highway 59 to Gulf Shores*: This zone consists of properties fronting Highway 59 from Interstate 10 to the canal connection Bon Secour Bay and Wolf Bay

**A-13**, *Perdido Key:* This zone is bounded by the Gulf of Mexico in the south, beginning at the Alabama/Florida state line. The western boundary is the state line situated in the Old River and Perdido Bay. The northern boundary is as follows:

- Bayou Garcon to the point due north of the end of Corinna Street
- Corinna Street from terminus to Highway 292A (Gulf Beach Highway)
- Highway 292A from Corinna Street to Radford Boulevard
- Radford Boulevard from Highway 292A to Fuel Farm Road

028273

- Fuel Farm Road from Radford Boulevard to Big Lagoon
- Big Lagoon from Fuel Farm Road to its outlet to the Gulf of Mexico

**A-14**, *Gulf Breeze:* This zone is bounded by Pensacola Bay to the west, the Santa Rosa Sound to the south, and the eastern edge of the Tiger Point Golf Course development to the east.  Its northern boundary runs from Pensacola Bay to Highway 98, then along Highway 98 to the eastern edge of the Tiger Point Golf Course development.

**A-15**, *Navarre Beach/Pensacola Beach:* This zone contains the areas between the Santa Rosa Sound to the north and the Gulf of Mexico to the south.  The western boundary is the eastern edge of Fort Pickens State Park, and the eastern boundary is the Escambia County/Santa Rosa County line.

**A-16**, *Okaloosa Island*: This zone contains the areas between the Santa Rosa Sound to the north and the Gulf of Mexico to the south.  The western boundary is the Escambia County/Santa Rosa County line, and the eastern boundary is East Pass, where Choctawhatchee Bay enters the Gulf of Mexico.

**A-17**, *Destin*: This zone is bounded by the Gulf of Mexico to the south and Choctawhatchee Bay/East Pass to the west.  The eastern boundary is the Okaloosa County/Walton County line.  The northern boundary is as follows:

- Choctawhatchee Bay to Joe's Bayou
- Joe's Bayou from Choctawhatchee Bay to Bayview Street
- Bayview Street from Joe's Bayou to Spring Lake Drive
- Spring Lake Drive from Bayview Street to Beach Drive
- Beach Drive  from Spring Lake Drive to Highway 98
- Highway 98 from Beach Drive to Okaloosa County/Walton County line

**A-18**, *Walton County*: This zone is bounded by the Okaloosa/Walton County line to the west, the Gulf of Mexico to the south, and the Walton/Bay County line to the east.  The northern boundary is as follows:

- Highway 98 from the Okaloosa/Walton County line to Ponce de Leon Street.
- Ponce de Leon Street. from Highway 98 to Choctawhatchee Bay
- Choctawhatchee Bay from Ponce de Leon Street to E. Hewett Road
- E. Hewett Road from Choctawhatchee Bay to Highway 98
- Highway 98 from E. Hewett Road to Walton/Bay County line

**A-19**, *Panama City Beach*: This zone is bounded by the Walton/Bay County line to the west, East Pass between the Gulf of Mexico and Upper Grand Lagoon to the east, and the Gulf of Mexico to the south. Its northern boundary is as follows:

- Highway 98 (Back Beach Road) from the Walton/Bay County line to Clara Avenue
- Clara Avenue from Back Beach Road to Hutchison Boulevard
- Hutchison Boulevard from Clara Avenue to Front Beach Boulevard
- Front Beach Boulevard from Hutchison Boulevard to Highway 98

6

- Highway 98 from Front Beach Boulevard to East Pass

**A-20**, *Bay County East of Tyndall AFB*: This zone is bounded by the Gulf of Mexico to the south, Crooked Island Beach Road to the west, and the Bay County/Gulf County line to the east.  The northern boundary is as follows:

- Highway 98 from Crooked Island Beach Road to the beginning of dirt roads immediately north of developed land (commonly known as the "Bear Swamp Roads")
- "Bear Swamp Roads" from Highway 98 to northern terminus of Paradise Cove Boulevard
- Paradise Cove Boulevard from northern terminus to 15th Street
- 15th Street from Paradise Cove Boulevard to County Road 386 S (also the Bay County/Gulf County line)

**A-21**, *Gulf County*: This zone is bounded by the Gulf of Mexico to the south, the Bay County/Gulf County line to the west, and the Gulf County/Franklin County line (Ochlockonee River) to the east.  The northern boundary consists of the edge of developed residential properties until Westview Boulevard/Sea Turtle Drive, at which point the boundary becomes Highway 319.  The zone also includes the entirety of St. Joseph Peninsula surrounding St. Joseph Bay.

**A-22**, *Franklin County*: This zone is bounded by the Gulf of Mexico to the south, the Gulf County/Franklin County line to the west, and the Franklin County/Wakulla County line to the east.  The northern boundary is as follows:

- Highway 98 from the Gulf County/Franklin County line to Big Bend Scenic Byway (Highway 319)
- Big Bend Scenic Byway (Highway 319) from Highway 98 to the southern bank of the Ochlockonee River/Bay.

The zone also includes St. Vincent Island, Little St. George Island, St. George Island, Dog Island, and St. James Island.

**A-23**, *Wakulla County*: This zone is bounded by the Gulf of Mexico to the south, the Franklin County/Wakulla County line to the west, the Wakulla County/Jefferson County line to the east, and Highway 98 to the north.

**A-24**, *Horseshoe Beach*: This zone is bounded by the Gulf of Mexico on the south and west, by the eastern terminus of  1st Avenue at the north , and by the canal at the eastern edge of the island on the east.

**A-25**, *Cedar Key*: This zone consists exclusively and entirely of the island of Cedar Key.

**A-26**, *Clearwater/Tampa Islands*: This zone consists of the entirety of the series of islands/keys off the Gulf Coast of Florida stretching from Anclote Key in the north to Lido Key in the south.

**A-27**, *Sanibel/Captiva:* This zone consists of the entirety of the series of islands off the Gulf Coast of Florida stretching from Lacosta Island in the north to Sanibel Island in the south.

7

**A-28**: *Florida Keys*: This zone consists of the entirety of the series of islands off the south coast of Florida stretching from Key West in the south/west to Key Largo in the north/east.

## ZONE B DEFINITIONS

**B-1**, *South Louisiana 1*: This zone consists of an area of southern Louisiana spanning from the Louisiana/Texas state line to Caminada Bay. Although the zone is one contiguous polygon, this description divides it into two parts. The first of these parts includes the larger areas moving as far east and south as Golden Meadow, and the second includes the narrower portion of the zone south of Golden Meadow/Bayou Lafourche. Its western boundary is the Texas/Louisiana state line.

The zone's northern/eastern boundary is as follows:

- The southern boundary of Calcasieu Parish from the Texas/Louisiana state line until the eastern boundary of Calcasieu Parish intersects Interstate 10
- Interstate 10 from the Calcasieu Parish line to the Lafayette Parish line
- The Lafayette Parish line south of Interstate 10 until it intersects again with Interstate 10 on the east side of Lafayette Parish
- Interstate 10 from the Lafayette Parish line to Highway 1 west of Baton Rouge
- Highway 1 from Interstate 10 to the Intracoastal Waterway in Larose
- Intracoastal Waterway from Highway 1 to Station No. 7 Road/Canal and levee system
- Station No. 7 Road/canal and levee system from Intracoastal Waterway to Bayou Lafourche

Its southern boundary is as follows:

- Highway 82 from Sabine Pass to Bayou Road
- Bayou Road from Highway 82 to Parish Road 548
- Parish Road 548 from Bayou Road to its terminus
- The line connecting the terminus of Parish Road 548 to the northern shore of Mud Lake
- The line connecting the northern shore of Mud Lake to the intersection of Highway 82 and the Calcasieu River
- Highway 82 to Schooner Bayou Canal
- The northern bank of Schooner Bayou Canal from Highway 82 to Vermilion Bay
- The northern shoreline of Vermilion Bay and West Cote Blanche Bay from Schooner Bayou Canal to southern terminus of Highway 317
- The boundary continues throughout southern Louisiana east of Vermilion Bay in a line connecting the end of the following roads:
  - Highway 317 (St. Mary Parish)
  - Levee Road (Terrebonne Parish)
  - Bayou Dularge Road (Terrebonne Parish)
  - Four Point Road (Terrebonne Parish)
  - Mouth of Houma Navigation Canal (Terrebonne Parish)
  - Island Road (Terrebonne Parish)

8

- o Lower Highway 665 (Terrebonne Parish)
- o Eastern terminus of Jean Plaisance Canal (Lafourche Parish)

The portions of this zone south of Golden Meadow are bounded on the west by Highway 1 until it splits from Bayou Lafourche, and Bayou Lafourche until the Gulf of Mexico. It is bounded on the east by the end of developed land east of Highway 1, continuing until Highway 1 crosses into Grand Isle (Caminada Pass). The southern boundary of this portion of the zone is the Gulf of Mexico.

**B-2**, *South Louisiana 2*: This zone consists of developed land on the east and west banks of the Mississippi River from approximately the Belle Chasse Naval Station to the Gulf of Mexico. Its northern boundary is Buccaneer Road on the west bank and the Perez Canal on the east bank, and the line that connects the end of Buccanneer Road with the Perez Canal across the Mississippi River. Its southern boundary is Southwest Pass/Pass a Loutre at the mouth of the Mississippi River. Its western boundary is as follows:

- Bayou Barriere from Buccaneer Road to the Hero Canal
- North bank of Hero Canal from Bayou Barriere to levee west of Highway 23
- Levee west of Highway 23 from Hero Canal to Wilkinson Canal
- Western bank of Wilkinson Canal toward Mississippi River to levee west of Highway 23
- Levee west of Highway 23 from Wilkinson Canal to Deer Range Canal
- Eastern bank of Deer Range Canal to Canal/Levee East of Hermitage Road
- Northern/eastern levee from Hermitage Road to Highway 23 in West Point a la Hache
- Highway 23 from West Pointe a la Hache to levee in Happy Jack
- Levee in Happy Jack to Adams Bay Shoreline west of Highway 23
- Eastern shoreline of Adams Bay/Long Bay/Hospital Bay/Yellow Cotton Bay from levee to Spanish Pass
- Northern/eastern shoreline of Spanish Pass from Yellow Cotton Bay to Highway 23 Highway 23 from Spanish Pass to intersection of Venice Boat Harbor Road
- Line connecting intersection of Venice Boat Harbor Road with Pass Tante Phine
- Northern bank of Pass Tante Phine to Tiger Pass
- Western shore of Tiger Pass from Pass Tante Phine to the western shoreline of the Mississippi River
- Western Shoreline of Mississippi River through the Southwest Pass to the Gulf of Mexico

The eastern boundary is as follows:

- Western bank of Joe Brown Canal from Perez Canal to Belair Canal
- Northern bank of Belair Canal from Joe Brown Canal to Highway 39
- 
- Highway 39 from Belair Canal to Back Levee Canal (just east of Phoenix)
- Southern/western bank of Back Levee Canal from Highway 39 to Fucich Bayou
- Southern bank of Fucich Bayou from Back Levee Canal to western shore of Breton Sound
- western shore of Breton Sound from past Fucich Bayou to Bayou Lamoque

9

028277

- Northern bank of Bayou Lamoque from western shore of California Bay to Bayou Tortillen
- Southern bank of Bayou Tortillen from Bayou Lamoque to Ostrica Locks
- Ostrica Locks from Bayou Tortillen to eastern shore of Mississippi River
- Eastern shore of Mississippi River from Ostrica Locks to Pass a Loutre

**B-3,** *Downtown New Orleans:* This zone is bounded by Calliope Street (which runs underneath the Pontchartrain Expressway) to the west, Claiborne Avenue (which runs underneath Interstate 10) to the north, and Esplanade Avenue to the east.  The southern boundary is as follows:

- St. Charles Avenue from Calliope Street to St. Joseph Street
- St. Joseph Street from St. Charles Avenue to S. Peters Street
- S. Peters Street from St. Joseph Street to Notre Dame Street
- Notre Dame Street from S. Peters Street to Convention Center Boulevard
- Convention Center Boulevard from Notre Dame Street to Poydras Street
- Poydras Street from Convention Center Boulevard to S. Peters Street
- S. Peters Street from Poydras Street to Canal Street
- Canal Street from S. Peters Streetto N. Rampart Street
- Rampart Street from Canal Street to Esplanade Avenue

**B-4,** *Uptown New Orleans*: This zone is bounded by Calliope Street (which runs underneath the Pontchartrain Expressway) to the east, St. Charles Avenue to the north, and Walnut Street (at the edge of Audubon Park) to the west.  The southern boundary is as follows:

- Railroad tracks from Front Street/Walnut Street to River Drive
- The Mississippi River from River Drive to River Drive/East Drive
- East Drive from River Driveto Tchoupitoulas Street
- Tchoupitoulas Street from East Drive to Calliope Street

**B-5,** *Bucktown/Lakeshore*, New Orleans: This zone is bounded by Lake Pontchartain to the north and Bonnabel Boulevard to the west.  The southern boundary is as follows:

- West Esplanade Avenue from Bonnabel Boulevard to the 17th Street Canal (Jefferson/Orleans Parish line)
- 17th Street Canal from W. Esplanade Avenue to 38th Street
- 38th Street from the 17th Street Canal to Pontchartrain Boulevard/West End Boulevard

The eastern boundary is as follows:

- Pontchartrain Boulevard/West End Boulevard from 38th Street to Hammond Highway/Robert E. Lee Boulevard
- Lakeshore Drive from Hammond Highway/Robert E. Lee Boulevard to beginning of harbor/boat slips
- Harbor/boat slips to Lake Pontchartrain

10

**B-6**, *St. Tammany Parish*: This zone is bounded by the north shore of Lake Pontchartrain to the south, Causeway Boulevard to the west, and the Highway 11 railroad to the east.  The northern boundary is as follows:

- Monroe Street from Causeway Boulevard to Girod Street
- Girod Street from Monroe Street to Highway 190
- Highway 190 from Girod Street to Thompson Road
- Thompson Road from Highway 190 to Bayou Liberty Road
- Bayou Liberty Road to Highway 11 railroad tracks

**B-5**, *Battleship Parkway*: This zone consists of the following roads:

- Battleship Parkway (U.S. Highway 90) from Interstate 10 near Polecat Bay to Spanish Fort Boulevard (U.S. Highway 31)
- Spanish Fort Boulevard (U.S. Highway 31) from Battleship Parkway to Mobile Plantation Parkway (Highway 181)
- Mobile Plantation Parkway (Highway 181) from Spanish Fort Boulevard to Interstate 10

**B-7**, *Daphne/Fairhope*: This zone is bounded by Mobile Bay to the west, Spanish Fort Boulevard to the north, Highway 98 to the east, and Highway 98 to the south.

**B-8**, *Gulf Breeze*: This zone is bounded by the Santa Rosa Sound to the north and Highway 98 to south and west.  The eastern boundary is the line between Baltar Drive and Hickory Shores Drive, including the eastern terminus of Sandy Bluff Drive.

**B-9**, *Foley Area*: This zone is bounded on the north by Highway 98 from the eastern shore of Mobile Bay to the Foley Beach Expressway.  Its southern boundary is the northern bank of the Intracoastal Waterway from Mobile Bay to the Foley Beach Expressway.  Its western boundary is Mobile Bay from the intersection of Alabama's Coastal Connection and U.S Highway 98 to the northern bank of the Intracoastal Waterway.  Its eastern boundary is the Foley Beach Expressway from Highway 98 to the northern bank of the Intracoastal Waterway.  This zone excludes the portions of Zone A-12 which run through it.

**B-10**, *Foley Beach Expressway*: This zone consists of Foley Beach Expressway from Highway 59 to Highway 98.

**B-11,** *Downtown Pensacola*:  This zone is bounded in the south by the northern bank of Bayou Grande from S. Navy Boulevard to the northern shore of Pensacola Bay, and by the northern shore of Pensacola Bay from Bayou Grande to the Pensacola Bay Bridge (Highway 98).  Its western boundary is S. Navy Boulevard from Barrancas Avenue to the northern bank of Bayou Grande.  Its northern boundary is as follows:

- Barrancas Avenue from S. Navy Road to W. Garden Street
- W. Garden Street from Barrancas Avenue to N. Alcaniz Street

11

- N. Alcaniz Street from E. Garden Street to E. Gregory Street
- E. Gregory Street from N. Alcaniz Avenue to the Pensacola Bay Bridge

**B-12**, *Highway 98 from Gulf Breeze to Fort Walton Beach:* This zone consists of U.S. Highway 98 (Gulf Breeze Parkway, Navarre Parkway, or Miracle Strip Parkway) from the eastern edge of Zone A-14 (edge of the Tiger Point Golf Course development) to the northern shore of Santa Rosa Sound.

**B-13**, *Highway 293 in Destin*: This zone consists of Highway 293 from the northern shore of Choctawhatchee Bay to Highway 98 (Emerald Coast Parkway).

**B-14**, *Panama City Beach*: This zone is bounded on the north by Highway 98 (Back Beach Road) from Clara Avenue to Front Beach Road. Its western boundary is Clara Avenue from Highway 98 to Hutchinson Boulevard. Its southern boundary is as follows:

- Hutchinson Boulevard from Clara Avenue to Front Beach Road
- Front Beach Road from Hutchinson Avenue to Highway 98

**B-15**, *Panama City*: This zone consists of two roads, as described below:

- W. Highway 98/W. 18th Street from the western shore of the Upper Grand Lagoon to Beck Avenue
- W. 23rd Street/E. 23rd Street from Highway 98 to N. Cove Boulevard/Martin Luther King, Jr. Boulevard

**B-16**, *Port St. Joe*: This zone is bounded on the west by Monument Avenue from 1st Street to Cecil G. Costin Boulevard. Its northern boundary is 1st Street from Monument Avenue to Woodward Avenue. Its eastern boundary is Woodward Avenue from 1st Street to Cecil G. Costin Boulevard. It southern boundary is Cecil G. Costin Boulevard from Monument Avenue to Woodward Avenue.

**B-17**, *Apalachicola*: This zone is bounded on the east by the western bank of Scipio Creek/Apalachicola River. Its northern boundary is as follows:

- Avenue M from 12th Street to Market Street
- Market street from Avenue M to marina/inlet at Scipio Creek
- Northern bank of inlet/marina to Scipio Creek

Its western boundary is as follows:

- 12th Street from Avenue M to Avenue L
- Avenue L from 12th Street to 14th Street
- 14th Street from Avenue L to Avenue E

Its southern boundary is as follows:

- Avenue E from 14th Street to Market Street
- Market Street from Avenue E to the eastern shore of the Apalachicola River

12

## ZONE C DEFINITIONS

**C-1**, *Galveston*: This zones contains the entirety of Galveston Island and the Bolivar Peninsula/Crystal Beach.  The zone's eastern boundary is the water passageway from the Gulf of Mexico to Rollover Bay, located just east of N. Bauer Street.

**C-2**, *Port Arthur*: This zone consists of the following boundaries, moving clockwise beginning at its northernmost tip at the intersection of Highway 82 and Taylor Bayou.

- Highway 82 from the eastern bank of Taylor Bayou to the Sabine Neches Canal
- Southern bank of Sabine Neches Canal from Highway 82 to northern terminus of S. Levee Road
- S. Levee Road from southern bank of Sabine Neches Canal to the southern shore of Sabine Lake
- Southern shore of Sabine Lake/Sabine Pass from S. Levee Road to eastern terminus of Jetty Road
- Jetty Road/1st Street from eastern terminus to Quinn Street
- Quinn Street from Jetty Road to S. 8th Avenue (Route 3322)
- S. 8th Avenue (Route 3322/Highway 87) from Quinn Street to northern bank of Intracoastal Waterway
- Northern bank of Intracoastal Waterway from S. 8th Avenue to eastern bank of Taylor Bayou
- Eastern bank of Taylor Bayou from northern bank of Intracoastal Waterway to Highway 82

**C-3**, *South Louisiana*: This zone consists of three parts spanning across southern Louisiana.  The first portion consists of Calcasieu Parish south of Interstate 10.  The second portion consists of Lafayette Parish south of Interstate 10.

The third and largest portion is bounded on the south/west by Highway 1 from Interstate 10 to the Intracoastal Waterway in Larose.  Its eastern boundary is as follows:

- Western/northern bank of Intracoastal Waterway from Highway 1 to the western bank of Bayou Barataria
- Western/northern bank of Bayou Barataria from northern bank of Intracoastal Waterway to Highway 3134
- Highway 3134 from northern bank of Bayou Barataria to Barataria Boulevard (Highway 45)
- Barataria Boulevard from Highway 3134 to Westbank Expressway (Highway 90)
- Westbank Expressway from Barataria Boulevard to Interstate 310
- Interstate 310 from Westbank Expressway to Interstate 10
- Interstate 10 from Interstate 310 to end of Bonnet Carret Spillway, where it meets the shore of Lake Pontchartrain
- Southern/western/northern shore of Lake Pontchartrain from Bonnet Carret Spillway to N. Causeway Boulevard on the northshore
- N. Causeway Boulevard from northern shore of Lake Pontchartrain  to Monroe Street
- Monroe Street from N. Causeway Boulevard to Girod Street
- Girod Street from Monroe Street  to Florida Street (Highway 190)

13

The northern boundary is as follows:

- Interstate 10 from Highway 1 west of Baton Rouge to Highway 22 east of Gonzales
- Highway 22 from Interstate 10 to Causeway Boulevard, where it becomes Highway 190
- Highway 190 (Florida Street) from Highway 22 to Girod Street

**C-4,** *Uptown New Orleans:* This zone is bounded on the west by Monticello Avenue (the Orleans/Jefferson Parish line) from Oak Street to S. Claiborne Avenue. Its eastern boundary is as follows:

- Canal Street from S. Broad Street to Interstate 10/S. Claiborne Avenue
- Interstate 10/S. Claiborne Avenue from Canal Street to the Pontchartrain Expressway/Calliope St.
- Pontchartrain Expressway/Calliope Street from Claiborne Avenue to St. Charles Avenue

Its southern boundary is as follows:

- Oak Street from Monticello Avenue to Leake Avenue
- Leake Avenue/Front Street from Oak Street to Walnut Street (western edge of Audubon Park)
- Walnut Street from Front Street to St. Charles Avenue
- St. Charles Avenue from Walnut Street to the Pontchartrain Expressway/Calliope Street

Its northern boundary is as follows:

- S. Claiborne Avenue from Monticello Avenue to S. Carrollton Avenue
- S. Carrollton Avenue from S. Claiborne Avenue to Fontainebleau Drive
- Fontainebleau Drive from S. Carrollton Avenue to Broad Street
- S. Broad Street from Fontainebleau Avenue to Canal Street

**C-5,** *Pearlington*: This zone is situated between the Slidell Area and Bay St. Louis Zones A. Its boundaries are Highway 90 between the Pearl River (Mississippi/Louisiana state line) and Old Lower Bay Road to the north, the eastern bank of the Pearl River from Highway 90 to the northern bank of Campell Inside Bayou in the west, and the northern bank of Campbell Inside Bayou to the south. Its eastern boundary is as follows:

- Old Lower Bay Road from Highway 90 to Lower Bay Road
- Lower Bay Road from Old Lower Bay Road to (30.236°N, -89.52°W) at which point the boundary cuts due south to intersect with the western bank of John's Bayou
- Western bank of John's Bayou from line due south of (30.236°N, -89.52°W) to northern bank of Grand Plains Bayou
- Northern/western bank of Grand Plains Bayou from western bank of John's Bayou to the northern bank of Campbell Inside Bayou

14

**C-6,** *Bay St. Louis*: This zone is bounded by Interstate 10 from Highway 607 to Interstate 110 in the north and Highway 607 from Interstate 10 to Highway 90 in the west.  Its eastern boundary is the western boundary of the Interstate 110 Zone A. Its southern boundary is as follows:

- Highway 607 from Interstate 10 to its merger with Highway 90
- Highway 90 from Highway 607 to Everett Street/Railroad Avenue in Pass ChristianRailroad Avenue from Highway 90 to Tegarden Road
- Tegarden Road from Railroad Avenue to E. Pass Road
- E. Pass Road from Tegarden Road to Lorraine Road
- Lorraine Road from Pass Road to the northern shore of Big Lake/Back Bay of Biloxi
- Back Bay of Biloxi from Lorraine Road to the beginning of the Interstate 110 Zone A

**C-7,** *Biloxi/Pascagoula/Mobile*: This zone spans three cities from Interstate 110 to Mobile Bay. Its western boundary is the eastern boundary of the Interstate 110 Zone A.  Its northern boundary is as follows:

- Interstate 10 from the Interstate 110 Zone A 1 zone to Interstate 65
- Interstate 65 from Interstate 10 to southern bank of Chickasaw Creek
- Southern bank of Chickasaw Creek from Interstate 65 to western bank of Black Bayou
- Western bank of Black Bayou from southern bank of Chickasaw Creek to the eastern bank of the Mobile River
- Eastern bank of Mobile River to the western bank of the Spanish River

Its southern boundary is as follows:

- The northern shore of Back Bay of Biloxi from the Interstate 110 Zone A to Washington Avenue
- Washington Avenue from the northern shore of the Back Bay of Biloxi to Highway 90
- Highway 90 from Washington Avenue to Halstead Road
- Halstead Road  from Highway 90 to the northern shore of Davis Bayou/Mississippi Sound
- Northern shore of Davis Bayou/Mississippi Sound from Halstead Road to the western bank of Bayou La Batre
- Western bank of Bayou La Batre from the Gulf of Mexico to Highway 188
- Highway 188 from Bayou La Batre to the eastern bank of Bayou Coden
- Eastern bank of Bayou Coden to the northern shore of the Gulf of Mexico
- Northern shore of the Gulf of Mexico from Bayou Coden to the western shore of Mobile Bay

Its eastern boundary is as follows:

- The western bank of the Spanish River from the Mobile River to the western shore of Mobile Bay
- The western shore of Mobile Bay from the Spanish River to the Gulf of Mexico

**C-8,** *Orange Beach/Pensacola*: This zone spans from the Zone B-7 and B-8 in the west to the eastern shores of Pensacola Bay and Escambia Bay south of Interstate 10 to the east.  It is bisected by the

15

028283

Highway 59 to Gulf Shores (Zone A-12) and by the Foley Beach Expressway north of Highway 98 (Zone B-10).  Its northern boundary is Interstate 10 from Highway 98 to Escambia Bay.  Its western boundary is as follows:

- U.S. Highway 98/42 from Interstate 10 to Highway 98 (Alabama's Coastal Connection)
- Highway 98 (Alabama's Coastal Connection) from U.S.  Highway 98 to the Foley Beach Expressway
- Foley Beach Expressway from Highway 98 to the northern bank of the Intracoastal Waterway

Its southern boundary is as follows:

- The northern shore of the Intracoastal Waterway from  Mobile Bay to Wolf Bay
- The northern shores of Wolf Bay, Bayou La Launch, Amica Bay, and Perdido Bay from the Intracoastal Waterway to the northern bank of Bayou Garcon
-  The northern bank of Bayou Garcon from Perdido Bay  to (30.323°N, -87.425°W), a point due north of the end of Corinna Street
- Corinna Street from the line due south of (30.323°N, -87.425°W) to Highway 292A
- Highway 292A from Corinna Street to Highway 173
- Highway 173 from Highway 292A to Fuel Farm Road
- Fuel Farm Road from Highway 173 to the northern shore of Big Lagoon
- Northern shore of Big Lagoon from Fuel Farm Road to the west shore of Pensacola Bay

Its eastern boundary is as follows:

- Western shore of Escambia Bay/Pensacola Bay from Interstate 10 to Highway 98 (Pensacola Bay Bridge).
- Highway 98 (E. Gregory Street) from Pensacola Bay to S. Alcaniz Street
- S. Alcaniz Street from E. Gregory Street to E. Garden Street.
- E. Garden Street/W. Garden Street from E. Gregory Street to Barrancas Avenue
- Barrancas Avenue from W. Garden Street to S. Navy Boulevard
- S. Navy Boulevard from Barrancas Avenue to the northern bank of Bayou Grande
- Northern bank of Bayou Grande from S. Navy Boulevard to the western shore of Pensacola Bay
- Western shore of Pensacola Bay from Bayou Grande to the northern shore of Big Lagoon

**C-9**, *Gulf Breeze/Fort Walton/Niceville*: This zone is bounded on the south by the northern shores of the Santa Rosa Sound and Choctawhatchee Bay.  Its western boundary is as follows:

- The green space between Baltar Drive and Hickory Shores Boulevard from the southern shore of East Bay to Highway 98
- Highway 98 (Gulf Breeze Parkway) from the green space to the eastern edge of the Tiger Point Golf Course development.
- The eastern edge of the Tiger Point Golf Course development from Highway 98 to the northern shore of Santa Rosa Sound

16

The northern and eastern boundary is as follows:

- The southern shore of East Bay from the green space between Baltar Drive and Hickory Shores Boulevard (at the eastern terminus of Sandy Bluff Drive E.) to the East Bay River
- East Bay River from the East Bay to (30.429°N, -86.807°W), due north of Crescent Wood Road
- Crescent Wood Road from the point described above to Highway 98 (Navarre Parkway)
- Highway 98 from Crescent Wood Road to Cody Avenue
- Cody Avenue from Highway 98 to Independence Road
- Independence Road from Cody Avenue to S. Golf Course Road
- S. Golf Course Road from Independence Road to Heritage Road
- Heritage Road from S. Golf Course Road to Martin Luther King, Jr. Boulevard
- Martin Luther King, Jr. Boulevard from Heritage Road to Green Acres Road
- Green Acres Road from Martin Luther King, Jr. Boulevard to Highway 189 (Lewis Turner Boulevard)
- Highway 189 from Green Acres Road to Highway 85
- Highway 85 from Highway 189 to E. John Sims Parkway
- E. John Sims Parkway from Highway 85 to Route 285
- Route 285 (N. Partin Drive) from E. John Sims Parkway to E. College Boulevard
- E. College Boulevard from Route 285 to Forest Road
- Forest Road from E. College Boulevard to Rocky Bayou Road
- Rocky Bayou Road from Forest Road to Huntington Road
- Huntington Road from Rocky Bayou Road to the north shore of Rocky Bayou
- North shore of Rocky Bayou from Huntington Road to Highway 20
- Highway 20 from Rocky Bayou to Highway 293
- Highway 293 (White Point Road) from Highway 20 to the north shore of Choctawhatchee Bay

Zone B-12 runs from east to west through the middle of this zone between Gulf Breeze and Fort Walton Beach.

**C-10**, *Destin*:  This zone is bounded by the south shore of Choctawhatchee Bay on the north and Highway 98 to the south.  Its eastern boundary is Ponce de Leon Street from Choctawhatchee Bay to Highway 98 Its western boundary is as follows:

- The eastern shore of Joe's Bayou from Choctawhatchee Bay to Bayview Street
- Bayview Street from Joe's Bayou to Spring Lake Drive
- Spring Lake Drive from Bayview Street to Beach Drive
- Beach Drive from Spring Lake Drive to Highway 98

This zone is bisected by Zone B-13, which runs along Highway 293.

**C-11**: *Eglin AFB*: This zone is bounded by Interstate 10 to the north and Highway 331 to the east.  Its western boundary consists of the eastern shores of Escambia Bay and Backwater Bay/East Bay, and its southern boundary is as follows:

17

- The northern shore of East Bay to the East Bay River
- East Bay River from East Bay to (30.429°N, -86.807°W)
- The line connecting (30.429°N, -86.807°W)to the end of Crescent Wood Road
- Crescent Wood Road to Highway 98
- Highway 98 from Crescent Wood Road to Cody Avenue
- Cody Avenue from Highway 98 to Independence Road
- Independence Road from Cody Avenue to South Golf Course Road
- South Golf Course Road from Independence Road to Heritage Road
- Heritage Road from South Golf Course Road to Martin Luther King Boulevard
- Martin Luther King Boulevard from Heritage Road to Green Acres Road
- Green Acres Road from Martin Luther King Boulevard to Highway 189
- Highway 189 from Green Acres Road to Highway 85
- Highway 85 from Highway 189 to W. John Sims Parkway
- W. John Sims Parkway/E. John Sims Parkway from Highway 85 to North Partin Drive
- North Partin Drive from Highway 85 to East College Boulevard
- East College Boulevard from North Partin Drive to Forest Road
- Forest Road from East College Boulevard to Rocky Bayou Drive
- Rocky Bayou Drive from Forest Road to Huntington Road
- Huntington Road from Rocky Bayou Drive to the north shore of Rocky Bayou
- The eastern and southern shore of Rocky Bayou from Huntington Road to Highway 20
- Highway 20 from Rocky Bayou to White Point Road (Highway 293)
- White Point Road (Highway 293) from Highway 20 to the north shore of Choctawhatchee Bay
- North shore of Choctawhatchee Bay from White Point Road to Highway 331 South

**C-12**, *Walton County*: This zone is bounded by the south shore of Choctawhatchee Bay and Hogtown Bayou on the north (although this boundary extends slightly into Tucker Bayou at its eastern edge) and Highway 98 to the south. Its western boundary is E. Hewett Road from Choctawhatchee Bay to Highway 98.  Its eastern boundary is Peach Creek from the Intracoastal Waterway to Highway 98.

**C-13**, *Panama City*:  This zone is bounded by the southern shore of North Bay to the north and the northern shores of Upper Grand Lagoon and St. Andrew Bay to the south.  Its eastern boundary is as follows:

- Highway 2321 from North Bay to Nehi Road at N. Highway 231
- Nehi Road from N. Highway 231 to Highway 2315 (N. Star Avenue)
- Highway 2315 from Nehi Road to E. Highway 22
- E. Highway 22 from Highway 2315 to Callaway Bayou

Zone B-15, consisting of W. 18th Street and W. 23rd Street, is also contained within Zone C-13.

**C-14**: *Walton County to Franklin County*: This zone is bounded on the west by Peach Creek and on the east by Highway 98.  Its northern boundary is as follows:

028286

- The Intracoastal Waterway from Peach Creek to Highway 79
- Highway 79 from Intracoastal Waterway to Highway 388
- Highway 388 from the Highway 79 to Highway 231
- Highway 231 from Highway 388 to Highway 2315
- Highway 2315 from Highway 231 to Highway 22
- Highway 22 from Highway 2315 to Lake Grove Road
- Lake Grove Road from Highway 22 to eastern terminus at the Apalachicola River
- Western bank of the Apalachicola River from Lake Grove Road to the southern edge of Apalachicola National Forest
- Southern edge of Apalachicola National Forest from the Apalachicola River to the western bank of the Ochlocknee River at point (30.333°N, -84.594°W)
- Western bank of the Ochlocknee River from point described above to Highway 319
- Highway 319 from Ochlocknee River to Highway 98

Its southern boundary is as follows:

- Highway 98 from Peach Creek to the western shore of West Bay
- The shoreline of West Bay, North Bay, Deer Point Lake, and Bayou George from Highway 98 to Highway 2321
- Highway 2321 from Deer Point Lake/Bayou George to Nehi Road
- Nehi Road from Highway 2321 to Highway 2315
- Highway 2315 from Nehi Road to Highway 22
- Highway 22 from Highway 2315 to St. Andrew Bay
- Shore of St. Andrew Bay from Highway 2315 to Highway 98
- Highway 98 from St. Andrew Bay to Sabre Drive
- Sabre Drive from Highway 98 to Bambi Trail
- Bambi Trail from Sabre Drive to Beacon Beach Road
- Beacon Beach Road from Sabre Drive to St. Andrew Bay
- St. Andrew Bay to Hurricane Island and Gulf of Mexico
- Gulf of Mexico from edge of Hurricane Island to western edge of Tyndall AFB Zone A
- Northern edge of Tyndall AFB Zone A, including "Bear Swamp Roads" to Highway 98/319
- Highway 98/319 from Bear Swamp Roads to 1st Street in downtown Port St. Joe
- 1st Street from Highway 98 (Monument Avenue) to Woodward Avenue
- Woodward Avenue from Monument Avenue to Cecil G. Costin Boulevard
- Cecil G. Costin Boulevard from Woodward Avenue to Monument Avenue (Highway 98/319)
- Highway 98/319 from Cecil G. Costin Boulevard to 14th Street in downtown Apalachicola
- 14th Street from Highway 98/319 (Avenue E) to Avenue L
- Avenue L from 14th Street to 12th Street
- 12th Street from Avenue L to Avenue M
- Avenue M from 12th Street to Market Street
- Market Street from Avenue M to the inlet at the marina at Scipio Creek

19

028287

- Marina/inlet to western bank of Scipio Creek
- Western bank of Scipio Creek/Apalachicola River to Highway 98/319
- Highway 319 from Apalachicola River to Ochlockonee River

**C-15**, *Tyndall Air Force Base*: This zone consists of the peninsula west of Highway 98 and Tyndall Air Force Base. Its northern, western, and southern boundaries are defined by St. Andrew's Bay. Its eastern boundary is as follows:

- Highway 98 (Tyndall Parkway) from St. Andrew's Bay to Sabre Drive
- Sabre Drive from Highway 98 to Bambi Trail
- Bambi Trail from Sabre Drive to Beacon Beach Road
- Beacon Beach Road from Bambi Trail to beach access road beginning at -83.623, 30.083
- Beach access road from point described above to northern shore of St. Andrew's Bay

**C-16**, *Apalachee Bay to Holiday*: This zone extends from the Wakulla/Jefferson County line to the Pinellas/Pasco County line, with its western boundary being the Gulf of Mexico. Its eastern/northern boundary is as follows:

- Highway 98 from the Wakulla/Jefferson County line to Highway 356 (Hampton Springs Avenue)
- Hampton Springs Avenue from Highway 98 to CR-593
- CR-593 from Hampton Springs Avenue to Turkey Roost Road
- Turkey Roost Road from CR-593 to Puckett Road
- Puckett Road from Turkey Roost Road to Spring Warrior Road
- Spring Warrior Road from Puckett Road to CR-535
- CR-535 from Spring Warrior Road to Beach Road
- Beach Road until it becomes 2nd Street NW in Steinhatchee
- 2nd Street NW from Beach Road to 1st Avenue S
- 1st Avenue S from 2nd Street NW to 10th Street E/SW 875th Street
- 10th Street E/SW 875th Street from 1st Avenue SW to Highway 358
- Highway 358 from SW 875th Street Street to Highway 361
- Highway 361 from Highway 358 to SW 477th Avenue
- SW 477th Avenue from Highway 361 to SW 623rd Street
- SW 623rd Street from SW 477th Avenue to SW 586th Avenue
- SW 586th Avenue from SW 623rd Street to Highway 351
- Highway 351 from SW 586th Street to SW 782nd Avenue
- SW 782nd Avenue from Highway 351 to SE 54th Street
- SE 54th Street from SW 782nd Avenue to SE 198th Street
- SE 198th Street from SE 54th Street to Highway 349
- Highway 349 from SE 198th Street to Highway 19/98
- Highway 19/98 from Highway 349 to Highway 320 (NW 115th Street)
- NW 115th Street from Highway 19/98 to NW 107th Terrace
- NW 107th Terrace from NW 115th Street to NW 102nd Place

20

028288

- NW 102nd Place from NW 107th Terrace to NW 128th Court
- NW 128th Court from NW 102nd Place to NW 90th Street
- NW 90th Street from NW 128th Court to NW Camp Azalea Road
- NW Camp Azalea Road from NW 90th Street to NW County Road 347
- NW County Road 347 from NW Camp Azalea Road Place to SR-24
- SR-24 from County Road 347 to SW SW 95th Avenue
- SW 95th Avenue from SR-24 to SW 94th Terrace
- SW 94th Terrace from SR-24 to SW Hodge Road/SW Main Line Road
- SW Main Line Road from SW 94th Terrace to Fiber Factory Road
- Fiber Factory Road from SW Main Line Road to SE 80th Street
- SE 80th Street from Fiber Factory Road to SE 25th Avenue
- SE 25th Avenue from SE 80th Street to SE 76th Lane
- SE 76th Lane from SE 25th Street to Highway 19/98
- Highway 19/98 from SE 76th Lane to Pasco/Pinellas County line

**C-17**, *Tampa to Marco Island*: This zone is bounded by the eastern shores of the Gulf of Mexico (excluding the islands included in Zone A), Tampa/Hillsborough Bay, and Charlotte Harbor Bay to the west. Its northern boundary is the Pasco/Pinellas County line, and its southern boundary is the edge of Marco Island. Its eastern boundary is as follows:

- Highway 19 from the Pasco/Pinellas County line to Ulmerton Road
- Ulmerton Road from Highway 18 to Interstate 275
- Interstate 275 from Ulmerton Road to Interstate 4
- Interstate 4 from Interstate 275 to Highway 41
- Highway 41 from Interstate 4 to Highway 951
- Highway 951 to Marco Island/Big Marco River

**FEEDER ROUTES**

The following road segments are included in Zone C.   The zones are described in order from west to east, grouped in the states in which they terminate.

<u>Texas</u>

- Highway 124 from Interstate 10 to Highway 87, and Highway 87 from Highway 124 to the beginning of the Bolivar Peninsula

<u>Louisiana</u>

- Canal Street from Claiborne Avenue to City Park Avenue
- Barataria Boulevard from the Westbank Expressway (Highway 90) to Highway 3134, and Highway 3134 from Barataria Boulevard to intersection with Barataria Boulevard nearest the Intercoastal Waterway

21

- Peters Road from Westbank Expressway to Engineers Road, and Engineers Road from Peters Road to Belle Chasse Highway
- Belle Chasse Highway (Highway 23) from Westbank Expressway (Highway 90) to beginning of the South Louisiana Zone B zone
- General de Gaulle Drive from Westbank Expressway (Highway 90) to Behrman Highway, and Behrman Highway from General de Gaulle Drive to Highway 23
- Westbank Expressway (Highway 90) from Barataria Boulevard to the west bank of the Mississippi River
- Interstate 59 from Highway 98 south of Hattiesburg to Interstate 12 in Slidell

## Mississippi

- Highway 49 from Highway 98 south of Hattiesburg to Interstate 10 north of Gulfport

## Alabama

- Highway 98 from Interstate 59 south of Hattiesburg to Interstate 65 in Mobile
- Interstate 65 from East Old Fort Road east of Fort Deposit to Interstate 165 in Mobile
- Interstate 10 across Mobile Bay
- Highway 98 across Mobile Bay
- Highway 59 from Interstate 65 to Interstate 10
- Highway 287 (Rabun Road) from Interstate 65 to Highway 59

## Florida

- Interstate 10 from west shore of Escambia Bay to Highway 231
- Highway 331 from Interstate 10 to south shore of Choctawhatchee Bay
- Highway 331 from Interstate 10 to Highway 54
- Highway 79 from Florida/Alabama state line to Highway 30A
- Highway 109/77 from Highway 231 south of Dothan to south shore of North Bay
- Highway 231 from 231/431 loop south of Dothan to Panama City buffer zone
- Highway 319 from split from Highway 61 to Highway 98

028290

# EXHIBIT 1C

# ZONE CLASSIFICATIONS AND IMPLEMENTATION

**ZONE A**

All geographic areas designated as Zone A are shown in YELLOW on the attached maps.

**ZONE B**

All geographic areas designated as Zone B are shown in PURPLE on the attached maps.

**ZONE C**

All geographic areas designated as Zone C are shown in RED on the attached maps.

-------------------------------------------------------------------------------------------------------------

**IMPLEMENTATION ASPECTS FOR ROADWAYS AND HIGHWAYS**

**The following criteria shall govern whether a parcel is included within a zone:**

1. On surface roads only (e.g. Canal Street in New Orleans) the following parcels shall be included:
    1. Any parcel directly accessible to a surface road via a driveway, parking lot, or on-street parking.
    2. Any parcel with the road as a street address
2. On surface roads with exit ramps and frontage roads[2] (e.g. Highway 49 from Hattiesburg to Gulfport), the following parcels shall be included:
    1. Any parcel directly accessible to a surface road via a driveway, parking lot, or on-street parking.
    2. Any parcel with the road as a street address
    3. Any parcel on a frontage road within 2.0 mile from the exit ramp[2]
    4. Any parcel within a 0.25 mile radius from the end of each exit ramp right-of-way
3. On limited access roads (e.g. Interstate 10 and Interstate 65), the following parcels shall be included:
    1. Any parcel within a 0.25 mile radius from the end of each exit ramp right-of-way
    2. Any parcel on a frontage road within 2.0 mile of the beginning access point of that frontage road[2]
4. If a road borders on 2 different types of zones, the parcels on this road shall be deemed to be within the more preferential zone. (Example: Zone A over Zone B).

[1] Other than excluded businesses.
[2] A frontage road is defined as:
   a) the closest road running parallel to a limited-access highway, and
   b) an access point that is no farther than ¾ mile from the exit ramp right-of-way.

026397

# EXHIBIT 2

# Tourism

**Tourism** means businesses which provide services such as attracting, transporting, accommodating or catering to the needs or wants of persons traveling to, or staying in, places outside their home community. Therefore, if you are in one of the following businesses or work for such a business, you are in the Tourism Industry.[1]

### 447110 - Gasoline Stations with Convenience Stores
This industry comprises establishments engaged in retailing automotive fuels (e.g., diesel fuel, gasohol, gasoline) in combination with convenience store or food mart items. These establishments can either be in a convenience store (i.e., food mart) setting or a gasoline station setting. These establishments may also provide automotive repair services.
>  Convenience food with gasoline stations
>  Gasoline stations with convenience stores
>  Gasoline with convenience stores

### 447190 - Other Gasoline Stations
This industry comprises establishments known as gasoline stations (except those with convenience stores) primarily engaged in one of the following: (1) retailing automotive fuels (e.g., diesel fuel, gasohol, gasoline) or (2) retailing these fuels in combination with activities, such as providing repair services; selling automotive oils, replacement parts, and accessories; and/or providing food services.
>  Gasoline stations without convenience stores
>  Marine service stations
>  Service stations, gasoline
>  Truck stops

### 448110 - Men's Clothing Stores
This industry comprises establishments primarily engaged in retailing a general line of new men's and boys' clothing. These establishments may provide basic alterations, such as hemming, taking in or letting out seams, or lengthening or shortening sleeves.
>  Apparel stores, men's and boys' clothing
>  Clothing stores, men's and boys'

### 448120 - Women's Clothing Stores
This industry comprises establishments primarily engaged in retailing a general line of new women's, misses'; and juniors' clothing, including maternity wear. These establishments may provide basic alterations, such as hemming, taking in or letting out seams, or lengthening or shortening sleeves.
>  Apparel stores, women's and girls' clothing
>  Clothing stores, women's and girls'
>  Maternity shops

### 448130 - Children's and Infants' Clothing Stores
This industry comprises establishments primarily engaged in retailing a general line of new children's and infants' clothing. These establishments may provide basic alterations, such as hemming, taking in or letting out seams, or lengthening or shortening sleeves.
>  Apparel stores, children's and infants' clothing
>  Baby clothing shops
>  Clothing stores, children's and infants'

---

[1] This Tourism Definition substitutes for the Tourism Definition previously at Bates 026632 - 026646.

028973

**448140 - Family Clothing Stores**

This industry comprises establishments primarily engaged in retailing a general line of new clothing for men, women, and children, without specializing in sales for an individual gender or age group. These establishments may provide basic alterations, such as hemming, taking in or letting out seams, or lengthening or shortening sleeves.

    Clothing stores, family
    Family clothing stores
    Unisex clothing stores
    Western wear stores

**448150 - Clothing Accessories Stores**

This industry comprises establishments primarily engaged in retailing single or combination lines of new clothing accessories, such as hats and caps, costume jewelry, gloves, handbags, ties, wigs, toupees, and belts.

    Apparel accessory stores
    Clothing accessories stores
    Costume jewelry stores
    Furnishings stores, men's and boys'
    Furnishings stores, women's and girls'
    Handbag stores
    Hat and cap stores
    Jewelry stores, costume
    Neckwear stores
    Tie shops
    Wig and hairpiece stores

**448190 - Other Clothing Stores**

This industry comprises establishments primarily engaged in retailing specialized lines of new clothing (except general lines of men's, women's, children's, infants', and family clothing). These establishments may provide basic alterations, such as hemming, taking in or letting out seams, or lengthening or shortening sleeves.

    Bridal gown shops (except custom)
    Coat stores
    Costume stores (including theatrical)
    Dress shops
    Fur apparel stores
    Furriers
    Hosiery stores
    Leather coat stores
    Lingerie stores
    School uniform stores
    Swimwear stores
    T-shirt shops, custom printed
    Uniform stores (except athletic)

**451110 - Sporting Goods Stores**

This industry comprises establishments primarily engaged in retailing new sporting goods, such as bicycles and bicycle parts; camping equipment; exercise and fitness equipment; athletic uniforms; specialty sports footwear; and sporting goods, equipment, and accessories.

    Athletic equipment and supply stores (including uniforms)
    Bicycle (except motorized) shops
    Bowling equipment and supply stores

028974

Diving equipment stores
Exercise equipment stores
Fishing supply stores (e.g., bait)
Footwear (e.g., bowling, golf, spiked), specialty sports, stores
Golf pro shops
Gun shops
Outdoor sporting equipment stores
Pro shops (e.g., golf, skiing, tennis)
Saddlery stores
Shoe stores, specialty sports footwear (e.g., bowling, golf, spiked)
Sporting goods stores
Sports gear stores (e.g., outdoors, scuba, skiing)
Tack shops
Tackle shops (i.e., fishing)
Uniform stores, athletic

**452111 - Department Stores (except Discount Department Stores)**

This U.S. industry comprises establishments known as department stores that have separate departments for various merchandise lines, such as apparel, jewelry, home furnishings, and linens, each with separate cash registers and sales associates. Department stores in this industry generally do not have central customer checkout and cash register facilities.

Department stores (except discount department stores)

**452990 - All Other General Merchandise Stores**

This industry comprises establishments primarily engaged in retailing new goods in general merchandise stores (except department stores, warehouse clubs, superstores, and supercenters). These establishments retail a general line of new merchandise, such as apparel, automotive parts, dry goods, hardware, groceries, housewares or home furnishings, and other lines in limited amounts, with none of the lines predominating.

Catalog showrooms, general merchandise (except catalog mail-order)
Dollar stores
General stores
Home and auto supply stores
Limited price variety stores
Trading posts, general merchandise
Variety stores

**453220 - Gift, Novelty, and Souvenir Stores**

This industry comprises establishments primarily engaged in retailing new gifts, novelty merchandise, souvenirs, greeting cards, seasonal and holiday decorations, and curios.

Balloon shops
Card shops, greeting
Christmas stores
Collectible gift shops (e.g., crystal, pewter, porcelain)
Craft (except craft supply) stores
Curio shops
Gift shops
Gift stands, permanent location
Greeting card shops
Novelty shops
Party goods (e.g., paper supplies, decorations, novelties) stores
Seasonal and holiday decoration stores

3

028975

Souvenir shops

**481111 - Scheduled Passenger Air Transportation**

This U.S. industry comprises establishments primarily engaged in providing air transportation of passengers or passengers and freight over regular routes and on regular schedules. Establishments in this industry operate flights even if partially loaded. Scheduled air passenger carriers including commuter and helicopter carriers (except scenic and sightseeing) are included in this industry.

Air commuter carriers, scheduled
Air passenger carriers, scheduled
Commuter air carriers, scheduled
Helicopter passenger carriers, scheduled
Passenger air transportation, scheduled
Passenger carriers, air, scheduled
Scheduled air passenger carriers
Scheduled air passenger transportation

**485310 - Taxi Service**

This industry comprises establishments primarily engaged in providing passenger transportation by automobile or van, not operated over regular routes and on regular schedules. Establishments of taxicab owner/operators, taxicab fleet operators, or taxicab organizations are included in this industry.

Cab (i.e., taxi) services
Taxicab dispatch services
Taxicab fleet operators
Taxicab organizations
Taxicab owner-operators
Taxicab services

**487110 - Scenic and Sightseeing Transportation, Land**

This industry comprises establishments primarily engaged in providing scenic and sightseeing transportation on land, such as sightseeing buses and trolleys, steam train excursions, and horse-drawn sightseeing rides. The services provided are usually local and involve same-day return to place of origin.

Buses, scenic and sightseeing operation
Cable car, land, scenic and sightseeing operation
Carriage, horse-drawn, operation
Cog railway, scenic and sightseeing, operation
Horse-drawn carriage operation
Monorail, scenic and sightseeing, operation
Railroad transportation, scenic and sightseeing
Railroad, scenic and sightseeing, operation
Railway transportation, scenic and sightseeing
Scenic and sightseeing excursions, land
Sightseeing bus operation
Sightseeing operation, human-drawn vehicle
Steam train excursions
Tour bus, scenic and sightseeing, operation
Tracked vehicle sightseeing operation
Trolley, scenic and sightseeing, operation

4

028976

**487210 - Scenic and Sightseeing Transportation, Water**

This industry comprises establishments primarily engaged in providing scenic and sightseeing transportation on water, with the exception that Charter Fishing, as defined in the Settlement Agreement, is excluded from this Tourism definition. The services provided are usually local and involve same-day return to place of origin.

> Airboat (i.e., swamp buggy) operation
> Dinner cruises
> Excursion boat operation
> Harbor sightseeing tours
> Hovercraft sightseeing operation
> Scenic and sightseeing excursions, water
> Sightseeing boat operation
> Swamp buggy operation
> Whale watching excursions

**487990 - Scenic and Sightseeing Transportation, Other**

This industry comprises establishments primarily engaged in providing scenic and sightseeing transportation (except on land and water). The services provided are usually local and involve same-day return to place of departure.

> Aerial cable car, scenic and sightseeing, operation
> Aerial tramway, scenic and sightseeing, operation
> Glider excursions
> Helicopter ride, scenic and sightseeing, operation
> Hot air balloon ride, scenic and sightseeing, operation
> Scenic and sightseeing excursions, aerial
> Tramway, aerial, scenic and sightseeing operation

**532111 - Passenger Car Rental**

This industry comprises establishments primarily engaged in renting passenger cars without drivers, generally for short periods of time.

> Automobile rental
> Car rental
> Car rental agencies
> Hearse rental
> Limousine rental without driver
> Luxury automobile rental
> Passenger car rental
> Passenger van rental
> Passenger van rental agencies
> Sport utility vehicle rental
> Van (passenger) rental

**532292 - Recreational Goods Rental**

This U.S. industry comprises establishments primarily engaged in renting recreational goods, such as bicycles, canoes, motorcycles, skis, sailboats, beach chairs, and beach umbrellas.

> Beach chair rental
> Beach umbrella rental
> Bicycle rental
> Boat rental, pleasure
> Canoe rental

5

028977

Exercise equipment rental
Golf cart rental
Houseboat rental
Moped rental
Motorcycle rental
Personal watercraft rental
Pleasure boat rental
Recreational goods rental
Rowboat rental
Sailboat rental
Ski equipment rental
Snow ski equipment rental
Sporting goods rental
Sports equipment rental
Surfboard rental
Tent, camping, rental
Water ski rental
Yacht rental without crew

**561520 - Tour Operators**

This industry comprises establishments primarily engaged in arranging and assembling tours. The tours are sold through travel agencies or tour operators. Travel or wholesale tour operators are included in this industry.

Tour operators (i.e., arranging and assembling tours)
Travel tour operators
Wholesale tour operators

**561599 - All Other Travel Arrangement and Reservation Services**

This U.S. industry comprises establishments (except travel agencies, tour operators, and convention and visitors bureaus) primarily engaged in providing travel arrangement and reservation services. Illustrative Examples: Condominium time-share exchange services Ticket (e.g., airline, bus, cruise ship, sports, theatrical) offices Reservation (e.g., airline, car rental, hotel, restaurant) services Ticket (e.g., amusement, sports, theatrical) agencies Road and travel services automobile clubs.

Airline reservation services
Airline ticket offices
Automobile clubs, road and travel services
Bus ticket offices
Car rental reservation services
Condominium time share exchange services
Cruise ship ticket offices
Hotel reservation services
Motor travel clubs
Railroad ticket offices
Reservation (e.g., airline, car rental, hotel, restaurant) services
Sports ticket offices
Theatrical ticket offices
Ticket (e.g., airline, bus, cruise ship, sports, theatrical) offices
Ticket (e.g., airline, bus, cruise ship, sports, theatrical) sales offices
Ticket (e.g., amusement, sports, theatrical) agencies
Ticket (e.g., amusement, sports, theatrical) sales agencies

028978

Ticket agencies, amusement
Ticket agencies, sports
Ticket agencies, theatrical
Ticket offices for foreign cruise ship companies
Time share exchange services, condominium

### 711211 - Sports Teams and Clubs

This U.S. industry comprises professional or semiprofessional sports teams or clubs primarily engaged in participating in live sporting events, such as baseball, basketball, football, hockey, soccer, and jai alai games, before a paying audience. These establishments may or may not operate their own arena, stadium, or other facility for presenting these events.

Baseball clubs, professional or semiprofessional
Baseball teams, professional or semiprofessional
Basketball clubs, professional or semiprofessional
Basketball teams, professional or semiprofessional
Boxing clubs, professional or semiprofessional
Football clubs, professional or semiprofessional
Football teams, professional or semiprofessional
Hockey clubs, professional or semiprofessional
Hockey teams, professional or semiprofessional
Ice hockey clubs, professional or semiprofessional
Jai alai teams, professional or semiprofessional
Major league baseball clubs
Minor league baseball clubs
Professional baseball clubs
Professional football clubs
Professional sports clubs
Roller hockey clubs, professional or semiprofessional
Semiprofessional baseball clubs
Semiprofessional football clubs
Semiprofessional sports clubs
Soccer clubs, professional or semiprofessional
Soccer teams, professional or semiprofessional
Sports clubs, professional or semiprofessional
Sports teams, professional or semiprofessional

### 712110 - Museums

This industry comprises establishments primarily engaged in the preservation and exhibition of objects of historical, cultural, and/or educational value.

Art galleries (except retail)
Art museums
Community museums
Contemporary art museums
Decorative art museums
Fine arts museums
Galleries, art (except retail)
Halls of fame
Herbariums
Historical museums
Human history museums
Interactive museums

7

Marine museums
Military museums
Mobile museums
Multidisciplinary museums
Museums
Natural history museums
Natural science museums
Observatories (except research institutions)
Planetariums
Science and technology museums
Sports halls of fame
Traveling museum exhibits
War museums
Wax museums

**712120 - Historical Sites**

This industry comprises establishments primarily engaged in the preservation and exhibition of sites, buildings, forts, or communities that describe events or persons of particular historical interest. Archeological sites, battlefields, historical ships, and pioneer villages are included in this industry.

Archeological sites (i.e., public display)
Battlefields
Heritage villages
Historical forts
Historical ships
Historical sites
Pioneer villages

**712130 - Zoos and Botanical Gardens**

This industry comprises establishments primarily engaged in the preservation and exhibition of live plant and animal life displays.

Animal exhibits, live
Animal safari parks
Aquariums
Arboreta
Arboretums
Aviaries
Botanical gardens
Conservatories, botanical
Gardens, zoological or botanical
Menageries
Parks, wild animal
Petting zoos
Reptile exhibits, live
Wild animal parks
Zoological gardens
Zoos

**712190 - Nature Parks and Other Similar Institutions**

This industry comprises establishments primarily engaged in the preservation and exhibition of natural areas or settings.

Bird sanctuaries

8

Caverns (i.e., natural wonder tourist attractions)
Conservation areas
Interpretive centers, nature
National parks
Natural wonder tourist attractions (e.g., caverns, waterfalls)
Nature centers
Nature parks
Nature preserves
Nature reserves
Parks, national
Parks, nature
Provincial parks
Waterfalls (i.e., natural wonder tourist attractions)
Wildlife sanctuaries

### 713110 - Amusement and Theme Parks

This industry comprises establishments, known as amusement or theme parks, primarily engaged in operating a variety of attractions, such as mechanical rides, water rides, games, shows, theme exhibits, refreshment stands, and picnic grounds. These establishments may lease space to others on a concession basis.

Amusement parks (e.g., theme, water)
Parks (e.g., theme, water), amusement
Piers, amusement
Theme parks, amusement
Water parks, amusement

### 713120 - Amusement Arcades

This industry comprises establishments primarily engaged in operating amusement (except gambling, billiard, or pool) arcades and parlors.

Amusement arcades
Amusement device (except gambling) parlors, coin-operated
Amusement devices (except gambling) operated in own facilities
Arcades, amusement
Electronic game arcades
Family fun centers
Indoor play areas
Pinball arcades
Video game arcades (except gambling)

### 713910 - Golf Courses and Country Clubs

This industry comprises (1) establishments primarily engaged in operating golf courses (except miniature) and (2) establishments primarily engaged in operating golf courses, along with dining facilities and other recreational facilities that are known as country clubs. These establishments often provide food and beverage services, equipment rental services, and golf instruction services.

Country clubs
Golf and country clubs
Golf courses (except miniature, pitch-n-putt)

9

028981

**713990 - All Other Amusement and Recreation Industries**

This industry comprises establishments (except amusement parks and arcades; gambling industries; golf courses and country clubs; skiing facilities; marinas; fitness and recreational sports centers; and bowling centers) primarily engaged in providing recreational and amusement services.

Amateur sports teams, recreational
Amusement device (except gambling) concession operators (i.e., supplying and servicing in others' facilities)
Amusement ride concession operators (i.e., supplying and servicing in others' facilities)
Archery ranges
Athletic clubs (i.e., sports teams) not operating sports facilities, recreational
Aviation clubs, recreational
Ballrooms
Baseball clubs, recreational
Basketball clubs, recreational
Bathing beaches
Beach clubs, recreational
Beaches, bathing
Billiard parlors
Billiard rooms
Boating clubs without marinas
Boccie ball courts
Bowling leagues or teams, recreational
Boxing clubs, recreational
Boys' day camps (except instructional)
Bridge clubs, recreational
Camps (except instructional), day
Canoeing, recreational

Carnival ride concession operators (i.e., supplying and servicing in others' facilities)
Coin-operated nongambling amusement device concession operators (i.e., supplying and servicing in others' facilities)
Concession operators, amusement device (except gambling) and ride
Curling facilities
Dance halls
Discotheques (except those serving alcoholic beverages)
Driving ranges, golf
Fireworks display services
Fishing clubs, recreational
Fishing guide services
Fishing piers
Flying clubs, recreational
Football clubs, recreational
Galleries, shooting
Girls' day camps (except instructional)
Gocart raceways (i.e., amusement rides)

10

028982

Gocart tracks (i.e., amusement rides)
Golf courses, miniature
Golf courses, pitch-n-putt
Golf driving ranges
Golf practice ranges
Guide services (i.e., fishing, hunting, tourist)
Guide services, fishing
Guide services, hunting
Guide services, tourist
Gun clubs, recreational
Hockey clubs, recreational
Hockey teams, recreational
Horse rental services, recreational saddle
Horseback riding, recreational
Hunting clubs, recreational
Hunting guide services
Ice hockey clubs, recreational
Jukebox concession operators (i.e., supplying and servicing in others' facilities)
Kayaking, recreational
Lawn bowling clubs
Miniature golf courses
Mountain hiking, recreational
Nightclubs without alcoholic beverages
Nudist camps without accommodations
Observation towers
Outdoor adventure operations (e.g., white water rafting) without accommodations
Pack trains (i.e., trail riding), recreational
Para sailing, recreational
Picnic grounds

Pinball machine concession operators (i.e., supplying and servicing in others' facilities)
Ping pong parlors
Pool halls
Pool parlors
Pool rooms
Racetracks, slot car (i.e., amusement devices)
Raceways, gocart (i.e., amusement rides)
Recreational camps without accommodations
Recreational day camps (except instructional)
Recreational sports clubs (i.e., sports teams) not operating sports facilities
Recreational sports teams and leagues
Riding clubs, recreational
Riding stables
Rifle clubs, recreational
River rafting, recreational
Rowing clubs, recreational
Saddle horse rental services, recreational
Sailing clubs without marinas
Sea kayaking, recreational

11

Shooting clubs, recreational
Shooting galleries
Shooting ranges
Skeet shooting facilities
Slot car racetracks (i.e., amusement devices)
Snowmobiling, recreational
Soccer clubs, recreational
Sports clubs (i.e., sports teams) not operating sports facilities, recreational
Sports teams and leagues, recreational or youth
Stables, riding
Summer day camps (except instructional)
Tourist guide services
Trail riding, recreational
Trampoline facilities, recreational
Trapshooting facilities, recreational
Waterslides (i.e., amusement rides)
White water rafting, recreational
Yacht clubs without marinas
Youth sports leagues or teams

**721110 - Hotels (except Casino Hotels) and Motels**

This industry comprises establishments primarily engaged in providing short-term lodging in facilities known as hotels, motor hotels, resort hotels, and motels. The establishments in this industry may offer food and beverage services, recreational services, conference rooms and convention services, laundry services, parking, and other services.

Alpine skiing facilities with accommodations (i.e., ski resort)
Auto courts, lodging
Automobile courts, lodging
Health spas (i.e., physical fitness facilities) with accommodations
Hotel management services (i.e., providing management and operating staff to run hotel)
Hotels (except casino hotels)
Hotels (except casino hotels) with golf courses, tennis courts, and/or other health spa facilities (i.e., resorts)
Hotels, membership
Hotels, resort, without casinos
Hotels, seasonal, without casinos
Membership hotels
Motels
Motor courts
Motor hotels without casinos
Motor inns
Motor lodges
Resort hotels without casinos
Seasonal hotels without casinos
Ski lodges and resorts with accommodations
Summer resort hotels without casinos
Tourist lodges

12

**721191 - Bed-and-Breakfast Inns**

This U.S. industry comprises establishments primarily engaged in providing short-term lodging in facilities known as bed-and-breakfast inns. These establishments provide short-term lodging in private homes or small buildings converted for this purpose. Bed-and-breakfast inns are characterized by a highly personalized service and inclusion of a full breakfast in a room rate.

    Bed and breakfast inns

    Inns, bed and breakfast

**721199 - All Other Traveler Accommodation**

This U.S. industry comprises establishments primarily engaged in providing short-term lodging (except hotels, motels, casino hotels, and bed-and-breakfast inns).

    Cabins, housekeeping

    Cottages, housekeeping

    Guest houses

    Hostels

    Housekeeping cabins

    Housekeeping cottages

    Tourist homes

    Youth hostels

**721211 - RV (Recreational Vehicle) Parks and Campgrounds**

This U.S. industry comprises establishments primarily engaged in operating sites to accommodate campers and their equipment, including tents, tent trailers, travel trailers, and RVs (recreational vehicles). These establishments may provide access to facilities, such as washrooms, laundry rooms, recreation halls and playgrounds, stores, and snack bars.

    Campgrounds

    Recreational vehicle parks

    RV (recreational vehicle) parks

    Travel trailer campsites

**721214 - Recreational and Vacation Camps (except Campgrounds)**

This U.S. industry comprises establishments primarily engaged in operating overnight recreational camps, such as children's camps, family vacation camps, hunting and fishing camps, and outdoor adventure retreats that offer trail riding, white-water rafting, hiking, and similar activities. These establishments provide accommodation facilities, such as cabins and fixed campsites, and other amenities, such as food services, recreational facilities and equipment, and organized recreational activities.

    Boys' camps (except day, instructional)

    Camps (except day, instructional)

    Children's camps (except day, instructional)

    Dude ranches

    Fishing camps with accommodation facilities

    Girls' camps (except day, instructional)

    Guest ranches with accommodation facilities

    Hunting camps with accommodation facilities

    Nudist camps with accommodation facilities

    Outdoor adventure retreats with accommodation facilities

    Recreational camps with accommodation facilities (except campgrounds)

    Summer camps (except day, instructional)

    Trail riding camps with accommodation facilities

13

028985

Vacation camps (except campgrounds, day instructional)
Wilderness camps

### 721310 - Rooming and Boarding Houses

This industry comprises establishments primarily engaged in operating rooming and boarding houses and similar facilities, such as fraternity houses, sorority houses, off-campus dormitories, residential clubs, and workers' camps. These establishments provide temporary or longer-term accommodations which, for the period of occupancy, may serve as a principal residence. These establishments also may provide complementary services, such as housekeeping, meals, and laundry services.

Boarding houses
Clubs, residential
Dormitories, off campus
Fraternity houses
Migrant workers' camps
Off campus dormitories
Residence clubs, organizational
Residential clubs
Rooming and boarding houses
Sorority houses
Workers' camps
Workers' dormitories

### 722110 - Full-Service Restaurants

This industry comprises establishments primarily engaged in providing food services to patrons who order and are served while seated (i.e. waiter/waitress service) and pay after eating. These establishments may provide this type of food services to patrons in combination with selling alcoholic beverages, providing carry out services, or presenting live nontheatrical entertainment.

Bagel shops, full service
Diners, full service
Doughnut shops, full service
Family restaurants, full service
Fine dining restaurants, full service
Full service restaurants
Pizza parlors, full service
Pizzerias, full service
Restaurants, full service
Steak houses, full service

### 722211 - Limited-Service Restaurants

This U.S. industry comprises establishments primarily engaged in providing food services (except snack and nonalcoholic beverage bars) where patrons generally order or select items and pay before eating. Food and drink may be consumed on premises, taken out, or delivered to the customer's location. Some establishments in this industry may provide these food services in combination with selling alcoholic beverages.

Carryout restaurants
Delicatessen restaurants
Drive-in restaurants
Family restaurants, limited-service
Fast-food restaurants
Pizza delivery shops
Pizza parlors, limited-service

14

028986

Pizzerias, limited-service (e.g., take-out)
Restaurants, carryout
Restaurants, fast food
Sandwich shops, limited-service
Steak houses, limited-service
Take out eating places

### 722213 - Snack and Nonalcoholic Beverage Bars

This U.S. industry comprises establishments primarily engaged in (1) preparing and/or serving a specialty snack, such as ice cream, frozen yogurt, cookies, or popcorn or (2) serving nonalcoholic beverages, such as coffee, juices, or sodas for consumption on or near the premises. These establishments may carry and sell a combination of snack, nonalcoholic beverage, and other related products (e.g., coffee beans, mugs, coffee makers) but generally promote and sell a unique snack or nonalcoholic beverage.

Bagel shops, on premise baking and carryout service
Beverage (e.g., coffee, juice, soft drink) bars, nonalcoholic, fixed location
Canteens, fixed location
Coffee shops, on premise brewing
Confectionery snack shops, made on premises with carryout services
Cookie shops, on premise baking and carryout service
Doughnut shops, on premise baking and carryout service
Fixed location refreshment stands
Frozen custard stands, fixed location
Ice cream parlors
Pretzel shops, on premise baking and carryout service
Snack bars (e.g., cookies, popcorn, pretzels), fixed location
Soft drink beverage bars, nonalcoholic, fixed location

### 722310 - Food Service Contractors

This industry comprises establishments primarily engaged in providing food services at institutional, governmental, commercial, or industrial locations of others based on contractual arrangements with these type of organizations for a specified period of time. The establishments of this industry provide food services for the convenience of the contracting organization or the contracting organization's customers. The contractual arrangement of these establishments with contracting organizations may vary from type of facility operated (e.g., cafeteria, restaurant, fast-food eating place), revenue sharing, cost structure, to providing personnel. Management staff is always provided by the food service contractors.

Airline food services contractors
Cafeteria food services contractors (e.g., government office cafeterias, hospital cafeterias, school cafeterias)
Food concession contractors (e.g., convention facilities, entertainment facilities, sporting facilities)
Food service contractors, airline
Food service contractors, cafeteria
Food service contractors, concession operator (e.g., convention facilities, entertainment facilities, sporting facilities)
Industrial caterers (i.e., providing food services on a contractual arrangement (except single-event basis))

028987

**722410 - Drinking Places (Alcoholic Beverages)**

This industry comprises establishments known as bars, taverns, nightclubs, or drinking places primarily engaged in preparing and serving alcoholic beverages for immediate consumption. These establishments may also provide limited food services.

      Alcoholic beverage drinking places

      Bars (i.e., drinking places), alcoholic beverage

      Cocktail lounges

      Drinking places (i.e., bars, lounges, taverns), alcoholic

      Lounges, cocktail

      Nightclubs, alcoholic beverage

      Taverns (i.e., drinking places)

028988

# EXHIBIT 3

## ATTACHMENT A - SEAFOOD DISTRIBUTION CHAIN DEFINITIONS

**Seafood** shall be defined as fish and shellfish, including shrimp, oysters, crab, and finfish, caught in the Specified Waters of the Gulf of Mexico. **Seafood** shall exclude menhaden.

This document shall establish **Seafood** distribution chain definitions, as set forth below:

1. **Commercial Fishermen**, **Seafood Crew**, **Oyster Leaseholders** and **Seafood Vessel Owners**

   Economic loss claims by **Commercial Fishermen**, **Seafood Crew**, **Oyster Leaseholders** and **Seafood Vessel Owners** shall be governed by the **Seafood Program**.

   Definitions for **Commercial Fisherman**, **Seafood Crew**, **Oyster Leaseholder** and **Seafood Vessel Owner** are set forth below:

   a. **Commercial Fisherman** shall be defined as a Natural Person or entity that holds a commercial fishing license issued by the United States and/or the State(s) of Alabama, Florida, Louisiana, Mississippi and/or Texas and derives income from catching and selling **Seafood** that he caught. The following additional definitions are relevant with regard to the **Commercial Fisherman** definition:

      i. **Shrimp Fisherman** shall be defined as a **Commercial Fisherman** that catches shrimp.

      ii. **Oyster Harvester** shall be defined as a **Commercial Fisherman** that harvests oysters.

      iii. **Crab Fisherman** shall be defined as a **Commercial Fisherman** that catches crab.

      iv. **Finfish Fisherman** shall be defined as a **Commercial Fisherman** that catches finfish.

   b. **Seafood Crew** shall be defined as the **Seafood Boat Captain**, **Seafood First Mate**, **Seafood Second Mate**, **Seafood Boatswain**, **Seafood Deckhand**, working for a **Commercial Fisherman**.

      i. **Seafood Boat Captain** shall be defined as a Natural Person who owns or operates a **Commercial Fishing** vessel. In addition, the **Seafood Boat Captain** may plan and oversee the fishing operation, the fish to be sought, the location of the best fishing grounds, the method of capture, the duration of the trip, and the sale of the catch. A person with the job of skipper will be considered to satisfy this definition.

      ii. **Seafood First Mate** shall be defined as a Natural Person who assists a **Seafood Boat Captain** and assumes control of the **Commercial Fishing** vessel when the **Seafood Boat Captain** is off duty, and who assists in directing the fishing operations and sailing responsibilities of the **Seafood Deckhands**, including the operation, maintenance, and repair of the vessel and the gathering, preservation, stowing, and unloading of the catch.

      iii. **Seafood Second Mate** shall be defined as a Natural Person who assists in performing the duties of a **Seafood First Mate**.

    iv.  **Seafood Boatswain** shall be defined as a Natural Person who is a highly skilled **Seafood Deckhand** with supervisory responsibilities on a **Commercial Fishing** vessel, and who directs the **Seafood Deckhands** as they carry out sailing and fishing operations.

    v.  **Seafood Deckhand** shall be defined as a Natural Person who provides services on marine vessels (not personally owned or leased) to any type of **Commercial Fisherman**, including, but not limited to, the following:

1. Operating fishing gear;
2. Letting out and pulling in nets and lines;
3. Extracting the catch;
4. Washing, salting, icing and stowing the catch;
5. Ensuring the decks are clear and clean at all times;
6. Loading equipment and supplies prior to departure; and/or
7. Unloading the catch.

  c.  An **Oyster Leaseholder** shall be defined as a Natural Person or entity that is a lessee holding one or more private oyster leases.

  d.  **Seafood Vessel Owner** shall be defined as a Natural Person or entity that owns a vessel and earns income from leasing or renting that vessel to a **Commercial Fisherman** and/or **Oyster Leaseholder**.  A **Seafood Vessel Owner** may also be a **Commercial Fisherman** and/or an **Oyster Leaseholder**.

2. **Primary Seafood Industry**

The **Primary Seafood Industry** shall be comprised of entities and Natural Persons that satisfy the definitions of **Landing Site**, **Commercial Wholesale or Retail Dealer A**, and **Primary Seafood Processor**, and Natural Persons employed by a **Landing Site**, **Commercial Wholesale or Retail Dealer A**, or **Primary Seafood Processor**, including **Seafood Dockside Workers**.

Economic loss claims by entities and Natural Persons claiming losses related to business income required to be reported on Internal Revenue Service Form 1040 Schedules C, E or F, and that satisfy the **Primary Seafood Industry** definition above shall be compensated pursuant to the **Compensation Framework for Business Economic Loss Claims**.

Economic loss claims by **Individuals** satisfying the **Primary Seafood Industry** definition above shall be compensated pursuant to the **Framework for Individual Economic Loss Claims**.

Definitions of **Landing Site**, **Commercial Wholesale or Retail Dealer A**, **Primary Seafood Processor**, and **Seafood Dockside Worker** are set forth below:

  a.  **Landing Site** shall be defined as a business at which boats first land their catch, including facilities for unloading and handling **Seafood**.  A landing site may also include the provision of ice, fresh water fuel and boat repair or service in connection with the landing of **Seafood**. The following additional definition is relevant with regard to **Landing Site**:

    i.  **Seafood Dockside Worker** shall be a Natural Person performing services for a **Landing**

Site.

b. **Commercial Wholesale or Retail Dealer A** shall be defined as an entity or Natural Person that holds a commercial wholesale or retail dealer license issued by the State(s) of Alabama, Florida, Louisiana, Mississippi and/or Texas for which 75% or more of the 2009 cost or weight in pounds of the product it purchases constitutes **Seafood** purchased directly from **Commercial Fisherman** or **Landing Site** and re-sells to **Primary Seafood Processors**, **Seafood Distributors**, **Seafood Wholesalers** and **Seafood Retailers**.

c. **Primary Seafood Processor** shall be defined as an entity or Natural Person that receives and prepares **Seafood** purchased from a **Commercial Fisherman**, **Landing Site**, or **Commercial Wholesale** or **Retail Dealer** including, but not limited to, cleaning, cooking, canning, smoking, salting, drying or freezing, grading by size, packing storing **Seafood** for shipment.

3. **Secondary Seafood Industry**

The **Secondary Seafood Industry** shall be comprised of entities that satisfy the definitions of **Commercial Wholesale or Retail Dealer B**, **Secondary Seafood Processor**, **Seafood Wholesaler or Distributor**, and **Seafood Retailer**, and Natural Persons employed by a **Commercial Wholesale or Retail Dealer B**, **Secondary Seafood Processor**, **Seafood Wholesaler or Distributor**, or **Seafood Retailer**.

Economic loss claims by entities and Natural Persons claiming losses related to business income required to be reported on Internal Revenue Service Form 1040 Schedules C, E or F, and that satisfy the **Secondary Seafood Industry** definition above shall be compensated pursuant to the **Compensation Framework for Business Economic Loss Claims**.

Economic loss claims by **Individuals** satisfying the **Secondary Seafood Industry** definition above shall be compensated pursuant to the **Framework for Individual Economic Loss Claims**.

Definitions of **Commercial Wholesale or Retail Dealer B**, **Secondary Seafood Processor**, **Seafood Wholesaler or Distributor**, and **Seafood Retailer** are set forth below:

a. **Commercial Wholesale or Retail Dealer B** shall be defined as an entity or Natural Person that holds a commercial wholesale or retail dealer license issued by the State(s) of Alabama, Florida, Louisiana, Mississippi and/or Texas for which less than 75% of the cost or weight in pounds of the product it purchases constitutes **Seafood** purchased directly from a **Commercial Fisherman** or **Landing Site**, and re-sells to **Primary Seafood Processors**, **Seafood Distributors**, **Seafood Wholesalers** and **Seafood Retailers**.

b. **Secondary Seafood Processor** shall be defined as an entity or Natural Person that purchases **Seafood** from a **Primary Seafood Processor** in order to add further value including, but not limited to, cleaning, cooking, canning, smoking, salting, drying or freezing, grading by size packing and storing **Seafood** for shipment.

c. **Seafood Wholesaler or Distributor** shall be defined as an entity or Natural Person that purchases **Seafood** in bulk quantities and sells to retailers such as restaurants, fish shop and supermarkets.

d. **Seafood Retailer** shall be defined as an entity that is an end user of **Seafood** such as a restaurant, fish market or super market for which 25% or more of total food costs for 2009 constitute **Seafood**.

Concerning Item 1 of the PSC's Package To Close, dated March 1, 2012, it states: "PSC will take Deckhands and Crew—working on boats (non-Dockside workers) into the Seafood Program (Attachment "A")."

Subject to the understanding expressly set forth below, concerning Attachment A, BP agrees with the PSC's deletions on page 1 of the Attachment A, which is entitled "Seafood Distribution Chain Definitions", specifically BP agrees to delete the following from the Definitions: "and/or Other Seafood Crew….".

Subject to the same understanding expressly set forth below, BP also agrees with the PSC's deletions on page 2 of that same Attachment A, specifically, BP agrees to delete the following from the Definitions: "(6) Ensuring that the vessel's engines and equipment are kept in good working order" and BP also agrees with the other deletion on page 2 of the same Attachment A: "vi. Other Seafood Crew shall be defined as any Natural Person who provides any other services not covered by the definition of Seafood Boar Captain, Seafood First Mate, Seafood Second mate, Seafood Boatswain, or Seafood Deckhand, to any type of Commercial Fisherman, including dockside series not provided by an employee of a Landing Site."

With respect to each of the deletions from the Attachment A as set forth and quoted above, however, BP's agreement to make each of the deletions is expressly conditioned upon the express understanding with the PSC that if a member of a boat crew also performs dockside work or services incidental to or because of his primary job of serving as a member of an on-the-water crew, then such persons are included in Attachment A, and are not deleted or excluded from Attachment A's definitions. For example, if a member of the boat crew also acts as the boat's engineer, then his or her engineering services are incidental to their on the water boat crew services and hence are not deleted from Attachment A. Similarly, if a boat crew member performs dockside work incidental to his or her work for the boat, then that person is not excluded from Attachment A.

1

# EXHIBIT 4A

# Documentation Requirements for Business Economic Loss Claims[1]

The framework detailed below describes the documentation requirements for business economic loss claims.

In order to be eligible for compensation, a business claimant must provide the following:

1.   A Claim Form which the claimant (or claimant's representative) shall verify under penalties of perjury. The Claim Form shall direct the claimant to provide information, including the claimant's chosen Compensation Period and corresponding Benchmark Period[2] in the year(s) selected by the claimant. The claimant shall attach required documents supporting the claim. All statements made in and documents submitted with the Claim Form may be verified as judged necessary by the Claims Administrator.

2.   Documents reflecting the business structure and ownership of the claimant, including but not limited to articles of incorporation, shareholder list(s), and partnership or limited partnership agreements.

3.   Federal tax returns (including all schedules and attachments) for the years included in the claimant-selected Benchmark Period, 2010, and, if applicable, 2011.[3]

   a)   Provide the complete federal tax return and the applicable supporting documentation.
   b)   For self employed individuals, provide Form 1040, pages 1 and 2, along with Schedules C, D, E, and F and Form 1099 if applicable.

4.   Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents establishing monthly revenues and expenses for the claimed Benchmark Period,[4] 2010 and, if applicable,

---

[1] These Documentation Requirements also apply generally to (i) start-up businesses and (ii) businesses claiming to have ceased operations due to and resulting from the DWH Spill, subject to such exclusions as may be noted in the frameworks governing compensation for such businesses. Other provisions of the settlement agreement might require additional documentation for specific business types.

[2] As used herein, Benchmark Period will have the meaning set forth in the Compensation Framework for Business Economic Loss Claims), and may include (i) 2009, (ii) 2008 and 2009, or (iii) 2007-2009. If the claimant selects a Benchmark Period including dates in years prior to 2009, the claimant shall provide the relevant documents for each of those years.

[3] Claimants who must satisfy the requirements of Sections II and III of the Causation Requirements for Business Economic Loss Claims are required to submit 2011 federal tax returns.

[4] If the claimant's Benchmark Period includes dates in years prior to 2009, the claimant shall provide the relevant documents for the applicable years.

026539

2011.[5] Profit and loss statements shall identify the dates on which they were created. The Claims Administrator may, in his discretion, request source documents for profit and loss statements. If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.

5. If the claimant falls within any of the specific business types listed below, the following additional documents are required for the years included in the Benchmark Period, 2010, and, if applicable, 2011:

    a) Retail
        i. Monthly sales and use tax returns.

    b) Lodging (including hotels, motels, and vacation rental properties):
        i. Lodging tax returns;
        ii. Occupancy reports or historical rental records, on a per unit basis if available;
        iii. Documentation to identify how the rental property is managed, such as (i) a management contract from a third-party management company or (ii) a **Sworn Written Statement** from an owner that manages its own property.

6. Additional documents may be required depending on the causation provisions the claimant is seeking to satisfy, as reflected in "Causation Requirements for Business Economic Loss Claims". These documents include, where applicable:

    a) Documents used to satisfy the Customer Mix Tests accompanying the Modified V-Test and/or Down Only Revenue Pattern Test:

        i. Credit card receipts, or other contemporaneously-maintained records of payment from customers;
        ii. Customer registration logs, such as hotel registries;
        iii. Documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers;
        iv. Business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

    b) Documents providing contemporaneous written evidence of the cancellation of a contract as the direct result of the DWH Spill, which the claimant was not able to replace, under the same terms, or a Sworn Written Statement from an individual third party affirming that the cancellation was Spill-related. A copy of all corresponding contracts shall also be provided.

---

[5] Claimants included in Sections II or III of the Causation Requirements for Business Economic Loss Claims are required to submit 2011 monthly profit and loss statements or alternate source documents.

026540

c) Specific documentation identifying factors outside the control of the claimant that prevented the recovery of revenues in 2011, such as:

    i. The entry of a competitor in 2011;

    ii. Bankruptcy of a significant customer;

    iii. Nearby road closures affecting the business;

    iv. Unanticipated interruption resulting in the closure of the business;

    v. Product/service replacement by customer; or

    vi. Loss of financing and/or reasonable terms of renewal.

d) Documents created during the period April 21, 2010 - December 31, 2010, that evidence spill-related reservation cancellations during that period that the claimant was not able to rebook under the same terms, such as letters, emails, hotel logs for the relevant time, or a Sworn Written Statement from an independent third party citing the DWH Spill as the reason for the cancellation. Written evidence of the original reservation shall also be provided.

e) Documents demonstrating expenses associated with purchases of seafood harvested in the Gulf of Mexico during 2009, such as historical purchase orders or invoices.

f) Other business documents the claimant believes establish causation pursuant to the terms of the Economic and Property Damages Settlement Agreement. Purchase orders or invoices documenting seafood purchase costs for the compensation period, and for the year 2010 or 2011 if applicable.

7. Claimant must provide a copy of any applicable federal, state, or local governmental license required to operate its business. For example, claimants shall produce the following for the Benchmark Period, 2010 and, if applicable, 2011:

a) Real estate sales licenses

b) Occupancy licenses (lodging businesses, including hotels, motels, and vacation rental properties)

c) Business or occupational licenses

    i. Restaurant licenses

    ii. Bars (liquor) licenses

    iii. Taxi/livery licenses

    iv. Service licenses or permits

8. Claimants who have received any of the payments listed below must provide documentation of the amount of payments received:

a) VoO payments

b) Payments from GCCF

c) Payments from BP as part of its OPA claims process.

026541

9.  Additional documentation for claimants with annual revenue of $75,000 or less which seek to establish causation on the basis of a Causation Proxy Claimant:

   a) Sworn Written Statement from Claimant documenting the following:
      i.   Contact information and verification of status in MDL 2179 Settlement of the Causation Proxy Claimant to be used by the claimant to satisfy causation;
      ii.  Business linkage between the claimant and the Causation Proxy Claimant; and
      iii. Proximity of the claimant to the Causation Proxy Claimant (must be within 100 yards for urban claimants and within one-quarter mile for rural claimants).
   b) Sworn Written Statement from Causation Proxy Claimant authorizing claimant's use of the Causation Proxy Claimant's documentation to satisfy causation.

10. Form affirming that the individual filing the claim on behalf of the business is an authorized representative of the claimant.

026542

# EXHIBIT 4B

## CAUSATION REQUIREMENTS FOR BUSINESSES ECONOMIC LOSS CLAIMS[1]

**I.   Business Claimants for Which There is No Causation Requirement**

1) If you are a business in Zone A, you are not required to provide any evidence of causation unless you fall into one of the exceptions agreed to by the parties, and listed in footnote (1).

2) If you are a "Landing Site," or "Commercial Wholesale or Retail Dealer A," or "Primary Seafood Processor," as set forth in "Seafood Distribution Chain Definitions," you are not required to provide any evidence of causation.

3) If you are in Zone A, B or C and you are a "Commercial or Wholesale or Retail Dealer B," or a "Secondary Seafood Processor," or a "Seafood Wholesaler or Distributor," or a "Seafood Retailer," as set forth in "Seafood Distribution Chain Definition," you are not required to provide any evidence of causation.

4) If you are in Zone A or Zone B, and you meet the "Tourism Definition," you are not required to provide any evidence of causation.

5) If you are in Zone A, B or C, and you meet the "Charter Fishing Definition" you are not required to provide any evidence of causation.

**II.   Causation Requirements for Zone B and Zone C**

If you are not entitled to a presumption as set forth in (I) above and you are located in Zone B or Zone C then you must satisfy the requirements of one of the following sections A-E below:

A.  V-Shaped Revenue Pattern:

Total business revenue shows the following pattern:

1. <u>DOWNTURN:</u>  a decline of an aggregate of 8.5% or more in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant;[2] AND

2. <u>LATER UPTURN:</u>  an increase of an aggregate of 5% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010.[3]

OR

---

[1] This Causation Requirements for Business Economic Loss Claims does not apply to (i) Start-up Businesses; (ii) Failed Businesses; (iii) Entities, Individuals or Claims not included within the Economic Class definition; and (iv) Claims covered under the Seafood Program.
[2] See Compensation Framework for Business Economic Loss Claims.
[3] See Exhibit A attached hereto for an example of how this calculation is performed.

028725

B.  Modified V-Shaped Revenue Pattern:

Total business revenue shows the following pattern:

1.  DOWNTURN: a decline of an aggregate of 5% or more in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant;[4] AND

2.  <u>LATER UPTURN:</u> an increase of an aggregate of 5% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010;

<u>AND ONE OR MORE OF THE FOLLOWING:</u>

a.  The claimant demonstrates a decline of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by claimant for the Modified V-Shaped Revenue Pattern as identified in (II.B.1) compared to the same three consecutive month period in 2009, as reflected in:[5]

- customer credit card receipts or other contemporaneously maintained records of payment; or
- customer registration logs (e.g., hotel registries); or
- documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
- business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[6]

OR

b.  For business claimants that have customers in Zones A-C, the claimant demonstrates a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of the three consecutive months from May-December 2010 as selected by claimant for the Modified V-Shaped Revenue Pattern as identified in (II.B.1) compared to the same three consecutive month period in 2009, as reflected in:

---

[4] See Compensation Framework for Business Economic Loss Claims.
[5] A Customer shall be considered a "non-local customer" if they reside more than 60 miles from a claimant business location.
[6] See Exhibit B attached hereto for an example of how this calculation is performed.

2

028726

- customer credit card receipts or other contemporaneously maintained records of payment; or
- customer registration logs (e.g., hotel registries); or
- documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
- business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[7]

OR

c. The claimant provides contemporaneous written evidence of the cancellation of a contract as the direct result of the spill that claimant was not able to replace. Proof of a spill-related contract cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery only of damages solely associated with such contract.

OR

C. Decline-Only Revenue Pattern:

1. DOWNTURN: a decline of an aggregate of 8.5% or more in revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant;[8]

AND

2. Specific documentation identifying factors outside the control of the claimant that prevented the recovery of revenues in 2011, such as:
   - The entry of a competitor in 2011
   - Bankruptcy of a significant customer in 2011
   - Nearby road closures affecting the business
   - Unanticipated interruption resulting in closure of the business
   - Product/Service replacement by Customer
   - Loss of financing and/or reasonable terms of renewal;

AND

3. ONE OF THE FOLLOWING:

---

[7] See Exhibit C attached hereto for an example of how this calculation is performed.
[8] See Compensation Framework for Business Economic Loss Claims.

3

- The claimant demonstrates proof of a decline of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Decline-Only Revenue Pattern as identified in (II.C.1) compared to the same three consecutive month period in 2009, as reflected in:[9]
  - o customer credit card receipts or other contemporaneously maintained records of payment; or
  - o customer registration logs (e.g., hotel registries); or
  - o documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
  - o business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[10]

- For business claimants that have customers in Zones A-C, the claimant demonstrates proof of a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Decline-Only Revenue Pattern as identified in (II.C.1) compared to the same three consecutive month period in 2009, as reflected in:
  - o customer credit card receipts or other contemporaneously maintained records of payment; or
  - o customer registration logs (e.g., hotel registries); or
  - o documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
  - o business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[11]

OR

D. Proof of Spill-Related Cancellations

- Claimant may establish causation by providing contemporaneous written evidence of spill-related reservation cancellations (*i.e.*, letters, emails, hotel logs for the relevant time, or an affidavit from an independent third party citing the

---

[9] A Customer shall be considered a "non-local customer" if they reside more than 60 miles from a claimant business location.

[10] See Exhibit B attached hereto for an example of how this calculation is performed.

[11] See Exhibit C attached hereto for an example of how this calculation is performed.

4

spill as the reason for cancellation) that the claimant was unable to rebook. Proof of spill-related reservation cancellations only establishes causation for the specific cancellations substantiated by the claimant and may result in recovery only of damages solely associated with such cancellations established as causally resulting from the spill.  However, if the lodging facility has food and/or beverage services on site, the evidence of cancellation shall satisfy causation for the specific losses corresponding to such cancellation in those service areas as well.

- The claimant provides contemporaneous written evidence of the cancellation of a contract as the direct result of the spill that claimant was not able to replace. In the absence of contemporaneous written evidence, the claimant must present an affidavit from an independent third party affirming that the cancellation was spill-related.  Proof of a spill-related contract cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery only of damages solely associated with such contract.

OR

E.   A non-rural business claimant on a property that is in close proximity (within 100 yards) to the property of a separate MDL 2179 business claimant that has established causation ("Causation Proxy Claimant") may rely on the documentation submitted by such Causation Proxy Claimant to satisfy these Causation Requirements for Business Economic Loss Claims.  A "Rural Business" claimant located within one quarter-mile of the property of the Causation Proxy Claimant may rely on the documentation submitted by the Causation Proxy Claimant to satisfy these causation requirement only if the claimant provides information sufficient for the Claims Administrator to determine that a causal relationship exists between the claimant's financial performance and the financial performance of the Causation Proxy Claimant. A Rural Business shall be defined as one is located in area outside an Urban Area or Urban Cluster, as defined by the US Census Bureau's classification. Only business claimants with annual revenue of $75,000 or below are eligible to establish causation under this Subpart IIE.

III.   Causation Requirements for Zone D

If you are not entitled to a presumption as set forth in (I) above and you are located  outside of Zones A, B or C, then you must satisfy the requirements of one of the following sections A-F below:

A.   V-Shaped Revenue Pattern:

Business revenue shows the following pattern:

5

1. <u>DOWNTURN:</u>  a decline of an aggregate of  15% or more in total revenues over a period of  three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant;[12]

   AND

2. <u>LATER UPTURN:</u> an increase of an aggregate of 10% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010. [13]

OR

B.   Modified V-Shaped Revenue Pattern:

Total business revenue shows the following pattern:

1. <u>DOWNTURN:</u>  a decline of an aggregate of 10% or more in total revenues over the same period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant;[14]

   AND

2. <u>LATER UPTURN:</u>  an increase of an aggregate of 7% or more in total revenues over the same period of three consecutive months in 2011 compared to 2010;

   AND

3.  <u>ONE OF THE FOLLOWING</u>:

   - The claimant demonstrates proof of a decline of 10%  in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Shaped Revenue Pattern identified in (III.B.1) compared to the same three consecutive month period in 2009, as reflected in:[15]

---

[12] See Compensation Framework for Business Economic Loss Claims.

[13] See Exhibit A attached hereto for an example of how this calculation is performed.

[14] See Compensation Framework for Business Economic Loss Claims.

[15] A Customer shall be considered a "non-local customer" if they reside more than 60 miles from a claimant business location.

028730

- o customer credit card receipts or other contemporaneously maintained records of payment; or
- o customer registration logs (e.g., hotel registries); or
- o documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
- o business documents reflecting contemporaneous recording of receipts or invoices listing customers by location. [16]

- • For business claimants that have customers in Zones A-C, the claimant demonstrates proof of a decline of 10% in the share of total revenue generated by customers located in Zones A-C over the same period of the three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Shaped Revenue Pattern identified in (III.B.1) compared to the same three consecutive month period in 2009, as reflected in:
  - o customer credit card receipts or other contemporaneously maintained records of payment; or
  - o customer registration logs (e.g., hotel registries); or
  - o documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
  - o business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.[17]

- • The claimant provides contemporaneous written evidence of the cancellation of a contract as the direct result of the spill that claimant was not able to replace.  Proof of a spill-related contract cancellation only establishes causation for the specific contract substantiated by the claimant and may result in recovery only of damages solely associated with such contract.

OR

C.     Decline-Only Revenue Pattern:

1.   <u>DOWNTURN:</u> a decline of an aggregate of 15% or more in total revenues over a period of three consecutive months between May-December 2010 compared to the same months in the Benchmark Period selected by the claimant without a recovery in the corresponding months of 2011; [18]

---

[16] See Exhibit B attached hereto for an example of how this calculation is performed.
[17] See Exhibit C attached hereto for an example of how this calculation is performed.
[18] See Compensation Framework for Business Economic Loss Claims.

7

AND

2. Specific documentation identifying factors outside the control of the claimant that prevented the recovery of revenues in 2011:
   - The entry of a competitor in 2011
   - Bankruptcy of a significant customer in 2011
   - Nearby road closures affecting the business
   - Unanticipated interruption resulting in closure of the business
   - Produce/Source replacement by Customer,
   - Loss of financing and/or reasonable terms of renewal;

AND

3. <u>ONE OR MORE OF THE FOLLOWING</u>:

- The claimant demonstrates proof of a decline of 10% in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Decline-Only Revenue Patter as identified in (III.C.1) compared to the same three consecutive month period in 2009, as reflected in:[19]
  - customer credit card receipts or other contemporaneously maintained records of payment; or
  - customer registration logs (e.g., hotel registries); or
  - documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or
  - business documents reflecting contemporaneous recording of receipts or invoices listing customers by location. [20]

- For business claimants that have customers in Zones A-C, the claimant demonstrates proof of a decline of a 10% in the share of total revenue generated by customers located in Zone A, Zone B, or Zone C over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Decline-Only Revenue Pattern as identified in (III.C.1) compared to the same three consecutive month period in 2009, as reflected in:
  - customer credit card receipts or other contemporaneously maintained records of payment; or
  - customer registration logs (e.g., hotel registries); or

---

[19] A Customer shall be considered a "non-local customer" if they reside more than 60 miles from a claimant business location.
[20] See Exhibit B attached hereto for an example of how this calculation is performed.

8

o documentation maintained in the ordinary course of business that
lists customers by location and monthly sales associated with
those customers; or

o business documents reflecting contemporaneous recording of
receipts or invoices listing customers by location.[21]

OR

D. Proof of Spill-Related Reservation Cancellations

- Claimant may establish causation by providing contemporaneous written
evidence of spill-related reservation cancellations (*i.e.*, letters, emails, hotel logs
for the relevant time) that the claimant was unable to rebook. Proof of spill-
related reservation cancellations only establishes causation for the specific
cancellations substantiated by the claimant and may result in recovery only of
damages solely associated with such cancellations established as causally
resulting from the spill. However, if the lodging facility has food and/or beverage
services on site, the evidence of cancellation shall satisfy causation for the losses
in those service areas as well.

- The claimant provides contemporaneous written evidence of the cancellation of
a contract as the direct result of the spill that claimant was not able to replace.
In the absence of contemporaneous written evidence, the claimant must present
an affidavit from an independent third party affirming that the cancellation was
spill-related. Proof of a spill-related contract cancellation only establishes
causation for the specific contract substantiated by the claimant and may result
in recovery of damages solely associated with such contract.

OR

E. For claimants defined as "Seafood Retailers" (including restaurants):

o Claimant demonstrates purchases of Gulf of Mexico harvested seafood
from Zone A, Zone B or Zone C vendors represented at least 10% of food
costs during 2009, as reflected in historical purchase orders and/or
invoices.

AND

---

[21] See Exhibit C attached hereto for an example of how this calculation is performed.

9

  o Claimant demonstrates a decline of 7.5% in gross profit (gross sales less cost of goods sold) over a period of three consecutive months between May-December 2010 compared to the same months in 2009.

OR

F. A non-rural business claimant on a property that is in close proximity (within 100 yards) to the property of a separate MDL 2179 business claimant that has established causation ("Causation Proxy Claimant") may rely on the documentation submitted by such Causation Proxy Claimant to satisfy these Causation Requirements for Business Economic Loss Claims. A "Rural Business" claimant located within one quarter-mile of the property of the Causation Proxy Claimant may rely on the documentation submitted by the Causation Proxy Claimant to satisfy these causation requirement only if the claimant provides information sufficient for the Claims Administrator to determine that a causal relationship exists between the claimant's financial performance and the financial performance of the Causation Proxy Claimant. A Rural Business shall be defined as one is located in area outside an urban area or urban cluster, as defined by the US Census Bureau's classification. Only business claimants with annual revenue of $75,000 or below are eligible to establish causation under this Subpart IIIF.

**Exhibit A**

### Summary of Revenue Pattern Requirements for Causation Tests

| Test | Zone A | | Zone B (Non-Tourism and Non-Seafood) | | Zone C (Non-Seafood) | | Zone D | |
|---|---|---|---|---|---|---|---|---|
| | Down | Up | Down | Up | Down | Up | Down | Up |
| V-Test | N/A | | -8.5% | 5% | -8.5% | 5% | -15% | 10% |
| Modified V-Test * | N/A | | -5% | 5% | -5% | 5% | -10% | 7% |
| Down Only Test * | N/A | | -8.50% | N/A | -8.50% | N/A | -15% | N/A |

* = For the Modified V-Test and the Down Only Test, additional requirements apply, as described in Sections IIB, IIC, IIIB, and IIIC above.

10

028734

## Examples of Revenue Pattern Requirements for Causation Tests

In these examples, the claimant is located in Zone B or C, uses 2008-2009 average as Benchmark Period, and has selected June, July and August as its three consecutive months.

### Example 1:

| | Revenue by Year | | | | |
|---|---|---|---|---|---|
| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
| June | 325,000 | 300,000 | 312,500 | 285,000 | 305,000 |
| July | 360,000 | 350,000 | 355,000 | 330,000 | 345,000 |
| August | 340,000 | 325,000 | 332,500 | 295,000 | 330,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 1,025,000 | 975,000 | 1,000,000 | 910,000 | 980,000 |

Down Percentage: -9.0% =(910,000 - 1,000,000)/1,000,000
Up Percentage: 7.7% =(980,000 - 910,000)/910,000

*Claimant passes V-Test. Note: A claimant that satisfies the revenue pattern requirements for the V-Test will always also satisfy the requirements for the Modified V-Test and Down Only Test.*

### Example 2:

| | Revenue by Year | | | | |
|---|---|---|---|---|---|
| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
| June | 325,000 | 300,000 | 312,500 | 295,000 | 320,000 |
| July | 360,000 | 350,000 | 355,000 | 335,000 | 355,000 |
| August | 340,000 | 325,000 | 332,500 | 315,000 | 340,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 1,025,000 | 975,000 | 1,000,000 | 945,000 | 1,015,000 |

Down Percentage: -5.5% =(945,000 - 1,000,000)/1,000,000
Up Percentage: 7.4% =(1,015,000 - 945,000)/945,000

*Claimant fails V Test and the Down Only Test.*
*Claimant has satisfied the revenue pattern requirement for the Modified V-Test and can establish causation if able to satisfy the additional requirements described in Section IIB above.*

### Example 3:

| | Revenue by Year | | | | |
|---|---|---|---|---|---|
| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
| June | 325,000 | 300,000 | 312,500 | 285,000 | 300,000 |
| July | 360,000 | 350,000 | 355,000 | 330,000 | 325,000 |
| August | 340,000 | 325,000 | 332,500 | 295,000 | 310,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 1,025,000 | 975,000 | 1,000,000 | 910,000 | 935,000 |

Down Percentage: -9.0% =(910,000 - 1,000,000)/1,000,000
Up Percentage: 2.7% =(935,000 - 910,000)/910,000

*Claimant fails V Test and the Modified V-Test.*
*Claimant has satisfied the revenue pattern requirement for the Down Only Test and can establish causation if able to satisfy the additional requirements described in Section IIC above.*

Notes:

The causation tests would work in the same way for claimants in Zone D with higher thresholds for the tests. In Zone D, the V-Test thresholds are -15% decline, 10% upturn; the Modified V-Test thresholds are -10% decline, 7% upturn; the Down-Only Test threshold is -15%.

11

028735

## Examples of Revenue Pattern Requirements for Causation Tests

> In these examples, the claimant is located in Zone B or C, uses 2008-2009 average as Benchmark Period, and has selected June, July and August as its three consecutive months.

> Example 4 demonstrates that under an aggregate test, three months of revenues are summed. The individual months may be up or down, as long as the three month aggregate period passes the test.

### Example 4A:

| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| June | 325,000 | 300,000 | 312,500 | 285,000 | 305,000 |
| July | 360,000 | 350,000 | 355,000 | 330,000 | 345,000 |
| August | 340,000 | 325,000 | 332,500 | 295,000 | 330,000 |
| 3-Month Aggregate: | 1,025,000 | 975,000 | 1,000,000 | 910,000 | 980,000 |
| [Sum of June, July, August] | | | | | |

Down Percentage: **-9.0%** =(910,000 - 1,000,000)/1,000,000
Up Percentage: **7.7%** =(980,000 - 910,000)/910,000

*Claimant passes V-Test. Note: A claimant that satisfies the revenue pattern requirements for the V-Test will always also satisfy the requirements for the Modified V-Test and Down Only Test.*

### Example 4B:

| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| June | 325,000 | 300,000 | 312,500 | 385,000 | 305,000 |
| July | 360,000 | 350,000 | 355,000 | 230,000 | 345,000 |
| August | 340,000 | 325,000 | 332,500 | 295,000 | 330,000 |
| 3-Month Aggregate: | 1,025,000 | 975,000 | 1,000,000 | 910,000 | 980,000 |
| [Sum of June, July, August] | | | | | |

Down Percentage: **-9.0%** =(910,000 - 1,000,000)/1,000,000
Up Percentage: **7.7%** =(980,000 - 910,000)/910,000

*Claimant passes V-Test.*

### Example 4C:

| Month | 2008 | 2009 | Average of 2008-2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| June | 325,000 | 300,000 | 312,500 | 385,000 | 305,000 |
| July | 360,000 | 350,000 | 355,000 | 430,000 | 345,000 |
| August | 340,000 | 325,000 | 332,500 | 95,000 | 330,000 |
| 3-Month Aggregate: | 1,025,000 | 975,000 | 1,000,000 | 910,000 | 980,000 |
| [Sum of June, July, August] | | | | | |

Down Percentage: **-9.0%** =(910,000 - 1,000,000)/1,000,000
Up Percentage: **7.7%** =(980,000 - 910,000)/910,000

*Claimant passes V-Test.*

Notes:

The causation tests would work in the same way for claimants in Zone D with higher thresholds for the tests. In Zone D, the V-Test thresholds are -15% decline, 10% upturn: the Modified V-Test thresholds are -10% decline, 7% upturn: the Down-Only Test threshold is -15%.

028736

Exhibit B

## Example of Customer Mix Test (Non-Local Customers)

The claimant in this Exhibit B uses the same three-month time period as the claimant in Exhibit A (June-July-August).

To pass the test, claimants must demonstrate proof of a decline of 10% or more in the share of total revenue generated by non-local customers over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Test or Down Only Tests compared to the same three consecutive months in 2009.

### Example 1:

LT= Less than     GE=Greater than or equal to

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| LT 60 miles from claimant | $80,000 | $66,000 |
| GE 60 miles from claimant | $20,000 | $14,000 |
| Total | $100,000 | $80,000 |
| % GE 60 miles | 20% | 17.5% |

*Claimant passes Customer Mix Test: Claimant has a 12.5 percent decline in share of total revenue from non-local customers [12.5% = .125 = (20-17.5)/20].*

### Example 2:

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| LT 60 miles from claimant | $50,000 | $40,000 |
| GE 60 miles from claimant | $50,000 | $40,000 |
| Total | $100,000 | $80,000 |
| % GE 60 miles | 50% | 50% |

*Claimant fails Customer Mix Test: No change in share of total revenue from non-local customers. [0% = 0 = (50-50)/50].*

### Example 3:

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| LT 60 miles from claimant | $50,000 | $48,000 |
| GE 60 miles from claimant | $50,000 | $40,000 |
| Total | $100,000 | $88,000 |
| % GE 60 miles | 50% | 45.5% |

*Claimant fails Customer Mix Test: Claimant has a 9% decline in share of total revenue from non-local customers [9% = .09 = (50-45.5)/50].*

13

028737

Exhibit C

## Example of Customer Mix Test (Customers in Zones A-C)

The claimant in this Exhibit B uses the same three-month time period as the claimant in Exhibit A (June-July-August).

To pass the test, claimants must demonstrate proof of a decline of 10% or more in the share of total revenue generated by customers in Zones A-C over the same period of three consecutive months from May-December 2010 as selected by the claimant for the Modified V-Test or Down Only Tests compared to the same three consecutive months in 2009.

### Example 1:

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| Zone D | $80,000 | $66,000 |
| Zones A-C | $20,000 | $14,000 |
| Total | $100,000 | $80,000 |
| % Zones A-C | 20% | 17.5% |
| | *Claimant passes Customer Mix Test:  Claimant has a 12.5 percent decline in share of total revenue from customers in Zones A-C  [12.5%= .125 = (20-17.5)/20]* | |

### Example 2:

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| Zone D | $50,000 | $40,000 |
| Zones A-C | $50,000 | $40,000 |
| Total | $100,000 | $80,000 |
| % Zones A-C | 50% | 50% |
| | *Claimant fails Customer Mix Test:  No change in share of total revenue from customers in Zones A-C. [0% = 0 = (50-50)/50]* | |

### Example 3:

| Customer Residence | June-August '09 | June-August '10 |
|---|---|---|
| Zone D | $50,000 | $48,000 |
| Zones A-C | $50,000 | $40,000 |
| Total | $100,000 | $88,000 |
| % Zones A-C | 50% | 45.5% |
| | *Claimant fails Customer Mix Test:  Claimant has a 9% decline in share of total revenue from customers in Zones A-C [9% = .09 = (50-45.5)/50]* | |

14

028738

Addendum To
Causation Requirements For Business Economic Loss Claims and
Compensation Framework for Business Economic Loss Claims

The term "Benchmark Period" is defined at pp. 1-2 in the **Compensation Framework for Business Economic Loss Claims** (Ex. 4C).  That definition provides:

> The Benchmark Period is the pre-DWH Spill time period which claimant chooses as the baseline for measuring its historical financial performance.  The claimant can select among the following Benchmark Periods: 2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes.

Footnote 2 of the **Causation Requirements For Business Economic Loss Claims** (Ex. 4B) specifically incorporates that definition of Benchmark Period by reference.

Accordingly, once the claimant selects the Benchmark Period year(s) (2009, the average of 2008-2009, or the average of 2007-2009), the **same** Benchmark Period year(s) are used "for all Benchmark Period purposes" -- specifically, the same Benchmark Period year(s) are used for purposes of determining **both** causation and compensation.

In contrast, a claimant is not required to use the same **months** in the Benchmark Period for purposes of establishing causation pursuant to Ex. 4B and determining compensation pursuant to Ex. 4C.

For example, when evaluating whether a claimant can satisfy causation using the "V Test," the claimant may select any consecutive 3-month period between May and December 2010 for comparison to a comparable period in the Benchmark Period (i.e., 2009, the average of 2008-2009, or the average of 2007-2009).  After establishing causation, however, the claimant may select a different 3 or more consecutive months between May and December 2010 in determining compensation in accordance with the **Compensation Framework for Business Economic Loss Claims**, so long as the claimant uses the same Benchmark Period years as the basis for comparison.  Thus, if the claimant selected for *causation* the three months of May - July in the Benchmark Period years of the average of 2008-2009, the claimant can select for *compensation* different months -- e.g., August - October -- but must use the same average of 2008-2009 Benchmark Period.  The same Benchmark Period year(s) thus must be used both for causation (Ex. 4B) and compensation (Ex. 4C).

The additional examples on the next page illustrate these rules:

028779

Scenario 1:

1) Claimant selected the months of May-July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009 and 2007-2009;

2) In determining Compensation, Claimant would be allowed to select the months of August through November 2010 as compared to the months of August through November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years – whichever provides the highest compensation.

Scenario 2:

1) Claimant selected the months of October – December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009;

2) In determining compensation, Claimant could select the months of May-September 2010 as compared to the months of May-September in either 2009 or 2008-2009 – whichever provides the highest compensation.

Scenario 3:

1) Claimant selected the months of June – August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009.  In addition, Claimant selected the months of August – October 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2007-2009;

2) In determining compensation, Claimant could select the months of May-December 2010 as compared to the months of May-December in either 2009 or 2007-2009 – whichever provides the highest compensation.

# EXHIBIT 4C

### Compensation Framework for Business Economic Loss Claims

The compensation framework for business claimants compares the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010.[1]  The calculation is divided into two steps:

> **Step 1** – Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period.  Step 1 compensation reflects the reduction in Variable Profit (which reflects the claimant's revenue less its variable costs) over this period.

> **Step 2** – Compensates claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to sales from the Benchmark Period. This calculation reflects a Claimant-Specific Factor that captures growth or decline in the pre-spill months of 2010 compared to the comparable months of the Benchmark Period and a General Adjustment Factor.

For purposes of the two step calculation, the parties have agreed to a defined list of fixed and variable expenses as reflected in Attachment A.

In order to allocate payroll expenses (including Salaries and Wages, Employee Benefits, and, where applicable, 401K Payments, but excluding Owner/Officer Compensation) into fixed and variable components, a minimum level of fixed payroll costs will be measured based on the average of the two months between May 2010 and December 2010 in which the claimant had its lowest payroll costs. Certain exceptions are identified below for identifying months with the claimant's lowest payroll costs.

For claimants that include Cost of Goods Sold (COGS) in their financial statements, COGS will be treated as a variable expense after excluding, to the extent possible, the following cost items which may be embedded in COGS and are likely to be fixed in nature: Fixed COGS Payroll, Amortization, Depreciation, Insurance Expense, Interest Expense, and Contract Services.

Based on these considerations, the resulting calculations are performed to determine compensation for claimants.

I.    Definitions

For the purposes of this calculation, the following are defined terms:

**Compensation Period:**  The Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.

**Benchmark Period:** The Benchmark Period is the pre-DWH Spill time period which claimant chooses as the baseline for measuring its historical financial performance.  The claimant can select among the

---

[1] This Compensation Framework for Business Claims does not apply to (i) start-up businesses and (ii) failed businesses.  Compensation frameworks for these types of businesses will be presented separately.

1

following Benchmark Periods: 2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes.

<u>Claimant-Specific Factor</u>:  In order to capture the impact of pre-DWH Spill trends in the claimant's revenue performance that might have been expected in the post-DWH Spill Benchmark Period, revenue will be adjusted by a Claimant-Specific Factor.  The following steps will be used to compute the Claimant-Specific Factor:

    A. Calculate the difference between claimant's total revenue for January through April 2010 and total revenue in January through April of the corresponding claimant – selected Benchmark Period.

    B. Divide the revenue change calculated in Step A by total revenue in January through April of the Benchmark Period to derive the Claimant-Specific Factor. If the calculated Claimant-Specific Factor falls below -2% or exceeds +10%, then it will be set at -2% or +10%, respectively.

<u>General Adjustment Factor</u>:  In addition to the Claimant-Specific factor, all Claimants shall be entitled to a 2.0% General Adjustment Factor.

<u>Variable Profit</u>:  This is calculated for both the Benchmark Period and the Compensation Period as follows:

1. Sum the monthly revenue over the period.
2. Subtract the corresponding variable expenses from revenue over the same time period. Variable expenses include:
   a. Variable Costs as identified in Attachment A.
   b. Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.
   c. Variable portion of COGS, calculated by excluding salary costs (which are discussed below in the definition of Fixed and Variable Payroll Expenses) and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.

<u>Variable Margin</u>:  This is calculated only for the Benchmark Period and is calculated as follows:

1. Sum Variable Profit from May through December of the years selected by the claimant to be used for the Benchmark Period.
2. Sum total revenue from May through December of the years selected by the claimant to be used for the Benchmark Period.
3. Calculate Variable Margin percent as Variable Profit calculated in (1) divided by total revenue calculated in (2).

026295

**Fixed and Variable Payroll Expenses:**  Fixed and Variable Payroll Expenses are calculated based on the understanding that every business must operate with a minimum core staff and are defined using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims, for May through December 2010.  Fixed and Variable Payroll expenses are calculated as follows:

1. Obtain monthly amounts for the following payroll expenses (excluding Owner/Officer Compensation):  (a) Salaries & wages; (b) Payroll taxes (including FICA, workers compensation insurance, unemployment tax); (c) Employer costs for employee benefits.  Calculations include components of salaries and related expenses included in both Selling, General & Administrative Expenses ("SG&A") and COGS.
2. Sum these payroll expenses on a monthly basis to determine the Total Payroll Expense for each month.
3. Identify the two months between May and December 2010 with the lowest Total Payroll Expense.
   - Months in which the claimant has zero revenue, zero non-officer payroll expenses, or the business is closed, will be excluded from this calculation.
4. Define "Fixed Payroll Expenses" as the average payroll expense over the two months with the lowest Total Payroll Expense.
5. For any month with Total Payroll Expenses less than Fixed Payroll Expenses, all payroll costs will be considered fixed expenses.
6. For any month with Total Payroll Expenses greater than Fixed Payroll Expenses, the excess amount of Total Payroll Expenses will be considered variable expenses.

**Incremental Revenue**: Incremental revenue shall be calculated as (i) the claimant's revenue in a claimant-selected period of six, seven or eight consecutive months (as set forth in Step 2 below) between May and December of the years selected by the claimant to be included in the Benchmark Period, multiplied by (ii) the Claimant-Specific Factor and the General Adjustment Factor.

II.    Description of Compensation Calculation

**Step 1 Compensation**

Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.

As noted above, the Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.

3

For claimants that participated in the VoO program, Variable Profit in the Compensation Period will exclude revenue generated by or costs incurred in connection with VoO.[2]

Step 2 Compensation

Step 2 of the Compensation Calculation for Business Economic Loss Claims is intended to compensate claimants for incremental profits the claimant might have been expected to generate in 2010 in the absence of the spill, based on the claimant's growth in revenue in January-April of 2010 relative to the claimant-selected Benchmark Period (2009 or (average of 2008 and 2009) or (average of 2007, 2008 and 2009)).

Calculation:

Using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims:

1. Claimant may select from the following six-consecutive month periods for calculating Step 2 Compensation:
    a. May-October
    b. June-November
    c. July-December
    Unless claimant chose a seven-consecutive-month or eight-consecutive-month period in Step 1, in which case that same period of identical consecutive months in 2010 shall be used for Step 2.
2. Calculate the Claimant-Specific Factor:
    a. Calculate the difference between claimant's total revenue for January through April 2010 and total revenue in January through April of the Benchmark Period.
    b. Divide the revenue change calculated in [2.a] by total revenue in January through April of the Benchmark Period to derive the Claimant-Specific Factor.  If the calculated Claimant-Specific Factor falls below -2% or exceeds +10%, then it will be set at -2% or +10%, respectively.
3. Calculate Incremental Revenue:
    a. Calculate total revenue in the consecutive months of the Benchmark Period selected in [1] above.
    b. Multiply total revenue by the sum of the Claimant-Specific Factor and the General Adjustment Factor of 2% to calculate Incremental Revenue.
4. Multiply Incremental Revenue by the Variable Margin in the Benchmark Period to calculate Step 2 Compensation.

---

[2] Claimants are required to report payments received under the VoO program.  If claimants that received VoO payments fail separately to report costs incurred in VoO and non-VoO activities, then Step 1 Compensation for non-VoO activity alone can be determined through a pro-rata revenue based allocation of variable costs between VoO and non-VoO related activities.

026297

**Example 1:**

In this example, the claimant selects June-November as the six-consecutive month period in the Benchmark Period to calculate Step 2 Compensation:

| | | |
|---|---|---:|
| June-November Revenue in the Benchmark Period | [a] | $200,000 |
| Claimant-Specific Factor | [b] | 8% |
| General Adjustment Factor | [c] | 2% |
| Incremental Revenue | [d] = [a]*([b]+[c]) | $20,000 |
| Variable Margin Percentage | [e] | 50% |
| Step 2 Compensation | [f] = [d]*[e] | $10,000 |

**Example 2:**

In this example, the claimant selected June-December as the seven-consecutive month Compensation Period in Step 1 and therefore must use the same period of identical consecutive months in the Benchmark Period to calculate Step 2 Compensation:

| | | |
|---|---|---:|
| June-December Revenue in the Benchmark Period | [a] | $220,000 |
| Claimant-Specific Factor | [b] | 8% |
| General Adjustment Factor | [c] | 2% |
| Incremental Revenue | [d] = [a]*([b]+[c]) | $22,000 |
| Variable Margin Percentage | [e] | 50% |
| Step 2 Compensation | [f] = [d]*[e] | $11,000 |

<u>Total Compensation</u>

Total Compensation is calculated as follows:

(1)     Add Step 1 Compensation to Step 2 Compensation.

(2)     Apply the agreed-upon Risk Transfer Premium (RTP).

(3)     Where applicable, subtract from the sum of Step 1 Compensation and Step 2 Compensation any payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, as well as any VoO Settlement Payment Offset and VoO Earned Income Offset.

026298

Addendum To
Causation Requirements For Business Economic Loss Claims and
Compensation Framework for Business Economic Loss Claims

The term "Benchmark Period" is defined at pp. 1-2 in the **Compensation Framework for Business Economic Loss Claims** (Ex. 4C).  That definition provides:

> The Benchmark Period is the pre-DWH Spill time period which claimant chooses as the baseline for measuring its historical financial performance.  The claimant can select among the following Benchmark Periods: 2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes.

Footnote 2 of the **Causation Requirements For Business Economic Loss Claims** (Ex. 4B) specifically incorporates that definition of Benchmark Period by reference.

Accordingly, once the claimant selects the Benchmark Period year(s) (2009, the average of 2008-2009, or the average of 2007-2009), the **same** Benchmark Period year(s) are used "for all Benchmark Period purposes" -- specifically, the same Benchmark Period year(s) are used for purposes of determining **both** causation and compensation.

In contrast, a claimant is not required to use the same **months** in the Benchmark Period for purposes of establishing causation pursuant to Ex. 4B and determining compensation pursuant to Ex. 4C.

For example, when evaluating whether a claimant can satisfy causation using the "V Test," the claimant may select any consecutive 3-month period between May and December 2010 for comparison to a comparable period in the Benchmark Period (i.e., 2009, the average of 2008-2009, or the average of 2007-2009).  After establishing causation, however, the claimant may select a different 3 or more consecutive <u>months</u> between May and December 2010 in determining compensation in accordance with the **Compensation Framework for Business Economic Loss Claims**, so long as the claimant uses the same Benchmark Period <u>years</u> as the basis for comparison.  Thus, if the claimant selected for <u>*causation*</u> the three months of May - July in the Benchmark Period years of the average of 2008-2009, the claimant can select for <u>*compensation*</u> different months -- e.g., August - October -- but must use the same average of 2008-2009 Benchmark Period.  The same Benchmark Period year(s) thus must be used both for causation (Ex. 4B) and compensation (Ex. 4C).

The additional examples on the next page illustrate these rules:

028779

Scenario 1:

1) Claimant selected the months of May-July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009 and 2007-2009;

2) In determining Compensation, Claimant would be allowed to select the months of August through November 2010 as compared to the months of August through November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years – whichever provides the highest compensation.

Scenario 2:

1) Claimant selected the months of October – December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009;

2) In determining compensation, Claimant could select the months of May-September 2010 as compared to the months of May-September in either 2009 or 2008-2009 – whichever provides the highest compensation.

Scenario 3:

1) Claimant selected the months of June – August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period year of 2009.  In addition, Claimant selected the months of August – October 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2007-2009;

2) In determining compensation, Claimant could select the months of May-December 2010 as compared to the months of May-December in either 2009 or 2007-2009 – whichever provides the highest compensation.

# EXHIBIT 4D

## Attachment A

**Fixed Costs**

| | |
|---|---|
| Advertising Expense | Fixed |
| Auto Expense | Fixed |
| Bank Charges | Fixed |
| Cleaning and Housekeeping Costs | Fixed |
| COGS - Fixed | Fixed |
| Computer and Internet Expenses | Fixed |
| Contract Services | Fixed |
| Dues and Subscriptions | Fixed |
| Fees | Fixed |
| Franchise Fees - Fixed | Fixed |
| Insurance | Fixed |
| Interest Expense | Fixed |
| Lease Expense | Fixed |
| Licenses And Taxes | Fixed |
| *Maintenance | Fixed |
| Misc Expense | Fixed |
| Overhead | Fixed |
| Postage | Fixed |
| Professional Services | Fixed |
| Property Taxes | Fixed |
| Renovation Expense | Fixed |
| Rental Expense | Fixed |
| Retirement Expense | Fixed |
| Security Services | Fixed |
| Storage Expense | Fixed |
| Supplies | Fixed |
| Unemployment Tax | Fixed |
| Uniforms | Fixed |
| Utilities | Fixed |

**Variable Costs**

| | |
|---|---|
| Bad Debt Expense | Variable |
| COGS - Variable | Variable |
| Commissions | Variable |
| Consumable Goods | Variable |
| Contract Labor | Variable |
| Credit Card Fees | Variable |
| Discounts & Rebates | Variable |
| Donations / Contributions | Variable |
| Drug Testing | Variable |
| Franchise Fees - Variable | Variable |
| Freight | Variable |
| Fuel Expense | Variable |
| Inventory Adjustment | Variable |
| *Repairs (excluding Maintenance) | Variable |
| Sales/Lodging Tax | Variable |
| Training & Education | Variable |
| Travel & Entertainment | Variable |

Note: Payroll expenses (including Salaries and Wages, Employee Benefits, Overtime Wages, and, where applicable, 401K Payments, but excluding Owner/Officer Compensation) will be allocated between fixed and variable components based on the agreed-upon payroll methodology.

*If claimant's financial statements, books and/or records do not separately identify Maintenance costs and Repair costs, claimant shall allocate costs associated with Repairs and Maintenance 50% to Fixed Costs and 50% to Variable Costs.

# EXHIBIT 4E

## Addendum to Compensation for Business Economic Loss Claims:
## Compensation for Spill-Related Cancellations

**A. Eligibility**

This addendum sets forth the exclusive compensation methodology for business claimants that provide appropriate documentation and which establish causation by demonstrating (a) a Spill-Related Cancellation pursuant to Causation for Business Economic Loss Claims Section II.D or Section III.D, or (b) the Modified V-Shaped Revenue Pattern *and* a contract cancellation pursuant to Causation for Business Economic Loss Claims Section II.B or Section III.B.

**B. Definitions**

1. A "Canceled Contract" shall be a contract (i) which was in place as of April 20, 2010, (ii) to be performed between April 21, 2010 and December 31, 2010, (iii) which was canceled between April 21, 2010 and December 31, 2010, (iv) which the claimant was unable to replace on the same or similar terms between April 21, 2010 and the date the claimant's claim is filed, and (v) for which causation was established pursuant to the provisions of Causation for Business Economic Loss Claims specified in Addendum Section A above.[1]

2. A "Canceled Reservation" shall be a reservation (i) which was in place as of April 20, 2010, (ii) which was to occur between April 21, 2010 and December 31, 2010, (iii) which was canceled between April 21, 2010 and December 31, 2010, (iv) which the claimant was unable to rebook on the same or similar terms, and (v) for which causation was established pursuant to the provisions of Causation for Business Economic Loss Claims specified in Addendum Section A above.

3. A "Replacement Contract" shall be a contract (i) which the claimant entered after April 21, 2010 and after the Canceled Contract was canceled, but before December 31, 2010, (ii) which provided complete or partial replacement of profit expected from the Canceled Contract, and (iii) for which services were performed between April 21, 2010 and December 31, 2010.

4. A "Replacement Reservation" shall be a reservation (i) which the claimant booked between April 21, 2010 and December 31, 2010, and after the Canceled Reservation was canceled, (ii) which provided partial replacement of profit expected from the Canceled Reservation, and (iii) which was completed between April 21, 2010 and December 31, 2010.

**C. Compensation:**

Compensation for the claimants listed in Addendum Section A above shall be calculated as follows:

---

[1] As used in this Addendum, "contracts" shall refer to agreements entered in the normal course of business and shall specifically exclude contracts for the sale of real property, fixed assets, non-operating assets, or for all or a portion of the business itself.

1.  **Determine lost revenue from the Canceled Contract or Canceled Reservation**

    a.  "Lost Contract Revenue" shall be the amount that a claimant would have been paid by a customer between April 21, 2010 and December 31, 2010 in connection with a Canceled Contract, had that contract not been canceled as a result of the DWH Spill.

        Lost Contract Revenue shall be determined based on information set forth in the Canceled Contract, and, if necessary, other contemporaneous documentation provided by the claimant, such as purchase orders or shipping schedules. Lost Contract Revenue may include any food, beverage, or other ancillary revenue that the claimant can demonstrate would have been expected in connection with the Canceled Contract.

    b.  "Lost Reservation Revenue" shall be the amount that a claimant would have been paid by a customer (or customers) between April 21, 2010 and December 31, 2010 in connection with a Canceled Reservation, had that reservation not been canceled as a result of the DWH Spill.

        Lost Reservation Revenue shall be determined based on information set forth in the documentation reflecting the terms of the Canceled Reservation, and/or other contemporaneous documentation provided by the claimant. Lost Reservation Revenue may include food and beverage sales that the claimant can demonstrate would have been expected in connection with the Canceled Reservation.

2.  **Determine lost profit associated with the Canceled Contract or Canceled Reservation**

    "Lost Contract Profit" shall be the amount of variable profit that a claimant would have earned between April 21, 2010 and December 31, 2010 in connection with a Canceled Contract, had that contract not been canceled as a result of the DWH Spill.

    "Lost Reservation Profit" shall be the amount of variable profit that a claimant would have earned between April 21, 2010 and December 31, 2010 in connection with a Canceled Reservation, had that reservation not been canceled as a result of the DWH Spill.

    If (i) the Canceled Contract or Canceled Reservation documentation either specifies costs to be incurred by the claimant, or specifies a profit margin in connection with the Canceled Contract or Canceled Reservation, or (ii) the claimant is otherwise able to provide a specific estimate of the profit expected from the Canceled Contract or Canceled Reservation based on specific accounting for prior events that took place after January 1, 2007 and were comparable in terms of type, size and revenue, the claimant's lost profits associated with the Canceled Contract or Canceled Reservation shall be determined according to (a) below. Otherwise the claimant's lost profits associated with the Canceled Contract or Canceled Reservation shall be determined according to (b) below.

    a.  Canceled Contracts or Canceled Reservations with Explicit Cost Information

        For Canceled Contracts and/or Canceled Reservations with explicit cost information, Lost Contract Profit and Lost Reservation Profit shall be determined as follows:

2

      i.    Identify the variable expenses that would have been incurred (but were not actually incurred) by the claimant in carrying out the Canceled Contract or Canceled Reservation according to either (i) the information set forth in the Canceled Contract or Canceled Reservation documentation, or (ii) documentation provided by the claimant regarding variable expenses incurred in connection with prior events which were comparable in terms of type, size and revenue and took place after January 1, 2007.  The total variable expenses shall also include any commissions or bonuses that would have been paid to sales or other staff had the Canceled Contract or Canceled Reservation not been canceled.

      ii.    Sum (a) total variable expenses associated with the Canceled Contract or Canceled Reservation and (b) any cancellation fees, non-refundable deposits or other amounts received by the claimant in connection with the Canceled Contract or Canceled Reservation and (c) the liquidation or salvage value of any product which remains unsold as of the claim filing date.

      iii.    Subtract the sum of (ii) from the Lost Contract Revenue or Lost Reservation Revenue as applicable.

**b.  Canceled Contracts or Canceled Reservations without Explicit Cost Information**

For Canceled Contracts and/or Canceled Reservations without explicit cost information, Lost Contract Profit and Lost Reservation Profit shall be determined as follows:

      i.    Determine the variable margin for the claimant's business for the period May through December 2009 by dividing:

         1.    The claimant's total variable expenses from May through December 2009 (where variable expenses include those identified in Attachment A to the Compensation Framework for Business Economic Loss Claims) by

         2.    The claimant's total revenues from May through December 2009.

      ii.    Multiply the claimant's variable margin calculated in A.2.b.i by the claimant's Lost Contract Revenue or Lost Reservation Revenue, as appropriate.

      iii.    From the result of (ii), subtract any non-refundable deposits or other amounts received by the claimant in connection with the Canceled Contract or Canceled Reservation and the liquidation or salvage value of any product which remains unsold as of the claim filing date.

**3.  Determine revenue from the Replacement Contract or Replacement Reservation**

a.  "Replacement Contract Revenue" shall be the amount that a claimant was paid by a customer between April 21, 2010 and December 31, 2010 in connection with a Replacement Contract.

3

Replacement Contract Revenue shall be determined based on documentation establishing actual revenue received (such as, for example, purchase orders and/or shipping schedules) including, if relevant, information set forth in the Replacement Contract, provided that actual cash receipts or other activity shall be used if conflicting information is provided. Replacement Contract Revenue must include any food, beverage, or other ancillary revenue that the claimant earned in connection with the Replacement Contract, if relevant.

b.  "Replacement Reservation Revenue" shall be the amount that a claimant was paid by a customer (or customers) between April 21, 2010 and December 31, 2010 in connection with a Replacement Reservation.

Replacement Reservation Revenue shall be determined based on documentation establishing actual revenue received, including, if relevant, information set forth in the documentation reflecting the terms of the Replacement Reservation, provided that actual cash receipts or other activity shall be used if conflicting information is provided. Replacement Reservation Revenue must include food and beverage sales that the claimant made in connection with the Replacement Reservation, if relevant.

4.  **Determine profit associated with the Replacement Contract or Replacement Reservation**

"Replacement Contract Profit" shall be the amount of variable profit that a claimant earned between April 21, 2010 and December 31, 2010 in connection with a Replacement Contract.

"Replacement Reservation Profit" shall be the amount of profit that a claimant earned between April 21, 2010 and December 31, 2010 in connection with a Replacement Reservation.

If contemporaneous documentation regarding the Replacement Contract or Replacement Reservation establishes the actual costs incurred by the claimant in carrying out the Replacement Contract or Replacement Reservation, the claimant's variable profits associated with the Replacement Contract or Replacement Reservation shall be determined according to (a) below.  Otherwise the claimant's variable profit associated with the Replacement Contract or Replacement Reservation shall be determined according to (b) below.

a.  **Replacement Contracts or Replacement Reservations with Actual Cost Information**

i.  Identify the variable expenses that were actually incurred by the claimant in carrying out the Replacement Contract or Replacement Reservation according to documentation provided by the claimant and/or information set forth in the Replacement Contract or Replacement Reservation documentation, provided that information regarding actual costs shall be used where conflicting sources of cost information exist.  The total variable expenses shall also include any commissions or bonuses that were paid to sales or other staff had the Replacement Contract or Replacement Reservation not been canceled.

ii.  Subtract the total variable expenses associated with the Replacement Contract or Replacement Reservation from the Replacement Contract Revenue or Replacement Reservation Revenue, respectively.

4

    b.   **Replacement Contracts or Replacement Reservations without Actual Cost Information**

        i.   Determine the variable margin for the claimant's business for the period May through December 2009 by dividing:

           1.   The claimant's total variable expenses from May through December 2009 (where variable expenses include those identified in Attachment A to the Compensation Framework for Business Economic Loss Claims) by

           2.   The claimant's total revenues from May through December 2009.

        ii.   Multiply the claimant's variable margin calculated in A.2.b.i by the claimant's Lost Contract Revenue or Lost Reservation Revenue, as appropriate.

5.   **Calculate Total Compensation Related to the Canceled Contract or Canceled Reservation**

"Spill-Related Cancellation Compensation" shall be compensation for the Canceled Contract or Canceled Reservation, net of amounts received in connection with any Replacement Contract(s) or Replacement Reservation(s), as applicable, and shall be calculated as follows:

    a.   The claimant's Lost Contract Profit/Lost Reservation Profit (calculated in Step 2), less
    b.   Any Replacement Contract Profit or Replacement Reservation Profit (calculated in Step 4), less
    c.   Any payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process compensating for the loss, as well as VoO Settlement Payment Offset and VoO Earned Income Offset related to the Canceled Contract or Canceled Reservation.

An RTP shall apply to claimant's Spill-Related Cancellation Compensation consistent with the claimants industry and/or zone.

D.  **Documentation**

A claimant shall also provide documentation establishing any Replacement Contract or Replacement Reservation, including the following:

1.   Documentation regarding any Canceled Contract(s) or Canceled Reservation(s), including the following:

    a.   A copy of each Canceled Contract and documentation establishing the terms of each Canceled Reservation.

    b.   Documentation providing contemporaneous written evidence that each Canceled Contract and each Canceled Reservation was canceled as the direct result of the DWH Spill, and/or a Sworn Written Statement from an individual third party affirming that each cancellation was due to or resulting from the DWH Spill.

028785

    c.  Documentation providing contemporaneous written evidence that the claimant was not able to replace each Canceled Contract or Canceled Reservation on the same or similar terms, *provided*, that if no such documentation exists, the claimant may provide a Sworn Written Statement (1) stating that no such contemporaneous written evidence exists, (2) describing the claimant's efforts to replace the Canceled Contract or Canceled Reservation, and (3) describing the extent to which the claimant was not able to replace the Canceled Contract or Canceled Reservation.

    d.  If not provided in a Canceled Contract or the Canceled Reservation documentation, the claimant shall provide documentation establishing revenue (including any food, beverage or other ancillary revenue) expected in connection with that Canceled Contract and/or Canceled Reservation and one of the following:

        i.  Documentation establishing variable expenses (including any variable expenses related to any food, beverage or other ancillary revenues) incurred in connection with prior events which were comparable in terms of type, size and revenue and took place after January 1, 2007

        OR

        ii.  Documentation establishing the total revenue and total variable expenses for the claimant's business for the period May 1 through December 31, 2009.

    Variable expenses include those identified in Attachment A to the Compensation Framework for Business Economic Loss Claims.

    e.  Documentation establishing any cancellation fees, non-refundable deposits or other amounts received by the claimant in connection with the Canceled Contract or Canceled Reservation.

    f.  Documentation reflecting the liquidation or salvage value of any product which remains unsold as of the claim filing date.

2.  Documentation regarding any Replacement Contract(s) or Replacement Reservation(s), if relevant, including the following:

    a.  A copy of each Replacement Contract and documentation establishing the terms of each Replacement Reservation.

    b.  Documentation establishing projected and actual revenues and variable expenses related to each Replacement Contract and each Replacement Reservation, including any food, beverage or other ancillary revenue and/or expenses recognized in connection with each Replacement Contract and each Replacement Reservation. The claimant must also provide the basis for such amounts and any corresponding supporting documentation. Variable expenses include those identified in Attachment A to the Compensation Framework for Business Economic Loss Claims.

6

**EXHIBIT 5**

## Compensation for Multi-Facility Businesses

This document is intended to provide options, or other guidance, to a Multi-Facility Business making a Business Economic Loss Claim.  Each **Multi-Facility Business** must satisfy all documentation requirements set forth in <u>Documentation Requirements for Business Economic Loss Claims and in II below.</u>

The choices available to Multi-Facility Businesses are dictated by: (i) where the business' Headquarters are located; (ii) whether the business maintained separate contemporaneous profit and loss statements for each Facility; and (iii) whether all of the business' Facilities are located within the Gulf Coast Areas.

A Multi-Facility Business with its Headquarters and all Facilities located within the Gulf Coast Areas that maintained separate contemporaneous profit and loss statements for each Facility during the Benchmark Period and 2010, may, at its option, elect to file claims in one of two ways:  1) A claim for each individual Facility that the Multi-Facility Business chooses to include in the claim, or  2) a consolidated claim. If the Multi-Facility Business chooses to file separate claims for one, some, or all of its Facilities, the applicable Causation standard and RTP shall be applied separately to each claiming Facility based on its location and industry.  If the Multi-Facility Business chooses to file a consolidated facility claim, the Causation standard and RTP applicable to the Headquarters shall be applied to the entire consolidated claim.

A Multi-Facility Business with its Headquarters and all Facilities located within the Gulf Coast Areas that did not maintain separate contemporaneous profit and loss statements for each Facility during the Benchmark Period and 2010, may, at its option, elect to file claims in one of two ways:  1) A claim for each individual Facility that the Multi-Facility Business chooses to include in the claim, or  2) a consolidated claim.  If the Multi-Facility Business chooses to file separate claims for one, some, or all of its Facilities, the Additional Multi-Facility Business Documentation must be provided, and the Settlement Program shall apply the relevant Causation standard and RTP separately to each claiming Facility based on its location and industry.  If the Multi-Facility Business chooses to file a consolidated claim, the Causation standard and RTP applicable to the Headquarters shall be applied to the entire consolidated claim.

A Multi-Facility Business with its Headquarters located within the Gulf Coast Areas that has one or more Facilities located outside of the Gulf Coast Areas and maintained separate contemporaneous profit and loss statements for each Facility during the Benchmark Period and 2010, may, at its option, elect to file claims in one of two ways:  1) A claim for each individual Facility located in the Gulf Coast Areas that the Multi-Facility Business chooses to include in the claim, or  2) a consolidated claim on behalf of all Facilities located in the Gulf Coast Areas. If the Multi-Facility Business chooses to file separate claims for one, some, or all of its Facilities located in the Gulf Coast Areas, the relevant Causation standard and RTP for each claiming Facility based on its location and industry shall apply.  If the Multi-Facility Business chooses to file a consolidated claim, the Additional Multi-Facility Business Documentation must be

provided, and the Settlement Program shall utilize the Causation standard and RTP applicable to the Headquarters to determine the Settlement Payment that is owed with respect to the losses suffered by all Facilities located within the Gulf Coast Areas.

A Multi-Facility Business with its Headquarters located within the Gulf Coast Areas that has one or more Facilities located outside of the Gulf Coast Areas and did not maintain separate contemporaneous profit and loss statements for each Facility during the Benchmark Period and 2010, may, at its option, elect to file claims in one of two ways: 1) A claim for each individual Facility located in the Gulf Coast Areas that the Multi-Facility Business chooses to include in the claim, or 2) a consolidated claim on behalf of all Facilities located in the Gulf Coast Areas. If the Multi-Facility Business chooses to file separate claims for one, some, or all of its Facilities located in the Gulf Coast Areas, the Additional Multi-Facility Business Documentation must be provided and the relevant Causation standard and RTP for each claiming Facility based on its location and industry shall apply. If the Multi-Facility Business chooses to file a consolidated claim, the Additional Multi-Facility Business Documentation must be provided, and the Settlement Program shall utilize the Causation standard and RTP applicable to the Headquarters to determine the Settlement Payment that is owed with respect to the losses suffered by all Facilities located within the Gulf Coast Areas.

A Multi-Facility Business with its Headquarters located outside of the Gulf Coast Areas that maintained separate contemporaneous profit and loss statements for each Facility in the Gulf Coast Areas during the Benchmark Period and 2010, may submit separate claims for one, some or all Facilities located within the Gulf Coast Areas. The applicable Causation standard and RTP shall be applied separately to each claiming Facility based on its location and industry.

A Multi-Facility Business with its Headquarters located outside of the Gulf Coast Areas that did not maintain separate contemporaneous profit and loss statements for each Facility in the Gulf Coast Areas during the Benchmark Period and 2010, may submit a consolidated claim for all Facilities located within the Gulf Coast Areas. The Additional Multi-Facility Business Documentation must be provided, and the Settlement Program shall apply the relevant Causation standard and RTP separately to each Facility located within the Gulf Coast Areas.


I.      Definitions

Multi-Facility Business:   A business entity that, during the period April 1, 2010 through December 31, 2010, maintained **Facilities** in more than one location and had at least one **Facility** within the Gulf Coast Areas.

Facility:  A separate and distinct physical location of a **Multi-Facility Business** at which it performs or manages its operations.

028020

II.    Multi-Facility Business Documentation

1.  Separate profit and loss (P&L) statements for each individual **Facility** that were prepared and maintained in the normal course of business must be provided.

2.  <u>Organizational Description</u>:  A chart or description detailing all **Facilities** included in the **Multi-Facility Business**.

III.   Additional Multi-Facility Business Documentation

1.  <u>Consolidating Financial Statements</u>:  Consolidating financial statements are required for the **Multi-Facility Business** specifying profit and loss for all **Facilities** and detailing eliminating entries required.  In addition, the **Multi-Facility Business** will complete a **Sworn Written Statement** that separate profit and loss  statements for each of the claiming **Facilities** do not exist, and individual **Facility** P&L statements prepared for the purpose of filing a claim are based on the business's books and records.

2.  <u>Intercompany Transaction Reports</u>:  Listing of all intercompany transactions between **Facilities** included in the **Multi-Facility Business**.

3.  <u>Allocated Cost Schedule</u>:  Listing of all shared costs between **Facilities** of the **Multi-Facility Business** and the calculations used to allocate those expenses between **Facilities**.  Where a **Multi-Facility Business** prepares individual **Facility** P&L statements based on its books and records to support a claim, all shared costs shall be allocated among all **Facilities** based on their share of the total revenue of the **Multi-Facility Business**.

IV. Cost Allocation

1.  Where a Multi-Facility business maintained separate contemporaneous profit and loss statements for each Facility during the Benchmark Period and 2010, and files a claim for one, some, or all facilities within the Gulf Coast Areas, all direct expenses associated with each claiming Facility in the Facility's contemporaneously-prepared P&L statements, and only such expenses, will be included in the calculation.

2.  Where a **Multi-Facility Business** prepares individual **Facility** P&L statements based on its books and records to support a claim, all shared costs shall be allocated among all **Facilities** based on their share of the total revenue of the **Multi-Facility Business**.

V.    Compensation

1.  For a **Multi-Facility Business** which has all **Facilities** (including Headquarters) in the Gulf Coast Areas and files a consolidated claim on behalf of the entire business, compensation shall be determined as set forth in the Business Compensation Framework.

2.  For any other **Multi-Facility Business**, compensation shall be calculated using the Business Compensation Framework modified as follows:

a.  Sum lost profits and RTP(s) for all **Facilities** in claim.

3

b. Subtract any spill-related Payments from the initial BP claims process and/or the GCCF to the **Multi-Facility Business** claimant.

c. Subtract any applicable VoO Settlement Payment Offset and/or any applicable VoO Earned Income Offset.

028022

# EXHIBIT 6

## Failed Business Compensation Framework[1]

### I.      Definitions

A "Failed Business" shall be an entity that commenced operations prior to November 1, 2008, and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy (through the filing of a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) otherwise initiated or completed a liquidation of substantially all of its assets.

A "Failed Start-Up Business" shall be an entity that commenced operations on or after November 1, 2008, and, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy (through the filing of a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) otherwise initiated or completed a liquidation of substantially all of its assets.

### II.     Causation Requirements

If the claim is not excluded by the application of III below, a claimant may establish causation as follows:

1.      If the claimant is a Failed Business or a Failed Start-Up Business in Zone A, the claimant is not required to provide any evidence of causation unless you fall into the exception agreed to by the parties, and listed in footnote (1).

2.      If the claimant is a Failed Business or a Failed Start-Up Business meeting the definition of a "Commercial Fisherman," or "Landing Site," or "Commercial Wholesale or Retail Dealer A," or "Primary Seafood Processor," as set forth in "Seafood Distribution Chain Definitions," the claimant is not required to provide any evidence of causation.

3.      If the claimant is a Failed Business or a Failed Start-Up Business in Zone A, B or C and the claimant is also a "Commercial or Wholesale or Retail Dealer B," or a "Secondary Seafood Processor," or a "Seafood Wholesaler or Distributor," or a "Seafood Retailer," as set forth in "Seafood Distribution Chain Definition," the claimant is not required to provide any evidence of causation.

4.      If the claimant is a Failed Business or a Failed Start-Up Business in Zone A or Zone B, and the claimant also meets the "Tourism Definition," the claimant is not required to provide any evidence of causation.

---

[1]   This Failed Business Compensation Framework does not apply to (i) Start-Up businesses (except Failed Start-Ups), (ii) Entities, Individuals or Claims not included within the Economic Class definition; or (iii) Claims covered under the Seafood Program.

028690

5.    If you are in Zone A, B or C, and you meet the "Charter Fishing Definition" you are not required to provide any evidence of causation.

6.    If the claimant is a Failed Business in Zone B not receiving a presumption, causation may be established by demonstrating the following:

    a.    A 8.5% decline in revenues during the months for which it operated between May 2010 and its last full month of operations (not to extend beyond April 2011) as compared to the comparable months during the period of May 2009 through April 2010.

    AND

    b.    The Administrator is provided evidence through documentation and/or affidavits that provide a reasonable basis to conclude that the DWH Spill was a substantial cause of the revenue decline.  For example, the claimant provides evidence of customer cancellations or lost contracts related to the DWH Spill.

7.    If the claimant is a Failed Business that meets the definition of "Seafood Retailer" operating outside of Zone A, B, or C, the claimant may alternatively establish causation by showing that it experienced a 15% increase in costs during the months for which it operated between May 2010 and its last full month of operations (not to extend beyond April 2011) as compared to the comparable months during the period from May 2009 through April 2010.  The claimant must also establish the specific basis for the cost increase and that, absent the DWH Spill, the increase in costs would not have occurred.

8.    If the claimant is a Failed Start-Up Business in Zone B not receiving a presumption, causation may be established by demonstrating the following:

    a.    A 8.5% decline in revenues during the months for which it operated between May 2010 and its last full month of operations (not to extend beyond April 2011) relative to expected revenue in the same time period as demonstrated by contemporaneous financial projections (to the extent available) and expressed as a percentage of expected revenue;[2]

    AND

    b.    The Administrator is provided evidence through documentation and/or affidavits that provide a reasonable basis to conclude that the DWH Spill was a substantial cause of the revenue decline.   For example, the

---

[2] See Exhibit A attached hereto for an example of how this calculation is performed.

028691

claimant provides evidence of customer cancellations or lost contracts related to the DWH Spill.

9.    If the claimant is a Failed Business or Failed Start-Up Business in Zone C, then paragraphs 6 and 8 apply with the percentage of decline changing to 10%.

10.    If the claimant is a Failed Business or Failed Start-Up Business in Zone D, then paragraphs 6 and 8 apply with the percentage of decline changing to 15%.

## III.    Excluded Business Failure

Any Failed Business satisfying subparts (a), (b), or (c), below shall not be entitled to compensation pursuant to section IV.

a.    The Failed Business or Failed Start-Up Business reported negative EBITDA[3] for the twelve month period prior to May 1, 2010 (or, in the event that the claimant is a Failed Start-Up Business with less than twelve months of operating history, negative EBITDA for the months during which the business operated prior to May 1, 2010).

b.    The Failed Business or Failed Start-Up Business was in default prior to May 1, 2010 under any existing financing agreement.

c.    The Failed Business or Failed Start-Up Business is located in Zone D and does not satisfy the "Tourism" or "Seafood Distribution Chain" definitions.

## IV.    Documentation Requirements

1.    Claimant shall provide the following documentation:

a.    An affidavit from an authorized representative of the claimant certifying the following:

b.    The position of the affiant, his or her relationship to the claimant, and certification that the affiant is authorized to act on behalf of the claimant.

c.    The date on which the entity was incorporated and the date on which it began operations.

d.    Certification that, as of May 1, 2010:

---

[3] EBITDA is defined as earnings before interest, income taxes, depreciation, amortization and owner's compensation.

028692

       i.           No bankruptcy filing, asset liquidation, or debt restructuring had been initiated; (A renewal of a business loan will not be deemed restructuring.)

       ii.          The business was in full compliance with all covenants as to financial condition governing outstanding borrowing or credit agreements prior to the DWH Spill; and

       iii.        All documentation submitted consists of or was derived from documents maintained in the ordinary course of business.

2.     Documents reflecting corporate or partnership organization (e.g., articles of incorporation or partnership agreements).

3.     Actual annual and monthly financial statements (including income statements and balance sheets) for at least all of 2009 and January-April of 2010 or if the claimant is a Failed Start-Up Business, for all months of operation prior to May 1, 2010.  Claimant may prepare financial statements from contemporaneous business records currently maintained, as long as the claimant provides the documents or information upon which any subsequently-prepared financial statements are based.

4.     Actual annual and monthly financial statements (including income statements and balance sheets) for May 2010 through present, or through the liquidation of the company, or cessation of operation, whichever occurs first.  Claimant may prepare financial statements from contemporaneous business records currently maintained, as long as the claimant provides the documents or information upon which any subsequently-prepared financial statements are based.

5.     Any and all credit agreements, promissory notes, lease agreements, letters of credit and other loan documentation, including any notices of default, in existence as of April 20, 2010 or entered into thereafter including amendments related thereto.

6.     Any and all projections, forecasts or budgets prepared prior to April 20, 2010 projecting, predicting or forecasting the financial performance of the business for any period after April 20, 2010.

7.     To the extent applicable, any and all bankruptcy schedules, including the original petition, any confirmed plans of liquidation or reorganization, and any documentation evidencing standing to pursue claims if vested with any entity or other party other than the debtor filing bankruptcy.  To the extent the claimant has not filed for bankruptcy protection, (a) documentation reflecting the company's entry into the liquidation process, (b) any and all documentation reflecting the standing or authority of the claimant to pursue any claims of the

028693

business, and (c) any documentation evidencing standing to pursue claims if vested with any entity or other party other than the claimant pursuing the liquidation of its assets.

8.    Evidence of any asset sales, including a description of each asset and the corresponding sales prices, and evidence of any payments of liquidation proceeds in satisfaction of debt and/or other creditor obligations.

9.    A listing of any assets which have not been liquidated at the time of the claim submission, including a description of each asset, the recorded net book value of each asset, and, if available, all certified appraisals of the value of each asset.

10.    A listing of any debt and/or trade creditor obligations outstanding at the time of the claim submission.

## V.   Compensation

1.    For Failed Businesses that meet one of the causation requirements set forth above, claimant compensation shall be determined as follows:

    a.    Sum the latest twelve months EBITDA of the business for the twelve month period prior to May 1, 2010.

    b.    Identify the general industry in which claimant operates and locate the corresponding median Market Value of Invested Capital ("MVIC") to EBITDA multiple from Table 1 below.  If an appropriate industry and multiple cannot be found in the Table 1, use the "All Deals" median MVIC to EBITDA multiple at the bottom of the table.

    c.    Multiply the EBITDA by the MVIC to EBITDA multiple to calculate the Pre-DWH Spill total enterprise value ("TEV").

    d.    Determine the Liquidation Value of assets as either (i) the court-approved reorganization value, to the extent reorganized under bankruptcy law process or (ii) sales proceeds from assets liquidated plus certified appraisal values of assets yet to be liquidated under a plan of liquidation, net of actual or anticipated liquidation costs (including out-of-pocket costs to the claimant for the liquidation or wind down process), as relevant.  If no certified appraisal exists for un-liquidated assets, net book values will be used.  The total liquidation value (including both realized and unrealized amounts) shall be increased for any creditor claims existing pre-DWH Spill and discharged during bankruptcy, and any amounts received by the claimant from BP or the GCCF pursuant to BP's OPA Claims process, or profits earned by the claimant by participating in any BP-sponsored spill remediation program to determine the Net

5

028694

Liquidation Value.  However, no credit will be taken for unliquidated assets that the claimant tenders to BP.

e.   Calculate claimant compensation by subtracting the Net Liquidation Value from the Pre-DWH Spill TEV.

f.   A Risk Transfer Premium ("RTP") will not be applied to claimant compensation for Failed Businesses because the measurement of TEV incorporates the future lost profits of the business.

2.   For Failed Start-Up Businesses that meet one of the causation requirements set forth above, claimant compensation shall be calculated as follows:

a.   Calculate book value of equity as of May 1, 2010.

b.   Subtract amounts distributed to equity holders subsequent to the DWH Spill.

c.   Add the total current amount of unpaid obligations of claimant to its creditors.

d.   Subtract the book value of assets remaining to be liquidated unless such assets are tendered to BP then the value shall not be subtracted.

e.   Subtract any other proceeds received by the claimant from BP or the GCCF pursuant to BP's OPA Claims process, or profits earned by the claimant by participating in any BP-sponsored spill remediation program.

f.   Where a Failed Start-Up Business receives compensation under this framework, compensation shall be provided to the claimant for an owner's "sweat equity" if the owners submit  affidavits setting forth for each owner (i) the nature of services provided by that owner to the claimant for which the owner received no compensation or less than fair market compensation, (ii) the time period over which the services were rendered, (iii) the average amount of time per week devoted to the Failed Start-Up Business, and, (iv) if employed outside the Failed Start-Up Business during the time the business operated, a description of that employment.

Where these criteria are satisfied, claimant shall be entitled to "sweat equity" compensation as set forth below.  In addition, two example calculations are attached hereto as Exhibit B.

1.   Step 1: Calculate the Monthly Sweat Equity Benchmark Income pursuant to Step 1 subparts (a) through (d).

6

Step 1a:  Identify the "Commencement Date": the day that the Failed Start-Up Business commenced operations.

Step 1b:  Identify the "Sweat Equity Contribution Start Date": the date when the owner first began performing sweat equity work or the date six months prior to the Commencement Date, whichever yields the shorter time period.

Step 1c:  Establish the Sweat Equity Benchmark Period:  The Sweat Equity Benchmark Period shall consist of the time period from the "Sweat Equity Benchmark Period Start Date" through the "Sweat Equity Benchmark Period End Date."

The "Sweat Equity Benchmark Period Start Date" will be either:

a)      January 1 of the calendar year preceding the year in which the Sweat Equity Contribution Start Date occurred, or

b)      January 1 of any year prior to the year identified in (a) above, but not preceding January 1, 2007.

For example, for a business with a Commencement Date of January 1, 2010, and a Sweat Equity Contribution Start Date of August 10, 2009, the claimant may choose as the Sweat Equity Benchmark Period Start Date either January 1, 2008 or January 1, 2007.

The "Sweat Equity Benchmark Period End Date" shall be defined as the end of the last full month preceding the Sweat Equity Contribution Start Date.  For example, if the Sweat Equity Contribution Start Date was August 10, 2009, the Sweat Equity Benchmark Period End Date will be July 31, 2009.

Step 1d:  Calculate the "Monthly Sweat Equity Benchmark Income."  The owner shall provide documentation of income earned for the Sweat Equity Benchmark Period, including tax returns, W-2s, year-end pay stub information and, if available, monthly or other periodic pay stubs or other records reflecting monthly earned income ("Earned Income Documentation").  Monthly Sweat Equity Benchmark Income shall be determined by dividing:

(i)      Total income earned from all employers and/or activities (including self-employment) during the

7

028696

Sweat Equity Benchmark Period, as reflected in Earned Income Documentation

by

(ii) The total number of months in the Sweat Equity Benchmark Period, adjusted, if relevant, to exclude months where the owner provides documents evidencing that

    a. No income was earned, *and*

    b. The owner was not employed, functioning as an independent contractor, or otherwise engaged in income-generating activities unrelated to the Failed Start-Up Business.  For example, if the owner was a real estate agent operating as an independent contractor, the owner must include all months for which he or she functioned as a real estate agent, even if no income was earned in a particular month.

2. Step 2: For each owner, determine the "Sweat Equity Compensation Period" as the period from his or her Sweat Equity Contribution Start Date to the date the Failed Start-Up Business (i) ceased operations and wound down, or (ii) entered bankruptcy (through the filing of a petition for bankruptcy protection in a court of competent jurisdiction), or (iii) otherwise initiated or completed a liquidation of substantially all of its assets ("Failure Date").  Total Monthly Sweat Equity across all owners in a given month is calculated by summing the monthly Sweat Equity Benchmark Income for each owner with sweat equity in the relevant month for all months in the Sweat Equity Compensation Period.  The maximum amount of Total Monthly Sweat Equity in any month is $12,500.  Total Sweat Equity represents the sum of the Total Monthly Sweat Equity for all owners and cannot exceed $150,000.

3. Step 3:  To determine Net Sweat Equity for each owner, from the Total Sweat Equity in Step 2, subtract (i) any funds (including payroll earnings, draws, cancelled loans or other distributions) actually paid to an owner by the Failed Start-Up during its

8

028697

operation and (ii) any income earned by the owner from employment outside the Failed Start-Up.  These amounts shall be established by the owner providing documentation in the form of tax returns, W-2s, year-end pay stub information or the Failed Start-Up's contemporaneously maintained payroll records.

g.      An RTP will not be applied to claimant compensation for Failed Start-Up Businesses.

028698

*Table 1: Industry Multiples*

| General SIC Code | Industry Description | Median MVIC to EBITDA Multiple |
|---|---|---|
| 41 | Local And Suburban Transit And Interurban Highway Passenger Transportation | 3.1x |
| 42 | Motor Freight Transportation And Warehousing | 2.9x |
| 44 | Water Transportation | 7.1x |
| 45 | Transportation By Air | 4.6x |
| 47 | Transportation Services | 3.6x |
| 48 | Communications | 5.5x |
| 50 | Wholesale Trade-durable Goods | 5.0x |
| 51 | Wholesale Trade-non-durable Goods | 3.9x |
| 52 | Building Materials, Hardware, Garden Supply, And Mobile Home Dealers | 3.4x |
| 53 | General Merchandise Stores | 1.5x |
| 54 | Food Stores | 2.4x |
| 55 | Automotive Dealers And Gasoline Service Stations | 1.8x |
| 56 | Apparel And Accessory Stores | 2.6x |
| 57 | Home Furniture, Furnishings, And Equipment Stores | 3.5x |
| 58 | Eating And Drinking Places | 1.9x |
| 59 | Miscellaneous Retail | 3.2x |
| 65 | Real Estate | 2.8x |
| 70 | Hotels, Rooming Houses, Camps, And Other Lodging Places | 1.8x |
| 72 | Personal Services | 2.3x |
| 73 | Business Services | 4.4x |
| 75 | Automotive Repair, Services, And Parking | 3.3x |
| 76 | Miscellaneous Repair Services | 4.0x |
| 79 | Amusement And Recreation Services | 2.1x |
| 81 | Legal Services | 3.2x |
| 82 | Educational Services | 4.6x |
| 83 | Social Services | 4.1x |
| 87 | Engineering, Accounting, Research, Management, And Related Services | 5.0x |
| | **All Deals** | **3.2x** |

Source: Pratt's Stats® - Private Company Merger and Acquisition Transaction Database. Data reflects all deals in the database with a disclosed MVIC to EBITDA multiple and a report date of January 1, 2008 or later.

028699

**Exhibit A**

## Summary of Revenue Decline Causation Tests for Failed Businesses

| | Zone A | Zone B (Non-Tourism and Non-Seafood) | Zone C (Non-Seafood) | Zone D |
|---|---|---|---|---|
| | Decline Threshold | Decline Threshold | Decline Threshold | Decline Threshold |
| Revenue Decline Test | N/A | -8.5% | -10.0% | -15% |

11

028700

**Exhibit A (continued)**

## Example of Revenue Decline Causation Tests for Failed Business Claims

In Examples 1 and 2, the claimant is assumed to be in Zone B and the claimant's last full month of operations is July 2010. These examples demonstrate a claimant that passes and a claimant that fails the Revenue Decline Causation Test.

### Example 1:

| | Revenue by Year | |
|---|---|---|
| Month | 2009 | 2010 |
| | | |
| May | 300,000 | 250,000 |
| June | 350,000 | 275,000 |
| July | 325,000 | 225,000 |
| | | |
| 3-Month Aggregate: | 975,000 | 750,000 |
| [Sum of June, July, August] | | |
| Revenue Decline Percentage: | **-23.1%** | =(750,000 - 975,000)/975,000 |

*Claimant Passes Revenue Decline Test*

### Example 2:

| | Revenue by Year | |
|---|---|---|
| Month | 2009 | 2010 |
| | | |
| May | 300,000 | 295,000 |
| June | 350,000 | 335,000 |
| July | 325,000 | 315,000 |
| | | |
| 3-Month Aggregate: | 975,000 | 945,000 |
| [Sum of June, July, August] | | |
| Revenue Decline Percentage: | **-3.1%** | =(945,000 - 975,000)/975,000 |

*Claimant Fails Revenue Decline Test*

Notes:

Revenue Decline Causation Test works in the same way for claimants in Zones C or D, with higher thresholds for the revenue decline. In Zone C the revenue decline percentage must be 10%. In Zone D the revenue decline percentage must be 15%.

028701

**Exhibit A (continued)**

<div align="center">

**Example of Revenue Decline Causation Tests for Failed Business Claims**
**Claimant in Zone B (8.5% Revenue Decline Test)**

</div>

> In Examples 3A-C the claimant is assumed to be in Zone B and the claimant's last full month of operations is July 2010. Examples 3A-C demonstrate that under an aggregate test, three months of revenues are summed. The individual months may be up or down, as long as the three month aggregate period passes the test.

### Example 3A:

| Month | Revenue by Year | |
|---|---|---|
| | 2009 | 2010 |
| May | 300,000 | 250,000 |
| June | 350,000 | 275,000 |
| July | 325,000 | 225,000 |
| 3-Month Aggregate: | 975,000 | 750,000 |
| [Sum of June, July, August] | | |
| Revenue Decline Percentage: | **-23.1%** | =(750,000 - 975,000)/975,000 |

*Claimant Passes Revenue Decline Test*

### Example 3B:

| Month | Revenue by Year | |
|---|---|---|
| | 2009 | 2010 |
| May | 300,000 | 350,000 |
| June | 350,000 | 175,000 |
| July | 325,000 | 225,000 |
| 3-Month Aggregate: | 975,000 | 750,000 |
| [Sum of June, July, August] | | |
| Revenue Decline Percentage: | **-23.1%** | =(750,000 - 975,000)/975,000 |

*Claimant Passes Revenue Decline Test*

### Example 3C:

| Month | Revenue by Year | |
|---|---|---|
| | 2009 | 2010 |
| May | 300,000 | 350,000 |
| June | 350,000 | 375,000 |
| July | 325,000 | 25,000 |
| 3-Month Aggregate: | 975,000 | 750,000 |
| [Sum of June, July, August] | | |
| Revenue Decline Percentage: | **-23.1%** | =(750,000 - 975,000)/975,000 |

*Claimant Passes Revenue Decline Test*

Notes:

Revenue Decline Causation Test works in the same way for claimants in Zones C or D, with higher thresholds for the revenue decline. In Zone C the revenue decline percentage must be 10%. In Zone D the revenue decline percentage must be 15%.

028702

# Exhibit B

### Examples of Sweat Equity Calculation

**Example 1:**

Step 1: Calculate Monthly Sweat Equity Benchmark Income

| | | | |
|---|---|---|---|
| Step 1a: Identify the Commencement Date of Operations | | January 1, 2010 | [a] |
| Step 1b: Identify the Sweat Equity Contribution Start Date<br>(6 months or less prior to the Commencement Date) | | August 10, 2009 | [b] |

Step 1c: Establish the Sweat Equity Benchmark Period
| | | | |
|---|---|---|---|
| Sweat Equity Benchmark Period Start Date | Option 1: | January 1, 2008 | [c] |
| (Must begin no later than January 1 of the calendar year preceding the | | - or - | |
| year in which the Sweat Equity Contribution Start Date occurred. | Option 2: | January 1, 2007 | [d] |
| However, the Claimant may, if relevant, elect a longer period and add | | | |
| the twelve months of 2008 or the 24 months of 2007 and 2008.  Period | | | |
| ends with the last full month preceding the Sweat Equity Contribution | | | |
| Start Date.) | | | |
| | | | |
| Sweat Equity Benchmark Period End Date | | July 31, 2009 | [e] |
| (Last full month prior to the Sweat Equity Contribution Start Date) | | | |

Step 1d: Calculate Monthly Sweat Equity Benchmark Income
| | | |
|---|---|---|
| Historical Earned Income | | |
| January - December 2007 Earned Income | $50,000 | [f] |
| January - December 2008 Earned Income | $55,000 | [g] |
| January - July 2009 Earned Income | $35,000 | [h] |
| | | |
| Sweat Equity Benchmark Period Options | | |
| Option 1: January 1, 2008 - July 30, 2009[1] | | |
| Total Compensation | $90,000 | [i]=[g]+[h] |
| Number of Months in Period with Earned Income | 19 | [j]=count of months from [c] to [e] |
| Average Monthly Compensation | $4,737 | [k]=[i]/[j] |
| | | |
| Option 2: January 1, 2007 - July 30, 2009[2] | | |
| Total Compensation | $140,000 | [l]=[f]+[g]+[h] |
| Number of Months in Period with Earned Income | 31 | [m]=count of months from [d] to [e] |
| Average Monthly Compensation | $4,516 | [n]=[l]/[m] |
| | | |
| Owner Selects Option 1 for Monthly Benchmark Period Income | $4,737 | [o]=maximum of [k] and [n] |
| (Maximum of $12,500) | | |

Step 2: Calculate Total Sweat Equity

| | | |
|---|---|---|
| Failure Date | December 31, 2010 | [p] |
| (Date the Failed Start-Up either (i) ceased operations and wound down, | | |
| (ii) filed for bankruptcy protection, or (iii) otherwise initiated or | | |
| completed a liquidation of substantially all of its assets) | | |
| | | |
| Selected Average Monthly Benchmark Period Income | $4,737 | =[o] |
| Number of Months Sweat Equity Provided | 17 | [q]=count of months from [b] to [p] |
| (Number of months between the Sweat Equity Contribution Start Date | | |
| and the Failure Date) | | |
| | | |
| Total Gross Sweat Equity | $80,526.32 | [r]=[o]*[q] |
| (Maximum of $150,000) | | |

Step 3: Calculate Net Sweat Equity Compensation by Subtracting Actual Earned Income

| | | |
|---|---|---|
| Actual Earned Income after the Sweat Equity Contribution Start Date | $0 | [s] |
| | | |
| Net Sweat Equity Compensation | $80,526 | [t]=[r]-[s] |

Notes:
[1]  Claimant uses only the minimum time to calculate the Sweat Equity Benchmark Period, which provides a larger monthly amount here.
[2]  Claimant uses the full months available to calculate the Sweat Equity Benchmark Period.

028703

## Exhibit B (continued)

**Example 2:**

**Step 1: Calculate Monthly Sweat Equity Benchmark Income**

| | | |
|---|---|---|
| **Step 1a: Identify the Commencement Date of Operations** | December 10, 2008 | [a] |
| **Step 1b: Identify the Sweat Equity Contribution Start Date** | August 10, 2008 | [b] |
| (6 months or less prior to the Commencement Date) | | |
| **Step 1c: Establish the Sweat Equity Benchmark Period** | | |
| Sweat Equity Benchmark Period Start Date | January 1, 2007 | [c] |
| (Must begin no later than January 1 of the calendar year preceding the year in which the Sweat Equity Contribution Start Date occurred. However, the Claimant may, if relevant, elect a longer period and add the twelve months of 2008 or the 24 months of 2007 and 2008. Period ends with the last full month preceding the Sweat Equity Contribution Start Date.) | | |
| Sweat Equity Benchmark Period End Date | July 30, 2008 | [d] |
| (Last full month prior to the Sweat Equity Contribution Start Date) | | |
| **Step 1d: Calculate Monthly Sweat Equity Benchmark Income** | | |
| Historical Earned Income | | |
| January - December 2007 Earned Income | $50,000 | [e] |
| January - July 2008 Earned Income | $30,000 | [f] |
| Sweat Equity Benchmark Period (One Option) | | |
| January 1, 2007 - July 30, 2008 | | |
| Total Compensation | $80,000 | [g]=[e]+[f] |
| Number of Months in Period with Earned Income | 19 | [h]=count of months from [c] to [d] |
| Average Monthly Compensation | $4,211 | [i]=[g]/[h] |
| **Monthly Benchmark Period Income** | $4,211 | [j]=[i] |
| (Maximum of $12,500) | | |

**Step 2: Calculate Total Sweat Equity**

| | | |
|---|---|---|
| **Failure Date** | December 31, 2010 | [k] |
| (Date the Failed Start-Up either (i) ceased operations and wound down, (ii) filed for bankruptcy protection, or (iii) otherwise initiated or completed a liquidation of substantially all of its assets) | | |
| Selected Average Monthly Benchmark Period Income | $4,211 | =[j] |
| Number of Months Sweat Equity Provided | 29 | [l]=count of months from [b] to [k] |
| (Number of months between the Sweat Equity Contribution Start Date and the Failure Date) | | |
| **Total Gross Sweat Equity** | $122,105 | [m]=[j]*[l] |
| (Maximum of $150,000) | | |

**Step 3: Calculate Net Sweat Equity Compensation by Subtracting Actual Earned Income**

| | | |
|---|---|---|
| Actual Earned Income after the Sweat Equity Contribution Start Date | $0 | [n] |
| **Net Sweat Equity Compensation** | $122,105 | [o]=[m]-[n] |

15

028704

# EXHIBIT 7

# Framework for Start-up Business Claims

The framework outlined below applies to claims for start-up businesses.  For purposes of this Framework, a "Start-up Business" is considered to be a claimant with less than eighteen months of operating history at the time of the DWH Spill.[1]

I.    DEFINITIONS[2]

Business Compensation Framework:  Business Compensation Framework is the Compensation Framework for Business Economic Loss Claims.

Compensation Period:  The Compensation Period is selected by the claimant to include three or more consecutive months between May 2010 and April 2011.

Benchmark Period:  The Benchmark Period is the post-spill time period between May 2011 and April 2012 corresponding to the months of the Compensation Period that serves as the basis for estimating the claimant's Expected Profit during 2010.

Fixed and variable payroll expenses shall be calculated in the same manner as in the Business Compensation Framework, provided that subpart 3 of the "Fixed & Variable Payroll Expenses (SG&A and COGS)" Definition shall be modified to identify the two months between May and December 2010 with the lowest Total Payroll Expense.

Variable Costs shall be determined in accordance with Business Compensation Framework Attachment A.

II.    OVERVIEW

As set forth more fully in the Compensation Calculation section below, 2010 claimant compensation (before any adjustments) will be calculated according to the following methodology:

A.    Establish (i) the revenue the claimant would have expected to earn during the Compensation Period in the absence of the DWH Spill ("Expected Revenue"), and (ii) the variable costs the claimant would have expected to incur during the Compensation Period ("Expected Costs") to generate the Expected Revenue.

---

[1] This Framework for Start-up Business Claims does not apply to (i) Failed Businesses; (ii) Entities, Individuals or Claims not included within the Economic Class definition; or (iii) Claims covered under the Seafood Program.
[2] In addition to the following, other terms are defined in this document and indicated by initial capitals.

The difference between Expected Revenue and Expected Costs is Expected Profit.

B.  Calculate actual profit/loss realized by the claimant during the Compensation Period based on the difference between (i) actual revenue, and (ii) actual variable costs.

C.  Deduct actual profit/loss from Expected Profit over the Compensation Period to determine the Base Compensation Loss.

III.  CAUSATION REQUIREMENTS

A.  **Start-Up Businesses in Zones A, B and C For Which Causation Shall Be Presumed**

1)  If the claimant is a Start-up Business in Zone A that is not excluded pursuant to the exception agreed to by the parties, and listed in footnote (1), the claimant is not required to provide any evidence of causation.

2)  If the claimant is a Start-up Business meeting the definition of a "Commercial Fisherman," or "Landing Site," or "Commercial Wholesale or Retail Dealer A," or "Primary Seafood Processor," as set forth in "Seafood Distribution Chain Definitions," the claimant is not required to provide any evidence of causation.

3)  If the claimant is a Start-up Business in Zone A, B or C and the claimant is also a "Commercial or Wholesale or Retail Dealer B," or a "Secondary Seafood Processor," or a "Seafood Wholesaler or Distributor," or a "Seafood Retailer," as set forth in "Seafood Distribution Chain Definition," the claimant is not required to provide any evidence of causation.

4)  If the claimant is a Start-up business in Zone B, and the claimant also meets the "Tourism Definition," the claimant is not required to provide any evidence of causation.

5)  If you are in Zone A, B or C, and you meet the "Charter Fishing Definition" you are not required to provide any evidence of causation.

B.  **Causation Requirements For Start-Up Businesses In Zones B and C**

If the claimant is located within Zones B or C and not entitled to a presumption, it must establish:

2

028662

1.    **UPTURN REVENUE PATTERN PLUS**

    a.    Claimant must demonstrate:

        1.    If in Zone B, an increase of an aggregate of 8.5% or more in total revenues over a period of three consecutive months from May 2011 to April 2012 compared to the same months from May 2010 to April 2011 as selected by the claimant;[3]

        2.    If in Zone C, an increase of an aggregate of 10% or more in total revenues over a period of three consecutive months from May 2011 to April 2012 compared to the same months from May 2010 to April 2011 as selected by the claimant;[4]

        AND

    b.    <u>one or more of the following</u>:

        1.    For business claimants that have customers in Zones A-C, the claimant demonstrates proof of an aggregate of 10% increase in the share of total revenue generated by customers located in Zones A-C over the same period of three consecutive months from May 2011 to April 2012 as selected by the claimant for the upturn revenue pattern as identified in § III.B.1.a compared to the same three consecutive month period from May 2010 to April 2011,[5] as reflected in:

            (a)    customer credit card receipts or other contemporaneously maintained records of payment; or

            (b)    customer registration logs (e.g., hotel registries); or

            (c)    documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or

---

[3] See Exhibit A attached hereto for an example of how this calculation is performed.
[4] See Exhibit A attached hereto for an example of how this calculation is performed.
[5] See Exhibit B attached hereto for an example of how this calculation is performed.

028663

    (d)    business documents reflecting contemporaneous recording of receipts or invoices listing customers by location; or

    (e)    Any other documentation providing evidence of the portion of the claimant's revenue projected to be generated by customers in Zones A-C versus outside of Zones A-C during the Compensation Period.  The claimant must be able to demonstrate that the projections were prepared prior to the DWH Spill and provided to and utilized by a financial institution extending credit to the Start-up Business.

OR

2.    For businesses meeting the Tourism Definition or the Seafood Distribution Chain Definition, the claimant demonstrates proof of an aggregate of 10% increase in the share of total revenue generated by non-local customers[6] over the same period of three consecutive months from May 2011 to April 2012 as selected by claimant for the upturn revenue pattern as identified in § III.B.1.a compared to the same three consecutive month period from May 2010 to April 2011,[7] as reflected in:

    (a)    customer credit card receipts or other contemporaneously maintained records of payment; or

    (b)    documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or

    (c)    business documents reflecting contemporaneous recording of receipts or invoices listing customers by location; or

    (d)    customer registration logs (e.g., hotel registries); or

---

[6] A Customer shall be considered a "non-local customer" if they reside more than 60 miles from a claimant business location.
[7] See Exhibit C attached hereto for an example of how this calculation is performed.

4

028664

(e)     Any other documentation providing evidence of the portion of claimant's revenue projected to be generated by local versus non-local customers during the Compensation Period.  The claimant must be able to demonstrate that the projections were prepared prior to the DWH Spill and provided to and utilized by a financial institution extending credit to the Start-up Business.

OR

2.     <u>Proof of Spill-Related Cancellations</u>

a.     Claimant may establish causation by providing contemporaneous written evidence of  spill-related reservation cancellations (*i.e.,* letters, emails, hotel logs for the relevant time, or an affidavit from an independent third party citing the DWH Spill as the reason for cancellation) that the claimant was unable to rebook ("Un-replaced Cancellations").  Proof of Un-replaced Cancellations only establishes causation for those specific Un-replaced Cancellations substantiated by the claimant and may result in recovery only with respect to such Un-replaced Cancellations. However, if the lodging facility has food and/or beverage services on site, the evidence of Un-replaced Cancellations shall satisfy causation for the specific losses corresponding to such Un-replaced Cancellations in those service areas as well.

OR

b.     The claimant provides contemporaneous written evidence of the cancellation of a contract, or loss of previously-committed capital investments from investors and/or business loans arising from the DWH Spill that the claimant was not able to replace.  In the absence of contemporaneous written evidence, the claimant must present an affidavit from an independent third party affirming that the cancellation or loss was spill-related.  Proof of any spill-related contract cancellations or losses discussed above only establishes causation for the specific loss substantiated by the claimant and may result in recovery of amounts solely associated with such loss.

5

C.      Causation Requirements for Start-Up Businesses in Zone D

If the claimant is located within Zone D, it must establish one or more of the following:

1.      <u>UPTURN REVENUE PATTERN PLUS</u>

a.      an increase of an aggregate of 15% or more in total revenues over a period of three consecutive months  from May 2011 to April 2012 compared to the same months from May 2010 to April 2011 as selected by the claimant;[8]

AND

b.      <u>one of the following</u>:

1.      For business claimants that have customers in Zones A-C, the claimant demonstrates proof of an aggregate of 10% increase in the share of total revenue generated by customers located in Zones A-C over the same period of three consecutive months from May 2011 to April 2012 as selected by the claimant for the upturn revenue pattern as identified in § III.C.1.a compared to the same three consecutive month period from May 2010 to April 2011,[9] as reflected in:

(a)     customer credit card receipts or other contemporaneously maintained records of payment;

(b)     customer registration logs (e.g., hotel registries);

(c)     documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or

(d)     business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

---

[8] See Exhibit A attached hereto for an example of how this calculation is performed.
[9] See Exhibit B attached hereto for an example of how this calculation is performed.

028666

OR

2.   For businesses meeting the Tourism Definition or the Seafood Distribution Chain Definition, the claimant demonstrates proof of an aggregate of 10% increase in the share of total revenue generated by non-local customers over the same period of three consecutive months from May 2011 to April 2012 as selected by claimant for the upturn revenue pattern as identified in § III.C.1.a compared to the same three consecutive month period from May 2010 to April 2011,[10] as reflected in:

(a)   customer credit card receipts or other contemporaneously maintained records of payment; or

(b)   customer registration logs (e.g., hotel registries).

(c)   documentation maintained in the ordinary course of business that lists customers by location and monthly sales associated with those customers; or

(d)   business documents reflecting contemporaneous recording of receipts or invoices listing customers by location.

2.   **PROOF OF SPILL-RELATED CANCELLATIONS**

a.   Claimant may establish causation by providing contemporaneous written evidence of spill-related reservation cancellations (i.e., letters, emails, hotel logs for the relevant time, or an affidavit from an independent third party citing the DWH Spill as the reason for cancellation) that the claimant was unable to rebook ("Un-replaced Cancellations"). Proof of Un-replaced Cancellations only establishes causation for those specific Un-replaced Cancellations substantiated by the claimant and may result in recovery only with respect to such Un-replaced Cancellations. However, if the lodging facility has food and/or beverage services on site, the evidence of Un-replaced Cancellations shall satisfy causation for the specific losses corresponding to such Un-replaced Cancellations in those service areas as well.

---

[10] See Exhibit C attached hereto for an example of how this calculation is performed.

028667

OR

b.    The claimant provides contemporaneous written evidence of the cancellation of a contract, or loss of previously-committed capital investments from investors and/or business loans arising from the DWH Spill that the claimant was not able to replace.  In the absence of contemporaneous written evidence, the claimant must present an affidavit from an independent third party affirming that the cancellation or loss was spill-related.  Proof of any spill-related contract cancellations or losses discussed above only establishes causation for the specific loss substantiated by the claimant and may result in recovery of amounts solely associated with such loss.

## IV.   COMPENSATION CALCULATION

### A.   Determination of Claimant's Expected Profit/Loss

1.   Claimant's Expected Revenue and Expected Costs shall equal, respectively:

a.   Actual revenue earned and actual variable costs incurred by claimant's business during the Benchmark Period; or

b.   Claimants can alternatively elect to establish Expected Revenue and Expected Costs based on financial projections for the Start-up Business.  Projections must be prepared prior to the DWH Spill and provided to and utilized by a financial institution, other entity in the primary business of lending or investing money (ex.- private equity firms, investment banks, etc.), or non-family private investors with business lending experience (hereafter referred to as "Lender") who confirm their use of such projections in extending credit to the Start-up Claimant.

c.   Regardless of the basis upon which Expected Revenue and Expected Costs are established, the determination will exclude any one-time non-operating income/expenses (including, but not limited to, any business interruption insurance proceeds received by the claimant during the relevant period), any payments received by the claimant from BP or the GCCF pursuant to BP's OPA Claims process for the same business claim.

8

028668

2.    Claimant's Expected Profit/Loss for the Compensation Period will be calculated as the difference between the claimant's Expected Revenue and Expected Costs, provided that Expected Revenue and Expected Costs must both be based on actual results from the Benchmark Period, or, if alternatively selected by claimants in Zones B and C, both Expected Revenue and Expected Costs must both be based on qualifying projections as described herein.

B.    **Determination of Claimant's Actual Profit/Loss**

1.    Actual Profit/Loss generated over the Compensation Period will be calculated as the difference between (i) the claimant's actual revenues and (ii) the claimant's actual variable costs, both for the Compensation Period.

2.    Actual revenue and actual Variable Costs will exclude any one-time non-operating income/expenses (including any business interruption insurance proceeds received by the claimant during the relevant period), any payments received by the claimant from BP or the GCCF pursuant to BP's OPA Claims process.  Further, for claimants that participated in the VoO program, Actual Profit/Loss will exclude revenue generated by or costs incurred in connection with VoO.[11]

C.    **Calculation of Claimant Compensation**

1.    Calculate the claimant's Base Compensation Loss as the difference between (i) claimant's Expected Profit/Loss and (ii) the claimant's Actual Profit/Loss generated over the Compensation Period.

2.    Apply the agreed-upon RTP.

3.    Deduct any payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process, any VoO Settlement Payment Offset and VoO Earned Income Offset, where applicable.

D.    **DOCUMENTATION REQUIREMENTS**

In addition to the relevant information requirements set forth in the Documentation Requirements for Business Claims, the following supplemental information may be required:

---

[11] Claimants are required to report payments received under the VoO program.  If claimants that received VoO payments fail separately to report costs incurred in VoO and non-VoO activities, then Actual Profit/Loss for non-VoO activity alone can be determined through a pro-rata revenue based allocation of variable costs between VoO and non-VoO related activities.

9

028669

1. Contemporaneously prepared monthly financial statements from the inception of the start-up business through 2011.

2. Documents evidencing loss of previously-committed capital investments from investors and/or business loans due, and the inability to procure replacement financing, as relevant. Acceptable documentation includes a letter withdrawing capital, or other contemporaneous documentation evidencing the investment withdrawal.

3. Evidence of any payments received by the claimant from BP or the GCCF pursuant to BP's OPA claims process.

4. All financial projections (or business plans containing financial projections) prepared for the Start-up Business prior to the DWH Spill, and contemporaneous documentation and/or written confirmation from the Lender establishing that such projections were submitted to and utilized by the Lender prior to extending credit to the Start-up Business.

   a. Additional documentation as necessary to provide the background and experience of any Lenders not regulated by a government agency (ex.- FDIC, SEC, etc.).

   b. Written confirmation from Lender that projections submitted as part of the claim were utilized by the Lender in granting credit prior to the DWH Spill.

5. Claimants shall provide an executed subrogation waiver or indemnity in the release.

028670

Exhibit A

## Example of Upturn Revenue Causation Tests for Start-Up Business Claims
## Claimant in Zone B (8.5% Upturn Revenue Test)

| Examples 1 and 2 demonstrate a claimant that passes or fails the Upturn Revenue Causation Test. |
|---|

### Example 1:

| | Revenue by Year | |
|---|---|---|
| Month | 2010 | 2011 |
| June | 285,000 | 320,000 |
| July | 330,000 | 350,000 |
| August | 295,000 | 335,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 910,000 | 1,005,000 |
| Upturn Revenue Percentage: | **10.4%** =(1,005,000 - 910,000)/910,000 | |
| *Claimant Passes Upturn Revenue Test* | | |

### Example 2:

| | Revenue by Year | |
|---|---|---|
| Month | 2010 | 2011 |
| June | 285,000 | 290,000 |
| July | 330,000 | 330,000 |
| August | 295,000 | 315,000 |
| 3-Month Aggregate: [Sum of June, July, August] | 910,000 | 935,000 |
| Upturn Revenue Percentage: | **2.7%** =(935,000 - 910,000)/910,000 | |
| *Claimant Fails Upturn Revenue Test* | | |

Notes:

Upturn Revenue Causation Test works in the same way for claimants in Zones C or D, with higher thresholds for the revenue upturn. In Zone C the upturn revenue percentage must be 10%. In Zone D the upturn revenue percentage must be 15%.

In these examples the Start-Up business claimant has selected June, July, and August as the three consecutive months to use.

11

028671

## Example of Upturn Revenue Causation Tests for Start-Up Business Claims
## Claimant in Zone B (8.5% Upturn Revenue Test)

Example 3 demonstrates that under an aggregate test, three months of revenues are summed. The individual months may be up or down, as long as the three month aggregate period passes the test.

### Example 3A:

| Month | Revenue by Year | |
|---|---|---|
| | 2010 | 2011 |
| June | 285,000 | 320,000 |
| July | 330,000 | 350,000 |
| August | 295,000 | 335,000 |
| 3-Month Aggregate: | 910,000 | 1,005,000 |
| [Sum of June, July, August] | | |

Upturn Revenue Percentage: **10.4%** =(1,005,000 - 910,000)/910,000

*Claimant Passes Upturn Revenue Test*

### Example 3B:

| Month | Revenue by Year | |
|---|---|---|
| | 2010 | 2011 |
| June | 285,000 | 220,000 |
| July | 330,000 | 450,000 |
| August | 295,000 | 335,000 |
| 3-Month Aggregate: | 910,000 | 1,005,000 |
| [Sum of June, July, August] | | |

Upturn Revenue Percentage: **10.4%** =(1,005,000 - 910,000)/910,000

*Claimant Passes Upturn Revenue Test*

### Example 3C:

| Month | Revenue by Year | |
|---|---|---|
| | 2010 | 2011 |
| June | 285,000 | 220,000 |
| July | 330,000 | 250,000 |
| August | 295,000 | 535,000 |
| 3-Month Aggregate: | 910,000 | 1,005,000 |
| [Sum of June, July, August] | | |

Upturn Revenue Percentage: **10.4%** =(1,005,000 - 910,000)/910,000

*Claimant Passes Upturn Revenue Test*

Notes:

Upturn Revenue Causation Test works in the same way for claimants in Zones C or D, with higher thresholds for the revenue upturn. In Zone C the upturn revenue percentage must be 10%. In Zone D the upturn revenue percentage must be 15%.

In these examples the Start-Up business claimant has selected June, July, and August as the three consecutive months to use.

028672

**Exhibit B**

# Example of Customer Mix Test for Start Up Business Claimants
## (Customers in Zones A-C)
Based on 3-month time period selected for Modified V or Down-Only test

## Example 1:   LT= Less than                              GE=Greater than or equal to

| Customer Residence | Aggregate of June-August '10 | Aggregate of June-August '11 |
|---|---|---|
| Zone D | $80,000 | $85,000 |
| Zones A-C | $20,000 | $25,000 |
| Total | $100,000 | $110,000 |
| % Zones A-C | 20% | 23% |

*Claimant passes Customer Mix Test: Claimant has a 15 percent increase in share of revenue from customers in Zones A-C [15%= .15 = (23-20)/20]*

## Example 2:

| Customer Residence | Aggregate of June-August '10 | Aggregate of June-August '11 |
|---|---|---|
| Zone D | $50,000 | $55,000 |
| Zones A-C | $50,000 | $55,000 |
| Total | $100,000 | $110,000 |
| % Zones A-C | 50% | 50% |

*Claimant fails Customer Mix Test: No change in share of revenue from customers in Zones A-C.*

## Example 3:

| Customer Residence | Aggregate of June-August '10 | Aggregate of June-August '11 |
|---|---|---|
| Zone D | $50,000 | $55,000 |
| Zones A-C | $50,000 | $65,000 |
| Total | $100,000 | $120,000 |
| % Zones A-C | 50% | 54% |

*Claimant fails Customer Mix Test: Claimant has an 8% increase in share of revenue from customers in Zones A-C [8% = .08 = (54-50)/50]*

13

028673

Exhibit C

# Example of Customer Mix Test for Start Up Business Claimants (Non-Local Customers)

Based on 3-month time period selected for Modified V or Down-Only test

**Example 1:** LT= Less than                    GE=Greater than or equal to

| Customer Residence | Aggregate of June-August '10 | Aggregate of June-August '11 |
|---|---|---|
| LT 60 miles from claimant | $80,000 | $85,000 |
| GE 60 miles from claimant | $20,000 | $25,000 |
| Total | $100,000 | $110,000 |
| % GE 60 miles | 20% | 23% |

*Claimant passes Customer Mix Test: Claimant has a 15 percent increase in share of revenue from non-local customers [15%=.15 =(23-20)/20]*

**Example 2:**

| Customer Residence | Aggregate of June-August '10 | Aggregate of June-August '11 |
|---|---|---|
| LT 60 miles from claimant | $50,000 | $55,000 |
| GE 60 miles from claimant | $50,000 | $55,000 |
| Total | $100,000 | $110,000 |
| % GE 60 miles | 50% | 50% |

*Claimant fails Customer Mix Test: No change in share of revenue from non-local customers.*

**Example 3:**

| Customer Residence | Aggregate of June-August '10 | Aggregate of June-August '11 |
|---|---|---|
| LT 60 miles from claimant | $50,000 | $55,000 |
| GE 60 miles from claimant | $50,000 | $65,000 |
| Total | $100,000 | $120,000 |
| % GE 60 miles | 50% | 54% |

*Claimant fails Customer Mix Test: Claimant has an 8% increase in share of revenue from non-local customers [8% = .08 = (54-50)/50]*

028674

# EXHIBIT 8A

## Framework for Individual Economic Loss Claims

### Overview

Individual economic loss claims are claims by **Individuals**, who shall be defined as (i) Natural Persons who (a) satisfy (or whose employers satisfy) the Class Definition and (b) whose losses are not excluded from the Class and (ii) who seek compensation for lost earnings from employment due to or resulting from the DWH Spill for claims that are not excluded from the Class, with the following exceptions:

1. All Natural Persons (other than Natural Persons addressed in 2, 3 and 4 below) claiming losses related to business income required to be reported on Internal Revenue Service Form 1040 Schedules C, E or F are governed by the **Documentation Requirements for Business Economic Loss Claims**, **Causation Requirements for Business Economic Loss Claims**, and **Compensation Framework for Business Economic Loss Claims**, or, if appropriate, the **Failed Business Framework** or the **Start-up Business Framework**, rather than this **Framework for Individual Economic Loss Claims**.[1]

2. All Natural Persons claiming losses as an **Individual Periodic Vendor ("IPV")** or a **Festival Vendor** are governed by the **Addendum to Individuals Framework – IPVs and Festival Vendors**.[2]

3. Claims for lost earnings from employment as a **Commercial Fisherman**, **Seafood Crew**, **Oyster Leaseholder**, or **Seafood Vessel Owner**, all as defined in the **Seafood Distribution Chain Definitions**, shall be compensated through the **Seafood Program**, rather than this **Framework for Individual Economic Loss Claims**.

4. Claims by self-employed Natural Persons who satisfy the definition of a **Commercial Fisherman**, **Seafood Crew**, **Oyster Leaseholder**, or **Seafood Vessel Owner**, all as defined in the **Seafood Distribution Chain Definitions**, shall be compensated through the **Seafood Program**, rather than this **Framework for Individual Economic Loss Claims**.

As detailed below, **Individual** compensation for lost earnings is calculated as the difference between (i) a claimant's **Expected Earnings** for a specified period of time after the DWH Spill and (ii) a claimant's **Actual Earnings** over the same specified period.[3]  Each claimant must submit proof of earnings during the relevant time periods, as well as specified additional documentation to establish that the DWH Spill caused a loss of earnings.

Under this **Framework for Individual Economic Loss Claims**, a claimant may recover for lost earnings by submitting a sworn Claim Form and supporting documentation (when required) establishing that the claimant satisfies the documentation and causation requirements of one of

---

[1] Words or phrases in **Capitalized Bold-face Type** are defined terms with the meaning set forth in the "Definitions" section of this **Individual Economic Loss Claim Framework**.

[2] The terms **IPV** and **Festival Vendor** are defined in the **Addendum to Individuals Framework – IPVs and Festival Vendors**.

[3] All damages paid shall be paid on a pre-tax basis with proper Form 1099 or other reporting as required by the IRS.

four alternative methodological categories.  These categories, which are set forth fully in Sections I-IV of this **Framework for Individual Economic Loss Claims**, are summarized below.[4]

I.  <u>INDIVIDUAL CLAIMANTS WITH CONTEMPORANEOUS TAX DOCUMENTS FOR 2010 AND BENCHMARK PERIOD</u>:  Applies to **Individuals** providing **Tax Information Documents** for 2010 and the claimant selected **Base Year(s)**.  Requirements detailed in Section I must be fulfilled (**Category I**, beginning at page 10).

II.  <u>INDIVIDUAL CLAIMANTS WITH PAY PERIOD OR OTHER EARNINGS DOCUMENTATION FOR 2010 AND BENCHMARK PERIOD</u>:  Applies to **Individuals** without **Tax Information Documents** but with other contemporaneous documents presenting employment and compensation information for 2010 and the **Benchmark Period**.  Requirements detailed in Section II must be fulfilled (**Category II**, beginning at page 19).

III.  <u>INDIVIDUAL CLAIMANTS WITH EARNINGS DOCUMENTATION FOR 2010 BUT WITHOUT COMPARABLE BENCHMARK PERIOD EARNINGS</u>:  Applies to **Individuals** with **Tax Information Documents** or other contemporaneous documents presenting employment and compensation information for 2010 but without a comparable **Benchmark Period**.  Requirements detailed in Section III must be fulfilled (**Category III**, beginning at page 28).

IV.  <u>INDIVIDUAL CLAIMANTS WITHOUT EARNINGS DOCUMENTATION WHO SUBMIT INDIVIDUAL AND EMPLOYER SWORN WRITTEN STATEMENTS TO ESTABLISH EARNINGS</u>:  Applies to **Individuals** without any documentary proof but providing **Sworn Written Statements** (from both the claimant and the employer) presenting employment and compensation information for 2010.  Requirements detailed in Section IV must be fulfilled (**Category IV**, beginning at page 44).

<u>Definitions</u>

The following defined terms used in this **Framework for Individual Economic Loss Claims** shall have the meanings set forth below and be presented in **bold-faced type** throughout this Framework.

A.  <u>**Actual Earnings**</u>:  Claimant's income actually earned from the **Claiming Job(s)** during the **Compensation Period** excluding **Spill-Related Payments** and employment earnings from the VoO program (if any).  For purposes of calculating **Claimant Lost Earnings**, there may be

---

[4] For purposes of this **Framework for Individual Economic Loss Claims**, the presumption shall be that the location of economic loss for the **Claiming Job** is the location of the claimant's employer within the Class Definition geographic area, not the claimant's residence.  Claimants may establish an alternative location of economic loss for the **Claiming Job** other than their employer's location by providing evidence that their primary employment activities and responsibilities occur in a location different from their employer's business address, and that the claimed DWH Spill-related economic loss occurred at such location.  For example, the claimant works for a housekeeping company located in Zone C that services households in Zones A, B and C, including vacation condominiums located in Zone A, and the claimant establishes that she works primarily in Zone A.

2

028840

adjustments to **Actual Earnings** pursuant to Step 5 of the Compensation Calculations set forth in Categories I, II and III.

B. <u>Base Year(s)</u>: A claimant selected period used for historical comparison and defined as one of the following options, provided that once selected, the same **Base Year(s)** shall be used in this **Framework for Individual Economic Loss Claims** for all purposes for which a **Base Year(s)** is required:

    1.  2009; or

    2.  The average of 2008 and 2009; or

    3.  The average of 2007, 2008 and 2009.

C. <u>Benchmark Period</u>: A time period for which a claimant was engaged in a **Claiming Job** or a comparable job (where "comparable" shall mean a job with the same employer, or a job with a new employer where the claimant's earned income changed by less than 20% between January 1 – April 30 of the **Base Year(s)** and January 1 – April 30, 2010), and which a claimant chooses for the following:

    1.  To establish baseline earnings to be used in calculating the claimant's **Expected Earnings**.

        i.  For Categories I and II, the **Benchmark Period** is the time period of at least 90 consecutive days within the claimant-selected **Base Year(s)** that corresponds to the same calendar months and days selected by the claimant as the **Compensation Period**. In circumstances where the claimant chooses multiple **Base Years**, the **Benchmark Period** shall be calculated as the average of the time periods (of at least 90 consecutive days) from each **Base Year** that correspond to the same calendar months and days selected by the claimant as the **Compensation Period**.

        ii.  For a claimant in Category III, **2011 Benchmark Period** shall be defined as a 2011 time period of at least 90 consecutive days that corresponds to the same calendar months and days as the claimant's selected **Compensation Period**.

        iii.  If the pay periods fall on different dates in the **Benchmark Period** or the **2011 Benchmark Period**, earnings shall be allocated pro-rata to correspond to the dates of the **Compensation Period**.

        iv.  Examples of **Benchmark Period** and **2011 Benchmark Period** can be seen in Appendices A through F attached hereto.

AND

    2.  If applicable, to establish the baseline historical earnings to be used in calculating the **Claimant Specific Growth Factor**. For this purpose, the **Benchmark Period** is the consecutive pay periods which cover January through April of the claimant-selected **Base Year(s)**. In circumstances where the claimant chooses multiple **Base Years**, the **Benchmark Period** shall be calculated as the average of the corresponding periods from each **Base Year**. Examples can be seen in Appendices A through F attached hereto.

3

028841

D. **Claimant Lost Earnings:**  The claimant's **Expected Earnings** from all **Claiming Jobs** minus the claimant's **Actual Earnings** from all **Claiming Jobs** during the **Compensation Period**, minus any **Offsetting Earnings**.

E. **Claimants Without Comparable Benchmark Earnings:**  **Individuals** without historical earnings comparable to the **Compensation Period** employment shall use **2011 Benchmark Period** earnings (if any) to establish **Expected Earnings** (as described in Category III).  Those claimants are:

   1. **New Entrant To Employment:**  An **Individual** (i) who was not employed between January 1, 2007 and April 20, 2010, and (ii) who accepted an offer of first-time employment in a new job, full or part-time (including but not limited to seasonal employment), prior to April 20, 2010, to start working during the period April 21, 2010 to December 31, 2010, and (iii) whose offer was withdrawn or amended during 2010 after the DWH Spill.

      For example, if as of April 20, 2010, an **Individual** who had never been employed had received and accepted an offer of employment to begin working between April 21 and December 31, 2010, the **Individual** shall be considered a **New Entrant to Employment**.  Similarly, if an **Individual** had previously engaged in part-time work, but as of April 20, 2010 had accepted an offer for his or her first full-time position (or for his or her first seasonal employment position) to begin working between April 21 and December 31, 2010, the **Individual** shall also be considered a **New Entrant to Employment**.  And, if an **Individual** had worked prior to 2007, but not between January 1, 2007 and April 20, 2010, and had accepted an offer of employment to begin working between April 21 and December 31, 2010, the **Individual** shall be considered a **New Entrant to Employment**.

   2. **Claimant Who Had Less Than Twelve Months Of Earnings History But Was Employed On April 20, 2010:**  An **Individual** with 2010 earnings information who was employed on April 20, 2010 but who did not become employed until after April 20, 2009.

   3. **Career Changer:**  An **Individual** who (i) changed employer(s) and line of work between the **Benchmark Period** and the **Compensation Period** and (ii) whose earnings during the period January 1 - April 30, 2010 changed by more than plus or minus 20% compared to their earnings during the period January 1 - April 30 of the **Base Year(s)**.

F. **Claiming Job(s):**  The job held or secured by the claimant as of April 20, 2010 for which the claimant seeks compensation and for which causation requirements under this **Framework for Individual Economic Loss** are satisfied.  Any job from which the claimant generated earnings during the **Benchmark Period** and/or the **Compensation Period** (including Schedule C or F activities) and for which the claimant does not seek compensation shall be a **Non-Claiming Job**.

G. **Claims Administrator:**  The Claims Administrator and related staff appointed pursuant to the Economic And Property Damages Settlement Agreement and any Claims Administration Vendor operating in the Class Action Settlement Office.

4

H. **Compensation Period**:  The **Compensation Period** is selected by the claimant.  It must include 90 or more consecutive days between April 21, 2010 and December 31, 2010, except for claimants who are in the **Primary Seafood Industry**[5] for which the time period is 90 or more consecutive days between April 21, 2010 and April 30, 2011.  Claimant can select only one **Compensation Period**, and the **Compensation Period** must correspond with the pay periods used by the employer (*i.e.*, start and end with the standard daily, weekly, or monthly pay period used by the employer).[6]

I. **Eligible Employer**:  An employer that (a) filed a claim in the MDL 2179 settlement process and established causation according to rules described in **Causation Requirements For Business Economic Loss Claims** or (b) received a compensation offer from the GCCF.

J. **Employment-Related Benefits Losses**:  Losses defined in the **Addendum Regarding Compensation Related to a Claimant's Loss of Employment-Related Benefits Income as a Result of the DWH Spill**.

K. **Expected Earnings**:  Claimant's earnings in the **Compensation Period** in the **Claiming Job** that would have been expected in the absence of the DWH Spill.

L. **Final Claimant Compensation**:  The **Final Compensation Amount** shall be the amount owed to the claimant.  For Categories I, II, and III, the **Final Compensation Amount** shall equal the sum of the **Claimant Lost Earnings**, any applicable **RTP**, any **Employment-Related Benefits Losses**, any **Reimbursable Training Costs**, and any **Reimbursable Search Costs**, less any **Spill-Related Payments**.  For Category IV, the **Final Compensation Amount** shall be the sum of the **Claimant Lost Earnings** and any applicable **RTP**, less any **Spill-Related Payments**.

M. **Framework for Individual Economic Loss Claims**:  This **Framework for Individual Economic Loss Claims**.

N. **Growth Factor**:  For claimants in Categories I – III only, **Growth Factor** shall be defined as any of the growth-related factors described below that may be applied in the calculation of a claimant's **Expected Earnings**, where the claimant is eligible, including the **Claimant Specific Growth Factor** or the **General Growth Factor** and, if applicable, the **Industry Growth Factor**. Only certain claimants who qualify for compensation pursuant to Categories I, II and III below are eligible to receive any applicable factors.  **Growth Factors** are not applicable in Category IV.

1. **Claimant Specific Growth Factor**:  **Claimant Specific Growth Factor** shall be defined as an individualized **Growth Factor** for each **Claiming Job** for which the claimant provides

---

[5] As used herein, the definitions of **Primary Seafood Industry** and **Secondary Seafood Industry** are set forth in the **Seafood Distribution Chain Definitions**.

[6] If the claimant has multiple **Claiming Jobs** which utilize different pay periods, the **Compensation Period** dates shall be selected to correspond to pay periods from the position producing greatest earnings.  Other wages (utilizing different pay period schedules), including wages from jobs worked in the **Compensation Period** for which lost earnings are not sought (where relevant), shall be allocated pro-rata to the days corresponding to the **Compensation Period**.  See examples at Appendix C.

028843

Pay Period Earnings Documentation.  The **Claimant Specific Growth Factor** shall be calculated as the ratio of the claimant's actual January-April 2010 base earnings (including commissions but excluding bonuses) in the **Claiming Job** divided by actual January-April base earnings in the **Base Year(s)** (including commissions but excluding bonuses), provided that if the calculated rate is greater than +10%, the **Claimant Specific Growth Rate** shall be +10%, and if the calculated rate is less than -1.5%, the **Claimant Specific Growth Rate** shall be -1.5%.   If the **Claimant Specific Growth Factor** reflects a change of plus or minus 20% *and* the **Individual** was employed in a new line of work with a new employer, claimant shall be considered a **Career Changer** and be subject to the requirements of **Category III: INDIVIDUAL CLAIMANTS WITH EARNINGS DOCUMENTATION FOR 2010 BUT WITHOUT COMPARABLE BENCHMARK PERIOD EARNINGS**.

2. <u>General Growth Factor</u>:  General Growth Factor shall be defined as a **Growth Factor** of 2.0% that shall be assumed and applied for a claimant in Category I or Category II who does not provide **Pay Period Earnings Documentation** or who is a **Seasonal Employee** (and therefore has no **Claimant Specific Growth Factor** because he or she has provided no basis for calculating it).  For a claimant in Category III who has **2011 Benchmark Period** earnings, those earnings shall be decreased by the **General Growth Factor** to calculate **Expected Earnings**.  For a **Career Changer** who does not have 2011 earnings information for the **2011 Benchmark Period**, the **General Growth Factor** may apply in establishing **Expected Earnings** pursuant to Category III.

3. <u>Industry Growth Factor</u>:  Industry Growth Factor shall be defined as a **Growth Factor** of 1.5% and may be applied to claimants in Categories I, II and III in certain circumstances where the **Claiming Job** is a non-salaried, hourly wage job in both (i) the **Compensation Period** and (ii) the **Benchmark Period** or 2011, as relevant.

O. <u>Offsetting Earnings</u>:  Earnings from any **Non-Claiming Job(s)** during the claimant's **Compensation Period**  in excess of earnings from any **Non-Claiming Job(s)**  during the claimant's **Benchmark Period**, if any, shall offset **Claimant Lost Earnings** unless:

1. If the claimant provides documentation (as described in O.3) establishing that he or she worked the same or more total hours at all **Claiming Job(s)** during the **Compensation Period** (as compared to the **Benchmark Period**), then (a) no **Offsetting Earnings** shall apply, and (b) to the extent the claimant worked more total hours in all **Claiming Jobs** in the **Compensation Period** (relative to the **Benchmark Period**), **Actual Earnings** shall be limited as set forth in Step 5 of the Compensation Calculations set forth in Categories I, II and III.

OR

2. If the claimant (i) provides documentation (as described in O.3) establishing that he or she worked fewer total hours at all **Claiming Jobs** during the **Compensation Period** (as compared to the **Benchmark Period**), and (ii) provides evidence as to the number of hours worked in a **Non-Claiming Job(s)** during the **Compensation Period** and the **Benchmark Period**, then **Offsetting Earnings** shall be calculated as follows:

6

i. The average hourly rate for the **Non-Claiming Job(s)** during the **Compensation Period**, multiplied by the _lesser_ of the following:

    a. The total number of increased hours worked in the **Non-Claiming Job(s)** during the **Compensation Period** above the hours (if any) worked at that job or activity during the claimant's **Benchmark Period** (which may be zero); or

    b. The sum of the total number of hours lost in the **Claiming Job(s)**.

3. Documentation sufficient to satisfy O.1 and O.2 by establishing the number of hours worked (and, if relevant, wage rate) in (a) the **Claiming Job(s)** and (b) the **Non-Claiming Job(s)** during both (c) the **Compensation Period** and (d) the **Benchmark Period** (as relevant), includes the following:

    i. For any **Claiming Job** or **Non-Claiming Job** which is paid on an hourly basis, the claimant must provide documentation establishing the number of hours worked for each hourly position and for the relevant period(s). Documentation could include, for example, pay stubs.

    ii. For non-hourly jobs, the claimant must provide an **Employer Sworn Written Statement** and any other documentation establishing the number of hours worked for each relevant position and period, including, but not limited to documentation reflecting overtime worked.

    iii. For any Schedule C or F activity, the claimant must provide a **Claimant Sworn Written Statement** and all available supporting documentation disclosing the number of hours worked in connection with the identified activity for each of the relevant periods.

P. **One Time, Non-Recurring Event Compensation**:  If a claimant can establish lost earnings income or profit from a **Claiming Job** due to the cancellation of a contract for a **One Time, Non-Recurring Event** as set forth in the **One Time Loss Addendum**, the claimant may receive additional compensation in accord with **One Time Loss Addendum**.

Q. **Pay Period Earnings Documentation**:  Documentation sufficient to establish a claimant's earnings from employment and hours worked during the applicable period(s), including (i) the **Benchmark Period** (relevant for Categories I and II), (ii) January through April of 2010 and the **Base Year(s)**, (iii) the **Compensation Period** (relevant for Categories I through III), and (iv) the **2011 Benchmark Period** (relevant for Category III).  Documentation may include:

- Paycheck stubs; and/or

- Other employer records documenting actual amounts paid, if applicable; and/or

- Bank records showing income deposits and supporting documentation indicating the source of those deposits; and/or

7

028845

- A bank statement or other contemporaneous documentation verifying the absence of income for all or part of the **Compensation Period**; and/or

- Receipts or records from check cashing and payday loan services; and/or

- Contracts for employment accompanied by documentation establishing that wages or other amounts to be paid pursuant to the contract, if applicable, were in fact paid; and/or

- Pay period earnings detail submitted under oath and included in court filings (for example, documentation provided in connection with divorce, child support, or wage garnishment proceedings).

R. **Reimbursable Search Costs**:  Documented travel and job search costs actually incurred after April 20, 2010 in searching for alternative employment due to job loss or work reduction after the DWH Spill.

S. **Reimbursable Search Cost Documentation**:  Documents reflecting all amounts incurred for **Reimbursable Search Costs** sought by the claimant.

T. **Reimbursable Training Costs**:  Training, licensing and educational tuition, fees, and similar expenses for courses or programs related to improving job skills or securing alternate employment (*i.e.*, education not in pursuit of a two- or four-year degree) in which claimant enrolled and participated commencing on or after April 21, 2010 through December 31, 2010 due to job loss or work reduction after the DWH Spill.

U. **Reimbursable Training Cost Documentation**:  Documents reflecting all amounts paid for **Reimbursable Training Costs** sought by the claimant, and all certificates, course credits, diplomas, or licenses obtained by the claimant based upon the claimant's completion of such training.

V. **Risk Transfer Premium ("RTP")**:  A factor by which **Claimant Lost Income** may be multiplied as defined and agreed to in the **Economic And Property Damages Settlement Agreement**.

W. **Seasonal Employee**:  An **Individual** with earnings during 6 or fewer consecutive months during the **Base Year(s)** but who was not employed as of April 20, 2010, and who as of that date had accepted an offer of employment for a later period in 2010 which subsequently was withdrawn or amended during 2010 after the DWH Spill.

X. **Spill-Related Payments**:  Compensation paid to a claimant by BP or GCCF related to the DWH Spill for loss of earnings for the **Claiming Job**, including (but not limited to) payments made pursuant to the BP/GCCF Oil Pollution Act of 1990 ("OPA") claims facilities.

Y. **Sworn Written Statement**:  A written statement submitted under penalties of perjury, which may be submitted electronically, along with any attachments, but which must be manually signed by the person making the statement and reflect such manual signature.  In addition,

8

028846

the statement may have a second, electronic signature using an approved technology such as (but not limited to) Adobe Echosign.[7] A **Sworn Written Statement** submitted by a claimant is a **Claimant Sworn Written Statement** and a **Sworn Written Statement** submitted by a claimant's employer is an **Employer Sworn Written Statement**.

Z. **Tax Information Documents**: **Tax Returns** and Forms W-2 and/or 1099.

AA. **Tax Returns**: Federal or state income tax returns, including any relevant supporting schedules.

## Sworn Claim Form Requirement

Each claimant must complete and submit a Claim Form which the claimant shall verify under penalties of perjury. The Claim Form shall direct the claimant to provide information, including the claimant's chosen **Base Year(s)** and **Compensation Period**. The claimant shall attach required documents supporting the claim. All statements made in, and documents submitted with, the Claim Form may be verified as judged necessary by the **Claims Administrator**. The claimant shall provide forms in which the claimant shall authorize the **Claims Administrator** to: (1) verify employment and obtain copies of wage records, (2) obtain **Tax Information Documents** from the Internal Revenue Service and/or Social Security Administration, and (3) confirm any bank account information used in support of a claim, but the authorization for bank records shall be limited to the **Benchmark Period** (or the **2011 Benchmark Period**, where relevant) and **Compensation Period**. The Claim Form may be submitted in electronic fashion, including scanning of documents or copies of verification from public databases providing the same information as would be provided by the original document. The Claim Form and any **Sworn Written Statements** must be manually signed and reflect such manual signature. In addition, the Claim Form and any **Sworn Written Statement** may have a second, electronic signature using an approved technology such as (but not limited to) Adobe Echosign.[8]

---

[7] The parties agree that the signed statement must be as fully enforceable against the maker as a hand-signed statement. If and to the extent it is determined that an e-signed statement will be so enforceable, then an e-signed statement alone will suffice.

[8] The parties agree that the signed statement must be as fully enforceable against the maker as a hand-signed statement. If and to the extent it is determined that an e-signed statement will be so enforceable, then an e-signed statement alone will suffice.

028847

**I. CATEGORY I: INDIVIDUAL CLAIMANTS WITH CONTEMPORANEOUS TAX INFORMATION DOCUMENTS FOR 2010 AND BENCHMARK PERIOD**

If available, the **Individual** claimant must provide claimant's federal or state **Tax Returns** or Forms W-2 and/or 1099 for the **Compensation Period** and for the **Base Year(s)**.[9] In such cases, the **Individual** claimant's compensation shall be calculated according to this Category I. If **Tax Returns** or Forms W-2 and/or 1099 are not available, the claimant must provide a written statement under oath attesting that no **Tax Returns** are available and attesting that the claimant made diligent efforts to obtain Forms W-2 from his or her employer. An **Individual** claimant who is a **Career Changer** should proceed to Category III. A claimant who lacks **Tax Information Documents** and/or data for a **Benchmark Period** cannot proceed under this Category I and should proceed to Category II, III or IV, as relevant.

A. **Documentation Requirements**

1. **Documentation Establishing Employment Earnings:** For each year included in the **Base Year(s)**, and for 2010, **Individual** claimants must provide at least one of the following **Tax Information Documents**:

   - Federal tax Form 1040 pages 1 and 2, all pages of Schedules C, E, and F, and any supporting statements attached to the Form 1040 filing (including Form W-2s for joint returns); or
   - State tax return, including any supporting schedules or statements; or
   - Forms W-2 documenting earnings; and/or
   - Forms 1099 documenting earnings.

2. **Documentation Establishing Pay Period Earnings:** To the extent available, a claimant must provide **Pay Period Earnings Documentation** for the **Benchmark Period** and for 2010. A claimant also must provide documentation to establish any bonuses and/or commissions received during the **Benchmark Period** and the **Compensation Period**, as well as bonuses and/or commissions received during January or February of the **Base Year(s)**, 2010 and 2011 for all jobs worked.

   To the extent **Pay Period Earnings Documentation** is unavailable, the claimant shall so indicate in the sworn Claim Form, and earnings shall be treated as earned evenly throughout each year.

3. **Documentation Of Earnings From Other Sources During the Compensation Period:** Claimants must also submit documents sufficient to establish the source(s) and amounts of earnings, if any, from other post-DWH Spill sources of income including: (1) **Spill-Related**

---

[9] If an **Individual** claimant has not maintained copies of his or her federal income tax returns, he or she shall request a copy or transcript directly from the IRS. If a claimant has not maintained copies of his or her Forms W-2, he or she shall request copies directly from the IRS or each employer he or she worked for during the **Compensation Period** and the **Benchmark Period**. A federal **Tax Information Document** shall be considered available if it exists and is in the claimant's possession or has not been requested from the IRS and/or employer.

028848

**Payments**, and (2) compensation received from and hours worked in each employment position other than the **Claiming Job(s)**. The types of documents sufficient to satisfy this requirement are as follows:

- Forms W-2, paycheck stubs or other employer-provided payroll information; and/or
- Bank records showing income deposits and supporting documentation indicating the source of those deposits; and/or
- Documents from BP/GCCF showing payment and BP/GCCF Claim Number; and/or
- Forms 1099; and/or
- Receipts from check cashing services; and/or
- Other documents provided by an employer setting forth for such other employment position(s) (i) required hours of work, (ii) actual hours worked by claimant, and (iii) compensation rate.

4. **Documentation Establishing Other Costs/Losses:** The claimant may also submit **Reimbursable Training Cost Documentation**, **Reimbursable Search Cost Documentation**, and/or documentation regarding **Employment-Related Benefits Losses**.

5. **Additional Claimant Documentation:**

   a. **Claimant Employability Documentation:** Consists of both:

      i. A copy of a Social Security card, government-issued identification (for example, a valid driver's license), temporary worker visa, or green card that was valid as of April 20, 2010 for the claimant, or a print out from a public database providing the same information as would be provided by the original document;

      AND

      ii. Evidence the claimant was at least 16 years of age as of April 20, 2010. Acceptable evidence includes a copy of a valid driver's license, a valid passport, a certified copy of the claimant's birth certificate, or a print out from a public database providing the same information as would be provided by the original document.

   b. **Licensing Documentation:** If claimant's employment requires a government-issued license/permit, a copy of valid 2010 and 2011 licenses, if appropriate, or a print out from a public database providing the same information as would be provided by the original document. Licenses could include, but are not limited to:

      i. Taxi/livery licenses.

      ii. Real Estate Sales licenses.

      iii. Other licenses and permits related to income sources.

028849

    c. If the claimant's employment in the **Claiming Job** was terminated between April 20, 2010 and December 31, 2010, the claimant shall have the burden of proof to establish the termination was not for cause. The termination shall be deemed not for cause if:

        i. The claimant establishes that he or she filed for and received unemployment, including, for example, as evidenced by Form 1099 G.

        OR

        ii. Claimant provides a letter from the former employer or an **Employer Sworn Written Statement** confirming termination was not for cause. Any such letter must include contact information for an authorized representative of the employer.

        OR

        iii. Other documentation acceptable to the **Claims Administrator** that establishes that the claimant was not terminated for cause.

6. <u>Additional Documentation to Establish Causation Presumptions</u>:

If the claimant seeks to qualify for a causation presumption as set forth in Sections I.B.1 and I.B.2.a, the claimant must provide documentation for 2010 to establish that the claimant or the claimant's employer satisfies (or satisfied) the geographic requirements and/or the definition of an entity or Natural Person included in the **Primary Seafood Industry**, **Secondary Seafood Industry**, **Tourism**,[10] or **Charter Fishing**[11] as applicable. To satisfy this requirement, the claimant must demonstrate the employer's location and the following:

    a. That the claimant works or worked for an employer that filed a claim in the MDL No. 2179 settlement process and was determined by the **Claims Administrator** to satisfy one of the above-listed definitions;

    OR

    b. That the claimant's **Tax Information Documents**, **Pay Period Earnings Documentation**, or other documentation establishes that the claimant's employer satisfies one of the above-listed definitions.

B. <u>Causation Requirements</u>

In order to establish causation under this Category I, a claimant must satisfy the following:

1. The claimant must have been employed in the **Claiming Job** on April 20, 2010, unless the claimant is a **Seasonal Employee** who can provide evidence of historical seasonal employment beginning after April 20 in the **Base Year(s)**.

---

[10] The definition of **Tourism** is set forth in the **Tourism Definition**, Bates 026632 - 026646.
[11] The definition of **Charter Fishing** is set forth in Definitions Section 38 of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement.

028850

2.  The claimant must satisfy one of the following:

   a.  **Individual Claimants With Presumed Causation:**  The DWH Spill shall be presumed to be the cause of lost earnings for a **Claiming Job** during the **Compensation Period** for the following categories of claimants who submit the required documentation, provided that the claimant can demonstrate that any loss of income or employment related to the **Claiming Job** was not a function of the claimant's termination for cause pursuant to the Documentation Requirements set forth in Section I.A.5.c:

      i.  If a claimant is an **Individual** seeking compensation for an economic loss relating to employment within Zone A,[12] the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

      ii.  If a claimant is an individual seeking compensation for an economic loss for a job in which he or she was employed by, or exclusively serviced, an entity or Natural Person that satisfies the **Primary Seafood Industry** definition as set forth in the **Seafood Distribution Chain Definitions**, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

      iii.  If a claimant is an individual seeking compensation for an economic loss for a job in which he or she was employed by an entity or Natural Person that satisfies the **Secondary Seafood Industry** definition as set forth in the **Seafood Distribution Chain Definitions**, and the entity or Natural Person was located in Zones B or C, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

      iv.  If the claimant is an **Individual** seeking compensation for an economic loss for a job in which he or she was employed by a business located in Zone B that meets the definition of **Tourism**, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

      v.  If the claimant is an **Individual** seeking compensation for an economic loss for a job in which he or she was employed by an entity or Natural Person that satisfies the definition of **Charter Fishing**, and the **Charter Fishing** business was located in Zones A, B or C, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

---

[12] For purposes of this **Framework for Individual Economic Loss Claims**, the presumption shall be that the location of economic loss for the **Claiming Job** is the location of the claimant's employer within the Class Definition geographic area, not the claimant's residence.  Claimants may establish an alternative location of economic loss for the **Claiming Job** other than their employer's location by providing evidence that their primary employment activities and responsibilities occur in a location different from their employer's business address, and that the claimed DWH Spill-related economic loss occurred at such location.  For example, the claimant works for a housekeeping company located in Zone C that services households in Zones A, B and C, including vacation condominiums located in Zone A, and the claimant establishes that she works primarily in Zone A.

028851

OR

    b. <u>**Individual Claimants Without Presumed Causation:**</u>  If a claimant is not entitled to a causation presumption as set forth in Section I.B.2.a, the claimant can establish causation for a **Claiming Job** during the **Compensation Period** only by satisfying the requirements of one of the following sub-sections:

        i. Causation is established if the **Claiming Job** is with an **Eligible Employer**.  The **Claims Administrator** shall verify that the employer is an **Eligible Employer**.

        ii. Causation for a **Claiming Job** is established if the claimant provides an **Employer Sworn Written Statement** attributing the claimant's loss of income during the **Compensation Period** to the DWH Spill.  The **Employer Sworn Written Statement** must articulate in detail how the claimant's losses at the **Claiming Job** are causally related to the DWH Spill.  Such **Employer Sworn Written Statement** must also include contact information for an authorized representative of the employer.

        iii. The **Claims Administrator** shall evaluate the credibility and reliability of the information provided by the employer and the claimant, including any **Sworn Written Statements**, and have the right to request supplemental documentation and/or to interview the employer in accordance with the **Addendum Regarding Interviews of Claimant Alleging Economic Loss**.

## C. <u>Compensation Calculation</u>

The **Claims Administrator** shall use **Tax Information Documents** and other supporting documentation provided by the claimant to calculate the **Claimant Lost Earnings**.  As set forth in the steps below, **Claimant Lost Earnings** includes: (1) any reduction in earnings between the **Compensation Period** and the **Benchmark Period** for each **Claiming Job**, plus (2) any lost potential earnings growth expected for each **Claiming Job** in the absence of the DWH Spill, minus (3) any **Offsetting Earnings**.  Lost potential earnings growth expected for each **Claiming Job** shall be determined through application of (a) a **Claimant Specific Growth Factor**, or (b) a **General Growth Factor**; in addition, for claims based on non-salaried, hourly-wage jobs, an **Industry Growth Factor** is applied.

The claimant shall receive a lump-sum final payment that includes compensation for **Claimant Lost Earnings**, plus any applicable **RTP** agreed upon by the parties, plus compensation for properly documented **Employment-Related Benefits Losses**, **Reimbursable Training Costs** and **Reimbursable Search Costs**, or **One Time, Non-Recurring Event Commission Compensation**, if any, less any **Spill-Related Payments**.

Example compensation calculations are set forth in Appendices A through F attached hereto.

### <u>Step 1:  Claimant Selects Compensation Period and Benchmark Period</u>

    1. Claimant selects a **Compensation Period**.  For a claimant who (i) was terminated for cause in 2010 from the **Claiming Job(s)**, or (ii) otherwise ended employment at the

028852

**Claiming Job(s)** in 2010 for reasons unrelated to the DWH Spill, the **Compensation Period** may not extend beyond the termination date.

2. Claimant selects a **Base Year(s)**.

**Step 2: Determine Benchmark Period Earnings for the Months Corresponding to the Compensation Period**

Earnings during the **Benchmark Period** months (as evidenced by **Tax Information Documents**) shall include earned income from each **Claiming Job** (or comparable job) and shall be assumed to have been earned evenly throughout the year unless the claimant provides **Pay Period Earnings Documentation** sufficient to establish actual earnings distribution throughout the year. All bonuses and/or commissions shall be allocated pro rata across the period for which they were awarded, and annual performance bonuses paid in January and February shall be assumed to relate to the prior calendar year, unless the documents establish that the bonus related to a specific period of time.

**Step 3: Determine Earnings Growth Factor(s)**

1. *Claimant Specific Growth Factor*: For claimants who provide **Pay Period Earnings Documentation** sufficient to calculate a **Claimant Specific Growth Factor**, the following **Growth Factors** may apply:

   a. Claimant Specific Growth Factor is defined, and the calculation is explained, in Definitions Section N.1.

   b. Industry Growth Factor is defined in Definitions Section N.3.

2. *Claimants for Whom Claimant Specific Growth Factor Is Not Applicable*: For claimants unable to provide **Pay Period Earnings Documentation** sufficient to calculate a **Claimant Specific Growth Factor** and for **Seasonal Employees**, no **Claimant Specific Growth Factor** shall apply. Instead, the following **Growth Factors** may apply:

   a. General Growth Factor is defined in Definitions Section N.2 and is 2.0%.

   b. Industry Growth Factor is defined in Definitions Section N.3: For claims based on non-salaried, hourly-wage jobs, an **Industry Growth Factor** of 1.5% shall be applied.

**Step 4: Calculate Expected Earnings**

Expected Earnings equal the **Benchmark Period** earnings calculated in Step 2 increased by the applicable **Growth Factors** (from Step 3).

*Expected Earnings = Benchmark Period Earnings from Step 2 x (1 + applicable Step 3 Growth Factor(s))*

**Step 5: Determine Actual Earnings and Any Offsetting Earnings In The Compensation Period**

Actual Earnings for all **Claiming Jobs** and any applicable **Offsetting Earnings** during the **Compensation Period** shall be determined based on **Tax Information Documents** and **Pay**

15

Period Earnings Documentation provided by the claimant and other documentation relevant to determining **Offsetting Earnings**.

To the extent the claimant does not have **Pay Period Earnings Documentation** for a **Claiming Job**, **Actual Earnings** during the **Compensation Period** shall be estimated for that **Claiming Job** by dividing the claimant's total 2010 **Claiming Job** earnings by 12 and multiplying that amount by the number of months in the **Compensation Period**. All bonuses and/or commissions shall be allocated pro rata across the periods for which they were awarded, and annual performance bonuses paid in January and February shall be assumed to relate to the prior calendar year, unless the documents establish that the bonus related to a specific period of time.

**Offsetting Earnings** and **Actual Earnings** from all **Claiming Jobs** shall be calculated giving consideration to all **Claiming Jobs**, provided that:

1. If the claimant has only one **Claiming Job**, then:

    i. If **Pay Period Earnings Documentation** (or other documentation relevant to calculating **Offsetting Earnings**) reflects the same or an increased number of hours worked at the **Claiming Job** in the **Compensation Period** relative to the **Claiming Job** (or comparable job) in the **Benchmark Period**, **Actual Earnings** shall be limited to earnings from the **Claiming Job** (or comparable job) over the same total number of hours worked in the **Benchmark Period**, and no **Offsetting Earnings** shall apply.

       OR

    ii. If **Pay Period Earnings Documentation** (or other documentation) (i) reflects a decrease in hours worked at the **Claiming Job** during the **Compensation Period**, and (ii) the claimant's **Pay Period Earnings Documentation** reflects additional hours worked at a **Non-Claiming Job** (whether such **Non-Claiming Job** was held in the **Benchmark Period** or is a new position), **Offsetting Earnings** shall be calculated and factored into the determination of **Claimant Lost Earnings**.

2. If the claimant has more than one **Claiming Job**, then:

    i. If **Pay Period Earnings Documentation** (or other documentation relevant to calculating **Offsetting Earnings**) for all **Claiming Jobs** reflects the same or an increased number of total hours worked across all **Claiming Jobs** during the **Compensation Period** (relative to all **Claiming Jobs** (or comparable jobs) in the **Benchmark Period**), aggregate **Actual Earnings** in the **Compensation Period** shall be limited to total earnings from all **Claiming Jobs** (or comparable jobs) over the same number of total hours worked in the **Benchmark Period**, provided that earnings from hours lost in one **Claiming Job** shall be replaced by earnings from the same number of hours worked in a different **Claiming Job** during the **Compensation Period**. No **Offsetting Earnings** shall apply.

16

OR

    ii. If **Pay Period Earnings Documentation** (or other documentation relevant to calculating **Offsetting Earnings**) for all **Claiming Jobs** reflects (i) fewer total hours worked across all **Claiming Jobs** during the **Compensation Period** (relative to all **Claiming Jobs** (or comparable jobs) in the **Benchmark Period**), but (ii) more hours worked in one (or more) **Claiming Job(s)** in the **Compensation Period** (relative to the same **Claiming Job(s)** in the **Benchmark Period**), aggregate **Actual Earnings** in the **Compensation Period** shall include total earnings from all **Claiming Jobs** (or comparable jobs) in the **Compensation Period**. If the claimant's **Pay Period Earnings Documentation** also reflects additional hours worked at a different (**Non-Claiming Job**) position (whether such position was held in the **Benchmark Period** or is a new position), **Offsetting Earnings** shall be calculated and factored into the determination of **Claimant Lost Earnings** for the number of hours representing the difference between (a) total hours worked in all **Claiming Jobs** in the **Compensation Period**, and (b) total hours worked in all **Claiming Jobs** in the **Benchmark Period**.

OR

    iii. If **Pay Period Earnings Documentation** (or other documentation) for all **Claiming Jobs** (i) reflects a decrease in hours worked at each **Claiming Job** during the **Compensation Period**, and (ii) the claimant's **Pay Period Earnings Documentation** reflects additional hours worked at a different position (whether such position was held in the **Benchmark Period** or is a new position), **Offsetting Earnings** shall be calculated and factored into the determination of **Claimant Lost Earnings** for the total lost hours.

OR

    iv. If the claimant does not have **Pay Period Earnings Documentation** (or other documentation establishing hours worked) for all **Claiming Jobs**, then **Actual Earnings** shall include all earnings from all **Claiming Jobs** and **Offsetting Earnings** shall apply.

### Step 6: Determine Claimant Lost Earnings

**Claimant Lost Earnings** shall be calculated as (a) the difference between (i) the claimant's **Expected Earnings** during the **Compensation Period** (Step 4) from all **Claiming Jobs** and (ii) the claimant's **Actual Earnings** during the **Compensation Period**, as adjusted, if relevant, (Step 5) from all **Claiming Jobs**, reduced by (b) any applicable **Offsetting Earnings**.

### Step 7: Calculate Final Claimant Compensation

**Final Claimant Compensation** shall be **Claimant Lost Earnings** (Step 6) adjusted as follows:

1. Add any applicable **RTP** agreed to by the parties. For an employee terminated for cause from a **Claiming Job**, no **RTP** shall apply.

17

028855

– For claimants whose **Claimant Lost Earnings** result from more than one **Claiming Job**, the claimant's applicable **RTP** shall be calculated based on (i) the percentage of total **Claimant Lost Earnings** related to each **Claiming Job**, multiplied by (ii) the **RTP** applicable to each **Claiming Job**, which is determined by the job type (**Tourism**/Other Industries) and zone (Zone A, B, C or D). For example, a claimant with 50% of their lost earnings from a job Zone A hotel, and 50% of their lost earnings from a job in a Zone C restaurant shall receive an **RTP** that is calculated as follows:

$$\text{Applicable RTP} = .5 * \text{RTP}_{\text{Zone A Tourism (hotel)}} + .5 * \text{RTP}_{\text{Zone C Tourism (restaurant)}}$$

2. Add any **Reimbursable Training Costs**. **Reimbursable Training Costs** shall be fully reimbursed if the training led directly to earned income in 2010. If no corresponding income was earned in 2010, then **Reimbursable Training Costs** shall be reimbursed up to $2,000.

   For example: A claimant who paid $3,000 after April 20, 2010 to secure a commercial trucking license and who earned income as a commercial trucker in 2010 shall receive $3,000 in reimbursement. If the claimant earned no income from commercial trucking during 2010, the claimant would receive a $2,000 reimbursement.

3. Add any **Reimbursable Search Costs**.

4. Add any applicable **Employment-Related Benefits Losses**.

5. Add any **One Time, Non-Recurring Event Compensation**.

6. Subtract any **Spill-Related Payments**.

7. The formula for **Final Claimant Compensation** is:

   Claimant Lost Earnings

   + (**Claimant Lost Earnings x any applicable RTP**)

   + **Employment-Related Benefits Losses** (if applicable)

   + **Reimbursable Training Costs** (full if led to earned income in 2010 from area of training, otherwise $2,000) (if applicable)

   + **Reimbursable Search Costs** (if applicable)

   + **One Time, Non-Recurring Event Compensation** (if applicable)

   - **Spill-Related Payments** (if applicable)

   - VoO Settlement Offset and/or VoO Earned Income Offset (if any)

18

**II.** **CATEGORY II:  INDIVIDUAL CLAIMANTS WITH PAY PERIOD OR OTHER EARNINGS DOCUMENTATION FOR 2010 AND BENCHMARK PERIOD**[13]

    **Individual** claimants who do not have **Tax Information Documents** available for either 2010 or the **Base Year(s)** may instead provide **Pay Period Earnings Documentation** sufficient to establish earnings during the **Compensation Period** and the **Benchmark Period**.  Such **Individual** claimants must provide a written statement under oath attesting that no **Tax Returns** are available and attesting that the claimant made diligent efforts to obtain Forms W-2 from his or her employer and stating that they are not available.  An **Individual** claimant who is a **Career Changer** should proceed to Category III.  An **Individual** claimant who lacks **Tax Information Documents** and **Pay Period Earnings Documentation** for the **Benchmark Period** and/or 2010 must so state in the sworn Claim Form.  In such circumstances, claimant cannot proceed under this Category II and should proceed to Category III or IV to the extent the claimant qualifies under any such Category.

A.  **Documentation Requirements**

    1.  **Documentation Establishing Employment Earnings:**  To the extent available, the claimant must provide **Pay Period Earnings Documentation** for the **Benchmark Period** and for 2010.  Where incomplete **Pay Period Earnings Documentation** is provided, **Expected Earnings** and **Actual Earnings** shall be calculated based only on the actual documentation provided.  A claimant also must provide documentation to establish any bonuses and/or commissions received during the **Benchmark Period** and the **Compensation Period**, as well as bonuses and/or commissions received during January or February of the **Base Year(s)**, 2010 and 2011 for all jobs worked.

    2.  **Documentation Of Earnings From Other Sources During the Compensation Period:**  Claimants must also submit documents sufficient to establish the source(s) and amounts of earnings, if any, from other post-DWH Spill sources of income including:  (1) **Spill-Related Payments**, and (2) compensation received from and hours worked in each employment position other than the **Claiming Job(s)**.  The types of documents sufficient to satisfy this requirement are as follows:

- Forms W-2, paycheck stubs or other employer-provided payroll information; and/or
- Bank records showing income deposits and supporting documentation indicating the source of those deposits; and/or
- Document from BP/GCCF showing payment and BP/GCCF Claim Number; and/or
- Forms 1099; and/or
- Receipts from check cashing services; and/or
- Other documents provided by an employer setting forth for such other employment position(s) (i) required hours of work, (ii) actual hours worked by claimant, and

---

[13] A claimant who has no job earnings from any **Benchmark Period** may not proceed under Category II but should proceed to Category III as a potential **New Entrant To Employment** or **Claimant Who Had Less Than Twelve Months Of Earnings History But Was Employed On April 20, 2010**, or to Category IV, as relevant.

028857

        (iii) compensation rate.

3. **Documentation Establishing Other Costs/Losses**:  The claimant may also submit **Reimbursable Training Cost Documentation**, **Reimbursable Search Cost Documentation**, and/or documentation regarding **Employment-Related Benefits Losses**.

4. **Additional Claimant Documentation**

    a. **Claimant Employability Documentation**:  Consists of both:

        i. A copy of a Social Security card, government-issued identification (for example, a valid driver's license), temporary worker visa, or green card that was valid as of April 20, 2010 for the claimant, or a print out from a public database providing the same information as would be provided by the original document;

        AND

        ii. Evidence the claimant was at least 16 years of age as of April 20, 2010. Acceptable evidence includes a copy of a valid driver's license, a valid passport, a certified copy of the claimant's birth certificate, or a print out from a public database providing the same information as would be provided by the original document.

    b. **Licensing Documentation**:  If claimant's employment requires a government-issued license/permit, a copy of valid 2010 and 2011 licenses, if appropriate, or a print out from a public database providing the same information as would be provided by the original document.  Licenses could include, but are not limited to:

        i. Taxi/livery licenses.

        ii. Real Estate Sales licenses.

        iii. Other licenses and permits related to income sources.

    c. If the claimant's employment in the **Claiming Job** was terminated between April 20, 2010 and December 31, 2010, the claimant shall have the burden of proof to establish the termination was not for cause.  The termination shall be deemed not for cause if:

        i. The claimant establishes that he or she filed for and received unemployment, including, for example, as evidenced by Form 1099 G.

        OR

        ii. Claimant provides a letter from the former employer or an **Employer Sworn Written Statement** confirming termination was not for cause.  Any such letter must include contact information for an authorized representative of the employer.

        OR

        iii. Other documentation acceptable to the **Claims Administrator** that establishes that the claimant was not terminated for cause.

028858

5.  **Additional Documentation to Establish Causation Presumptions**:

If the claimant seeks to qualify for a causation presumption as set forth in Sections II.B.1 and II.B.2.a, the claimant must provide documentation for 2010 to establish that the claimant or the claimant's employer satisfies (or satisfied) the geographic requirements and/or the definition of an entity or Natural Person included in the **Primary Seafood Industry**, **Secondary Seafood Industry**, **Tourism**,[14] or **Charter Fishing**[15] as applicable.  To satisfy this requirement, the claimant must demonstrate the employer's location and the following:

a.  That the claimant works or worked for an employer that filed a claim in the MDL No.  2179 settlement process and was determined by the **Claims Administrator** to satisfy one of the above-listed definitions;

OR

b.  That the claimant's **Tax Information Documents**, **Pay Period Earnings Documentation**, or other documentation establishes that the claimant's employer satisfies one of the above-listed definitions.

B.  **Causation Requirements**

In order to establish causation under this Category II, a claimant must satisfy the following:

1.  The claimant must have been employed in the **Claiming Job** on April 20, 2010, unless the claimant is a **Seasonal Employee** who can provide evidence of historical seasonal employment beginning after April 20 in the **Base Year(s)**.

2.  The claimant must satisfy one of the following:

a.  **Individual Claimants With Presumed Causation**:  The DWH Spill shall be presumed to be the cause of lost earnings for a **Claiming Job** during the **Compensation Period** for the following categories of claimants who submit the required documentation, provided that the claimant can demonstrate that any loss of income or employment related to the **Claiming Job** was not a function of the claimant's termination for cause pursuant to the Documentation Requirements set forth in Section II.A.4.c:

i.  If a claimant is an **Individual** seeking compensation for an economic loss relating to employment within Zone A,[16] the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

---

[14] The definition of **Tourism** is set forth in the **Tourism Definition**, Bates 026632 - 026646.

[15] The definition of **Charter Fishing** is set forth in Definitions Section 38 of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement.

[16] For purposes of this **Framework for Individual Economic Loss Claims**, the presumption shall be that the location of economic loss for the **Claiming Job** is the location of the claimant's employer within the Class Definition geographic area, not the claimant's residence.  Claimants may establish an alternative location of economic loss for the **Claiming Job** other than their employer's location by providing evidence that their primary employment activities and responsibilities occur in a location different from their employer's business address, and that the claimed DWH Spill-related economic loss occurred at such location.  For example, the claimant works for a

028859

    ii.   If a claimant is an individual seeking compensation for an economic loss for a job in which he or she was employed by, or exclusively serviced, an entity or Natural Person that satisfies the **Primary Seafood Industry** definition as set forth in the **Seafood Distribution Chain Definitions**, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

    iii.   If a claimant is an individual seeking compensation for an economic loss for a job in which he or she was employed by an entity or Natural Person that satisfies the **Secondary Seafood Industry** definition as set forth in the **Seafood Distribution Chain Definitions**, and the entity or Natural Person was located in Zones B or C, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

    iv.   If the claimant is an **Individual** seeking compensation for an economic loss for a job in which he or she was employed by a business located in Zone B that meets the definition of **Tourism**, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

    v.   If the claimant is an **Individual** seeking compensation for an economic loss for a job in which he or she was employed by an entity or Natural Person that satisfies the definition of **Charter Fishing**, and the **Charter Fishing** business was located in Zones A, B or C, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

OR

b.  **Individual Claimants Without Presumed Causation**:  If a claimant is not entitled to a causation presumption as set forth in Section II.B.2.a, the claimant can establish causation for a **Claiming Job** during the **Compensation Period** only by satisfying the requirements of one of the following sub-sections:

    i.   Causation is established if the **Claiming Job** is with an **Eligible Employer**.  The **Claims Administrator** shall verify that the employer is an **Eligible Employer**.

    ii.   Causation for a **Claiming Job** is established if the claimant provides an **Employer Sworn Written Statement** attributing the claimant's loss of income during the **Compensation Period** to the DWH Spill.  The **Employer Sworn Written Statement** must articulate in detail how the claimant's losses at the **Claiming Job** are causally related to the DWH Spill.  Such **Employer Sworn Written Statement** must also include contact information for an authorized representative of the employer.

    iii.   The **Claims Administrator** shall evaluate the credibility and reliability of the information provided by the employer and the claimant, including any **Sworn Written Statements**, and have the right to request supplemental

---

housekeeping company located in Zone C that services households in Zones A, B and C, including vacation condominiums located in Zone A, and the claimant establishes that she works primarily in Zone A.

documentation and/or to interview the employer in accordance with the **Addendum Regarding Interviews of Claimant Alleging Economic Loss**.

C. <u>Compensation Calculation</u>

The **Claims Administrator** shall use **Pay Period Earnings Documentation** or annual employer-provided payroll information submitted by the claimant pursuant to Section II.A, and other supporting documentation provided by the claimant, to calculate the **Claimant Lost Earnings**. As set forth in the steps below, **Claimant Lost Earnings** includes: (1) any reduction in earnings between the **Compensation Period** and the **Benchmark Period** for each **Claiming Job**, plus (2) any lost potential earnings growth expected for each **Claiming Job** in the absence of the DWH Spill, minus (3) any **Offsetting Earnings**. Lost potential earnings growth expected for each **Claiming Job** shall be determined through application of (a) a **Claimant Specific Growth Factor**, or (b) a **General Growth Factor**; in addition, for claims based on non-salaried, hourly-wage jobs, an **Industry Growth Factor** is applied.

The claimant shall receive a lump-sum final payment that includes compensation for **Claimant Lost Earnings**, plus any applicable **RTP** agreed upon by the parties, plus compensation for properly documented **Employment-Related Benefits Losses**, **Reimbursable Training Costs** and **Reimbursable Search Costs**, or **One Time, Non-Recurring Event Commission Compensation**, if any, less any **Spill-Related Payments**.

Example compensation calculations are set forth in Appendices A through F attached hereto.

<u>Step 1:  Claimant Selects Compensation Period and Benchmark Period</u>

1. Claimant selects a **Compensation Period**. For a claimant who (i) was terminated for cause in 2010 from the **Claiming Job(s)**, or (ii) otherwise ended employment at the **Claiming Job(s)** in 2010 for reasons unrelated to the DWH Spill, the **Compensation Period** may not extend beyond the termination date.

2. Claimant selects a **Base Year(s)**.

<u>Step 2:  Determine Benchmark Period Earnings for the Months Corresponding to the Compensation Period</u>

Earnings during the **Benchmark Period** shall be established on the basis of **Pay Period Earnings Documentation** and shall include earned income from each **Claiming Job** (or comparable job). The specific determination of earnings for the **Benchmark Period** shall depend on the nature and extent of the **Pay Period Earnings Documentation** provided. For example, if the claimant submits **Pay Period Earnings Documentation** that covers only discrete portions of a given calendar year (e.g., employee commission statements from May 2009 and December 2009), the **Claims Administrator** shall base the **Benchmark Period** earnings only on the actual documentation provided (*i.e.,* data shall not be extrapolated to periods for which **Pay Period Earnings Documentation** was not provided).

If the claimant submits **Pay Period Earnings Documentation** that provides data as to full year earnings but not the allocation of those earnings (*i.e.,* a year-end paystub), and if the

23

claimant also provides additional **Pay Period Earnings Documentation** deemed by the **Claims Administrator** to be sufficient for purposes of allocating those earnings across the relevant period, earnings shall be allocated accordingly. If no additional information is provided regarding the allocation of those earnings, the **Claims Administrator** shall assume a pro rata distribution over the relevant period.

All bonuses and/or commissions shall be allocated pro rata across the period for which they were awarded, and annual performance bonuses paid in January and February shall be assumed to relate to the prior calendar year, unless the documents establish that the bonus related to a specific period of time.

### Step 3: Determine Earnings Growth Factor(s)

1. *Claimant Specific Growth Factor*: For claimants who provide **Pay Period Earnings Documentation** sufficient to calculate a **Claimant Specific Growth Factor**, the following **Growth Factors** may apply:

   a. **Claimant Specific Growth Factor** is defined, and the calculation is explained, in Definitions Section N.1).

   b. **Industry Growth Factor** is defined in Definitions Section N.3.

2. *Claimants for Whom Claimant Specific Growth Factor Is Not Applicable*: For claimants unable to provide **Pay Period Earnings Documentation** sufficient to calculate a **Claimant Specific Growth Factor** and for **Seasonal Employees**, no **Claimant Specific Growth Factor** shall apply. Instead, the following **Growth Factors** may apply:

   a. **General Growth Factor** is defined in Definitions Section N.2 and is 2.0%.

   b. **Industry Growth Factor** is defined in Definitions Section N.3: For claims based on non-salaried, hourly-wage jobs, an **Industry Growth Factor** of 1.5% shall be applied.

### Step 4: Calculate Expected Earnings

**Expected Earnings** equal the **Benchmark Period** earnings calculated in Step 2 increased by the applicable **Growth Factors** (from Step 3).

*Expected Earnings = Benchmark Period Earnings from Step 2 x (1 + applicable Step 3 Growth Factor(s))*

### Step 5: Determine Actual Earnings and Any Offsetting Earnings In The Compensation Period

**Actual Earnings** for all **Claiming Jobs** and any applicable **Offsetting Earnings** during the **Compensation Period** shall be determined based on **Pay Period Earnings Documentation** provided by the claimant and other documentation relevant to determining **Offsetting Earnings**. All bonuses and/or commissions shall be allocated pro rata across the period for which they were awarded, and annual performance bonuses paid in January and February shall be assumed to relate to the prior calendar year, unless the documents establish that the bonus related to a specific period of time.

24

028862

**Offsetting Earnings** and **Actual Earnings** from all **Claiming Jobs** shall be calculated giving consideration to all **Claiming Jobs**, provided that:

1. If the claimant has only one **Claiming Job**, then:

   i. If **Pay Period Earnings Documentation** (or other documentation relevant to calculating **Offsetting Earnings**) reflects the same or an increased number of hours worked at the **Claiming Job** in the **Compensation Period** relative to the **Claiming Job** (or comparable job) in the **Benchmark Period**, **Actual Earnings** shall be limited to earnings from the **Claiming Job** (or comparable job) over the same total number of hours worked in the **Benchmark Period**, and no **Offsetting Earnings** shall apply.

   OR

   ii. If **Pay Period Earnings Documentation** (or other documentation) (i) reflects a decrease in hours worked at the **Claiming Job** during the **Compensation Period**, and (ii) the claimant's **Pay Period Earnings Documentation** reflects additional hours worked at a **Non-Claiming Job** (whether such **Non-Claiming Job** was held in the **Benchmark Period** or is a new position), **Offsetting Earnings** shall be calculated and factored into the determination of **Claimant Lost Earnings**.

2. If the claimant has more than one **Claiming Job**, then:

   i. If **Pay Period Earnings Documentation** (or other documentation relevant to calculating **Offsetting Earnings**) for all **Claiming Jobs** reflects the same or an increased number of total hours worked across all **Claiming Jobs** during the **Compensation Period** (relative to all **Claiming Jobs** (or comparable jobs) in the **Benchmark Period**), aggregate **Actual Earnings** in the **Compensation Period** shall be limited to total earnings from all **Claiming Jobs** (or comparable jobs) over the same number of total hours worked in the **Benchmark Period**, provided that earnings from hours lost in one **Claiming Job** shall be replaced by earnings from the same number of hours worked in a different **Claiming Job** during the **Compensation Period**. No **Offsetting Earnings** shall apply.

   OR

   ii. If **Pay Period Earnings Documentation** (or other documentation relevant to calculating **Offsetting Earnings**) for all **Claiming Jobs** reflects (i) fewer total hours worked across all **Claiming Jobs** during the **Compensation Period** (relative to all **Claiming Jobs** (or comparable jobs) in the **Benchmark Period**), but (ii) more hours worked in one (or more) **Claiming Job(s)** in the **Compensation Period** (relative to the same **Claiming Job(s)** in the **Benchmark Period**), aggregate **Actual Earnings** in the **Compensation Period** shall include total earnings from all **Claiming Jobs** (or comparable jobs) in the **Compensation Period**. If the claimant's **Pay Period Earnings Documentation** also reflects additional hours worked at a different (**Non-Claiming Job**) position (whether

25

028863

such position was held in the **Benchmark Period** or is a new position), **Offsetting Earnings** shall be calculated and factored into the determination of **Claimant Lost Earnings** for the number of hours representing the difference between (a) total hours worked in all **Claiming Jobs** in the **Compensation Period**, and (b) total hours worked in all **Claiming Jobs** in the **Benchmark Period**.

OR

iii.   If **Pay Period Earnings Documentation** (or other documentation) for all **Claiming Jobs** (i) reflects a decrease in hours worked at each **Claiming Job** during the **Compensation Period**, and (ii) the claimant's **Pay Period Earnings Documentation** reflects additional hours worked at a different position (whether such position was held in the **Benchmark Period** or is a new position), **Offsetting Earnings** shall be calculated and factored into the determination of **Claimant Lost Earnings** for the total lost hours.

OR

iv.   If the claimant does not have **Pay Period Earnings Documentation** (or other documentation establishing hours worked) for all **Claiming Jobs**, then **Actual Earnings** shall include all earnings from all **Claiming Jobs** and **Offsetting Earnings** shall apply.

### Step 6:  Determine Claimant Lost Earnings

**Claimant Lost Earnings** shall be calculated as (a) the difference between (i) the claimant's **Expected Earnings** during the **Compensation Period** (Step 4) from all **Claiming Jobs** and (ii) the claimant's **Actual Earnings** during the **Compensation Period**, as adjusted, if relevant (Step 5) from all **Claiming Jobs**, reduced by (b) any applicable **Offsetting Earnings**.

### Step 7:  Calculate Final Claimant Compensation

**Final Claimant Compensation** shall be **Claimant Lost Earnings** (Step 6) adjusted as follows:

1.   Add any applicable **RTP** agreed to by the parties.  For an employee terminated for cause from a **Claiming Job**, no **RTP** shall apply.

   –   For claimants whose **Claimant Lost Earnings** result from more than one **Claiming Job**, the claimant's applicable **RTP** shall be calculated based on (i) the percentage of total **Claimant Lost Earnings** related to each **Claiming Job**, multiplied by (ii) the **RTP** applicable to each **Claiming Job**, which is determined by the job type (**Tourism**/Other Industries) and zone (Zone A, B, C or D).  For example, a claimant with 50% of their lost earnings from a job Zone A hotel, and 50% of their lost earnings from a job in a Zone C restaurant shall receive an **RTP** that is calculated as follows:

$$\text{Applicable RTP} = .5 * \text{RTP}_{\text{Zone A Tourism (hotel)}} + .5 * \text{RTP}_{\text{Zone C Tourism (restaurant)}}$$

2.   Add any **Reimbursable Training Costs**.  **Reimbursable Training Costs** shall be fully reimbursed if the training led directly to earned income in 2010.  If no corresponding

26

income was earned in 2010, then **Reimbursable Training Costs** shall be reimbursed up to $2,000.

> For example:  A claimant who paid $3,000 after April 20, 2010 to secure a commercial trucking license and who earned income as a commercial trucker in 2010 shall receive $3,000 in reimbursement.  If the claimant earned no income from commercial trucking during 2010, the claimant would receive a $2,000 reimbursement.

3. Add any **Reimbursable Search Costs**.

4. Add any applicable **Employment-Related Benefits Losses**.

5.  Add any **One Time, Non-Recurring Event Compensation**.

6. Subtract any **Spill-Related Payments**.


7. The formula for **Final Claimant Compensation** is:

|   | |
|---|---|
|   | Claimant Lost Earnings |
| + | (**Claimant Lost Earnings x any applicable RTP**) |
| + | **Employment-Related Benefits Losses** (if applicable) |
| + | **Reimbursable Training Costs** (full if led to earned income in 2010 from area of training, otherwise $2,000) (if applicable) |
| + | **Reimbursable Search Costs** (if applicable) |
| + | **One Time, Non-Recurring Event Compensation** (if applicable) |
| - | **Spill-Related Payments** (if applicable) |
| - | VoO Settlement Offset and/or VoO Earned Income Offset (if any) |

27

028865

III. **CATEGORY III: CLAIMANTS WITH EARNINGS DOCUMENTATION FOR 2010 BUT WITHOUT COMPARABLE BENCHMARK PERIOD EARNINGS**

For **Individual Claimants Without Comparable Benchmark Earnings** who meet the definition of a **New Entrant To Employment**, a **Claimant Who Had Less Than Twelve Months Of Earnings History But Was Employed On April 20, 2010** or a **Career Changer**, **2011 Benchmark Period** earnings shall be used to establish **Expected Earnings**, provided that if no such earnings exist, the claimant's **Expected Earnings** will be based on the applicable alternative identified in this Category III, Step 2.

If available, the Category III claimant must provide federal or state **Tax Returns** or Forms W-2 for 2010 and 2011 (and for 2009 if the claimant is a **Career Changer** who did not work in the relevant 2011 time period).[17] If **Tax Returns** or Forms W-2 and/or 1099 are not available, the claimant must provide a written statement under oath attesting that no **Tax Returns** are available and attesting that the claimant made diligent efforts to obtain Forms W-2 from his or her employer.

Category III claimants who do not have **Tax Information Documents** available may instead provide **Pay Period Earnings Documentation** sufficient to establish earnings during the **Compensation Period** and 2011 (and for 2009 if the claimant is a **Career Changer** who did not work in the relevant 2011 time period). If no **Pay Period Earnings Documentation** or other annual employer-provided payroll documentation is available for 2010 and 2011 (and for 2009 if the claimant is a **Career Changer** who did not work in the relevant 2011 time period), claimant shall so state in the sworn Claim Form.

In the event a claimant cannot provide **Tax Information Documents** or **Pay Period Earnings Documentation** or, for claimants who were not employed in 2011, other documentation required in III.B.1.b or III.B.2.b, claimant may not proceed under this Category III and should proceed to Category IV to the extent the claimant qualifies for compensation under that Category.

A. **Documentation Requirements**

    1. **Documentation Establishing Employment Earnings**: Claimants under this Category who have **Tax Information Documents** for 2010 and 2011 must provide at least one of the following **Tax Information Documents** for 2010 and 2011 and, if a **Career Changer**, for 2009:

- Federal tax Form 1040 pages 1 and 2, all pages of Schedules C, E, and F, and any supporting statements attached to the Form 1040 filing (including Form W-2s for joint returns); or
- State tax return, including any supporting schedules or statements; or
- Forms W-2 documenting earnings; or
- Forms 1099 documenting earnings.

---

[17] If a claimant has not maintained copies of his or her federal income tax returns, he or she shall request a copy or transcript directly from the IRS. If a claimant has not maintained copies of his or her Forms W-2, he or she shall request copies directly from the IRS for each employer they worked for during the **Compensation Period** and 2011 (and, if the claimant is a **Career Changer**, for 2009). A federal **Tax Information Document** shall be considered available if it exists and is in the claimant's possession or has not been requested from the IRS and/or employer.

28

2. **Documentation Establishing Pay Period Earnings**:  To the extent it is available, or if **Tax Information Documents** for 2010 and 2011 are not available, a claimant must provide **Pay Period Earnings Documentation** for 2010 and the **2011 Benchmark Period**.  A claimant also must provide documentation to establish any bonuses and/or commissions received during the **2011 Benchmark Period** and the **Compensation Period**, as well as bonuses and/or commissions received during January or February of the 2010 and 2011 for all jobs worked.  A **Career Changer** must also provide such information for 2009.  To the extent **Pay Period Earnings Documentation** is unavailable, the claimant shall so indicate in the sworn Claim Form, and earnings shall be treated as earned evenly throughout each year.

3. **Documentation Of Earnings From Other Sources During the Compensation Period**:  Claimants must also submit documents sufficient to establish the source(s) and amounts of earnings, if any, from other post-DWH Spill sources of income (and, if a **Career Changer**, for 2009) including: (1) **Spill-Related Payments**, and (2) compensation received from and hours worked in each employment position other than the **Claiming Job(s)**.  The types of documents sufficient to satisfy this requirement are as follows:

   - Forms W-2, paycheck stubs or other employer-provided payroll information; and/or

   - Bank records showing income deposits and supporting documentation indicating the source of those deposits; and/or

   - Documents from BP/GCCF showing payment and BP/GCCF Claim Number; and/or

   - Forms 1099; and/or

   - Receipts from check cashing services; and/or

   - Other documents provided by an employer setting forth for such other employment position(s) (i) required hours of work, (ii) actual hours worked by claimant, and (iii) compensation rate.

4. **Documentation Establishing Other Costs/Losses**:  The claimant may also submit **Reimbursable Training Cost Documentation**, **Reimbursable Search Cost Documentation**, and/or documentation regarding **Employment-Related Benefits Losses**.

5. **Additional Claimant Documentation**:

   a. **Claimant Employability Documentation**:  Consists of both:

      i. A copy of a Social Security card, government-issued identification (for example, a valid driver's license), temporary worker visa, or green card that was valid as of April 20, 2010 for the claimant, or a print out from a public database providing the same information as would be provided by the original document;

         AND

      ii. Evidence the claimant was at least 16 years of age as of April 20, 2010. Acceptable evidence includes a copy of a valid driver's license, a valid passport, a certified copy of the claimant's birth certificate, or a print out from a public

028867

database providing the same information as would be provided by the original document.

b. <u>**Licensing Documentation**</u>:  If claimant's employment requires a government-issued license/permit, a copy of valid 2010 and 2011 licenses, if appropriate, or a print out from a public database providing the same information as would be provided by the original document.  Licenses could include, but are not limited to:

    i. Taxi/livery licenses.

    ii. Real Estate Sales licenses.

    iii. Other licenses and permits related to income sources.

c. If the claimant's employment in the **Claiming Job** was terminated between April 20, 2010 and December 31, 2010, the claimant shall have the burden of proof to establish the termination was not for cause.  The termination shall be deemed not for cause if:

    i. The claimant establishes that he or she filed for and received unemployment, including, for example, as evidenced by Form 1099 G.

    OR

    ii. Claimant provides a letter from the former employer or an **Employer Sworn Written Statement** confirming termination was not for cause.  Any such letter must include contact information for an authorized representative of the employer.

    OR

    iii. Other documentation acceptable to the **Claims Administrator** that establishes that the claimant was not terminated for cause.

6. <u>**Additional Documentation to Establish Causation Presumptions**</u>:

If the claimant is (i) a **Career Changer** or a **Claimant Who Had Less Than Twelve Months of Earnings History But Was Employed On April 20, 2010** who seeks to qualify for a causation presumption as set forth in Sections III.B.1.a, III.B.1.b and III.B.1.c.i, or (iii) a **New Entrant to Employment** who seeks to qualify for a causation presumption as set forth in Sections III.B.2.a, III.B.2.b and III.B.2.c.i, the claimant must provide documentation 2010 and 2011 (and, if the claimant is a **Career Changer**, for 2009) to establish that the claimant or the claimant's employer satisfies (or satisfied) the geographic requirements and/or the definition of an entity or Natural Person included in the **Primary Seafood Industry**, **Secondary Seafood Industry**, **Tourism**,[18] or **Charter Fishing**[19] as applicable.  To satisfy this requirement, the claimant must demonstrate the employer's location and the following:

---

[18] The definition of **Tourism** is set forth in the **Tourism Definition**, Bates 026632 - 026646.

[19] The definition of **Charter Fishing** is set forth in Definitions Section 38 of the *Deepwater Horizon* Economic and Property Damages Settlement Agreement.

028868

    a. That the claimant works or worked for an employer that filed a claim in the MDL No. 2179 settlement process and was determined by the **Claims Administrator** to satisfy one of the above-listed definitions;

    OR

    b. That the claimant's **Tax Information Documents**, **Pay Period Earnings Documentation**, or other documentation establishes that the claimant's employer satisfies one of the above-listed definitions.

7. The Causation Requirements set forth in Section III.B below may require additional documentation.

B. <u>Causation Requirements</u>

1. <u>Causation for a Career Changer and a Claimant Who Had Less Than Twelve Months of Earnings History But Was Employed On April 20, 2010</u>: In order for a **Career Changer** or a **Claimant Who Had Less Than Twelve Months of Earnings History But Was Employed On April 20, 2010** to establish causation under this Category III, the claimant must satisfy the following:

    a. The claimant must have been employed in the **Claiming Job** on April 20, 2010.

    AND

    b. During the **2011 Benchmark Period** (even if 2011 is not used to calculate **Expected Earnings**), the claimant was either (i) employed, (ii) temporarily medically incapacitated such that the claimant was unable to work but expected to return to the workforce shortly thereafter, (iii) engaged in activities or in a condition entitling an employee to leave under Section 102 of The Family Medical Leave Act, of 1993, as amended, 29 U.S.C. §§ 2601, 2612, but did not receive compensation,[20] (iv) involuntarily unemployed and can appropriately document job search activities, provided that the claimant can demonstrate that any involuntary unemployment was not a function of the claimant's termination for cause, (v) a full time student, (vi) medically incapacitated such that the claimant was unable to work and was expected to be unable to return to the workforce, or (vii) was engaged in full-time volunteer or missionary work or had chosen to leave the workforce to serve as a full-time parent or legal guardian. Documentation satisfying this requirement includes one of the following:

        i. For a claimant employed during 2011, **Tax Information Documents**, **Pay Period Earnings Documentation**, or other annual employer-provided payroll

---

[20] If the claimant is (i) a **Career Changer** or a **Claimant Who Had Less Than Twelve Months Of Earnings History But Was Employed On April 20, 2010**, and (ii) was on temporary medical leave from his or her employer pursuant to the Family Medical Leave Act, and (iii) received compensation during the time period of **2011 Benchmark Period**, the claimant shall be considered to have been employed during the time he or she was receiving compensation.

028869

information or other documentary evidence acceptable to the **Claims Administrator**.

ii. For a temporarily medically-incapacitated **Individual**, documentation establishing that claimant experienced the temporary disability, such as hospital or medical records or records reflecting receipt of short-term disability or similar benefits.

iii. For an **Individual** engaged in activities or a condition entitling an employee to leave under Section 102 of The Family Medical Leave Act, of 1993, as amended, 29 U.S.C. §§ 2601, 2612, who did not receive compensation during the **2011 Benchmark Period**, documentation establishing the activities or condition, the duration of such activities or condition, any compensation received during such periods, and/or communications with the employer regarding the same.

iv. For an involuntarily unemployed **Individual**, contemporaneous documentation evidencing a job search and diligent efforts to secure employment, as well as the documentation set forth in Section III.A.5 demonstrating that the involuntary unemployment was not a function of the claimant's termination for cause.

v. For a full-time student, documentation reflecting full-time matriculation or enrollment at a college or university, such as a matriculation certificate, tuition bill and evidence of payment, a transcript, a degree, certificate, or diploma indicating completion of a course of study, or a letter from the college or university registrar verifying the matriculation.

vi. For a medically-incapacitated **Individual** not expected to return to the workforce, documentation establishing the claimant experienced such disability, such as hospital or medical records or records reflecting receipt of Social Security or other disability benefits.

vii. For an **Individual** who was engaged in full-time volunteer or missionary work or who had chosen to leave the workforce to serve as a full-time parent or legal guardian, documentation evidencing the reason that the **Individual** was not engaged in work for monetary compensation.

AND

c. The claimant must satisfy one of the following:

i. <u>Presumed Causation:</u>  The DWH Spill shall be presumed to be the cause of lost earnings for a **Claiming Job** during the **Compensation Period** for the following categories of claimants who submit the required documentation, provided that the claimant can demonstrate that any loss of income or employment related to the **Claiming Job** was not a function of the claimant's termination for cause pursuant to the Documentation Requirements set forth in Section III.A.5.c:

32

028870

1) If a claimant is an **Individual** seeking compensation for an economic loss relating to employment within Zone A,[21] the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

2) If a claimant is an individual seeking compensation for an economic loss for a job in which he or she was employed by, or exclusively serviced, an entity or Natural Person that satisfies the **Primary Seafood Industry** definition as set forth in the **Seafood Distribution Chain Definitions**, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

3) If a claimant is an individual seeking compensation for an economic loss for a job in which he or she was employed by an entity or Natural Person that satisfies the **Secondary Seafood Industry** definition as set forth in the **Seafood Distribution Chain Definitions**, and the entity or Natural Person was located in Zones B or C, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

4) If the claimant is an **Individual** seeking compensation for an economic loss for a job in which he or she was employed by a business located in Zone B that meets the definition of **Tourism**, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

5) If the claimant is an **Individual** seeking compensation for an economic loss for a job in which he or she was employed by an entity or Natural Person that satisfies the definition of **Charter Fishing**, and the **Charter Fishing** business was located in Zones A, B or C, the claimant is not required to provide any evidence of causation relating to that **Claiming Job**.

OR

ii. <u>**Individual Claimant Without Presumed Causation**</u>:  If a claimant is not entitled to a causation presumption as set forth in Section III.B.1.c.i, the claimant can establish causation for a **Claiming Job** during the **Compensation**

---

[21] For purposes of this **Framework for Individual Economic Loss Claims**, the presumption shall be that the location of economic loss for the **Claiming Job** is the location of the claimant's employer within the Class Definition geographic area, not the claimant's residence.  Claimants may establish an alternative location of economic loss for the **Claiming Job** other than their employer's location by providing evidence that their primary employment activities and responsibilities occur in a location different from their employer's business address, and that the claimed DWH Spill-related economic loss occurred at such location.  For example, the claimant works for a housekeeping company located in Zone C that services households in Zones A, B and C, including vacation condominiums located in Zone A, and the claimant establishes that she works primarily in Zone A.

028871

**Period** only by satisfying the requirements of one of the following sub-sections:

    1) Causation is established if the **Claiming Job** is with an **Eligible Employer**. The **Claims Administrator** shall verify that the employer is an **Eligible Employer**.

    2) Causation for a **Claiming Job** is established if the claimant provides an **Employer Sworn Written Statement** attributing the claimant's loss of income during the **Compensation Period** to the DWH Spill. The **Employer Sworn Written Statement** must articulate in detail how the claimant's losses at the **Claiming Job** are causally related to the DWH Spill. Such **Employer Sworn Written Statement** must also include contact information for an authorized representative of the employer.

    iii. The **Claims Administrator** shall evaluate the credibility and reliability of the information provided by the employer and the claimant, including any **Sworn Written Statements**, and have the right to request supplemental documentation and/or to interview the employer in accordance with the **Addendum Regarding Interviews of Claimant Alleging Economic Loss**.

2. **Causation for a New Entrant to Employment**: In order for a **New Entrant to Employment** to establish causation under this Category III, the claimant must satisfy the following:

    a. The claimant must satisfy the definition of a **New Entrant to Employment** and shall provide documentation showing residency, or that the claimant took significant affirmative steps to establish residency, within close enough proximity to the anticipated location of employment to travel to the job as frequently as required by the employer, for a period of at least 60 days after April 20, 2010 but before December 31, 2010 (or before April 30, 2011 for claimants whose employer or expected employer satisfied the **Primary Seafood Industry** definition). Documentation meeting this requirement includes:

        i. A lease or rental agreement; or

        ii. A sublease agreement; or

        iii. Contemporaneous utility bills.

    AND

    b. During the **2011 Benchmark Period**, the claimant was either (i) employed, (ii) temporarily medically incapacitated such that the claimant was unable to work but expected to return to the workforce shortly thereafter, (iii) engaged in activities or in a condition entitling an employee to leave under Section 102 of The Family Medical Leave Act, of 1993, as amended, 29 U.S.C. §§ 2601, 2612, but did not

34

receive compensation,[22] (iv) involuntarily unemployed and can appropriately document job search activities, provided that the claimant can demonstrate that any involuntary unemployment was not a function of the claimant's termination for cause, (v) a full time student, (vi) medically incapacitated such that the claimant was unable to work and was expected to be unable to return to the workforce or (vii) was engaged in full-time volunteer or missionary work or had chosen to leave the workforce to serve as a full-time parent or legal guardian. Documentation satisfying this requirement includes one of the following:

   i. For a claimant employed during 2011, **Tax Information Documents**, **Pay Period Earnings Documentation**, or other annual employer-provided payroll information or other documentary evidence acceptable to the **Claims Administrator**.

   ii. For a temporarily medically-incapacitated **Individual**, documentation establishing that claimant experienced the temporary disability, such as hospital or medical records or records reflecting receipt of short-term disability or similar benefits.

   iii. For an **Individual** engaged in activities or a condition entitling an employee to leave under Section 102 of The Family Medical Leave Act, of 1993, as amended, 29 U.S.C. §§ 2601, 2612, who did not receive compensation during the **2011 Benchmark Period**, documentation establishing the activities or condition, the duration of such activities or condition, any compensation received during such periods, and/or communications with the employer regarding the same.

   iv. For an involuntarily unemployed **Individual**, contemporaneous documentation evidencing a job search and diligent efforts to secure employment, as well as the documentation set forth in Section III.A.5 demonstrating that the involuntary unemployment was not a function of the claimant's termination for cause.

   v. For a full-time student, documentation reflecting full-time matriculation or enrollment at a college or university, such as a matriculation certificate, tuition bill and evidence of payment, a transcript, a degree, certificate, or diploma indicating completion of a course of study, or a letter from the college or university registrar verifying the matriculation.

   vi. For a medically-incapacitated **Individual** not expected to return to the workforce, documentation establishing the claimant experienced such disability, such as hospital or medical records or records reflecting receipt of Social Security or other disability benefits.

---

[22] If the claimant is (i) a **Career Changer** or a **Claimant Who Had Less Than Twelve Months Of Earnings History But Was Employed On April 20, 2010**, and (ii) was on temporary medical leave from his or her employer pursuant to the Family Medical Leave Act, and (iii) received compensation during the time period of **2011 Benchmark Period**, the claimant shall be considered to have been employed during the time he or she was receiving compensation.

028873

vii. For an **Individual** who was engaged in full-time volunteer or missionary work or who had chosen to leave the workforce to serve as a full-time parent or legal guardian, contemporaneous documentation evidencing the reason that the **Individual** was not engaged in work for monetary compensation.

AND

c. The claimant must satisfy one of the following:

    i. <u>Presumed Causation:</u> The DWH Spill shall be presumed to be the cause of lost earnings for a **Claiming Job** during the **Compensation Period** for **New Entrants to Employment** who provide documentation showing proof of an offer of employment made and accepted prior to April 20, 2010 for employment to begin between April 21 and December 31, 2010 (or for employment to begin between April 21, 2010 and April 30, 2011 for claimants in the **Primary Seafood Industry**), provided that the following conditions are also met:

        1) The offer documentation evidences expected employment:

            a) Within Zone A;[23] or,

            b) In which the offering employer was an entity or Natural Person that satisfies the **Primary Seafood Industry** definition as set forth in the **Seafood Distribution Chain Definitions**; or,

            c) In which the offering employer was an entity or Natural Person that satisfies the **Secondary Seafood Industry** definition as set forth in the **Seafood Distribution Chain Definitions**, and the entity or Natural Person was located in Zones B or C; or

            d) In which the offering employer was a business located in Zone B that meets the definition of **Tourism**; or

            e) In which the offering employer was a business located in Zones A, B or C that satisfies the definition of **Charter Fishing**.

---

[23] For purposes of this **Framework for Individual Economic Loss Claims**, the presumption shall be that the location of economic loss for the **Claiming Job** is the location of the claimant's employer within the Class Definition geographic area, not the claimant's residence. Claimants may establish an alternative location of economic loss for the **Claiming Job** other than their employer's location by providing evidence that their primary employment activities and responsibilities occur in a location different from their employer's business address, and that the claimed DWH Spill-related economic loss occurred at such location. For example, the claimant works for a housekeeping company located in Zone C that services households in Zones A, B and C, including vacation condominiums located in Zone A, and the claimant establishes that she works primarily in Zone A.

028874

2) The documentation provided must include information sufficient to establish proposed start and end dates, wage rate and projected hours, and withdrawal of the offer during the period April 21 through December 31, 2010.

OR

ii. **Individual Claimant Without Presumed Causation**: If the **New Entrant to Employment** is not entitled to a causation presumption as set forth in Section III.B.2.c.i, the claimant can establish causation for a **Claiming Job** during the **Compensation Period** only by providing an **Employer Sworn Written Statement** attributing the claimant's loss of income during the **Compensation Period** to the DWH Spill. The statement must articulate in detail how the claimant's losses are causally related to the DWH Spill, and must specifically (i) attest to the claimant's accepted employment offer (including start and end dates, wage rate and projected hours), and (ii) verify that the employer's decision not to employ the claimant, or to employ the claimant in a reduced capacity, was due to or resulting from the DWH Spill. Such letter must also include contact information for an authorized representative of the employer.

iii. The **Claims Administrator** shall evaluate the credibility and reliability of the information provided by the employer and the claimant, including any **Sworn Written Statement(s)**, and have the right to request supplemental documentation and/or interview the employer in accordance with the **Addendum Regarding Interviews of Claimant Alleging Economic Loss**.

C. <u>Compensation Calculation</u>

For claimants who were employed in 2011 in the same job or similar job as that performed or offered and withdrawn in the **Compensation Period** selected by the claimant, the **Claims Administrator** shall use either **Tax Information Documents** and/or **Pay Period Earnings Documentation**, to calculate the **Claimant's Lost Earnings**. As set forth in the steps below, **Claimant's Lost Earnings** includes any lower amount of earnings in the **Compensation Period** as compared to the **2011 Benchmark Period**, after those 2011 earnings have been decreased by the **General Growth Factor**, less any **Offsetting Earnings**. In addition, for claims based on non-salaried, hourly-wage jobs, the claimant's 2011 earnings shall also be decreased by the **Industry Growth Factor**.

For any Category III claimant not employed in 2011 in the same job or similar job as that performed or offered and withdrawn in the **Compensation Period** selected by the claimant and satisfying a requirement of Section III.B.1.b or III.B.2.b above, **Expected Earnings** for each type of Category III claimant shall be based on alternative data, as described in detail in Item 2 of Step 2 below.

The claimant shall receive a lump-sum final payment that includes compensation for **Claimant's Lost Earnings**, plus any applicable **RTP** agreed upon by the parties, plus compensation for properly documented **Employment-Related Benefits Losses, Reimbursable Training Costs** and

37

Reimbursable Search Costs, if any, less the amounts of any Spill-Related Payments.

Example compensation calculations are set forth in Appendices A through F attached hereto.

**Step 1: Claimant Selects Compensation Period**

1. Claimant selects a **Compensation Period**. For a claimant who (i) was terminated for cause in 2010 from the **Claiming Job(s)**, or (ii) otherwise ended employment at the **Claiming Job(s)** in 2010 for reasons unrelated to the DWH Spill, the **Compensation Period** may not extend beyond the termination date.

**Step 2: Identify 2011 Benchmark Period Earnings to Be Used in Calculating Expected Earnings**

The purpose of this Step 2 is to identify earnings to be used in calculating **Expected Earnings**.

1. For claimants employed during a **2011 Benchmark Period**, the claimant's earnings used in calculating **Expected Earnings** shall be the claimant's earnings from such 2011 period.

   a. **Claimants with Tax Information Documents:** Earnings during the **2011 Benchmark Period** as evidenced by **Tax Information Documents** shall include earned income from the **Claiming Job** (or comparable job) and shall be assumed to have been earned evenly throughout 2011 unless the claimant provides **Pay Period Earnings Documentation** sufficient to establish actual earnings distribution. All bonuses and/or commissions shall be allocated pro rata across the period for which they were awarded, and annual performance bonuses paid in January and February shall be assumed to relate to the prior calendar year, unless the documents establish that the bonus related to a specific period of time.

   b. **Claimants with only Pay Period Earnings Documentation:** Earnings during the **2011 Benchmark Period** as evidenced by **Pay Period Earnings Documentation** for each **Claiming Job** shall be determined based upon the nature and extent of the documentation provided.

      i. If the claimant submits **Pay Period Earnings Documentation** that covers only discrete portions of 2011, the **Claims Administrator** shall base the **2011 Benchmark Period** earnings for that job only on the actual documentation provided (i.e., data shall not be extrapolated to periods for which **Pay Period Earnings Documentation** was not provided).

38

    ii.    If the claimant submits **Pay Period Earnings Documentation** for a job that provides data as to full year earnings but not the allocation of those earnings (*i.e.*, a year-end paystub), then if the claimant also provides additional **Pay Period Earnings Documentation** deemed by the **Claims Administrator** to be sufficient for purposes of allocating those earnings across the relevant period, earnings for that job shall be allocated consistent with that **Pay Period Earnings Documentation**.

    iii.    If no additional information is provided regarding the allocation of those earnings, the **Claims Administrator** shall assume a pro rata distribution over the relevant period.

    iv.    All bonuses and/or commissions shall be allocated pro rata across the period for which the claimant indicates they were awarded, and annual performance bonuses paid in January and February shall be assumed to relate to the prior calendar year, unless the documents establish that the bonus related to a specific period of time.

OR

2. For claimants not employed during the **2011 Benchmark Period**, but who satisfied the causation requirement in Section III.B.3, the claimant's earnings used in calculating **Expected Earnings** shall be one of the following:

a. **New Entrant To Employment:** The claimant's **Expected Earnings** during the **Compensation Period** shall be based on the rescinded or reduced offer of employment or **Employer Sworn Written Statement** used to establish causation.

b. **Claimant Who Had Less Than Twelve Months Of Earnings History But Was Employed On April 20, 2010:** The claimant's **Expected Earnings** shall be based on the claimant's average monthly pre-DWH Spill earnings in the **Claiming Job**, recognizing that this calculation shall be based on less than twelve months of earnings data and shall be subject to an **Industry Growth Factor** only, if relevant, as described below.

c. **Career Changer:** The claimant's **Expected Earnings** shall be based on earnings in the 2009 time period of at least 90 consecutive days corresponding to the time period of at least 90 consecutive days within the same months selected by the claimant as the **Compensation Period**.

### Step 3: Determine Earnings Growth Factor(s)

1. The following **Growth Factors** may apply for purposes of calculating **Expected Earnings**:

a. <u>General Growth Factor</u> is defined in Definitions Section N.2 and is 2.0%.

b. <u>Industry Growth Factor</u> is defined in Definitions Section N.3. For claimants in non-salaried, hourly wage jobs, the **Industry Growth Factor** of 1.5% shall be

39

028877

applied.

   c. <u>Claimant Specific Growth Factor</u> is defined, and the calculation is explained in Definitions Section N.1. For purposes of this Section III, a **Claimant Specific Growth Factor** may apply only in the limited circumstance of a **Career Changer** who does not have earnings during the **2011 Benchmark Period** for one of the reasons set forth in Section III.B.3.

### Step 4: Calculate Expected Earnings

**Expected Earnings** will be calculated as follows:

1. For claimants covered by Step 2.a, **Expected Earnings** equal the earnings over the **2011 Benchmark Period**, decreased by the applicable **Growth Factors** (from Step 3).

   *Expected Earnings = 2011 Benchmark Period Earnings from Step 2 x (1 - applicable Step 3 Growth Factor(s))*

2. For claimants covered by Step 2.b, **Expected Earnings** are calculated according to one of the following:

   a. **New Entrant To Employment:** The claimant's **Expected Earnings** during the **Compensation Period** shall be based on the rescinded or reduced offer of employment or **Employer Sworn Written Statement** used to establish causation. No **Growth Factors** apply.

   b. **Claimant Who Had Less Than Twelve Months Of Earnings History But Was Employed On April 20, 2010:** The claimant's **Expected Earnings** shall be based on the claimant's average monthly pre-DWH Spill earnings in the **Claiming Job**, recognizing that this calculation shall be based on less than twelve months of earnings data and shall be increased by the **Industry Growth Factor**, if relevant. No other **Growth Factors** shall apply.

   c. **Career Changer:** The claimant's **Expected Earnings** shall be based on earnings in the 2009 time period of at least 90 consecutive days corresponding to the time period of at least 90 consecutive days within the same months selected by the claimant as the **Compensation Period**, increased by the **Claimant Specific Growth Factor** or the **General Growth Factor**, as applicable, and by an **Industry Growth Factor**, if applicable.

### Step 5: Determine Actual Earnings and Any Offsetting Earnings In The Compensation Period

**Actual Earnings** for all **Claiming Jobs** and any applicable **Offsetting Earnings** during the **Compensation Period** shall be determined based on **Tax Information Documentation** or **Pay Period Earnings Documentation** provided by the claimant and other documentation relevant to determining **Offsetting Earnings**.

To the extent the claimant does not have **Pay Period Earnings Documentation** for a **Claiming Job**, **Actual Earnings** during the **Compensation Period** shall be estimated for that **Claiming Job** by dividing the claimant's total 2010 **Claiming Job** earnings by 12 and

40

028878

multiplying that amount by the number of months in the **Compensation Period**. All bonuses and/or commissions shall be allocated pro rata across the periods for which they were awarded, and annual performance bonuses paid in January and February shall be assumed to relate to the prior calendar year, unless the documents establish that the bonus related to a specific period of time.

**Offsetting Earnings** and **Actual Earnings** from all **Claiming Jobs** shall be calculated giving consideration to all **Claiming Jobs**, provided that:

1. If the claimant has only one **Claiming Job**, then:

    i. If **Pay Period Earnings Documentation** (or other documentation relevant to calculating **Offsetting Earnings**) reflects the same or an increased number of hours worked at the **Claiming Job** in the **Compensation Period** relative to the **Claiming Job** (or comparable job) in the **Benchmark Period**, **Actual Earnings** shall be limited to earnings from the **Claiming Job** (or comparable job) over the same total number of hours worked in the **Benchmark Period**, and no **Offsetting Earnings** shall apply.

    OR

    ii. If **Pay Period Earnings Documentation** (or other documentation) (i) reflects a decrease in hours worked at the **Claiming Job** during the **Compensation Period**, and (ii) the claimant's **Pay Period Earnings Documentation** reflects additional hours worked at a **Non-Claiming Job** (whether such **Non-Claiming Job** was held in the **Benchmark Period** or is a new position), **Offsetting Earnings** shall be calculated and factored into the determination of **Claimant Lost Earnings**.

2. If the claimant has more than one **Claiming Job**, then:

    i. If **Pay Period Earnings Documentation** (or other documentation relevant to calculating **Offsetting Earnings**) for all **Claiming Jobs** reflects the same or an increased number of total hours worked across all **Claiming Jobs** during the **Compensation Period** (relative to all **Claiming Jobs** (or comparable jobs) in the **Benchmark Period**), aggregate **Actual Earnings** in the **Compensation Period** shall be limited to total earnings from all **Claiming Jobs** (or comparable jobs) over the same number of total hours worked in the **Benchmark Period**, provided that earnings from hours lost in one **Claiming Job** shall be replaced by earnings from the same number of hours worked in a different **Claiming Job** during the **Compensation Period**. No **Offsetting Earnings** shall apply.

    OR

    ii. If **Pay Period Earnings Documentation** (or other documentation relevant to calculating **Offsetting Earnings**) for all **Claiming Jobs** reflects (i) fewer total hours worked across all **Claiming Jobs** during the **Compensation Period** (relative to all **Claiming Jobs** (or comparable jobs) in the **Benchmark Period**), but (ii)

41

028879

more hours worked in one (or more) **Claiming Job(s)** in the **Compensation Period** (relative to the same **Claiming Job(s)** in the **Benchmark Period**), aggregate **Actual Earnings** in the **Compensation Period** shall include total earnings from all **Claiming Jobs** (or comparable jobs) in the **Compensation Period**. If the claimant's **Pay Period Earnings Documentation** also reflects additional hours worked at a different (**Non-Claiming Job**) position (whether such position was held in the **Benchmark Period** or is a new position), **Offsetting Earnings** shall be calculated and factored into the determination of **Claimant Lost Earnings** for the number of hours representing the difference between (a) total hours worked in all **Claiming Jobs** in the **Compensation Period**, and (b) total hours worked in all **Claiming Jobs** in the **Benchmark Period**.

OR

iii. If **Pay Period Earnings Documentation** (or other documentation) for all **Claiming Jobs** (i) reflects a decrease in hours worked at each **Claiming Job** during the **Compensation Period**, and (ii) the claimant's **Pay Period Earnings Documentation** reflects additional hours worked at a different position (whether such position was held in the **Benchmark Period** or is a new position), **Offsetting Earnings** shall be calculated and factored into the determination of **Claimant Lost Earnings** for the total lost hours.

OR

iv. If the claimant does not have **Pay Period Earnings Documentation** (or other documentation establishing hours worked) for all **Claiming Jobs**, then **Actual Earnings** shall include all earnings from all **Claiming Jobs** and **Offsetting Earnings** shall apply.

## Step 6: Determine Claimant Lost Earnings

**Claimant Lost Earnings** shall be calculated as (a) the difference between (i) the claimant's **Expected Earnings** during the **Compensation Period** (Step 4) from all **Claiming Jobs** and (ii) the claimant's **Actual Earnings** during the **Compensation Period**, as adjusted, if relevant, (Step 5) from all **Claiming Jobs**, reduced by (b) any applicable **Offsetting Earnings**.

## Step 7: Calculate Final Claimant Compensation

Final claimant compensation shall be **Claimant Lost Earnings** (Step 6) adjusted as follows:

1. Add any applicable **RTP** agreed to by the parties, provided that:

   – For claimants whose **Claimant Lost Earnings** result from more than one **Claiming Job**, the claimant's applicable **RTP** shall be calculated based on (i) the percentage of total **Claimant Lost Earnings** related to each **Claiming Job**, multiplied by (ii) the **RTP** applicable to each **Claiming Job**, which is determined by the job type (**Tourism**/Other Industries) and zone (Zone A, B, C or D). For example, a claimant with 50% of their lost earnings from a job

42

028880

Zone A hotel, and 50% of their lost earnings from a job in a Zone C restaurant shall receive an **RTP** that is calculated as follows:

$$\text{Applicable RTP} = .5 * RTP_{\text{Zone A Tourism (hotel)}} + .5 * RTP_{\text{Zone C Tourism (restaurant)}}$$

– For claimants unable to work in 2011 because they were (i) a full time student, (ii) medically incapacitated such that the claimant was unable to work and was expected to be unable to return to the workforce, or (iii) engaged in full-time volunteer or missionary work or had chosen to leave the workforce to serve as a full-time parent or legal guardian (as set forth in Section III.B.3), no **RTP** shall be applied.

– For an employee terminated for cause in 2010 from a **Claiming Job**, no **RTP** shall apply.

2.  Add any **Reimbursable Training Costs**.  **Reimbursable Training Costs** shall be fully reimbursed if the training led directly to earned income in 2010.  If not, then **Reimbursable Training Costs** shall be reimbursed up to $2,000.

    For example:  A claimant who paid $3,000 after April 20, 2010 to secure a commercial trucking license and who earned income as a commercial trucker in 2010 shall receive $3,000 in reimbursement.  If the claimant earned no income from commercial trucking during 2010, the claimant would receive a $2,000 reimbursement.

3.  Add any **Reimbursable Search Costs**.

4.  Add any applicable **Employment-Related Benefits Losses**.

5.  Add any **One Time, Non-Recurring Event Compensation**.

6.  Subtract any **Spill-Related Payments**.

7.  The formula for **Final Claimant Compensation** is:

    **Claimant Lost Earnings**

    +  (**Claimant Lost Earnings x applicable RTP (if any)**)

    +  **Employment-Related Benefits Losses** (if applicable)

    +  **Reimbursable Training Costs** (full if led to earned income in 2010 from area of training, otherwise $2,000) (if applicable)

    +  **Reimbursable Search Costs** (if applicable)

    +  **One Time, Non-Recurring Event Compensation** (if applicable)

    -  **Spill-Related Payments** (if applicable)

    -  VoO Settlement Offset and/or VoO Earned Income Offset (if any)

43

028881

## IV. CATEGORY IV: CLAIMANTS WITHOUT EARNINGS DOCUMENTATION WHO SUBMIT CLAIMANT AND EMPLOYER SWORN WRITTEN STATEMENTS TO ESTABLISH EARNINGS

Any claimant who satisfies all of the following criteria may be eligible for compensation pursuant to this Category IV:

1. The claimant's employer or employment is located in Zones A, B or C.[24]

2. The claimant does not have **Tax Information Documents** or **Pay Period Earnings Documentation** for the **Claiming Job** evidencing his or her earnings during the relevant time period. For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the relevant periods shall be (i) April 21, 2009 through April 20, 2010, and (ii) April 21, 2010 through April 30, 2011. For all other claimants, the requisite periods shall be (i) April 21 through December 31, 2009 and (ii) April 21 through December 31, 2010.

3. The claimant is not a **New Entrant to Employment**.

Claimants who meet the criteria above may instead establish lost earnings and causation by submitting, in addition to a sworn Claim Form, (a) a **Claimant Sworn Written Statement** with specified contents, (b) one or more **Employer Sworn Written Statement(s)** providing information for at least the periods April 21 through December 31, 2009, and April 21 through December 31, 2010,[25,26] and, at the claimant's option, for additional periods as described below, (c) any other specified documentation. In addition, the **Claims Administrator** may interview the claimant and/or the employer consistent with the **Addendum Regarding Interviews of Claimant Alleging Economic Loss** and Section IV.B, below.

### A. Documentation And Causation Requirements:

A Category IV claimant must provide a sworn Claim Form and all of the documents identified below. The **Claims Administrator** shall review and assess the documentation provided by the claimant, including information from the claimant's employer(s), and any other information deemed relevant by the **Claims Administrator**, for purposes of determining whether the

---

[24] For purposes of this **Framework for Individual Economic Loss Claims**, the presumption shall be that the location of economic loss for the **Claiming Job** is the location of the claimant's employer within the Class Definition geographic area, not the claimant's residence. Claimants may establish an alternative location of economic loss for the **Claiming Job** other than their employer's location by providing evidence that their primary employment activities and responsibilities occur in a location different from their employer's business address, and that the claimed DWH Spill-related economic loss uniquely occurred at such location. For example, the claimant works for a housekeeping company located in Zone C that services households in Zones A, B and C, including vacation condominiums located in Zone A, and the claimant establishes that she works primarily in Zone A.

[25] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the claimant should instead provide one or more **Employer Sworn Written Statement(s)** for the periods (i) April 21, 2009 through April 20, 2010 and (ii) April 21, 2010 through April 20, 2011.

[26] If the information for both required periods can be satisfied with an **Employer Sworn Written Statement** from one employer, only one **Employer Sworn Written Statement** is required. If a single employer is not able to provide the necessary information for both required periods set forth above, the claimant must submit at least one **Employer Sworn Written Statement** for each period.

028882

claimant experienced a loss of earnings during April 21 through December 31, 2010,[27] and, if so, whether the loss was due to or resulting from the DWH Spill. The **Claims Administrator** shall rely on his assessment of the credibility and reliability of the information submitted in determining if this causation requirement is satisfied.

1. <u>Claimant Sworn Written Statement</u>: The claimant shall submit a **Claimant Sworn Written Statement** which sets forth the following information and shall attach any relevant documents in claimant's possession:

   a. No **Tax Returns** are available for 2009 and 2010.

   b. No **Pay Period Earnings Documentation** is available for the **Claiming Job(s)** for the period April 21 through December 31 of 2009 and 2010.[28]

   c. The claimant made diligent efforts to obtain Form W-2s for 2009 and 2010 from his or her employer(s) and they are not available.

   d. The claimant's employment history with each employer, including, for example, the nature of the work performed, number of years worked, whether the employment is steady or seasonal, year-round or intermittent, and the circumstances of the claimant's departure and/or termination, if applicable. At a minimum, the claimant shall include the following:

      i. The business name, last known address, telephone number and, if available, website of each of claimant's employers for the period April 21 through December 31 of 2009 and 2010.[29]

      ii. To be potentially eligible for an **RTP**, the claimant must also provide the above information for the period April 21 through December 31, 2011.[30]

   e. The claimant's actual earned income from all sources in 2009 and 2010, and any other earnings history that the claimant believes is relevant to support the claim, including any support for the claimant's belief that these actual earned amounts are accurate.

   f. If applicable, the claimant's BP/GCCF Claim Number, and a listing of any **Spill-Related Payments** received by the claimant.

   g. An explanation of how the reduction of claimant's hours of work, termination of the claimant's employment, and/or withdrawal of an offer of employment

---

[27] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the potential loss period shall be April 21, 2010 through April 20, 2011.

[28] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the claimant should instead verify that no **Pay Period Earnings Documentation** for the **Claiming Job** is available for the periods (i) April 21, 2009 through April 20, 2010 and (ii) April 21, 2010 through April 20, 2011.

[29] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the claimant should instead provide the business name and last known address of each of claimant's employers for the periods (i) April 21, 2009 through April 20, 2010 and (ii) April 21, 2010 through April 20, 2011.

[30] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the claimant should instead provide the business name and last known address of each of claimant's employers for the period April 21, 2011 through April 20, 2012 to be potentially eligible for an **RTP**.

45

028883

related to the **Claiming Job(s)** during the period from April 21, 2010 - December 31, 2010 was due to or resulting from the DWH Spill.[31]

h. A statement and any available documentation establishing that the claimant was present and available to work in Zones A, B or C in close enough proximity to the anticipated location of employment to travel to the job as frequently as required by the employer during the period from April 21, 2010 to December 31, 2010.[32]

　　i. To be potentially eligible for an **RTP**, the claimant must satisfy the above requirement for the period April 21 through December 31, 2011.[33]

　　ii. Documentation that could demonstrate presence and availability includes, but is not limited to, the following:

　　　　1) A lease or rental agreement; or
　　　　2) A sublease agreement; or
　　　　3) Contemporaneous utility bills.

2. **Claimant Employability Documentation:**

Consists of both:

a. A copy of a Social Security card, government-issued identification (for example, a valid driver's license), temporary worker visa, or green card that was valid as of April 20, 2010, or a print out from a public database providing the same information as would be provided by the original document.

*AND*

b. Evidence that the claimant was at least 16 years of age as of April 20, 2010. Acceptable evidence includes a valid driver's license, a valid passport, or a copy of the claimant's birth certificate, or a print out from a public database providing the same information as would be provided by the original document.

3. **Licensing Documentation:** If the claimant's employment in the **Claiming Job** requires a government-issued license/permit, the claimant shall provide a copy of valid 2009, 2010 and, if applicable, 2011 licenses, or a print out from a public database providing the same information as would be provided by the original document, such as:

---

[31] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the claimant should instead provide an explanation of how the reduction of claimant's hours of work, termination of the claimant's employment, and/or withdrawal of an offer of employment for the periods (i) April 21, 2009 through April 20, 2010 and (ii) April 21, 2010 through April 20, 2011 was due to or resulting from the DWH Spill.

[32] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the claimant should instead provide information regarding his or her presence and availability for work in Zones A, B or C for the period April 21, 2010 through April 20, 2011.

[33] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the claimant should instead provide information regarding his or her presence and availability for work in Zones A, B or C for the period April 21, 2011 through April 20, 2012 to be potentially eligible for an **RTP**.

028884

    a.  Taxi/livery licenses.

    b.  Real Estate Sales licenses.

    c.  Other licenses and permits related to income sources.

4.  **Employer Sworn Written Statement**:  The claimant shall submit an **Employer Sworn Written Statement** from at least one of his or her employers during each of the periods April 21 through December 31 of 2009 and 2010, which sets forth the following information with any relevant documents attached.[34] If the information for both required periods can be satisfied with an **Employer Sworn Written Statement** from one employer, only one **Employer Sworn Written Statement** is required.  If a single employer is not able to provide the necessary information for both required periods, the claimant must submit at least one **Employer Sworn Written Statements** for each period.

    a.  **Employer Information**

        i.  Employer's business name

        ii.  Address(es)

        iii.  Telephone number(s)

        iv.  Website(s), if available

        v.  A description of the nature of the business

        vi.  Compensation practices (for example, weekly or bi-weekly pay periods), wage rates, and typical hours worked for employees holding jobs comparable to the **Claiming Job**.

        vii.  If the employer is not an **Eligible Employer**, information sufficient to establish the following:

          1)  The size and scale of the employer's business, such as:

            a)  Size of physical plant;

            b)  Best estimate of the number of customers;

            c)  Best estimate of the volume of product produced;

            d)  Best estimate of the number of full-time and part-time employees;

            e)  Financial information; and/or

            f)  To the extent the business is a seasonal business, this information should be provided to reflect business size during different seasons.

---

[34] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the **Employer Sworn Written Statement** shall be provided from each of the claimant's employers for the periods (i) April 21, 2009 through April 20, 2010 and (ii) April 21, 2010 through April 20, 2011.

47

028885

2) Copies of any applicable required licenses possessed by the employer during the period April 21 through December 31 of 2009 and 2010,[35] or a print out from a public database providing the same information as would be provided by the original document .

b. **Employee Information**

i. The claimant's employment history with employer, including, for example, the nature of the work performed, number of years worked, whether the employment is steady or seasonal, year-round or intermittent, and the circumstances of the claimant's departure and/or termination, if applicable.

ii. The claimant's wage rate and total compensation for the following periods, if applicable:

1) April 21 through December 31, 2009;[36]
2) April 21 through December 31, 2010;[37]
3) April 21 through December 31, 2011;[38] and
4) Any other time period for which the employer is able and elects to provide the requested information.

If the employer cannot provide precise actual dates and times, it shall be sufficient for the employer to provide more general information satisfying this standard – for example, "Claimant was employed for 30 days at a rate of $100 per day for 12 weeks during the months of [June - August 2009]".

iii. If the employer (i) employed the claimant and/or (ii) offered the claimant employment during the period from April 21, 2010 - December 31, 2010,[39] the employer shall provide the following:

1) How the employer (a) terminated the claimant's employment, (b) reduced the claimant's hours of work, (c) withdrew an offer of employment, (d) did not extend an offer of seasonal (partial year) employment to the claimant, or (e) otherwise reduced employee's compensation due to or resulting from the DWH Spill with sufficient

---

[35] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the employer should instead provide copies of any applicable required licenses for the periods (i) April 21, 2009 through April 20, 2010 and (ii) April 21, 2010 through April 20, 2011.

[36] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the appropriate period is from April 21, 2009 through April 20, 2010.

[37] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the appropriate period is from April 21, 2010 through April 20, 2011.

[38] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the appropriate period is from April 21, 2011 through April 20, 2012.

[39] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the appropriate period is from April 21, 2010 through April 20, 2011.

028886

detail to permit the **Claims Administrator** to calculate the claimant's lost hours of work and lost earnings from such employment during such period.

2) A specific explanation of how (i) the reduction of claimant's hours of work identified, or (ii) the withdrawal of, or (iii) the failure to extend, an offer of employment was due to or resulting from the DWH Spill.

The number of affidavits submitted by an employer on behalf of the claimant and any other claimants shall be monitored by the **Claims Administrator** for reasonableness in light of the employer's operations. For example, it would be anticipated that a 10-room motel would have approximately five full-time equivalent employees, or that a 50-seat diner-style restaurant would have approximately five full-time equivalent servers.

B. <u>Interviews</u>

1. The **Claims Administrator** shall have the right to interview all claimants and related employer(s) in this Category IV claiming lost earnings of $7,500 or more and up to 25% of all other claimants within this Category IV and their supporting employer(s), in accordance with the provisions of the **Addendum Regarding Interviews of Claimant Alleging Economic Loss**.[40]

2. In addition, and notwithstanding the provisions of Section IV.B.1, the **Claims Administrator** shall have the right to interview any employer who submits an **Employer Sworn Written Statement** on behalf of more claimants than the **Claims Administrator** determines is reasonable for the position for which the employer is providing the **Employer Sworn Written Statement**, in accordance with the provisions of the **Addendum Regarding Interviews of Claimant Alleging Economic Loss**.

C. <u>Description Of Compensation Calculation</u>

The **Claims Administrator** shall determine the **Final Claimant Compensation** amount based on the totality of the information provided by the claimant and his or her employer(s), including the sworn Claim Form, **Claimant Sworn Written Statement**, **Employer Sworn Written Statement(s)**, interviews (if any), and/or any supplemental information the **Claims Administrator** may require the claimant to provide to support the claim, and/or any other information the **Claims Administrator** may determine to be relevant and reliable (collectively, the "Claim File"). The **Claims Administrator** shall rely on his assessment of the reliability and credibility of the **Claim File** information and the specifics of any claimed economic loss in determining the claimant's compensation, if any, to be provided to the claimant.

---

[40] In addition, nothing in this **Framework for Individual Economic Loss Claims** shall in any way limit the right and obligation of the **Claims Administrator** to investigate fully all suspicions of fraudulent conduct by or on behalf of any claimant, including but not limited to conducting any interviews and obtaining any documents the **Claims Administrator** deems necessary. Any such interviews will not be included in the 25% limit set forth above.

028887

**Step 1: Calculate Claimant's Lost Earnings**

In determining the claimant's lost earnings for the **Claiming Job**, the **Claims Administrator** shall consider the following factors:

1. **Prior Employment History:** The extent to which the **Claim File** establishes the claimant's pre-DWH Spill employment in the **Claiming Job**, including the type of work performed, wage rate, and amount of time spent working in the **Claiming Job**.

2. **Post-DWH Spill Anticipated Employment**: The extent to which the **Claim File** establishes the claimant's post-DWH Spill expected employment in the **Claiming Job**, including the job description, wage rate, and amount of time claimant was expected to be employed in the **Claiming Job** during the period from April 21 through December 31, 2010,[41] and wages expected to be earned in the **Claiming Job**.

3. **Post-DWH Spill Actual Employment**: The extent to which the **Claim File** establishes the claimant's actual post-DWH Spill employment in the **Claiming Job**, including the job description, wage rate, amount of time claimant actually was employed in the **Claiming Job** during the period from April 21 through December 31, 2010,[42] and actual earnings in the **Claiming Job and** any other employment during that period.

4. **Lost Earnings And Causation**: The extent to which the **Claim File** establishes (a) a reduction in anticipated employment and earnings in the **Claiming Job** during the period from April 21 through December 31, 2010,[43] and (b) the extent to which any such reduction in anticipated employment and earnings was due to or resulting from the DWH Spill.

5. **Continued Employment in 2011**: The extent to which the **Claim File** establishes that the claimant was employed in the **Claiming Job** or a similar job in 2011 and lived within 60 miles of his place of employment.

Based on the **Claims Administrator's** consideration of the totality of the information above, the **Claims Administrator** shall determine the claimant's lost earnings for the period April 21 through December 31, 2010[44] up to a cap of $20,000.

---

[41] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the **Claims Administrator** shall consider the extent to which the claimant has established his or her expected post-DWH Spill employment in the **Claiming Job** for the period April 21, 2010 through April 20, 2011.

[42] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the **Claims Administrator** shall consider the extent to which the claimant has established his or her actual post-DWH Spill employment in the **Claiming Job** for the period April 21, 2010 through April 20, 2011.

[43] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the claimant shall establish the claimant's lost earnings for the period April 21, 2010 through April 20, 2011.

[44] For claimants whose employer(s) is an entity or Natural Person satisfying the **Primary Seafood Industry** definition, the claimant shall establish the claimant's expected post-DWH Spill employment for the period April 21, 2010 through April 20, 2011.

028888

<u>Step 2:  Apply RTP, If Applicable</u>

Only claimants who, in 2011, (1) continued to be employed in a position the same as, or similar to, the **Claiming Job**, and (2) still lived within 60 miles of their place of employment, shall be eligible for an **RTP** of 1.

If eligible, the claimant's lost earnings shall be multiplied by the **RTP**.

<u>Step 3:  Determine Claimant's Compensation</u>

Deduct any **Spill-Related Payments** from the sum of Steps 1 and 2 to determine claimant's compensation amount.

Claimants under this Category IV shall not be eligible to recover **Reimbursable Search Costs**, **Reimbursable Training Costs** or **Employment-Related Benefits Losses**.

The formula for the claimant's compensation is:

> **Claimant's lost earnings (not to exceed $20,000) (from Step 1)**
>
> + **(Claimant's lost earnings (not to exceed $20,000) x RTP (if any)) (from Step 2)**
>
> + **One Time, Non-Recurring Event Compensation:** if applicable, provided, however, that in no event shall this amount exceed:  ($20,000 less Claimant's lost earnings from Step 1)
>
> - **Spill-Related Payments (if applicable) (from Step 3)**
>
> - VoO Settlement Offset and/or VoO Earned Income Offset (if any)

51

028889

## One Time Loss Addendum

A **One Time, Non-Recurring Event** shall be defined as an event or sale that (i) would have occurred in the **Claiming Job** between April 21, 2010 and December 31, 2010, and (ii) had not been included in the **Individual's** income from the **Claiming Job** in 2007, 2008 or 2009, and (iii) was canceled due to or resulting from DWH Spill.

An **Individual** asserting lost earnings due to cancellation of a **One Time, Non-Recurring Event** must provide documentation and establish causation as follows:

Documentation and Causation

The claimant shall provide all of the following:

1. Copy of contract for the **One Time, Non-Recurring Event** scheduled to occur during the period April 21, 2010 and December 31, 2010, and canceled subsequent to April 21, 2010. The contract must indicate the date, time and details of the event.

2. Documentation sufficient to establish the lost earnings, income or profit, to the claimant in respect of the **One Time, Non-Recurring Event**, including but not limited to a **Sworn Written Statement** by the party responsible for canceling the contract for the **One Time, Non-Recurring Event**.

3. Documentation establishing that the lost earnings, income or profit, identified in 2 is (a) for claimants with more than ten sales per year in the **Base Year(s)**, equal to or greater than 10% of the claimant's earnings in the **Base Year(s)** from the **Claiming Job**, or (b) for claimants with fewer than ten sales per year in the **Base Year(s)**, greater than two times the claimant's average commission on all transactions in the **Base Year(s)** from the **Claiming Job**.

4. Documentation sufficient to establish that (a) the cancellation of the **One Time, Non-Recurring Event** was due to or resulting from the DWH Spill, including but not limited to a **Sworn Written Statement** by the party responsible for canceling the contract for the **One Time, Non-Recurring Event**, and (b) the cancellation was a loss to claimant.

5. Documentation establishing that the lost earnings, income or profit, are not duplicative of amounts quantified as **Claimant Lost Earnings** in Step 6 of the **Compensation Calculation** for Categories I, II or III.

6. Itemized commission statements for 2007, 2008 and 2009, if applicable.

Compensation for the One Time, Non-Recurring Event

Compensation for the **One Time, Non-Recurring Event** shall equal the lost earnings for the **One Time, Non-Recurring Event**, and no **RTP** shall be applicable to the corresponding loss.

52

028890

# EXHIBIT 8B

# Introduction to Example Appendices A through F

**INDIVIDUAL ECONOMIC LOSS CLAIMS: EXAMPLES**

The following Appendices give examples of **Individual Economic Loss Categories I-III**. In each example, the **Compensation Period** selected is the period between April 21, 2010 and December 31, 2010 that produces maximum **Claimant Lost Earnings** for that example. In each example, **Final Claimant Compensation** for claimants who establish causation depends primarily on the following factors:

1. **Components of Lost Earnings**: **Claimant Lost Earnings** is calculated as the sum of two factors: (i) any decrease in earnings during the claimant selected **Compensation Period** compared to the same period(s) in the **Base Year(s)**, and (ii) any expected growth in earnings during the same **Compensation Period** relative to the **Base Year(s)**. Thus, the claimant selected **Compensation Period** is relevant for both factors, and claimants will want to consider both factors in selecting their **Compensation Period**.

2. **Length and Duration Of Economic Loss (Compensation Period)**: Each claimant selects a period of loss (or **Compensation Period**) reflecting the period in which the claimant's **Actual Earnings** were less than **Expected Earnings** due to or resulting from the DWH Spill. The **Compensation Period** must consist of at least 90 consecutive days between April 21, 2010 and December 31, 2010, and may extend for the entire period, at the claimant's election. In selecting a **Compensation Period**, claimant should be aware that any period when income (i) fell, (ii) stayed the same, or (iii) demonstrated a percentage increase lower than the applicable **Growth Factor(s)** (percentages), will result in **Actual Earnings** being less than **Expected Earnings**, and therefore a higher level of loss and compensation.

3. **Location and Industry Of Economic Loss**: Claimants incurring economic loss due to or resulting from the DWH Spill may also receive **Risk Transfer Premium (RTP)** compensation based upon the industry and location of their loss. The **RTP** is calculated as a multiple of the claimant's loss during the **Compensation Period**.

## Appendix A1

## Example of Compensation Calculation:  Category I Individual

> **Category I Individual with Pay Period Earnings Documentation**:  In this example, the claimant has passed the causation requirements and provides **Tax Information Documents** demonstrating annual earnings, and also provides **Pay Period Earnings Documentation** sufficient to establish monthly/pay period earnings, allowing for the calculation of a **Claimant Specific Growth Factor**.  This claimant was a salaried worker at a resort in Zone A who lost his job at the end of September 2010.  Because the claimant is a salaried worker, no **Industry Growth Factor** is applicable.

### Data Submitted by Claimant

|  | 2009 | 2010 |
|---|---|---|
| Annual Earnings per Tax Information Documents | $ 61,500 | $ 47,250 |
| **Pay Period Earnings** | | |
| January | $ 5,000 | $ 5,250 |
| February | $ 5,000 | $ 5,250 |
| March | $ 5,000 | $ 5,250 |
| April | $ 5,000 | $ 5,250 |
| May | $ 5,000 | $ 5,250 |
| June | $ 5,000 | $ 5,250 |
| July | $ 5,250 | $ 5,250 |
| August | $ 5,250 | $ 5,250 |
| September | $ 5,250 | $ 5,250 |
| October | $ 5,250 | $ - |
| November | $ 5,250 | $ - |
| December | $ 5,250 | $ - |
| **Total Earnings** | $ 61,500 | $ 47,250 |

*(2009 July–December marked --Benchmark Period--; 2010 July–December marked --Compensation Period--)*

### Step 1:  Claimant Selects Compensation Period & Base Year

Claimant has selected July 1, 2010 through December 31, 2010 as the **Compensation Period**, and chosen 2009 as the **Base Year**.

### Step 2:  Determine Benchmark Period Earnings Corresponding to the Compensation Period

**Benchmark Period** earnings are the actual earnings during the period of the **Base Year** of the same length and dates corresponding to the **Compensation Period**.  Given the selection in Step 1, the **Benchmark Period** earnings equal the earnings between July 1, 2009 and December 31, 2009, and are calculated as follows:

**Benchmark Period Earnings** (July 1-Dec 31, 2009)          $ 31,500

## Appendix A1

# Example of Compensation Calculation: Category I Individual

### Step 3: Determine Earnings Growth Factor(s)

The Claimant has provided pay period detail, and a **Claimant Specific Growth Factor** can be calculated using January through April earnings in 2010 and the **Base Year**. **Industry Growth Factor** does not apply (**Benchmark Period** earnings are salaried).

|  | 2009 | 2010 |
|---|---|---|
| January - April Earnings | $ 20,000 [a] | $ 21,000 [b] |
| **Calculated Claimant Specific Growth Factor** | | 5.0% [c]=([b]-[a])/[a] |
| 5.0% = ($21,000 - $20,000)/$20,000 | | |
| [c] = ([b] - [a]) / [a] | | |
| **Claimant Specific Growth Factor (max of +10%, min of -1.5%)** | | 5.0% [d] |

### Step 4: Calculate Expected Earnings

**Expected Earnings** equals **Benchmark Period** earnings (calculated in Step 2) increased by the applicable **Growth Factors** (from Step 3).

| | | |
|---|---|---|
| **Benchmark Period** Earnings (from Step 2) | $ 31,500 [e] | |
| **Claimant Specific Growth Rate** (if applicable from Step 3) | 5.0% = [d] | |
| **Industry Growth Factor** (if hourly, see Step 3) | n/a [f] | |
| **Expected Earnings for the Compensation Period** | $ 33,075 [g]=[e]*(1+[d]+[f]) | |

$33,075 = $31,500 x (1 + 0.05 + 0)

[g] = [e] x (1 + [d] + [f])

### Step 5: Determine Actual Earnings in the Compensation Period

**Actual Earnings** in the claimant selected **Compensation Period** in this example includes all earnings between the period selected by the Claimant in Step 1, July 1, 2010 through December 31, 2010.

**Actual Earnings** (July 1-December 31, 2010)  $ 15,750 [h]

### Step 6: Determine Claimant Lost Earnings

**Lost Earnings** is the difference between the **Expected Earnings** (Step 4) and the **Actual Earnings** (Step 5) over the **Compensation Period**.

**Lost Earnings**  $ 17,325 [i]=[g]-[h]

$17,325 = $33,075 - $15,750

[i] = [g] - [h]

028584

**Appendix A1**

## Example of Compensation Calculation:  Category I Individual

**Step 7:  Calculate Final Claimant Compensation**

**Final Claimant Compensation** includes **Lost Earnings** increased by the agreed upon **Risk Transfer Premium** (Zone A Tourism= 2.5), then adjusted for any **Employee-Related Benefits Loss** (assume $2,000), any **Reimbursable Training & Search Costs** (assume $500 each for training and search) and any **Spill Related Payments** (assume $3,000).

| | | | |
|---|---|---:|---|
| **Lost Earnings (Step 6)** | $ | 17,325 | = [i] |
| + **Lost Earnings Multiplied by Other Industries RTP (2.5 in Zone A)** | $ | 43,313 | [j]=[i] x RTP |
| = $17,325 x 2.5 | | | |
| + **Employment Related Benefits Losses** | $ | 2,000 | Given above. |
| + **Reimbursable Training Costs** | $ | 500 | Given above. |
| + **Reimbursable Search Costs** | $ | 500 | Given above. |
| - **Spill Related Payments** | $ | (3,000) | Given above. |
| **Final Claimant Compensation** | $ | 60,638 | |

Appendix A2

## Example of Compensation Calculation:  Category I Individual with Bonus

**Category I Individual with Pay Period Earnings Documentation**:  In this example, the claimant has passed the causation requirements and provides **Tax Information Documents** demonstrating annual earnings, and also provides **Pay Period Earnings Documentation** sufficient to establish monthly/pay period earnings, allowing for the calculation of a **Claimant Specific Growth Factor**.  This claimant was a salaried worker at a resort in Zone A who lost his job at the end of September 2010.  Because the claimant is a salaried worker, no **Industry Growth Factor** is applicable.  The claimant's documentation indicated that the claimant received a bonus in March 2009 related to calendar year 2008, and a bonus in March 2010 related to calendar year 2009.  Because the claimant lost his job, no bonus was received for calendar year 2010.

### Data Submitted by Claimant and Reallocation of Bonus Earnings

| | 2009 - Bonus Included in Year Paid | 2010 - Bonus Included in Year Paid | 2009 - No Bonus | 2010 - No Bonus | 2009 - Bonus Allocated to Year Earned* | 2010 - Bonus Allocated to Year Earned** |
|---|---|---|---|---|---|---|
| Regular Pay | $ 61,500 | $ 47,250 | $ 61,500 | $ 47,250 | $ 61,500 | $ 47,250 |
| Total Bonuses Paid | $ 5,000 | $ 6,000 | | | $ 6,000 | $ - |
| Total Annual Earnings | $ 66,500 | $ 53,250 | $ 61,500 | $ 47,250 | $ 67,500 | $ 47,250 |
| **Pay Period Earnings** | | | | | | |
| January | $ 5,000 | $ 5,250 | $ 5,000 | $ 5,250 | $ 5,500 | $ 5,250 |
| February | $ 5,000 | $ 5,250 | $ 5,000 | $ 5,250 | $ 5,500 | $ 5,250 |
| March | $ 10,000 | $ 11,250 | $ 5,000 | $ 5,250 | $ 5,500 | $ 5,250 |
| April | $ 5,000 | $ 5,250 | $ 5,000 | $ 5,250 | $ 5,500 | $ 5,250 |
| May | $ 5,000 | $ 5,250 | $ 5,000 | $ 5,250 | $ 5,500 | $ 5,250 |
| June | $ 5,000 | $ 5,250 | $ 5,000 | $ 5,250 | $ 5,500 | $ 5,250 |
| July | $ 5,250 | $ 5,250 | $ 5,250 | $ 5,250 | $ 5,750 | $ 5,250 |
| August | $ 5,250 | $ 5,250 | $ 5,250 | $ 5,250 | $ 5,750 | $ 5,250 |
| September | $ 5,250 | $ 5,250 | $ 5,250 | $ 5,250 | $ 5,750 | $ 5,250 |
| October | $ 5,250 | $ - | $ 5,250 | $ - | $ 5,750 | $ - |
| November | $ 5,250 | $ - | $ 5,250 | $ - | $ 5,750 | $ - |
| December | $ 5,250 | $ - | $ 5,250 | $ - | $ 5,750 | $ - |
| **Total Earnings** | $ 66,500 | $ 53,250 | $ 61,500 | $ 47,250 | $ 67,500 | $ 47,250 |

\*    $6,000 bonus received in 2010 relates to 2009 performance and is therefore allocated evenly across the months of 2009.

\*\*  No bonus was received for calendar year 2010, so no bonus earnings are allocated to 2010.

### Step 1:  Claimant Selects Compensation Period & Base Year

Claimant has selected July 1, 2010 through December 31, 2010 as the **Compensation Period**, and chosen 2009 as the **Base Year**.

### Step 2:  Determine Benchmark Period Earnings Corresponding to the Compensation Period

**Benchmark Period** earnings are the actual earnings during the period of the same length and dates corresponding to the **Compensation Period**. Given the selection in Step 1, the **Benchmark Period** earnings equal the earnings between July 1, 2009 and December 31, 2009, and are calculated as follows (inclusive of the allocated bonus):

| | |
|---|---|
| **Benchmark Period Earnings** (July 1-Dec 31, 2009) | $  34,500 |

### Step 3:  Determine Earnings Growth Factor(s)

The Claimant has provided pay period detail, and a **Claimant Specific Growth Factor** can be calculated using January through April earnings in 2010 and the **Base Year** (excluding any bonus amounts).  **Industry Growth Factor** does not apply (**Benchmark Period** earnings are salaried).

| | 2009 - No Bonus | 2010 - No Bonus | |
|---|---|---|---|
| January - April Earnings | $    20,000 [a] | $   21,000 [b] | |
| Calculated Claimant Specific Growth Factor | | **5.0%** [c]=([b]-[a])/[a] | |
| 5.0% = ($21,000 - $20,000)/$20,000 | | | |
| [c]  =   ([b]   -   [a])   / [a] | | | |
| Claimant Specific Growth Factor (max of +10%, min of -1.5%) | | 5.0% [d] | |

Appendix A2

## Example of Compensation Calculation:  Category I Individual with Bonus

| Step 4:  Calculate Expected Earnings | | | |
|---|---|---|---|

Expected Earnings equals **Benchmark Period** earnings (calculated in Step 2) increased by the applicable **Growth Factors** (from Step 3).

| | | | |
|---|---|---|---|
| **Benchmark Period** Earnings (from Step 2) | $ | 34,500 | [e] |
| **Claimant Specific Growth Rate** (if applicable from Step 3) | | 5.0% | = [d] |
| **Industry Growth Factor** (if hourly, see Step 3) | | n/a | [f] |
| **Expected Earnings for the Compensation Period** | $ | 36,225 | [g]=[e]*(1+[d]+[f]) |

$36,225 = $34,500 x (1 + 0.05 + 0)
  [g]   =   [e]   x   (1 + [d] + [f])

| Step 5:  Determine Actual Earnings in the Compensation Period | | | |
|---|---|---|---|

**Actual Earnings** in the claimant selected **Compensation Period** in this example includes all earnings between the period selected by the Claimant in Step 1, July 1, 2010 through December 31, 2010.

| | | | |
|---|---|---|---|
| **Actual Earnings** (July 1-December 31, 2010) | $ | 15,750 | [h] |

| Step 6:  Determine Claimant Lost Earnings | | | |
|---|---|---|---|

**Lost Earnings** is the difference between the **Expected Earnings** (Step 4) and the **Actual Earnings** (Step 5) over the **Compensation Period**.

| | | | |
|---|---|---|---|
| **Lost Earnings** | $ | 20,475 | [i]=[g]-[h] |

$20,475 = $36,225 - $15,750
  [i]   =   [g]   -   [h]

| Step 7:  Calculate Final Claimant Compensation | | | |
|---|---|---|---|

**Final Claimant Compensation** includes **Lost Earnings** increased by the agreed upon **Risk Transfer Premium** (Zone A Tourism= 2.5), then adjusted for any **Employee-Related Benefits Loss** (assume $2,000), any **Reimbursable Training & Search Costs** (assume $500 each for training and search) and any **Spill Related Payments** (assume $3,000).

| | | | |
|---|---|---|---|
| Lost Earnings (Step 6) | $ | 20,475 | = [i] |
| + Lost Earnings Multiplied by Other Industries RTP (2.5 in Zone A) | $ | 51,188 | [j]=[i] x RTP |
| = $20,475 x 2.5 | | | |
| + Employment Related Benefits Losses | $ | 2,000 | Given above. |
| + Reimbursable Training Costs | $ | 500 | Given above. |
| + Reimbursable Search Costs | $ | 500 | Given above. |
| - Spill Related Payments | $ | (3,000) | Given above. |
| **Final Claimant Compensation** | $ | 71,663 | |

028587

## Appendix A3

### Example of Compensation Calculation: Category I Individual with Commissions

**Category I Individual with Pay Period Earnings Documentation**: In this example, the claimant has passed the causation requirements and provides **Tax Information Documents** demonstrating annual earnings, and also provides **Pay Period Earnings Documentation** sufficient to establish monthly/pay period earnings, allowing for the calculation of a **Claimant Specific Growth Factor**. This claimant was a worker at a resort in Zone A who received a salary plus quarterly commissions, and who lost his job at the end of September 2010. Because the claimant is a salaried worker, no **Industry Growth Factor** is applicable.

**Data Submitted by Claimant and Reallocation of Commission Earnings**

| | 2009 - Commission Included as Paid | 2010 - Commission Included as Paid | | 2009 - Commission Allocated to Period Earned* | 2010 - Commission Allocated to Period Earned* | |
|---|---|---|---|---|---|---|
| **Regular Pay** | **$ 61,500** | **$ 47,250** | **Regular Pay** | **$ 61,500** | **$ 47,250** | |
| **Commission Paid in:** | | | **Commission Related to:** | | | |
| **January** | **$ 1,000** | **$ 1,250** | **January-March** | **$ 1,250** | **$ 1,500** | |
| **April** | **$ 1,250** | **$ 1,500** | **April-June** | **$ 1,250** | **$ 1,500** | |
| **July** | **$ 1,250** | **$ 1,500** | **July-October** | **$ 1,250** | **$ -** | |
| **October** | **$ 1,250** | **$ -** | **October-December** | **$ 1,250** | **$ -** | |
| **Total Commissions*** | **$ 4,750** | **$ 4,250** | **Total Commissions*** | **$ 5,000** | **$ 3,000** | |
| **Total Annual Earnings** | **$ 66,250** | **$ 51,500** | | **$ 66,500** | **$ 50,250** | |
| **Pay Period Earnings** | | | | | | |
| January | $ 6,000 | $ 6,500 | --Growth Rate-- | $ 5,417 | $ 5,750 | --Growth Rate-- |
| February | $ 5,000 | $ 5,250 | --Growth Rate-- | $ 5,417 | $ 5,750 | --Growth Rate-- |
| March | $ 5,000 | $ 5,250 | --Growth Rate-- | $ 5,417 | $ 5,750 | --Growth Rate-- |
| April | $ 6,250 | $ 6,750 | --Growth Rate-- | $ 5,417 | $ 5,750 | --Growth Rate-- |
| May | $ 5,000 | $ 5,250 | | $ 5,417 | $ 5,750 | |
| June | $ 5,000 | $ 5,250 | | $ 5,417 | $ 5,750 | |
| July | $ 6,500 | $ 6,750 | ----Benchmark Period---- | $ 5,667 | $ 5,250 | --Compensation Period-- |
| August | $ 5,250 | $ 5,250 | ----Benchmark Period---- | $ 5,667 | $ 5,250 | --Compensation Period-- |
| September | $ 5,250 | $ 5,250 | ----Benchmark Period---- | $ 5,667 | $ 5,250 | --Compensation Period-- |
| October | $ 6,500 | $ - | ----Benchmark Period---- | $ 5,667 | $ - | --Compensation Period-- |
| November | $ 5,250 | $ - | ----Benchmark Period---- | $ 5,667 | $ - | --Compensation Period-- |
| December | $ 5,250 | $ - | ----Benchmark Period---- | $ 5,667 | $ - | --Compensation Period-- |
| **Total Earnings** | **$ 66,250** | **$ 51,500** | | **$ 66,500** | **$ 50,250** | |

* Commissions were paid quarterly. Commissions paid in 2009 were $1,250 each. The commission paid in January related to October-December 2008, the commission paid in April 2009 related to January-March 2009, the commission paid in July 2009 related to April-June 2009, and the commission paid in October 2009 related to July through September 2009. Commissions paid in 2010 were also $1,500 each. The commission paid in January 2010 related to October-December 2009, the commission paid in April 2010 related to January-March 2010, and the commission paid in July 2010 related to April-June 2010. The claimant was terminated in September 2010 and did not receive any additional commissions.

**Step 1: Claimant Selects Compensation Period & Base Year**

Claimant has selected July 1, 2010 through December 31, 2010 as the **Compensation Period**, and chosen 2009 as the **Base Year**.

**Step 2: Determine Benchmark Period Earnings Corresponding to the Compensation Period**

**Benchmark Period** earnings are the actual earnings during the period of the **Base Year** of the same length and dates corresponding to the **Compensation Period**. Given the selection in Step 1, the **Benchmark Period** earnings equal the earnings between July 1, 2009 and December 31, 2009, and are calculated as follows (inclusive of the allocated commissions):

**Benchmark Period Earnings** (July 1-Dec 31, 2009) **$ 34,000**

Appendix A3

## Example of Compensation Calculation:  Category I Individual with Commissions

### Step 3:  Determine Earnings Growth Factor(s)

The Claimant has provided pay period detail, and a **Claimant Specific Growth Factor** can be calculated using January through April earnings in 2010 and the **Base Year** (including commissions).  **Industry Growth Factor** does not apply (**Benchmark Period** earnings are salaried).

| | 2009 - Commission Allocated to Period Earned* | 2010 - Commission Allocated to Period Earned* |
|---|---|---|
| January - April Earnings | $        21,667 [a] | $        23,000 [b] |
| Calculated Claimant Specific Growth Factor | | 6.2% [c]=([b]-[a])/[a] |
| 6.2% = ($23,000 - $21,667)/$23,000 | | |
| [c] = ([b] - [a]) / [a] | | |
| Claimant Specific Growth Factor (max of +10%, min of -1.5%) | | 6.2% [d] |

### Step 4:  Calculate Expected Earnings

**Expected Earnings** equals **Benchmark Period** earnings (calculated in Step 2) increased by the applicable **Growth Factors** (from Step 3).

| | |
|---|---|
| **Benchmark Period** Earnings (from Step 2) | $        34,000 [e] |
| **Claimant Specific Growth Rate** (if applicable from Step 3) | 6.2% = [d] |
| **Industry Growth Factor** (if hourly, see Step 3) | n/a [f] |
| **Expected Earnings for the Compensation Period** | $        36,108 [g]=[e]*(1+[d]+[f]) |
| $36,092 = $34,000 x (1 + 0 062 + 0) | |
| [g]  =  [e]  x  (1 + [d] + [f]) | |

### Step 5:  Determine Actual Earnings in the Compensation Period

**Actual Earnings** in the claimant selected **Compensation Period** in this example includes all earnings between the period selected by the Claimant in Step 1, July 1, 2010 through December 31, 2010.

| | |
|---|---|
| **Actual Earnings** (July 1-December 31, 2010) | $        15,750 [h] |

### Step 6:  Determine Claimant Lost Earnings

**Lost Earnings** is the difference between the **Expected Earnings** (Step 4) and the **Actual Earnings** (Step 5) over the **Compensation Period**.

| | |
|---|---|
| **Lost Earnings** | $        20,358 [i]=[g]-[h] |
| $20,342 = $36,092 - $15,750 | |
| [i]  =  [g]  -  [h] | |

### Step 7:  Calculate Final Claimant Compensation

**Final Claimant Compensation** includes **Lost Earnings** increased by the agreed upon **Risk Transfer Premium** (Zone A Tourism= 2.5), then adjusted for any **Employee-Related Benefits Loss** (assume $2,000), any **Reimbursable Training & Search Costs** (assume $500 each for training and search) and any **Spill Related Payments** (assume $3,000).

| | | |
|---|---|---|
| Lost Earnings (Step 6) | $        20,358 | = [i] |
| + Lost Earnings Multiplied by Other Industries RTP (2.5 in Zone A) | $        50,895 | [j]=[i] x RTP |
| = $20,342 x 2 5 | | |
| + Employment Related Benefits Losses | $        2,000 | Given above. |
| + Reimbursable Training Costs | $        500 | Given above. |
| + Reimbursable Search Costs | $        500 | Given above. |
| - Spill Related Payments | $        (3,000) | Given above. |
| **Final Claimant Compensation** | $        71,253 | |

Appendix B

## Example of Compensation Calculation:  Category I Individual (Salaried)

Category I Individual with Pay Period Earnings Documentation:  In this example, the claimant has passed the causation requirements and provides **Tax Information Documents** demonstrating annual earnings, and also provides **Pay Period Earnings Documentation** sufficient to establish pay period earnings, allowing for the calculation of a **Claimant Specific Growth Factor**.  This claimant was a salaried worker at a manufacturing facility in Zone A paid monthly in 2009 who changed jobs and began being compensated using an hourly wage for which he was paid twice monthly.  Because the claimant was a salaried worker in the **Benchmark Period**, no **Industry Growth Factor** is applicable.

### Data Submitted by Claimant

|  | 2009 | 2010 |
|---|---|---|
| Annual Earnings per Tax Information Documents | $   61,500 | $   45,950 |
| **Pay Period Earnings (Period Ending...)** | | |
| January 15 | - | $   2,600 |
| January 31 | $   5,000 | $   2,650 |
| February 15 | - | $   2,550 |
| February 28 | $   5,000 | $   2,300 |
| March 15 | - | $   2,350 |
| March 31 | $   5,000 | $   2,550 |
| April 15 | - | $   2,600 |
| April 30 | $   5,000 | $   2,700 |
| May 15 | - | $   2,800 |
| May 31 | $   5,000 | $   2,850 |
| June 15 | - | $   2,900 |
| June 30 | $   5,000 | $   1,750 |
| July 15 | $   - | $   1,400 |
| July 31 | $   5,250 | $   1,300 |
| August 15 | $   - | $   1,200 |
| August 31 | $   5,250 | $   1,100 |
| September 15 | $   - | $   1,200 |
| September 30 | $   5,250 | $   1,240 |
| October 15 | $   - | $   1,320 |
| October 31 | $   5,250 | $   1,340 |
| November 15 | $   - | $   1,250 |
| November 30 | $   5,250 | $   1,200 |
| December 15 | $   - | $   1,300 |
| December 31 | $   5,250 | $   1,500 |
| **Total Earnings** | $   61,500 | $   45,950 |

*(The June 30 – December 31, 2009 column is marked "Benchmark Period"; the June 15 – December 31, 2010 column is marked "Compensation Period.")*

### Step 1:  Claimant Selects Compensation Period & Base Year

Claimant has selected June 15, 2010 through December 31, 2010 as the **Compensation Period**, and chosen 2009 as the **Base Year**.

### Step 2:  Determine Benchmark Period Earnings Corresponding to the Compensation Period

**Benchmark Period** earnings are the actual earnings during the period of the **Base Year** of the same length and dates as in the **Compensation Period**.  Given the selection in Step 1, the **Benchmark Period** earnings equal the earnings between June 15, 2009 and December 31, 2009, and are calculated as follows:

| | | |
|---|---|---|
| Earnings June 15-July 1, 2009 | $   2,500 | (=$5,000 x 0.5 months) |
| Earnings July 1-December 31, 2009 | $   31,500 | (=$5,250 x 6 months) |
| Total Benchmark Period Earnings | $   34,000 | |

### Step 3:  Determine Earnings Growth Factor(s)

Appendix B

## Example of Compensation Calculation:  Category I Individual (Salaried)

The Claimant has provided pay period detail, and a **Claimant Specific Factor** can be calculated using January through April earnings in 2010 and the **Base Year**.  **Industry Growth Factor** does not apply as Benchmark Period earnings are salaried.

|  | 2009 | 2010 |
|---|---|---|
| January - April Earnings | $  20,000  [a] | $  20,300  [b] |

| | |
|---|---|
| Calculated Claimant Specific Growth Factor | 1.5%  [c]=([b]-[a])/[a] |

1.5% = ($20,300 - $20,000)/$20,000
[c]  =  ([b]   -   [a]) /  [a]

| | |
|---|---|
| Selected Claimant Specific Growth Factor (max of +10%, min of -1.5%) | 1.5% [d] |

### Step 4:  Calculate Expected Earnings

**Expected Earnings** equals **Benchmark Period** earnings (calculated in Step 2) increased by the applicable **Growth Factors** (from Step 3).

| | |
|---|---|
| **Benchmark Period** Earnings (from Step 2) | $  34,000  [e] |
| **Claimant Specific Growth Rate** (if applicable from Step 3) | 1.5% = [d] |
| **Industry Growth Factor** (if hourly, see Step 3) | n/a [f] |
| Expected Earnings for the Compensation Period | $  34,510  [g]=[e]*(1+[d]+[f]) |

$34,510 = $34,000 x (1 + 0.015 + 0)
[g]   =   [e]   x   (1 + [d] + [f])

### Step 5:  Determine Actual Earnings in the Compensation Period

**Actual Earnings** in the claimant selected **Compensation Period** in this example includes all earnings in the 2010 period selected by the Claimant in Step 1, June 15, 2010 through December 31, 2010.

| | |
|---|---|
| **Actual Earnings** (June 15-December 31, 2010) | $  17,100  [h] |

### Step 6:  Determine Claimant Lost Earnings

**Lost Earnings** is the difference between the **Expected Earnings** (Step 4) and the **Actual Earnings** (Step 5) over the **Compensation Period**.

| | |
|---|---|
| Lost Earnings (Step 4: Expected Earnings - Step 5: Actual Earnings) | $  17,410  [i]=[g]-[h] |

$17,410 = $34,510 - $17,100
[i]  =   [g]   -  [h]

028591

Appendix B

## Example of Compensation Calculation: Category I Individual (Salaried)

**Step 7: Calculate Final Claimant Compensation**

Final Claimant Compensation includes **Lost Earnings** increased by the agreed upon **Risk Transfer Premium** (Zone A Other Industries= 1.5), then adjusted for any **Employment-Related Benefits Losses** (assume $2,000), any **Reimbursable Training & Search Costs** (assume none) and any Spill Related Payments (assume $3,000).

| | | | |
|---|---|---:|---|
| | Lost Earnings (Step 6) | $ 17,410 | [i] |
| + | Lost Earnings Multiplied by Other Industries RTP (1.5 in Zone A) | $ 26,115 | [j]=[i] x RTP |
| + | Employment Related Benefits Losses | $ 2,000 | Given above. |
| + | Reimbursable Training Costs | $ - | Given above. |
| + | Reimbursable Search Costs | $ - | Given above. |
| - | Spill Related Payments | $ (3,000) | Given above. |
| | **Final Claimant Compensation** | **$ 42,525** | |

**Appendix C1**

### Example of Compensation Calculation:
### Category I Individual (Multiple Hourly Claiming Jobs)

---

**Category I Individual with Pay Period Earnings Documentation**:  In this example, the claimant has passed the causation requirements and provides **Tax Information Documents** demonstrating annual earnings, and also provides **Pay Period Earnings Documentation** sufficient to establish pay period earnings, allowing for the calculation of a **Claimant Specific Growth Factor**.  This claimant was an hourly worker with two **Claiming Jobs**: one Zone B construction job (Job 1) which paid monthly and one Zone B restaurant job which paid twice monthly (Job 2).  Because the claimant is an hourly wage worker, an **Industry Growth Factor** is applicable.

---

**Data Submitted by Claimant**

| | 2009-Job 1 | 2009-Job 2 | 2010-Job 1 | 2010-Job 2 |
|---|---|---|---|---|
| Annual Earnings per Tax Info Docs | $ 28,800 | $ 17,720 | $ 24,600 | $ 15,320 |
| | | | | |
| **Pay Period Earnings (Period Ending...)** | | | | |
| January 15 | - | $ 800 | - | $ 820 |
| January 31 | $ 2,300 | $ 760 | $ 2,400 | $ 780 |
| February 15 | - | $ 680 | - | $ 660 |
| February 28 | $ 2,350 | $ 660 | $ 2,450 | $ 700 |
| March 15 | - | $ 640 | - | $ 740 |
| March 31 | $ 2,130 | $ 700 | $ 2,600 | $ 800 |
| April 15 | - | $ 710 | - | $ 860 |
| April 30 | $ 2,220 | $ 730 | $ 2,300 | $ 860 |
| May 15 | - | $ 720 | - | $ 740 |
| May 31 | $ 2,450 | $ 800 | $ 2,200 | $ 640 |
| June 15 | - | $ 820 | - | $ 600 |
| June 30 | $ 2,500 | $ 800 | $ 1,950 | $ 540 |
| July 15 | - | $ 840 | - | $ 560 |
| July 31 | $ 2,650 | $ 880 | $ 1,800 | $ 600 |
| August 15 | - | $ 780 | - | $ 560 |
| August 31 | $ 2,700 | $ 770 | $ 1,800 | $ 600 |
| September 15 | - | $ 810 | - | $ 620 |
| September 30 | $ 2,250 | $ 680 | $ 1,740 | $ 540 |
| October 15 | - | $ 660 | - | $ 520 |
| October 31 | $ 2,350 | $ 640 | $ 1,660 | $ 480 |
| November 15 | - | $ 660 | - | $ 400 |
| November 30 | $ 2,400 | $ 700 | $ 1,800 | $ 560 |
| December 15 | - | $ 680 | - | $ 500 |
| December 31 | $ 2,500 | $ 800 | $ 1,900 | $ 640 |
| | | | | |
| **Total Earnings** | $ 28,800 | $ 17,720 | $ 24,600 | $ 15,320 |

*(Benchmark Period brackets May 31 through December 31 for 2009 columns; Compensation Period brackets May 31 through December 31 for 2010 columns)*

---

**Step 1:  Claimant Selects Compensation Period & Base Year**

Claimant has selected May 15, 2010 through December 31, 2010 as the **Compensation Period**, and chosen 2009 as the **Base Year**.

Appendix C1

## Example of Compensation Calculation:
## Category I Individual (Multiple Hourly Claiming Jobs)

### Step 2:  Determine Benchmark Period Earnings Corresponding to the Compensation Period

**Benchmark Period** earnings are the actual earnings during the period of the **Base Year** of the same length and dates corresponding to the **Compensation Period**.  Given the selection in Step 1, the **Benchmark Period** earnings equal the earnings between May 15, 2009 and December 31, 2009, and are calculated as follows:

|  | Job 1 | Job 2 |  |
|---|---|---|---|
| Earnings May 15-June 1, 2009 | $ 1,225 | $ 800 | (Job 1=$2,450 x 50%) |
| Earnings June 1-December 31, 2009 | $ 17,350 | $ 10,520 |  |
| **Total Benchmark Period Earnings** | $ 18,575 | $ 11,320 |  |

### Step 3:  Determine Earnings Growth Factor(s)

The Claimant has provided **Pay Period Earnings Documentation**, and a **Claimant Specific Growth Factor** can be calculated using January through April earnings in 2010 and the **Base Year**.  **Industry Growth Factor** (1.5%) applies as **Benchmark Period** earnings are paid hourly.

|  | 2009-Job 1 | 2009-Job 2 | 2010-Job 1 | 2010-Job 2 |  |
|---|---|---|---|---|---|
| January - April Earnings | $ 9,000 | $ 5,680 [a] | $ 9,750 | $ 6,220 [b] |
| **Calculated Claimant Specific Growth Factor** |  |  | 8.3% | 9.5% | [c]=([b]-[a])/[a] |

$$8.3\% = (\$9{,}750 - \$9{,}000)/\$9{,}000$$
$$9.5\% = (\$6{,}220 - \$5{,}680)/\$5{,}680$$
$$[c] = ([b] - [a]) / [a]$$

|  |  | 2010-Job 1 | 2010-Job 2 |  |
|---|---|---|---|---|
| Claimant Specific Growth Factor (max of +10%, min of -1.5%) |  | 8.3% | 9.5% | [d] |

### Step 4:  Calculate Expected Earnings

**Expected Earnings** equals **Benchmark Period** earnings (calculated in Step 2) increased by the applicable **Growth Factors** (from Step 3).

|  | 2010-Job 1 | 2010-Job 2 |  |
|---|---|---|---|
| **Benchmark Period** Earnings  (from Step 2) | $ 18,575 | $ 11,320 | [e] |
| **Claimant Specific Growth Rate** (if applicable from Step 3) | 8.3% | 9.5% | = [d] |
| **Industry Growth Factor** (if hourly, see Step 3) | 1.5% | 1.5% | [f] |
| Expected Earnings for the Compensation Period | $ 20,402 | $ 12,566 | [g]=[e]*(1+[d]+[f]) |

$$\$20{,}402 = \$18{,}575 \times (1 + 0.083 + 0.015)$$
$$\$12{,}566 = \$11{,}320 \times (1 + 0.095 + 0.015)$$
$$[g] = [e] \times (1 + [d] + [f])$$

028594

Appendix C1

## Example of Compensation Calculation:
## Category I Individual (Multiple Hourly Claiming Jobs)

**Step 5: Determine Actual Earnings in the Compensation Period**

**Actual Earnings** in the claimant selected **Compensation Period** in this example includes all earnings between the period selected by the Claimant in Step 1, May 15, 2010 through December 31, 2010.

| | | | |
|---|---|---|---|
| Actual Earnings (May 15-December 31, 2010) | $ 13,750 | $ 8,360 | [h] |

**Step 6: Determine Claimant Lost Earnings**

Lost Earnings is the difference between the **Expected Earnings** (Step 4) and the **Actual Earnings** (Step 5) over the **Compensation Period**.

| | Job 1 | Job 2 | |
|---|---|---|---|
| Lost Earnings | $ 6,652 | $ 4,206 | [i]=[g]-[h] |

$6,652 = $20,402 - $13,750
$4,206 = $12,566 - $8,360
[i] = [g] - [h]

**Step 7: Calculate Final Claimant Compensation**

**Final Claimant Compensation** includes **Lost Earnings** increased by the agreed upon **Risk Transfer Premium** (RTP Job 1= 1.25: Job 2= 2.5), then adjusted for any **Employee-Related Benefits Loss** (assume $2,000 for Job 1), any **Reimbursable Training & Search Costs** (assume $500 for each training and search) and any **Spill Related Payments** (assume $3,000).

| | Job 1 | Job 2 | |
|---|---|---|---|
| Lost Earnings (Step 6) | $ 6,652 | $ 4,206 | [i] |
| + Lost Earnings Multiplied by RTP (Job 1= 1.25; Job 2= 2.5) | $ 8,314 | $ 10,515 | [j]=[i] x RTP |
| + Employment Related Benefits Losses | $ 2,000 | $ - | [k] |
| | $ 16,966 | $ 14,721 | [l]=[i]+[j]+[k] |

| | | |
|---|---|---|
| **Total Claimant Lost Earnings** | $ 31,687 | Total of [l] |
| + Reimbursable Training Costs | $ 500 | Given above. |
| + Reimbursable Search Costs | $ 500 | Given above. |
| - Spill Related Payments | $ (3,000) | Given above. |
| **Final Claimant Compensation** | $ 29,687 | |

028595

Appendix C2

## Example of Compensation Calculation:
### Category I Individual (Hourly Claiming Job and Multiple Sources of Compensation Period Income)

**Category I Individual with Pay Period Earnings Documentation**: In this example, the claimant has passed the causation requirements, provided **Tax Information Documents** demonstrating annual earnings, and also provided **Pay Period Earnings Documentation** sufficient to establish pay period earnings (allowing for the calculation of a **Claimant Specific Growth Factor**). This claimant is an hourly wage worker with one job meeting causation, a Zone B construction job (Job 1) which paid monthly. After the DWH Spill, the claimant found a second hourly job at a restaurant in Zone C which also pays monthly (Job 2). Because the claimant is an hourly wage worker, an **Industry Growth Factor** is applicable. To the extent the claimant found new work to replace any hours lost due to or resulting from the DWH Spill, compensation for those replaced hours are included in **Actual Earnings**.

### Data Submitted by Claimant

|  | 2009 - Job 1 | | | 2010 - Job 1 | | | 2010 - Job 2 | | |
|---|---|---|---|---|---|---|---|---|---|
| Annual Earnings per Tax Info Docs |  | | $ 8,920 |  | | $ 8,370 |  | | $ 525 |
| Pay Period Earnings (Period Ending...) | *Hrs* | *Hourly Rate* | *Total Pay* | *Hrs* | *Hourly Rate* | *Total Pay* | *Hrs* | *Hourly Rate* | *Total Pay* |
| January 31 | 76 | $ 10 | $ 760 | 80 | $ 10 | $ 800 | - | $ | $ - |
| February 28 | 66 | $ 10 | $ 660 | 72 | $ 10 | $ 720 | - | $ | $ - |
| March 31 | 70 | $ 10 | $ 700 | 74 | $ 10 | $ 740 | - | $ | $ - |
| April 30 | 73 | $ 10 | $ 730 | 76 | $ 10 | $ 760 | - | $ | $ - |
| May 31 | 80 | $ 10 | $ 800 | 70 | $ 10 | $ 700 | 10 | $ 5 | $ 50 |
| June 30 | 80 | $ 10 | $ 800 | 60 | $ 10 | $ 600 | 25 | $ 5 | $ 125 |
| July 31 | 88 | $ 10 | $ 880 | 75 | $ 10 | $ 750 | 20 | $ 5 | $ 100 |
| August 31 | 77 | $ 10 | $ 770 | 66 | $ 10 | $ 660 | 15 | $ 5 | $ 75 |
| September 30 | 68 | $ 10 | $ 680 | 54 | $ 10 | $ 540 | 15 | $ 5 | $ 75 |
| October 31 | 64 | $ 10 | $ 640 | 60 | $ 10 | $ 600 | 20 | $ 5 | $ 100 |
| November 30 | 70 | $ 10 | $ 700 | 70 | $ 10 | $ 700 | - | $ | $ - |
| December 31 | 80 | $ 10 | $ 800 | 80 | $ 10 | $ 800 | - | $ | $ - |
| **Total Earnings & Hours** | 892 | | $ 8,920 | 837 | | $ 8,370 | 105 | | $ 525 |

*(2009 May-Dec bracketed as "Benchmark Period"; 2010 May-Dec bracketed as "Compensation Period")*

### Step 1: Claimant Selects Compensation Period & Base Year

Claimant has selected May 1, 2010 through December 31, 2010 as the **Compensation Period**, and chosen 2009 as the **Base Year**.

### Step 2: Determine Benchmark Period Earnings and Hours Corresponding to the Compensation Period

**Benchmark Period** earnings are the actual earnings during the period of the **Base Year** of the same length and dates corresponding to the **Compensation Period**. Given the selection in Step 1, the **Benchmark Period** earnings equal the earnings between May 1, 2009 and December 31, 2009, and are calculated as follows:

|  | Job 1 | |
|---|---|---|
|  | Hrs | Earnings |
| **Benchmark Period** Earnings (May 1 - Dec. 31, 2009) | 607 [a] | $ 6,070 [b] |

Step 3: Determine Earnings Growth Factor(s)

The Claimant has provided **Pay Period Earnings Documentation**, and a **Claimant Specific Growth Factor** can be calculated using January through April earnings in 2010 and the **Base Year**. **Industry Growth Factor** (1.5%) applies as **Benchmark Period** earnings are paid hourly.

|  | 2009 - Job 1 |  | 2010 - Job 1 |  |
|---|---|---|---|---|
| January - April Earnings | $ 2,850 | [c] | $ 3,020 | [d] |
| Calculated Claimant Specific Growth Factor |  |  | 6.0% | [e] [(d]-[c])/[c] |
| 6.0% = ($3,020 - $2,850)/$2,850 |  |  |  |  |
| [e] = ([d] - [c]) / [c] |  |  |  |  |
| Claimant Specific Growth Factor (max of +10%, min of -1.5%) |  |  | 6.0% | [f] |

Step 4: Calculate Expected Earnings

**Expected Earnings** equals **Benchmark Period** earnings (calculated in Step 2) increased by the applicable **Growth Factors** (from Step 3).

|  | Job 1 |  |
|---|---|---|
| **Benchmark Period** Earnings (see Step 2) | $ 6,070 | [b] |
| **Claimant Specific Growth Rate** (if applicable from Step 3) | 6.0% | [f] |
| **Industry Growth Factor** (if hourly, see Step 3) | 1.5% | [g] |
| Expected Earnings for the Compensation Period | $ 6,523 | [h] [b]*(1+[f]+[g]) |
| $6,523 = $6,070 x (1 + 0.06 + 0 015) |  |  |
| [h] = [b] x (1 + [f] + [g]) |  |  |

Step 5: Determine Actual Earnings in the Compensation Period

**Actual Earnings** in the claimant selected **Compensation Period** in this example includes all earnings between the period selected by the Claimant in Step 1, May 1, 2010 through December 31, 2010. Earnings from Job 2 are only included to the extent they replace hours from Job 1.

|  |  |  |
|---|---|---|
| Actual Earnings - **Job 1** (May 1 - December 31, 2010) | $ 5,350 | [i] |
| <u>Actual Earnings - **Job 2** (May 1 - October 31, 2010)</u> |  |  |
| Hours Worked in **Benchmark Period** - Job 1 (May 1-Dec. 31, 2009) | 607 |  |
| Hours Worked in **Compensation Period** - Job 1 (May 1-Dec. 31, 2010) | 535 |  |
| Decreased Hours In **Claiming Job** | 72 | [j] |
| Hours Worked in **Compensation Period** - Job 2 (May 1-Dec. 31, 2010) | 105 |  |
| Hours Worked in **Benchmark Period** - Job 2 (May 1-Dec. 31, 2009) | - |  |
| Increased Hours Worked | 105 | [k] |
| Redirected Hours (lesser of [jj] and [k]) | 72 | [l] |
| Average **Compensation Period** Wage Rate in the non-**Claiming Job** | $ 5.00 | [m] |
| (= Total **Compensation Period** Earnings/Total **Compensation Period** Hours= $525/105) |  |  |
| Job 2 **Actual Earnings** to Include | $ 360 | [n] [l] x [m] |
| $360 = 72 x $5 00 |  |  |
| [n] = [l] x [m] |  |  |
| **Total Actual Earnings** | $ 5,710 | [o] [i] + [n] |
| $5,710 = $5,350 + $360 |  |  |
| [o] = [i] + [n] |  |  |

028597

**Step 6:  Determine Claimant Lost Earnings**

**Claimant Lost Earnings** is the difference between the **Expected Earnings** (Step 4) and the **Actual Earnings** (Step 5) over the **Compensation Period**.

Lost Earnings                                          $    813    [p]  [h]-[o]
                $813 = $6,523 - $5,710
                [p]   =   [h]   -   [o]

**Step 7:  Calculate Final Claimant Compensation**

**Final Claimant Compensation** includes **Lost Earnings** increased by the agreed upon **Risk Transfer Premium** (RTP Job 1= 1.25), then adjusted for any **Employee-Related Benefits Loss** (assume $2,000 for Job 1), any **Reimbursable Training & Search Costs** (assume $500 for each training and search) and any **Spill Related Payments** (assume $1,000).

| | | |
|---|---:|---|
| Lost Earnings (Step 6) | $    813 | [I] |
| + **Lost Earnings Multiplied by RTP (Job 1= 1.25)** | $  1,016 | [J]  [I] x RTP |
| + **Employment Related Benefits Losses** | $  2,000 | [k] |
| | $  3,830 | [I]  [I]+[J]+[k] |
| | | |
| **Total Claimant Lost Earnings** | $  3,830 | Total of [I] |
| + Reimbursable Training Costs | $    500 | Given above. |
| + Reimbursable Search Costs | $    500 | Given above. |
| - Spill Related Payments | $ (1,000) | Given above. |
| | | |
| **Final Claimant Compensation** | **$  3,830** | |

## Appendix D
### Example of Compensation Calculation:  Category II Individual

Category II Individual with detailed Pay Period Earnings Documentation:  In this example, the claimant has passed the causation requirements but provided incomplete **Pay Period Earnings Documentation** insufficient to calculate a **Claimant Specific Growth Factor**.  This claimant is an hourly worker at a factory in Zone C in both periods, and an **Industry Growth Factor** is therefore applicable.  Because the Claimant is missing information for certain pay periods in the **Base Year** and has not provided total annual earnings for the **Base Year**, the **Compensation Period** and **Benchmark Period** may not include those pay periods.  If the claimant provided total annual earnings for the **Base Year** (2009), the earnings for April 30th and August 15th could be derived from the annual data by subtracting the sum of the **Pay Period Earnings Documentation** data provided from total annual earnings.  If appropriate, the claimant could then have considered alternative **Compensation Periods** that included the April 30th and August 15th pay periods.

### Data Submitted by Claimant

| | | 2009 | | 2010 |
|---|---|---|---|---|
| **Annual Earnings per Tax Information Documents** | | Not Given | | Not Given |
| **Pay Period Earnings (Period Ending...)** | | | | |
| January 15 | $ | 2,200 | $ | 2,250 |
| January 31 | $ | 2,250 | $ | 2,300 |
| February 15 | $ | 2,200 | $ | 2,200 |
| February 28 | $ | 2,100 | $ | 2,150 |
| March 15 | $ | 2,200 | $ | 2,200 |
| March 31 | $ | 2,300 | $ | 2,400 |
| April 15 | $ | 2,300 | $ | 2,250 |
| April 30 | | Not Given | $ | 2,500 |
| May 15 | $ | 2,500 | $ | 1,750 |
| May 31 | $ | 2,525 | $ | 1,400 |
| June 15 | $ | 2,600 | $ | 1,300 |
| June 30 | $ | 2,500 | $ | 1,200 |
| July 15 | $ | 2,650 | $ | 1,100 |
| July 31 | $ | 2,725 | $ | 1,200 |
| August 15 | | Not Given | $ | 1,240 |
| August 31 | $ | 2,550 | $ | 1,320 |
| September 15 | $ | 2,500 | $ | 1,340 |
| September 30 | $ | 2,400 | $ | 1,250 |
| October 15 | $ | 2,300 | $ | 1,200 |
| October 31 | $ | 2,325 | $ | 1,300 |
| | | | | |
| **Total Pay Period Earnings Provided** | $ | 43,125 | $ | 33,850 |

Benchmark Period applies to May 15 – July 31 of the 2009 column. Compensation Period applies to May 15 – July 31 of the 2010 column.

028599

## Appendix D
## Example of Compensation Calculation: Category II Individual

**Step 1: Claimant Selects Compensation Period & Base Year**

Claimant has selected May 1, 2010 through July 31, 2010 as the **Compensation Period**, and has chosen 2009 as the **Base Year**.

**Step 2: Determine Benchmark Period Earnings Corresponding to the Compensation Period**

**Benchmark Period** earnings are the actual earnings during the period of the **Base Year** of the same length and dates corresponding to the **Compensation Period**. Given the selection in Step 1, the **Benchmark Period** earnings equal the earnings between May 1, 2009 and July 31, 2009, and are calculated as follows:

Earnings May 1-July 31, 2009        $    15,500

**Step 3: Determine Earnings Growth Factor(s)**

The claimant has provided pay period detail, but insufficient to calculate a **Claimant Specific Growth Factor** due to the missing periods and the absence of annual earnings documentation. The **General Growth Factor** (2%) will therefore apply, and an **Industry Growth Factor** (1.5%) will apply because the claimant is an hourly worker.

|  | 2009 |  | 2010 |  |
|---|---|---|---|---|
| January - April Earnings | N/A | [a] | N/A | [b] |
| Calculated Claimant Specific Growth Factor |  |  | N/A | [c]=([b]-[a])/[a] |
| General Growth Factor |  |  | 2.0% | [d] |

**Step 4: Calculate Expected Earnings**

**Expected Earnings** equals **Benchmark Period** earnings (calculated in Step 2) increased by the applicable **Growth Factors** (from Step 3).

| | | |
|---|---|---|
| **Benchmark Period** Earnings (from Step 2) | $    15,500 | [e] |
| **General Growth Rate** (if applicable from Step 3) | 2.0% | [d] |
| **Industry Growth Factor** (if hourly, see Step 3) | 1.5% | [f] |
| **Expected Earnings for the Compensation Period** | $    16,043 | [g]=[e]*(1+[d]+[f]) |

$16,043 = $15,500 x (1 + 0.02 + 0.015)
[g]  =   [e]   x (1+  [d]  +  [f])

028600

## Appendix D
## Example of Compensation Calculation: Category II Individual

### Step 5: Determine Actual Earnings in the Compensation Period

**Actual Earnings** in the claimant selected **Compensation Period** in this example includes all earnings between the **Compensation Period** selected by the claimant in Step 1, May 1, 2010 through July 31, 2010.

Actual Earnings (May 1-July 31, 2010)      $    7,950 [h]

### Step 6: Determine Claimant Lost Earnings

**Lost Earnings** is the difference between the **Expected Earnings** (Step 4) and the **Actual Earnings** (Step 5) over the **Compensation Period**.

Lost Earnings      $    8,093 [i]=[g]-[h]

$8,093 = $16,043 - $7,950

[i] = [g] - [h]

### Step 7: Calculate Final Claimant Compensation

**Final Claimant Compensation** includes **Lost Earnings** increased by the agreed upon **Risk Transfer Premium** (Zone C Other Industries= 0.25), then adjusted for any **Employee-Related Benefits Loss** (assume $2,000), any **Reimbursable Training & Search Costs** (assume $500 each for training and search) and any **Spill Related Payments** (assume $3,000).

| | | |
|---|---|---|
| Lost Earnings (Step 6) | $ 8,093 | [i] |
| + Lost Earnings Multiplied by Other Industries RTP (0.25 in Zone C) | $ 2,023 | [j]=[i] x RTP |
| + Employment Related Benefits Losses | $ 2,000 | Given above. |
| + Reimbursable Training Costs | $ 500 | Given above. |
| + Reimbursable Search Costs | $ 500 | Given above. |
| - Spill Related Payments | $ (3,000) | Given above. |
| **Final Claimant Compensation** | $ 10,116 | |

028601

Appendix E

## Example of Compensation Calculation:
## Category III Individual - New Entrant to Employment

**Category III Individual - New Entrant to Employment**:  In this example, the claimant has passed the causation requirements and accepted, as of April 20, 2010, a first-time offer of employment in Zone A in the Tourism category that was rescinded due to or resulting from the DWH Spill.  The claimant procures employment in January 2011 and provides information sufficient to establish monthly pay period earnings.  This claimant is considered a **New Entrant to Employment** and 2011 earnings adjusted downward by the **General Growth Factor** will be used in lieu of **Benchmark Period** earnings.  Because the claimant is a salaried worker, no **Industry Growth Factor** is applicable.

### Data Submitted by Claimant

| | 2010 | 2011 |
|---|---|---|
| Annual Earnings per Tax Information Documents | $            - | $      55,200 |
| | | |
| **Pay Period Earnings** | | |
| January | $            - | $       4,600 |
| February | $            - | $       4,600 |
| March | $            - | $       4,600 |
| April | $            - | $       4,600 |
| May | $            - | $       4,600 |
| June | $            - | $       4,600 |
| July | $            - | $       4,600 |
| August | $            - | $       4,600 |
| September | $            - | $       4,600 |
| October | $            - | $       4,600 |
| November | $            - | $       4,600 |
| December | $            - | $       4,600 |
| | | |
| **Total Earnings** | $            - | $      55,200 |

(Compensation Period bracket spans May–December 2010; Benchmark Period bracket spans May–December 2011)

### Step 1:  Claimant Selects Compensation Period & Base Year

Claimant has selected May 1, 2010 through December 31, 2010 as the **Compensation Period**, and 2011 is the **Base Year** as claimant is a **New Entrant to Employment**.

### Step 2:  Determine Benchmark Period Earnings Corresponding to the Compensation Period

**Benchmark Period** earnings are the actual earnings during the period of the **Base Year** of the same length and dates corresponding to the **Compensation Period**.  Given the selection in Step 1, the **Benchmark Period** earnings equal the earnings between May 1, 2011 and December 31, 2011, and is calculated as follows:

Earnings May 1-December 31, 2011    | $      36,800 | [a]

Appendix E

## Example of Compensation Calculation:
## Category III Individual - New Entrant to Employment

| Step 3:  Determine Earnings Growth Factor(s) |
|---|

Because the claimant is a **New Entrant to Employment**, **Benchmark Period** earnings are discounted back to 2010 using agreed upon **Growth Factors**. The General Growth Rate of 2.0% is applied, but since claimant is a salaried worker no **Industry Growth Factor** is applied.

| Step 4:  Calculate Expected Earnings |
|---|

**Expected Earnings** equals **Benchmark Period** earnings (calculated in Step 2) decreased back to 2010 levels using the applicable **Growth Factors** (from Step 3).

| | | |
|---|---|---|
| **Benchmark Period** Earnings (from Step 2) | $       36,800 | = [a] |
| Reduce 2011 Earnings by **General Growth Factor** (from Step 3) | -2.0% | [b] |
| Reduce 2011 Earnings by **Industry Growth Factor** (from Step 3) | n/a | [c] |
| **Expected Earnings for the Compensation Period** | $          36,064 | [d]=[a]*(1+[b]+[c]) |

$36,064 = $36,800 x (1 - 0.02 + 0)
[d]   =       [a]    x (1 + [b] + [c])

| Step 5:  Determine Actual Earnings in the Compensation Period |
|---|

**Actual Earnings** in the claimant selected **Compensation Period** in this example includes all earnings between the period selected by the claimant in Step 1, May 1, 2010 through December 31, 2010.

| | |
|---|---|
| **Actual Earnings** (May 1 -December 31, 2010) | $              - [e] |

| Step 6:  Determine Claimant Lost Earnings |
|---|

**Lost Earnings** is the difference between the **Expected Earnings** (Step 4) and the **Actual Earnings** (Step 5) over the **Compensation Period**.

| | |
|---|---|
| Lost Earnings | $          36,064 [f]=[d]-[e] |

$36,064 = $36,064 - 0
[f]   =    [d]  - [e]

**Appendix E**

## Example of Compensation Calculation:
## Category III Individual - New Entrant to Employment

---

Step 7:  Calculate Final Claimant Compensation

---

**Final Claimant Compensation** includes **Lost Earnings** increased by the agreed upon **Risk Transfer Premium** (Zone A Tourism= 2.5 RTP), then adjusted for any **Employee-Related Benefits Loss** (assume $2,000), any **Reimbursable Training & Search Costs** (assume $500 each for training and search) and any **Spill Related Payments** (assume $3,000).

| | | |
|---|---:|---|
| Lost Earnings (Step 6) | $ 36,064 | =[f] |
| + Lost Earnings Multiplied by Tourism RTP (2.5 in Zone A) | $ 90,160 | [g]=[f] x RTP |
| + Employment Related Benefits Losses | $ 2,000 | Given above. |
| + Reimbursable Training Costs | $ 500 | Given above. |
| + Reimbursable Search Costs | $ 500 | Given above. |
| - Spill Related Payments | $ (3,000) | Given above. |
| | | |
| Final Claimant Compensation | $ 126,224 | |

Appendix F

## Example of Compensation Calculation:
## Category III Individual - Career Changer

Category III Individual - Career Changer:  In this example, the claimant has passed the causation requirements and provides **Tax Information Documents** demonstrating annual earnings, and also provides **Pay Period Earnings Documentation** sufficient to establish monthly/pay period earnings.  The **Individual** switched jobs at the end of 2009 and was employed in Zone B Tourism in 2010, and the **Claimant Specific Growth Factor** exceeded 20%, so this claimant is considered a **Career Changer** and 2011 earnings adjusted downward by the **General Growth Factor** will be used in lieu of a **Benchmark Period**.  Because the claimant is a salaried worker, no **Industry Growth Factor** is applicable.

Data Submitted by Claimant

| | 2009 | 2010 | 2011 |
|---|---|---|---|
| Annual Earnings per Tax Information Documents | $   36,000 | $   22,500 | $   55,200 |
| **Pay Period Earnings** | | | |
| January | $   3,000 | $   4,500 | $   4,600 |
| February | $   3,000 | $   4,500 | $   4,600 |
| March | $   3,000 | $   4,500 | $   4,600 |
| April | $   3,000 | $   4,500 | $   4,600 |
| May | $   3,000 | $   4,500 | $   4,600 |
| June | $   3,000 | $   - | $   4,600 |
| July | $   3,000 | $   - | $   4,600 |
| August | $   3,000 | $   - | $   4,600 |
| September | $   3,000 | $   - | $   4,600 |
| October | $   3,000 | $   - | $   4,600 |
| November | $   3,000 | $   - | $   4,600 |
| December | $   3,000 | $   - | $   4,600 |
| **Total Earnings** | $   36,000 | $   22,500 | $   55,200 |

(2010: June–December marked "--Compensation Period--"; 2011: June–December marked "--Benchmark Period--")

### Step 1:  Claimant Selects Compensation Period & Base Year

Claimant selects June 1, 2010 through December 31, 2010 as the **Compensation Period**, and 2011 is the **Base Year** for calculating **Expected Earnings** because claimant is a **Career Changer**.

### Step 2:  Determine Benchmark Period Earnings Corresponding to the Compensation Period

**Benchmark Period** earnings are the actual earnings during the period of the **Base Year** of the same length and dates corresponding to the **Compensation Period**.  Given the selection in Step 1, the **Benchmark Period** earnings equal the earnings between June 1, 2011 and December 31, 2011:

Earnings June 1-December 31, 2011          $      32,200

### Step 3:  Determine Earnings Growth Factor(s)

028605

**Appendix F**

<div align="center">

### Example of Compensation Calculation:
### Category III Individual - Career Changer

</div>

As illustrated below, the claimant's income changed by more than 20%, and, therefore, the claimant is a **Career Changer**, and the **General Growth Factor** (2%) applies. Since claimant is a salaried worker no **Industry Growth Factor** is applied.

Determination of **Claimant Specific Growth Factor**

|  | 2009 | 2010 |  |
|---|---|---|---|
| January - April Earnings | $ 12,000 [a] | $ 18,000 | [b] |
| **Calculated Claimant Specific Growth Factor** |  | 50.0% | [c]=([b]-[a])/[a] |

$$50.0\% = (\$18,000 - \$12,000) / \$12,000$$
$$[c] \ = \ ( \quad [b] \quad - \quad [a] \quad ) / \quad [a]$$

| General Growth Factor | 2.0% | [d] |
|---|---|---|

*(Claimant earnings changed by more than 20%, therefore, 2011 becomes Base Year and growth rate defaults to General Growth Factor of 2%.)*

**Step 4:  Calculate Expected Earnings**

**Expected Earnings** equals **Benchmark Period** earnings (calculated in Step 2) decreased back to 2010 levels using the applicable **Growth Factors** (from Step 3).

| **2011 Benchmark Period** Earnings | $ 32,200 [e] |
|---|---|
| Reduce 2011 Earnings by **General Growth Factor** (from Step 3) | -2.0% [d] |
| Reduce 2011 Earnings by **Industry Growth Factor** (from Step 3) | n/a [f] |
| **Expected Earnings for the Compensation Period** | $ 31,556 [g]=[e]*(1+[d]+[f]) |

$$\$31,556 = \$32,200 \times (1 - 0.02 + 0)$$
$$[g] \ = \ [e] \quad \times (1 - [d] + [f])$$

**Step 5:  Determine Actual Earnings in the Compensation Period**

**Actual Earnings** in the claimant selected **Compensation Period** in this example includes all earnings between the period selected by the claimant in Step 1, June 1, 2010 through December 31, 2010.

| **Actual Earnings** (June-December 2010) | $ - [h] |
|---|---|

**Appendix F**

## Example of Compensation Calculation:
## Category III Individual - Career Changer

---

**Step 6: Determine Claimant Lost Earnings**

**Lost Earnings** is the difference between the **Expected Earnings** (Step 4) and the **Actual Earnings** (Step 5) over the **Compensation Period**.

| Lost Earnings | | $ | 31,556 | [i]=[g]-[h] |
|---|---|---|---|---|

$31,556 = $31,556 - 0
[i]  =  [g]  - [h]

---

**Step 7: Calculate Final Claimant Compensation**

**Final Claimant Compensation** includes **Lost Earnings** increased by the agreed upon **Risk Transfer Premium** (Zone B Tourism= 2.0 RTP), then adjusted for any **Employee-Related Benefits Loss** (assume $2,000), any **Reimbursable Training & Search Costs** (assume $500 each for training and search) and any **Spill Related Payments** (assume $3,000).

| | | | |
|---|---|---:|---|
| Lost Earnings (Step 6) | $ | 31,556 | =[i] |
| + Lost Earnings Multiplied by Tourism RTP (2.0 in Zone B) | $ | 63,112 | [j]=[i] x RTP |
| + Employment Related Benefits Losses | $ | 2,000 | Given above. |
| + Reimbursable Training Costs | $ | 500 | Given above. |
| + Reimbursable Search Costs | $ | 500 | Given above. |
| - Spill Related Payments | $ | (3,000) | Given above. |
| | | | |
| **Final Claimant Compensation** | $ | 94,668 | |

# EXHIBIT 8C

**Addendum Regarding Compensation Related to a Claimant's Loss of Employment-Related Benefits Income as a Result of the DWH Spill**

**I.   Eligibility:**

Only **Eligible Claimants** shall qualify for compensation pursuant to this Addendum.  To be an **Eligible Claimant**, a claimant must satisfy all of the following **Eligibility Criteria**:

1.   The claimant must qualify for compensation pursuant to Section I, Section II or Section III of the **Framework for Individual Economic Loss Claims.**

2.   Unless the claimant is a **New Entrant to Employment**, the claimant must have been covered by a health insurance and/or retirement plan provided by the claimant's employer as of April 20, 2010 ("**Pre-Spill Benefit Providing Employer**").

3.   If the claimant is a **New Entrant to Employment**, then as of April 20, 2010 the claimant must have had and accepted an offer from a **Pre-Spill Benefit Providing Employer** which included healthcare insurance coverage and/or retirement benefits commencing within the period May 1, 2010 through December 31, 2011.

4.   The claimant must demonstrate "**Employment-Related Benefit Losses**".  **Employment Related Benefits Losses** shall consist of (i) **Health Insurance Coverage Losses** and/or (b) **Retirement Benefit Losses** (both of which are defined below) due to:
    a.   The termination of the claimant's employment by the **Pre-Spill Benefit Providing Employer**; or
    b.   Other termination of claimant's benefits (e.g., a change in employee's eligibility); or
    c.   A reduction in claimant's compensation related to the DWH Spill; or
    d.   For **New Entrants to Employment**, that the healthcare insurance and/or retirement benefits became unavailable as a result of the offer being withdrawn or amended as a result of the DWH Spill.

"**Health Insurance Coverage Losses**" and "**Retirement Benefit Losses**" shall be defined as follows:

    a.   **Health Insurance Coverage Losses**: The claimant's post-DWH Spill loss of income related to the loss of coverage under a health insurance plan from a **Pre-Spill Benefit Providing Employer** in which the claimant was enrolled as of April 20, 2010 (or which was part of the benefits package a **New Entrant to Employment** would have received from his or her **Pre-Spill Benefit Providing Employer**), including any medical, prescription drug, dental and/or vision insurance plan coverages ("**Pre-Spill Insurance Plan Coverages**");[1]

    AND/OR

---

[1] For purposes of this addendum, each individual health insurance policy coverage (i.e., medical, prescription drug, dental, and/or vision) will be evaluated separately.

025226

      b. **Retirement Benefit Losses**: The claimant's post-DWH Spill loss of income related to the loss of or reduction in retirement or pension benefits provided by his or her **Pre-Spill Benefit Providing Employer**, including employer pension payments, and/or other employer contributions related to a claimant's 401(k) or 403(b) account, profit sharing plan or other type of retirement account ("**Pre-Spill Retirement Benefits**").

## II.  Supplemental Documentation

Each **Eligible Claimant** must provide the documentation set forth below (in addition to other documentation required to establish their individual economic loss claim).

### A.  *Health Insurance Coverage Losses*

An **Eligible Claimant** seeking compensation for **Health Insurance Coverage Losses** must provide the following documentation:

1. For all claimants other than **New Entrants to Employment**, documentation establishing that the **Eligible Claimant** participated in one or more **Pre-Spill Insurance Plan Coverage(s)** provided by the **Pre-Spill Benefit-Providing Employer** as of April 20, 2010, and certain relevant information regarding the **Pre-Spill Insurance Plan Coverage(s)**, including the following:

    a. Documentation establishing whether the **Eligible Claimant** was enrolled in an individual or family plan coverage for each of the **Pre-Spill Insurance Plan Coverages**.

    b. Documentation evidencing periodic (annual, monthly, etc.) premium costs to the claimant, if any, in effect at the time of the DWH Spill for each **Pre-Spill Insurance Plan Coverage**.

    c. Documentation establishing the termination and effective termination date(s) of any of **Eligible Claimant**'s **Pre-Spill Insurance Plan Coverages** as a result of either (i) the post-Spill termination of the **Eligible Claimant's** employment by the **Pre-Spill Benefit-Providing Employer**, or (ii) a post-Spill change in the **Eligible Claimant**'s employment status with the **Pre-Spill Benefit-Providing Employer** leading to termination of the **Eligible Claimant's** coverage.

    d. If available, and if the **Eligible Claimant** so chooses, a **Sworn Written Statement** from an authorized representative of the **Pre-Spill Benefit Providing Employer** indicating the amount of periodic premiums (pay period, monthly, annual, etc.) that would have been paid for the **Eligible Claimant's Pre-Spill Insurance Plan Coverage(s)** by the **Pre-Spill Benefit Providing Employer** absent the DWH Spill.

Documentation may include, for example, an April 2010 paystub evidencing premium deductions for qualifying **Pre-Spill Insurance Plan Coverages**, insurance cards, and other relevant employer provided documentation, etc.

2. For **New Entrants to Employment**, documentation establishing the following:

<div align="center">2</div>

025227

a. That the **Eligible Claimant's** offer included **Pre-Spill Insurance Plan Coverage(s)**.

b. That as of April 20, 2010, the **New Entrant to Employment** planned to participate in one or more of those **Pre-Spill Insurance Plan Coverage(s)**, including (i) specific identification of all relevant **Pre-Spill Insurance Plan Coverage(s)**, (ii) whether the **Eligible Claimant** intended to enroll as an individual or family, and (iii) the date on which the coverage would have begun, as relevant.

c. The amount of periodic (annual, monthly, etc.) premium costs for which the claimant would have been responsible, if any, for each **Pre-Spill Insurance Plan Coverage**.

d. If the **New Entrant to Employment's** offer was amended rather than withdrawn, that the inability to participate in the **Pre-Spill Insurance Plan Coverage(s)** was due to the DWH Spill, including the specific basis.

e. The **New Entrant to Employment** shall provide a **Sworn Written Statement** from an authorized representative of the **Pre-Spill Benefit Providing Employer** indicating the amount of periodic premiums (pay period, monthly, annual, etc.) that would have been paid for the **Eligible Claimant's Pre-Spill Insurance Plan Coverage(s)** by the **Pre-Spill Benefit Providing Employer** absent the DWH Spill if the following apply:

   i. If the **New Entrant to Employment's** offer was withdrawn, or if the **New Entrant to Employment's** offer was only amended, but he or she was no longer eligible for **Pre-Spill Insurance Plan Coverage**; and

   ii. If the **New Entrant to Employment** did not obtain **Replacement Health Insurance Coverage** or a **New Employer Insurance Plan** (as defined herein) prior to December 31, 2011.

Documentation may include, for example, the **Eligible Claimant's** relevant offer letter, insurance plan information received from the **Pre-Spill Benefit-Providing Employer**, and/or a **Sworn Written Statement** from an authorized representative of the from the **Pre-Spill Benefit-Providing Employer** with relevant information regarding the **Pre-Spill Insurance Plan Coverage(s)**, such as premium information, the claimant's eligibility, etc., as applicable.

3. If, after the termination of any **Pre-Spill Insurance Plan Coverage**, the **Eligible Claimant** obtained health insurance coverage through COBRA, the **Eligible Claimant** shall provide all of the following:

   a. Documents evidencing the period for which the **Eligible Claimant** was covered by COBRA, including the first and last effective dates of coverage.

   b. Documents evidencing the COBRA premiums (and the period to which each premium relates) through the earlier of (i) the termination of COBRA, or (ii) December 31, 2011.

   c. Documents evidencing the claimant's payment of any COBRA premiums for which the **Eligible Claimant** seeks reimbursement.

4. If, after the termination of any **Pre-Spill Insurance Plan Coverage**, the **Eligible Claimant** obtained and paid for replacement health insurance other than in connection with COBRA,

025228

new employment or an alternative health care insurance plan for which the claimant was eligible (as discussed below)("**Replacement Health Insurance Coverage**"), the **Eligible Claimant** shall provide all of the following:

    a.  Documents evidencing the period for which the **Eligible Claimant** procured any **Replacement Health Insurance Coverage**, including the first and last effective dates of coverage, provided that evidence of coverage beyond December 31, 2011 need not be provided.

    b.  Documents evidencing the premium amounts (and the period to which each premium relates), as well as claimant's payment of those premiums, for each policy providing **Replacement Health Insurance Coverage** through the earlier of (i) the termination of the policy providing **Replacement Health Insurance Coverage**, or (ii) December 31, 2011.

5.  If, after the termination of any **Pre-Spill Insurance Plan Coverages**, the **Eligible Claimant** was offered but did not accept health insurance coverage pursuant to COBRA or a policy providing **Replacement Health Insurance Coverage**, the **Eligible Claimant** shall provide contemporaneous documents evidencing the terms of any offer of COBRA coverage, including the corresponding premium. If the **Eligible Claimant** was not eligible for COBRA because the **Pre-Spill Benefit-Providing Employer** no longer provided health insurance to its existing employees, or because it was not required by law to provide such coverage, the claimant should certify in writing that no COBRA coverage was offered.

6.  If the **Eligible Claimant** obtained or was covered by health insurance from a new or former employer, or by an alternative health care insurance plan for which the claimant was eligible (through, for example, a spouse, domestic partner, parent, legal guardian, veteran's or other plan, as applicable) after the termination of the **Pre-Spill Insurance Plans,** but prior to December 31, 2011 ("**Post-Spill Employer Insurance Plan Coverage**"), the **Eligible Claimant** shall provide documents setting forth the type and effective date(s) of any **Post-Spill Employer Insurance Plan Coverages**.

B.  *Retirement Benefit Losses*

An **Eligible Claimant** seeking compensation for **Retirement Benefit Losses** must provide the following documentation:

1.  Documentation establishing that the **Eligible Claimant** was enrolled, eligible for and receiving vested **Pre-Spill Retirement Benefits** from the **Pre-Spill Benefit-Providing Employer** as of April 20, 2010. Documentation evidencing **Pre-Spill Retirement Benefits** could include, for example, a paystub including matching contributions, investment statement, or other third party document evidencing the employer's contributions to or payment of **Pre-Spill Retirement Benefits** on behalf of the **Eligible Claimant**, and the vesting schedule.

4

2. Documentation establishing that the **Eligible Claimant**'s **Pre-Spill Retirement Benefits** were terminated after April 20, 2010 as a result of either (i) the post-Spill termination of the **Eligible Claimant**'s employment by the **Pre-Spill Benefit-Providing Employer**, or (ii) a post-Spill change in the **Eligible Claimant**'s employment status with the **Pre-Spill Benefit-Providing Employer.**

3. Documentation evidencing the amount of vested **Pre-Spill Retirement Benefits** contributed on behalf of the **Eligible Claimant** by the **Pre-Spill Benefit-Providing Employer** between May 1, 2009 and the documented termination date of the **Pre-Spill Retirement Benefits**.  To the extent the **Eligible Claimant** had been employed with the **Pre-Spill Benefit-Providing Employer** for less than twelve months, he or she should provide the requested information from his or her start date with the **Pre-Spill Benefit-Providing Employer** through the date **Pre-Spill Retirement Benefits** ceased.

4. If the **Eligible Claimant's Pre-Spill Retirement Benefits** were terminated, the claimant shall provide documentation evidencing the termination of the **Eligible Claimant**'s **Pre-Spill Retirement Benefits**, including the effective date of termination.

5. If the **Eligible Claimant** experienced a post-DWH Spill reduction in **Pre-Spill Retirement Benefits**, the claimant shall provide the following:

   a. Documents regarding any retirement benefits provided by the **Pre-Spill Benefit-Providing Employer** after the DWH Spill ("**Actual Post-Spill Retirement Benefits**"); and

   b. If applicable, any documents evidencing a change in the terms by which the **Pre-Spill Benefit-Providing Employer** provided the **Pre-Spill Retirement Benefits** (e.g., such as an elimination of employer matching) or a change in vesting schedule terms unrelated to the DWH Spill ("**Unrelated Plan Change**").  It will be assumed that any plan change is unrelated to the DWH Spill for purposes of this addendum, unless the claimant provides documentation establishing that the plan change was due to or resulting from the DWH Spill ("**Spill-Related Plan Change**").  Documentation could include, for example, contemporaneous notification received from, or a **Sworn Written Statement** provided by an authorized representative of, the **Pre-Spill Benefit Providing Employer**.

7. For **New Entrants to Employment**, documentation establishing all of the following:
   a. That the **Eligible Claimant's** offer included **Pre-Spill Retirement Benefits**.
   b. That as of April 20, 2010, the **New Entrant to Employment** planned to participate in the offered **Pre-Spill Retirement Benefits**.
   c. The amount of **Pre-Spill Retirement Benefits** for which the **Eligible Claimant** would have been eligible, the vesting schedule for such benefits, and, if the amount or

025230

vesting of **Pre-Spill Retirement Benefits** was contingent upon the **Eligible Claimant's** contributions, the planned contributions of the **Eligible Claimant**.

d. If the **New Entrant to Employment's** offer was amended rather than withdrawn, the **Eligible Claimant's** and his or her **Pre-Spill Benefit Providing Employer's** actual post-DWH Spill contributions to the **Pre-Spill Retirement Plan**.

Documentation may include, for example, the **Eligible Claimant's** relevant offer letter, retirement plan information received from the **Pre-Spill Benefit-Providing Employer**, and/or a **Sworn Written Statement** from an authorized representative of the **Pre-Spill Benefit-Providing Employer** with relevant information regarding the **Pre-Spill Retirement Benefits**, such as contribution terms and conditions, the claimant's eligibility, etc.

6. If the **Eligible Claimant** obtained retirement benefits from a new employer after the termination of the **Pre-Spill Retirement Benefits,** but prior to December 31, 2011 ("**New Employer Retirement Benefits**"), the claimant shall provide documents setting forth the effective date(s) of any **New Employer Retirement Benefits**.

## III. Compensation for Health Insurance Coverage Losses

**Eligible Claimants** who assert **Health Insurance Coverage Losses** shall be eligible for compensation pursuant to one of the following methodologies, if applicable:

1. <u>Compensation Based on COBRA or Replacement Health Insurance Coverage Premiums</u>[2]: The **Eligible Claimant** may be reimbursed based on premium(s) paid for COBRA, or the premium(s) paid for policies providing **Replacement Health Insurance Coverage** in which the **Eligible Claimant** enrolled after the termination of a corresponding **Pre-Spill Insurance Plan Coverage.** The total loss of income will equal (i) the daily rate for such COBRA or **Replacement Health Insurance Coverage,** less the daily rate for the **Eligible Claimant's** portion of the premium on the **Pre-Spill Insurance Plan Coverages**, multiplied by (ii) the total number of days in the period for which the **Eligible Claimant** qualifies for **Health Insurance Coverage Losses**, provided that if the result in (i) is negative, no compensation will be paid to the **Eligible Claimant.** **Health Insurance Coverage Losses** will be calculated over the period extending from:

   a. The termination of the **Pre-Spill Insurance Plan Coverage** or, for **New Entrants to Employment**, the date on which the **Pre-Spill Insurance Plan Coverage** would have begun absent the DWH Spill, until

   b. The earlier of (i) the **Eligible Claimant**'s enrollment in a **New Employer Insurance Plan**, or (ii) December 31, 2011.

   OR

---

[2] **Eligible Claimants** who qualify for compensation pursuant to Option 1 may alternatively be compensated on the basis of Option 2 (if the appropriate information is provided).

025231

2. **Compensation Based on Documentation Regarding Premiums Paid by the Pre-Spill Benefit Providing Employer**[3]:  If the **Eligible Claimant** provides a **Sworn Written Statement** from an authorized representative of the **Pre-Spill Benefit Providing Employer**, the **Eligible Claimant** may be reimbursed based on the premium(s) paid for the **Pre-Spill Insurance Plan Coverage(s)** by the **Pre-Spill Benefit Providing Employer**.  The total loss of income will equal (i) the daily rate funded by the **Pre-Spill Benefit Providing Employer** multiplied by (ii) the total number of days in the period for which the **Eligible Claimant** qualifies for **Health Insurance Coverage Losses**. **Health Insurance Coverage Losses** will be calculated over the period extending from:

   a. The termination of the **Pre-Spill Insurance Plan Coverage** or, for **New Entrants to Employment**, the date on which the **Pre-Spill Insurance Plan Coverage** would have begun absent the DWH Spill, until
   b. The earlier of (i) the **Eligible Claimant**'s enrollment in a **New Employer Insurance Plan**, or (ii) December 31, 2011.

   OR

3. **Compensation Based on Estimated Premiums Paid by the Pre-Spill Benefit Providing Employer**[4]:  An **Eligible Claimant** who did not replace coverage through COBRA or **Replacement Health Insurance Coverage**, the **Eligible Claimant**'s **Health Insurance Coverage Losses** will be calculated as follows:

   a. **Step 1:  Establish the Pre-Spill Employer Premium**
      i. For all **Eligible Claimants** who were not **New Entrants to Employment:**
         1. Identify the participating premiums paid by the **Eligible Claimant** as evidenced by payroll deductions for the relevant **Pre-Spill Insurance Plan Coverage** in April 2010, or other relevant documentation evidencing the **Eligible Claimant's** premiums related to the **Pre-Spill Insurance Plan Coverage(s)**.
         2. If the **Eligible Claimant** participated in an individual plan, divide the premium by 0.2, and if the premium related to a family plan, divide the premium by 0.4[5] to calculate the **"Gross Premium"** associated with the **Pre-Spill Insurance Plan Coverage**, inclusive of both the portion funded by the claimant and the portion funded by the employer.

---

[3] **Eligible Claimants** who qualify for compensation pursuant to Option 2 may alternatively be compensated on the basis of Option 1 (if the appropriate information is provided).
[4] Option 3 will only be used in circumstances where the **Eligible Claimant** is unable to provide the information necessary to perform the calculations set forth in Options 1 or 2.
[5] These factors represent the approximate portion of healthcare insurance premiums funded by employees based on data from the Bureau of Labor Statistics Employee Benefits Survey.

025232

3. Multiply the **Gross Premium** by 0.8 for claimants with individual plans and 0.6 for claimants with family plans[6] to estimate the portion of the premium funded by the employer ("**Pre-Spill Employer Premium**").

    ii. For all **New Entrants to Employment:**

        1. The **Pre-Spill Employer Premium** will be the premium that would have been funded by the **Pre-Spill Benefit Providing Employer** for the **New Entrant to Employment's Pre-Spill Insurance Plan Coverage** absent the DWH Spill according to the **Sworn Written Statement** from the **Pre-Spill Benefit Providing Employer**.

  b. **Step 2: Calculate the Daily Pre-Spill Employer:** Divide the **Pre-Spill Employer Premium** by the number of days covered by the premium to calculate a "**Daily Employer Premium**".

  c. **Step 3: Calculate Health Insurance Coverage Losses:**

    i. For all **Eligible Claimants** who were not **New Entrants to Employment:**

        1. Multiply the **Daily Employer Premium** by the number of days between the effective termination date of the relevant **Pre-Spill Insurance Plan Coverage** and the earlier of (i) the effective date of any corresponding **Post-Spill Employer Insurance Plan Coverage**, if applicable[7], or (ii) December 31, 2011.

    ii. For all **New Entrants to Employment:**

        1. Multiply the **Daily Employer Premium** by the number of days between the day on which the **Pre-Spill Insurance Plan Coverage** would have taken effect absent the DWH Spill, and the earlier of (i) the effective date of any corresponding **Post-Spill Employer Insurance Plan Coverage**, if applicable, or (ii) December 31, 2011.

No RTP will be applied to any calculated **Health Insurance Coverage Losses**.

## IV. Compensation for Retirement Benefit Losses

**Eligible Claimants** who claim **Retirement Benefit Losses** shall be compensated in an amount equal to the **Pre-Spill Retirement Benefits** contributed on behalf of or paid to the **Eligible Claimant** by the **Pre-Spill Benefit-Providing Employer** for a period extending from:

  a. The termination of or reduction to the **Pre-Spill Retirement Benefits** or, for **New Entrants to Employment,** the date on which the **Pre-Spill Retirement Benefits** would have begun absent the DWH Spill, to

---

[6] These factors represent the approximate portion of healthcare insurance premiums funded by employees based on data from the Bureau of Labor Statistics Employee Benefits Survey.

[7] For example, if the **Eligible Claimant** received coverage from **Post-Spill Employer Insurance Plan Coverage** as of the date of the termination of the **Eligible Claimant's Pre-Spill Insurance Plan Coverage**, the claimant will not have suffered a compensable loss and will therefore not receive compensation.

025233

    b. The earlier of (i) the effective date of any **New Employer Retirement Benefits**, or (ii) December 31, 2011.

The Eligible Claimant's **Retirement Benefit Losses** shall be determined as follows:

1. **Step 1: Establish Daily Retirement Benefits Rate(s)**
   a. If the **Eligible Claimant's Pre-Spill Retirement Benefits** were eliminated as described above, calculate the "**Pre-Spill Daily Retirement Benefits Rate**" by dividing (i) by (ii), as described below:
      i. The total vested portion of the **Pre-Spill Retirement Benefits** contributed on behalf of the **Eligible Claimant** by the **Pre-Spill Benefit-Providing Employer** between the later of May 1, 2009 or the commencement date of the **Eligible Claimant's** employment with the **Pre-Spill Benefit-Providing Employer**, and the documented date on which the **Pre-Spill Retirement Benefits** were reduced or terminated, by
      ii. The total number of days in that period.
   b. If the **Eligible Claimant's Pre-Spill Retirement Benefits** were reduced, then:
      i. If there was no post-DWH Spill **Plan Change**, the **Pre-Spill Retirement Benefits Rate** calculated in (a) above will apply for all relevant periods; or
      ii. If there was a post-DWH Spill **Plan Change**, then:
         1. The **Pre-Spill Daily Retirement Benefits Rate** calculated as in (a) above will apply for the relevant period prior to the **Plan Change**, and
         2. For the relevant period after the **Plan Change**, the "**Revised Daily Retirement Benefits Rate**" will be the expected daily rate based on the **Pre-Spill Benefit Providing Employer's** revised contribution terms relative to the **Eligible Claimant's** pre-DWH Spill earnings.
   c. If the **Eligible Claimant** was a **New Entrant to Employment**, the "**New Entrant Retirement Benefits Rate**" will be calculated as the **Pre-Spill Benefit Providing Employer's** expected average daily contribution on behalf of the **Eligible Claimant** based on documents provided by the **Eligible Claimant**.

2. **Step 2: Calculate Expected Post- Spill Retirement Benefits**
   a. If the **Eligible Claimant's Pre-Spill Retirement Benefits** were eliminated as described above, the **Eligible Claimant's** employer-funded retirement benefits expected in the absence of the DWH Spill ("**Expected Post-Spill Retirement Benefits**") are calculated by multiplying the **Pre-Spill Daily Retirement Benefits Rate** calculated in (1) by the total number of days between:
      i. The termination of the **Eligible Claimant**'s **Pre-Spill Retirement Benefits**, and
      ii. The earlier of (i) the effective date of any **New Employer Retirement Benefits**, or (ii) December 31, 2011.
   b. If the **Eligible Claimant's Pre-Spill Retirement Benefits** were reduced rather than eliminated, then:

025234

       i.  If there was no post-DWH Spill **Plan Change**, the **Eligible Claimant's Expected Post-Spill Retirement Benefits** shall calculated as in (a) above.

      ii.  If there was a post-DWH Spill **Plan Change**, the **Eligible Claimant's Expected Post-Spill Retirement Benefits** shall be calculated as the sum of the following:

        1.  The **Pre-Spill Daily Retirement Benefits Rate** shall be multiplied by the number of days between (i) the **Eligible Claimant's** post-DWH Spill reduction in **Pre-Spill Retirement Benefits**, and (ii) the documented change in the terms of the **Pre-Spill Benefit Providing Employer's** retirement contributions; and

        2.  The **Revised Daily Retirement Benefits Rate** shall be multiplied by the number of days between:

          a.  The effective date of the **Pre-Spill Benefit Providing Employer's** post-DWH Spill **Plan Change**; and

          b.  The earlier of (i) the effective date of any **New Employer Retirement Benefits**, or (ii) December 31, 2011.

  c.  If the **Eligible Claimant** was a **New Entrant to Employment,** the **Eligible Claimant's Expected Post-Spill Retirement Benefits** are calculated by multiplying the **New Entrant Retirement Benefits Rate** calculated in subpart (c) of Step 1 above by the total number of days between:

       i.  The date on which the **Eligible Claimant's** vested **Pre-Spill Retirement Benefits** would have begun absent the DWH Spill, or the date on which the reduced benefits actually began, and

      ii.  The earlier of (i) the effective date of any **New Employer Retirement Benefits**, or (ii) December 31, 2011.

3.  **Step 3: Calculate Eligible Claimant's Retirement Benefit Losses**

  a.  If the **Eligible Claimant's Pre-Spill Retirement Benefits** were terminated as a result of the DWH Spill, the **Eligible Claimant's Retirement Benefit Losses** shall be equal to the **Expected Post-Spill Retirement Benefits**; or

  b.  If the **Eligible Claimant's Pre-Spill Retirement Benefits** were reduced as a result of the DWH Spill, the **Eligible Claimant's Retirement Benefit Losses** shall be equal to the difference between **Expected Post-Spill Retirement Benefits** and the **Eligible Claimant's Actual Post-Spill Retirement Benefits** for the same period.

  c.  If the **Eligible Claimant** was a **New Entrant to Employment,** the **Eligible Claimant's Retirement Benefit Losses** shall be equal to the **Expected Post-Spill Retirement Benefits** calculated in subpart (c) of Step 2.

No RTP will be applied to any calculated **Retirement Benefit Losses**.

025235

# EXHIBIT 8D

# Addendum to Individual Framework

I.   **Individual Periodic Vendors ("IPV")**[1]

A.   **Eligibility**

An **IPV** is a Natural Person claiming economic loss during a period in May through December 2010 who satisfies all of the following criteria:

1.   Regularly sold at retail during 2009 and 2010 any of the legal food, souvenir, art, tourist-related or water-related goods or services listed in Attachment A or substantially equivalent items ("**Covered Sales**") to CONSUMERS in Zones A, B or C during May through December 2009 and/or May through December 2010.

2.   Made such **Covered Sales**, primarily to non-local CONSUMERS,[2] except that water-related **Covered Sales**, need not be primarily made to non-local CONSUMERS.

3.   Did not maintain a permanent business location in a building at which the claimant made **Covered Sales**.

4.   Held any licenses required by law.

5.   Was not employed by an employer in connection with such **Covered Sales**.

6.   Does not have **Tax Information Documents** sufficient to support a claim under the Business Compensation Framework for this claimed loss.

B.   **Causation**

1.   Causation shall be presumed for claimed losses associated with lost **Covered Sales** in Zones A and B.  If the claimant alleges lost **Covered Sales** in Zone C, the claimant must provide either:

a.   Documents establishing a decline of 5% or more in net earnings from the claimant's **Covered Sales** in Zone C during the claimant-selected period of 3 consecutive months or more during May through December 2010 ("**Compensation Period**"), compared to the same 3 or more consecutive month period in 2009; OR

---

[1]   This section is not intended to compensate losses associated with vendors who do not qualify for compensation pursuant to Sections I – V and whose claimed losses relate to income from **Festivals** (as defined herein).  **Festival**-related losses are addressed in a separate section of this document.  Claimants may, however, file separate claims for compensation associated with **Festival**-related losses and **IPV**-related losses, as applicable.

[2]   CONSUMER shall have the meaning in the Economic and Property Damages Settlement Agreement.  A CONSUMER shall be considered a "non-local CONSUMER" if they reside more than 60 miles from the location at which claimant made the **Covered Sale**.

027375

        b.        A statement from an **Adjacent Business** as defined in Section I(C)4(e) below, that the **Adjacent Business** experienced a decline in sales to non-local CONSUMERS during May through December 2010 compared to May through December 2009 due to or resulting from the DWH Spill.

**C.**      **Documentation Requirements**

An **IPV** under this Section must provide the documents indicated below:

1.      **Records Regarding Covered Sales**

      a.      Documents regarding the **IPV**'s **Covered Sales** in Zones A, B or C to CONSUMERS, including non-local CONSUMERS, from May through December 2009 and May through December 2010. The information must be sufficient for the **Claims Administrator** to determine that the **IPV** was in the business of regularly making such **Covered Sales** prior to April 20, 2010, and includes all information regarding the **IPV**'s revenues from **Covered Sales** from May through December 2009 and May through December 2010, as well as corresponding expenses. Such documentation could include, but is not limited to, the following:

          i.     Sales logs, sales tax receipts, cash receipts registers, credit card registers, bank statements or other contemporaneous records; and/or

          ii.     Receipts from third-party vendors or other sources related to the purchase of materials or equipment related to the **Covered Sales**; and/or

          iii.     Documents establishing any wages paid to employees or amounts paid to other individuals who assisted in making the **Covered Sales**, or any other expenses incurred in connection with the **Covered Sales**.

      b.      Photographs and other documentation (including but not limited to news articles, sales flyers or advertisements) reflecting (i) the goods or services sold in **Covered Sales** by the **IPV**, (ii) the location(s) at which the **IPV** sold the goods or services (including any documents providing information regarding an **Adjacent Business**), (iii) the prices charged for **Covered Sales** of goods or services, and/or other product information, and (iv) any biographical or other background information on the **IPV** selling the goods or services. The **IPV** shall also provide the date(s) of any photographs and the locations depicted. If the exact date is not available, the **IPV** may provide the month, or range of months, and year.

      c.      Documents establishing the **IPV**'s total earned income from **Covered Sales** (net of all variable expenses) for May through December 2009 and May through December 2010.

027376

    d.    Any available documents showing that the **IPV** made **Covered Sales** to non-local CONSUMERS in each period, with supporting information and/or documentation sufficient to permit the **Claims Administrator** to reasonably conclude that the **IPV** made sales to non-local CONSUMERS in each period.

        i.    For **IPVs** selling in Zones A and B, sales to non-local CONSUMERS shall be presumed.

        ii.    For **Covered Sales** in Zone C, the **IPV** may provide **IPV's** receipts reflecting purchasers' addresses, and/or documentation establishing that the **Covered Sales** were made on an interstate highway or other highway in Zone C or in an area generally visited by Tourist such as a museum, zoo, or historic site.

    e.    Documents identifying by name, address and telephone number any employee in connection with the **Covered Sales** of claimant during 2009 or 2010.

2.    <u>**Licensing Documentation**</u>:  If a government-issued license/permit was required to make any **Covered Sales**, **IPV** shall provide a copy of valid 2009 and 2010 licenses,[3] or evidence such existed, such as:

- Business license.

- Vendor's license.

- Peddlers license.

- Itinerant Vendor license.

- Commercial/recreational fishing license.

- Occupational license.

- Sales tax license.

- Other licenses & permits related to income sources.

- Canceled check for license or affidavit from issuing government body.

3.    <u>**IPV Employability Documentation**</u>[4]:  The **IPV** must provide both:

---

[3]   To the extent a state or municipality or other governmental agency agrees to provide the **Claims Administrator** with access to any official database sufficient for the **Claims Administrator** to confirm the claimant possessed a valid 2009 and 2010 license, the **Claims Administrator** need not require from the claimant a copy of the valid license.  Rather, the **Claims Administrator** is authorized to accept from the claimant the license number as sufficient to satisfy this subpart, and the **Claims Administrator** will use the database to confirm claimant's license is valid.

027377

a. A copy of a Social Security card, government issued identification, temporary worker visa, or green card that was valid as of April 20, 2010 or verification of existence of at least one such document from a public database providing the same information as would be provided from the original document;

*AND*

b. Evidence that the **IPV** was at least 16 years of age as of April 20, 2010. Acceptable evidence includes a copy of a valid driver's license, a valid passport, or the **IPV**'s birth certificate, other government issued identification indicating date of birth, or verification of existence of at least one such document from a public database providing the same information as would be provided from the original document.

4. **IPV Sworn Written Statement:** The **IPV** must submit a **Sworn Written Statement** that sets forth all of the following:

a. Verification that the **IPV** does not have available, and is not able to provide, **Tax Information Documents** sufficient to support a claim as a business under the Business Compensation Framework for the claimant **Covered Sales**.

b. A description of the **Covered Sales** made by the **IPV**, including a description of the relevant goods or services sold by the **IPV**.

c. A statement that (i) the **IPV** possessed and has attached copies of all required licenses as set forth in section IC.2., or (ii) the reason no such license(s) were required.

d. A statement that all available documentation regarding revenue and expenses related to **Covered Sales** during the periods (i) May through December 2009 and (ii) May through December 2010 that the **IPV** possesses or has access to has been provided in support of the claim.

e. The name, address, telephone number and a brief description of at least one business satisfying the Tourism definition and located on a parcel of property with a boundary within 100 yards of any location at which the **IPV** made or arranged for **Covered Sales** ("**Adjacent Business**"), and a **Sworn Written Statement** from an owner or employee of such business

---

[4] To the extent the state or federal government agrees to provide the **Claims Administrator** with access to any official database sufficient for the **Claims Administrator** to confirm that a claimant possessed valid documentation of the type required in subparts 3(a) and 3(b). The **Claims Administrator** may not require from the claimant a copy of the requested document. Rather, the **Claims Administrator** is authorized to accept from the claimant the relevant government issued number as sufficient to satisfy this subpart 3, and the **Claims Administrator** shall utilize the database to confirm the claimant's government issued numbered is valid.

027378

in support of the claim. If no such **Adjacent Business** exists, the **IPV** shall so state.

f. To the extent the **IPV** is not able to provide documents demonstrating the revenue associated with **Covered Sales**, the **IPV** should estimate the **Covered Sales** revenues in each of Zone A, B or C for both May through December 2009 and May through December 2010, and explain the basis for the estimates provided (e.g., "Sold ___ bags of peanuts at ____ per unit"). To the extent documentation exists in support of the earned income estimate (or components thereof), copies of such documentation must be provided.

g. To the extent the **IPV** is not able to provide documents demonstrating the expenses associated with the **Covered Sales**, the **IPV** should provide (i) a description of any materials purchased by the **IPV** in connection with making the **Covered Sales**, including the name and address of the provider of the materials, and the estimated costs of such materials in total and/or for each good or service sold in **Covered Sales**, (ii) an estimate of any wages paid to employees or amounts paid to other individuals who assisted in making the **Covered Sales** and an identification of the period to which such payments relate, and (iii) a description and estimate of any other expenses incurred in connection with the **Covered Sales**.

h. A description of any cash or in-kind payments made by the **IPV** in 2009, 2010 and/or 2011 to an **Adjacent Business** in consideration of such **Adjacent Business** permitting or facilitating **IPV**'s **Covered Sales**.

i. An explanation sufficient to permit the **Claims Administrator** to determine that any reduction of **IPV**'s net earnings from **Covered Sales** from May through December 2010 compared to prior periods was due to or resulting from the DWH Spill.

5. <u>Adjacent Business Sworn Written Statement</u>:

The **IPV** must procure and submit a **Sworn Written Statement** from an owner or employee of an **Adjacent Business(es)** ("**Adjacent Business Affiant**"), setting forth the following:

a. The name, address, telephone number of the **Adjacent Business Affiant** and relationship to the **Adjacent Business**; and

b. The business name, address(es), telephone number(s), and website(s) of the **Adjacent Business**, and a description of the nature of the business; and

c. A description of any cash or other payments made by the **IPV** in 2009, 2010 and/or 2011 to the **Adjacent Business** in consideration of such **Adjacent Business** permitting or facilitating the **IPV**'s sales; and

027379

d. A statement setting forth the dates and other information regarding the **IPV**'s **Covered Sales** witnessed by the **Adjacent Business Affiant** – e.g., "I observed **IPV** selling _____ [TYPE OF GOODS OR SERVICES] at [LOCATION] during approximately [DAYS OR WEEKS] during [PRE-SPILL PERIOD] and I observed the **IPV** selling _____ [TYPE OF GOODS OR SERVICES at [LOCATION] during approximately [DAYS OR WEEKS] during [the **Compensation Period**]." If the **IPV** made **Covered Sales** in multiple locations during the pre-DWH Spill period, and wishes to rely upon all of those sales, the **IPV** should submit an **Adjacent Business Sworn Written Statement** with respect to each such location; and

e. For an **IPV** alleging losses in Zone C who does not submit documentation establishing a decline of 5% or more in net earnings from **Covered Sales** in Zone C during the **Compensation Period**, compared to the same 3 or more consecutive month period in 2009, then the **Adjacent Business Affiant** must set forth the following additional information:

i. A statement from the **Adjacent Business Affiant** that the **Adjacent Business** experienced a decline in sales to non-local CONSUMERS during the same three or more consecutive months in May through December 2010 compared to the same three or more consecutive months in May through December 2009;

ii. A description of the amount and time period of such decline, the **Adjacent Business Affiant**'s basis for such statements; and

iii. An explanation of how the decline was due to or resulting from the DWH Spill.

**D. Compensation Calculation**

Consistent with the Causation provisions of Section B.1., the **Claims Administrator** shall evaluate the sufficiency and reliability of information provided by **IPV** and the supporting **Adjacent Business Affiant(s)**, including the sworn claim form, **Sworn Written statements**, interviews (if any) and/or any supplemental information the **Claims Administrator** may require, to determine whether (i) the **IPV** engaged in **Covered Sales** to non-local CONSUMERS and such non-local **Covered Sales** declined in the **Compensation Period** and/or (ii) the **IPV** experienced any other decline in **Covered Sales** due to or resulting from the DWH Spill. Compensation may be awarded where the **Claims Administrator** determines that causation has been established based upon the above-described information as well as sufficient documentation for the **Claims Administrator** to determine that the **Covered Sales** identified by the claimant occurred during the periods indicated ("**Sufficient Documentation**"). Examples of such **Sufficient Documentation** include:

1. A summary spreadsheet with accompanying supporting schedules reflecting the total revenues and total expenses associated with **Covered Sales**; or

6

027380

2.      Documents from persons or entities unrelated to the claimant that reflect the total revenues and total expenses associated with **Covered Sales**.

The **IPV Earnings from Covered Sales** shall be calculated as the difference between a) the **IPV's** total revenues less corresponding total expenses related to **Covered Sales** for any claimant selected **Compensation Period** of three or more consecutive months between May 1 and December 31, 2010, and b) the same months in 2009.

The **IPV's Lost Earnings** shall be calculated as the **IPV Earnings from Covered Sales** for the **Base Period** minus the **IPV Earnings from Covered Sales** for the **Compensation Period.**

The **IPV's Compensation Amount** shall be equal to the lesser of the **IPV's Lost Earnings** or $12,000.  An RTP of 1 shall be applicable.

If the **Claims Administrator** has reason to question the reliability of the information provided or if the **Claims Administrator** feels that the information supplied is insufficient for a determination of the **IPV**'s loss to be made under this Section I, then the **Claims Administrator** may request an interview of the **IPV** and/or the **Adjacent Business Affiant(s)** consistent with the **Interview Procedures** set forth in the **Addendum Regarding Interviews of Claimants Alleging Individual Economic Loss.**[5]

The **Claims Administrator** shall determine the Final Compensation Amount based on the information provided by the **IPV** and the supporting **Adjacent Business Affiant**(s), including the sworn claim form, affidavits, interviews, any supplemental information the Claims Administrator may require the **IPV** to provide to support the claim, and/or any other information the **Claims Administrator** may determine to be relevant and reliable. The **Claims Administrator** may rely on his credibility and reliability determinations in determining the Final Compensation amount, if any, to be provided to the **IPV**.

## II.   FESTIVAL VENDORS[6]

### A.   Eligibility

A "**Canceled Festival**" is a **Festival** that occurred at any time from May through December 2009 and was originally scheduled to occur at any time between May through December 2010, but was canceled after April 20, 2010 as a result of the DWH Spill.

---

[5]   Nothing in this Individual Economic Loss Framework shall in any way limit the right and obligation of the **Claims Administrator** to investigate fully all suspicions of fraudulent conduct by or on behalf of any claimant, including but not limited to conducting any interviews and obtaining any documents the **Claims Administrator** deems necessary.

[6]   For purposes of this document, **IPVs** and **Festival Vendors** are considered to be separate claimants, but nothing precludes a claimant from making a claim both as a **IPV** and as a **Festival Vendor**.

[6]   The Parties shall seek a Court Order authorizing them to obtain from relevant state and local authorities information regarding examples of **Festivals** that may be presented at the Fairness Hearing.

027381

A "**Festival**" includes organized street festivals, tournaments or major sporting events, outdoor art exhibitions, carnivals or other similar events of the type set forth in Attachment B held in Zone A, B or C at any time during May through December 2009 and/or May through December 2010.

"**Festival Sales**" are legal sales of items defined as **Covered Sales** made at retail at **Festivals**.

A "**Replacement Festival**" includes any organized street festival, tournament or major sporting event, outdoor art exhibition, carnival or other similar event of the type set forth in Attachment B, regardless of where that event was held, in which the claimant participated between May and December 2010 in lieu of a **Canceled Festival**.

"**Replacement Festival Sales**" are legal sales of items defined as **Covered Sales** made at retail at **Replacement Festivals**.

A claimant must be an eligible **Festival Vendor** to qualify for compensation pursuant to this Section II.  A "**Festival Vendor**" (also referred to herein as "claimant") is a Natural Person claiming economic loss for a period in May through December 2010 who satisfied all of the following criteria below:

1.      Regularly made **Festival Sales** prior to April 20, 2010; and

2.      Held any and all licenses and/or permits required by law; and

3.      Was not employed by an employer in connection with such sales; and

4.      Does not have **Tax Information Documents** sufficient to support a claim under the Business Compensation Framework; and

5.      Claims a loss of revenue and earnings related to a **Festival** in which the **Festival Vendor** participated or would have participated absent the DWH Spill.

B.      **Causation**

1.      Causation shall be presumed for claimed losses associated with **Festival Sales** in Zones A and B.

2.      If the claimant alleges lost eligible **Festival Sales** in Zone C, the claimant must provide all of the following:

a.      A **Festival Vendor Sworn Written Statement** that includes the information required in Section I(C)5(g); and

b.      Certain relevant documentation specified herein; and

c.      A **Festival Coordinator Sworn Written Statement** by a **Festival Coordinator** of each **Festival** at which the **Festival Vendor** planned to, or did, make **Festival Sales**.  The terms **Festival Coordinator Sworn**

8

027382

**Written Statement** and **Festival Coordinator** are defined in Sections II(C)5 below.

C.     <u>Documentation Requirements</u>

A **Festival Vendor** under this Section must provide the documents indicated below:

1.     <u>Records Regarding Festival Sales</u>

a.     Documents regarding the **Festival Vendor**'s **Festival Sales**, from both May through December 2009 and May through December 2010, and for any **Replacement Festival Sales** from May through December 2010. The information must be sufficient for the **Claims Administrator** to determine that the **Festival Vendor** was in the business of regularly making **Festival Sales** prior to April 20, 2010, and includes all information regarding the **Festival Vendor's** revenues and expenses from **Festival Sales** from May through December 2009 and May through December 2010, and for **Replacement Festival Sales** from May through December 2010.  Such documentation could include, but is not limited to, the following:

i.      Sales logs, sales tax receipts, cash receipts registers, credit card registers, bank statements or other contemporaneous records; and/or

ii.     Receipts from vendors or other sources related to product costs, material purchases, and/or equipment purchases related to the **Festival Sales** and **Replacement Festival Sales**; and/or

iii.    Documents establishing any wages paid to employees or amounts paid to other individuals who assisted in making the **Festival Sales** or **Replacement Festival Sales**, or any other expenses incurred in connection with the **Festival Sales** or **Replacement Festival Sales**.

b.     Documents evidencing participation in any and all **Festivals** during the period May through December 2009 and May through December 2010, and all **Replacement Festivals** from May through December 2010, including but not limited to (i) records of payment made by **Festival Vendor** to participate in each **Festival** or **Replacement Festival**, if applicable, and (ii) entry or registration forms, or other documents showing all booth or stall assignments, if applicable.

c.     If applicable, documents evidencing **Festival Vendor's** intended participation in a **Canceled Festival**, including but not limited to (i) records of payment made by **Festival Vendor** to participate in each **Festival** and returned due to the **Canceled Festival** being canceled, and (ii) entry or registration forms, or other documents showing all booth or stall assignments, and (iii) any documents notifying the **Festival Vendor** that the **Canceled Festival** was canceled.  The **Festival Vendor shall** also

9

027383

identify any **Replacement Festival** in which the **Festival Vendor** participated and the corresponding **Canceled Festival**. If the **Festival Vendor** did not participate in any **Replacement Festivals**, the **Festival Vendor** should so state.

    d.    Documents identifying by name, address and telephone number any employee in connection with the **Festival Sales** or **Replacement Festival Sales** of claimant during 2009 or 2010.

2.    <u>Licensing Documentation</u>[7]:  If a government-issued license/permit was required to make any **Festival Sales** or **Replacement Festival Sales**, **Festival Vendor** shall provide a copy of valid 2009 and 2010 licenses, such as:

- Business license.
- Vendor's license.
- Commercial/recreational fishing license.
- Occupational license.
- Peddler's license.
- Itinerant Vendor license.
- Sales tax license.
- Other licenses & permits related to income sources.

3.    <u>Festival Vendor's Employability Documentation</u>[8]:  The **Festival Vendor** must provide both:

    a.    A copy of a Social Security card, government issued identification or card, temporary worker visa, or green card that was valid as of April 20, 2010 or a verification of existence of at least one such document from a public database providing the same information as would be provided from the original document;

---

[7]    To the extent a state or municipality or other governmental agency agrees to provide the **Claims Administrator** with access to any official database sufficient for the **Claims Administrator** to confirm the claimant possessed a valid 2009 and 2010 license, the **Claims Administrator** need not require from the claimant a copy of the valid license. Rather, the **Claims Administrator** is authorized to accept from the claimant the license number as sufficient to satisfy this subpart, and the **Claims Administrator** will use the database to confirm claimant's license is valid.

[8]    To the extent the state or federal government agrees to provide the **Claims Administrator** with access to any official database sufficient for the **Claims Administrator** to confirm that a claimant possessed valid documentation of the type required in subparts 3(a) and 3(b). The **Claims Administrator** may not require from the claimant a copy of the requested document. Rather, the **Claims Administrator** is authorized to accept from the claimant the relevant government issued number as sufficient to satisfy this subpart 3, and the **Claims Administrator** shall utilize the database to confirm the claimant's government issued numbered is valid.

027384

*AND*

b.  Evidence that the **Festival Vendor** was at least 16 years of age as of April 20, 2010.  Acceptable evidence includes a copy of a valid driver's license, a valid passport, or a copy of the **Festival Vendor**'s birth certificate or verification of existence of at least one such document from a public database providing the same information as would be provided from the original document.

4.  <u>**Festival Vendor Sworn Written Statement:**</u>  The **Festival Vendor** must submit a **Festival Vendor Sworn Written Statement** setting forth all of the items below:

a.  Verification that the **Festival Vendor** does not have available, and is not able to provide, **Tax Information Documents** sufficient to support a claim as a business under the Business Compensation Framework.

b.  A description of the **Festival Sales** and **Replacement Festival Sales**, made by the **Festival Vendor**, including a description of the relevant goods or services sold by the **Festival Vendor**.

c.  A statement that (i) the **Festival Vendor** possessed and has attached copies of all required licenses and/or permits as set forth in Section II(C)2, or (ii) that no such license(s) were required.

d.  A statement that all available receipts or records of **Festival Sales** and/or **Replacement Festival Sales** from (i) May through December 2009 and (ii) May through December 2010 that **Festival Vendor** possesses or has access to have been provided in support of the claim.

e.  A list of each **Festival** and **Replacement Festival** in which the **Festival Vendor** participated as a vendor in 2009 and 2010, and each **Canceled Festival**.  The **Festival Vendor** must also provide the following in writing, as well as the supporting documentation identified above:

i.  the name, date(s) and location(s) of each **Festival**, or **Replacement Festival**, and, for **Canceled Festivals**, the name and originally planned date(s) and location(s);

ii.  the name, address, business telephone number, and a brief description of any sponsor or organizer of each **Festival**, **Canceled Festival** and **Replacement Festival**;

iii.  a description of all fees paid in connection with participation or exhibition in each **Festival**, **Canceled Festival** or **Replacement Festival**; and

iv.  for each **Festival** or **Replacement Festival**, a statement that provides all booth or stall assignments, records of payment made by **Festival Vendor** to participate in each **Festival** or

11

027385

Replacement Festival, and sales tax receipts obtained by the **Festival Vendor** in connection with their participation.

f.    To the extent the **Festival Vendor** is unable to provide documents demonstrating the revenue associated with **Festival Sales** and/or **Replacement Festival Sales**, the **Festival Vendor** should estimate the revenue from **Festival Sales** for both May through December 2009 and May through December 2010 and for **Replacement Festival Sales** from May through December 2010, and explain the basis for the estimates provided (e.g., "Sold __ bags of peanuts at ___ per unit"). To the extent documentation exists in support of the earned income estimate (or components thereof), provide copies of such documentation.

g.    To the extent the **Festival Vendor** is not able to provide documents demonstrating all expenses associated with the **Festival Sales** or **Replacement Festival Sales**, the **Festival Vendor** should provide a description of any materials purchased by **Festival Vendor** in connection with making the **Festival Sales** or **Replacement Festival Sales**, including the name and address of the provider of the materials, the actual or estimated costs of such materials in total and/or for each good or service item sold.

h.    An explanation sufficient to permit the **Claims Administrator** to determine that any reduction of **Festival Vendor Earnings** from **Festival Sales** or **Replacement Festival Sales** in May through December 2010 compared to **Festival Vendor Earnings** from the same **Festivals** (and any **Festivals** canceled in 2010 due to the DWH Spill) was due to or resulting from the DWH Spill, where **"Festival Vendor Earnings"** shall be calculated as the **Festival Vendor's** total revenues less total expenses associated with **Festival Sales**.

5.    **Festival Coordinator Sworn Written Statement(s):**  A **Sworn Written Statement** from an individual representing the entity or committee responsible for organizing the **Festival** ("**Festival Coordinator**") for each **Festival, Canceled Festival** or **Replacement Festival** for which loss is claimed setting forth all of the following:[9]

a.    The name, address, telephone number of the **Festival Coordinator** affiant.

b.    The name, date and location of each **Festival** or **Replacement Festival** for which the affiant served as a **Festival Coordinator** and in which the **Festival Vendor** applied to participate, and the name, address and

---

[9]   If the **Festival Coordinator** is willing to provide at one time information identified in subparts 5(c), 5(d) and 5(e) for all **Festival Vendors** at one time, then a single **Festival Coordinator Sworn Written Statement** shall be sufficient for all claims by **Festival Vendors**.  Alternatively, the **Festival Coordinator** may prefer to provide separate **Festival Coordinator Sworn Written Statements** for each **Festival Vendor** containing the information required in subparts 5(c), 5(d) and 5(e), and this shall likewise be acceptable.

027386

business telephone number of any sponsor or organizer of each such **Festival**, **Canceled Festival** or **Replacement Festival**.

c.    Identification of each **Festival** or **Replacement Festival** in which the **Festival Vendor** (i) submitted an application, and (ii) paid a deposit or fee, and (iii) either (a) participated, or (b) did not participate because it was a **Canceled Festival**.  If the **Festival Coordinator** is providing information regarding a **Canceled Festival** that was canceled after April 20, 2010, and therefore (i) no application was submitted by the **Festival Vendor**, and/or (ii) no deposit or fee was paid by the **Festival Vendor** for the **Canceled Festival**, the **Festival Coordinator** need only provide the requested information regarding the **Festival Vendor's** participation in the same **Festival** in prior periods, as well as any information available to the **Festival Coordinator** regarding the **Festival Vendor's** expected participation in the **Canceled Festival**.

d.    Copies of any application, or record of deposit or fee or notice of cancellation identified in (c) above.

e.    Any applicable permit required to hold any **Festival** or **Replacement Festival**, and, if available, any **Canceled Festival**, in which the **Festival Vendor** applied to participate.

f.    Attendance data (or an estimate) for each **Festival** in which the **Festival Vendor** participated and, if the same **Festival** was held in a prior year, attendance data (or an estimate) for the nearest prior year or period prior to the DWH Spill.

g.    Only if the **Festival** is located in Zone C, the **Festival Coordinator** must also set forth that the **Festival** was a **Canceled Festival** or experienced a decline in attendance, compared to either the prior year or projected attendance, due to or resulting from the DWH Spill.  The **Festival Coordinator** must include (i) a statement describing the reasons for the cancellation or the amount of decline, and the affiant's basis for such statements, and (ii) a statement that the **Festival Coordinator** affiant believes that the cancellation of a **Canceled Festival**, or the decline in attendance at a **Festival** during the period May 1 through December 31, 2010 was due to or resulting from the DWH Spill.

6.    **Sponsor Sworn Written Statement**:  If no **Festival Coordinator** affiant is available, submit a **Sworn Written Statement** from another person other than a relative who has personal knowledge of the **Festival Vendor's** participation in a **Festival** or non-participation in a **Canceled Festival** (including but not limited to a customer, fellow **Festival Vendor**, or operator of a business located within 100 feet of the **Festival Vendor's** sales location at the **Festival**), providing details regarding the **Festival** or **Canceled Festival** and the **Festival Vendor's** relationship to such **Sponsor** that shall set forth all of the following:

a.    Name, address, phone and e-mail of the **Sponsor**.

13

027387

b.    Basis for the personal knowledge.

c.    Description of the **Festival** or **Canceled Festival**.

d.    Information regarding the **Festival Vendor's** participation in the **Festival** (including date(s), location(s) and the description of the **Festival Sales**, if applicable).

e.    Information regarding **Canceled Festival** in which the **Festival Vendor** was scheduled and registered to participate (including date(s), location(s) and the description of the **Festival Sales**, if applicable) but did not participate because it was a **Canceled Festival**, and how the cancellation was due to or resulting from the DWH Spill.

7.    The **Claims Administrator** shall evaluate the sufficiency and reliability of information provided by **Festival Vendor** and the supporting **Festival Coordinator** affiant(s), including the sworn claim form, the **Festival Vendor Sworn Written Statement**, the **Festival Coordinator Sworn Written Statement(s)**, the **Sponsor Sworn Written Statement(s)** and/or any supplemental information the **Claims Administrator** may require, to determine whether (i) **Festival Vendor** engaged in **Festival Sales** and (ii) such sales declined in the period May through December 2010.

**D.    Compensation Calculation**

Where the **Claims Administrator** determines that causation has been established based upon (i) the Zone, or (ii) the **Festival Vendor Sworn Written Statement** and either (a) **Festival Coordinator Sworn Written Statement(s)** or (b) **Sponsor Sworn Written Statement(s)**, as well as other documentation, a **Festival Vendor** relying on this Section II may receive compensation as follows:

1.    **Festival Vendors with Documentation Establishing Loss of Earnings from Festivals**

a.    **Step 1**:  Specify **Festivals** or **Canceled Festivals** for which claimant incurred economic loss related to the DWH Spill.

The **Festival Vendor** will be eligible for compensation for losses associated with each **Eligible Festival.**  An "**Eligible Festival**" shall be defined as a **Festival** or **Canceled Festival** that satisfies all of the following criteria:

i.    The **Festival Vendor** must demonstrate losses associated with the **Festival**.

ii.    The **Festival** must have taken place (or for a **Canceled Festival**, must have been originally scheduled to take place) between May 1, 2010 and December 31, 2010.

14

    iii.    Claimant must have participated in the **Festival** in 2010, or, for **Canceled Festivals**, the claimant must provide documents establishing the cancellation, and that the claimant participated in same **Festival** in 2009.

    iv.    Documentation (including **Festival Coordinator Sworn Written Statement(s)**) must be sufficient to establish loss.

b.    **Step 2:** Determine **Festival Vendor Earnings** in May through December 2009 from **Eligible Festivals** identified in Step 1.

c.    **Step 3:** Determine **Festival Vendor Earnings** from **Eligible Festival(s)** or **Replacement Festival(s)** in May through December 2010.

d.    **Step 4:** Calculate **Festival Vendor Lost Earnings**

**Festival Vendor Lost Earnings** will be calculated as the difference between **Festival Vendor Earnings** from **Eligible Festival(s)** from May through December 2009 (determined in Step 2) less **Festival Vendor Earnings** from **Eligible Festival(s)** or **Replacement Festival(s)** from May through December 2010 (determined in Step 3).

Total **Festival Vendor Lost Earnings** may not exceed $12,000. An RTP of an amount agreed upon by the arties not to exceed 1 shall be applicable.

2.    **Festival Vendor Without Sufficient Documentation Of Earnings From Festival Sales Who Relies On Festival Coordinator Sworn Statements**.

For a **Festival Vendor** without documentation sufficient to demonstrate and calculate **Festival Vendor Earnings** from **Eligible Festival(s)**, and who relies on a **Sworn Written Statement(s)** by a **Festival Coordinator**, such **Festival Vendor** will be compensated up to $10,000, based upon the **Claims Administrator's** assessment of the credibility and reliability of the information provided by the **Festival Vendor** in support of the claim (including financial performance, completeness and accuracy of documentation, interview results, and any other relevant information). No RTP shall be applicable.

If the **Claims Administrator** has reason to question the reliability of the information provided or if the **Claims Administrator** feels that the information supplied in insufficient for a determination of the **Festival Vendor's** loss under this Section II. Then the **Claims Administrator** may request an interview of the **Festival Vendor** and/or the **Festival Coordinator**, consistent with the **Interview Procedures** set forth in the **Addendum Regarding Interviews of Claimants Alleging Economic Loss**.

The **Claims Administrator** shall determine the Final Compensation Amount based on the information provided by the **Festival Vendor** and the supporting **Festival Coordinator** affiant(s), including the sworn claim form, the **Festival Vendor Sworn Written Statement**, the **Festival Coordinator Sworn Written Statement(s)**, the **Sponsor Sworn Written Statement(s)**, interviews and/or any supplemental information the **Claims Administrator** may require the **Festival**

027389

**Vendor** to provide to support the claim. The **Claims Administrator** may rely on his credibility and reliability determinations in determining the Final Compensation Amount, if any, to be provided to the **Festival Vendor**.

16

027390

Case 2:10-cv-04182-CJB-SS Document 6144-10 Filed 03/15/13 Page 380 of 646

**Attachment A**

## COVERED SALES

1.  Peanuts (boiled or roasted) or popcorn

2.  Hot dogs

3.  Ice Cream

4.  Snow Cones

5.  Tattoos

6.  Snakes

7.  Beads

8.  Fresh fish or shellfish

9.  Jams, jellies and preserves, and other canned fruit and vegetables

10. Fruit

11. Small wood carvings such as wood clocks, statues or wall hangings

12. Shell jewelry

13. Street artists, caricaturists, or facepainters

14. Street performers, mimes and magicians

15. Sellers of clothing specifically promoting the city, beaches or other tourism activities (sports teams, fishing, etc.)

16. Hair-weaving and braiding (not including cutting and hairdressing)

17. Shallow Water Divers in portions of the Gulf contained in the Class Definition

18. Boat Repair Divers in portions of the Gulf contained in the Class Definition

19. Swamp Boat and Air Boat Operators in portions of the Gulf contained in the Class Definition

20. Parasail, scuba and snorkel teachers/operators in portions of the Gulf contained in the Class Definition

Expressly excluded from this Framework are Deepwater Divers and any individuals working on an Oil Rig.

17

## INCLUDED IN FESTIVALS

1.  Street festivals or fairs (excluding neighborhood block parties or garage sales or flea markets)

2.  Outdoor art exhibitions (same exclusions)

3.  Fishing tournaments

4.  Golf tournaments

5.  Boating tournaments

6.  Rodeos

7.  4-H competitions

8.  Major college or professional sports events (not including regular season games, local club or K-12 school events)

9.  Carnivals

027392

# EXHIBIT 8E

**Addendum Regarding Interviews Of Claimants Alleging Individual Economic Loss
And Other Individuals Providing Sworn Statements In Support Of Such A Claim**

*The Parties agree to the following proposed Addendum, which applies where it is referenced in
the Framework for Individual Economic Loss Claims, subject to the understanding that it is contingent on
the concurrence of the selected Claims Administrator[1] that the terms, conditions and deadlines set forth
in the addendum are realistic and achievable.*

If, after reviewing the Claim Form, and other information submitted by or on behalf of the claimant
(collectively, the "**Claim Submission**"), the **Claims Administrator** believes there is a reasonable basis to
question the credibility and reliability of information in the **Claim Submission**, the **Claims Administrator**
may interview the claimant and/or any other individual providing a sworn statement in support of the
claimant's claim, in order to resolve any such question regarding reliability.  Such interviews may, at the
**Claims Administrator**'s option, be conducted in-person, by telephone or electronically (e.g., via Skype).

1. <u>Deadline To Conduct Interviews</u>.  The **Claims Administrator** shall use their best efforts to
   conduct any interview of a claimant, and/or any other individual providing a sworn statement in
   support of the claimant's claim, within 45 (forty-five) days of the **Claims Administrator's**
   acknowledgment of a complete **Claim Submission**, provided that such 45-day limit cannot start
   to run until after the announced opening of the **Class Action Settlement Facility**.[2]  At the
   Claimant's option, the interview period can be extended further; any such extension request by
   the claimant and agreed-upon extension shall be documented by the **Claims Administrator**.  If
   at  any time the Claims Facility receives and/or has pending a number of claims within Category
   IV of the **Individual Compensation Framework** such that the above deadline cannot be met
   despite the **Claims Administrator's** good faith compliance with all of the other provisions of this
   Addendum , the **Claims Administrator** will promptly so advise Lead  Class Counsel and BP
   Counsel so that the parties can seek resolution of the issue through the Claims Administration
   Panel.

2. <u>Timing And Location Of Interviews</u>.  The **Claims Administrator** shall use their best efforts to
   arrange to conduct interviews at a time and location convenient to the claimant and/or other
   interviewee.  The claimant may provide the **Claims Administrator** with reasonable advance
   notice of convenient times and locations and the **Claims Administrator** shall seek in good faith
   to honor such scheduling and location requests.

3. <u>Interviewing Staff</u>.  The **Claims Administrator** shall use their best efforts to recruit and train a
   claims staff that is of diverse races, ethnicities, and genders matching the communities served
   by the Claims Facility and its offices, and who have the cultural background, training and
   language skills required to interview claimants or other individuals in their native languages,
   including but not limited to Vietnamese, Khmer, and Native American languages and cultures.
   To the extent claimants, or other individuals providing a sworn statement in support of claims,

---

[1] As explained in Economic and Property Damages Settlement Agreement §§ 3.3.3 and 3.3.6, the Claims
Administrator is responsible for overseeing the Claims Administration Vendors who process claims.

[2] The Claims Administrator will determine the opening date of the Claims Facility.

and they or their representatives request that any interview be conducted by an individual of the same ethnic background, the **Claims Administrator** shall endeavor in good faith to comply with that request.  If and to the extent the **Claims Administrator** concludes  compliance with this provision are causing significant delay in claims processing, they shall bring the issue to the attention of Lead  Class Counsel and BP Counsel so that the parties can seek resolution of the issue through the Claims Administration Panel.

4. <u>Limitations on interviews</u>.  To the extent provisions of the **Individual Compensation Framework** impose limitations on the number of interviews that may be conducted of claimants in certain categories, or individuals supporting their claims, for purposes of resolving questions of reliability, the **Claims Administrator** shall comply with such limitations.

5. The **Claims Administrator** shall maintain records documenting their compliance with the requirements of this Addendum.

6. Nothing in this paragraph or in the **Individual Compensation Framework** is intended, nor shall it be construed, to limit in any way the right and obligation of the **Claims Administrator** and/or **Claims Administrator** to investigate fully all suspicions of fraudulent conduct by or on behalf of any claimant, including but not limited to conducting any interviews and obtaining any documents the **Claims Administrator** deems necessary.

# EXHIBIT 9

## Framework For Subsistence Claims

**A.**     **Eligibility**

1.     Only claimants who satisfy the "**Subsistence Claimant**" definition shall be eligible for compensation pursuant to this **Framework for Subsistence Claims**.

2.     "**Subsistence Claimant**" shall be defined as follows: (i) a Natural Person who satisfies the Class Definition, (ii) who fishes or hunts to harvest, catch, barter, consume or trade Gulf of Mexico natural resources (including **Seafood** and **Game**[1]), in a traditional or customary manner, to sustain his or her basic personal or family dietary, economic security, shelter, tool, or clothing needs[2], and (iii) who relied upon subsistence resources that were diminished or restricted in the geographic region used by the claimant due to or resulting from the DWH Spill.

3.     The **Subsistence Claimant** definition includes claimants who satisfy the definitions of a **Commercial Fisherman** and **Seafood Crew**, provided such claimants satisfy the other elements of the **Subsistence Claimant** definition and provide the documentation listed below.[3]

4.     The **Subsistence Claimant** definition does not include **Recreational Fishermen** or **Recreational Hunters**. "**Recreational Fishermen**" shall be defined as Natural Persons who fish for pleasure or sport. "**Recreational Hunters**" shall be defined as Natural Persons who hunt for pleasure or sport. The **Subsistence Claimant** definition does include claimants who hold a Recreational Fishing license, provided such claimants satisfy the other elements of the **Subsistence Claimant** definition and provide the documentation listed below.

**B.**     **Compensation**

1.     Identify the time period of loss of subsistence use consistent with the closure or impairment of geographic areas relied upon by the Claimant between April 20, 2010 and December 31, 2011.

2.     Identify the quantity of lost natural resources, including **Seafood** and **Game**. This will include quantity of natural resources given to members of Claimant's extended family unit for their personal consumption or for the purposes of barter. In making the determination, the Claims Administrator must evaluate any lost

---

[1]     "**Game**" is defined as nutria, mink, otters, raccoons, muskrats, alligators, and other wetlands and coastal wildlife.

[2]     This definition is derived from various statutory and regulatory sources (e.g., ANILCA, Coast Guard) revised to reflect the socio-economic realities of the Gulf Coast ethnic, traditional, and customary subsistence communities and individuals.

[3]     The definitions of **Seafood**, **Commercial Fisherman** and **Seafood Crew** from the **Seafood Distribution Chain** Definitions document shall apply herein.

earnings claim also submitted by the claimant for compensation under the Seafood Program to ensure that any in-kind **Seafood** compensation received by the claimant is appropriately allocated between the claimant's lost earnings and subsistence claims.  For example, **Seafood** sold by the claimant, rather than used for barter should be allocated toward lost earnings which shall be compensated through the Seafood Program.

    a.    Quantity of lost natural resources will be determined based on information provided by the claimant in intake forms and interviews with the Claims Administrator.

    b.    Quantity of lost natural resources will be calculated in, or converted to, measures of consumable retail product by the Claims Administrator.

    c.    Quantities of lost natural resources shall not exceed reasonable consumption rates as determined by the Claims Administrator.

3.    Calculate the **Total Value of Loss of Subsistence Use of Natural Resources** by multiplying the quantity in pounds by average post-spill retail price or, if unavailable, an estimated retail price based on a reasonable proxy.  Average post-spill retail prices, and any proxies there for, will be determined the Parties based on, where available, data on retail prices for Gulf of Mexico natural resources, and be subject to approval by the Claims Administration Panel. The Parties shall provide a chart of the approved, mutually agreed-upon prices to the Claims Administrator for use in calculation of Subsistence claims.

4.    Claimant will receive a Risk Transfer Premium ("RTP") of 2.25, in order to compensate for factors including value of Subsistence use, including damage to subsistence family and community customs and culture.

5.    Claimant's compensation pursuant to this Framework For Subsistence Claims shall be equal to the sum of (i) the Claimant's **Total Value of Lost Natural Resources** calculated in B(3) plus (ii) the Claimant's **Total Value of Lost Natural Resources** multiplied by 2.25.

**C.**    **Documentation Requirements**

The Claimant must provide sufficient information for the Claims Administrator to determine (1) that the claimant satisfies the **Subsistence Claimant** definition and, (2) the quantity of Gulf of Mexico natural resources from within the **Class Definition** geographic area lost by the **Subsistence Claimant** during the time period April 20, 2010 to December 31, 2011.  The required documents shall include:

1.    The Gulf of Mexico location(s) within the **Class Definition** geographic area where claimant fished or hunted or utilized Gulf of Mexico natural resources immediately prior to the oil spill.

2

        a.      **Type of documentation:** (1) Identification on map and narrative description on claims form; (2) narrative description on claims form of equipment used to fish or hunt; and (3) affidavit verifying location of claimant's fishing or hunting grounds.

2.      The location where the claimant fished or hunted or utilized Gulf of Mexico natural resources between April 20, 2010 and December 31, 2011.

        a.      **Type of documentation:** Information provided by claimant on claims form.

3.      Length of time that fishing or hunting areas were closed or impaired as a result of the spill.

        a.      **Type of documentation:** Information provided by claimant on claims form, to be confirmed by claims facility by reference to closure maps and other relevant reports.

4.      Prior to spill, claimant relied upon the fishing or hunting area at issue for subsistence purposes as defined above.

        a.      **Type of documentation:** (1) Claimant to specify on claims form number of people in the extended family unit who rely on natural resources caught by the Subsistence Claimant, the specific species and amounts of natural resources relied upon, the percentage of subsistence source that natural resources from closed or impaired areas provided prior to the spill, and (2) a supporting affidavit.[4] Following an interview with the claimant, members of the claims administration staff may, at their discretion, require an additional affidavit from a third party or other appropriate supporting information.

5.      Copy of state and/or federal commercial or recreational fishing and/or hunting license. Deckhands or others that are not required to possess a fishing license are excused from this requirement.

**D.**    <u>**Court-Appointed Distribution Agents Audit Process**</u>

BP, the PSC and the Claims Administrator shall jointly propose a Court-Appointed Distribution Agent ("CADA"). Upon approval, the CADA shall work under the direction and supervision of the Claims Administrator. The CADA shall establish a dedicated team to assist Subsistence claimants in completing the claim form and collecting supporting documentation, and will also confirm the eligibility status of the claimants. The CADA will conduct subsistence interviews with claimants and apply the

---

[4] The Parties shall collaborate on a form affidavit for Subsistance Claimants, which shall be subject to approval by the Claims Administrator Panel.

028017

compensation formula. The CADA team shall establish a physical presence and a reasonable operating schedule to allow claimants to be interviewed in their geographical area including at Landing Dock locations.

**E.**     **Field Visits**

There is no pre-set cap on payment amounts for Subsistence claims. However, the CADA will not pay Subsistence claims with a base amount greater than $10,000 per extended family unit without conducting a field visit and investigation as to the accuracy of the claim prior to the payment.

**F.**     **RTP**

An RTP of 2.25 shall be applied to the base compensation amount.

4

# EXHIBIT 10

# SEAFOOD COMPENSATION PROGRAM

## TABLE OF CONTENTS

                                                                              **Page**

GENERAL FRAMEWORK AND OVERVIEW OF SEAFOOD COMPENSATION           3
PROGRAM DISTRIBUTION

SHRIMP COMPENSATION PLAN                                         4

I.      Expedited Compensation Method                           8

II.     Reduced Expedited Method                                13

III.    New Entrant Compensation Method                         15

IV.     Historical Revenue Method                               18

V.      Vessel Lease Compensation Allocation                    24

OYSTER COMPENSATION PLAN                                         25

1.      Oyster Leaseholder Interest Compensation                28

2.      Oyster Leaseholder Lost Income Compensation             29

3.      Oyster Harvester Lost Income Compensation               30

4.      Vessel Lease Compensation Allocation                    40

FINFISH COMPENSATION PLAN                                        41

I.      Historical Revenue Method                               44

II.     Compensation for IFQ Quota Holders                      49

III.    Vessel Lease Compensation Allocation                    50

BLUE CRAB/OTHER SEAFOOD COMPENSATION PLAN                        52

I.      Historical Revenue Method                               56

II.     Vessel Lease Compensation Allocation                    63

SEAFOOD CREW COMPENSATION PLAN                                  65

I.      Category I Crew Compensation                            68

II.     Category II Crew Compensation                           70

III.    Category III Crew Compensation                          78

SEAFOOD SPILL-PAYMENT REDUCTION PROCEDURES                      85

029298

# SEAFOOD COMPENSATION PROGRAM

## OVERVIEW

The Seafood Compensation Program shall cover and compensate Commercial Fishermen, Seafood Boat Captains, all other Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners for economic loss claims relating to Seafood.[1]  All economic loss claims by Commercial Fishermen, Seafood Boat Captains, all other Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners relating to Seafood will be part of and must be brought under the Seafood Compensation Program.[2]

The Seafood Compensation Program is divided into the following compensation categories and claim types:

## TABLE 1

| CATEGORY | COMPENSABLE CLAIMS |
|---|---|
| Shrimp | • Vessel Owner/Commercial Fisherman Vessel Lessee claims<br>• Boat Captain claims |
| Oyster | • Leaseholder Interest claims<br>• Leaseholder Lost Income claims<br>• Vessel Owner/Oyster Harvester Vessel Lessee claims<br>• Boat Captain claims |
| Finfish | • Vessel Owner/Commercial Fisherman Vessel Lessee claims<br>• Boat Captain claims<br>• Individual Fishing Quota holder claims |
| Blue Crab/Other Seafood | • Vessel Owner/Commercial Fisherman Vessel Lessee claims  (including crab trap damage)<br>• Boat Captain claims |

---

[1]  The terms Commercial Fisherman, Seafood Boat Captains, Seafood Crew, Oyster Leaseholders and Seafood Vessel Owners as defined in the "Seafood Distribution Chain Definitions" (Exhibit 3 to the *Deepwater Horizon* Economic and Property Damages Settlement Agreement) shall apply in this Seafood Compensation Program.

[2]  To the extent terms herein are defined in the *Deepwater Horizon* Economic And Property Damages Settlement Agreement, those definitions shall apply in the Seafood Compensation Program.  Nevertheless, any term specifically defined within the Seafood Compensation Program, shall be interpreted as set forth in this Seafood Compensation Program, notwithstanding any contrary definition in the *Deepwater Horizon* Economic And Property Damages Settlement Agreement.

| CATEGORY | COMPENSABLE CLAIMS |
|---|---|
| Seafood Crew (excluding Boat Captains) for all Seafood industries | • Crew claimants with standard documentation<br>• Crew claimants with documentation supplied by employer<br>• Crew claimants with documentation supplied by non-employers |

For each category and compensable claim type, a Claimant will have to establish that the Claimant is a Class Member and meets the separate eligibility requirements defined below. In addition, Claimants are subject to the requirements of the *Deepwater Horizon* Economic And Property Damages Settlement Agreement and any applicable Court order, except as otherwise modified or provided by the Seafood Compensation Program.

Claimants are able to file a single Seafood Compensation Program Sworn Claim Form seeking compensation for multiple compensable claims. A Claimant filing a claim under the different plan in the Seafood Compensation Program, may be required to use different historical information for the Benchmark Period and must review the definition of Benchmark Period in each plan. For example, the Claimant may use a different Benchmark Period for the Claimant's claim under the Shrimp Compensation Plan and the Claimant's claim under the Oyster Compensation Plan. The following provides a non-exhaustive list of examples in which a single claimant might be eligible to receive compensation for multiple compensable claims:

- A shrimp Vessel Owner/Commercial Fisherman Vessel Lessee who is also a shrimp Boat Captain may be eligible to receive compensation both as a shrimp Vessel Owner/Commercial Fisherman Vessel Lessee and shrimp Boat Captain.
- An oyster leaseholder may be eligible to receive compensation for both Leaseholder Interest and Leaseholder Lost Income claims. If the oyster leaseholder claimant is also a Vessel Owner/Commercial Fisherman Vessel Lessee and a Boat Captain, that claimant may be eligible to receive compensation as both an oyster Vessel Owner/Commercial Fisherman Vessel Lessee and an oyster Boat Captain.
- A claimant who is a Boat Captain for vessel(s) in both the blue crab industry and shrimp industry may be eligible to receive compensation under applicable blue crab and shrimp categories.

Seafood Compensation Program Sworn Claim Forms may be submitted at any time after entry of the Preliminary Approval Order, but no later than thirty (30) days from the date of entry of the Final Order and Judgment of the District Court ruling upon final approval of the Settlement (**Bar Date**). Claims will be processed and paid as expeditiously as possible by the Claims Administrator.

It is expressly acknowledged that the fact that a Claimant has made a claim and/or received compensation under the Seafood Compensation Program, does not preclude that claimant from making an independent claim and/or receiving compensation under the *Deepwater Horizon* Economic And Property Damages Settlement Agreement.

2

029300

Compensation received by an eligible Claimant under the Seafood Compensation Program will be reduced by the amount of prior Seafood Spill-Related Payments as described in the Seafood Spill Related Payment Reduction Procedures in this document.[3] No other reductions to the compensation amount under the Seafood Compensation Program will be taken, including compensation received for work in the VoO Program or compensation for VoO Damages under the Settlement.

The Seafood Compensation Program shall cover and compensate the economic loss claims for Commercial Fishermen, Seafood Crew, Oyster Leaseholders, and Seafood Vessel Owners. It does not cover subsistence claims.

## General Framework and Overview of Seafood Compensation Program Distribution

The Seafood Compensation Program is estimated to result in prompt claims payments totaling more than $1.9 billion representing approximately 83% of the $2.3 billion Seafood Compensation Program Amount. After applying the terms of the *Deepwater Horizon* Economic And Property Damages Settlement Agreement (including determining the Seafood Compensation Program Amount) and paying the eligible Seafood Compensation Program claims, the Claims Administrator shall determine the amount of funds, if any, constituting the remaining Seafood Compensation Program Amount. In the event there are Seafood Compensation Program Amount funds remaining, such funds will be distributed to claimants that received compensation from the Seafood Compensation Program. The balance will be distributed to each Claimant in proportion to the Claimant's gross compensation expressed as a share of the gross compensation paid by the Claims Administrator to all claimants under the Seafood Compensation Program.[4] Gross compensation reflects compensation paid by the Claims Administrator prior to deduction for Seafood Spill-Related Payments. If, however, the Court-Appointed Neutral determines that a distribution other than purely proportional would be more appropriate in light of the information available at the time of the second distribution, he may recommend to the Court that the second distribution be reallocated in an alternative fashion. Any such reallocation will be subject to court approval.

---

[3]  Seafood Spill-Related Payments are defined as compensation paid to a claimant through the OPA Process, by BP, the GCCF, or through the Transition Facility for economic loss claims relating to Seafood.

[4]  All claimants who receive compensation under the Seafood Compensation Program are entitled to a share of the distribution of the balance whether or not their individual claims have been characterized as "lump sum" or a similar term, and whether or not they are members of Categories II and III of the Seafood Crew Compensation Plan (each of which provides for an Aggregate Compensation Amount, which shall not apply as a limitation to a Claimant's entitlement to a share of the balance to be distributed).

029301

## SHRIMP COMPENSATION PLAN

**Generally Applicable Provisions of the Shrimp Compensation Plan:**

1.  Eligible Claimants shall be comprised of Class Members (i) who do not fall within the exclusions to the Economic Loss and Property Class Definition, (ii) who are Vessel Owners, Commercial Fishermen who lease Seafood Vessels (Commercial Fisherman Vessel Lessee), and/or Seafood Boat Captains that derive earnings from commercial shrimping and (iii) who meet the additional criteria listed in this Shrimp Compensation Plan.

2.  It is understood that in some instances, the Vessel Owner is also the Commercial Fisherman; however, it may be the case that the Vessel Owner leased the vessel to a Commercial Fisherman.  In those instances where the vessel was leased during the time period of April 20, 2010 to December 31, 2010, the Vessel Owner and Commercial Fisherman Vessel Lessee must file the vessel claim jointly in order to receive compensation prior to the **Bar Date**, and they shall share any Vessel Owner/Commercial Fisherman Vessel Lessee compensation provided for in this Shrimp Compensation Plan.  If at the time of the **Bar Date** either the Vessel Owner or the Commercial Fisherman Vessel Lessee has not filed a claim, the one that has filed the claim shall receive the full Vessel Owner/Commercial Fisherman Vessel Lessee compensation for the vessel.  The allocation of compensation between Vessel Owner and Commercial Fisherman Vessel Lessee shall be determined as provided in Section V.  If the vessel was not leased to a Commercial Fisherman Vessel Lessee during the time period of April 20, 2010 to December 31, 2010, the Vessel Owner is entitled to the full Vessel Owner/Commercial Fisherman Vessel Lessee compensation for the vessel.

3.  It is understood that in some instances, the Vessel Owner and/or the Commercial Fisherman Vessel Lessee is also the Boat Captain.  In those instances where the Vessel Owner and/or the Commercial Fisherman Vessel Lessee were also the Boat Captain, they shall be eligible to receive the Boat Captain compensation portion for the vessel under the Shrimp Compensation Plan as set forth below.  If the Vessel Owner and/or Commercial Fisherman Vessel Lessee employed a Boat Captain on the vessel and did not serve as a Boat Captain on that vessel, the hired Boat Captain is eligible for the Boat Captain compensation, not the Vessel Owner or Commercial Fisherman Vessel Lessee.

4.  To establish eligibility to participate in the Shrimp Compensation Plan, a Vessel Owner Claimant must provide for each vessel(s) for which the Claimant is seeking compensation:

    A.  Proof of ownership of the vessel during the time period of April 20, 2010 to December 31, 2010.

    B.  Proof that as of April 20, 2010 there was a government license (even if it had expired before that date) that authorized that vessel to commercially fish for shrimp in the Specified Gulf Waters for the 2009 season or the 2010 season.  However, a Vessel Owner who did not have such a license for the vessel can

4

participate in the Shrimp Compensation Plan for that vessel if the Claimant can establish the criteria for the New Entrant Compensation Method as described in Section III below.

C.    The vessel name and any applicable federal and/or state vessel registration numbers.

D.    Proof that either:

    1.    the vessel was home ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012; or,

    2.    the vessel landed shrimp in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.

E.    A sworn statement attesting as to whether or not the vessel was leased during the time period April 20, 2010 to December 31, 2010.  If the vessel was leased during this time period, the Vessel Owner must provide a copy of the lease agreement.

F.    A sworn statement attesting as to whether or not the Vessel Owner was the Boat Captain for that vessel during January 1, 2007 through December 31, 2009.  If the Vessel Owner was not the sole Boat Captain for that vessel for some portion of January 1, 2007 through December 31, 2009, to the extent possible, the Claimant shall identify all other Boat Captains employed on the vessel and the time periods for which the Boat Captains were employed.

5.    To establish eligibility to participate in the Shrimp Compensation Plan, a Commercial Fisherman Vessel Lessee must provide for each vessel for which the claimant seeks compensation:

A.    Proof that during the period of April 20, 2010 through December 30, 2010 the Claimant leased the vessel to be used for commercial shrimping.

B.    Proof that as of April 20, 2010 there was a government license (even if it had expired before that date) that authorized that vessel to commercially fish for shrimp in the Specified Gulf Waters for the 2009 season or the 2010 season.  However, a Commercial Fisherman Vessel Lessee who did not have such a license for the vessel can participate in the Shrimp Compensation Plan for that vessel if the Claimant can establish the criteria for the New Entrant Compensation Method as described in Section III below.

C.    The vessel name and any applicable federal and/or state vessel registration identification numbers.

D.    Proof that either:

    1.    the vessel was home ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012; or,

5

2.      the vessel landed shrimp in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.

E.      A sworn statement, attesting that the Commercial Fisherman Vessel Lessee leased the vessel during the time period of April 20, 2010 to December 31, 2010.  The Commercial Fisherman Vessel Lessee must also provide a copy of the lease agreement for the vessel.

F.      A sworn statement attesting as to whether or not the Commercial Fisherman Vessel Lessee was the Boat Captain for that vessel during January 1, 2007 through December 31, 2009.  If the Commercial Fisherman Vessel Lessee was not the sole Boat Captain for that vessel for some portion of January 1, 2007 through December 31, 2009, to the extent possible, the Claimant shall identify all other Boat Captains employed on the vessel and the time periods for which the Boat Captains were employed.

6.      To establish eligibility to participate in the Shrimp Compensation Plan a Boat Captain must provide:

A.      Proof that as of April 20, 2010 the Boat Captain held a governmental license (even if it had expired before that date) authorizing the Claimant to operate as a Boat Captain and/or to commercially fish for shrimp in the Specified Gulf Waters for the 2009 season or the 2010 season.

B.      Proof that either the Boat Captain worked:

1.      on one or more commercial shrimping vessels home ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012; or,

2.      on one or more commercial shrimping vessels that landed shrimp in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.

7.      A Vessel Owner/Commercial Fisherman Vessel Lessee who does not have either a 2009 or 2010 fishing license or proof of shrimp landings in 2009, 2010 or 2011 can participate in the Shrimp Compensation Program if that Vessel Owner can establish the criteria for the New Entrant Compensation Method as defined in Section III below.  Additionally, a Boat Captain who had not previously worked as a Boat Captain for a commercial shrimping vessel in the Gulf Coast Areas and who prior to April 20, 2010 had a written job offer for employment as a Boat Captain on a vessel home ported in the Gulf Coast Areas for the 2010 shrimping season may be able to establish the criteria for the New Entrant Compensation Method as defined in Section III below.

8.      A Sworn Statement attesting whether or not the Claimant received any Seafood Spill-Related Payments.  If the Claimant received Seafood Spill-Related Payments, the Claimant shall provide documents[5] sufficient to establish the timing, amount and source

---

[5]    When documents are requested in the Seafood Compensation Program, Claimant may provide either legible copies or originals of the documents.

029304

of Seafood Spill-Related Payments, including documents providing the claimant's BP/GCCF/Transition Facility Claim Number, if applicable, and any corresponding payments.

## Shrimp Compensation Plan Definitions:

Benchmark Period[6] is selected by the Claimant and can be (i) 2009, (ii) 2008 and 2009, or (iii) 2007, 2008 and 2009. If the Claimant elects to use years 2008 and 2009 or 2007, 2008, and 2009, the annual revenue amounts shall be averaged. In the event the Claims Administrator determines that the Claimant (individual or vessel) did not participate at the same level of effort in shrimp harvesting due to circumstances beyond the Claimant's control (such as illness, disability or major mechanical failure), the Claims Administrator may at his discretion allow the Claimant to exclude one or more years of the Benchmark Period.

A Vessel Owner or Commercial Fisherman Vessel Lessee must submit separate Vessel Owner/Commercial Fisherman Vessel Lessee claims for each vessel they owned or leased and may select different Benchmark Periods for different vessels.

A Boat Captain's claim reflects the Claimant's activities on all vessels, and the Boat Captain must select a single Benchmark Period for the Claimant's claim.

A Vessel Owner or Commercial Fisherman Vessel Lessee who also submits a Boat Captain claim may select different Benchmark Periods for the Claimant's Vessel Owner/Commercial Fisherman Vessel Lessee claim and the Claimant's Boat Captain claim.

## Compensation Plan Methods:

There are four methods for a Vessel Owner/Commercial Fisherman Vessel Lessee and/or Boat Captain to be compensated under the Shrimp Compensation Plan. The options are:

- Expedited Compensation Method
- Reduced Expedited Compensation Method
- New Entrant Compensation Method
- Historical Revenue Method

A Vessel Owner or Commercial Fisherman Vessel Lessee may select different Compensation Plan Methods for different vessels. There is no qualifying revenue level required for the Historical Revenue Method. The qualifying vessel revenue for the Expedited Compensation Method and Reduced Expedited Compensation Method is summarized in the second column of Table 2 and the compensation amount is summarized in the third column. The eligibility, documentation and details of each method are described more fully in Sections I and II below.

---

[6]   For the Seafood Compensation Program, the Benchmark Period is defined independently for each Seafood Compensation Program Plan and is set forth within the specific Plan. Definitions of Benchmark Period in any other frameworks in the *Deepwater Horizon* Economic And Property Damages Settlement Agreement do not apply in the Seafood Compensation Program.

029305

A Boat Captain must select a single Compensation Method for his claim. There is no qualifying revenue for the Historical Revenue Method. The qualifying vessel revenue for the Expedited Compensation Method and Reduced Expedited Compensation Method must be made based on revenue for a single vessel size and type category (but not necessarily for a single vessel). The qualifying revenue for the Expedited Compensation Method and Reduced Expedited Compensation Method is summarized in the second column of Table 2 and the compensation amount is summarized in the third and fourth columns. The eligibility, documentation and details of each method are described more fully in Sections I and II below.

## TABLE 2

### Qualifying Vessel Revenue and Compensation for Expedited and Reduced Expedited Methods

| Vessel Size | Qualifying Vessel Revenue | Vessel Owner/Commercial Fisherman Vessel Lessee Compensation | Boat Captain Compensation |
|---|---|---|---|
| **Expedited Method:** | | | |
| < 30 feet | $32,500 | $104,063 | $92,813 |
| 30 - 44 feet | $40,000 | $135,281 | $107,250 |
| 45 - 74 feet (Ice) | $90,000 | $270,563 | $160,875 |
| 45 - 74 feet (Freezer) | $275,000 | $478,688 | $284,625 |
| 75+ feet (Ice) | $225,000 | $416,250 | $206,250 |
| 75+ feet (Freezer) | $400,000 | $582,750 | $288,750 |
| **Reduced Expedited Method:** | | | |
| < 30 feet | N/A | N/A | N/A |
| 30 - 44 feet | $25,000 | $62,438 | $49,500 |
| 45 - 74 feet (Ice) | $50,000 | $145,688 | $86,625 |
| 45 - 74 feet (Freezer) | $200,000 | $333,000 | $198,000 |
| 75+ feet (Ice) | $150,000 | $291,375 | $144,375 |
| 75+ feet (Freezer) | $290,000 | $457,875 | $226,875 |

## I.  Expedited Compensation Method

### A.  Eligibility Requirements

#### 1.  Vessel Owner/Commercial Fisherman Vessel Lessee

In order to qualify for compensation under the Expedited Compensation Method, the Vessel Owner/Commercial Fisherman Vessel Lessee must provide for each vessel:

8

a.    A copy of the 2009 or 2010 governmental issued vessel registration for each of Claimant's vessel(s) establishing the home port of the vessel was within the states of Louisiana, Mississippi and Alabama or a Florida registered vessel with its home port in the counties of Escambia, Santa Rosa, Okaloosa, Walton, Holmes, Washington, Bay, Jackson, Calhoun, Gulf, Liberty, Franklin, Gadsden, Leon, Wakulla in the State of Florida; and,

b.    Proof of revenue from commercial shrimping equal to or greater than the Qualifying Revenue in Table 3 based on vessel size and type for the Benchmark Period.

## 2.    Boat Captains

In order to qualify for compensation under the Expedited Compensation Method, the Boat Captain must provide for each vessel:

a.    Proof that during the Benchmark Period:

i.    the Claimant was a Boat Captain on a commercial shrimping vessel with the home port of the vessel that was within the states of Louisiana, Mississippi and Alabama or a Florida registered vessel with its home port in the counties of Escambia, Santa Rosa, Okaloosa, Walton, Holmes, Washington, Bay, Jackson, Calhoun, Gulf, Liberty, Franklin, Gadsden, Leon, Wakulla in the State of Florida; and,

ii.   the vessel had revenue from commercial shrimping equal to or greater than the Qualifying Revenue in Table 3 based on vessel size and type for the Benchmark Period. A Boat Captain may combine vessel revenue from multiple vessels of the same size and type for the Benchmark Period; and,

iii.  the Claimant was the Boat Captain of the vessel during the time period for which the vessel generated the revenue on which the Claimant relies to establish the Qualifying Revenue for the Benchmark Period reported in Table 3.

9

029307

**TABLE 3**

| VESSEL SIZE | QUALIFYING VESSEL REVENUE |
|---|---|
| <30 feet | $32,500 |
| 30-44 feet | $40,000 |
| 45-74 feet Ice | $90,000 |
| 45-74 feet Freezer | $275,000 |
| 75+ feet Ice | $225,000 |
| 75+ feet Freezer | $400,000 |

**B.   Documentation Required**

**1.   Vessel Owners/Commercial Fisherman Vessel Lessees**

Vessel Owners/Commercial Fisherman Vessel Lessees seeking compensation under the Expedited Compensation Method must provide documents sufficient to prove eligibility pursuant to the applicable paragraphs of the "Generally Applicable Provisions of the Shrimp Compensation Plan" and the requirements in Section I.A.1, and to determine compensation pursuant to Section I.C below, including the following:

   a.   Trip Tickets or their equivalents such as dealer forms, which show the volume of shrimp harvested and the sales price as shown on the trip tickets or their equivalents for the Benchmark Period. The total volume multiplied by the price will be the applicable gross revenue.

   – OR –

   b.   Federal or state tax and financial information as follows:

      i.   If Claimant is an entity, federal or state tax returns and sufficient documentation to identify those components of gross revenue derived from commercial shrimp harvesting by vessel for the Benchmark Period for each vessel for which the Claimant submits a Vessel Owner/Commercial Fisherman Vessel Lessee claim.

      ii.   If Claimant is an individual, federal form 1040 including Schedules C, E and F or state tax forms with supporting documents, as well as sufficient documentation to identify those components of earnings derived from commercial shrimp harvesting by vessel for the Benchmark Period.

      iii.   In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify (i) Claimant's revenue from shrimping as

10

compared to other sources, (ii) Claimant's revenue from landings in the Gulf Coast Areas.  If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

c.      Also, the Claimant must provide documentation sufficient to establish the vessel size and type for each vessel for which the Claimant seeks compensation.

d.      In addition, if available, it is requested that the Claimant also provide the following documents, to assist the Claims Administrator:

    i.      Vessel log book

    ii.     Share sheets

    iii.    Sales or other production reports maintained in the normal course of business.

### 2.      Boat Captains

Boat Captains seeking compensation under the Expedited Compensation Method must provide documents sufficient to prove eligibility pursuant to the applicable paragraphs of the "Generally Applicable Provisions of the Shrimp Compensation Plan" and the eligibility requirements in Section I.A.2, and to determine compensation pursuant to Section I.C below, including the following:

a.      Trip Tickets or their equivalents for each vessel, which show the volume of shrimp harvested and the sales price as shown on the trip tickets or their equivalents for the Benchmark Period.  The total volume multiplied by the price will be the applicable gross revenue.

– OR –

b.      Federal tax returns, including Schedules C, E and F, W-2s, and 1099s or state tax returns and supporting documents for the Benchmark Period and sufficient documentation to identify those components of earnings derived from commercial shrimp harvesting for the Benchmark Period for the vessel(s) selected by the Claimant.  In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify revenue from shrimp landings in the Gulf Coast Areas for each vessel while the Claimant was Boat Captain.  If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

11

      c.      Also, the Claimant must provide documentation sufficient to establish the vessel size and type for the vessel(s) for which the Claimant seeks compensation.

      d.      In addition, if available, it is requested that the Claimant also provide the following documents, to assist the Claims Administrator:

            i.      Captain's log book

            ii.      Vessel log book

            iii.      Share sheets

            iv.      Sales or other production reports maintained in the normal course of business.

## C. Compensation Amounts

### 1. Vessel Owner/Commercial Fisherman Vessel Lessee Compensation

If the Claims Administrator determines that the Vessel Owner or Commercial Fisherman Vessel Lessee has provided necessary proof of eligibility and the required documentation, the Claimant shall receive the Vessel Owner/Commercial Fisherman Vessel Lessee Compensation for the vessel set forth in Table 4. The Vessel Owner/Commercial Fisherman Vessel Lessee Compensation includes an RTP of 8.25. A Claimant may have more than one vessel and is eligible for compensation for each vessel for which the Claimant independently satisfies the eligibility and documentation requirements.

### TABLE 4

| VESSEL SIZE | VESSEL OWNER/COMMERCIAL FISHERMAN VESSEL LESSEE COMPENSATION |
|---|---|
| <30 feet | $104,063 |
| 30-44 feet | $135,281 |
| 45-74 feet Ice | $270,563 |
| 45-74 feet Freezer | $478,688 |
| 75+ feet Ice | $416,250 |
| 75+ feet Freezer | $582,750 |

### 2. Boat Captain Compensation

If the Claims Administrator determines that the Boat Captain has provided necessary proof of eligibility and the required documentation for a vessel, the Claimant shall receive the Boat

029310

Captain Compensation set forth in Table 5. The Boat Captain Compensation includes an RTP of 7.25.

### TABLE 5

| VESSEL SIZE | BOAT CAPTAIN COMPENSATION |
|---|---|
| <30 feet | $92,813 |
| 30-44 feet | $107,250 |
| 45-74 feet Ice | $160,875 |
| 45-74 feet Freezer | $284,625 |
| 75+ feet Ice | $206,250 |
| 75+ feet Freezer | $288,750 |

## II.  Reduced Expedited Compensation Method

If a Claimant does not qualify for the Expedited Compensation Method, the Claimant may qualify for the Reduced Expedited Compensation Method for each vessel.

### A.  Eligibility Requirements

#### 1.  Vessel Owner/Commercial Fisherman Vessel Lessee

In order to qualify for compensation under the Reduced Expedited Compensation Method, the Vessel Owner/Commercial Fisherman Vessel Lessee must provide for each vessel:

  a. A copy of the 2009 or 2010 governmental issued vessel registration for each of Claimant's vessel(s) establishing the home port of the vessel was within the states of Louisiana, Mississippi and Alabama or a Florida registered vessel with its home port in the counties of Escambia, Santa Rosa, Okaloosa, Walton, Holmes, Washington, Bay, Jackson, Calhoun, Gulf, Liberty, Franklin, Gadsden, Leon, Wakulla in the State of Florida; and,

  b. Proof of revenue from commercial shrimping equal to or greater than the Qualifying Revenue in Table 6 based on vessel size and type for the Benchmark Period.

#### 2.  Boat Captains

In order to qualify for compensation under the Reduced Expedited Compensation Method, the Boat Captain must provide for each vessel:

  a. Proof that during the Benchmark Period:

    i. the Claimant was a Boat Captain on a commercial shrimping vessel with the home port of the vessel that was

13

029311

within the states of Louisiana, Mississippi and Alabama or a Florida registered vessel with its home port in the counties of Escambia, Santa Rosa, Okaloosa, Walton, Holmes, Washington, Bay, Jackson, Calhoun, Gulf, Liberty, Franklin, Gadsden, Leon, Wakulla in the State of Florida; and,

ii.    the vessel had revenue from commercial shrimping equal to or greater than the Qualifying Revenue in Table 6 based on vessel size and type for the Benchmark Period, a Boat Captain may combine vessel revenue from multiple vessels of the same size and type for the Benchmark Period; and,

iii.   the Claimant was the Boat Captain of the vessel during the time period for which the vessel generated the revenue on which the Claimant relies to establish the Qualifying Revenue for the Benchmark Period reported in Table 6.

### TABLE 6

| VESSEL SIZE | QUALIFYING VESSEL REVENUE |
|---|---|
| <30 feet | n/a |
| 30-44 feet | $25,000 |
| 45-74 feet Ice | $50,000 |
| 45-74 feet Freezer | $200,000 |
| 75+ feet Ice | $150,000 |
| 75+ feet Freezer | $290,000 |

**B.    Documentation Required**

**1.    Vessel Owners/Commercial Fisherman Vessel Lessees**

See documentation requirements for Vessel Owner/Commercial Fisherman Vessel Lessee Claimants under Expedited Compensation Method in Section I above.

**2.    Boat Captains**

See documentation requirements for Boat Captain Claimants under Expedited Compensation Method in Section I above.

**C.    Compensation Amounts**

**1.    Vessel Owner/Commercial Fisherman Vessel Lessee Compensation**

If the Claims Administrator determines that the Vessel Owner or Commercial Fisherman Vessel Lessee has provided necessary proof of eligibility and the required documentation for a vessel,

14

the Claimant shall receive the Vessel Owner/Commercial Fisherman Vessel Lessee Compensation set forth in Table 7. The Vessel Owner/Commercial Fisherman Vessel Lessee Compensation includes an RTP of 8.25. A Claimant may have more than one vessel and is eligible for compensation for each vessel for which the Claimant independently satisfies the eligibility and documentation requirements.

**TABLE 7**

| VESSEL SIZE | VESSEL OWNER/COMMERCIAL FISHERMAN VESSEL LESSEE COMPENSATION |
|---|---|
| <30 feet | n/a |
| 30-44 feet | $62,438 |
| 45-74 feet Ice | $145,688 |
| 45-74 feet Freezer | $333,000 |
| 75+ feet Ice | $291,375 |
| > 75 feet Freezer | $457,875 |

### 2. Boat Captain Compensation

If the Claims Administrator determines that the Boat Captain has provided necessary proof of eligibility and the required documentation, the Claimant shall receive the Boat Captain Compensation set forth in Table 8. The Boat Captain Compensation includes an RTP of 7.25.

**TABLE 8**

| VESSEL SIZE | BOAT CAPTAIN COMPENSATION |
|---|---|
| <30 feet | n/a |
| 30-44 feet | $49,500 |
| 45-74 feet Ice | $86.625 |
| 45-74 feet Freezer | $198,000 |
| 75+ feet Ice | $144,375 |
| 75+ feet Freezer | $226,875 |

## III. New Entrant Compensation Method

### A. Eligibility Requirements

#### 1. Vessel Owner

In order to qualify for the New Entrant Compensation Method, the Vessel Owner/Commercial Fisherman Vessel Lessee must establish for each vessel that as of April 20, 2010:

      a.      If the vessel is over 30 feet:

029313

        i.        the Claimant owned or leased the vessel and the vessel was specifically designed for commercial shrimping, such as a trawler, freezer boat, or ice boat, and

        ii.      the Claimant had expenditures in excess of $25,000 within 12 months prior to April 20, 2010 for purchase or repair of the vessel.

    b.     If the vessel is less than or equal to 30 feet:

        i.        the Claimant owned or leased a vessel and intended to use the vessel predominantly as a shrimping boat, and

        ii.      the Claimant had expenditures for the vessel on shrimping gear, such as trawls, nets, iceboxes, or winches, in excess of $6,000 within 12 months prior to April 20, 2010.

## 2. Boat Captains

A Claimant may receive Boat Captain compensation under the New Entrant Compensation Method if the Claimant: (i) qualifies for compensation as a Vessel Owner/Commercial Fisherman Vessel Lessee under the New Entrant Compensation Method for the same vessel and (ii) has not submitted a separate claim for compensation as a Boat Captain under any Shrimp Compensation Plan. Such Claimant cannot qualify as a Boat Captain for more than one vessel under the New Entrant Compensation Method.

Additionally, a Claimant who had not previously worked as a Boat Captain for a commercial shrimping vessel home ported in the Gulf Coast Areas may receive Boat Captain compensation under the New Entrant Compensation Method if the Claimant provides proof:

    a.     of an agreement entered prior to April 20, 2010 with a Vessel Owner/Commercial Fisherman Vessel Lessee for employment as a Boat Captain on a commercial shrimping vessel home ported in the Gulf Coast Areas during April 20, 2010 to December 31, 2010 that is supported by some written documentation that pre-dates April 20, 2010.

    b.     information sufficient to establish the proposed compensation, such as proposed start and end dates, wage rates, projected hours or Boat Captain's share of the shrimping vessel revenue, and

    c.     that offer for employment as a Boat Captain on a commercial shrimping vessel home ported in the Gulf Coast Areas was rescinded or withdrawn as a result of the Deepwater Horizon Oil Spill.

16

029314

        d.     Information regarding the employer, including: (i) employer's business name, address(es), telephone number(s), website(s) (if available), and a description of the nature of the business.

The Claims Administrator shall have the right to interview the Claimant and potential employer if the Claims Administrator determines an interview is appropriate.

### B.    Documentation Required

#### 1.    Vessel Owner/Commercial Fisherman Vessel Lessee

Vessel Owners and Commercial Fisherman Vessel Lessees seeking compensation under the New Entrant Compensation Method must provide documents sufficient to prove eligibility pursuant to the applicable paragraphs of the "Generally Applicable Provisions of the Shrimp Compensation Plan" and the eligibility requirements in Section III.A.1, and to determine compensation pursuant to Section III.C below, including proof of (i) vessel size and type, (ii) expenditures for purchase and/or repair of the vessel, or (iii) purchases of shrimping gear.

#### 2.    Boat Captains

Boat Captains seeking compensation under the New Entrant Compensation Method must provide documents sufficient to prove eligibility pursuant to the applicable paragraphs of the "Generally Applicable Provisions of the Shrimp Compensation Plan" and the eligibility requirements in Section III.A.2, and to determine compensation pursuant to Section III.C below.

### C.    Compensation Amount

#### 1.    Vessel Owner/Commercial Fisherman Vessel Lessee

If the Claims Administrator determines that the Vessel Owner/Commercial Fisherman Vessel Lessee has provided necessary proof of eligibility and the required documentation for a vessel, the Claimant shall receive the Vessel Owner/Commercial Fisherman Vessel Lessee Compensation set forth in Table 9. The Vessel Owner/Commercial Fisherman Vessel Lessee Compensation includes an RTP of 8.25.

### TABLE 9

| VESSEL SIZE | VESSEL OWNER/COMMERCIAL FISHERMAN VESSEL LESSEE COMPENSATION |
|:---:|:---:|
| <30 feet | $26,016 |
| 30-44 feet | $33,820 |
| 45-74 feet Ice | $67,641 |
| 45-74 feet Freezer | $119,672 |
| 75+ feet Ice | $104,063 |
| > 75 feet Freezer | $145,688 |

029315

### 2. Boat Captains

If the Claims Administrator determines that a Claimant seeking compensation as a Boat Captain has provided necessary proof of eligibility and the required documentation, the Claimant shall receive the Boat Captain Compensation set forth in Table 10. The Boat Captain Compensation includes an RTP of 7.25.

### TABLE 10

| VESSEL SIZE | BOAT CAPTAIN COMPENSATION |
|---|---|
| <30 feet | $23,203 |
| 30-44 feet | $26,813 |
| 45-74 feet Ice | $40,219 |
| 45-74 feet Freezer | $71,156 |
| 75+ feet Ice | $51,563 |
| 75+ feet Freezer | $72,188 |

## IV. Historical Revenue Method

### A. Eligibility Requirements

#### 1. Vessel Owner/Commercial Fisherman Vessel Lessee

To be eligible under the Historical Revenue Method, a Vessel Owner/Commercial Fisherman Vessel Lessee must meet the eligibility requirements of the applicable paragraphs of the "Generally Applicable Provisions of the Shrimp Compensation Plan" and provide evidence to demonstrate the Claimant's commercial shrimping revenue during the selected Benchmark Period.

#### 2. Boat Captains

To be eligible under the Historical Revenue Method, a Boat Captain must meet the eligibility requirements of the applicable paragraphs of the "Generally Applicable Provisions of the Shrimp Compensation Plan" and provide evidence to demonstrate the Claimant's earnings from commercial shrimping on vessels for which the Claimant served as Boat Captain during the selected Benchmark Period.

### B. Documentation Required

#### 1. Vessel Owners/Commercial Fisherman Vessel Lessees

Vessel Owners/Commercial Fisherman Vessel Lessees seeking compensation under the Historical Revenue Method must provide documents sufficient to prove the eligibility requirements in Section IV.A and to determine compensation pursuant to Section IV.C below, including the following:

18

029316

a.  Trip Tickets or their equivalents for each vessel for which Claimant seeks compensation, which show the volume of shrimp harvested and the sales price as shown on the trip tickets or their equivalents for the Benchmark Period for shrimp landed in the Gulf Coast Areas.   The Claimant must provide sufficient documentation for the Claims Administrator to be able to identify gross revenue derived for each vessel solely for shrimp catch landed in the Gulf Coast Areas during the Benchmark Period.  The total volume multiplied by price will be the applicable gross revenue.

– OR –

b.  Federal or state tax and financial information as follows:

i.  If Claimant is an entity, federal or state tax returns, and sufficient documentation to identify those components of gross revenue derived from commercial shrimp harvesting by vessel for the Benchmark Period for each vessel for which the Claimant submits a Vessel Owner/Commercial Fisherman Vessel Lessee claim.

ii.  If Claimant is an individual, federal form 1040 including Schedules C, E and F or state tax forms and supporting documents, as well as sufficient documentation to identify those components of earnings derived from commercial shrimp harvesting by vessel for the Benchmark Period.

iii.  In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify (i) Claimant's revenue from shrimping as compared to other sources, (ii) Claimant's revenue from landings in the Gulf Coast Areas.   If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

c.  Also, the Claimant must provide documentation sufficient to establish the vessel size and type for each vessel for which the Claimant seeks compensation.

d.  In addition, if available, it is requested that the Claimant also provide the following documents, to assist the Claims Administrator:

i.  Vessel log book

ii.  Share sheets

19

029317

iii.     Sales or other production reports maintained in the normal course of business.

### 2.     Boat Captains

Boat Captains seeking compensation under the Historical Revenue Method must provide documents sufficient to prove the eligibility requirements in section IV.A.2 and to determine compensation pursuant to Section IV.C below, including the following:

a.     Trip tickets or their equivalents for each vessel for which Claimant seeks compensation which show the volume of shrimp harvested and the sales price as shown on the trip tickets or their equivalents for the Benchmark Period for shrimp landed in the Gulf Coast Areas.  The total volume multiplied by price will be the applicable gross revenue.

– OR –

b.     Federal tax returns, including Schedules C, E and F, W-2s, and 1099s or state tax returns with supporting documents for the Benchmark Period and sufficient documentation to identify those components of earnings derived from commercial shrimp harvesting for the Benchmark Period for the vessel(s) selected by the Claimant.  In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify revenue from shrimp landings in the Gulf Coast Areas for each vessel while the Claimant was Boat Captain.  If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

c.     Also, the Claimant must provide documentation sufficient to establish the vessel size and type for each vessel for which the Claimant seeks compensation.

d.     In addition, if available, it is requested that the Claimant also provide the following documents, to assist the Claims Administrator:

i.     Captain's log book

ii.     Vessel log book

iii.     Share sheets

iv.     Sales or other production reports maintained in the normal course of business

20

### C. Compensation Calculations

1. Calculate Benchmark Shrimp Revenue

   a. If trip tickets or their equivalents are used, the volume and price of shrimp on the trip tickets or their equivalents are used to calculate gross revenue from shrimp landed in the Gulf Coast Areas. If the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee, the Claimant may provide trip tickets for the Benchmark Period for each vessel for which compensation is being sought. If the Claimant is a Boat Captain, the Claimant may provide trip tickets or their equivalents for all vessels the Claimant served as a Captain during the Benchmark Period.

   – OR –

   b. The Claims Administrator may determine the gross vessel revenue or Boat Captain earnings from shrimp landings in the Gulf Coast Areas based on the Claimant's tax returns, monthly profit and loss statements, or financial information if the Claims Administrator has sufficient information to determine: (i) Claimant's revenue from shrimping as compared to other sources, and (ii) Claimant's revenue from shrimp landings in the Gulf Coast Areas. If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

2. Calculate Additional Catch Adjusted Benchmark Shrimp Revenue by multiplying Benchmark Shrimp Revenue by the Additional Catch Factor. The Additional Catch Factor is presented in Table 11 and is intended to compensate for lost undocumented catch and in-kind payments.

Additional Catch Adjusted Benchmark Shrimp Revenue = (Benchmark Shrimp Revenue * Additional Catch Factor)

### TABLE 11

| VESSEL SIZE | ADDITIONAL CATCH FACTOR |
|---|---|
| <30 feet | 1.25 |
| 30-44 feet | 1.20 |
| 45-74 feet Ice | 1.15 |
| 45-74 feet Freezer | 1.05 |
| 75+ feet Ice | 1.05 |
| 75+ feet Freezer | 1.05 |

21

3. Calculate Total Adjusted Benchmark Shrimp Revenue by multiplying the Additional Catch Adjusted Benchmark Shrimp Revenue by 1.2, the Adjustment for Changes in 2010-11 Prices.

Total Adjusted Benchmark Shrimp Revenue = (Additional Catch Adjusted Benchmark Shrimp Revenue * Adjustment for Changes in 2010-11 Prices).

4. If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Benchmark Revenue was calculated using trip tickets or their equivalents, calculate Benchmark Shrimp Cost. Benchmark Shrimp Cost is calculated by multiplying Benchmark Shrimp Revenue by the Shrimp Cost Percentage. The Shrimp Cost Percentage, presented in Table 12, is expressed as a percentage of revenue and reflects standard industry non-labor variable costs. If the Claimant is a Boat Captain and Benchmark Revenue was calculated based upon his earnings, such as from tax return or financial information, then no Shrimp Cost Percentage is applied, skip to step 5.

Benchmark Shrimp Cost = (Benchmark Shrimp Revenue * Shrimp Cost Percentage)

## TABLE 12

| VESSEL SIZE | SHRIMP COST PERCENTAGE |
|---|---|
| <30 feet | 42% |
| 30-44 feet | 39% |
| 45-74 feet Ice | 39% |
| 45-74 feet Freezer | 42% |
| 75+ feet Ice | 54% |
| 75+ feet Freezer | 52% |

5. Calculate the Base Shrimp Loss using the Shrimp Loss Percentage of 35%.

a. If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Total Adjusted Benchmark Shrimp Revenue was calculated using trip tickets or their equivalents, the Base Loss is calculated as follows:

Base Shrimp Loss = (Total Adjusted Benchmark Shrimp Revenue – Benchmark Shrimp Cost) * 35%

22

029320

        b.      If the Claimant is a Boat Captain and Total Adjusted Benchmark Shrimp Revenue was calculated using a different source than trip tickets or their equivalents, the Base Loss is calculated as follows:

Base Shrimp Loss = Total Adjusted Benchmark Shrimp Revenue * 35%

     6.      Determine Base Compensation by multiplying Base Shrimp Loss by the appropriate Vessel Owner/Commercial Fisherman Vessel Lessee or Boat Captain share.  Vessel Owner and Boat Captain shares differ by boat size and type and are presented in Table 13.

        a.      Base Compensation for Vessel Owners/Commercial Fisherman Vessel Lessees is calculated as:

Base Compensation = Base Shrimp Loss * Shrimp Vessel Share

        b.      Base Compensation for Shrimp Boat Captains is calculated as:

           i.      If Shrimp Boat Captain Compensation is calculated based on trip tickets then the Base Compensation for Shrimp Boat Captains is calculated as:

Base Compensation = Base Shrimp Loss * Shrimp Boat Captain Share

           ii.      If Shrimp Boat Captain Compensation is calculated based on tax returns and financial records, then the Base Compensation for Shrimp Boat Captains is calculated as:

Base Compensation = Base Shrimp Loss

### TABLE 13

| VESSEL TYPE AND SIZE | SHRIMP VESSEL OWNER/COMMERCIAL FISHERMAN VESSEL LESSEE SHARE | SHRIMP BOAT CAPTAIN SHARE |
|---|---|---|
| <30 feet | 45% | 45% |
| 30-44 feet | 45% | 40% |
| 45-74 feet Ice | 45% | 30% |
| 45-74 feet Freezer | 45% | 30% |
| 75+ feet Ice | 45% | 25% |
| 75+ feet Freezer | 45% | 25% |

029321

7.    Apply the RTP to Base Compensation in order to determine Final Compensation.  Base Compensation is specific to Claimant type and is found in Table 14.

Final Compensation = Base Compensation + (Base Compensation * RTP)

**TABLE 14**

|  | **VESSEL OWNERS/COMMERCIAL FISHERMAN VESSEL LESSEES** | **BOAT CAPTAINS** |
|---|---|---|
| RTP | 8.25 | 7.25 |

## V.    Vessel Lease Compensation Allocation

To the extent the vessel was leased by the Vessel Owner to the Commercial Fisherman Vessel Lessee as of April 20, 2010, compensation will be allocated between the parties based upon Benchmark Revenue, as calculated above and Annual Lease Payment.  The Annual Lease Payment shall be calculated as the annual payment to the Vessel Owner by the Commercial Fisherman Vessel Lessee for the lease in effect as of April 20, 2010.  The ratio of the Annual Lease Payment to Benchmark Revenue multiplied by the Final Compensation determines the Vessel Owner Share of Final Compensation.  The Commercial Fisherman Vessel Lessee's Share of Compensation is Final Compensation less the Vessel Owner's Share of Final Compensation.

Vessel Owner Share of Final Compensation = Final Compensation * (Annual Lease Payment / Benchmark Revenue)

Commercial Fisherman Vessel Lessee's Share of Final Share of Compensation = Final Compensation - Vessel Owner Share of Final Compensation.

029322

## OYSTER COMPENSATION PLAN

The Oyster Compensation Plan provides compensation to Oyster Leaseholders and Oyster Harvester Claimants. Oyster Harvesters eligible under the Oyster Compensation Plan are (i) Seafood Vessel Owners, (ii) Oyster Harvester lessees of Seafood Vessels, and (iii) Seafood Boat Captains. Oyster Leaseholders can submit Leaseholder Property Claims and/or Leaseholder Lost Income Claims. Oyster Harvesters can submit Harvester Lost Income Claims. A single Claimant can qualify as both an Oyster Leaseholder and an Oyster Harvester. Compensation plans for each of these claim types are set forth below.

In some instances, Oyster Leaseholders earn income solely from allowing another natural person or entity to harvest oysters from their oyster leaseholds. In other instances, Oyster Leaseholders may be combined such that they both own oyster leaseholds and harvest from those and other leaseholds. For purposes of the Oyster Compensation Plan, Claimants should submit claims reflecting both their harvesting and leaseholder claims together. A combined Oyster Leaseholder/Oyster Harvester is eligible for compensation as both an Oyster Leaseholder and an Oyster Harvester.

### Generally Applicable Provisions of the Oyster Compensation Plan:

1. Eligible Claimants shall be comprised of Class Members (i) who do not fall within the exclusions to the Economic Loss and Property Class Definitions; (ii) who are Oyster Leaseholders or Oyster Harvesters; and (iii) who meet the following additional criteria.

2. An Oyster Leaseholder Claimants shall be an entity or individual with an oyster leasehold interest.

3. Oyster Leaseholder Claimants are eligible to receive compensation for leaseholds that are located within Zone A, B or C as reflected on the Oyster Leasehold Compensation Zone Map attached hereto, as Exhibit 1. Oyster Harvesters are eligible to receive compensation for oysters landed in the Gulf Coast Areas.

4. It is understood that in some instances, the Vessel Owner is also the Oyster Harvester; however, it may be the case that the Vessel Owner leased the vessel to an Oyster Harvester Vessel Lessee. In those instances where the vessel was leased during the time period of April 20, 2010 to December 31, 2010, the Vessel Owner and Oyster Harvester Vessel Lessee must file the vessel claim jointly in order to receive compensation prior to the **Bar Date**, and they shall share any Vessel Owner/Oyster Harvester Vessel Lessee compensation provided for in this Oyster Compensation Plan. If at the time of the **Bar Date** either the Vessel Owner or the Oyster Harvester Vessel Lessee has not filed a claim, the one that has filed the claim shall receive the full Vessel Owner/Oyster Harvester Vessel Lessee compensation for the vessel. The allocation of compensation between Vessel Owner and Oyster Harvester Vessel Lessee shall be determined as provided in Section 4. If the vessel was not leased to an Oyster Harvester Vessel Lessee during the time period of April 20, 2010 to December 31, 2010, the Vessel Owner is entitled to the full share of the Vessel Owner/ Oyster Harvester Vessel Lessee compensation.

25

5.      It is understood that in some instances, the Vessel Owner or the Oyster Harvester Vessel Lessee is also the Boat Captain.  In those instances where the Vessel Owner and/or the Oyster Harvester Vessel Lessee were also the Boat Captain, the Claimant shall be eligible to receive the Boat Captain compensation under the Oyster Compensation Plan as set forth below.  If the Vessel Owner and/or Oyster Harvester Vessel Lessee employed a Boat Captain on the vessel and did not serve as a Boat Captain on that vessel, the hired Boat Captain is eligible for the Boat Captain compensation, not the Vessel Owner or Oyster Harvester Vessel Lessee.

6.      To establish eligibility to participate in the Oyster Compensation Plan, an Oyster Leaseholder Claimant must provide:

   A.      Valid oyster lease entered into by Claimant that establishes, as of April 20, 2010, the Claimant as the lessee of the oyster leasehold, or a copy of the actual title for the leasehold. Claimants are required to provide documentation that their leasehold interest is in good standing, such as proof of renewal.

   B.      Information sufficient to ascertain the geographic boundaries of the oyster leasehold, including the oyster lease ID number.

7.      To establish eligibility to participate in the Oyster Compensation Plan, a Vessel Owner Claimant must provide for each vessel for which the Claimant is seeking compensation:

   A.      Proof of ownership of the vessel during the time period of April 20, 2010 to December 31, 2010.

   B.      Proof that as of April 20, 2010 there was a government license (even if it had expired as of that date) that authorized that vessel to harvest and land oysters in the Gulf Coast Areas for the 2009 season or the 2010 season.

   C.      The vessel name and any applicable federal and/or state vessel registration identification numbers.

   D.      Proof that the vessel landed oysters in the Gulf Coast Areas in 2009 or 2010.  For example, this can be demonstrated using trip tickets (or equivalent documents such as dealer forms) or Federal or state tax returns.

   E.      A sworn statement attesting as to whether or not the vessel was leased during the time period April 20, 2010 to December 31, 2010.  If the vessel was leased during this time period, the Vessel Owner must provide a copy of the lease agreement.

8.      To establish eligibility to participate in the Oyster Compensation Plan, an Oyster Harvester who leases a Seafood Vessel (Oyster Harvester Vessel Lessee) must provide for each vessel for which the Claimant is seeking compensation:

   A.      Proof that during the time period of April 20, 2010 to December 31, 2010 the Claimant leased a vessel to be used for oyster harvesting.

029324

      B.      Proof that as of April 20, 2010 there was a government license (even if it had expired as of that date) that authorized the vessel to harvest and land oysters in the Gulf Coast Areas for the 2009 season or the 2010 season.

      C.      Proof that the vessel landed oysters in the Gulf Coast Areas in 2009 or 2010. For example, this can be demonstrated using trip tickets (or equivalent documents such as dealer forms) or Federal or State tax returns.

      D.      A sworn statement attesting that the Claimant leased the vessel from the Vessel Owner during the time period of April 20, 2010 to December 31, 2010. The Oyster Harvester Vessel Lessee must also provide a copy of the lease agreement.

9.      Oyster Boat Captain Claimants must provide:

      A.      Proof that as of April 20, 2010 the Boat Captain held a governmental license (even if it had expired before that date) authorizing the Claimant to operate as a Boat Captain and/or to commercially harvest and land oysters in the Gulf Coast Areas.

      B.      Proof that Claimant landed oysters in the Gulf Coast Areas in 2009 or 2010. This can be demonstrated using trip tickets (or equivalent documents such as dealer forms) or federal or state tax returns.

10.    A Sworn Statement attesting whether or not the Claimant received any Seafood Spill-Related Payments. If the Claimant received Seafood Spill-Related Payments, the Claimant shall provide documents[7] sufficient to establish the timing, amount and source of Seafood Spill-Related Payments, including documents providing the claimant's BP/GCCF/Transition Facility Claim Number, if applicable, and any corresponding payments:

### Oyster Compensation Plan Methods Available:

There are two types of claims available to Oyster Leaseholders:

- Leaseholder Interest Compensation

- Leaseholder Lost Income Compensation

There is one type of claim available to Oyster Harvesters:

- Historical Revenue Compensation

---

[7]    When documents are requested in the Seafood Compensation Program, Claimant may provide either legible copies or originals of the documents.

27

029325

A given Claimant may submit claims for more than one form of compensation, for example a combined Oyster Leaseholder/Oyster Harvester may submit claims for all three forms of compensation.

**Oyster Compensation Plan Definition:**

The Benchmark Period for the Claimant is the combination of 2007, 2008 and 2009. All calculations of Benchmark Period revenues, costs or payments use the average of annual figures across 2007, 2008 and 2009. In the event that a Claimant entered the oyster industry after 2007, then the Benchmark Period will include all full years since the Claimant entered the oyster harvesting industry, so 2008-2009 or 2009. In the event the Claims Administrator determines that the Claimant (individual or vessel) did not participate at the same level of effort in oyster harvesting due to circumstances beyond the Claimant's control (such as illness, disability or major mechanical failure), the Claims Administrator may at his discretion allow the Claimant to exclude one or more years of the Benchmark Period.

### 1. Oyster Leaseholder Interest Compensation

Oyster Leaseholder Interest Compensation provides all eligible Oyster Leaseholders with compensation on a per acre basis for their leaseholds. Compensation shall be determined by the geographic location of the oyster leasehold as set forth below.

**1.1     Eligibility for Oyster Leaseholder Property Claim**

Eligible leaseholds are those located within Zone A, B or C as reflected on the Oyster Leasehold Compensation Zone Map.

**1.2     Documentation Requirement for Oyster Leaseholder Interest Compensation**

The Oyster Leaseholder must provide the documentation required under the Generally Applicable Provisions of the Oyster Compensation Plan.

**1.3     Calculation of Oyster Leaseholder Interest Compensation**

The Oyster Leaseholder Claimant shall receive compensation on a per acre basis based upon where the lease is located on the Oyster Leaseholder Compensation Zone Map. The per acre compensation amounts for each zone are as follows:

Zone A:        $2,000

Zone B:        $1,000

Zone C:        $400

If a lease crosses two zones, compensation will be determined based on the number of acres of the lease in each zone. For example, if a lease covers 20 acres in Zone A and 30 acres in Zone B, then compensation will be calculated as: (20 acres * $2,000) + (30 acres * $1,000) = $70,000.

029326

The per acre payment is not subject to any RTP.

## 2. Oyster Leaseholder Lost Income Compensation

The Oyster Leaseholder Lost Income Compensation provides eligible Oyster Leaseholders with compensation for income earned through payments from another natural person or entity that harvests oysters on their leases. This Section 2 describes compensation for an Oyster Leaseholder that is not also an Oyster Vessel Owner/Oyster Harvester Vessel Lessee. If the Oyster Leaseholder is also a Vessel Owner/Oyster Harvester Vessel Lessee, the Oyster Leaseholder shall receive compensation for a combined Oyster Leaseholder and Vessel Owner/Oyster Harvester Vessel Lessee, as described in Section 3.5.

### 2.1    Eligibility Requirements for Oyster Leaseholder Lost Income Claims

Oyster Leaseholder Claimants who meet the eligibility requirements set forth in the applicable paragraphs of the "Generally Applicable Provisions of the Oyster Compensation Plan" and Section 1.1 above are eligible to receive Oyster Leaseholder Lost Income Claims Compensation.

### 2.2    Documentation Requirements for Oyster Leaseholder Lost Income Claims

To receive Oyster Leaseholder Lost Income Compensation, a Claimant must provide:

A.    Tax returns, financial statements or business documents establishing revenue earned by the Claimant during the Benchmark Period from another natural person or entity that harvests oysters on their leaseholds located in Zones A, B or C, as reflected on the Oyster Leasehold Compensation Zone Map.

B.    Contracts or agreements between the Oyster Leaseholder and another natural person or entity that harvests oysters from their leaseholds located in Zones A, B or C, as reflected on the Oyster Leasehold Compensation Zone Map.

In addition, if available, it is requested that the Claimant also provide the following documents, to assist the Claims Administrator:

A.    A list of all Oyster Harvesters who harvested oysters on Claimant's leasehold(s) during 2007 through 2009.

### 2.3    Calculation of Oyster Leaseholder Lost Income Compensation

For all Oyster Leaseholder Claimants, the Oyster Leaseholder Lost Income Compensation is calculated as follows:

A.    Calculate Benchmark Revenue as the average annual revenue earned by the Claimant during the Benchmark Period from other natural people or entities that harvest oysters on the Claimant's leaseholds that are located in Zones A, B or C, as reflected on the Oyster Leasehold Compensation Zone Map.

29

B.     Calculate Total Adjusted Benchmark Revenue by multiplying Benchmark Revenue by 1.1, the Adjustment For Changes in 2010-11 Prices.

Total Adjusted Benchmark Revenue = Benchmark Revenue * 1.1

C.     Calculate Base Compensation as Total Adjusted Benchmark Revenue multiplied by the Oyster Loss Percentage of 40%.

Base Compensation = Total Adjusted Benchmark Revenue * 40%

D.     Apply an RTP of 8.75 to Base Compensation in order to determine Final Compensation.

Final Compensation = Base Compensation + (Base Compensation * 8.75)

| **TABLE 1** | | |
|---|---|---|
| **Example of Compensation Calculation for Hypothetical Oyster Leaseholder Lost Income Claimant** | | |
| Inputs | | |
| Benchmark Revenue | [A] | $20,000 |
| Adjustment for Changes in 2010-2011 Prices | [B] | 1.10 |
| Oyster Loss Percentage | [C] | 40% |
| RTP | [D] | 8.75 |
| Calculation | | |
| Total Adjusted Benchmark Revenue | [E] = [A] * [B] | $22,000 |
| Base Compensation | [F] = [E] * [C] | $8,800 |
| Final Compensation | [G] = [F] + [F] * [D] | $85,800 |

### 3. Oyster Harvester Lost Income Compensation

An Oyster Harvester Claimant may seek compensation for the Claimant's economic loss from oyster harvesting by establishing historical revenue generated by Oyster Harvesting. Section 3.3 describes calculation of compensation for an oyster Boat Captain, Section 3.4 describes calculation of compensation for a Vessel Owner/Oyster Harvester Vessel Lessee that is not also an Oyster Leaseholder. If a Vessel Owner/Oyster Harvester Vessel Lessee is also an Oyster Leaseholder, Section 3.5 describes the calculation of both Oyster Leaseholder Lost Income and Oyster Harvester Lost Income for that Claimant.

029328

## 3.1    Eligibility and Documentation – Boat Captain

To be eligible to receive compensation for lost oyster harvesting earnings, a Boat Captain Claimant (i) must meet the applicable paragraphs of the Generally Applicable Provisions of the Oyster Compensation Plan and (ii) provide evidence to document the oyster harvesting revenue earned by vessels on which the Claimant served as Boat Captain, or the earnings the Claimant earned as Boat Captain of oyster harvesting vessels, during the Benchmark Period.  This revenue must be established using:

> A.    Trip tickets (or equivalent documents such as dealer forms) for each vessel for which Claimant seeks compensation which show the volume of oysters harvested and the sales price for the Benchmark Period for oysters landed in the Gulf Coast Areas.  The total volume multiplied by the price will be the applicable gross revenue.
>
> -OR-
>
> B.    Federal or state tax returns, including Schedules C, E and F, W-2s, and 1099s for the Benchmark Period and sufficient documentation to identify those components of earnings derived from oyster harvesting for the Benchmark Period for the vessel(s) selected by the Claimant.  In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify revenue from oyster landings in the Gulf Coast Areas for each vessel while the Claimant was Boat Captain.  If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

In addition, if available, it is requested that the Claimant also provide the following documents to assist the Claims Administrator:

> A.    Captain's Log Book
>
> B.    Share Sheets
>
> C.    Vessel name and any applicable federal and/or state vessel registration identification numbers for any vessels the Claimant captained during the Benchmark Period

## 3.2    Eligibility and Documentation: Seafood Vessel Owner – Oyster Harvester Vessel Lessee

To be eligible to receive compensation for lost harvesting income, a Vessel Owner/Oyster Harvester Vessel Lessee must meet the eligibility requirements set forth in the applicable paragraphs of the "Generally Applicable Provisions of the Oyster Compensation Plan" and provide evidence to document harvesting revenue and certain costs associated with oyster harvesting during their Benchmark Period for landings in the Gulf Coast Areas.  Oyster

31

harvesting gross revenue earned by Claimants during their Benchmark Period must be established using:

A.   Trip tickets (or equivalent documents such as dealer forms) for each vessel for which Claimant seeks compensation which show the volume of oysters harvested and the sales price for the Benchmark Period for oysters landed in the Gulf Coast Areas. The total volume multiplied by the price will be the applicable gross revenue.

-OR-

B.   Federal or state tax forms and financial information as follows:

1.   If a Claimant is an entity, federal or state tax returns, and sufficient documentation to identify those components of gross revenue derived from oyster harvesting by vessel for the Benchmark Period for landings in the Gulf Coast Areas for each vessel for which the Claimant submits a Vessel Owner/Oyster Harvester Vessel Lessee claim.

2.   If the Claimant is an individual, federal form 1040 including Schedules C, E and F or state tax forms with supporting documents as well as sufficient documentation to identify components of earnings derived from oysters landed in the Gulf Coast Areas by vessel for the Benchmark Period.

3.   In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify Claimant's revenue from oyster harvesting in the Gulf Coast Areas as compared to other sources of revenue. If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

In addition, if available, it is requested that the Claimant also provide, for each vessel for which the Claimant is seeking compensation, the following documents to assist the Claims Administrator:

1.   Vessel Log Book

2.   Share Sheets

3.   Names and periods of employment of Boat Captains employed on the vessel during 2007, 2008 and 2009

### 3.3.1  Calculation of Harvester Lost Income Compensation for Boat Captains for Captains Using Trip Tickets to Document Claims

A.   Calculate average annual revenue in Benchmark Period for (i) oysters harvested from public grounds (Public Benchmark Harvest Revenue) and (ii) oysters harvested from private leaseholds (Private Benchmark Harvest Revenue). Public

029330

Benchmark Harvest Revenue and Private Benchmark Harvest Revenue shall be separately calculated as described above in 3.1. If the Claimant does not have information sufficient to establish the split between revenue from oysters harvested on public grounds and oysters harvested on private leaseholds, all oyster harvesting revenue shall be assumed to have come from private leaseholds.

B.    Calculate Total Adjusted Benchmark Revenue by multiplying the sum of Public Benchmark Harvest Revenue and Private Benchmark Harvest Revenue by 1.1, the Adjustment For Changes in 2010-11 Prices.

Total Adjusted Benchmark Revenue = (Public Benchmark Harvest Revenue + Private Benchmark Harvest Revenue) * 1.1

C.    Determine Variable Harvest Cost by multiplying the sum of Public Benchmark Revenue and Private Benchmark Revenue by 12%. If the Claimant establishes Benchmark Revenue through individual income tax forms, Variable Harvest Cost shall be zero ($0).

Variable Harvest Cost = (Public Benchmark Revenue + Private Benchmark Revenue) * 12%

D.    Calculate Leaseholder Payment Cost by multiplying Private Benchmark Revenue by Leaseholder Payment Percentage of 33%. If the Claimant establishes Benchmark Revenue through individual income tax forms, Variable Harvest Cost shall be zero ($0).

Leaseholder Payment Cost = Private Benchmark Revenue * 33%

E.    Calculate Base Harvest Margin as Total Adjusted Benchmark Oyster Revenue less Variable Harvest Cost and Leaseholder Payment Cost.

Base Harvest Margin = Total Adjusted Benchmark Oyster Revenue – Variable Harvest Cost – Leaseholder Payment Cost

F.    Determine Base Harvest Loss by multiplying Base Harvest Margin by Oyster Loss Percentage of 40%.

Base Harvest Loss = Base Harvest Margin * 40%

G.    Multiply Base Harvest Loss by Boat Captain Share of 40% to determine Base Compensation.

Base Compensation = Base Harvest Loss * 40%

H.    Apply an RTP of 7.75 to Base Compensation in order to determine Final Compensation.

Final Compensation = Base Compensation + (Base Compensation * 7.75)

33

| **TABLE 2** | | |
|---|---|---|
| **Example of Compensation Calculation for Hypothetical Boat Captain Harvester Lost Income Claimant Who Uses Trip Tickets** | | |
| Inputs | | |
| Public Benchmark Harvest Revenue | [A] | $50,000 |
| Private Benchmark Harvest Revenue | [B] | $100,000 |
| Adjustment for Changes in 2010-2011 Prices | [C] | 1.10 |
| Variable Harvest Cost Percentage | [D] | 12% |
| Leaseholder Payment Percentage | [E] | 33% |
| Oyster Loss Percentage | [F] | 40% |
| Boat Captain Share | [G] | 40% |
| RTP | [H] | 7.75 |
| Calculation | | |
| Total Adjusted Benchmark Revenue | [I] = ([A] + [B]) * [C] | $165,000 |
| Variable Harvest Cost | [J] = ([A] + [B]) * [D] | $18,000 |
| Leaseholder Payment Cost | [K] = [B] * [E] | $33,000 |
| Base Harvest Margin | [L] = [I] - [J] - [K] | $114,000 |
| Base Harvest Loss | [M] = [L] * [F] | $45,600 |
| Base Compensation | [N] = [M] * [G] | $18,240 |
| Final Compensation | [O] = [N] + [N] * [G] | $159,600 |

**3.3.2   Calculation of Harvester Lost Income Compensation for Boat Captains for Captains Using Tax Returns and/or Financial Records to Document Claims.**

A.   Calculate Average Earnings in Benchmark Period for oysters landed in the Gulf Coast Areas.

B.   Calculate Total Adjusted Earnings in Benchmark Period by multiplying Average Earnings in Benchmark Period by 1.1, the Adjustment For changes in 2010-11 Prices.

C.   Determine Base Earnings Loss by multiplying total Adjusted Earnings in Benchmark Period by Oyster Loss Percentage of 40%.

Base Earnings Loss = Total Adjusted Earnings in Benchmark Period * 40%

D.   Apply at RTP of 7.75 to Base Earnings Loss to determine Final Compensation

Final Compensation = Base Earnings Loss + (Base Earnings Loss * 7.75)

34

**3.4 Calculation of Harvester Lost Income Compensation for Oyster Vessel Owners/Oyster Harvester Vessel Lessees that Are Not Oyster Leaseholders**

This Section 3.4 describes compensation for an Oyster Vessel Owner/Oyster Harvester Vessel Lessee that is not also an Oyster Leaseholder.

A. Calculate average annual revenue in Benchmark Period for (i) oysters harvested from public grounds (Public Benchmark Harvest Revenue) and (ii) oysters harvested from private leaseholds (Private Benchmark Harvest Revenue). Public Benchmark Harvest Revenue and Private Benchmark Harvest Revenue shall be separately calculated as described above in 3.2. If the Claimant does not have information sufficient to establish the split between revenue from public grounds and private leaseholds, all oyster harvesting revenue shall be assumed to have come from private leaseholds.

B. Calculate Total Adjusted Benchmark Revenue by multiplying the sum of Public Benchmark Harvest Revenue and Private Benchmark Harvest Revenue by 1.1, the Adjustment For Changes in 2010-11 Prices.

Total Adjusted Benchmark Revenue = (Public Benchmark Harvest Revenue + Private Benchmark Harvest Revenue) * 1.1

C. Determine Variable Harvest Cost by multiplying the sum of Public Benchmark Revenue and Private Benchmark Revenue by 12%.

Variable Harvest Cost = (Public Benchmark Revenue + Private Benchmark Revenue) * 12%

D. Determine Leaseholder Payment Cost by multiplying Private Benchmark Revenue by Leaseholder Payment Percentage of 33%.

Leaseholder Payment Cost = Private Benchmark Revenue * 33%

E. Calculate Base Margin as Total Adjusted Benchmark Revenue less Variable Harvest Cost and Leaseholder Payment Cost.

Base Harvest Margin = Total Adjusted Benchmark Revenue – Variable Harvest Cost – Leaseholder Payment Cost

F. Determine Base Harvest Loss by multiplying Base Harvest Margin by Oyster Loss Percentage of 40%.

Base Harvest Loss = Base Harvest Margin * 40%

G. Multiply Base Harvest Loss by Vessel Owner Share of 40% to determine Base Compensation.

Base Compensation = Base Harvest Loss * 40%

35

H. Apply an RTP of 8.75 to Base Compensation in order to determine Final Compensation.

Final Compensation = Base Compensation + (Base Compensation * 8.75)

| **TABLE 3** |||
| :---: | :---: | :---: |
| **Example of Compensation Calculation for Hypothetical Vessel Owner / Oyster Harvester Vessel Lessee** |||
| **Harvester Lost Income Claimant** |||
| Inputs | | |
| Public Benchmark Harvest Revenue | [A] | $50,000 |
| Private Benchmark Harvest Revenue | [B] | $100,000 |
| Adjustment for Changes in 2010-2011 Prices | [C] | 1.10 |
| Variable Harvest Cost Percentage | [D] | 12% |
| Leaseholder Payment Percentage | [E] | 33% |
| Oyster Loss Percentage | [F] | 40% |
| Vessel Owner Share | [G] | 40% |
| RTP | [H] | 8.75 |
| Calculation | | |
| Total Adjusted Benchmark Revenue | [I] = ([A] + [B]) *[C] | $165,000 |
| Variable Harvest Cost | [J] = ([A] + [B]) * [D] | $18,000 |
| Leaseholder Payment Cost | [K] = [B] * [E] | $33,000 |
| Base Harvest Margin | [L] = [I] - [J] - [K] | $114,000 |
| Base Harvest Loss | [M] = [L] * [F] | $45,600 |
| Base Compensation | [N] = [M] * [G] | $18,240 |
| Final Compensation | [O] = [N] + [N] * [H] | $177,840 |

## 3.5 Calculation of Harvester Lost Income Compensation for Oyster Vessel Owners/Oyster Harvester Vessel Lessees that are also Oyster Leaseholders

This section explains compensation for the Oyster Harvester that is also an Oyster Leaseholder and includes compensation for a Claimant's role as an Oyster Leaseholder and a Vessel Owner/Oyster Harvester Vessel Lessee. If the Claimant is also a Boat Captain, the Claimant can receive compensation based on the Boat Captain Compensation framework described in Section 3.3 above.

Compensation for an Oyster Leaseholder/Vessel Owner/Oyster Harvester Vessel Lessee's role as an Oyster Leaseholder and Vessel Owner/Oyster Harvester Vessel Lessee depends on Claimant's Total Benchmark Revenue less Total Benchmark Costs.

36

029334

Total Benchmark Revenue includes four types of revenues received by Claimant:

- Oyster Leaseholder Revenue, which reflects revenue received from another natural person or entity that harvests oysters on the Claimant's leaseholds;
- Own Lease Harvest Revenue, which reflects revenue received from oysters harvested by Claimant on the Claimant's leaseholds;
- Harvest Revenue from other private leaseholds, which reflects revenue received from oysters harvested from private leaseholds owned by others; and
- Public Harvest Revenue, which reflects revenue received from harvests from public oyster grounds.

Total Benchmark Cost includes three types of costs incurred by Claimant:

- Variable Harvest Cost
- Payments to Other Leaseholders as compensation for oysters harvested from their leases
- Payments to Boat Captains and Seafood Crew

The following steps describe calculation of compensation for Oyster Vessel Owners/Oyster Harvester Vessel Lessees that are also Oyster Leaseholders. The calculation is summarized in Table 4 below. Exhibit 2 presents a table summarizing the approach in additional detail and includes a further example summarizing compensation for Lost Leaseholder Income and Lost Harvester income when the claimant also acts as the sole Boat Captain.

**Calculate Revenue**:

1.  Calculate Oyster Leaseholder Benchmark Revenue which reflects revenue received from other harvesters as payment for oysters harvested from the claimant's lease. Calculate Adjusted Oyster Leaseholder Benchmark Revenue as 1.1*Oyster Leaseholder Benchmark Revenue

2.  Calculate harvest revenues:

    A.  Calculate Private Benchmark Harvest Revenue, which reflects revenue generated from oysters harvested on private leaseholds, including leaseholds owned by the Claimant and leaseholds owned by others. Calculate Adjusted Private Benchmark Harvest Revenue as 1.1*Private Benchmark Harvest Revenue

    B.  Calculate Public Benchmark Harvest Revenue, which reflects revenue generated from oysters harvested on public grounds and Adjusted Public Benchmark Harvest Revenue as 1.1*Public Benchmark Harvest Revenue

    C.  Calculate Adjusted Total Harvest Benchmark Revenue as the sum of Adjusted Private Benchmark Harvest Revenue and Adjusted Public Benchmark Harvest Revenue.

37

3. Calculate Adjusted Total Benchmark Revenue as the sum of Adjusted Total Benchmark Harvest Revenue and Adjusted Oyster Benchmark Leaseholder Income.

**Calculate Costs**:

1. Calculate Variable Harvest Cost as 12% multiplied by the sum of (i) Public Benchmark Harvest Revenue and (ii) Private Benchmark Harvest Revenue.

2. Calculate Estimated Total Leaseholder Costs as Adjusted Benchmark Private Harvest Revenue *33%

3. Calculate or estimate Claimant's Lease Payments to Other Leaseholders based on tax returns, financial statements and business records provided by Claimant.

4. Calculate Payments to Boat Captains and Seafood Crew

   A. Calculate Claimant's Adjusted Total Benchmark Harvest Revenue, minus Variable Harvest Cost, minus Estimated Total Leaseholder Costs

   B. Multiply by 60% to determine Payments to Boat Captains and Seafood Crew

5. Calculate Total Cost as Variable Harvest Cost plus Claimants' Lease Payments to Other Leaseholders plus Payments to Boat Captains and Seafood Crew

**Calculate Final Compensation:**

1. Calculate Total Margin as Adjusted Total Benchmark Revenue minus Total Cost

2. Calculate Base Compensation as Total Margin multiplied by Oyster Loss Percentage of 40%.

3. Apply an RTP of 8.75 to Base Compensation in order to determine Final Compensation.

   Final Compensation = Base Compensation + (Base Compensation * 8.75)

38

**TABLE 4**

**Example of Compensation Calculation for Hypothetical Oyster Leaseholder / Oyster Harvester Claimant**
Calculation Determines Compensation for Lost Leaseholder Income
and Lost Harvester Income

| | | |
|---|---|---|
| Oyster Leaseholder Benchmark Revenue | [A] | $10,000 |
| Adjusted Oyster Leaseholder Benchmark Revenue | [B]=[A]*1.1 | $11,000 |
| Private Benchmark Harvest Revenue | [C] | $75,000 |
| Adjusted Private Benchmark Harvest Revenue | [D]=[C]*1.1 | $82,500 |
| Public Benchmark Harvest Revenue | [E] | $25,000 |
| Adjusted Public Benchmark Harvest Revenue | [F]=[E]*1.1 | $27,500 |
| Adjusted Total Benchmark Harvest Revenue | [G]=[D]+[F] | $110,000 |
| Adjusted Total Benchmark Revenue | [H]=[B]+[G] | $121,000 |
| Variable Harvest Cost | [I]=([C]+[E])*12% | $12,000 |
| Estimated Total Leaseholder Cost | [J]=[D]*33% | $27,225 |
| Claimants Lease Payments to Other Leaseholders | [K]=[based on claimant records] | $10,000 |
| Payments to Boat Captains and Seafood Crew | [L]=([G]-[I]-[J])*60% | $42,465 |
| Total Cost | [M]=[I]+[K]+[L] | $64,465 |
| Total Margin | [N]=[H]-[M] | $56,535 |
| Base Compensation | [O]=[N]*40% | $22,614 |
| Final Compensation | [P]=[O]+[O]*8.75 | $220,487 |

39

## 4. Vessel Lease Compensation Allocation

To the extent the vessel was leased by the Vessel Owner to the Oyster Harvester Vessel Lessee as of April 20, 2010, compensation will be allocated between the parties based upon Benchmark Revenue, as calculated above at Section 3.4 or 3.5, and Annual Lease Payment. The Annual Lease Payment shall be calculated as the annual payment to the Vessel Owner by the Oyster Harvester Vessel Lessee for the lease in effect as of April 20, 2010. The ratio of the Annual Lease Payment to Benchmark Revenue multiplied by the Final Compensation determines the Vessel Owner Share of Final Compensation. The Oyster Harvester Vessel Lessee's Share of Compensation is Final Compensation less the Vessel Owner's Share of Final Compensation.

Vessel Owner Share of Final Compensation =
Final Compensation * (Annual Lease Payment / Benchmark Revenue)

Oyster Harvester Vessel Lessee's Share of Final Share of Compensation =
Final Compensation - Vessel Owner Share of Final Compensation.

| **TABLE 5** | | |
|---|---|---|
| **Example of Vessel Lease Compensation Allocation Between Vessel Owner Claimant and Oyster Harvester Vessel Lessee Claimant** | | |
| Inputs (Based on Table 3) | | |
| Benchmark Revenue | [A] | $165,000 |
| Annual Lease Payment | [B] | $55,000 |
| Final Compensation | [C] | $177,840 |
| | | |
| Calculation | | |
| Annual Lease Payment / Benchmark Revenue | [D] = [B] / [A] | 33% |
| Vessel Owner's Share of Final Compensation | [E] = [C] * [D] | $59,280 |
| Oyster Harvester Vessel Lessee's Share of Final Compensation | [F] = [C] - [E] | $118,560 |

029338

# Oyster Compensation Plan
## Exhibit 1

# Oyster Leasehold Compensation Zone Map

029339





029340











# Oyster Compensation Plan

# Exhibit 2

029346

**Exhibit 2**

**Example of Compensation Calculation for Hypothetical Oyster Leaseholder / Oyster Harvester Claimant**

Calculation Determines Compensation for Lost Leaseholder Income and Lost Harvester Income

| | | Harvesting Operations [1] | | Leaseholding Operations [2] | Combined Operations [3] | Combined Operations [3] |
|---|---|---|---|---|---|---|
| | | From Public Grounds | From Private Leaseholds | Payments From Other Harvesters | Claimant Employs Hired Captain | Claimant Is Also Sole Captain |
| COLUMN NUMBER: | | [1] | [2] | [4] | [5] | [6] |
| Benchmark Revenue | [A] | 25,000 | 75,000 | 10,000 | 110,000 | 110,000 |
| Benchmark Harvest Revenue | [B] | 100,000 | | | | |
| Variable Harvest Cost Percentage | [C] | 12% | | | | |
| Variable Harvest Cost | [D]=[B]*[C] | 12,000 | | | 12,000 | 12,000 |
| Adjustment to Revenue for Changes in 2010-2011 Prices | [E] | 1.1 | | 1.1 | | |
| Adjusted Benchmark Revenue | [F]=[A]*[E] | 27,500 | 82,500 | 11,000 | 121,000 | 121,000 |
| Adjusted Total Benchmark Harvest Revenue | [G] | 110,000 | | | | |
| Adjusted Private Benchmark Harvest Revenue | [H]=[F] | 82,500 | | | | |
| Leaseholder Payment Percentage | [I] | 33% | | | | |
| Estimated Total Leaseholder Cost | [J]=[H]*[I] | 27,225 * | | | | |
| Claimant's Lease Payments to Other Leaseholders | [K]=[based on claimant records] | 10,000 | | | 10,000 | 10,000 |
| * Used to Calculate Captain/Crew Costs | | | | | | |
| Adjusted Benchmark Harvest Margin | [L]=[G]-[D]-[J] | 70,775 | | | | |
| Boat Captain Share | [M] | 40% | | | | |
| Payments to Boat Captains | [N]=[L]*[M] | 28,310 | | | 28,310 | |
| Adjusted Benchmark Harvest Margin | [O]=[G]-[D]-[J] | 70,775 | | | | |
| Seafood Crew Share | [P] | 20% | | | | |
| Payments to Seafood Crew | [Q]=[O]*[P] | 14,155 | | | 14,155 | 14,155 |
| Total Cost | [R]=[D]+[K]+[N]+[Q] | | | | 64,465 | 36,155 |
| Margin Received by the Claimant | [S]=[F]-[R] | | | | 56,535 | 84,845 |
| As Owner/Leaseholder | [T]=COLUMN [5], ROW [S] | | | | | 56,535 |
| As Captain | [U]=COLUMN [5], ROW [N] | | | | | 28,310 |
| Oyster Loss Percentage | [V] | | | | 40% | 40% |
| Risk Transfer Premium - Owner/Leaseholder | [W] | | | | 8.75 | 8.75 |
| Risk Transfer Premium - Captain | [X] | | | | | 7.75 |
| Compensation - Owner/Leaseholder | [Y]=[S]*[V]*(1+[W]) | | | | 220,487 | |
| Compensation - Owner/Leaseholder | [Z]=[T]*[V]*(1+[W]) | | | | | 220,487 |
| Compensation - Captain | [AA]=[U]*[V]*(1+[X]) | | | | | 99,085 |
| Final Compensation | [AB]=[Y]+[Z]+[AA] | | | | 220,487 | 319,572 |

1. Reflects revenues and costs associated with the Claimant's oyster harvesting operations.
2. Reflects revenues earned by the Claimant from other harvesters for use of the Claimant's leasehold(s).
3. Reflects revenues and costs associated with the Claimant's oyster harvesting and leaseholding operations.

## FINFISH COMPENSATION PLAN

**Generally Applicable Provisions of the Finfish Compensation Plan:**

1.      Eligible Claimants shall be comprised of Class Members (i) who do not fall within the exclusions to the Economic Loss and Property Class Definition, (ii) who are Vessel Owners, Commercial Fishermen who lease Seafood Vessels (Commercial Fisherman Vessel Lessee), and/or Seafood Boat Captains that derive income from commercial finfishing, and (iii) who meet the additional criteria listed in this Finfish Compensation Plan.

2.      It is understood that in some instances, the Vessel Owner is also the Commercial Fisherman; however, it may be the case that the Vessel Owner leased the vessel to a Commercial Fisherman.  In those instances where the vessel was leased during the time period of April 20, 2010 to December 31, 2010, the Vessel Owner and Commercial Fisherman Vessel Lessee must file the vessel claim jointly in order to receive compensation prior to the **Bar Date**, and they shall share any Vessel Owner/Commercial Fisherman Vessel Lessee compensation provided for in this Finfish Compensation Plan. If at the time of the **Bar Date** either the Vessel Owner or the Commercial Fisherman Vessel Lessee has not filed a claim, the one that has filed the claim shall receive the full Vessel Owner/Commercial Fisherman Vessel Lessee compensation for the vessel.  The allocation of compensation between Vessel Owner and Commercial Fisherman Vessel Lessee shall be determined as provided in Section III.  If the vessel was not leased to a Commercial Fisherman Vessel Lessee during the time period of April 20, 2010 to December 31, 2010, the Vessel Owner is entitled to the full Vessel Owner/Commercial Fisherman Vessel Lessee compensation for the vessel.

3.      It is understood that in some instances, the Vessel Owner and/or the Commercial Fisherman Vessel Lessee is also the Boat Captain.  In those instances where the Vessel Owner and/or the Commercial Fisherman Vessel Lessee were also the Boat Captain, they shall be eligible to receive the Boat Captain compensation portion for the vessel under the Finfish Compensation Plan as set forth below.  If the Vessel Owner and/or Commercial Fisherman Vessel Lessee employed a Boat Captain on the vessel and did not serve as a Boat Captain on that vessel, the hired Boat Captain is eligible for the Boat Captain compensation, not the Vessel Owner or Commercial Fisherman Vessel Lessee.

4.      To establish eligibility to participate in the Finfish Compensation Plan, a Vessel Owner Claimant must provide for each vessel(s) for which the Claimant is seeking compensation:

   A.      Proof of ownership of the vessel during the time period of April 20, 2010 to December 31, 2010.

   B.      Proof that as of April 20, 2010 there was a government license (even if it had expired before that date) that authorized that vessel to commercially fish for finfish in the Specified Gulf Waters for the 2009 season or the 2010 season.

029348

C.    The vessel name and any applicable federal and/or state vessel registration identification numbers.

D.    Proof that either:

    1.    the vessel was home ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012; or,

    2.    the vessel landed finfish in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.

E.    A sworn statement attesting as to whether or not the vessel was leased during the time period April 20, 2010 to December 31, 2010. If the vessel was leased during this time period, the Vessel Owner must provide a copy of the lease agreement.

F.    A sworn statement attesting as to whether or not the Vessel Owner was the Boat Captain for that vessel during January 1, 2007 through December 31, 2009. If the Vessel Owner was not the sole Boat Captain for that vessel for some portion of January 1, 2007 through December 31, 2009, to the extent possible, the Claimant shall identify all other Boat Captains employed on the vessel and the time periods for which the Boat Captains were employed.

5.    To establish eligibility to participate in the Finfish Compensation Plan, a Commercial Fisherman Vessel Lessee must provide for each vessel for which he or she seeks compensation:

A.    Proof that during the period of April 20, 2010 through December 31, 2010 he or she leased the vessel to be used for commercial finfishing.

B.    Proof that as of April 20, 2010 there was a government license (even if it had expired before that date) that authorized that vessel to commercially fish for finfish in the Specified Gulf Waters for the 2009 season or the 2010 season.

C.    The vessel name and any applicable federal and/or state vessel registration identification numbers.

D.    Proof that either:

    1.    the vessel was home ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012; or,

    2.    the vessel landed finfish in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.

E.    A sworn statement, attesting that the Commercial Fisherman Vessel Lessee leased the vessel during the time period of April 20, 2010 to December 31, 2010. The Commercial Fisherman Vessel Lessee must also provide a copy of the lease agreement for the vessel.

029349

F.   A sworn statement attesting as to whether or not the Commercial Fisherman Vessel Lessee was the Boat Captain for that vessel during January 1, 2007 through December 31, 2009.  If the Commercial Fisherman Vessel Lessee was not the sole Boat Captain for that vessel for some portion of January 1, 2007 through December 31, 2009, to the extent possible, the Claimant shall identify all other Boat Captains employed on the vessel and the time periods for which the Boat Captains were employed.

6.   To establish eligibility to participate in the Finfish Compensation Plan a Boat Captain must provide:

A.   Proof that as of April 20, 2010 the Boat Captain held a governmental license (even if it had expired before that date) authorizing the Claimant to operate as a Boat Captain and/or to commercially fish for finfish in the Specified Gulf Waters for the 2009 season or the 2010 season.

B.   Proof that either the Boat Captain worked:

1.   on one or more commercial finfishing vessels that were home ported in the Gulf Coast Areas from April 20, 2010 through the date of execution of the Settlement Agreement; or,

2.   one or more commercial finfishing vessels that landed finfish in the Gulf Coast Areas from April 20, 2009 through the date of execution of the Settlement Agreement.

7.   A Sworn Statement attesting whether or not the Claimant received any Seafood Spill-Related Payments.  If the Claimant received Seafood Spill-Related Payments, the Claimant shall provide documents[8] sufficient to establish the timing, amount and source of Seafood Spill-Related Payments, including documents providing the claimant's BP/GCCF/Transition Facility Claim Number, if applicable, and any corresponding payments.

**Finfish Compensation Plan Definition:**

Benchmark Period[9] is selected by the Claimant and can be (i) 2009, (ii) 2008 and 2009, or (iii) 2007, 2008 and 2009.  If the Claimant elects to use years 2008 and 2009 or 2007, 2008, and 2009, the annual revenue amounts shall be averaged.  In the event the Claims Administrator determines that the Claimant (individual or vessel) did not participate at the same level of effort in finfish harvesting due to circumstances beyond the Claimant's control (such as illness,

---

[8]   When documents are requested in the Seafood Compensation Program, Claimant may provide either legible copies or originals of the documents.

[9]   For the Seafood Compensation Program, the Benchmark Period is defined independently for each Seafood Compensation Program Plan and is set forth within the specific Plan.  Definitions of Benchmark Period in any other frameworks in the *Deepwater Horizon* Economic And Property Damages Settlement Agreement do not apply in the Seafood Compensation Program.

029350

disability or major mechanical failure), the Claims Administrator may at his discretion allow the Claimant to exclude one or more years of the Benchmark Period.

A Vessel Owner or Commercial Fisherman Vessel Lessee must submit separate Vessel Owner/Commercial Fisherman Vessel Lessee claims for each vessel they owned or leased and may select different Benchmark Periods for different vessels.

A Boat Captain's claim reflects the Claimant's activities on all vessels, and the Claimant must select a single Benchmark Period for the Boat Captain's claim.

A Vessel Owner or Commercial Fisherman Vessel Lessee who also submits a Boat Captain claim may select different Benchmark Periods for the Claimant's Vessel Owner/Commercial Fisherman Vessel Lessee claim and the Claimant's Boat Captain claim.

**Compensation Plan Method:**

Vessel Owners/Commercial Fisherman Vessel Lessees and Boat Captains will be compensated through the Historical Revenue Method. A Vessel Owner or Commercial Fisherman Vessel Lessee must submit separate Vessel Owner/Commercial Fisherman Vessel Lessee claims for each vessel they owned or leased.

Additionally, owners of Individual Fishing Quota ("IFQ") shares may be eligible to receive compensation for their IFQ shares under the IFQ Share Compensation Method.

## I.    Historical Revenue Method

### A.    Eligibility Requirements

#### 1.    Vessel Owner/Commercial Fisherman Vessel Lessee

To be eligible under the Historical Revenue Method, a Vessel Owner/Commercial Fisherman Vessel Lessee must meet the eligibility requirements of the applicable paragraphs of the "Generally Applicable Provisions of the Finfish Compensation Plan" above and provide evidence to demonstrate his or her commercial finfishing revenue during the selected Benchmark Period.

#### 2.    Boat Captains

To be eligible under the Historical Revenue Method, a Boat Captain must meet the eligibility requirements of the applicable paragraphs of the "Generally Applicable Provisions of the Finfish Compensation Plan" above and provide evidence to demonstrate his or her commercial gross earnings from commercial finfishing on vessels for which he or she served as Boat Captain during the selected Benchmark Period.

44

029351

**B.** **Documentation Required**

      **1.** **Vessel Owners/Commercial Fisherman Vessel Lessees**

Vessel Owners/Commercial Fisherman Vessel Lessees seeking compensation under the Historical Revenue Method must provide documents sufficient to prove the eligibility requirements in Section I.A.1 above and to determine compensation pursuant to Section I.C below, including the following:

      a.    Trip ticket or their equivalents, such as dealer forms, for each vessel for which Claimant seeks compensation, which show the volume of finfish harvested and the sales price as shown on the trip tickets or their equivalents for the Benchmark Period for finfish landed in the Gulf Coast Areas. The Claimant must provide sufficient documentation for the Claims Administrator to be able to identify gross revenue derived for each vessel solely for finfish landed in the Gulf Coast Areas during the Benchmark Period. The total volume multiplied by price will be the applicable gross revenue.

              – OR –

      b.    Federal or state tax and financial information as follows:

          i.    If Claimant is an entity, federal tax returns or state tax returns, and sufficient documentation to identify components of gross revenue derived from commercial finfish harvesting by vessel for the Benchmark Period for each vessel for which the Claimant submits a Vessel Owner/Commercial Fisherman Vessel Lessee claim.

          ii.    If Claimant is an individual, federal form 1040 including Schedules C, E and F or state tax forms as well as sufficient documentation to identify those components of earnings derived from commercial finfish harvesting by vessel for the Benchmark Period.

          iii.    In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify (i) the Claimant's revenue from finfishing as compared to other sources and (ii) Claimant's revenue from landings in the Gulf Coast Areas. If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

      c.    In addition, if available, it is requested that the Claimant also provide the following documents, to assist the Claims Administrator:

029352

        i.       Vessel log book

        ii.      Share sheets

        iii.     Proof of vessel size and type

        iv.     Sales or other production reports maintained in the normal course of business

### 2.    Boat Captains

Boat Captains seeking compensation under the Historical Revenue Method must provide documents sufficient to prove the eligibility requirements in Section I.A.2 and to determine compensation pursuant to Section I.C below, including the following:

    a.    Trip tickets or their equivalents for each vessel for which the Claimant seeks compensation, which show the volume of finfish harvested and the sales price as shown on the trip tickets or their equivalents for the Benchmark Period for finfish landed in the Gulf Coast Areas. The total volume multiplied by price will be the applicable gross revenue.

    – OR –

    b.    Federal tax returns, including Schedules C, E and F, W-2s, and 1099s or state tax returns with supporting documents for the Benchmark Period and sufficient documentation to identify those components of earnings derived from commercial finfish harvesting for the Benchmark Period for the vessel(s) selected by the Claimant. In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify revenue from finfish landings in the Gulf Coast Areas for each vessel while the Claimant was Boat Captain. If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

    c.    In addition, if available, it is requested that the Claimant also provide the following documents, to assist the Claims Administrator:

        i.       Captain's log book

        ii.      Vessel log book

        iii.     Share sheets

        iv.     Proof of vessel size and type for Captained vessels

029353

       v.       Sales or other production reports maintained in the normal course of business

## C.    Compensation Calculations

1.    Calculate Benchmark Finfish Revenue.

    a.    If trip tickets or their equivalents are used, the volume and price of finfish on the trip tickets or their equivalents are used to calculate gross revenue from finfish landed in the Gulf Coast Areas. If the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee, the Claimant may provide trip tickets or their equivalents for the Benchmark Period for each vessel for which compensation is being sought. If the Claimant is a Boat Captain, the Claimant may provide trip tickets or their equivalents for all vessels he or she served as a Captain during the Benchmark Period.

    – OR –

    b.    The Claims Administrator may determine the gross vessel revenue for Boat Captain earnings from finfish landings in the Gulf Coast Areas based on the Claimant's tax returns, or financial information if the Claims Administrator has sufficient information to determine: (i) Claimant's revenue from finfish harvesting as compared to other sources, (ii) Claimant's revenue from finfish landings in the Gulf Coast Areas. If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

2.    If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Benchmark Revenue was calculated using trip tickets or their equivalents, calculate Benchmark Finfish Cost. Benchmark Finfish Cost is calculated by multiplying Benchmark Finfish Revenue by the Finfish Cost Percentage. The Finfish Cost Percentage, 27%, is expressed as a percentage of revenue and reflects standard industry non-labor variable costs. If the Claimant is a Boat Captain and Benchmark Revenue was calculated based upon his earnings, such as from tax returns or financial information, then no Finfish Cost Percentage is applied, skip to step 3.

Benchmark Finfish Cost = (Benchmark Finfish Revenue * Finfish Cost Percentage)

3.    Calculate the Base Finfish Loss using the Finfish Loss Percentage of 25%.

    a.    If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Benchmark Revenue was calculated using trip tickets or their equivalents, the Base Loss is calculated as follows:

47

Base Finfish Loss = (Benchmark Finfish Revenue – Benchmark Finfish Cost) * 25%

      b.      If the Claimant is a Boat Captain and Benchmark Revenue was calculated using a different source than trip tickets or their equivalents, the Base Loss is calculated as follows:

Base Finfish Loss = Benchmark Finfish Revenue * 25%

4.      Determine Base Compensation by multiplying Base Finfish Loss by the appropriate Vessel Owner/Commercial Fisherman Vessel Lessee or Boat Captain share. Vessel Owner/Commercial Fisherman and Boat Captain shares are: 45% for the Vessel/Owner Commercial Fisherman and 35% for the Finfish Boat Captain.

      a.      Base Compensation for Vessel Owners/Commercial Fisherman Vessel Lessees is calculated as below and found in Table 1:

Base Compensation = Base Finfish Loss * Finfish Vessel Share

## TABLE 1

| FINFISH VESSEL OWNERS/COMMERCIAL FISHERMAN VESSEL LESSEE SHARE | FINFISH BOAT CAPTAIN SHARE |
|---|---|
| 45% | 35% |

      b.      Base Compensation for Finfish Boat Captains is calculated as:

      i.      If Finfish Boat Captain Compensation is calculated based on trip tickets, then the Base Compensation for the Finfish Boat Captain is calculated as:

Base Compensation = Base Finfish Loss * Finfish Boat Captain Share

      ii.      If Finfish Boat Captain Compensation is calculated based on tax returns and financial records, then the Base Compensation for the Finfish Boat Captain is calculated as:

Base Compensation = Base Finfish Loss

5.      Apply the RTP to Base Compensation in order to determine Final Compensation. Base Compensation is specific to Claimant type and is found in Table 2.

48

Final Compensation = Base Compensation + (Base Compensation * RTP)

## TABLE 2

|  | FINFISH VESSEL OWNERS/COMMERCIAL FISHERMAN VESSEL LESSEES | FINFISH BOAT CAPTAINS |
|---|---|---|
| RTP | 6.0 | 5.0 |

## II.    Compensation for IFQ Quota Holders

The Finfish Quota Allocation Method provides a fixed compensation amount to Claimants that meet certain requirements and are Individual Fishing Quota ("IFQ") shareholders.

### A.    Eligibility and Documentation Requirements

In order to be eligible to qualify for compensation under the Individual Fishing Quota Shareholder Method, the Claimant must provide:

1.    Proof of ownership as of April 20, 2010 of the Individual Fishing Quota share for all species identified by IFQs, including Red Snapper, Gag Grouper Red Grouper, Deep Water Grouper Shallow Water Grouper and Tilefish.

### B.    Compensation Calculations

1.    Individual Fishing Quota Shareholders that have provided the proof of eligibility and the required documentation set forth in section II.A. above shall receive the compensation based on the value of Individual Fishing Quota shares held.  IFQ shares are defined as the right to catch 0.0001% of the pounds of the catch the relevant species that can be caught by commercial fishermen under the relevant quota.

2.    In the aggregate, IFQ holders will receive compensation of $50 million.  If the $50 million is not exhausted in payment of IFQ Shareholder claimants, then any remaining amount shall be distributed as part of the balance described in the "General Framework and Overview of Seafood Compensation Program Distribution" section of this Seafood Compensation Program.

3.    IFQ Shareholder Claimants will be compensated in proportion to the percentage of the total value of IFQ shares, calculated across all species. The relevant prices and aggregate value of IFQ shares is summarized in Table 2.  The table reports NOAA 2010 IFQ data on the prices at which IFQ shares were sold, with a "share" defined as 0.0001% of pounds of catch allowed under the species-specific IFQ program.

49

<u>**TABLE 2**</u>

| Species | Price per .0001% Share | Total Value ($Million) |
|---|---|---|
| Red Snapper | $44.90 | $44.9 |
| Gag Grouper | $6.75 | $6.8 |
| Red Grouper | $20.67 | $20.7 |
| Deep Water Grouper | $4.99 | $5.0 |
| Shallow Water Grouper | $1.64 | $1.6 |
| Tilefish | $1.08 | $1.1 |
| Total | | $80.0 |

4.    Compensation for IFQ share holders is calculated as follows:

a.    The value of a Claimant's IFQ shares is calculated as the product of the species-specific number of quota shares held and the species-specific value per quota share, as reflected in Table 3.

b.    The compensation received by a Claimant is calculated by multiplying the value of the Claimant's share multiplied by 0.625.

For example, a Claimant with 1,000 shares of Red Grouper would have a IFQ share value of $20,670 (1,000 shares * $20.67). The Claimant would then receive compensation of $12,918.75 ($20,670 * 0.625).

## III.    Vessel Lease Compensation Allocation

To the extent the Vessel was leased by the Vessel Owner to the Commercial Fisherman Vessel Lessee as of April 20, 2010, compensation will be allocated between the parties based upon Benchmark Revenue, as calculated above and Annual Lease Payment. The Annual Lease Payment shall be calculated as the annual payment to the Vessel Owner by the Commercial Fisherman Vessel Lessee for the lease in effect as of April 20, 2010. The ratio of the Annual Lease Payment to Benchmark Revenue multiplied by the Final Compensation determines the Vessel Owner Share of Final Compensation. The Commercial Fisherman Vessel Lessee's Share of Compensation is Final Compensation less the Vessel Owner's Share of Final Compensation.

Vessel Owner Share of Final Compensation = Final Compensation * (Annual Lease Payment / Benchmark Revenue)

50

029357

Commercial Fisherman Vessel Lessee's Share of Final Share of Compensation = Final Compensation - Vessel Owner Share of Final Compensation.

029358

## BLUE CRAB/OTHER SEAFOOD COMPENSATION PLAN

**Generally Applicable Provisions of the Blue Crab/Other Seafood Compensation Plan:**

1.  Eligible Claimants shall be comprised of Class Members (i) who do not fall within the exclusions to the Economic Loss and Property Class Definition, (ii) who are Vessel Owners, Commercial Fishermen who lease Seafood Vessels (Commercial Fisherman Vessel Lessee), and/or Seafood Boat Captains that derive income from commercial fishing for blue crab and/or Other Seafood,[10] and (iii) who meet the additional criteria listed in this Blue Crab/Other Seafood Compensation Plan.

2.  It is understood that in some instances, the Vessel Owner is also the Commercial Fisherman; however, it may be the case that the Vessel Owner leased the vessel to a Commercial Fisherman. In those instances where the vessel was leased during the time period of April 20, 2010 to December 31, 2010, the Vessel Owner and Commercial Fisherman Vessel Lessee must file the vessel claim jointly in order to receive compensation prior to the **Bar Date**, and they shall share any Vessel Owner/Commercial Fisherman Vessel Lessee compensation provided for in this Blue Crab/Other Seafood Compensation Plan. If at the time of the **Bar Date** either the Vessel Owner or the Commercial Fisherman Vessel Lessee has not filed a claim, the one that has filed the claim shall receive the full Vessel Owner/Commercial Fisherman Vessel Lessee compensation for the vessel. The allocation of compensation between Vessel Owner and Commercial Fisherman Vessel Lessee shall be determined as provided in Section II. If the vessel was not leased to a Commercial Fisherman Vessel Lessee during the time period of April 20, 2010 to December 31, 2010, the Vessel Owner is entitled to the full Vessel Owner/Commercial Fisherman Vessel Lessee compensation for the vessel.

3.  It is understood that in some instances, the Vessel Owner and/or the Commercial Fisherman Vessel Lessee is also the Boat Captain. In those instances where the Vessel Owner and/or the Commercial Fisherman Vessel Lessee were also the Boat Captain, they shall be eligible to receive the Boat Captain compensation portion for the vessel under the Blue Crab/Other Seafood Compensation Plan as set forth below. If the Vessel Owner and/or Commercial Fisherman Vessel Lessee employed a Boat Captain on the vessel and did not serve as a Boat Captain on that vessel, the hired Boat Captain is eligible for the Boat Captain compensation, not the Vessel Owner or Commercial Fisherman Vessel Lessee.

4.  To establish eligibility to participate in the Blue Crab/Other Seafood Compensation Plan, a Vessel Owner Claimant must provide for each vessel(s) for which the Claimant is seeking compensation:

    A.  Proof of ownership of the vessel during the time period of April 20, 2010 to December 31, 2010.

---

[10] Other Seafood shall be defined to mean all forms of seafood included in the Exhibit 3 of the *Deepwater Horizon* Economic And Property Damages Settlement Agreement (Seafood Distribution Chain Definitions) including stone crab and spiny lobster, but excluding shrimp, oysters, finfish and blue crab.

029359

B.      Proof that as of April 20, 2010 there was a government license (even if it had expired before that date) that authorized that vessel to commercially fish for blue crab or Other Seafood in the Specified Gulf Waters for the 2009 season or the 2010 season.

C.      The vessel name and any applicable federal and/or state vessel registration identification numbers.

D.      Proof that either:

      1.     the vessel was home ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012; or,

      2.     the vessel landed blue crab and/or Other Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.

E.      A sworn statement attesting as to whether or not the vessel was leased during the time period April 20, 2010 to December 31, 2010. If the vessel was leased during this time period, the Vessel Owner must provide a copy of the lease agreement.

F.      A sworn statement attesting as to whether or not the Vessel Owner was the Boat Captain for that vessel during January 1, 2007 through December 31, 2009. If the Vessel Owner was not the sole Boat Captain for that vessel for some portion of January 1, 2007 through December 31, 2009, to the extent possible, the Claimant shall identify all other Boat Captains employed on the vessel and the time periods for which the Boat Captains were employed.

5.     To establish eligibility to participate in the Blue Crab/Other Seafood Compensation Plan, a Commercial Fisherman Vessel Lessee must provide for each vessel for which the Claimant seeks compensation:

A.      Proof that during the period of April 20, 2010 through December 31, 2010 the Claimant leased the vessel to be used for commercial blue crab and/or Other Seafood harvesting.

B.      Proof that as of April 20, 2010 there was a government license (even if it had expired before that date) that authorized that vessel to commercially fish for blue crab and/or Other Seafood in the Specified Gulf Waters for the 2009 season or the 2010 season.

C.      The vessel name and any applicable federal and/or state vessel registration identification numbers.

D.      Proof that either:

      1.     the vessel was home ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012; or,

029360

    2.    the vessel landed blue crab and/or Other Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.

E.    A sworn statement, attesting that the Commercial Fisherman Vessel Lessee leased the vessel during the time period of April 20, 2010 to December 31, 2010. The Commercial Fisherman Vessel Lessee must also provide a copy of the lease agreement for the vessel.

F.    A sworn statement attesting as to whether or not the Commercial Fisherman Vessel Lessee was the Boat Captain for that vessel during January 1, 2007 through December 31, 2009. If the Commercial Fisherman Vessel Lessee was not the sole Boat Captain for that vessel for some portion of January 1, 2007 through December 31, 2009, to the extent possible, the Claimant shall identify all other Boat Captains employed on the vessel and the time periods for which the Boat Captains were employed.

6.    To establish eligibility to participate in the Blue Crab/Other Seafood Compensation Plan a Boat Captain must provide:

A.    Proof that as of April 20, 2010 the Boat Captain held a governmental license (even if it had expired before that date) authorizing the Claimant to operate as a Boat Captain and/or to commercially fish for blue crab and/or Other Seafood in the Specified Gulf Waters for the 2009 season or the 2010 season.

B.    Proof that either the Boat Captain worked:

    1.    on one or more commercial blue crab or Other Seafood vessels that were home ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012; or,

    2.    on one or more commercial blue crab or Other Seafood vessels that landed blue crab or Other Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012.

7.    A Sworn Statement attesting whether or not the Claimant received any Seafood Spill-Related Payments. If the Claimant received Seafood Spill-Related Payments, the Claimant shall provide documents[11] sufficient to establish the timing, amount and source of Seafood Spill-Related Payments, including documents providing the claimant's BP/GCCF/Transition Facility Claim Number, if applicable, and any corresponding payments.

---

[11]    When documents are requested in the Seafood Compensation Program, Claimant may provide either legible copies or originals of the documents.

029361

**Blue Crab/Other Seafood Compensation Plan Definition:**

Benchmark Period[12] is selected by the Claimant and can be (i) 2009, (ii) 2008 and 2009, or (iii) 2007, 2008 and 2009. If the Claimant elects to use years 2008 and 2009 or 2007, 2008, and 2009, the annual revenue amounts shall be averaged. In the event the Claims Administrator determines that the Claimant (individual or vessel) did not participate at the same level of effort in blue crab/other seafood harvesting due to circumstances beyond the Claimant's control (such as illness, disability or major mechanical failure), the Claims Administrator may at his discretion allow the Claimant to exclude one or more years of the Benchmark Period.

A Vessel Owner or Commercial Fisherman Vessel Lessee must submit separate Vessel Owner/Commercial Fisherman Vessel Lessee claims for each vessel they owned or leased and may select different Benchmark Periods for different vessels.

A Boat Captain's claim reflects the Claimant's activities on all vessels, and the Boat Captain must select a single Benchmark Period for the Claimant's claim.

A Vessel Owner or Commercial Fisherman Vessel Lessee who also submits a Boat Captain claim may select different Benchmark Periods for the Claimant's Vessel Owner/Commercial Fisherman Vessel Lessee claim and the Claimant's Boat Captain claim.

**Compensation Plan Method:**

Vessel Owners/Commercial Fisherman Vessel Lessees and Boat Captains will be separately compensated for blue crab claims and Other Seafood claims through the Historical Revenue Method. Claimants may submit a claim for either or both blue crab or Other Seafood categories. Compensation for blue crab claims is set forth in Section I.C and compensation for Other Seafood claims is set forth in Section I.D. A Vessel Owner or Commercial Fisherman Vessel Lessee must submit separate Vessel Owner/Commercial Fisherman Vessel Lessee claims for each vessel they owned or leased.

Additionally, Vessel Owners and Commercial Fisherman Vessel Lessees that establish they commercially fished for blue crab in the Benchmark Period and who satisfy the applicable paragraphs of the Generally applicable Provisions of the Blue Crab/Other Seafood Compensation Plan above and in Section I.A. below will receive a lump sum payment as set forth in Section I.

---

[12] For the Seafood Compensation Program, the Benchmark Period is defined independently for each Seafood Compensation Program Plan and is set forth within the specific Plan. Definitions of Benchmark Period in any other frameworks in the *Deepwater Horizon* Economic And Property Damages Settlement Agreement do not apply in the Seafood Compensation Program.

029362

## I. Historical Revenue Method

### A. Eligibility Requirements

#### 1. Vessel Owner/Commercial Fisherman Vessel Lessee

To be eligible under the Historical Revenue Method, a Vessel Owner/Commercial Fisherman Vessel Lessee must meet the eligibility requirements of the applicable paragraphs of the "Generally Applicable Provisions of the Blue Crab/Other Seafood Compensation Plan" and provide evidence to demonstrate the Claimant's commercial blue crab and/or Other Seafood revenue during the selected Benchmark Period.

#### 2. Boat Captains

To be eligible under the Historical Revenue Method, a Boat Captain must meet eligibility requirements of the applicable paragraphs of the "Generally Applicable Provisions of the Blue Crab/Other Seafood Compensation Plan" requirements of the Blue Crab/Other Seafood Compensation Plan and provide evidence to demonstrate the Claimant's gross earnings from commercial blue crab and/or Other Seafood harvesting on vessels for which the Claimant served as Boat Captain during the selected Benchmark Period.

### B. Documentation Required

#### 1. Vessel Owners/Commercial Fisherman Vessel Lessees

Vessel Owners/Commercial Fisherman Vessel Lessees seeking compensation under the Historical Revenue Method must provide documents sufficient to prove the eligibility requirements in Section I.A.1 above and to determine compensation pursuant to Section I.C or I.D below, including the following:

    a.    Trip ticket or their equivalents, such as dealer forms, for each vessel for which Claimant seeks compensation, which show the volume of blue crab and/or Other Seafood harvested and the sales price as shown on the trip tickets or their equivalents for the Benchmark Period for blue crab and/or Other Seafood landed in the Gulf Coast Areas. The Claimant must provide sufficient documentation for the Claims Administrator to be able to identify gross revenue derived for each vessel solely for blue crab and/or Other Seafood landed in the Gulf Coast Areas during the Benchmark Period. The total volume multiplied by price will be the applicable gross revenue.

        – OR –

    b.    Federal or state tax returns and financial information as follows:

        i.    If Claimant is an entity, federal tax returns, state tax returns and sufficient documentation to identify components of

029363

gross revenue derived from commercial blue crab and/or Other Seafood harvesting by vessel for the Benchmark Period for each vessel for which the Claimant submits a Vessel Owner/Commercial Fisherman Vessel Lessee claim.

ii.     If Claimant is an individual, federal form 1040 including Schedules C, E and F or state tax forms and supporting documents as well as sufficient documentation to identify by vessel components of gross earnings derived from commercial blue crab and/or Other Seafood harvesting for the Benchmark Period for each vessel for which the Claimant submits a Vessel Owner/Commercial Fisherman Vessel Lessee claim.

iii.    In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify (i) the Claimant's revenue from blue crab and/or Other Seafood as compared to other sources and (ii) Claimant's revenue from landings in the Gulf Coast Areas. If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

c.      In addition, if available, it is requested that the Claimant also provide the following documents, to assist the Claims Administrator:

i.     Vessel log book

ii.    Share sheets

iii.   Proof of vessel size and type

iv.    Sales or other production reports maintained in the normal course of business

## 2.     Boat Captains

Boat Captains seeking compensation under the Historical Revenue Method must provide documents sufficient to prove the eligibility requirements in Section I.A.2 above and to determine compensation pursuant to Section I.C. or I.D. below, including the following:

a.      Trip tickets or their equivalents for each vessel for which the Claimant seeks compensation, which show the volume of blue crab and/or Other Seafood harvested and the sales price as shown on the trip tickets or their equivalents for the Benchmark Period for blue crab and/or Other Seafood landed in the Gulf Coast Areas. The

57

029364

total volume multiplied by price will be the applicable gross revenue.

– OR –

b. Federal tax returns, including Schedules C, E and F, W-2s, and 1099s or state tax returns with supporting documents for the Benchmark Period and sufficient documentation to identify those components of gross earnings derived from commercial blue crab and/or Other Seafood harvesting for the Benchmark Period for the vessel(s) selected by the Claimant. In addition, the Claimant must provide sufficient documentation for the Claims Administrator to be able to identify revenue from blue crab and/or Other Seafood landings in the Gulf Coast Areas for each vessel while the Claimant was Boat Captain. If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

c. In addition, if available, it is requested that the Claimant also provide the following documents, to assist the Claims Administrator:

i. Captain's log book

ii. Vessel log book

iii. Share sheets

iv. Proof of vessel size and type for Captained vessels

v. Sales or other production reports maintained in the normal course of business

### C. Compensation Calculations for Blue Crab

The Claims Administrator shall determine compensation separately for blue crab and for Other Seafood. The compensation for gross revenue or earnings attributable to blue crab is determined as set forth in Section I.C. The separate and independent compensation for gross revenue or earnings attributable to Other Seafood is determined as set forth in Section I.D.

1. Calculate Benchmark Blue Crab Revenue.

a. If trip tickets or their equivalents are used, the volume and price of blue crab on the trip tickets or their equivalents are used to calculate gross revenue from blue crab landed in the Gulf Coast Areas. If the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee, the Claimant may provide trip tickets for the Benchmark Period for each Vessel for which compensation is

58

029365

being sought.  If the Claimant is a Boat Captain, the Claimant may provide trip tickets or their equivalents for all vessels the Claimant served as a Captain during the Benchmark Period.

– OR –

b.       The Claims Administrator may determine the gross vessel revenue or Boat Captain earnings from blue crab landings in the Gulf Coast Areas based on the Claimant's tax returns or financial information if the Claims Administrator has sufficient information to determine: (i) Claimant's revenue from blue crab as compared to other sources and (ii) Claimant's revenue from blue crab landings in the Gulf Coast Areas.  If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

2.       Calculate Total Adjusted Benchmark Blue Crab Revenue by multiplying the Adjusted Benchmark Blue Crab Revenue by 1.2, the Adjustment for Changes in 2010-11 Prices.

Total Adjusted Benchmark Blue Crab Revenue =
(Benchmark Blue Crab Revenue * Adjustment for Changes in 2010-11 Prices).

3.       If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Benchmark Revenue was calculated using trip tickets or their equivalents, calculate Benchmark Blue Crab Cost.  Benchmark Blue Crab Cost is calculated by multiplying Benchmark Blue Crab Revenue by the Blue Crab Cost Percentage of 35%.  The Blue Crab Cost Percentage is expressed as a percentage of revenue and reflects standard industry non-labor variable costs.  If the Claimant is a Boat Captain and Benchmark Revenue was calculated based upon his earnings, such as from tax returns or financial information, then no Blue Crab Cost Percentage is applied, skip to step 4.

Benchmark Blue Crab Cost = (Benchmark Blue Crab Revenue * Blue Crab Cost Percentage)

4.       Calculate the Base Blue Crab Loss using the Blue Crab Loss Percentage of 35%.

a.       If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Benchmark Revenue was calculated using trip tickets or their equivalents, the Base Loss is calculated as follows:

Base Blue Crab Loss =
(Total Adjusted Benchmark Blue Crab Revenue – Benchmark Blue Crab Cost) * 35%

59

b. If the Claimant is a Boat Captain and Total Adjusted Benchmark Revenue was calculated using a different source than trip tickets or their equivalents, the Base Loss is calculated as follows:

Base Blue Crab Loss = Adjusted Benchmark Blue Crab Revenue * 35%

5. Determine Base Compensation by multiplying Base Blue Crab Loss by the appropriate Vessel Owner/Commercial Fisherman Vessel Lessee share. Vessel Owner and Boat Captain shares are presented in Table 1.

a. Base Compensation for Vessel Owners/Commercial Fisherman Vessel Lessees is calculated as:

Base Compensation = Base Blue Crab Loss * 50%

b. Base Compensation for Blue Crab Boat Captains is calculated as:

i. if Blue Crab Boat Captain Compensation is calculated based on trip tickets, then the Base Compensation for Blue Crab Boat Captain is calculated as:

Base Compensation = Base Blue Crab Loss * 30%

ii. If Blue Crab Boat Captain Compensation is calculated based on tax returns and financial records, Compensation for Blue Crab Boat Captain is calculated as:

Base Compensation = Base Blue Crab Loss

## TABLE 1

| BLUE CRAB VESSEL OWNER/COMMERCIAL FISHERMAN VESSEL LESSEE SHARE | BLUE CRAB BOAT CAPTAIN SHARE |
|---|---|
| 50% | 30% |

6. Apply the RTP to Base Compensation in order to determine Final Compensation. Base Compensation is specific to Claimant type and is found in Table 2.

Final Blue Crab Compensation = Base Compensation + (Base Compensation * RTP)

60

**TABLE 2**

|  | **BLUE CRAB VESSEL OWNERS/COMMERCIAL FISHERMAN VESSEL LESSEES** | **BLUE CRAB BOAT CAPTAINS** |
|---|---|---|
| RTP | 6.0 | 5.0 |

In addition, Vessel Owners/Commercial Fisherman Vessel Lessees who receive Final Blue Crab Compensation shall also receive a lump sum payment of $7,500 per vessel.

**D.    Compensation Calculations for Other Seafood**

1.    Calculate Benchmark Other Seafood Revenue

a.    If trip tickets or their equivalents are used, the volume and price of Other Seafood on the trip tickets or their equivalents are used to calculate gross revenue from Other Seafood landed in the Gulf Coast Areas.  If the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee, the Claimant may provide trip tickets or their equivalents for the Benchmark Period for each Vessel for which compensation is being sought.  If the Claimant is a Boat Captain, the Claimant may provide trip tickets for all vessels the Claimant served as a Captain during the Benchmark Period.

– OR –

b.    The Claims Administrator may determine the gross vessel revenue or Boat Captain earnings from Other Seafood landings in the Gulf Coast Areas based on the Claimant's tax returns, monthly profit and loss statements, or financial information if the Claims Administrator has sufficient information to determine: (i) Claimant's revenue from Other Seafood as compared to other sources and (ii) Claimant's revenue from Other Seafood landings in the Gulf Coast Areas.  If necessary, the Claims Administrator may require supplemental information from the Claimant in order to make these determinations.

2.    Calculate Total Adjusted Benchmark Other Seafood Revenue by multiplying the Additional Catch Adjusted Benchmark Other Seafood Revenue by 1.1, the Adjustment for Changes in 2010-11 Prices.

Total Adjusted Benchmark Other Seafood Revenue =
(Benchmark Other Seafood Revenue * Adjustment for Changes in 2010-11 Prices).

61

3.    If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Benchmark Revenue was calculated using trip tickets or their equivalents, calculate Benchmark Other Seafood Cost. Benchmark Other Seafood Cost is calculated by multiplying Benchmark Other Seafood Revenue by the Other Seafood Cost Percentage of 35%. The Other Seafood Cost Percentage is expressed as a percentage of revenue and reflects standard industry non-labor variable costs. If the Claimant is a Boat Captain and Benchmark Revenue was calculated based upon his earnings, such as from tax returns or financial information, then no Other Seafood Cost Percentage is applied, skip to step 5.

Benchmark Other Seafood Cost =
(Benchmark Other Seafood Revenue * Other Seafood Cost Percentage)

4.    Calculate the Base Other Seafood Loss using the Other Seafood Loss Percentage of 10%.

a.    If (i) the Claimant is a Vessel Owner/Commercial Fisherman Vessel Lessee or (ii) the Claimant is a Boat Captain and Benchmark Revenue was calculated using trip tickets or their equivalents, the Base Loss is calculated as follows

Base Other Seafood Loss =
(Total Adjusted Benchmark Other Seafood Revenue – Benchmark Other Seafood Cost) * 10%

b.    If the Claimant is a Boat Captain and Benchmark Revenue was calculated using a different source than trip tickets or their equivalents, the Base Loss is calculated as follows

Base Other Seafood Loss = Total Adjusted Benchmark Other Seafood Revenue * 10%

5.    Determine Base Compensation by multiplying Base Other Seafood Loss by the appropriate Vessel Owner/Commercial Fisherman Vessel Lessee or Boat Captain share. Vessel Owner and Boat Captain shares are presented in Table 3.

a.    Base Compensation for Vessel Owners/Commercial Fisherman Vessel Lessees is calculated as:

Base Compensation = Base Other Seafood Loss * 50%

b.    Base Compensation for Other Seafood Boat Captains is calculated as:

62

i.  If Other Seafood Boat Captain Compensation is calculated based on trip tickets, then Other Seafood Boat Captain Base Compensation is calculated as:

Base Compensation = Base Other Seafood Loss * 30%

ii.  If Other Seafood Boat Captain Compensation is calculated based on tax returns and financial records, then Other Seafood Boat Captain Base Compensation is calculated as:

Base Compensation = Base Other Seafood Loss

### TABLE 3

| OTHER SEAFOOD VESSEL OWNER/COMMERCIAL FISHERMAN VESSEL LESSEE SHARE | OTHER SEAFOOD BOAT CAPTAIN SHARE |
| --- | --- |
| 50% | 30% |

6.  Apply the RTP to Base Compensation in order to determine Final Compensation. Base Compensation is specific to Claimant type and is found in Table 1.

Final Compensation = Base Compensation + (Base Compensation * RTP)

### TABLE 4

|  | OTHER SEAFOOD VESSEL OWNERS/COMMERCIAL FISHERMAN VESSEL LESSEES | OTHER SEAFOOD BOAT CAPTAINS |
| --- | --- | --- |
| RTP | 5.5 | 4.5 |

## II.  Vessel Lease Compensation Allocation

To the extent the Vessel was leased by the Vessel Owner to the Commercial Fisherman Vessel Lessee as of April 20, 2010, compensation will be allocated between the parties based upon Benchmark Revenue, as calculated above and Annual Lease Payment. The Annual Lease Payment shall be calculated as the annual payment to the Vessel Owner by the Commercial Fisherman Vessel Lessee for the lease in effect as of April 20, 2010. The ratio of the Annual Lease Payment to Benchmark Revenue multiplied by the Final Compensation determines the

029370

Vessel Owner Share of Final Compensation. The Commercial Fisherman Vessel Lessee's Share of Compensation is Final Compensation less the Vessel Owner's Share of Final Compensation.

Vessel Owner Share of Final Compensation = Final Compensation * (Annual Lease Payment / Benchmark Revenue)

Commercial Fisherman Vessel Lessee's Share of Final Share of Compensation = Final Compensation - Vessel Owner Share of Final Compensation.

029371

<u>**Seafood Crew Compensation Plan for Individuals Who Are Seafood First Mates, Seafood Second Mates, Seafood Boatswains, and Seafood Deckhands**</u>

<u>**Overview**</u>

This **Seafood Crew Compensation Plan** is for Class Members who are **Seafood First Mates**, **Seafood Second Mates**, **Seafood Boatswains** and **Seafood Deckhands** claiming economic loss from employment by a **Commercial Fisherman** due to or resulting from the *Deepwater Horizon* oil spill. Claimants seeking compensation under Category I or III must show they were employed by a **Commercial Fisherman** in 2009, and Claimants seeking compensation under Category II must show that they were employed by a **Commercial Fisherman** in 2009 or that they had accepted a job offer to work for a **Commercial Fisherman** in 2010.

Any eligible Claimant may receive compensation based upon one of the following three categories (but no more than one of the three categories), provided the Claimant satisfies the requirements outlined below.

I. <u>INDIVIDUAL CLAIMANTS WITH TAX INFORMATION OR PAY PERIOD EARNINGS DOCUMENTATION FOR 2009:</u> Applies to Claimants providing **Tax Information Documents** or **Pay Period Earnings Documentation** for the selected **Base Year(s)**. Requirements detailed in Section I must be fulfilled.

II. <u>INDIVIDUAL CLAIMANTS WITHOUT TAX INFORMATION OR PAY PERIOD EARNINGS DOCUMENTATION WHO SUBMIT A CLAIMANT SWORN WRITTEN STATEMENT AND EMPLOYER SWORN WRITTEN STATEMENT TO ESTABLISH EARNINGS:</u> Applies to two types of Claimants: (i) those without sufficient **Tax Information Documents** or **Pay Period Earnings Documentation** regarding 2009 earnings, but who provide **Sworn Written Statements** (from both the Claimant and the Claimant's employer) presenting employment and compensation information for 2009; and (ii) those with proof of an offer of employment in a **Claiming Job** for 2010. Requirements detailed in Section II must be fulfilled.

III. <u>INDIVIDUAL CLAIMANTS WITHOUT TAX INFORMATION OR PAY PERIOD EARNINGS DOCUMENTATION WHO SUBMIT A CLAIMANT SWORN WRITTEN STATEMENT, SPONSOR SWORN WRITTEN STATEMENT(S) AND ATTORNEY SWORN WRITTEN STATEMENT (IF APPLICABLE) TO ESTABLISH EARNINGS:</u> Applies to Claimants without sufficient **Tax Information Documents** or **Pay Period Earnings Documentation** and without an **Employer Sworn Written Statement** to document earnings for 2009 but who provide at least three **Sworn Written Statements** presenting employment and compensation information for 2009. Requirements detailed in Section III must be fulfilled.

65

## Definitions

The following defined terms used in this **Seafood Crew Compensation Plan** shall have the meanings set forth below and be presented in **bold-faced type**.[13]

A.     **Actual Earnings:** Claimant's **Income** actually earned from the **Claiming Job**.

B.     **Base Year(s)**: A Claimant selected period, applicable to Category I only, used for historical comparison and defined as one of the following options, provided that once selected, the same **Base Year(s)** shall be used in this **Seafood Crew Compensation Plan** for all purposes for which a **Base Year(s)** is required for that Claimant. Provided further, a Claimant is restricted to the following three options in choosing the Claimant's **Base Year(s).**

- 2009; or

- The average of 2008 and 2009; or

- The average of 2007, 2008 and 2009.

C.     **Benchmark Period**: For purposes of this **Seafood Crew Compensation Plan**, the **Benchmark Period** for claimants in Category I is the period of April 20 through December 31 of the year or years selected from the **Base Year(s)**, and the **Benchmark Period** for claimants in Categories II and III is April 20, 2009 through December 31, 2009. The **Benchmark Period** is used to establish baseline earnings to be used in calculating the Claimant's lost earnings arising out of the harvesting of seafood due to the *Deepwater Horizon* oil spill.

D.     **Category II Aggregate Compensation Amount:** $80 million is the Aggregate Compensation Amount for Category II claims.

E.     **Category III Aggregate Compensation Amount:** $50 million is the Aggregate Compensation Amount available to pay Category III claims.

F.     **Claiming Job(s):** The job held by the Claimant that meets the definition of **Seafood First Mate, Seafood Second Mate, Seafood Boatswain** or **Seafood Deckhand**.

G.     **Claims Administrator:** The Claims Administrator and related staff appointed pursuant to the *Deepwater Horizon* Economic And Property Damages Settlement Agreement.

H.     **Income:** Gross earnings from the **Claiming Job**.

---

[13]    These definitions apply to the **Seafood Crew Compensation Plan** only and not to other aspects of the **Seafood Compensation Program** generally.

029373

I.  **Pay Period Earnings Documentation:**  Documentation sufficient to establish a Claimant's earnings from employment and hours worked during the applicable **Benchmark Period**.  Documentation may include:

- Paycheck stubs; and/or

- Other employer records documenting actual amounts paid, if applicable; and/or

- Bank records showing income deposits and supporting documentation indicating the source of those deposits; and/or

- Receipts or records from check cashing or payday loan services and supporting documentation indicating the source of those funds; and/or

- Contracts for employment accompanied by documentation establishing that wages or other amounts to be paid pursuant to the contract, if applicable, were in fact paid; and/or

- Pay period earnings detail submitted under oath and included in court filings (for example, documentation provided in connection with divorce, child support, or wage garnishment proceedings).

J.  **Tax Information Documents**:  **Tax Returns** or Forms W-2 and/or 1099s.

K.  **Tax Returns**:  Federal or state income tax returns, including any relevant supporting schedules.

L.  **Sworn Claim Form**:  Each Claimant must complete and submit a Claim Form which the Claimant shall verify under penalties of perjury.  The **Claim Form** shall direct the Claimant to provide information, including the Claimant's chosen **Base Year(s)** for **Category I**.  The Claimant shall attach required documents supporting the claim.  All statements made in, and documents submitted with, the **Sworn Claim Form** may be verified as judged necessary by the **Claims Administrator**.  The Claimant shall provide forms in which the Claimant shall authorize the **Claims Administrator** to: (1) verify employment and obtain copies of wage records, (2) obtain the relevant **Tax Information Documents** from the Internal Revenue Service and/or Social Security Administration, and (3) confirm any bank account information used in support of a claim, but the authorization for bank records shall be limited to the Claimant's chosen **Base Year(s)**.  The Claim Form may be submitted in electronic fashion, including scanning of documents or copies of verification from public databases providing the same information as would be provided by the original document.

67

**I.**     **CATEGORY I:  INDIVIDUAL CLAIMANTS WITH TAX INFORMATION OR PAY PERIOD EARNINGS DOCUMENTATION FOR 2009**

Category I is open to all eligible Class Members claiming economic loss arising out of the harvesting of Seafood where the Claimant was employed by a **Commercial Fisherman** in 2009, worked or anticipated to work harvesting Seafood in 2010, and can provide sufficient documentation as set forth below.  Claimant must provide either: (i) Claimant's federal or state **Tax Information Documents** (**Tax Returns** or Forms W-2 and/or 1099) for the selected **Base Year(s)** or (ii) **Pay Period Earnings Documentation** sufficient to establish earnings from the **Claiming Job** for the selected **Base Year(s)**.  The Claimant's compensation shall be calculated as set forth in Section I.D below and shall be based on the earnings from the **Benchmark Period** and the applicable **RTP**.

   **A.**     **Documentation Requirements**

        **1.**     **Documentation Establishing Employment Earnings:**   For each year included in the selected **Base Year(s)**, Individual Claimants must provide at least one of the following **Tax Information Documents**:

- Federal tax Form 1040 pages 1 and 2, all pages of Schedules C, E, and F, and any supporting statements attached to the Form 1040 filing (including Form W-2s for joint returns); or

- State tax return, including any supporting schedules or statements; or

- Forms W-2 documenting earnings from the **Claiming Job**; or

- Forms 1099 documenting earnings from the **Claiming Job**.

          AND/OR

For each year included in the selected **Base Year(s)**, **Pay-Period Earnings Documentation** sufficient to establish the source(s) and amounts of earnings, which may include as follows:

- Bank records showing income deposits and supporting documentation indicating the source of those deposits; and/or

- Documents from BP/GCCF/Transition Facility showing payment and the Claimant's BP/GCCF/Transition Facility Claim Number;

- Receipts or records from check cashing services or payday loan services and supporting documentation indicating the source of the funds; and/or

68

029375

- Other documents provided by an employer setting forth for such other employment position(s): (i) required hours of work, (ii) actual hours worked by Claimant, and (iii) compensation rate for the **Claiming Jobs**.

2.    **Additional Claimant Documentation:**

a.    **Claimant Employability Documentation:** Consists of both:

   i.    A copy of a Social Security card, government-issued identification (for example, a valid driver's license), temporary worker visa, or green card that was valid as of April 20, 2010 for the Claimant, or a print out from a public database providing the same information as would be provided by the original document;

   AND

   ii.    Evidence the Claimant was at least 16 years of age as of April 20, 2010.  Acceptable evidence includes a copy of a valid driver's license, a valid passport, a certified copy of the Claimant's birth certificate, or a print out from a public database providing the same information as would be provided by the original document.

b.    **Licensing Documentation**:  If Claimant's employment requires a government-issued license/permit, a copy of valid 2009 or 2010 licenses (even if it had expired), if appropriate, or a print out from a public database providing the same information as would be provided by the original document.

c.    **Work Availability:**  A statement and documentation sufficient to establish that the Claimant was present and available to work in close enough proximity to the location of employment to travel to the job as frequently as required by the employer during the period from April 21, 2010 through December 31, 2010.

   i.    Documentation that could demonstrate presence and availability includes, but is not limited to, the following:

      (A)    Proof of home ownership and address; or

      (B)    A lease or rental agreement; or

      (C)    A sublease agreement; or

      (D)    Contemporaneous utility bills.

69

029376

> ii. Documentation that could demonstrate location of employment includes, but is not limited to, the following:
>
> > (A) Employer's business name and address; or
> >
> > (B) Jobsite location; or
> >
> > (C) Docking and port information for a vessel.

### 3. Seafood Spill-Related Payments:

The Claimant shall provide a Sworn Written Statement attesting whether or not the Claimant received any Seafood Spill-Related Payments. If the Claimant received Seafood Spill-Related Payments, the Claimant shall provide documents sufficient to establish the timing, amount and source of Seafood Spill-Related Payments, including documents providing the claimant's BP/GCCF/Transition Facility Claim Number, if applicable, and any corresponding payments.

### B. Causation Requirements

For Claimant's who satisfy the Documentation Requirements, the DWH Spill shall be presumed to be the cause of the Claimant's lost earnings for a **Claiming Job.**

### C. RTP

An **RTP** of 2.25 shall apply to all Claimants with claims that qualify for compensation under Category I of this **Seafood Crew Compensation Plan.**

### D. Compensation Calculation

The **Claims Administrator** shall use **Tax Information Documents** and/or **Pay Period Earnings Documentation** and/or other supporting documentation provided by the Claimant to calculate the Claimant's lost earnings from the **Claiming Job**. The Claimant's lost earnings shall be calculated as 37% of the average **Actual Earnings** from the **Claiming Jobs** held by the Claimant during the **Benchmark Period**. The Claimant shall receive a lump-sum payment of this amount. Claimants who provide documents sufficient to prove **Work Availability** as set forth in Section I.A.2.c above will also receive the applicable **RTP**.

## II. INDIVIDUAL CLAIMANTS WITHOUT TAX INFORMATION OR PAY PERIOD EARNINGS DOCUMENTATION WHO SUBMIT A CLAIMANT SWORN WRITTEN STATEMENT AND EMPLOYER SWORN WRITTEN STATEMENT TO ESTABLISH EARNINGS

Category II is open to all eligible **Class Members** who anticipated working in the **Seafood Industry** in 2010 and can provide sufficient documentation as set forth below, through two alternative methods. First, any Claimant who does not have sufficient **Tax Information Documents** or **Pay Period Earnings Documentation** for the **Claiming**

029377

**Job** evidencing the Claimant's earnings during 2009 may instead establish lost earnings and causation by submitting, in addition to a **Sworn Claim Form**, (a) a **Claimant Sworn Written Statement** with specified contents (see below), (b) one or more **Employer Sworn Written Statement(s)** providing information for 2009, and (c) any other specified documentation (see below). If the Claimant submits an **Employer Sworn Written Statement** from a parent, grandparent, child, grandchild, spouse, brother, sister, aunt, uncle, niece, nephew, brother-in-law, sister-in-law, step-parent, step-brother, step-sister or step-child of the Claimant, then the Claimant shall submit an additional **Sponsor Sworn Written Statement** from a person not related to the Claimant. The Claimant's compensation shall be calculated as set forth in Section II.D below and shall be based on the earnings from 2009 in the **Benchmark Period** and the applicable **RTP**.

In addition, Claimants who can establish that they were offered and accepted employment in a **Claiming Job** prior to April 20, 2010 for the period of April 20, 2010 through December 31, 2010 and that the offer was withdrawn or rescinded in whole or part after April 20, 2010 may establish lost earnings and causation by submitting, in addition to a **Sworn Claim Form**, (a) a **Claimant Sworn Written Statement** with specified contents (see below), (b) one or more **Employer Sworn Written Statements**(s) providing information related to the job offer, and (c) any other specific documentation (see below).

All Claimants who seek compensation under Category II shall submit the **Sworn Claim Form** and all necessary documents in a final and complete form no later than the **Bar Date**. Any claim that is not filed as of the **Bar Date** shall be rejected, and the Claimant shall receive no compensation under this **Settlement Agreement** for the Claimant's lost earnings for the **Claiming Job**.

The **Claims Administrator** shall receive and process claims under Category II as required to allow for Claimant and/or the **Claims Administrator** to supplement the claim or acquire any additional necessary information or documentation. However, no Category II claim shall be paid until after the **Bar Date**. After the **Bar Date**, the **Claims Administrator** shall process as expeditiously as possible all timely submitted claims as described in further detail in Section II.C below.

### A. Documentation And Causation Requirements:

A Category II claimant must provide a **Sworn Claim Form** and the documents identified below. The **Claims Administrator** shall review and assess the documentation provided by the Claimant, including information from the Claimant's employer(s), and any other information deemed relevant by the **Claims Administrator**, for purposes of determining whether the Claimant had earnings in 2009 from employment as a **Seafood First Mate, Seafood Second Mate, Seafood Boatswain** or **Seafood Deckhand** or whether the Claimant had a legitimate job offer that was rescinded or withdrawn in whole or in part for employment as a **Seafood First Mate, Seafood Second Mate, Seafood Boatswain or Seafood Deckhand.** The **Claims Administrator** shall rely on his assessment of the credibility and reliability of the information submitted in determining if the causation

71

requirement is satisfied and the amount of any lost earnings arising out of the harvesting of Seafood due to the *Deepwater Horizon* oil spill.

1. **Claimant Sworn Written Statement**: The Claimant shall submit a **Claimant Sworn Written Statement** which sets forth all of the following information and shall attach any relevant documents in Claimant's possession:

   a. The Claimant's employment history with each employer, including, for example, the nature of the work performed, number of years worked, whether the employment is steady or seasonal, year-round or intermittent, and the circumstances of the Claimant's departure and/or termination, if applicable. At a minimum, the Claimant shall include for each of the Claimant's employers in 2009, the business name, last known address and telephone number.

   b. The Claimant's income from all sources in 2009, and any other earnings history that the Claimant believes is relevant to support the claim, including any support for the Claimant's belief that these actual earned amounts are accurate.

   c. A statement attesting whether or not the Claimant received any Seafood Spill-Related Payments. If the Claimant received Spill-Related Payments, the Claimant shall provide documents sufficient to establish the timing, amount and source of Seafood Spill-Related Payments, including documents providing the claimant's BP/GCCF/Transition Facility Claim Number, if applicable, and any corresponding payments.

   d. **Work Availability**: A statement and documents sufficient to establish that the Claimant was present and available to work in close enough proximity to the anticipated location of employment to travel to the job as frequently as required by the employer during the period from April 21, 2010 through December 31, 2010.

      i. To be potentially eligible for an **RTP**, the Claimant must satisfy the above requirement for the period April 21, 2010 through December 31, 2010.

      ii. Documentation that could demonstrate presence and availability includes, but is not limited to, the following:

         (A) A lease or rental agreement; or

         (B) A sublease agreement; or

         (C) Contemporaneous utility bills.

72

029379

        iii.     Documentation that could demonstrate location of employment includes, but is not limited to, the following:

           (A)    Employer's business name and address; or

           (B)    Jobsite location; or

           (C)    Docking and port information for a vessel.

e.     If the Claimant is seeking compensation based on a job offer, the Claimant shall provide proof of an offer of employment made and accepted prior to April 20, 2010 for employment between April 21 and December 31, 2010.  The proof must include information sufficient to establish proposed start and end dates, wage rates and projected hours, and withdrawal in whole or part of the offer during the period April 21 through December 31, 2010.

**2.**     **Claimant Employability Documentation:**

In order to prove employability, the Claimant should provide both:

a.     A copy of a Social Security card, government-issued identification (for example, a valid driver's license), temporary worker visa, or green card that was valid as of April 20, 2010, or a print out from a public database providing the same information as would be provided by the original document.

        AND

b.     Evidence that the Claimant was at least 16 years of age as of April 20, 2010.  Acceptable evidence includes a valid driver's license, a valid passport, or a copy of the Claimant's birth certificate, or a print out from a public database providing the same information as would be provided by the original document.

**3.**     **Licensing Documentation**:  If the Claimant's employment in the **Claiming Job** requires a government-issued license/permit, the Claimant shall provide a copy of 2009 license(s) (even if it had expired), or a print out from a public database providing the same information as would be provided by the original document.

4.     **Employer Sworn Written Statement:**  The Claimant shall submit an **Employer Sworn Written Statement** from at least one of the Claimant's employers for 2009, which sets forth the following information with any relevant documents attached.

029380

**a.  Employer Information**

  i.  Employer's business name

  ii.  Address(es)

  iii.  Telephone number(s)

  iv.  Website(s), if available

  v.  A description of the nature of the business

  vi.  Compensation practices (for example, weekly or bi-weekly pay periods), wage rates, and typical hours worked for employees holding jobs comparable to the **Claiming Job**.

  vii.  The size and scale of the employer's business, such as:

      (A)  Size of the vessel;

      (B)  Best estimate of the number of customers;

      (C)  Best estimate of the volume of product produced (such as volume of seafood harvested);

      (D)  Best estimate of the number of full-time and part-time employees; or,

      (E)  Financial information

  viii.  The number of **Employer Sworn Written Statements** submitted on behalf of any **Seafood Crew Compensation Plan**.

**b.  Employee Information**

  i.  The Claimant's employment history with employer, including, for example, the nature of the work performed, number of years worked, whether the employment is steady or seasonal, year-round or intermittent, and the circumstances of the Claimant's departure and/or termination, if applicable.

  ii.  The Claimant's wage rate and total compensation for 2009. If the employer cannot provide precise actual dates and times, it shall be sufficient for the employer to provide more general information satisfying this standard – for example, "Claimant was employed for 30 days at a rate of

74

029381

$100 per day for 12 weeks during the months of June - August 2009".

    iii.    If the employer (i) employed the Claimant and/or (ii) offered the Claimant employment during the period from April 20, 2010 to December 31, 2010, the employer shall provide the following:

    (A)    How the employer (a) terminated the Claimant's employment, (b) reduced the Claimant's hours of work, (c) withdrew an offer of employment, (d) did not extend an offer of seasonal (partial year) employment to the Claimant, or (e) otherwise reduced employee's compensation due to or resulting from the DWH Spill with sufficient detail to permit the **Claims Administrator** to calculate the Claimant's lost hours of work and lost earnings from such employment during such period.

    (B)    A specific explanation of how (i) the reduction of Claimant's hours of work, or (ii) the withdrawal of, or (iii) the failure to extend, an offer of employment was due to or resulting from the DWH Spill.

The number of **Employer Sworn Written Statements** submitted by an employer on behalf of the Claimant and any other Claimants shall be monitored by the **Claims Administrator** for reasonableness in light of the employer's operations. For example, it would be anticipated that a 45-foot boat would have approximately two full-time equivalent employees, or that a 75-foot boat would have approximately three full-time equivalent employees.

    **5.**    **Sponsor Sworn Written Statement:**

If the Claimant submits an **Employer Sworn Written Statement** from a parent, grandparent, child, grandchild, spouse, brother, sister, aunt, uncle, niece, nephew, brother-in-law, sister-in-law, step-parent, step-brother, step-sister or step-child of the Claimant, the Claimant shall also submit a **Sponsor Sworn Written Statement** which sets forth the following information with any relevant documents attached.

    a.    The sponsor's name, address, daytime and evening telephone numbers, Social Security number or government issued identification number, and the length of time the sponsor has resided at their current address.

    b.    A statement that a true and correct copy of one (or more) of the following forms of valid identification of the sponsor is attached: valid driver's license, Social Security card, valid U.S. Passport,

029382

Green Card, and attached copies, or verification from a public database that the sponsor has one or more of the listed items.

c. The sponsor's relationship to the Claimant, which must be other than the parent, grandparent, child, grandchild, spouse, brother, sister, aunt, uncle, niece, nephew, brother-in-law, sister-in-law, step-parent, step-sister, step-brother or step-child of the Claimant and the basis for the sponsor's personal knowledge of the Claimant's employment.[14]

d. A description of the Claimant's employment prior to April 20, 2010, if relevant, the Claimant's expected employment as a **Seafood First Mate**, **Seafood Second Mate**, **Seafood Boatswain**, or **Seafood Deckhand** thereafter, and the sponsor's basis of knowledge for these facts.

 i. An explanation of how the reduction of Claimant's hours of work, termination of the Claimant's employment, or withdrawal of an offer of employment during the period from April 21, 2010 through December 31, 2010, was due to or resulting from the DWH Spill and the sponsor's basis of knowledge for these facts.

 ii. A representation that the sponsor has not submitted a **Sponsor Sworn Written Statement** for more than ten other claimants.

 iii. A representation that the sponsor understands and acknowledges that the **Claims Administrator** will rely on statements in the **Sponsor Sworn Written Statement**, which acknowledgement the sponsor verifies under penalty of perjury is true and correct.

 iv. A representation that the sponsor understands that fraudulent claims and statements will be prosecuted to the full extent of the law.

**B.** <u>Interviews</u>

1. The **Claims Administrator** shall have the right to interview all Claimants, employer(s) and sponsor(s) as the **Claims Administrator** deems appropriate. For example, if an employer submits **Employee Sworn Statements** on behalf of more employees than the **Claims Administrator** determines could reasonably have been employed in the job by the

---

[14] The standard to be applied is whether or not the Sponsor's statement contains facts that would allow the Sponsor to testify under the Federal Rules of Evidence as being within the Sponsor's personal knowledge.

029383

employer, then the **Claims Administrator** may determine an interview of the employer is appropriate. The **Claims Administrator** shall follow the Interview Guidelines contained in Exhibit 83 of the *Deepwater Horizon* Economic and Property Settlement Agreement (Addendum to Individuals Framework - Interviews of Claimants Alleging Individual Economic Loss and Other Individuals Providing Sworn Statements in Support of Such a Claim).

## C.    RTP

An **RTP** of 2.25 shall apply only to Claimants with claims that qualify for compensation under Category II of this **Seafood Compensation Plan** and who provide documents sufficient to prove **Work Availability** as set forth in Section II.A.1.d above.

## D.    Description Of Compensation Calculation And Distribution Of Payments

The **Claims Administrator** shall determine the amount of Claimant's lost earnings relating to employment by a **Commercial Fisherman** due to or resulting from the *Deepwater Horizon* oil spill based on the totality of the information provided by the Claimant and the Claimant's employer(s), including the **Sworn Claim Form**, the **Claimant Sworn Written Statement**, the **Employer Sworn Written Statement(s)**, and, if applicable, the **Sponsor Sworn Written Statement(s)**, and any other supporting documentation provided by the Claimant. The Claims Administrator cannot rely solely on the **Claimant Sworn Written Statement** for proof of lost earnings.

The **Claims Administrator** shall receive and process claims under Category II as required to allow for Claimants and/or the **Claims Administrator** to supplement the claim or acquire any additional necessary information or documentation. No Category II claim shall be paid until after the **Bar Date**. After the **Bar Date** for Category II claims, the **Claims Administrator** shall determine whether each Claimant who timely submitted a Category II claim is eligible and qualified to receive compensation.

The **Claims Administrator** shall determine compensation for Category II Claimants as follows. For claimants that establish a valid job offer, their lost potential earnings relating to potential employment by a **Commercial Fisherman** due to or resulting from the *Deepwater Horizon* oil spill shall be calculated as the wages that the Claims Administrator establishes would have been earned from April 21, 2010 through December 31, 2010. For example, if the Claimant validly established a qualifying job offer for 40 hours per week that was revoked, the Claimant could establish lost earnings of the hourly wage times 40 hours per week times 36 weeks.

For Category II claimants, the Claimant's base compensation shall be calculated as: (i) 37% of the **Actual Earnings** from the **Claiming Jobs** held by the Claimant during the **Benchmark Period**; or, (ii) as 37% of the Claimant's potential earnings for April 20, 2010 through December 31, 2010.

The Claimant shall receive a lump-sum payment equal to the Claimant's base compensation plus any applicable RTP.

029384

No Claimant in Category II shall receive more than $9,500 in base compensation before application of the RTP. Further, if the total aggregate amount of Category II compensation claims for all claimants who have timely submitted eligible and qualifying Category II claims exceeds the **Aggregate Compensation Amount for Category II**, then Category II claimants will be subject to a pro rata reduction in compensation. If the **Aggregate Compensation Amount for Category II** is not exhausted, then any remaining amount within the **Aggregate Compensation Amount for Category II** shall be distributed as part of the balance described in the "General Framework and Overview of Seafood Compensation Program Distribution" Section of the Seafood Compensation Program.

There are no appeal process rights available under Category II of the **Seafood Crew Compensation Plan**. The decision of the **Claims Administrator** is final and not appealable.

III. **CLAIMANTS WITHOUT TAX INFORMATION OR PAY PERIOD EARNINGS DOCUMENTATION WHO SUBMIT A CLAIMANT SWORN WRITTEN STATEMENT, SPONSOR SWORN WRITTEN STATEMENT(S) AND ATTORNEY SWORN WRITTEN STATEMENT (IF APPLICABLE) TO ESTABLISH EARNINGS**

Any Claimant who does not have **Tax Information Documents** or **Pay Period Earnings Documentation** for the **Claiming Job** evidencing the Claimant's earnings during 2009 may instead establish lost earnings and causation, by submitting in addition to a **Sworn Claim Form:** (a) a **Claimant Sworn Written Statement** with specified contents, (b) one or more **Sponsor Sworn Written Statement(s)** and/or one or more **Attorney Sworn Written Statements(s)**, and (c) any other specified documentation. In addition, the **Claims Administrator** may interview the Claimant and/or the sponsor(s) and/or the attorney(s) if the **Claims Administrator** determines an interview is appropriate.

All Claimants who seek compensation under Category III shall submit the **Sworn Claim Form** and all necessary documents in a final and complete form no later than the **Bar Date**. Any claim that is not filed as of the **Bar Date** shall be rejected, and the Claimant shall receive no compensation under this **Settlement Agreement** for the Claimant's lost earnings for the **Claiming Job**.

The **Claims Administrator** shall receive and process claims under Category III as required to allow for Claimants and/or the **Claims Administrator** to supplement the claim or acquire any additional necessary information or documentation. However, no Category III claim shall be paid until after the **Bar Date**. After the **Bar Date**, the **Claims Administrator** shall process as expeditiously as possible all timely submitted claims as described in further detail in subsection C below.

There are no appeal process rights available under Category III of the **Seafood Crew Compensation Plan**. The decision of the **Claims Administrator** is final and not appealable.

029385

### A.     Documentation And Causation Requirements:

A Category III claimant must provide a **Sworn Claim Form** and all of the documents identified below.  The **Claims Administrator** shall review and assess the documentation provided by the Claimant, including information from the Claimant's sponsor(s) and/or attorney(s), and any other information deemed relevant by the **Claims Administrator**, for purposes of determining whether the Claimant had **Actual Earnings** in 2009 from employment as a **Seafood First Mate**, **Seafood Second Mate**, **Seafood Boatswain** or **Seafood Deckhand**.  The **Claims Administrator** shall rely on his assessment of the credibility and reliability of the information submitted in determining if the causation requirement is satisfied and the amount of any lost earnings relating to employment by a **Commercial Fisherman** due to or resulting from the *Deepwater Horizon* oil spill.

1.     **Claimant Sworn Written Statement**: The Claimant shall submit a **Claimant Sworn Written Statement** which sets forth all of the following information and shall attach any relevant documents in Claimant's possession:

   a.     Information about each employer for whom a claimant worked at any time in 2009 and/or 2010, including, for example, the nature of the work performed, number of years worked, whether the employment is steady or seasonal, year-round or intermittent, and the circumstances of the Claimant's departure and/or termination, if applicable.  At a minimum, the Claimant shall include the following:

   i.     The business name, last known address, and telephone number of each of Claimant's employers for 2009 and/or 2010.

   b.     The Claimant's actual earned income from all sources in 2009 and 2010, and any other earnings history that the Claimant believes is relevant to support the claim, including any support for the Claimant's belief that these actual earned amounts are accurate.

   c.     An explanation of how the reduction of Claimant's hours of work, termination of the Claimant's employment, and/or withdrawal of an offer of employment related to the **Claiming Job(s)** for the period from April 21 through December 31, 2010 was due to or resulting from the DWH Spill.

   d.     The name, address and telephone number of any individual submitting a **Sponsor Sworn Written Statement** and the Claimant's relationship to such sponsor and/or the name, address and telephone number of an attorney submitting an **Attorney Sworn Written Statement**.

79

029386

e.   A Sworn Statement attesting whether or not the Claimant received any Seafood Spill-Related Payments.  If the Claimant received Seafood Spill-Related Payments, the Claimant shall provide documents sufficient to establish the timing, amount and source of Seafood Spill-Related Payments, including documents providing the claimant's BP/GCCF/Transition Facility Claim Number, if applicable, and any corresponding payments.

f.   A statement and documents sufficient to establish that the Claimant was present and available to work in close enough proximity to the anticipated location of employment to travel to the job as frequently as required by the employer during the period from April 21, 2010 through December 31, 2010.

   i.   Documentation that could demonstrate presence and availability includes, but is not limited to, the following:

      (A)   A lease or rental agreement; or

      (B)   A sublease agreement; or

      (C)   Contemporaneous utility bills.

   ii.   Documentation that could demonstrate the location of employment or anticipated location of employment includes, but is not limited to, the following:

      (A)   Employer's business name and address; or

      (B)   Jobsite location; or

      (C)   Docking and port information for a vessel.

**2.   Claimant Employability Documentation:**

Consists of both:

a.   A copy of a Social Security card, government-issued identification (for example, a valid driver's license), temporary worker visa, or green card that was valid as of April 20, 2010, or a print out from a public database providing the same information as would be provided by the original document.

   AND

b.   Evidence that the Claimant was at least 16 years of age as of April 20, 2010.  Acceptable evidence includes a valid driver's license, a valid passport, or a copy of the Claimant's birth certificate, or a

80

029387

print out from a public database providing the same information as would be provided by the original document.

3.  **Licensing Documentation**:  If the Claimant's employment in the **Claiming Job** requires a government-issued license/permit, the Claimant shall provide a copy of valid 2009 and/or 2010 licenses (even if it had expired before that date), or a print out from a public database providing the same information as would be provided by the original document.

4.  **Sponsor Sworn Written Statements and/or Attorney Sworn Written Statement:**  In addition to the **Claimant Sworn Statement**, the Claimant must submit two additional **Sworn Written Statements**.  The Claimant shall be required to submit an **Attorney Sworn Written Statement** if an attorney:

    a.  submitted or pursued a claim on the Claimant's behalf in the OPA Process, or,

    b.  submitted or pursued a claim on the Claimant's behalf in the Transition Process, or,

    c.  submitted or pursued any claim on the Claimant's behalf in the *Deepwater Horizon* Economic Litigation, such as a Plaintiff Profile Form or Short Form Joinder, or

    d.  represents the Claimant for any claims arising from, or related to, the *Deepwater Horizon* Incident.

    If the attorney for the Claimant has withdrawn his or her representation of the Claimant, then the Claimant will not be required to submit an **Attorney Sworn Written Statement**.  In addition to the **Attorney Sworn Written Statement**, the Claimant shall also submit a **Sponsor Sworn Written Statement**.  A sponsor who submits a **Sponsor Sworn Written Statement** may not be the parent, grandparent, child, grandchild, spouse, brother, sister, aunt, uncle, niece, nephew, brother-in-law, sister-in-law, step-parent, step-brother, step-sister or step-child of the Claimant, unless such sponsor employed the Claimant at some time during 2009 or 2010.

    If the Claimant is not required to submit an **Attorney Sworn Written Statement** as set forth above, the Claimant must submit either two **Sponsor Sworn Written Statements** (at least one sponsor must be unrelated to the Claimant) or a **Sponsor Sworn Written Statement** and an **Attorney Sworn Written Statement**.

    e.  **Sponsor Sworn Written Statement:** a **Sponsor Sworn Written Statement** must include the following information:

81

029388

i.  The sponsor's name, address, daytime and evening telephone numbers, Social Security number or government issued identification number, and the length of time the sponsor has resided at their current address.

ii.  A statement that a true and correct copy of one (or more) of the following forms of valid identification of the sponsor is attached: valid driver's license, Social Security card, valid U.S. Passport, Green Card, and attached copies, or verification from a public database that the sponsor has one or more of the listed items.

iii.  The sponsor's relationship to the Claimant, which must be other than the parent, grandparent, child, grandchild, spouse, brother, sister, aunt, uncle, , niece, nephew, brother-in-law, sister-in-law, step-parent, step-sister, step-brother or step-child of the Claimant unless such person was the Claimant's employer in 2009 or 2010 and the basis for the sponsor's personal knowledge of the Claimant's employment.[15]

iv.  A description of the Claimant's employment prior to April 20, 2010, and, if relevant, the Claimant's expected employment as a **Seafood First Mate**, **Seafood Second Mate**, **Seafood Boatswain**, or **Seafood Deckhand** thereafter, and the sponsor's basis of knowledge for these facts.

v.  An explanation of how the reduction of Claimant's hours of work, termination of the Claimant's employment, or withdrawal of an offer of employment during the period from April 21, 2010 through December 31, 2010, was due to or resulting from the DWH Spill and the sponsor's basis of knowledge for these facts.

vi.  A representation that the sponsor has not submitted a **Sponsor Sworn Written Statement** for more than ten other claimants.

vii.  A representation that the sponsor understands and acknowledges that the **Claims Administrator** will rely on statements in the **Sponsor Sworn Written Statement**, which acknowledgement the sponsor verifies under penalty of perjury is true and correct.

---

[15] The standard to be applied is whether or not the Sponsor's statement contains facts that would allow the Sponsor to testify under the Federal Rules of Evidence as being within the Sponsors personal knowledge.

029389

viii. A representation that the sponsor understands that fraudulent claims and statements will be prosecuted to the full extent of the law.

f. **Attorney Sworn Written Statement:** an **Attorney Sworn Written Statement** must include the following information:

i. The attorney's full name, office address, office telephone number, and email address.

ii. The attorney's Bar Association membership number.

iii. The attorney's relationship to the Claimant, including a description of when the attorney began representation of the Claimant, and the scope of such representation.

iv. A representation that the attorney has made a reasonable investigation of the Claimant's **Sworn Claim Form** and **Claimant Sworn Written Statement** and that the attorney's findings are, to the best of the Attorney's knowledge, reasonably consistent with the content of such Claim Form and **Claimant Sworn Written Statement**. Such investigation shall be made by the attorney or a member of the attorney's staff. If a member of the attorney's staff makes the investigation, the **Attorney Sworn Written Statement** shall identify the staff member. Furthermore, whether the attorney or a staff member makes the investigation, the **Attorney Sworn Written Statement** shall state with specificity what steps were taken in the investigation in conducting the investigation.

v. A representation that the attorney understands and acknowledges that the Claims Administrator will rely on statements in the Attorney Sworn Written Statement, which acknowledgement the attorney verifies under penalty of perjury is true and correct.

B. __Interviews__

1. The **Claims Administrator** shall have the right to interview all Claimants and related sponsor(s) and/or attorney(s) in this Category III if the **Claims Administrator** determines an interview is appropriate.[16] The **Claims**

---

[16] In addition, nothing in this **Seafood Crew Compensation Program** shall in any way limit the right and obligation of the **Claims Administrator** to investigate fully all suspicions of fraudulent conduct by or on behalf of any claimant, including but not limited to conducting any interviews and obtaining any documents the **Claims Administrator** deems necessary.

83

029390

**Administrator** shall follow the Interview Guidelines contained in the *Deepwater Horizon* Economic and Property Settlement Agreement.

## C. Description Of Compensation Calculation And Distribution Of Payments

The **Claims Administrator** shall determine whether the Claimant is eligible and qualified to receive compensation for a Category III claim based on the totality of the information provided by the Claimant, the Claimant's sponsor(s), and the Claimant's attorney, including the **Sworn Claim Form**, the **Claimant Sworn Written Statement**, the **Claimant Employability Documentation**, the **Licensing Documentation**, the **Sponsor Sworn Written Statement and/or the Attorney Sworn Written Statement**, any other supporting documentation provided by the Claimant, and any additional interviews or information as deemed appropriate by the **Claims Administrator**. The Claimant is eligible and qualified to receive compensation for a Category III claim if the **Claims Administrator** determines, based upon this information, that the Claimant had actual earnings from employment as a **Seafood First Mate, Seafood Second Mate, Seafood Boatswain**, or **Seafood Deckhand** during the time period of January 1, 2009 through April 20, 2010.

The **Claims Administrator** shall receive and process claims under Category III as required to allow for Claimants and/or the **Claims Administrator** to supplement the claim or acquire any additional necessary information or documentation. No Category III claim shall be paid until after the **Bar Date**. After the **Bar Date** for Category III claims, the **Claims Administrator** shall determine whether each Claimant who timely submitted a Category III claim is eligible and qualified to receive compensation. If the **Claims Administrator** determines that a Claimant is eligible and qualified to receive compensation for a Category III claim, the Claimant shall receive a lump-sum payment of $5,000. If the total aggregate amount of Category III compensation claims for all claimants who have timely submitted eligible and qualifying Category III claims exceeds the **Aggregate Compensation Amount for Category III**, then Category III Claimants will be subject to a pro rata reduction in compensation. If the **Aggregate Compensation Amount for Category III** is not exhausted, then any remaining amount within the **Aggregate Compensation Amount for Category III** shall be distributed as part of the balance described in the "General Framework and Overview of Seafood Compensation Program Distribution" Section of the Seafood Compensation Program.

029391

## SEAFOOD SPILL-PAYMENT REDUCTION PROCEDURES

If the Claims Administrator determines that the Claimant has received Seafood Spill-Related Payments, the Claims Administrator shall offset any compensation under the Seafood Compensation Program by the total of the Seafood Spill-Related Payment amount. If a Claimant qualifies for compensation under multiple provisions of the Seafood Compensation Program, the Seafood Spill-Related Payment is only applied once. For example, if a Claimant qualifies to receive: (i) $275,563 under the Shrimp Reduced Expedited Compensation Program; (ii) $32,000 under the Blue Crab/Other Seafood Compensation Program; and (iii) received $25,000 in Seafood Spill-Related Payments, his compensation under the Seafood Compensation Program would be: $282,563 ($275,563 + $32,000 - $25,000).

029392

# EXHIBIT 11A

<u>**Compensation Framework for Coastal Real Property Claims**</u>

1. **Eligibility Requirements**

   A. **Eligible Claimants** shall be comprised of claimants who do not fall within the exclusions to the **Economic Loss and Property Class Definition** and who are owners or lessees of **Eligible Parcels** satisfying the following criteria:

      i. The claimant owned the **Eligible Parcel** during the time period April 20, 2010 to December 31, 2010; or

      ii. The claimant was a lessee of the **Eligible Parcel**, and the lease provided for possession of the **Eligible Parcel** for a period of 60 days or longer during the time period April 20, 2010 to December 31, 2010 and the lease was executed prior to April 20, 2010.

         i. The Claims Administrator shall determine whether an **Eligible Claimant(s)** is/are the owner(s) of an **Eligible Parcel**.

   B. **Coastal Real Property Claim Zone** shall be defined as the blue shaded portions of the **Coastal Real Property Claim Zone Map** attached as <u>Appendix A</u>. (See <u>Appendix B</u> for a description of the criteria used to establish the **Coastal Real Property Claim Zone**.)

   C. **Eligible Parcels** shall be comprised of the following two categories:

      i. Parcels located within the **Coastal Real Property Claim Zone** that have a County Land Use Designation included on the list attached as <u>Appendix C</u>. (A parcel is a specific tract of real property defined by a legal description of boundaries used for taxing purposes.)

      ii. **Deeded Boat Slips** located within the **Coastal Real Property Claim Zone**. **Deeded Boat Slips** shall be defined as boat slips for which the **Eligible Claimant** paid real property tax during the time period April 20, 2010 to December 31, 2010.

   D. An **Eligible Parcel** shall be placed into one of four **Compensation Categories**[1]:

      **Compensation Category A1** shall consist of **Eligible Parcels** satisfying the following two criteria: (i) the presence of oil was reported on the **Eligible Parcel** by the Deepwater Horizon Unified Command Shoreline Cleanup

---

[1] Grand Isle, Louisiana and Dauphin Island, Louisiana are included in the **Coastal Real Property Claim Zone** and will be placed into a **Compensation Category** consistent with Section 1. D.

027505

Assessment Teams (**SCAT**) or a Pre-Assessment conducted as part of Phase 1 of the Natural Resources Damages Assessment process ("**NRD Pre-Assessment**") and (ii) the **Eligible Parcel** includes, or is situated upon, a shoreline for which **no portion** of the shoreline has a primary Environmental Sensitivity Index ("**ESI**") classification of 10A (salt and brackish (coastal marshes)), 10B (freshwater marshes), 10C (freshwater swamps) or 10D (scrub-shrub wetlands (includes mangroves)) as determined by the National Oceanic and Atmospheric Administration ("NOAA")[2].

**Compensation Category A2** shall consist of **Eligible Parcels** satisfying the following two criteria: (i) the presence of oil was reported on the **Eligible Parcel** by **SCAT** or an **NRD Pre-Assessment** and (ii) the **Eligible Parcel** includes or is situated upon a shoreline for which **some portion** of the shoreline has a primary ESI classification of 10A (salt and brackish (coastal marshes)), 10B (freshwater marshes), 10C (freshwater swamps) or 10D (scrub-shrub wetlands (includes mangroves)) as determined by the NOAA.

**Compensation Category B1** shall consist of **Eligible Parcels** satisfying the following two criteria: (i) no presence of oil was reported on the **Eligible Parcel** by **SCAT** or an **NRD Pre-Assessment** and (ii) the **Eligible Parcel** includes or is situated upon a shoreline for which **no portion** of the shoreline has an ESI classification of 10A (salt and brackish (coastal marshes)), 10B (freshwater marshes), 10C (freshwater swamps) or 10D (scrub-shrub wetlands (includes mangroves)) as determined by the NOAA.

**Compensation Category B2** shall consist of **Eligible Parcels** satisfying the following two criteria: (i) no presence of oil was reported on the **Eligible Parcel** by **SCAT** or an **NRD Pre-Assessment** and (ii) the **Eligible Parcel** includes or is situated upon a shoreline for which **some portion** of the shoreline has a primary ESI classification of 10A (salt and brackish (coastal marshes)), 10B (freshwater marshes), 10C (freshwater swamps) or 10D (scrub-shrub wetlands (includes mangroves)) as determined by the NOAA**.**

i.    An **Eligible Parcel** shall be classified as having "the presence of oil" (a criteria for **Compensation Categories A1 and A2**) when any **SCAT** zone within the parcel has a maximum oiling classification other than "no oil observed" or (ii) an **NRD Pre-Assessment** conducted within the parcel reported the presence of oil on vegetation and/or sediment.

---

[2] Environmental Sensitivity Index numbers used by the National Oceanic and Atmospheric Administration can be found at the following website:
http://archive.orr.noaa.gov/gallery_gallery.php?RECORD_KEY%28gallery_index%29=joinphotogal_id,gallery_id,photo_id&joinphotogal_id(gallery_index)=86&gallery_id(gallery_index)=4&photo_id(gallery_index)=35

027506

ii. An **Eligible Parcel** is determined to have "no presence of oil" (a criteria for **Compensation Categories B1 and B2**) when (i) all **SCAT** zones within the parcel have a maximum oiling classification of "no oil observed" or (ii) no **NRD Pre-Assessment** conducted within the parcel reported the presence of oil on vegetation or sediment.

iii. **Administrator's Database**: The Claims administrator shall maintain a Geographic Information Systems database ("**Administrator's Database**") containing the results of **SCAT**, **NRD Pre-Assessment**, NOAA ESI shoreline classifications, County Land Use Designations and the official parcel boundaries for all real property within the **Coastal Real Property Claim Zone**. The Claims Administrator shall determine the **Compensation Category** for each **Eligible Parcel** based upon the information in the **Administrator's Database** and consistent with the criteria in this Section 1. D. Attached is a map classifying each known **Eligible Parcel** into a **Compensation Category** by applying the information in the **Administrator's Database** as of the settlement date. This map shall be referred to as the **Eligible Parcel Compensation Category Map**, and a copy is attached as <u>Appendix D</u>. **Administrator's Database** shall be periodically updated through the duration and term of the Settlement Agreement. **Administrator's Database** is presumed to be the best available evidence, however, that presumption may be rebutted as outlined in Sections E., F., G. and H. below. The use of environmental data (including SCAT and NRDA data) as part of this Compensation Framework shall not constitute an admission or judicial determination related to the admissibility or interpretation of such data for any other purpose, and, further, the use of such data shall have no effect on, and shall be without prejudice to, the use, admissibility and interpretation of such data for any other purpose, including any claims for natural resource damages.

E. A parcel not located within the **Coastal Real Property Claim Zone** may be added to the **Coastal Real Property Claim Zone** by the Claims Administrator only if the parcel is documented as oiled pursuant to **SCAT** or by an official assessment conducted by Natural Resource Trustees in connection with the DWH Spill. No other parcels outside the **Coastal Real Property Claim Zone** shall have the ability to become an **Eligible Parcel**.

F. The **Administrator's Database** contains the publicly available parcel boundary data released by county tax assessors for real property in the **Coastal Real Property Claim Zone**. In some instances, publicly available parcel boundary data may be incomplete or out-of-date. Accordingly, real property located in **Coastal Real Property Claim Zone** not identified as a parcel shall nonetheless be classified by the Claims Administrator as an **Eligible Parcel** provided the claimant documents the following:

i. Actual presence of the parcel in the **Coastal Real Property Claim Zone**. Documentation of actual presence of parcel in the **Coastal Real Property Claim Zone** must consist of an official document provided by the county

027507

tax assessor, Clerk of Court, Registrar of Lands or other governmental lands office or agency such as a 2010 county tax notice or a professional survey of the parcel.

G. The **Administrator's Database** contains publicly available County Land Use Designations for parcels within the **Coastal Real Property Claim Zone**. In some instances, publicly available County Land Use Designations may be incomplete or out-of-date. Accordingly, a parcel located within the **Coastal Real Property Claim Zone** for which the County Land Use Designation in the **Administrator's Database** is not listed in Appendix C nonetheless shall be categorized as an **Eligible Parcel** if the claimant provides documentation from the county tax assessor, Clerk of Court, Registrar of Lands or other governmental lands office or agency sufficient to show that the parcel does in fact have a County Land Use Designation listed in Appendix C.

H. An **Eligible Parcel** within the **Coastal Real Property Claim Zone** may be reclassified by the Claims Administrator into a different **Compensation Category** if one of the following conditions is satisfied:

    i. An **Eligible Parcel** placed in **Compensation Category B1** or **Compensation Category B2** pursuant to information in the **Administrator's Database** shall be reclassified by the Claims Administrator into **Compensation Category A1 or Compensation Category A2** if the **Eligible Claimant** provides independent documentation in the form of a government or academic report, not commissioned by the **Eligible Claimant** or **Eligible Claimant's** attorney or agent, with said independent documentation establishing that the **Eligible Parcel** contains the presence of oil released by the DWH Spill even though no portion of the parcel is classified as oiled pursuant to **SCAT** or **NRD Pre-Assessment**.

    ii. An **Eligible Parcel** on a shoreline with a primary **ESI** classification of less than 10 as determined by NOAA and classified into **Compensation Category A1** or **Compensation Category B1** shall be reclassified into **Compensation Category A2** or **Compensation Category B2** if the **Eligible Claimant** provides documentation from NOAA showing that the **Eligible Parcel** is on a shoreline with a primary ESI classification of 10A (salt and brackish (coastal marshes)), 10B (freshwater marshes), 10C (freshwater swamps) or 10D (scrub-shrub wetlands (includes mangroves)).

    iii. The Claims Administrator shall undertake an investigation to determine whether the information submitted pursuant to this Section satisfies the criteria for reclassification set out H. i. and H. ii.

## 2. Compensation for Eligible Parcels

027508

A. An **Eligible Claimant** must submit a **Claim Form**[3], all required supporting documents and a **Verification Statement** to receive compensation for **Eligible Parcels**. The **Claim Form**, **Document Requirements** and **Verification Statement** are attached as Appendices E, F and G, respectively.

B. An **Eligible Claimant** who satisfies the eligibility requirements of Section 1 and submits a **Claim Form**, all required supporting documents and a **Verification Statement**, shall be entitled to receive the appropriate Coastal Real Property compensation amount ("**Coastal Real Property Compensation Amount**") for an **Eligible Parcel** depending upon the criteria outlined in this section. The particular **Coastal Real Property Compensation Amount** shall be calculated as follows using a specified percentage of the **2010 Applicable Property Tax**[4] for the **Eligible Parcel**[5]:

    i. For an **Eligible Parcel** in **Compensation Category A1** the Coastal Real Property compensation amount shall be 40% of the **2010 Applicable Property Tax**.

    ii. For an **Eligible Parcel** in **Compensation Category A2**, the **Coastal Real Property Compensation Amount** shall be 45% of the 2010 **Applicable Property Tax**.

    iii. For an **Eligible Parcel** in **Compensation Category B1**, the **Coastal Real Property Compensation Amount** shall be 30% of the **2010 Applicable Property Tax**.

    iv. For an **Eligible Parcel** in **Compensation Category B2**, the **Coastal Real Property compensation amount** shall be 35% of the **2010 Applicable Property Tax**.

C. For the **Coastal Real Property Compensation Amount** described in Section 2. B, "**2010 Applicable Property Tax**" shall be defined as an **Eligible Parcel's** 2010 **County Appraised Value** multiplied by 1.18% ("**Applicable Real Property Tax Rate**").

D. "**County Appraised Value**" shall mean the following for an **Eligible Parcel** depending on the state it is located in:

    **Florida**: For an **Eligible Parcel** located in the Florida counties of Escambia, Okaloosa, Santa Rosa, Walton, Bay, Gulf, Franklin and

---

[3]The Claim Administrator may prepare the final Claim Form consistent with Appendix E.  In no case shall the final Claim Form omit the substance of any question contained in Appendix E.

[4] 2010 Applicable Property Tax is defined in Section 2. C.

[5] See Appendix H for example calculations of **Coastal Real Property Compensation Amounts**.

027509

Wakulla, **County Appraised Value** shall mean Just Value as determined by the respective Florida County tax assessor.

<u>Alabama</u>: For an **Eligible Parcel** located in Baldwin County, Alabama, **County Appraised Value** shall mean True Value as determined by the Baldwin County tax assessor. For an **Eligible Parcel** located in Mobile County, Alabama, **County Appraised Value** shall mean Market Value, as determined by the Mobile County tax assessor.

<u>Mississippi</u>: For an **Eligible Parcel** located in Jackson County Mississippi, County Appraised Value shall mean TOTALVAL as determined by Jackson County tax assessor. For an **Eligible Parcel** located in Harrison County, Mississippi, the **County Appraised Value** shall mean Total Value as determined by the Harrison County tax assessor. For an **Eligible Parcel** located in Hancock County, Mississippi the **County Appraised Value** shall mean LRTOT as determined by the Hancock County tax assessor.

<u>Louisiana</u>: For an **Eligible Parcel** located in Grand Isle, Jefferson Parish, Louisiana, **County Appraised Value** shall mean Fair Market Value as determined by the Jefferson Parish tax assessor.

    i.   If the **County Appraised Value** is net of a Homestead Exemption, the amount of such Homestead Exemption shall be added to the **County Appraised Value** for purposes of calculating the **Coastal Real Property Compensation Amount**.

E.  An **Eligible Parcel** with a **County Land Use Designation** listed in <u>Appendix I</u> shall be entitled to the greater of (i) calculation in 2. B. above or (ii) a minimum as detailed below.[6]

    i.   The minimum **Coastal Real Property Compensation Amount** shall be as follows:

        a.   $1,000 for an **Eligible Parcel** in **Compensation Category A1**.

        b.   $1,100 for an **Eligible Parcel** in **Compensation Category A2**.

        c.   $800 for an **Eligible Parcel** in **Compensation Category B1**.

        d.   $800 for an **Eligible Parcel** in **Compensation Category B2**.

    ii.   An **Eligible Parcel** for which the County Land Use Designation in the **Administrator's Database** is not listed in <u>Appendix H</u>, shall nonetheless

---

[6] See Appendix J for an example calculation of a minimum **Coastal Real Property Compensation Amount**.

027510

be categorized as an **Eligible Parcel** for which the County Land Use Designation is listed in Appendix H, if the claimant provides documentation from the county tax assessor sufficient to show that the parcel does in fact have a County Land Use Designation listed in Appendix H.

F. The **Coastal Real Property Compensation Amount** shall be allocated as follows:

    i. For an **Eligible Parcel** for which there is only one **Eligible Claimant,** the **Eligible Claimant** shall receive the entire portion of the applicable **Coastal Real Property Compensation Amount**.

    ii. For an **Eligible Parcel** for which there are more than one **Eligible Claimants**, the **Coastal Real Property Compensation Amount** shall be allocated based on the period of legal possession of the particular **Eligible Parcel** by each **Eligible Claimant** between April 20, 2010, and December 31, 2010. The allocation shall be determined by dividing the **Coastal Real Property Compensation Amount** by 255 days and then multiplying the product by the number of days each **Eligible Claimant** had legal possession of the **Eligible Parcel.**

    iii. The Claims Administrator shall determine whether an **Eligible Claimant(s)** is the owner of an **Eligible Parcel**

G. An RTP of 2.5 shall be applied to the **Coastal Real Property Compensation Amount**.  For example, a hypothetical **Coastal Real Property Compensation Amount** of $1,859 (refer to Appendix H), would receive an RTP equal to $4,648 for a total **Coastal Real Property Compensation Amount** of $6,507 inclusive of RTP.

3. **Physical Damage to Real or Personal Property**

A. **Physical Damage** shall be defined as any physical damage that occurred to an **Eligible Claimant's** real or personal property located on an **Eligible Parcel(s)** in connection with the DWH Spill or as a result of the response cleanup operations that were consistent with the National Contingency Plan or specifically ordered by the Federal On-Scene Coordinator or delegates thereof, with the exception of any damage claimed for intrusion of oil, dispersant or other substances onto the **Eligible Claimant's** **Eligible Parcel(s)**. Damages for claims of intrusion of oil, dispersants or other substances on an **Eligible Parcel** are addressed in Section 2. B. above.

    i. Examples of **Physical Damage** includes, for example, physical damage that occurred to landscaping, a structure, appurtenances, a dock, a building, a patio, or a deck furniture located on an **Eligible Parcel** caused by a vehicle, machinery or equipment in use for DWH Spill response cleanup operations.

027511

B. An **Eligible Claimant** must provide the Claims Administrator with satisfactory proof of all of the following items below in order to qualify to receive compensation for **Physical Damage**:

      i.    The claimant is an **Eligible Claimant**.

      ii.    The claimed **Physical Damage** occurred on an **Eligible Parcel**.

      iii.    The **Physical Damage** occurred between April 20, 2010 and the date the Economic Injury and Property Claim Settlement Agreement is executed by the parties.

      iv.    The condition of the real or personal property prior to the claimed physical damage.

      v.    The **Eligible Claimant** owned the real or personal property for which **Physical Damage** is claimed at the time the damage occurred.  The Claims Administrator shall determine whether an **Eligible Claimant(s)** is the owner of the real or personal property for which **Physical Damage** is claimed at the time the damage occurred.

      vi.    The **Physical Damage** was caused by DWH Spill response cleanup operations.

      vii.    For an **Eligible Claimant** claiming to have incurred costs to repair or replace the damaged property, evidence to establish that the costs were incurred by the **Eligible Claimant** and that they were reasonable and necessary.

      viii.    For an **Eligible Claimant** seeking compensation for costs not yet incurred to repair or replace the damaged property, a cost estimate and proof the costs are reasonable and necessary.

C. An **Eligible Claimant** must comply with the **Claim Form**, **Document Requirements** and **Verification Statement** listed in Appendices E, F and G in order to qualify to receive compensation for **Physical Damage**.

D. An **Eligible Claimant** who claims **Physical Damage** and satisfies Section 3. A, 3. B and 3. C above shall receive the lesser of the reasonable and necessary costs to repair or replace the damaged property.

027512

i.    The Claims Administrator shall have the authority to verify the **Eligible Claimant**'s estimate of repair and replacement costs, and to undertake an investigation to determine the reasonableness of the costs to repair or replace the damaged property, including obtaining an independent estimate.

ii.    In no event is an **Eligible Claimant** entitled to receive pursuant to this Section 3 damages for intrusion of oil, dispersants or other substances onto the **Eligible Claimant**'s **Eligible Parcel(s)**. Compensation for claims of intrusion of oil, dispersants or other substances on an **Eligible Parcel** are addressed in Section 2. B above.

**4.  Federal and State Regulatory Requirements**

A.  Nothing in this **Compensation Framework for Coastal Real Property Claims** shall alter, expand, or reduce BP's obligations for cleanup, removal, spill response and remediation of real property under applicable federal, state, or local laws, regulations, orders, or agreements. **Eligible Claimant** shall acknowledge that any right to require any cleanup or remediation of the parcel shall not lie with the claimant, but solely with governmental authorities, and that the need for any cleanup or remediation, and the standards by which the need for or sufficiency of such remediation is decided, shall be determined by governmental regulators of the executive department in accordance with properly promulgated law, rules, regulations, orders or agreements. Such governmental regulators alone shall make such determinations, and the **Eligible Claimant** shall not employ regulatory proceedings as a means to seek the redress of claims, which are extinguished pursuant to this Settlement Agreement. It is expressly agreed that this acknowledgement of continued potential responsibility for governmental compliance on the part of the BP (and all other parties released) shall not grant the claimant any personal jurisdiction recourse with respect to the regulatory obligations of the released parties. In the event proceedings, formal or informal, occur before governmental authorities, the claimant agrees to cooperate fully with the released parties in addressing questions or concerns presented by such proceedings; the **Eligible Claimant** shall provide full and free access to the **Eligible Parcel** in connection therewith, and shall further cooperate with the released parties in undertaking and proposing by the released parties such remediation that the released parties deem most appropriate, desirable, and/or cost-effective in meeting regulatory requirements, irrespective of any personal claims, preferences, rights of use or similar considerations of the **Eligible Claimant**, it being understood that such personal claims and considerations fall within the scope of the claims released by the **Eligible Claimant**.

027513

**Compensation Framework for Coastal Real Property Claims**
**Appendix A**
**Coastal Real Property Claim Zone Map**

The **Coastal Real Property Claim Zone Map** is found in a separate document.

**Compensation Framework for Coastal Real Property Claims**
**Appendix B**
**Criteria Used to Establish the Coastal Real Property Claim Zone**

The following criteria were used to establish the **Coastal Real Property Claim Zone**.

1. Areas directly intersected by the portions of shoreline assessed by SCAT teams ("**SCAT Line**"), regardless of whether or not the presence of oil was reported on that portion of the **SCAT Line** are included in the **Coastal Real Property Claim Zone**, as depicted below:



2. Areas not directly intersected by the **SCAT Line** but touching a portion of the coast on which the SCAT line is located, regardless of whether or not the presence of oil was reported on that portion of the **SCAT Line**, are included in the **Coastal Real Property Claim Zone**, as depicted below:



027515

3. Where portions of the **SCAT Line** showing the presence of oil terminated short of certain physical boundaries (such as waterways, bridges, or roads), parcels between the termination of the SCAT line and the particular physical boundary were included in the **Coastal Real Property Claim Zone**.  An example is depicted below.



027516

**Compensation Framework for Coastal Real Property Claims**
**Appendix C**
**County Land Use Designations Required for a Parcel to Qualify as an Eligible Parcel**

ABRASIVE, ASBESTOS, AND MISCELLANEO
ACREAGE NOT AGRICULTURAL
AGRICULTURAL
AIRPORTS, BUS TERMINALS, MARINE TERMINALS, PIERS, MARINAS
AIRPORTS, TERMINALS, MARINAS
AMUSEMENT-OTHER
APARTMENT (LOW RISE SINGLE BLDG)
APARTMENTS, DUPLEX
AUTO SALES, REPAIR, RENTAL, ETC.
BANK/FINANCIAL INSTITUTION
BARS AND TAVERNS
BOAT DOCKS, MARINAS, AND CAMPING AREA
BOAT HOUSE
BOWLING ALLEYS/SKATING RINKS
BUSINESS SERVICES
CAMPS
CANNING AND PRESERVING OF FRUITS, V
CASINOS
CHURCHES
CLUBS, LODGES, UNION HALLS
CLUBS/LODGES/UNION HALLS, ETC.
COMMERCIAL
COMMERCIAL PARKING
COMMERICAL FORESTRY PRODUCTION
COMMON AREAS
COMMUNITY SHOPPING CENTERS
CONCRETE, GYPSUM, AND PLASTER PRODU
CONDOMINIA
CONDOMINIUM
CONDOMINIUM RES.(HIGH RISE)
CONDOMINIUM RES.(LOW RISE)
CONDOMINIUM, MASTER CARD
CROPLAND (GOOD A1)
CULTURAL/ENTERTAIN/REC.-OTHER
DUPLEX RESIDENCE
ENCLOSED THEATRES/AUDITORIUMS
FARMS(GENERAL)
FINANCIAL INSTITUTIONS
FISHING ACTIVITIES AND RELATED SERV

027517

FOOD AND KINDRED PRODUCTS - MANUFAC
GENERAL MERCHANDISE
GOLF COURSES, DRIVING RANGES
HARDWARE,PLUMBING,HEATING EQUIP,AND
HIWAY AND STREET RIGHT OF WAY
HOTELS, MOTELS
HOTELS/MOTELS
HOTELS-RESIDENTIAL
HOUSEHOLD UNITS. (VAC)
HUNTING AND FISHING CLUBS
ISLAND
LAKES AND PONDS
LEASEHOLD INTERESTS
MACHINERY,EQUIPMENT AND SUPPLIES-WH
MANUFACTURING HOMES
MARINAS
MARINE REPAIR DOCKS
MASTER CARD
MEATS AND FISH MARKETS-RETAIL
MINITURE GOLF
MISCELLANEOUS RESIDENTIAL
MIXED USE
MOBILE HOME PARKS
MOBILE HOME PARKS OR COURT
MOBILE HOMES
MOBILE HOMES (SINGLE TRAILER)
MOTELS
MOTELS, TOURIST COURTS, ETC.
MULTI-FAMILY
MULTI-FAMILY (10 UNITS OR MORE)
MULTI-FAMILY (UNDER 10 UNITS)
MULTI-FAMILY 1O UNITS OR MORE
MULTI-FAMILY LESS THAN 10 UNITS
MULTI-USE AND MILTI-STORY BUILDING
NIGHTCLUBS, LOUNGES, BARS
NON AGRICULTURAL ACREAGE
NURSING HOMES
OFFICE (LOW RISE)
OFFICE BUILDINGS
OFFICE BUILDINGS - MULTI STORY
OFFICE BUILDINGS - ONE STORY
OFFICES-GENERAL
ONE FAMILY UNIT

027518

OPEN STORAGE/JUNK YARDS, ETC.
ORPHANAGES
OTHER FABRICATED METAL PRODUCTS - M
OTHER FINANCE,INSURANCE AND REAL ES
OTHER FOOD AND KINDRED PRODUCTS - M
OTHER FOOD PROCESSING
OTHER FOOD –RETAIL
OTHER FORESTRY ACTIVITIES AND RELAT
OTHER PUBLIC ASSEMBLY
OTHER RETAIL TRADE
PAINTS, VARNISHES, LACQUERS, ENAMEL
PARKING LOTS, MOBILE HOME PARKS
PARKS
PASTURELAND (GOOD B1)
PATIO HOME
POINT CADET DEVELOPMENT CORPORATION
PREFAB. METAL BUILDING (COMM.)
PREFAB. METAL BUILDING (FARM)
PROFESSIONAL SERVICE BUILDINGS
PROFESSIONAL SVCS. BUILDINGS
RECREATIONAL - CLASSIFIED USE
RECREATIONAL (LOW PARTITIONS)
RECREATIONAL ACTIVITIES
RELIGIOUS SERVICES
RENTAL-SERVICES
REPAIR SERVICE SHOPS
REPAIR SERVICES
REPAIR SHOPS (NOT AUTOMOTIVE)
RESIDENTIAL
RESTAURANT
RESTAURANTS
RESTAURANTS(ALCOHOLIC BEVERAGES)-RE
RESTAURANTS(CARRY-OUT SERVICE)-RETA
RESTAURANTS(CURB SERVICE)-RETAIL
RESTAURANTS, CAFETERIAS
RESTAURANTS-GENERAL
RETAIL TRADE-AUTOMOTIVE, MARINE CRA
RIGHTS-OF-WAY/STREETS/DITCHES
RIVERS AND LAKES
RIVERS/LAKES/SUBMERGED LANDS
SERVICE STATIONS
SERVICE STATIONS-RETAIL
SERVICES-OTHER

027519

SEWAGE DISPOSAL, SOLID WASTE, BORROW PITS, DRAINAGE RESERVOIRS,
WASTE LAND, MARSH, SAND DUNES, SWAMPS
SEWAGE DISPOSAL/LANDFILLS/MARSH
SINGLE FAMILY RESIDENCE
SINGLE FAMILY RESIDENTIAL
STORE (RETAIL TRADE)
STORES, ONE STORY
TIMBER (AVG)
TIMBER (GOOD)
TIMBER (POOR)
TIMBERLAND
TIMBERLAND (FAIR)
TIMBERLAND (POOR)
TIME SHARING COMPLEX
TOURIST ATTRACTIONS
TOWNHOUSE
TOWNHOUSE - SINGLE FAMILY
TWO FAMILY UNITS
UNDEFINED (DOR USE ONLY)
UNDEVELOPED AND UNUSED LAND
UNDEVELOPED LAND & WATER AREAS
UNION,FRATERNAL,CIVIC SERVICE FACIL
UNKNOWN COMMERCIAL
UNKNOWN LANDUSE
VACANT COMMERCIAL
VACANT FLOOR AREA, COMMERCIAL
VACANT INDUSTRIAL
VACANT IZ LAND (PAVE RD)
VACANT LAND NOT SUITABLE FOR DEVELO
VACANT LAND SUITABLE FOR DEVELOPMEN
VACANT MULTIFAMILY RESIDENTIAL
VACANT RESIDENTIAL
VACANT RESIDENTIAL LOT
VACANT RESIDENTIAL SUBDIVISION
VACANT ST RURAL LAND (NO ROAD)
VACANT ST RURAL LAND (PAVE RD)
VACANT WATERFRONT
VACANT/UNDEVELOPED LAND
WAREHOUSE
WAREHOUSING AND STORAGE
WAREHOUSING, DISTRIBUTION TERMINALS, TRUCKING TERMINALS
WAREHOUSING/TRUCKING TERMINALS
WATERFRONT IMPROVED

027520

027521

**Compensation Framework for Coastal Real Property Claims**
**Appendix D**
**Eligible Parcel Compensation Category Map**

The **Eligible Parcel Compensation Category Map** is found in a separate document.

027522

**Compensation Framework for Coastal Real Property Claims**
**Appendix E**
**Coastal Real Property Claim Form**

1. Are you claiming you are entitled to compensation for one or more parcels you <u>owned</u> during the time period April 20, 2010 to December 31, 2010 under the **Compensation Framework for Coastal Real Property Claims**?

_____ Yes       _____ No

2. Are you claiming you are entitled to compensation for one or more parcels you <u>leased</u> during the time period April 20, 2010 to December 31, 2010 under the **Compensation Framework for Coastal Real Property Claims**?

_____ Yes       _____ No

3. If you answered yes to Question 1 or 2 above, are you also claiming you are entitled to compensation for physical damage that occurred to your real or personal property located on your parcel(s) in connection with the DWH Spill response clean-up operations during the time period April 20, 2010 to December 31, 2010?

_____ Yes       _____ No

*If you answered yes to any of the questions above, (i) answer the questions below, (ii) provide the documentation required in the* **Document Requirements** *form (Appendix F), and (iii) complete a* **Coastal Real Property Verification Statement** *(Appendix G).*

4. What is the street address of the parcel(s)?

_____

_____

5. What is the tax assessment identification number of the parcel(s)?

_____

_____

027523

6. What is the parcel identification number of the parcel(s)?

_____

_____

7. If you owned the parcel(s) and leased it during the time period April 21, 2010 to December 31, 2010, when did the lease begin?

_____

_____

_____

8. If you owned the parcel(s) and leased it during the time period April 21, 2010 to December 31, 2010, when did the lease end?

_____

_____

9. If you were a lessee of the parcel(s) and you leased it during some time period between April 21, 2010 and December 31, 2010, when did the lease begin?

_____

_____

10. If you were a lessee of the parcel(s) and you leased it during some time period between April 21, 2010 and December 31, 2010, when did the lease end?

_____

_____

*You must only answer the following questions if you claim you are entitled to compensation for physical damage that occurred to your real or personal property located on your parcel(s).*

027524

11. Identify and describe the real or personal property that you claim was physically damaged in connection with the DWH Spill response cleanup operations.

_____

_____

_____

_____

_____

_____

12. Describe the physical damage that you claim occurred to your real or personal property located on your parcel(s) in connection with the DWH Spill response clean-up operations.

_____

_____

_____

_____

_____

13. Where on your parcel was your real or personal property located when the damage occurred?

_____

_____

_____

14. When did the physical damage to your real or personal property occur?

027525

_____

_____

15. Describe in detail what caused the physical damage to your real or personal property.

_____

_____

_____

_____

_____

16. If you know, who caused the physical damage to your real or personal property?

_____

_____

17. If you know, were the DWH Spill response cleanup operations that you claim caused the physical damage to your real or personal property consistent with the National Contingency Plan or specifically ordered by the Federal On-Scene Coordinator or delegates thereof?

_____ Yes       _____ No        _____ I Don't Know

18. Describe the condition of the real or personal property prior to the damage you claim occurred.

_____

_____

_____

19. Did you own the real or personal property that you claim was damaged at the time the damage occurred?

_____ Yes       ___ No

027526

20. Have you already incurred the cost to repair or replace the real or personal property that you claim was physically damaged?

<div align="center">

_____ Yes        ___ No
</div>

21. If your answer to Question 20 is yes, please identify the following:

    a.   Was the damaged property repaired or replaced?

        _____

    b.   If the damaged property was replaced, state the reasons that the property was replaced instead of being repaired.

        _____

        _____

        _____

    c.   If the damaged property was replaced, state the name and address of the individual or business from which the replacement was obtained and the cost you incurred to replace the property.

        _____

        _____

        _____

    d.   If the damaged property was repaired, state the name and address and telephone number of the individual or business that did the repairs, the cost you incurred to repair the property, and identify the repairs that were done.

        _____

        _____

        _____

22. If the answer to Question 20 is no, please identify the following:

027527

a. State whether the damaged property can be repaired?

_____ Yes        ___ No

b. If the damaged property can be repaired, have you obtained a cost estimate to repair the damaged property?

_____ Yes        ___ No

c. If you have obtained a cost estimate to repair the damaged property, state the name address and phone number of the individual or entity that provided the cost estimate, what repairs are being done and the amount of the cost estimate for the repairs.

_____

_____

_____

d. If you claim that the damaged property cannot be repaired, explain the reasons for your claim.

_____

_____

_____

_____

_____

027528

**Compensation Framework for Coastal Real Property Claims**
**Appendix F**
**Coastal Real Property Claim Form**
**Document Requirements**

*To receive compensation under the* **Compensation Framework for Coastal Real Property Claims** *you <u>must</u> provide copies of the documents described below.*

1. Owners of parcel(s) seeking compensation under the **Compensation Framework for Coastal Real Property Claims** must provide the following:

    a. Official copy of the deed for the parcel for which you are seeking compensation showing that you are the owner of the parcel.

        i. To the extent a state, county, municipality or other governmental agency agrees to provide the Claims Administrator with access to an official database sufficient for the Claims Administrator to confirm the claimant owned the parcel for which they are seeking compensation, the Claims Administrator need not require from the claimant an official copy of the deed or official copy of the 2010 property tax assessment notice for the parcel for which they are seeking compensation. Rather, the Claims Administrator is authorized to accept from the claimant the street address and tax identification number or parcel identification number for the parcel for which they are seeking compensation as sufficient to satisfy this subpart, and the Claims Administrator will use the database to confirm the claimant's valid ownership during the time period April 20, 2010 to December 31, 2010

    b. Official copy of the 2010 property tax assessment notice for the parcel for which you are seeking compensation.[7]

        i. To the extent a state, parish, municipality or other governmental agency agrees to provide the Claims Administrator with access to an official database sufficient for the Claims Administrator to confirm the claimant owned the parcel for which they are seeking compensation, the Claims Administrator need not require from the claimant an official copy of the deed or official copy of the 2010 property tax assessment notice for the parcel for which they are seeking compensation. Rather, the Claims Administrator is authorized to accept from the claimant the street address and tax identification number or parcel identification number for the parcel for which they are seeking compensation as sufficient to satisfy this subpart, and the Claims

---

[7] In some counties, issuance of 2010 tax assessment notices may occur prior to April 20, 2010 such that the correct owner of the eligible parcel may not be reflected, (for example if notices were mailed January 2010 but ownership changed February 2010). In such a case, a claimant may provide other documentation such as a copy of the real estate closing/settlement statement from a sale, in order to prove ownership.

027529

Administrator will use the database to confirm the claimant's valid ownership during the time period April 20, 2010 to December 31, 2010

c.   If you owned a parcel that you leased for a period of 60 days or longer during the time period April 20, 2010 and December 31, 2010 and the lease was executed prior to April 20, 2010, provide copies of the executed lease for any time period during April 20, 2010 and December 31, 2010.

d.   If you believe your parcel should be added to the **Coastal Real Property Claim Zone** (see Section 1. E.), documentation showing a parcel contains the presence of oil pursuant to **SCAT** or by an official assessment conducted by the Natural Resource Trustees in connection with the DWH Spill.

e.   If your parcel is not identified in the **Coastal Real Property Claim Zone** and should be (see Section 1. F. i.), an official document provided by the county tax assessor, Clerk of Court, Registrar of Lands or other governmental lands office or agency, or a professional survey of the parcel showing actual presence of the parcel within the **Coastal Real Property Claim Zone**.

f.   If your parcel has a County Land Use Designation listed in Appendix C but that is not reflected in the **Administrator's Database** (see Section 1. G.), documentation for the county tax assessor, Clerk of Court, Registrar of Lands or other governmental lands office or agency sufficient to show that the parcel does in fact have a County Land Use Designation listed in Appendix C.

g.   If you believe your parcel should be reclassified from **Compensation Category B1 or B2** to **Compensation Category A1 or A2** (see Section 1. H. i.), independent documentation in the form of a government or academic report, not commissioned by the **Eligible Claimant** or the **Eligible Claimant's** attorney or agent, with said independent documentation establishing that the **Eligible Parcel** contains the presence of oil released by the DWH Spill.

h.   If you believe your parcel is on a shoreline with a primary **ESI** classification of 10A (salt and brackish (coastal marshes)), 10B (freshwater marshes), 10C (freshwater swamps) or 10D (scrub-shrub wetlands (includes mangroves)) as determined by the NOAA, but that is not reflected in the **Administrator's Database** (see Section 1. H. ii.), documentation from NOAA showing that the **Eligible Parcel** is on a shoreline with a primary ESI classification of 10A, 10B, 10C or 10D.

i.   If you believe your parcel's **County Appraised Value** is net of a Homestead Exemption (See Section 2. D. i.), documentation showing the **Eligible Parcel's County Appraised Value** is net of a Homestead Exemption, and the amount of such Homestead Exemption.

j.   If your parcel has a County Land Use Designation listed in Appendix H but that is not reflected in the **Administrator's Database** (See Section 2. E. ii.), documentation

027530

from the county tax assessor, Clerk of Court, Registrar of Lands or other governmental lands office or agency that the parcel does in fact have a County Land Use Designation listed in Appendix H.

k.  Completed **Verification Statement**.

2.  Lessees of Parcel(s) seeking compensation under the **Compensation Framework for Coastal Real Property Claims** must provide the following:

   a.  Executed lease agreement showing possession of the **Eligible Parcel** for a period of 60 days or longer during the time period April 20, 2010 and December 31, 2010 and was executed prior to April 20, 2010.

   b.  Documents reflecting the lease payment(s) made for any time period during April 20, 2010 and December 31, 2010.

   c.  If you believe your parcel should be added to the **Coastal Real Property Claim Zone** (see Section 1. E.), documentation showing a parcel contains the presence of oil pursuant to **SCAT** or by an official assessment conducted by the Natural Resource Trustees in connection with the DWH Spill.

   d.  If your parcel is not identified in the **Coastal Real Property Claim Zone** and should be (see Section 1. F. i.), an official document provided by the county tax assessor, Clerk of Court, Registrar of Lands or other governmental lands office or agency, or a professional survey of the parcel showing actual presence of the parcel within the **Coastal Real Property Claim Zone**.

   e.  If your parcel has a County Land Use Designation listed in Appendix C but that is not reflected in the **Administrator's Database** (see Section 1. G.), documentation for the county tax assessor, Clerk of Court, Registrar of Lands or other governmental lands office or agency sufficient to show that the parcel does in fact have a County Land Use Designation listed in Appendix C.

   f.  If you believe your parcel should be reclassified from **Compensation Category B1 or B2** to **Compensation Category A1 or A2** (see Section 1. H. i.), independent documentation in the form of a government or academic report, not commissioned by the **Eligible Claimant** or the **Eligible Claimant's** attorney or agent, with said independent documentation establishing that the **Eligible Parcel** contains the presence of oil released by the DWH Spill.

   g.  If you believe your parcel is on a shoreline with a primary **ESI** classification of 10A (salt and brackish (coastal marshes)), 10B (freshwater marshes), 10C (freshwater swamps) or 10D (scrub-shrub wetlands (includes mangroves)) as determined by the NOAA, but that is not reflected in the **Administrator's Database** (see Section 1. H. ii.), documentation from NOAA showing that the **Eligible Parcel** is on a shoreline with a primary ESI classification of 10A, 10B, 10C or 10D.

027531

    h.  If you believe your parcel's **County Appraised Value** is net of a Homestead Exemption (See Section 2. D. i.), documentation showing the **Eligible Parcel's County Appraised Value** is net of a Homestead Exemption, and the amount of such Homestead Exemption.

    i.  If your parcel has a County Land Use Designation listed in Appendix H but that is not reflected in the **Administrator's Database** (See Section 2. E. ii.), documentation from the county tax assessor, Clerk of Court, Registrar of Lands or other governmental lands office or agency that the parcel does in fact have a County Land Use Designation listed in Appendix H.

    j.  **Completed Verification Statement**.

3.  Owners or Lessees of parcel(s) seeking compensation for physical damage to real or personal property pursuant to Section 3. B. of the **Compensation Framework for Coastal Real Property Claims**, <u>must</u> provide the Claims Administrator proof of the items below. Proof may consist of documents, receipts, photographs, videotaped footage, a sworn statement from the claimant and/or sworn statements from a witness(es).

    a.  The claimed physical damage to your real or personal property occurred on a parcel listed in the **Claim Form**.

    b.  The physical damage occurred between April 20, 2010 and [date of settlement agreement].

    c.  The condition of the real or personal property prior to the claimed physical damage.

    d.  You owned the real or personal property at the time the physical damage occurred.

    e.  The physical damage was caused by DWH Spill response cleanup operations.

    f.  If you claim to have incurred costs to repair or replace the damaged property, evidence to establish that the costs were incurred by you and that they were reasonable and necessary.

    g.  If you are seeking compensation for costs not yet incurred to repair or replace the damaged property, a cost estimate and proof the costs are reasonable and necessary.

027532

**Compensation Framework for Coastal Real Property Claims**
**Appendix G**
**Coastal Real Property Verification Statement**

<u>For parcel owners</u>, please check the box that applies:

| | |
|---|---|
| | 1.  I owned and <u>did not</u> lease my parcel at any time during the period April 20, 2010 to December 31, 2010. |
| | 2.  I owned and <u>did</u> lease my parcel for more than 60 days during the time period April 20, 2010 to December 31, 2010. |

<u>For parcel owners</u>, if you checked box #2, please provide the name(s) of the lessee(s) and time period of the lease(s).

| | Name of Lessee | Dates of Lease |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |

<u>For parcel lessees</u>, please check the box if applicable:

| | |
|---|---|
| | 1.  I leased my parcel for more than 60 days during the time period April 20, 2010 to December 31, 2010. |

027533

<u>For parcel lessees</u>, please provide the name of the owner of the parcel and time period of the lease.

| | Name of Owner | Dates of Lease |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |

I declare and affirm under penalty of perjury under the laws of the United States of America that the foregoing are true and correct.

_____

Name

_____

Signature

_____

Date

027534

**Compensation Framework for Coastal Real Property Claims**

**Appendix H**

**Calculation Examples for Coastal Real Property Compensation Amounts[8]**

| Compensation Category A1 | | | | | |
|---|---|---|---|---|---|
| A | B | C | D | E | F |
| | | | D = B * C | | F = D * E |
| Property | 2010 County Appraised Value | Applicable Real Property Tax Rate | 2010 Applicable Property Taxes | Applicable Percentage for Compensation Category A1 | Coastal Real Property Compensation Amount |
| Property A - ESI 2B | $350,000 | 1.18% | $4,130 | 40.0% | $1,652 |

| Compensation Category A2 | | | | | |
|---|---|---|---|---|---|
| A | B | C | D | E | F |
| | | | D = B * C | | F = D * E |
| Property | 2010 County Appraised Value | Applicable Real Property Tax Rate | 2010 Applicable Property Taxes | Applicable Percentage for Compensation Category A2 | Coastal Real Property Compensation Amount |
| Property B - ESI 10B | $350,000 | 1.18% | $4,130 | 45.0% | $1,859 |

| Compensation Category B1 | | | | | |
|---|---|---|---|---|---|
| A | B | C | D | E | F |
| | | | D = B * C | | F = D * E |
| Property | 2010 County Appraised Value | Applicable Real Property Tax Rate | 2010 Applicable Property Taxes | Applicable Percentage for Compensation Category B1 | Coastal Real Property Compensation Amount |
| Property C - ESI 6A | $350,000 | 1.18% | $4,130 | 30.0% | $1,239 |

| Compensation Category B2 | | | | | |
|---|---|---|---|---|---|
| A | B | C | D | E | F |
| | | | D = B * C | | F = D * E |
| Property | 2010 County Appraised Value | Applicable Real Property Tax Rate | 2010 Applicable Property Taxes | Applicable Percentage for Compensation Category B1 | Coastal Real Property Compensation Amount |
| Property D - ESI 10D | $350,000 | 1.18% | $4,130 | 35.0% | $1,446 |

---

[8] The final compensation amount shown in this Appendix is exclusive of an RTP of 2.50.

027535

**Compensation Framework for Coastal Real Property Claims**

**Appendix I**

**County Land Use Designations Eligible for Minimum Compensation**

APARTMENT (LOW RISE SINGLE BLDG)
APARTMENTS, DUPLEX
COMMON AREAS
CONDOMINIA
CONDOMINIUM
CONDOMINIUM RES.(HIGH RISE)
CONDOMINIUM RES.(LOW RISE)
CONDOMINIUM, MASTER CARD
DUPLEX RESIDENCE
MANUFACTURING HOMES
MASTER CARD
MISCELLANEOUS RESIDENTIAL
MOBILE HOMES
MOBILE HOMES (SINGLE TRAILER)
MULTI-FAMILY
MULTI-FAMILY (UNDER 10 UNITS)
MULTI-FAMILY 1O UNITS OR MORE
MULTI-FAMILY LESS THAN 10 UNITS
ONE FAMILY UNIT
PATIO HOME
RESIDENTIAL
SINGLE FAMILY RESIDENCE
SINGLE FAMILY RESIDENTIAL
TOWNHOUSE
TOWNHOUSE - SINGLE FAMILY
TWO FAMILY UNITS
WATERFRONT IMPROVED
MULTI-FAMILY (10 UNITS OR MORE)

027536

## Compensation Framework for Coastal Real Property Claims
## Appendix J
## Calculations Examples for Minimum Coastal Real Property Compensation Amounts[9]

| | | | | Compensation Category A1 | | | |
|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H |
| | | | D = B * C | | F = D * E | | |
| Property | 2010 County Appraised Value | Applicable Real Property Tax Rate | 2010 Applicable Property Taxes | Applicable Percentage for Compensation Category A1 | Coastal Real Property Compensation Amount | Minimum Coastal Real Property Compensation Amount (A1) | Actual Coastal Real Property Compensation Amount * |
| Property A - ESI 7 | $180,000 | 1.18% | $2,124 | 40.0% | $850 | $1,000 | $1,000 |

* The higher between the Coastal Real Property Compensation Amount and the Minimum Coastal Real Property Compensation Amount (A1)

| | | | | Compensation Category A2 | | | |
|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H |
| | | | D = B * C | | F = D * E | | |
| Property | 2010 County Appraised Value | Applicable Real Property Tax Rate | 2010 Applicable Property Taxes | Applicable Percentage for Compensation Category A2 | Coastal Real Property Compensation Amount | Minimum Coastal Real Property Compensation Amount (A2) | Actual Coastal Real Property Compensation Amount * |
| Property B - ESI 10A | $180,000 | 1.18% | $2,124 | 45.0% | $956 | $1,100 | $1,100 |

* The higher between the Coastal Real Property Compensation Amount and the Minimum Coastal Real Property Compensation Amount (A2)

| | | | | Compensation Category B1 | | | |
|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H |
| | | | D = B * C | | F = D * E | | |
| Property | 2010 County Appraised Value | Applicable Real Property Tax Rate | 2010 Applicable Property Taxes | Applicable Percentage for Compensation Category B1 | Coastal Real Property Compensation Amount | Minimum Coastal Real Property Compensation Amount (B1) | Actual Coastal Real Property Compensation Amount * |
| Property C - ESI 3B | $180,000 | 1.18% | $2,124 | 30.0% | $637 | $800 | $800 |

* The higher between the Coastal Real Property Compensation Amount and the Minimum Coastal Real Property Compensation Amount (B1)

| | | | | Compensation Category B2 | | | |
|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H |
| | | | D = B * C | | F = D * E | | |
| Property | 2010 County Appraised Value | Applicable Real Property Tax Rate | 2010 Applicable Property Taxes | Applicable Percentage for Compensation Category B1 | Coastal Real Property Compensation Amount | Minimum Coastal Real Property Compensation Amount (B2) | Actual Coastal Real Property Compensation Amount * |
| Property D - ESI 10C | $180,000 | 1.18% | $2,124 | 35.0% | $743 | $800 | $800 |

* The higher between the Coastal Real Property Compensation Amount and the Minimum Coastal Real Property Compensation Amount (B2)

---

[9] The final compensation amount shown in this Appendix is exclusive of an RTP of 2.50.

027537

# EXHIBIT 11B

# Appendix A to Compensation Framework for Coastal Real Property Claims:
# Coastal Real Property Claim Zone Map

025288

## Louisiana, Mississippi, Alabama, Florida



Appendix A: Coastal Real Property Claim
Zone Map

2

025289

# Hancock County, MS (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

025290

## Hancock County, MS (Detailed Portion 1)



Appendix A: Coastal Real Property Claim
Zone Map

4

025291

## Hancock County, MS (Detailed Portion 2)



Appendix A: Coastal Real Property Claim
Zone Map

5

025292

## Hancock County, MS (Detailed Portion 3)



Appendix A: Coastal Real Property Claim Zone Map

025293

## Harrison County, MS (Entire County)



025294

## Harrison County, MS (Detailed Portion 1)



Appendix A: Coastal Real Property Claim
Zone Map

8

025295

## Harrison County, MS (Detailed Portion 2)



Appendix A: Coastal Real Property Claim
Zone Map

9

025296

## Harrison County, MS (Detailed Portion 3)



Appendix A: Coastal Real Property Claim
Zone Map

10

025297

## Harrison County, MS (Detailed Portion 4)



025298

## Harrison County, MS (Detailed Portion 5)



Appendix A: Coastal Real Property Claim
Zone Map

12

025299

# Jackson County, MS (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

13

025300

## Jackson County, MS (Detailed Portion 1)



Appendix A: Coastal Real Property Claim
Zone Map

14

025301

## Jackson County, MS (Detailed Portion 2)



Appendix A: Coastal Real Property Claim
Zone Map

15

025302

## Jackson County, MS (Detailed Portion 3)



Appendix A: Coastal Real Property Claim
Zone Map

16

025303

## Jackson County, MS (Detailed Portion 4)



Appendix A: Coastal Real Property Claim
Zone Map

17

025304

## Mobile County, AL (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

025305

## Mobile County, AL (Detailed Portion 1)



Appendix A: Coastal Real Property Claim
Zone Map

19

025306

## Mobile County, AL (Detailed Portion 2)



Appendix A: Coastal Real Property Claim
Zone Map

20

025307

## Mobile County, AL (Detailed Portion 3)



Appendix A: Coastal Real Property Claim
Zone Map

21

025308

## Mobile County, AL (Detailed Portion 4)



Appendix A: Coastal Real Property Claim
Zone Map

22

025309

## Baldwin County, AL (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

23

025310

## Baldwin County, AL (Detailed Portion 1)



Appendix A: Coastal Real Property Claim
Zone Map

24

025311

## Baldwin County, AL (Detailed Portion 2)



Appendix A: Coastal Real Property Claim
Zone Map

25

025312

## Escambia County, FL (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

26

025313

## Escambia County, FL (Detailed Portion 1)



025314

## Escambia County, FL (Detailed Portion 2)



Appendix A: Coastal Real Property Claim
Zone Map

28

025315

## Santa Rosa County, FL (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

29

025316

## Santa Rosa County, FL (Detailed Portion 1)



Appendix A: Coastal Real Property Claim
Zone Map

30

025317

## Santa Rosa County, FL (Detailed Portion 2)



Appendix A: Coastal Real Property Claim
Zone Map

31

025318

## Okaloosa County, FL (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

32

025319

## Okaloosa County, FL (Detailed Portion 1)



## Okaloosa County, FL (Detailed Portion 2)



Appendix A: Coastal Real Property Claim
Zone Map

34

025321

## Walton County, FL (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

025322

## Walton County, FL (Detailed Portion 1)



025323

## Walton County, FL (Detailed Portion 2)



025324

## Walton County, FL (Detailed Portion 3)



Appendix A: Coastal Real Property Claim
Zone Map

38

025325

## Walton County, FL (Detailed Portion 4)



025326

## Walton County, FL (Detailed Portion 5)



025327

## Bay County, FL (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

41

025328

## Bay County, FL (Detailed Portion 1)



Appendix A: Coastal Real Property Claim
Zone Map

42

025329

## Bay County, FL (Detailed Portion 2)



025330

## Bay County, FL (Detailed Portion 3)



Appendix A: Coastal Real Property Claim
Zone Map

44

025331

## Bay County, FL (Detailed Portion 4)



Appendix A: Coastal Real Property Claim
Zone Map

45

025332

## Bay County, FL (Detailed Portion 5)



025333

## Bay County, FL (Detailed Portion 6)



025334

## Gulf County, FL (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

48

025335

## Gulf County, FL (Detailed Portion 1)



025336

## Gulf County, FL (Detailed Portion 2)



Appendix A: Coastal Real Property Claim
Zone Map

50

025337

## Gulf County, FL (Detailed Portion 3)



Appendix A: Coastal Real Property Claim
Zone Map

51

025338

## Gulf County, FL (Detailed Portion 4)



Appendix A: Coastal Real Property Claim
Zone Map

52

025339

## Franklin County, FL (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

53

025340

## Franklin County, FL (Detailed Portion 1)



025341

## Franklin County, FL (Detailed Portion 2)



025342

## Franklin County, FL (Detailed Portion 3)



025343

## Franklin County, FL (Detailed Portion 4)



Appendix A: Coastal Real Property Claim
Zone Map

57

025344

## Franklin County, FL (Detailed Portion 5)



Appendix A: Coastal Real Property Claim
Zone Map

025345

# Franklin County, FL (Detailed Portion 6)



025346

# Franklin County, FL (Detailed Portion 7)



Appendix A: Coastal Real Property Claim
Zone Map

025347

## Franklin County, FL (Detailed Portion 8)



Appendix A: Coastal Real Property Claim
Zone Map

61

025348

## Franklin County, FL (Detailed Portion 9)



025349

# Franklin County, FL (Detailed Portion 10)



025350

## Franklin County, FL (Detailed Portion 11)



Appendix A: Coastal Real Property Claim
Zone Map

64

025351

## Wakulla County, FL (Entire County)



Appendix A: Coastal Real Property Claim
Zone Map

65

025352

## Wakulla County, FL (Detailed Portion 1)



Appendix A: Coastal Real Property Claim
Zone Map

66

025353

## Wakulla County, FL (Detailed Portion 2)



025354

## Grand Isle, LA (Entire Island)



Appendix A: Coastal Real Property Claim
Zone Map

68

025355

# EXHIBIT 11C

# Appendix D to Compensation Framework for Coastal Real Property Claims:
# Eligible Parcel Compensation Category Map

1

025356

## Hancock County, MS (Entire County)



025357

## Hancock County, MS (Detailed Portion 1)



025358

## Hancock County, MS (Detailed Portion 2)



025359

## Hancock County, MS (Detailed Portion 3)



025360

## Hancock County, MS (Detailed Portion 4)



025351

## Hancock County, MS (Detailed Portion 5)



Legend:
- Public
- Zone A 1
- Zone A 2
- Zone B 1
- Zone B 2

025362

## Hancock County, MS (Detailed Portion 6)



025363

## Harrison County, MS (Entire County)



025364

## Harrison County, MS (Detailed Portion 1)



10

025365

Harrison County, MS (Detailed Portion 2)



025366

## Harrison County, MS (Detailed Portion 3)



12

025357

## Harrison County, MS (Detailed Portion 4)



13

025368

Harrison County, MS (Detailed Portion 5)



Public
Zone A 1
Zone A 2
Zone B 1
Zone B 2

14

025359

## Harrison County, MS (Detailed Portion 6)



15

025370

## Harrison County, MS (Detailed Portion 7)



| | |
|---|---|
| | Public |
| | Zone A 1 |
| | Zone A 2 |
| | Zone B1 |
| | Zone B2 |

16

025371

## Jackson County, MS (Entire County)



17

025372

Case 2:10-md-02179-CJB-SS   Document 6430-25   Filed 05/03/12   Page 19 of 144

## Jackson County, MS (Detailed Portion 1)



025373

## Jackson County, MS (Detailed Portion 2)



025374

Jackson County, MS (Detailed Portion 3)



20

025375

Case 2:10-md-02179-CJB-SS   Document 6430-25   Filed 05/03/12   Page 22 of 144

## Jackson County, MS (Detailed Portion 4)



Public
Zone A 1
Zone A 2
Zone B 1
Zone B 2

21

025376

## Jackson County, MS (Detailed Portion 5)



Public
Zone A 1
Zone A 2
Zone B 1
Zone B 2

22

025377

## Jackson County, MS (Detailed Portion 6)



Legend:
- Public
- Zone A 1
- Zone A 2
- Zone B 1
- Zone B 2

23

025378

Jackson County, MS (Detailed Portion 7)



025379

## Mobile County, AL (Entire County)



25

025380

## Mobile County, AL (Detailed Portion 1)



## Mobile County, AL (Detailed Portion 2)



27

025382

## Mobile County, AL (Detailed Portion 3)



Public
Zone A 1
Zone A 2
Zone B1
Zone B2

28

025383

## Mobile County, AL (Detailed Portion 4)



025384

## Mobile County, AL (Detailed Portion 5)



Public
Zone A 1
Zone A 2
Zone B 1
Zone B 2

30

025385

## Mobile County, AL (Detailed Portion 6)



025386

Mobile County, AL (Detailed Portion 7)





32

025387

## Mobile County, AL (Detailed Portion 8)



025388

## Baldwin County, AL (Entire County)



025389

## Baldwin County, AL (Detailed Portion 1)



35

025390

## Baldwin County, AL (Detailed Portion 2)



025391

## Baldwin County, AL (Detailed Portion 3)



Public
Zone A 1
Zone A 2
Zone B1
Zone B2

37

025392

## Baldwin County, AL (Detailed Portion 4)



Legend:
- Public
- Zone A 1
- Zone A 2
- Zone B 1
- Zone B 2

38

025393

Baldwin County, AL (Detailed Portion5)



025394

## Baldwin County, AL (Detailed Portion 6)



025395

Baldwin County, AL (Detailed Portion 7)



41

025396

Baldwin County, AL (Detailed Portion 8)





42

025397

## Baldwin County, AL (Detailed Portion 9)



43

025398

## Baldwin County, AL (Detailed Portion 10)



44

025399

Baldwin County, AL (Detailed Portion 11



45

025400

## Baldwin County, AL (Detailed Portion 12)



025401

## Baldwin County, AL (Detailed Portion 13)



025402

Baldwin County, AL (Detailed Portion 14)



025403

## Baldwin County, AL (Detailed Portion 15)



49

025404

## Baldwin County, AL (Detailed Portion 16)



025405

## Escambia County, FL (Entire County)





| | |
|---|---|
| ☐ | Public |
| ☐ | Zone A 1 |
| ☐ | Zone A 2 |
| ☐ | Zone B 1 |
| ☐ | Zone B 2 |

51

025406

## Escambia County, FL (Detailed Portion 1)



52

025407

## Escambia County, FL (Detailed Portion 2)



025408

## Escambia County, FL (Detailed Portion 3)



025409

## Escambia County, FL (Detailed Portion 4)



025410

## Escambia County, FL (Detailed Portion 5)



025411

## Escambia County, FL (Detailed Portion 6)



026412