# ATTACHMENT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: Oil Spill by the Oil Rig | * | MDL No. 2179 |
| "Deepwater Horizon" in the Gulf | * | |
| of Mexico, on April 20, 2010 | * | SECTION "J" |
| | * | |
| This Document Relates To: | * | JUDGE BARBIER |
| No. 12-970 | * | |
| | * | MAGISTRATE SHUSHAN |

**Review of Issue from Panel (Matching of Revenue and Expenses)**

Before the Court is a motion by BP, asking the Court to review and reverse the Claims

Administrator's January 15, 2013 policy decision interpreting certain portions of the Economic

Settlement Agreement.[1]

Accordingly, the Court has re-visited the issue of whether the Claims Administrator has

correctly interpreted the terms of the Economic and Property Damage Settlement Agreement as it

applies to the calculation of "Variable Profit" for Business Economic Loss Claims.

After fully reviewing the additional materials submitted by the parties and the relevant

portions of the Settlement Agreement, the Court affirms the Claims Administrator's interpretation

as set forth in the January 15, 2013 Announcement of Policy Decisions Regarding Claims

Administration.

Nowhere does the Agreement state or indicate that revenue and expenses must be "matched"

or revenues "smoothed," nor does it state that one should inquire into when revenue was "earned."

---

[1]Following the vacation of the Court's prior ruling in an email dated January 30, 2013, the parties have made further submissions to the Court and have met with Dan Balhoff, court appointed neutral, both privately and jointly. Mr. Balhoff also had the opportunity to meet with the Claims Administrator, Pat Juneau, and representatives of his professional accounting staff. The Court met with Mr. Balhoff on February 19, 2013 and received a report from him regarding his efforts. Mr. Balhoff reported that there is no likelihood of a negotiated resolution of the dispute. The fees of Mr. Balhoff for his participation in attempting to resolve this dispute shall be paid by BP as part of the cost of claims administration.

Rather, the provisions of Exhibit 4C and 4A, when read together, support the Claims Administrator's interpretation.

For example, Step 1 of the of Exhibit 4C's Compensation Framework states:

Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the ***comparable*** months of the Benchmark period.

Exhibit 4C p. 3 (emphasis added); *see also id.* at 1 ("**Step 1** – Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the ***comparable*** months of the Benchmark Period. Step 1 compensation reflects the reduction in Variable Profit (which reflects claimant's revenue less its variable costs) over this period." (emphasis added)). The meaning of "comparable" is illustrated by the examples provided in Exhibit 4C:

Scenario 1:
1) Claimant selected the months of May-July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009 and 2007-2009;
2) In determining Compensation, Claimant would be allowed to select the months of August through November 2010 ***as compared to the months*** of August through November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years – whichever provides the highest compensation.

Scenario 2:
1) Claimant selected the months of October – December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009;
2) In determining compensation, Claimant could select the months of May-September 2010 ***as compared to the months*** of May-September in either 2009 or 2008-2009 – whichever provides the highest compensation.

Scenario 3:
1) Claimant selected the months of June – August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period year of 2009. In addition, Claimant selected the months of August – October 2010 for the purpose of determining causation, and the

claimant, using these months, meets the causation test for the Benchmark period years of 2007-2009;

2) In determining compensation, Claimant could select the months of May-December 2010 *as compared to the months* of May-December in either 2009 or 2007-2009 – whichever provides the highest compensation.

Exhibit 4C, Addendum.  These examples make clear that the same months of the Compensation Period are to be compared with the months in the Benchmark period; not, as BP urges, that the Claims Administrator's accountants should seek out months where the claimant engaged in comparable activity.  Notably, this is the exact interpretation BP advocated while the parties negotiated the Settlement Agreement:

> The word "comparable" and phrase "comparable months of" is used throughout the document in the context of comparing the months selected by the Claimant in 2010 to compare against the *same months* in the Benchmark Period.

E-mail from Richard Godfrey to Joe Rice and Calvin Fayard (Feb. 17, 2012), Ex. 3 to PSC Submission (emphasis added).

The heart of this dispute, however, appears to center on the word "corresponding" as it is used in the calculation of "Variable Profit" (which, in turn, is used in Step 1 of the Compensation Framework):

> Variable Profit: This is calculated for both the Benchmark Period and the Compensation Period as follows:
> 1. Sum the monthly revenue over the period.
> 2. Subtract the *corresponding* variable expenses from revenue *over the same time period*. . . .

Exhibit 4C at 2 (emphasis added).  The question is whether variable expenses must correspond to the revenue those expenses produced, as BP contends, or whether variable expenses must correspond to "the same time period," as Class Counsel contends.  BP claims that Class Counsel's interpretation ignores "corresponding;" Class Counsel claims that BP's interpretation ignores "the same time

period."

The Court adopts Class Counsel's interpretation as it is most in line with the rest of the

Settlement Agreement.  For example, the documentation provisions contained within Exhibit 4A

make it clear that the Program's analysis is to be based on revenue and expenses during the relevant

periods chosen by the claimant, as reflected in historical business records. Specifically, the

Framework requires:

> Monthly and annual profit and loss statements (which identify individual expense
> line items and revenue categories), or alternate source documents ***establishing
> monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if
> applicable, 2011.***

Exhibit 4A ¶ 4 (emphasis added, footnotes omitted).  If expenses had to be "matched" to revenues,

then the Settlement Program would potentially need to consider financials that pre-date the

Benchmark Period.  Likewise, Exhibit 4A does not require that accounting occur on an "accrual"

basis, as opposed to a "cash" basis.[2]  Similarly, Exhibit 4C's examples quoted above reflect that the

Framework is based on the expenses and revenues that were recorded in the Claimant-selected

months, not expenses and revenues that occurred outside these months.  Furthermore, although a

claimant may select the Benchmark and Compensation Periods, his choice is subject to certain

restrictions.  Notably, the Benchmark and Compensation Periods must be a minimum of three

consecutive months.  This demonstrates that the parties anticipated that too short a snapshot could

create "anomalies," and the three-month minimum was the agreed-upon method for controlling for

---

[2] On a related note, Exhibit 4A ¶¶ 5, 6 does require certain additional documents for certain types of businesses and for certain types of causation tests.  However, Exhibit 4A does not require extra documents or a specific type of accounting for the businesses that are the subject of the instant dispute.  Similarly, while the Settlement Agreement permits the Claims Administrator to exercise his discretion to request ***source*** documents for profit and loss statements; it appears that this is to ensure that the statements are accurate and consistent, not that they use one accounting method over another.  *See* Exhibit 4A ¶ 4 ("If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.").

such anomalies.  *See* Fishkind Decl. ¶ 87;[3]  Henley Decl. ¶ 30 (submitted with BP's motion for final approval).

With respect to BP's argument that this interpretation of the Settlement Agreement can create absurd results, BP's declarant acknowledges that class settlement payments do not always perfectly match economic losses in every instance.  Polinsky Declaration, p.5 n.8, Ex. 9 to BP's submission. BP's counsel  similarly explained that "false positives" are an "inevitable concomitant of an objective quantitative, data-based test."  Letter from Mark Holstein to Patrick Juneau (Sept. 28, 2012), p. 3, Ex. 12 to PSC's Submission.

And, as mentioned above, the parties agreed to give Claimants flexibility in choosing the most favorable Compensation and Benchmark Periods.  Indeed, the Settlement Agreement provides that if a Claimant fails to select the period that generates the greatest recovery, the Program will choose that period for him.  Objective formulas, the possibility of "false positives," and giving claimants flexibility to choose the most favorable time periods are all consequences BP accepted when it decided to buy peace through a global, class-wide resolution.  In light of this, to the extent that the Claims Administrator's interpretation produces "false positives" or, as BP claims, "absurd" results, it appears that the Settlement Agreement anticipates that such results would sometimes occur.

The overarching theme of the Settlement is a transparent, uniform application of an objective quantitative data-based test which can be fairly and efficiently administered by the Claims Administrator.  Notably, the Settlement Agreement itself defines those businesses that lost profits,

---

[3]  "[T]he requirement that the Benchmark and Compensation periods used to measure decline and recovery be measured over at least 3 months is a reasonable means of ensuring that the data reflect a genuine trend in economic performance and not just routine month-to-month variation that any business can expect even absent any unusual event."

income, and/or earnings "as a result of" the Spill as those businesses that meet the objective

causation requirements set forth in Exhibit 4B. Once the Settlement's causation formula is met, then

all losses calculated under Exhibit 4C are presumed to be attributable to the oil spill. BP's

interpretation injects a subjective notion of alternative causation and a degree of complexity that are

contrary to the Settlement's terms.

New Orleans, Louisiana, this 5th day of March, 2013.

_____
United States District Judge